Page 1

1             UNITED STATES DISTRICT COURT

2             DISTRICT COURT OF MINNESOTA

3             Criminal No. 24-7  (JMB/DLM)

4

5       ---------------------------------X

6       UNITED STATES OF AMERICA,          :

7                       Plaintiff,         :

8       V.                                 :

9       DAVID V. ERICKSON,                 :

10                      Defendant          :

11      ---------------------------------X

12

13               Toronto, Ontario, Canada

14               Wednesday, May 14, 2025

15

16               Videotaped Deposition of CHAD MOLDON,

17      a witness herein, called for examination by counsel

18      for the Plaintiff, in the above-mentioned matter,

19      the witness having been duly affirmed, taken at

20      Veritext Legal Solutions, 77 King Street West,

21      Suite 2020, Toronto, Ontario, commencing at 9:13

22      a.m. on Wednesday, May 14, 2025, and the

23      proceedings taken down by Stenotype and transcribed

24      by KIMBERLY A. BARKER, CSR.

25      Job No. CS7296566

Page 2

```
 1                A P P E A R A N C E S:
 2

 3       On Behalf of the Plaintiffs:
 4       DEPARTMENT OF JUSTICE, TAX DIVISION
         BY:  BORIS BOURGET, Esquire
 5              - AND -
             AMANDA R. SCOTT, Esquire
 6       150 M Street NE
         Washington, DC  20002
 7       (202) 307-2182 (Bourget)
         (202) 718-2056 (Scott)
 8
 9       On Behalf of the Defendant,
         David V. Erickson:
10
         WILLIAM MAUZY ATTORNEY AT LAW
11       BY:  WILLIAM J. MAUZY, Esquire
                 - and -
12             WILLIAM DOOLING, Esquire
         650 Third Avenue South, Suite 260
13       Minneapolis, Minnesota 55402
         (612) 688-1154
14
15       On Behalf of Rypl:
16       JANSSEN LAW PROFESSIONAL CORPORATION
         BY: CHARLOTTE JANSSEN, Esquire
17       89 Scollard Street
         Toronto, Ontario M5R 1G4
18       (416) 929-1103
         cmj@janssen-law.com
19
20       On Behalf of the Witness:
21       LIPSITZ GREEN SCIME CAMBRIA
         BY: JUSTIN D. GINTER, Esquire
22       42 Delaware Avenue, Suite 120
         Buffalo, New York 14202
23       (716) 849-1333
         jginter@lglaw.com
24
25
```

Chad Moldon                                              May 14, 2025

                                                    Page 3

1        A P P E A R A N C E S (cont'd):

2

3        ALSO PRESENT:

4

5        Rusty Kiser, IRS Criminal Investigation

6        Kandia Aird, Attorney General of Canada

7        Lynne Axmith, Department of Justice Canada

8

9        VIDEOGRAPHER:

10       Peter Goodale, CLVS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Chad Moldon                                          May 14, 2025

Page 4

1

2                              I N D E X

3

4        WITNESS:    CHAD MOLDON

5                                                        PAGE

6

7        DIRECT EXAMINATION BY MR. BOURGET............ 11

8        CROSS-EXAMINATION BY MR. MAUZY............... 55

9        REDIRECT EXAMINATION BY MR. BOURGET......... 131

10        RECROSS-EXAMINATION BY MR. MAUZY........... 154

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

                          INDEX OF EXHIBITS

                          (PREVIOUSLY MARKED)


       NUMBER/DESCRIPTION                              PAGE NO.


       G-2:  A shareholders' register for             17:21

       Rypl.com Inc.

       G-3:  Surecom Corporation N.V.                 22:16

       Structure Chart.

       G-1001:  Organizational Chart.                 26:14

       G-60:  November 6, 2017, email                 33:18

       regarding advanced dividends.

       D-2:  An email sent on November 8,             37:19

       2017, from Chad Moldon to various

       individuals.

       D-3:  An email chain commencing                39:17

       Friday, January 15th to January 16th,

       2015.

       G-5:  A dividend declaration for               46:9

       Firefly on or around 2022.

       D-1:  An email from Dave Erickson to           89:10

       Chad Moldon, et al, dated May 16th,

       2014.

       D-4:  An email from David Erickson to          97:14

       Chad Moldon, et al, dated August 28,

Chad Moldon                                                    May 14, 2025

Page 6

1    2014.

2    D-5:  An email from Dave Erickson to       100:10

3    Richard Burry dated September 20, 2013.

4    D-6:  Emails from David Erickson on        103:21

5    February 7th and 10th, 2020.

6    D-6a:  Notes from 2020 Conversations       103:23

7    Re: Annual Meeting.

8    D-7:  An email chain including Chad        106:14

9    Moldon, et al, from January 16th to

10   February 22nd, 2023.

11   D-8:  An email from Gregory Elias on       112:4

12   August 10th, 2023, to Paul Eidsness

13   and Chad Moldon.

14   D-9:  The Resolution of the Sole           115:18

15   Managing Director of Firefly Lane

16   Corporation N.V.

17   D-10:  A Purchase Agreement of the         119:17

18   outstanding shares of Bannister.

19   D-11:  An email from Chad Moldon to        123:12

20   Dave Erickson, et al, dated September

21   23rd, 2019, RE: OMM sept.

22   D-12:  An email from Chad Moldon to        126:13

23   Dave Erickson, et al, dated February

24   3rd, 2020, RE: OMM Jan.

25

1         --- Upon commencing at 9:13 a.m.

2                   THE VIDEOGRAPHER:  Good morning.  We

3         are going on the record at 9:13 a.m. on May 14,

4         2025.  Please note that this deposition is being

5         conducted virtually.  The quality of recording

6         depends on the quality of camera and internet

7         connection of participants.  What is seen from the

8         witness and heard on screen is what will be

9         recorded.  Audio and video recording will continue

10        to take place unless all parties agree to go off

11        the record.

12                  This is media unit one of the

13        video-recorded deposition of Chad Moldon taken by

14        counsel for the Plaintiff in the matter of the

15        United States of America versus David V. Erickson

16        filed in the United States District Court, District

17        of Minnesota, case No. 0:24-CR-00007-JMB-DLM.

18                  The location of this deposition is

19        Veritext Ontario, 2020-77 King Street West,

20        Toronto, Ontario, Canada.

21                  My name is Peter Goodale, certified

22        legal videographer, representing Veritext Legal

23        Solutions.  The court reporter is Kim Barker, also

24        from the firm Veritext Legal Solutions.

25                  I am not authorized to administer an

Chad Moldon                                                    May 14, 2025

Page 8

 1          oath.  I am not related to any party in this

 2          action, nor am I financially interested in the

 3          outcome.

 4                    If there are any objections to

 5          proceeding, please, state them at the time of your

 6          appearance.

 7                    Counsel and all present, including

 8          remotely, will now state their appearances and

 9          affiliations for the record, beginning with the

10          noticing attorney.

11                    MR. BOURGET:  Good morning.  Boris

12          Bourget on behalf of the United States.

13                    MS. SCOTT:  Accompanied by Amanda Scott

14          on behalf of the United States.

15                    MR. DOOLING:  William Dooling,

16          D-O-O-L-I-N-G, on behalf of David Erickson.

17                    MR. MAUZY:  William Mauzy, representing

18          David Erickson.

19                    DAVID ERICKSON:  David Erickson on

20          behalf of David Erickson.

21                    RUSTY KISER:  Rusty Kiser with IRS

22          Criminal Investigation.

23                    LYNNE AXMITH:  Lynne Axmith, paralegal

24          at the Department of Justice in Toronto.

25                    MS. AIRD:  Kandia Aird, counsel with

Chad Moldon

Page 9

```
 1          the Attorney General of Canada.

 2                    MS. JANSSEN:  Charlotte Janssen,

 3          counsel to Rypl.

 4                    MR. GINTER:  Justin Ginter, counsel to

 5          Mr. Moldon.

 6                    CHAD MOLDON:  Chad Moldon, witness.

 7                    THE VIDEOGRAPHER:  Will the court

 8          reporter please swear in or affirm the witness?

 9          Then counsel may proceed.

10                    CHAD MOLDON:  AFFIRMED.

11                    MR. BOURGET:  Good morning.  Before we

12          begin the questioning, we do have representatives

13          from the Government of Canada here who need to make

14          a statement on the record, so I'll pass it on to

15          you.

16                    MS. AIRD:  Thank you.  I'll be very

17          brief.

18                    As I stated, I act as counsel for the

19          Attorney General of Canada.  My name is Kandia

20          Aird, and I'm here in relation to an American

21          treaty request to Canada for mutual legal

22          assistance in a criminal matter.

23                    The Canadian Central Authority has

24          granted American officials permission to conduct,

25          here in Toronto, voluntary depositions of
```

Page 10

1      witnesses, specifically Rypl.com Incorporated

2      employees.

3                  Counsel for the witnesses, Justin

4      Ginter, has confirmed their agreement to

5      voluntarily participate in these depositions.  The

6      voluntary depositions will be video recorded and

7      transcribed.

8                  As counsel for the AGC, I am present to

9      ensure the depositions proceed voluntarily and are

10     otherwise conducted in compliance with Canadian

11     law.  I would be pleased to answer any questions in

12     this regard.

13                 The depositions shall be in respect of

14     the US prosecution of David Vincent Erickson for

15     the following charges, I understand: tax evasion,

16     aiding and preparing/filing false tax returns, and

17     making false statements to the Internal Revenue

18     Service.  U.S. officials have advised that they

19     intend to introduce the testimony from these

20     depositions at the U.S. trial and have been

21     accorded permission to take such steps as are

22     appropriate to ensure the admissibility of said

23     testimony at the U.S. criminal proceeding.

24                 In accordance with U.S. officials'

25     request, representatives of the parties will be

Chad Moldon                                                          May 14, 2025

Page 11

1          allowed to state objections on the record

2          respecting matters of U.S. law relating to

3          resolution by an American court.

4                    The parties have already been

5          introduced.  I understand that today we're

6          proceeding with the testimony of Chad Moldon.

7          Following days, there will be Antonio Severin and

8          Amanda Zimmerman.

9                    As noted, the depositions are

10         voluntary.  As such, it is understood by all

11         parties that in the event a witness indicates they

12         no longer consent to reply to questions, the

13         voluntary deposition will end.

14                    I would just like to confirm this

15         understanding.

16                    MR. BOURGET:  Yes.

17                    MR. GINTER:  Yes.

18                    MS. AIRD:  Thank you.

19                    DIRECT EXAMINATION BY MR. BOURGET:

20                    Q.   Mr. Moldon, what city do you live

21         in?

22                    A.   Toronto.

23                    Q.   Are you testifying voluntarily

24         today?

25                    A.   I am.

Chad Moldon                                                    May 14, 2025

                                                        Page 12

1                    Q.   Have you been subpoenaed or

2        compelled to appear here today?

3                    A.   No.

4                    Q.   On May 5th, 2025, did you sign an

5        immunity agreement with the United States

6        government?

7                    A.   Yes.

8                    Q.   And what's your understanding of

9        that agreement?

10                   A.   That as long as I am truthful,

11       I'm...avoid prosecution.

12                   Q.   So you understand this agreement

13       requires you to give truthful and complete

14       testimony today?

15                   A.   Yes.

16                   Q.   Are you currently employed?

17                   A.   Yes.

18                   Q.   Where do you work?

19                   A.   Rypl.

20                   Q.   Do you have any post-secondary

21       degrees?

22                   A.   I do.

23                   Q.   And what are those degrees?

24                   A.   Bachelor of arts.

25                   Q.   What was your field of study?

1                   A.   Philosophy.

2                   Q.   Do you have any formal degrees or

3         training in accounting, tax, or a similar field?

4                   A.   No.

5                   Q.   You mentioned that you work for

6         Rypl.  What is your title at Rypl?

7                   A.   CEO.

8                   Q.   And as a company, what kind of

9         work does Rypl do?

10                  A.   We're a managed-solutions company.

11        We provide, for other businesses, accounting,

12        marketing, finance: these types of services.

13                  Q.   And I assume Rypl charges for

14        those services?

15                  A.   Correct.

16                  Q.   How long have you been the CEO of

17        Rypl?

18                  A.   Since its inception, I believe, in

19        2012.

20                  Q.   Have you held any other titles at

21        Rypl since that time?

22                  A.   No.

23                  Q.   As the CEO, can you give a brief

24        explanation of your day-to-day duties and

25        responsibilities?

Chad Moldon                                          May 14, 2025

Page 14

1                      A.   My primary focus is around the

2           platform, CAM4.  I work with the investment group

3           on its yearly plans: where I think the business

4           will go over the course of the year, what those

5           financials may look like, how the business may grow

6           or shrink, and the appropriate steps to manage

7           that.

8                      Q.   As CEO, do you have a direct

9           supervisor?

10                     A.   Not specifically, no.

11                     Q.   And in the time period between

12          2013 and 2019, was there anyone within the company

13          or outside the company that you, generally,

14          reported to?

15                     A.   I work and report to the board.

16          From Firefly's perspective, they are the largest

17          and single client that we operate under.  I give

18          them monthly updates in a yearly annual meeting.

19                     Q.   Do you know the Defendant in this

20          case, David Erickson?

21                     A.   I do.

22                     Q.   Is he in the room today?

23                     A.   He is.

24                     Q.   Can you point him out, and

25          describe what he's wearing?

Chad Moldon                                                    May 14, 2025

Page 15

1                    A.   He's wearing a blue jacket, a

2        white shirt, and he's at the end of the table.

3                    MR. BOURGET:   I just want to note for

4        the record that the witness has identified the

5        Defendant, David Erickson.

6                    BY MR. BOURGET:

7                    Q.   You mentioned that there's a board

8        that you report to as CEO.   Is the Defendant part

9        of that board?

10                   A.   He is.

11                   Q.   When did you first meet the

12       Defendant?

13                   A.   I don't know if I recall the exact

14       year but probably in '99, something like that, '98.

15                   Q.   Do you recall how you first met

16       him?

17                   A.   Not specifically.   Likely, it was

18       at one of the meetings or potentially in Toronto

19       when he came here to visit.

20                   Q.   You mentioned that you started as

21       CEO of Rypl in 2012.   What kind of work were you

22       doing with the Defendant at the time that you two

23       met?

24                   A.   Over the course of the years,

25       there's been certain variations.   At the time, I

Chad Moldon                                              May 14, 2025

Page 16

```
 1        was more focused on the sales-marketing side of an

 2        affiliate product.

 3                    Q.   And so between 2013 and 2019, did

 4        you work with the Defendant at Rypl?

 5                    A.   Yes.

 6                    Q.   Does the Defendant still work at

 7        Rypl?

 8                    A.   No.

 9                    Q.   Are you, generally, familiar with

10        his roles and responsibilities at Rypl while he

11        worked there?

12                    A.   Generally, yes.

13                    Q.   And did he have an official title

14        at Rypl?

15                    A.   No.

16                    Q.   While he worked there, what were

17        his day-to-day responsibilities?

18                    A.   Generally, Dave's oversight from a

19        financial perspective was what we utilized and

20        worked with.

21                    Q.   And what did that look like in

22        practice, in terms of his daily tasks?

23                    A.   Tony Severin was the controller at

24        the time, and I think Dave's role as a second set

25        of eyes was primarily what he was focused on.
```

Chad Moldon                                        May 14, 2025

Page 17

1                    Q.   As the CEO, did the Defendant

2         report to you?

3                    A.   I wouldn't characterize it as

4         such, no.

5                    Q.   Do you know if the Defendant

6         reported to anyone within Rypl?

7                    A.   I don't think so.

8                    Q.   Was the Defendant's performance

9         formally evaluated each year?

10                   A.   I don't know.

11                   Q.   Did you conduct any sort of formal

12        performance evaluation of the Defendant?

13                   A.   No, I did not.

14                   Q.   While you worked with the

15        Defendant, you -- obviously, you know each other;

16        how would you describe your relationship?  Were you

17        friends or strictly colleagues?

18                   A.   We were friends and colleagues.

19                   Q.   Okay.  I want to show you an

20        exhibit that's been marked as Exhibit G-2.

21                   EXHIBIT NO. G-2:  A shareholders'

22        register for Rypl.com Inc.

23                   BY MR. BOURGET:

24                   Q.   Mr. Moldon, do you recognize this

25        document?

Chad Moldon                                                    May 14, 2025

Page 18

```
 1                    A.   Yes.

 2                    Q.   What is it?

 3                    A.   It's a shareholders' register for

 4         Rypl.com Inc.

 5                    Q.   And generally, can you explain

 6         what a shareholders' register is?

 7                    A.   A shareholders' register outlines

 8         who and what entities own the shares in the

 9         company.

10                    Q.   And does this appear to be a true

11         and accurate copy of the Rypl shareholders'

12         register between November 19th, 2012, and September

13         of 2017?

14                    A.   Yes, I believe so.

15                    Q.   Now, I want to draw your attention

16         to the first entry at the top where it's dated

17         November 19, 2012, and your name, Chad Moldon,

18         appears.  Under the column "Shares Held," there's

19         500.  Was that the number of shares that you held

20         in Rypl at that time?

21                    A.   Yes.

22                    Q.   Now, looking at the bottom entry

23         there on the left where it says September 17, do

24         you see that?

25                    A.   Yes.
```

1          Q.   That same right-hand column now
2    says, 501.  Can you explain the change between the
3    shares you held from 500 to 501?
4          A.   I don't know, specifically, why
5    there's an additional share in 17.
6          Q.   Do you recall any conversations
7    about receiving an additional share of Rypl?
8          A.   Not currently, no.
9          Q.   Now, I want to draw your attention
10   to the two entries dated April 16, 2013, where it
11   says, Firefly Lane Limited and Halstead Bay
12   Holdings Inc.  Do you see that?
13         A.   I do.
14         Q.   What is Firefly Lane Limited?
15         A.   Firefly is the other half owner of
16   Rypl and the investment company that works with
17   Rypl.
18         Q.   And when you say, "the other half
19   owner," who's...what's the other -- what's the half
20   that's not Firefly?
21         A.   Myself.
22         Q.   Okay.  Is Halstead Bay Holdings
23   also an owner of Rypl?
24         A.   Currently, no.
25         Q.   Was it, during the years of 2013

1       and 2019?

2                       A.   Yes.

3                       Q.   Now, this states, "Firefly Lane

4       Limited."  Are you familiar with a company called

5       Firefly Lane Corporation?

6                       A.   Yes.

7                       Q.   Is that a separate company from

8       Firefly Lane Limited?

9                       A.   I don't believe so.

10                      Q.   Do you, generally, refer to these

11      companies collectively as Firefly?

12                      A.   I do, yes.

13                      Q.   And is that something that your

14      colleagues at Rypl do as well?

15                      A.   I believe so.

16                      Q.   Now, turning your attention to

17      Halstead Bay Holdings, what is Halstead Bay

18      Holdings?

19                      A.   This is the company that I

20      associate or associated with, one of which that

21      Dave Erickson operated.

22                      Q.   And how come you have that

23      association?

24                      A.   This was the company that some

25      billings and other things were used or sent to with

Chad Moldon                                        May 14, 2025

Page 21

1       Rypl.

2                  Q.   Based on your knowledge of the

3       Defendant, is it your understanding that he is the

4       owner of Halstead Bay Holdings?

5                  A.   Yes, that's my understanding.

6                  Q.   So other than you, Firefly Lane

7       Limited, and Halstead Bay Holdings, were there any

8       other owners of Rypl between November 19th, 2012,

9       and the end of 2019?

10                 A.   I don't believe so.

11                 Q.   So we spoke a little bit about

12      Firefly, but what is Firefly?

13                 A.   Firefly is an investment group,

14      and typically, their focus has been around

15      internet-related businesses that might overlap and

16      bring some success.

17                 Q.   And is this -- is Firefly the same

18      investment group that you mentioned earlier in your

19      testimony when you stated that you reported to a --

20                 A.   Yes --

21                 Q.   -- group?

22                 A.   -- it's the same group.

23                 Q.   What kind of companies does

24      Firefly investment in?

25                 A.   As I mentioned before, it

1      generally invests in internet-related or those type

2      of things, things they can leverage against each

3      other.

4                  Q.   Okay.  So can you explain a little

5      bit more of what that means in terms of -- what

6      does that mean, to "leverage against each other"?

7                  A.   Just things that may -- if you

8      have, say, an expertise in internet traffic or in

9      internet billing, things that overlap might make it

10     more worthwhile to be in multiple businesses on.

11                 Q.   All right.  I want to show you now

12     a...I'm showing you what's been marked as Exhibit

13     G-3.  I think the edges on the screen here are a

14     little cut off, so let me know if there's something

15     that doesn't make sense.

16                 EXHIBIT NO. G-3:  Surecom Corporation

17     N.V. Structure Chart.

18                 BY MR. BOURGET:

19                 Q.   Have you seen this chart before?

20                 A.   Yes.

21                 Q.   And what does this chart depict?

22                 A.   The basic structure of the

23     corporate entities that make up the different

24     companies listed on the sheet.

25                 Q.   Are you, generally, familiar with

```
 1          the ownership structure for Firefly?

 2                    A.   Generally, yes.

 3                    Q.   Does this chart -- let me see if I

 4          can get the date in here.  Does this chart

 5          adequately represent the structure of Firefly as of

 6          March 14th of 2022?

 7                    A.   I believe so, yes.

 8                    Q.   Now, I'm drawing your attention to

 9          the bottom left where it says, "Surecom Corporation

10          N.V."  Do you know what Surecom Corporation is?

11                    A.   Yes.

12                    Q.   What is it?

13                    A.   Surecom is the company that owns

14          the IP for the platform.

15                    Q.   Is that for CAM4?

16                    A.   For CAM4, correct.

17                    Q.   And when you say, "IP," do you

18          mean intellectual property?

19                    A.   Yes, and the technology as a

20          whole.

21                    Q.   Now, to the best of your

22          knowledge, the percentages that are listed on this

23          chart, do those adequately represent the ownership

24          shares of the various companies listed here?

25                    A.   I believe so, yes.
```

Chad Moldon                                          May 14, 2025

Page 24

1                    Q.   So as of -- in March of 2022, is

2       Firefly Lane Corporation the 100 percent owner of

3       Surecom Corporation?

4                    A.   I believe so as well.

5                    Q.   Are you a shareholder of Firefly?

6                    A.   I'm the recipient of Blue Waters

7       Trust listed on that sheet.

8                    Q.   And does Blue Waters Trust hold

9       the shares in Firefly Lane Corporation?

10                   A.   Indeed.

11                   Q.   Are you familiar with the other

12      Firefly shareholders?

13                   A.   Yes.

14                   Q.   Is the Defendant a shareholder of

15      Firefly?

16                   A.   I believe, as shown on the sheet,

17      that he's related through Bannister Corporation.

18                   Q.   Okay.  And other than what's shown

19      on here, is it your understanding -- your prior

20      understanding that --

21                   A.   Yes.

22                   Q.   -- he was a shareholder?

23                   A.   That's true.

24                   Q.   Now, does he also own his shares

25      through an entity?

1                    A.    I'm unsure how he owns his shares.

2                    Q.    So through Blue Waters Trust,

3        what's your percent ownership of Firefly?

4                    A.    Ten percent.

5                    Q.    Do you know what percent of

6        Firefly the Defendant owns?

7                    A.    I believe what's shown on here is

8        accurate, 20 percent, 20.25.

9                    Q.    Now, are you generally familiar

10       with the day-to-day operations of Firefly?

11                   A.    I can speak more to Rypl's side of

12       the component.  I don't know all the day-to-day for

13       all Firefly members.

14                   Q.    So what's your role with Firefly

15       as it relates to Rypl?

16                   A.    Primarily, my -- as previously

17       stated, I report on a monthly basis what's

18       happening with the Canaccord platform, what's

19       happening in relationship to its budgets, what's

20       happening in relationship to money in, money out,

21       so to speak, create predictions for what I think

22       that might look like in the timeframes going

23       forward, and then on a yearly basis, do an annual

24       meeting to summarize that work.

25                   Q.    Are you familiar with the

Chad Moldon                                          May 14, 2025

Page 26

1          Defendant's work with Firefly?

2                    A.   I'm familiar with his work with

3          Rypl and some work with Firefly.

4                    Q.   Was the Defendant involved in the

5          day-to-day operations of Firefly?

6                    A.   I believe he did some work for

7          Firefly.

8                    Q.   Do you know what kind of work he

9          did for Firefly?

10                   A.   I assume it's of a similar nature,

11         and what I'm aware of is some financial oversight.

12                   Q.   I want to show you now what's been

13         marked as Exhibit G-1001 for identification.

14                   EXHIBIT NO. G-1001:  Organizational Chart.

15                   BY MR. BOURGET:

16                   Q.   I want to just draw your attention

17         to the bottom of this chart.  Do you recognize the

18         three entities that form a triangle at the bottom

19         of this chart?

20                   A.   Yes.

21                   Q.   So you mentioned CAM4 previously

22         as the platform that is operated.  What kind of

23         website is CAM4?

24                   A.   CAM4 is a platform that connects

25         broadcasters and potential customers in the

 1          adult-nature space.

 2                    Q.    Okay.  And does this feature live

 3          performances?

 4                    A.    It does, yes.

 5                    Q.    Does CAM4 generate revenue?

 6                    A.    It does.

 7                    Q.    Can you explain how it makes

 8          money?

 9                    A.    Sure, there are three primary

10          sources: one of which is tipping, where a customer

11          makes a tip to the broadcaster during a live show;

12          the other is through memberships, which is when a

13          customer purchases a membership for certain

14          features on the site; and there's another component

15          of advertising revenue.

16                    Q.    For the first two categories that

17          you mentioned, the membership and the tipping, does

18          the revenue from that primarily come from credit

19          card transactions?

20                    A.    There's a mix of different ways it

21          comes depending on country, but yes, credit card is

22          a good assumption.

23                    Q.    If not credit cards, can you

24          explain other methods of payment that are used?

25                    A.    Direct deposits or other means of

Chad Moldon                                                    May 14, 2025

Page 28

1        potentially making payment.

2                      Q.   So direct deposit is a customer

3        depositing money on the website?

4                      A.   Similar to the banking structures

5        I suspect you use in the U.S, there are multiple

6        ways in which a customer -- from a credit card to

7        direct from their bank account to other third-party

8        platforms -- would move money between those

9        processes.

10                     Q.   And for the advertising piece, how

11       does the revenue get generated?  Do people purchase

12       advertising using a credit card?

13                     A.   No, typically not, maybe in some

14       small cases.  Typically, Rypl would find

15       advertisers of similar demographics, get a deal set

16       up in that process, and collect the money.

17                     Q.   I want to turn your attention now

18       to the bottom left of the chart where it says,

19       Granity Entertainment Limited.  Are you familiar

20       with Granity Entertainment?

21                     A.   Yes.

22                     Q.   Can you explain what it is?

23                     A.   Granity is the company that

24       collects the -- any of the funds that come from

25       credit card transactions.

Chad Moldon                                          May 14, 2025

Page 29

1                    Q.   Does it have any other role other

2          than collecting funds?

3                    A.   No.

4                    Q.   So other than that, what is the

5          relationship between Granity and CAM4?

6                    A.   That is basically the

7          relationship.

8                    Q.   Okay.  What's the relationship, if

9          any, between Surecom and Granity?

10                   A.   Granity pays Surecom for the use

11         of the technology platform, and I believe any of

12         the remaining monies either are paid to the

13         broadcaster or flow back up to Firefly.

14                   Q.   So when Granity collects revenue

15         from CAM4, does it take a cut of that revenue?

16                   A.   I don't know all of the details

17         for how Granity collects its money, but that seems

18         a fair assumption; they take payment for some of

19         their services.

20                   Q.   Other than those three entities at

21         the bottom, I just want to, kind of, run through --

22         we've -- I think the only other entity on here that

23         we have not discussed is third down from the

24         bottom, Ijshuis Corporation B.V.  Are you familiar

25         with that entity?

1                       A.    No.

2                       Q.    So as CEO of Rypl, did you receive

3      a salary?

4                       A.    I did.

5                       Q.    And approximately, how much per

6      year do you earn?

7                       A.    Roughly, 500,000 Canadian.

8                       Q.    And has that amount stayed,

9      roughly, the same since you started as CEO in 2012?

10                      A.    Roughly the same, yes.

11                      Q.    Now, between 2013 and 2019, other

12     than salary, did you receive any other form of

13     compensation?

14                      A.    During that time period, no.

15                      Q.    Between 2013 and 2019, did Rypl

16     have a formal dividend policy?

17                      A.    No, I don't believe Rypl did.

18                      Q.    During that period of time, can

19     you recall anything that you believe would have

20     prevented Rypl from issuing dividends during that

21     period of time?

22                      A.    I don't believe there's a specific

23     reason to stop Rypl, should it want to declare a

24     dividend.

25                      Q.    Between 2013 and 2019, did Firefly

1          have a formal dividend policy?

2                    A.   I'm not sure.

3                    Q.   Can you recall anything that would

4          have prevented Firefly from declaring dividends

5          during that period of time?

6                    A.   I don't specifically recall, no.

7                    Q.   As CEO, did you ever direct or

8          advise Rypl on whether and when to issue dividends?

9                    A.   I did not advise Rypl as such, no.

10                   Q.   Was there someone within Rypl that

11         you relied on to advise the company and other

12         shareholders on when dividends should be issued?

13                   A.   From Rypl's perspective?

14                   Q.   Yes.

15                   A.   Well, both Tony and Dave had some

16         financial oversight, surely, on them.

17                   Q.   Did you advise Firefly on when or

18         whether to issue dividends?

19                   A.   My advice is based on the outputs

20         of the platform itself, not specifically on when to

21         issue dividends.

22                   Q.   And when you say, "on the outputs

23         of the platform," what do you mean by that?

24                   A.   I mean my primary function is to

25         outline the financial end to what a year might look

Chad Moldon                                      May 14, 2025

Page 32

1          like from the CAM4 platform.

2                    Q.   Did you and the other Firefly

3          shareholders also rely on the Defendant and Tony

4          Severin to advise on whether and when to issue

5          dividends?

6                    A.   Yes.

7                    Q.   Do you recall ever personally

8          receiving dividends between 2013 and 2019 from

9          either Rypl or Firefly?

10                   A.   I did not during that timeframe.

11                   Q.   Do you recall if Blue Waters Trust

12         received any dividends from Firefly between 2013

13         and 2019?

14                   A.   It did not.

15                   Q.   Did the Defendant ever discuss

16         something he called advance dividends with you?

17                   A.   Yes.

18                   Q.   Is that a term you'd heard before

19         before the Defendant brought it up?

20                   A.   Before that?

21                   Q.   Yes.

22                   A.   I don't recall.

23                   Q.   Do you have an understanding of

24         what the difference is between a regular dividend

25         and a dividend advance?

Chad Moldon                                          May 14, 2025

Page 33

```
 1                    A.   I believe a regular dividend is an
 2         official declared dividend as a company might do,
 3         and an advance on dividend may be money loaned in
 4         lieu of that dividend coming out.
 5                    Q.   And just if you could, just speak
 6         up a little bit; I just want to make sure that the
 7         mic can hear you.
 8                    A.   Sure.
 9                    Q.   Now, from 2013 to 2019, do you
10         recall if Firefly issued dividend advances to its
11         partners?
12                    A.   I believe it did issue dividend
13         advances.
14                    Q.   I'm going to show you another
15         exhibit that's been marked as Exhibit G-6.  I'm
16         going to try to zoom in here.  I'm sorry, G-60.  I
17         said G-6.
18                    EXHIBIT NO. G-60:  November 6, 2017,
19         email regarding advanced dividends.
20                    BY MR. BOURGET:
21                    Q.   Can you see that on the screen
22         okay?
23                    A.   I can.
24                    Q.   Now, looking at the top, is this a
25         true and accurate copy of an email you received
```

Chad Moldon                                                    May 14, 2025

Page 34

1          from the Defendant on November -- excuse me, on

2          October 30th, 2017?

3                    A.   This appears to be from Tony to

4          Dave and myself.

5                    Q.   Right.

6                    A.   Yes.

7                    Q.   Does this appear to be a true and

8          accurate copy of that email?

9                    A.   Yes.

10                   Q.   Now, I want to look at the bottom

11         email in the chain.  So who is Tony Severin?

12         You've mentioned that name already, but I didn't

13         ask who he is.

14                   A.   Tony Severin is the CFO for Rypl.

15                   Q.   And between 2013 and 2019, did he

16         have another title?

17                   A.   I don't believe so.

18                   Q.   Did you mention previously in your

19         testimony that he was the controller for the

20         company?

21                   A.   Ah, that might be true, yes; he

22         was the controller for a period of time.

23                   Q.   And when he was the controller,

24         who did Tony Severin, generally, report to within

25         Rypl?

Page 35

1                    A.   He reported both to myself, and as

2         previously stated, had some oversight from

3         Mr. Erickson.

4                    Q.   Okay.  So this email from Tony

5         Severin to Dave Erickson that you were included on

6         later says:

7                         "Hi Dave, I took the liberty of

8                         putting together the dividend payout

9                         spreadsheet starting November 17th

10                        based on our conversation

11                        ($375,000).

12                             The current monthly dividend is

13                        the first sheet and the new payout

14                        is the second.

15                             Let me know if you are okay with

16                        this?"

17                             Did I read that correctly?

18                   A.   Yes.

19                   Q.   Do you have an understanding of

20        what Tony is writing to the Defendant here?

21                   A.   I believe he's showing the

22        financial implication of changing, I think, what

23        was based on your previous part of the email from

24        125 to 375 and what that might look like.

25                   Q.   Sure, let me pull that e-mail up.

Chad Moldon                                    May 14, 2025

1          So in this following email on October 30th, 2017,

2     Mr. Severin writes:

3                    "Hi Dave, I wanted to bring

4                    Chad into the conversation so I

5                    don't pull a 'Tony.'

6                    The discussion today centred

7                    around increasing the monthly

8                    dividend.

9                    I believe we agreed on an

10                   increase from the current $120K a

11                   month to $375K starting in Nov BUT

12                   we would hold off on the expected

13                   Dec-17 quarterly dividend until we

14                   re-looked at the dividend question

15                   at the Mar-18 Madrid meeting."

16                   Did I read that correctly?

17         A.   Yes.

18         Q.   Again, what's your understanding

19    of what Mr. Severin is discussing here?

20         A.   I believe he's discussing the

21    change from $120,000 a month to $375,000 a month

22    that is accrued as a...in his words, a dividend,

23    which I actually think is a dividend advance.

24         Q.   Okay.  And why do you think it's a

25    dividend advance?

Chad Moldon                                    May 14, 2025

Page 37

1              A.   To the previous statement that I

2       don't believe there were any official dividends

3       declared in that timeframe.

4              Q.   Do you know if -- beginning with

5       the old amount of $120,000 a month, do you recall

6       receiving a dividend of $120,000 a month during

7       this time?

8              A.   In my particular case as the

9       recipient of the family trust through Blue Waters,

10      I did not.  I believe that this is speaking in

11      reference to other potential shareholders.

12             Q.   Okay.  And do you know if those

13      other shareholders were receiving a dividend -- a

14      monthly dividend in this amount?

15             A.   I don't know.  I believe that some

16      of them were.

17             Q.   Now, I want to show you an exhibit

18      that's been marked as Exhibit D-2.

19             EXHIBIT NO. D-2:  An email sent on

20      November 8, 2017, from Chad Moldon to various

21      individuals.

22             BY MR. BOURGET:

23             Q.   And does this appear to be a true

24      and accurate copy of an email from you to various

25      individuals on November 8th, 2017?

Chad Moldon                                              May 14, 2025

Page 38

1                    A.    It does.

2                    Q.    Now, the individuals that are in

3          the "To:" field, Dave Erickson, Dave van der Poel,

4          Richard Burry, Toine Rodenburg, Paul Eidsness, Ryan

5          Maule, and Kevin Krieg -- obviously, we've talked

6          about Mr. Erickson -- but who are those other

7          individuals?

8                    A.    As you've shown -- as shown on the

9          previous, those are the other partners of the

10         Firefly group.

11                   Q.    Now, this is an e-mail from you to

12         you partners.  Can you explain, you know, what

13         you're communicating in this email?

14                   A.    Sure.  This summarizes, I think in

15         a more succinct way, what was discussed in the

16         previous email to that group.

17                   Q.    Okay.  So this is an email that

18         you're sending based on what was previously

19         communicated to you by Mr. Severin and

20         Mr. Erickson?

21                   A.    That's correct.

22                   Q.    Now, these amounts that are listed

23         here and the increase, did you have any input on

24         whether to change the monthly dividend?

25                   A.    My input is based on bringing the

1       guidance of what there may be in terms of future

2       revenues.  So the numbers that are set there are

3       not derived from me, specifically.

4                 Q.   So is it fair to say that your job

5       is to make sure that there's enough money in the

6       bank to make the payments happen?

7                 A.   Yes, to maximize the potential

8       revenue, yes.

9                 Q.   All right.  Now, between 2013 and

10      2019, do you recall borrowing, approximately,

11      $150,000 from Firefly?

12                A.   Yes.

13                Q.   I'm going to show you an exhibit

14      that's been marked as Exhibit D-3.  So just give me

15      one second.  I want to try to get two pages on the

16      screen here.

17                EXHIBIT NO. D-3:  An email chain

18      commencing Friday, January 15th to January 16th,

19      2015.

20                BY MR. BOURGET:

21                Q.   So just drawing your attention --

22      have you had an opportunity to review this email

23      before?

24                A.   Yes.

25                Q.   And I'll just draw your attention

Chad Moldon                                              May 14, 2025

Page 40

1     to the top here.  Does this appear to be a true and

2     accurate email chain that includes you from Friday,

3     January 16th of 2015?

4                    A.   Yes.

5                    Q.   Okay.  Now, I want to draw your

6     attention on the screen here to the left, this

7     first email from Dave Erickson to Amanda Zimmerman,

8     Tony Severin, dated January 15th of 2015.  Did I

9     read that correctly?

10                   A.   Yes.

11                   Q.   And Mr. Erickson says:

12                        "Lady and Gentleman, we will be

13                        advancing Chad CD$150,000 on May

14                        15th, 2015, (or there a bouts, as he

15                        wishes).

16                        I would like to smooth the cash

17                        flow by depositing into a local

18                        savings account CD$30,000 each 15th

19                        of the month, beginning on or about

20                        today if we have the resources."

21                        Did I read that correctly?

22                   A.   Yes.

23                   Q.   Okay.  And then from there, Tony

24     Severin responds and says:

25                        "We will need a proper legal

1                    loan agreement in place so Revenue

2                    Canada can't come back and assess as

3                    a taxable benefit.

4                         Paul can you get a loan agreement

5                    in place between Rypl and Chad?  It

6                    will need a 'market' interest rate.

7                         Loan will be for $150K paid in 5

8                    trounces," I think he probably meant

9                    tranches, "of 30,000 each over the

10                   next 5 months."

11                        Did I read that correctly?

12                   A.   Yes.

13                   Q.   Mr. Severin is referring to Paul

14        in this email, and there's a Paul Eidsness that's

15        copied.  Do you know who Paul Eidsness is?

16                   A.   Yes, he's one of the partners and

17        operates as legal counsel.

18                   Q.   Sorry, can you repeat that?

19                   A.   He's one of the partners and

20        operates as legal counsel.

21                   Q.   Okay.  And when you say, a

22        "partner," he's a shareholder in Firefly?

23                   A.   He is.

24                   Q.   All right.  I want to draw your

25        attention now to an email from Mr. Eidsness in

1          response...where Mr. Eidsness writes:

2                              "Raise your hand if you know

3                      what this means.

4                          I understand there's a loan being

5                      made at 8% interest..."

6                          It continues on, and then he ends

7                      the paragraph with:

8                          "There should be a master loan

9                      agreement and promissory notes as

10                     the loans are dealt out."

11                         I won't read this whole

12                     paragraph, but reading this, can you

13                     explain your understanding of what

14                     Mr. Eidsness is communicating here?

15                         A.   The overall discussion in general

16         seems to outline a loan to be made to myself, the

17         terms for what that might look like in interest,

18         and the timeframe for payout.

19                         Q.   And then on -- following that

20         email on January 15th, Mr. Erickson responds:

21                         "5 years.  Annual payments of

22                     interest only.  Balance at maturity.

23                     Let's make these standard terms for

24                     all such notes."

25                         Did I read that correctly?

Chad Moldon                                        May 14, 2025

                                            Page 43

1              A.   Yes.

2              Q.   Now, in this discussion, was there

3     anything unusual to you at the time about the fact

4     that the Defendant was dictating some of the terms

5     of this loan to you from Firefly?

6              A.   Not unusual, no.

7              Q.   And why was that not unusual?

8              A.   As I mentioned, David's experience

9     and oversight on these type of matters would be

10    looked at.

11             Q.   This sort of negotiation of the

12    terms was within his portfolio?

13             A.   Yes.

14             Q.   And then following that email just

15    above it is, again, an email from Tony Severin in

16    response.  He says:

17                  "Hi Dave, We will make sure to

18             collect the interest annually in

19             case Revenue Canada comes knocking.

20             The rate of 8% seems high as market

21             rate on a home equity loan is more

22             like 3%."

23             Did I read that correctly?

24             A.   Yes.

25             Q.   And again, was there anything

Chad Moldon                                                    May 14, 2025

Page 44

1          unusual about Tony and Dave discussing the terms of

2          the loan to you?

3                    A.   No.

4                    Q.   And then finally, at the top,

5          Mr. Erickson responds:

6                         "This is a loan in lieu of

7                         figuring out a tax preferred way to

8                         pay a bonus.  The bonus deferral

9                         earns 8% so the advance must pay the

10                        same."

11                       Did I read that correctly?

12                   A.   Yes.

13                   Q.   So did you actually receive this

14         loan?

15                   A.   I did.

16                   Q.   Do you recall signing an agreement

17         or a promissory note?

18                   A.   I did.

19                   Q.   And to the best of your knowledge,

20         did you fully repay this loan?

21                   A.   Yes.

22                   Q.   At some point while working at

23         Rypl and the years of 2013 to 2019 -- or I guess I

24         should say, at any point, did you learn that the

25         Defendant was being investigated by the IRS?

Chad Moldon                                                    May 14, 2025

Page 45

1              A.   Yes, I did.

2              Q.   At one point, did you learn that

3      in August 2019, the Defendant was interviewed at

4      his home by someone from the IRS?

5              A.   I don't know the exact date, but

6      it was shortly after the date you mentioned in

7      2019.

8              Q.   Do you recall when you first

9      learned about the IRS investigation?

10             A.   Not specifically.

11             Q.   Do you have a...

12             A.   I would say a few weeks or a few

13     days after the IRS had visited him in Minneapolis

14     was when I heard.

15             Q.   Do you recall who first told you

16     about the investigation?

17             A.   I don't specifically remember,

18     although my guess is either Tony Severin or Dave

19     Erickson himself told me.

20             Q.   So you recall speaking to the

21     Defendant about it?

22             A.   I don't know if that was the first

23     example that I ever spoke to him, but yes.

24             Q.   Do you recall what he told you

25     about the investigation?

Chad Moldon                                            May 14, 2025

Page 46

1                    A.   Just the details of what had

2         happened.

3                    Q.   And when you say, "the details of

4         what had happened," what do you mean by that?

5                    A.   That the IRS had visited him at

6         his house.

7                    Q.   I want to bring up now what's been

8         marked as Exhibit G-5.

9                    EXHIBIT NO. G-5:  A dividend

10        declaration for Firefly on or around 2022.

11                   BY MR. BOURGET:

12                   Q.   Can you see that document on the

13        screen okay?

14                   A.   Yes.

15                   Q.   Do you recognize it?

16                   A.   Yes.

17                   Q.   And what is it?

18                   A.   It appears to be a dividend

19        declaration for Firefly on or around 2022.

20                   Q.   And does this appear to be a fair

21        and accurate copy of that document?

22                   A.   Yes.

23                   Q.   I want to draw your attention to,

24        I believe, it's the fourth full paragraph on the

25        first page of the exhibit.  I want to make sure I

Chad Moldon

Page 47

1          got the number on the record; it's Exhibit G-5.
2          Where it says:
3                           "Pursuant to a discussion and
4                      vote of the Company's shareholders
5                      on December 15, 2021, it was
6                      determined by majority vote that the
7                      Company should declare a yearly
8                      dividend payable to its shareholders
9                      of record as of January 1, 2022, in
10                     the amount of US$5,000,000, to be
11                     paid prior to the end of 2022
12                     provided that the Company is
13                     profitable, has paid its debts, and
14                     has a minimum reserve fund.  The
15                     dividend will be divided into
16                     monthly payments and paid to the
17                     shareholders who were shareholders
18                     of record as of January 1st, 2022."
19                     Did I read that correctly?
20          A.   Yes.
21          Q.   So which company here, based on
22     this document, is issuing the dividend?
23          A.   I believe this is Firefly.
24          Q.   And do you recall discussing the
25     declaration of this dividend with your fellow

Chad Moldon                                            May 14, 2025

Page 48

1    shareholders?

2                    A.   Yes.

3                    Q.   Now, I want to turn to the second

4    page of the document, the signature block here.  Do

5    you know who signed this document?

6                    A.   Gregory Elias did.

7                    Q.   And who is Gregory Elias?

8                    A.   Gregory is the directory of

9    Firefly as well as some of the other Curaçao

10   companies for United Trust.

11                   Q.   Was it common for Gregory Elias to

12   sign declarations and other corporate documents in

13   lieu of the shareholders?

14                   A.   Yes.

15                   Q.   Was Mr. Elias involved in the

16   day-to-day business decisions of Firefly?

17                   A.   No.

18                   Q.   Was he involved in the day-to-day

19   business decisions of Rypl?

20                   A.   No.

21                   Q.   Now, you mentioned that you had

22   discussed this declaration or dividend with the

23   other shareholders.  Do you recall, approximately,

24   when that meeting was?

25                   A.   Not specifically.  Although I'm

Chad Moldon                                              May 14, 2025

Page 49

```
 1          sure, time-wise, it was in and around a month on
 2          one end of that declaration.
 3                    Q.   Do you remember if the Defendant
 4          attended that meeting?
 5                    A.   I don't remember, though, every --
 6          there would be every reason that he would
 7          potentially be in that meeting.
 8                    Q.   Was it common for him to attend
 9          shareholder meetings?
10                    A.   Yes.
11                    Q.   Now, do you recall if this
12          declaration or this dividend was issued before or
13          after you learned of the criminal investigation
14          into the Defendant?
15                    A.   I believe this was after.
16                    Q.   So we previously discussed Tony
17          Severin and his role within Rypl as the controller.
18          Is he now the CFO?
19                    A.   Yes.
20                    Q.   Does he have a specific role
21          within Firefly or did he between 2013 and 2019?
22                    A.   I don't think he has a specific
23          role in Firefly, but Firefly does rely on the
24          financial projections that Rypl puts together, so
25          in that way, yes.
```

1                    Q.   Do you know someone named Amanda
2        Zimmerman?
3                    A.   I do.
4                    Q.   And who is -- how do you know her?
5                    A.   She works for Tony and for Rypl
6        and does a variety of other accounting-based
7        services.
8                    Q.   Does she have a title at Rypl?
9                    A.   Yes, although I don't know if I
10       know it offhand.
11                   Q.   So what's her general role within
12       Rypl?
13                   A.   Typically, at least as I'm aware,
14       she does accounts payable and other payments.
15                   Q.   Does she have a specific role
16       within Firefly?
17                   A.   I don't think so.
18                   Q.   Does she work with Firefly in the
19       same way that Mr. Severin does?
20                   A.   Yes.
21                   Q.   Now, at some point, do you recall
22       learning about requests that the Defendant had sent
23       via email to -- let me rephrase that question.
24                   Do you recall learning about email
25       requests for payment sent from the Defendant to Mr.

Chad Moldon                                              May 14, 2025

Page 51

1          Severin and Ms. Zimmerman?

2                    A.   Yes.

3                    Q.   And what do you recall about these

4          emails requests?

5                    A.   They were a variety of requests

6          that specifically asked for certain amounts of

7          money to be paid.

8                    Q.   And when the Defendant made these

9          requests, did he notify you?

10                   A.   No.

11                   Q.   Did he ask your permission or your

12         approval before making these requests?

13                   A.   No.

14                   Q.   Do you have any knowledge of the

15         Defendant requesting approval from anyone within

16         Rypl or Firefly before making these requests?

17                   A.   I believe that Firefly had given

18         some -- there was a financial issue in paying

19         Mr. Erickson; I don't know what year that was in,

20         and Rypl was asked to make some payments on their

21         behalf.

22                   Q.   Did you ever make any similar

23         requests for Mr. Severin or Ms. Zimmerman?

24                   A.   Over the time period in question,

25         I'm sure it's possible that I've made a request for

1          something to be paid.

2                      Q.   Did you ever make an any email

3          requests for a loan?

4                      A.   Other than the one that was just

5          discussed, I'm not sure.  I don't think so.

6                      Q.   Now, as far as you know, did any

7          other shareholder or employee within Rypl or

8          Firefly make these kinds of requests to Mr. Severin

9          Ms. Zimmerman?

10                     A.   I can't speak for all Firefly

11         members and what requests they might make; I don't

12         believe there were other requests for Rypl

13         employees.

14                     Q.   Are you aware of the Defendant

15         signing any kind of agreement or promissory note to

16         agree to repay these funds that were sent to him?

17                     A.   I'm not aware of it, no.

18                     Q.   Have you ever seen a loan

19         agreement or promissory note related to these

20         payments?

21                     A.   I haven't seen it.

22                     Q.   Have you ever seen any document or

23         other evidence that the Defendant repaid the funds

24         that he received?

25                     A.   I don't know if he's repaid the

```
 1          funds.
 2                    Q.   As far as you know, has the
 3          Defendant ever made a repayment of these amounts
 4          that you requested?
 5                    MR. MAUZY:  Asked and answered.
 6                    MR. BOURGET:  You can answer.
 7                    THE WITNESS:  I don't know if he has or
 8          has not.
 9                    BY MR. BOURGET:
10                    Q.   Now, at the time that the
11          Defendant was making these requests, were you aware
12          of the full amounts that he was requesting and
13          receiving through these email requests?
14                    A.   I did not know the full amount at
15          the time.
16                    Q.   When did you become aware -- or
17          let me ask this:
18                    At some point, did you become aware of
19          the full amount that Mr. Erickson had received?
20                    A.   I did.
21                    Q.   And do you recall when you became
22          aware of that amount?
23                    A.   Once the IRS investigation came to
24          more light, more scrutiny was put together in
25          identifying what those numbers may or may not be.
```

Chad Moldon                                                    May 14, 2025

Page 54

1                      Q.   Do you know -- do you know the

2          total amount that the Defendant requested?

3                      A.   Not offhand right now, but

4          spreadsheets were put together to try and get a

5          handle on what they were in their entirety.

6                      Q.   So when you learned about the

7          total amount that the Defendant had requested and

8          received from the company through these requests,

9          how did you feel about that?

10                     A.   Surprised, disappointed a bit.

11                     Q.   Why disappointed?

12                     MR. MAUZY:  Objection, relevance.

13                     MR. BOURGET:  You can answer.

14                     THE WITNESS:  The scale at which, I

15         think, the total number was from a transparency

16         perspective, for me, it was a bit disappointing

17         because the numbers at that scale to me seemed it

18         would be something that would be discussed with

19         more transparency.

20                     MR. BOURGET:  Okay.  No further

21         questions.

22                     Can we go off the record for just one

23         second?

24                     THE VIDEOGRAPHER:  This marks the end

25         of media one.  We are going off the record at 10:03

Chad Moldon                                                    May 14, 2025

Page 55

```
1      a.m.

2                      --- Recess at 10:03 a.m.

3                      --- Resuming at 10:12 a.m..

4                      THE VIDEOGRAPHER:  This marks the

5      beginning of media two.  We're back on the record

6      at 10:12 a.m.

7                      Go ahead, Counsel.

8                      CROSS-EXAMINATION BY MR. MAUZY:

9           Q.   Good morning, Mr. Moldon.

10          A.   Good morning.

11          Q.   Bill Mauzy, and along with Will

12     Dooling, we represent David Erickson.

13                   We attempted to interview you before

14     your deposition.  Was that communicated to you?

15          A.   Yes.

16          Q.   And you refused to be interviewed

17     by us before the deposition?

18          A.   Yes, on legal counsel, that's

19     correct.

20          Q.   And you indicated in your proffer

21     that you did not want to come to the United States

22     to testify at this trial.  Why was that?

23          A.   Since the trial, I haven't been to

24     the United States at all.

25          Q.   Have you ever been to the United
```

Chad Moldon                                    May 14, 2025

Page 56

1          States?

2                    A.   No, of course I have.

3                    Q.   Have you had any problems going to

4          the United States?

5                    A.   No.

6                    Q.   Okay.  No difficulties at all in

7          going to the United States?

8                    A.   I don't believe so.

9                    Q.   Do you have any fear of going to

10         the United States?

11                   A.   Since the trial, I've had some

12         discomfort in going to the United States.

13                   Q.   Based on what?

14                   A.   Just the idea that I don't want to

15         end up going across the border in a way that, you

16         know, potentially makes it problematic.

17                   Q.   What would the problem be?

18                   A.   Due to the trial, I assume that

19         the Americans might have questions.

20                   Q.   Well, did the American

21         investigators come to Canada to interview you?

22                   A.   They did.

23                   Q.   And they did that several times?

24                   A.   Again, this was prior to that

25         happening.

1                Q.   Okay.  But you were interviewed in

2        Canada by American agents?

3                A.   Yes.

4                Q.   And you gave those interviews

5        voluntarily?

6                A.   I did.

7                Q.   Tell me why you did not want to go

8        to the United States --

9                MR. BOURGET:  Objection.

10                BY MR. MAUZY:

11                Q.   -- to be a witness at the trial.

12                A.   I thought I explained in the

13        previous question.  I just didn't want to end up in

14        a position without legal counsel at a border with a

15        bunch of questions I may not be able to answer.

16                Q.   And that's the only reason?

17                A.   Yes.

18                Q.   You have met with government

19        agents?

20                MR. BOURGET:  Objection, asked and

21        answered.

22                THE WITNESS:  Yes.

23                BY MR. MAUZY:

24                Q.   Did you meet with them recently?

25                A.   Yes.

Chad Moldon                                              May 14, 2025

1                 Q.   Did you meet with them on May

2       13th, 2025?

3                 A.   I believe so, yes.

4                 Q.   Did you meet with them last week?

5                 A.   Yes.

6                 Q.   Were you interviewed by them

7       November 14th, 2024?

8                 A.   I don't know the date off the top

9       of my head, but that sounds accurate.

10                Q.   And before that, when -- strike

11      that.

12                When you met with them last week, you

13      reviewed a memorandum of an interview that was

14      prepared based upon your November 14th, 2024,

15      interview.  Is that correct?

16                A.   That's correct.

17                Q.   Okay.  I'll show you that memo of

18      interview dated May 14, 2024.

19                A.   Yes, that's correct.

20                Q.   And that's the interview that you

21      reviewed, correct?

22                A.   Yes.

23                Q.   And you made a few corrections?

24                A.   Yes.

25                Q.   And we can assume that what you

 1          didn't correct, you believe to be correct?  Is that

 2          right?

 3                    A.   Yes.

 4                    Q.   All right.  Let's start by talking

 5          about the type of company that Rypl was.  Is this a

 6          formal company?

 7                    A.   Yes.

 8                    Q.   How many employees?

 9                    A.   It changed over the years in

10          question but roughly 35 to 50.

11                    Q.   Do you make decisions formally or

12          informally or both?

13                    A.   I don't understand the question.

14                    Q.   Describe the decision-making

15          process of Rypl to run the business.

16                    A.   Anything that relates to the

17          projects that we're working on, I would make a

18          decision on what direction I think they should go,

19          together with the other employees and people that

20          represent the interests of Rypl.

21                    Q.   Let's talk about Firefly.  What

22          type of company is Firefly?

23                    A.   An investment company.

24                    Q.   How many employees?

25                    A.   A minimal amount of employees.

Chad Moldon                                                                      May 14, 2025

Page 60

1            Q.   How many?

2            A.   I would say there's the six

3     partners and a few other administrative staff.

4            Q.   A fairly informal organization?

5            A.   I don't know if we share the same

6     "formal," but yes.

7            Q.   Are decisions made informally at

8     times?

9            A.   Define "informal."

10           Q.   Can shareholders agree on a

11    decision without a formal meeting?

12           A.   Yes.

13           Q.   A majority of shareholders can

14    have a discussion and arrive at a decision?

15           A.   Yes.

16           Q.   And that decision would be fully

17    authorized, if it's a majority of the shareholders?

18           A.   Yes.

19           Q.   And so important decisions can be

20    made without, necessarily, having meetings,

21    correct?

22           A.   Without having meetings?

23           Q.   Without having a formal

24    shareholder meeting.

25           A.   Yes.

Chad Moldon                                    May 14, 2025

                                                    Page 61

1                    Q.   So one shareholder can pick up a

2         phone, talk to another shareholder, and make a

3         decision?

4                    A.   Yes.

5                    Q.   And that can be an important

6         decision relating to Firefly and Firefly's

7         finances?

8                    A.   It could be.

9                    Q.   You're the CEO, the president of

10        Rypl?

11                   A.   Yes.

12                   Q.   What is your relationship with

13        CAM4?

14                   A.   My role is to maximize the outputs

15        and trajectory of CAM4 as a product for growth.

16                   Q.   What does Rypl actually do for

17        Firefly?

18                   A.   Accounting, administration,

19        marketing, product insight, media buys, a variety

20        of tasks.

21                   Q.   Would you describe yourself as --

22        Rypl as a facilitator?

23                   A.   Yes.

24                   Q.   An intermediary?

25                   A.   I don't know what you mean by,

Chad Moldon                                              May 14, 2025

Page 62

```
 1          "intermediary," at least, definition-wise.

 2                    Q.   Give me your best description of

 3          your relationship with Firefly.

 4                    A.   I believe that Rypl's primary

 5          function is to maximize the outputs of the

 6          products, in this particular case, CAM4.

 7                    Q.   Are you responsible for accounting

 8          for Firefly?

 9                    A.   Am I personally?

10                    Q.   Is Rypl?

11                    A.   Rypl provides accounting services

12          for Firefly.

13                    Q.   Does Rypl report to the Firefly

14          group?

15                    A.   Yes.

16                    Q.   And the Firefly group is primarily

17          David van der Poel, Toine Rodenburg, Richard Burry,

18          and David Erickson?

19                    A.   That's accurate.

20                    Q.   And Firefly evaluates whether or

21          not you meet your budget goals?  Is that correct?

22                    A.   Yes.

23                    Q.   Did you become a member of the

24          Firefly group?

25                    A.   Yes, through Blue Waters Trust.
```

Chad Moldon                                                    May 14, 2025

                                                    Page 63

1                    Q.    And you're a shareholder through

2        Blue Waters Trust?

3                    A.    That's accurate.

4                    Q.    And when did you become a

5        shareholder through Blue Waters Trust?

6                    A.    I believe the trust was set up in

7        2013.  It could be a little after that.

8                    Q.    And the percentage of Blue Waters

9        Trust of Firefly is 10 percent?

10                   A.    Yes.

11                   Q.    From 2021 onward, David van der

12       Poel owned 20 percent; David Erickson owned 20

13       percent; Toine Rodenburg owned 20 percent?

14                   A.    So the date you said was from

15       2021?

16                   Q.    Yes.

17                   A.    I believe that's accurate.

18                   Q.    Richard Burry owned 5 percent?

19                   A.    Off the top of my head, I don't

20       know Richard's individual percentage earning.

21                   Q.    Okay.  So as a group, David van

22       der Poel and David Erickson and Toine Rodenburg

23       constituted a majority of the shareholders,

24       correct?

25                   A.    Correct.

Chad Moldon

Page 64

1                    Q.   And a majority of the shareholders

2       could make decisions affecting the company,

3       Firefly?

4                    A.   Yes.

5                    Q.   They can make decisions on the

6       finances of Firefly?

7                    A.   Yes.

8                    Q.   They can make decisions on the

9       funds of Firefly?

10                   A.   Yes.

11                   Q.   They can make decisions on

12      payments from Firefly to shareholders?

13                   A.   Yes.

14                   Q.   So from 2012 through 2019, four

15      people were the owners of Firefly, that is, David

16      van der Poel, Toine Rodenburg, Richard Burry, and

17      David Erickson.  Is that correct?

18                   A.   Could you repeat the question,

19      please?

20                   Q.   Yes.  From 2012 through 2019, four

21      people were the owners of Firefly.  Those four

22      people were David van der Poel, Toine Rodenburg,

23      Richard Burry, and David Erickson?

24                   A.   The majority owners, yes.

25                   Q.   The majority?

Chad Moldon                                                    May 14, 2025

Page 65

1                       A.    Yes.

2                       Q.    And as a majority, they could make

3       the decisions on behalf of Firefly?

4                       A.    Yes.

5                       Q.    Including funds to shareholders?

6                       A.    Yes.

7                       Q.    Payments to shareholders?

8                       A.    Yes.

9                       Q.    Loans to shareholders?

10                      A.    Yes.

11                      Q.    And as part of your job, did you

12      send a monthly status report to these four men I

13      identified?

14                      A.    Yes.

15                      Q.    And did you give them a year-end

16      presentation to them?

17                      A.    Yes.

18                      Q.    Was your primary contact David van

19      der Poel and Richard Burry?

20                      A.    Yes.

21                      Q.    CAM4 falls under Surecom.  Is that

22      correct?

23                      A.    Surecom owns the technology and

24      IP.

25                      Q.    And Surecom was a subsidiary of

Chad Moldon                                                      May 14, 2025

Page 66

```
 1        Firefly?
 2                  A.   Yes.
 3                  Q.   Surecom owns the content and
 4        licences the content of Granity?
 5                  A.   That's correct.
 6                  Q.   And Rypl is the company that
 7        manages Firefly's expenses?
 8                  A.   Sorry, say that again.
 9                  Q.   You previously said that your
10        company manages Firefly's accounting functions.  Is
11        that correct?
12                  A.   I don't think that's accurate.
13        Rypl speaks to the accounting or does some of the
14        accounting services specifically around CAM4 and
15        some other services.  I don't know if it does all
16        of Firefly accounting.
17                  Q.   All right.  Does Rypl have other
18        customers besides Firefly?
19                  A.   No.
20                  Q.   Okay.  So Firefly is the only
21        customer for Rypl?
22                  A.   I don't know all of the layers.  I
23        don't know all of the investments that Firefly is
24        in.  I can speak to the CAM4 one specifically.
25                  Q.   But the only customer of Rypl is
```

```
 1          Firefly?

 2                    A.   That's accurate.

 3                    Q.   And you take care of the

 4          accounting for Firefly?  You manage it?

 5                    A.   We take care of the accounting as

 6          it relates to the web properties.

 7                    Q.   And the expenses relating to them?

 8                    A.   Yes.

 9                    Q.   And Rypl is a for-profit business?

10                    A.   Yes.

11                    Q.   Do you charge for your services?

12                    A.   We do.

13                    Q.   And Rypl charges Firefly ten

14          percent of all of the expenses it handles?

15                    A.   Yes.

16                    Q.   Just to be clear, Rypl's a company

17          that has one company: Firefly, correct?

18                    A.   Yes.

19                    Q.   And you manage Firefly's payments?

20                    A.   When you say, "Firefly," I would

21          more accurately define it as we manage CAM4's

22          payments.

23                    Q.   Okay.  On behalf of Firefly?

24                    A.   Yes.

25                    Q.   And Firefly pays you for managing
```

Chad Moldon                                        May 14, 2025

Page 68

1        those payments?

2                    A.   Yes.

3                    Q.   And you also deal with the

4        marketing and sponsoring part of CAM4?

5                    A.   Yes.

6                    Q.   When you make a payment or pay

7        expenses on behalf of Firefly from Rypl, you're

8        paid 10 percent?

9                    A.   I'm not entirely sure if that's

10       accurate.  Tony Severin could better answer that

11       question.

12                   Q.   When you made payments to

13       Erickson, did that generate income for Rypl?

14                   A.   It did.

15                   Q.   And that was based on your 10

16       percent management fee?

17                   A.   Again, I'm not entirely sure what

18       percentage was made in Erickson's fee, but there

19       was a money-movement markup.

20                   Q.   Let me ask you to review paragraph

21       39.  I'll show you the memorandum of the interview;

22       don't read it out loud.  It's just to refresh your

23       recollection, paragraph 39.

24                   A.   Yes, although to the point the 10

25       percent, I feel like the question you're asking me

```
 1        is in specificity to the number that was charged.

 2        I just am not sure that 10-percent number is the

 3        accurate number.  There was a percentage charge.  I

 4        don't know what it is.

 5                  Q.   Okay.  If you would review

 6        paragraph 28.

 7                  A.   Yes.

 8                  Q.   And what I handed you was the

 9        memorandum of the interview that was conducted with

10        your lawyer, Charlotte Janssen, Amanda Scott, Boris

11        Bourget, Rusty Kiser, and John Polson (ph) on

12        November 14th, 2024, correct?

13                  A.   Yes.

14                  Q.   And you reviewed that just last

15        week?

16                  A.   Yes.

17                  Q.   And you made corrections?

18                  A.   Yes.

19                  Q.   Did you inform them that Rypl

20        makes money by charging Firefly 10 percent of the

21        expenses that get paid through Rypl?

22                  A.   I don't recall the 10 percent

23        number, but yes, we make money through the

24        charging.

25                  Q.   Did you inform the agents that you
```

1          charge 10 percent?

2                    A.   I don't remember.

3                    Q.   All right.  And reading the

4          memorandum --

5                    A.   It seems accurate based on the

6          memorandum, yes.

7                    Q.   Based on the memorandum of your

8          interview that you agreed was correct, Rypl makes

9          money by charging Firefly 10 percent of expenses?

10                   A.   Yes.

11                   Q.   So when Rypl paid a loan to a

12         shareholder like Dave Erickson or another

13         shareholder, Rypl would make money on that payment,

14         correct?

15                   A.   When they paid a loan to them?

16                   Q.   Any payment to a shareholder.

17                   A.   I'm not sure.

18                   Q.   Okay.  I want you to review

19         paragraph 39 of the same memo of 2014 [sic].

20                   A.   Sorry, 39?

21                   Q.   Yes.

22                   A.   Yes.

23                   Q.   Okay.  This is a memorandum that

24         you agreed was correct?

25                   A.   The distinction, I think, that

1       we're making is that you're saying they made money

2       on the loan, and my distinction is that if a

3       payment was made on behalf of Firefly to Erickson,

4       we would charge a percentage of that.

5                   Q.   Right.  So just to be straight, if

6       you made a payment to Erickson of $10,000, you

7       would charge a 10 percent management fee, and you

8       would receive 1,000 from that?

9                   A.   I'm not sure in every instance

10      that money was moved that that is true, but there

11      is a fee that we provide for money movement to

12      Erickson in this case.

13                  Q.   Okay.  And you informed the agents

14      that that amount was 10 percent?

15                  A.   Yes.

16                  MR. BOURGET:  Objection, asked and

17      answered.

18                  BY MR. MAUZY:

19                  Q.   So what you told them was if there

20      was a payment going to Erickson, Rypl would

21      actually make money on that payment?

22                  MR. BOURGET:  Objection, asked and

23      answered.

24                  THE WITNESS:  Yes.

25                  BY MR. MAUZY:

Chad Moldon                                                    May 14, 2025

                                                                Page 72

1                    Q.   And these payments to the

2          shareholders, then, benefitted Rypl, right?  You

3          got paid for it?

4                    MR. BOURGET:  Objection, asked and

5          answered.

6                    THE WITNESS:  Yes.

7                    BY MR. MAUZY:

8                    Q.   Whose money was it that was paid

9          to the shareholders of Firefly?

10                   A.   Sorry?

11                   Q.   Where did the funds come from, if

12         you paid the shareholders of Firefly?

13                   A.   From CAM4, the platform.

14                   Q.   It was Firefly's money?

15                   A.   Yes.

16                   Q.   Not Rypl's money?

17                   A.   Correct.

18                   Q.   So the money going to David

19         Erickson from Rypl that you managed was Rypl -- was

20         not Rypl's money; in fact, it was Firefly's money?

21                   A.   Yes.

22                   Q.   If a loan was made to Erickson, it

23         was a loan from Firefly, right?

24                   A.   That's accurate.

25                   Q.   Not a loan from Rypl?

1                    A.   Yes.

2                    Q.   And money paid to other Firefly

3        shareholders by Rypl was not Rypl's money?

4                    A.   That's correct.

5                    Q.   It was money that you managed for

6        Firefly?

7                    A.   Yes.

8                    Q.   It was not money belonging to

9        Rypl?

10                   A.   That's correct.

11                   Q.   Any loan to a shareholder of

12       Firefly was from Firefly funds?

13                   A.   I can't speak to every potential

14       loan, but yes, the one in this case was true.

15                   Q.   The loans to David Erickson?

16                   A.   Correct.

17                   Q.   All of the loans to David Erickson

18       was Firefly funds.  Is that correct?

19                   A.   Yes.

20                   Q.   And not from Rypl's funds?

21                   A.   That's correct.

22                   Q.   And the loans to shareholders of

23       Firefly were made on behalf of Firefly?

24                   A.   I believe that to be accurate,

25       yes.

1          Q.   You don't personally deal with

2     international banking issues?

3          A.   No.

4          Q.   You primarily deal with local

5     banks?

6          A.   Primarily, yes.

7          Q.   Canadian banks?

8          A.   Yes.

9          Q.   International banking is more Tony

10    Severin's department?

11         A.   Yes.

12         Q.   Severin acts as a controller?

13         A.   That's accurate.

14         Q.   He has an accounting background?

15         A.   He does.

16         Q.   You do not have an accounting

17    background?

18         A.   That's accurate.

19         Q.   You wouldn't know who made

20    decisions relating to which bank accounts money was

21    transferred out of.  Is that correct?

22         A.   I wouldn't know.

23         Q.   Did you code these transactions?

24         A.   No.

25         Q.   Did you designate where they

1        should be entered into Rypl's ledgers?

2                    A.    No.

3                    Q.    And you wouldn't know anything

4        about how these transactions were coded?

5                    A.    That's correct.

6                    Q.    Or where they were recorded in

7        Rypl's books?

8                    A.    Correct.

9                    Q.    That was Tony Severin's

10       responsibility to enter the transactions into the

11       books?

12                   A.    I believe so, yes.

13                   Q.    And he would know about coding?

14                   A.    Yes.

15                   Q.    If David Erickson and David van

16       der Poel have conversations, you don't necessarily

17       know about that, correct?

18                   A.    Of course, I don't know.

19                   Q.    If David Erickson and Toine

20       Rodenburg have conversations, you're not

21       necessarily part of those conversations, correct?

22                   A.    Yes.

23                   Q.    The other shareholders couldn't

24       make deals that you don't know about?

25                   A.    Yes.

Chad Moldon                                                    May 14, 2025

```
 1                    Q.   And they could communicate by
 2         email that you weren't CC'd on?
 3                    A.   Yes.
 4                    Q.   And they make decisions about
 5         Firefly that you don't get included on, correct?
 6                    A.   Yes.
 7                    Q.   All right.  You are the
 8         beneficiary of Blue Waters Trust?
 9                    A.   Yes.
10                    Q.   That was set up sometime after
11         2012?
12                    A.   That's correct.
13                    Q.   Did David van der Poel set it up
14         for you?
15                    A.   Yes.
16                    Q.   Why was it set up?
17                    A.   As a form to provide some
18         potential equity at a certain time if the business
19         did well.  The trust was set up in order to help
20         facilitate that.
21                    Q.   So essentially, if you became a
22         shareholder, if the business did well at some point
23         of time in the future, you would receive additional
24         funds, correct?
25                    A.   That's the idea, yes.
```

Chad Moldon                                    May 14, 2025

1                    Q.   And that would be based on the

2      Blue Waters Trust shares?

3                    A.   Yes.

4                    Q.   So the idea was you set up a

5      trust; the trust gets funded along the way, and at

6      some point in time, there will be money in the

7      trust?

8                    A.   Yes.

9                    Q.   The owners told you they're going

10     to set up this trust and promised to do so for you,

11     right?

12                   A.   That's correct.

13                   Q.   And the shareholders, in fact, did

14     that for you?

15                   A.   They did.

16                   Q.   And that was to give you an

17     interest in Firefly?

18                   A.   That's correct.

19                   Q.   And potentially, a financial

20     reward from Firefly?

21                   A.   That's accurate.

22                   Q.   And that was the hope of all

23     shareholders, eventually, in effect, cash out your

24     interest in Firefly?

25                   A.   I believe so.

Chad Moldon                                          May 14, 2025

Page 78

1              Q.   Would you agree that each owner of

2      Firefly set up their companies differently?

3              A.   Yes.

4              Q.   Richard Burry set up a company

5      called Smartvu?

6              MR. BOURGET:  Objection, personal

7      knowledge.

8              THE WITNESS:  I believe that's his

9      company, yes.

10              BY MR. MAUZY:

11              Q.   David van der Poel set up a

12      company of Lloydsville?

13              MR. BOURGET:  Same objection.

14              THE WITNESS:  I believe that's accurate

15      as well.

16              BY MR. MAUZY:

17              Q.   Toine Rodenburg set up a company

18      called 10Q21?

19              MR. BOURGET:  Same objection.

20              THE WITNESS:  Again, I think that's

21      accurate.

22              BY MR. MAUZY:

23              Q.   David Erickson had a company

24      called Bannister?

25              A.   Yes.

Chad Moldon                                                    May 14, 2025

Page 79

```
1              Q.   Ryan Maule had a company named

2       Firewall?

3              MR. BOURGET:  Objection, personal

4       knowledge.

5              THE WITNESS:  I believe so, yes.

6              BY MR. MAUZY:

7              Q.   And these -- were there other

8       people that you had to have setting up done by

9       other people, setting up the trust?

10             A.   I'm unfamiliar with all the people

11      necessary to set up the trust, but I assume there's

12      more than that person.

13             Q.   Okay.  Your communication of

14      setting up the trust was with van der Poel?

15             A.   Yes.

16             Q.   And you believe he had the

17      authority to set up the trust?

18             A.   van der Poel spoke to me about

19      setting up the trust and did so, I think, yes.

20             Q.   And that was something entirely

21      approved by the other shareholders?

22             A.   I think so, yes.

23             Q.   He had the authority to set up the

24      trust?

25             MR. BOURGET:  Objection, personal
```

Chad Moldon                                                    May 14, 2025

Page 80

```
1        knowledge.

2                    THE WITNESS:  I believe he had the

3        authority.

4                    BY MR. MAUZY:

5                    Q.   And in fact, did so?

6                    A.   I'm not sure of all the parties

7        involved in the trust; certainly, van der Poel was

8        part of that trust.

9                    Q.   Was that trust ever funded?

10                   A.   It was.

11                   Q.   How much went into the trust?

12                   A.   What timeframe are you referring

13       to?

14                   Q.   Any timeframe.  When was it first

15       funded?

16                   A.   I think the first amounts that

17       went into Blue Waters were in 2021, 2022.

18                   Q.   How much was that?

19                   A.   I don't know offhand.  I don't

20       have access to the trust account.

21                   Q.   How much was it total?

22                   A.   I don't know.

23                   Q.   Have you received any -- you

24       personally received any money from that trust?

25                   A.   In what timeframe?
```

Chad Moldon                                    May 14, 2025

Page 81

1                    Q.   Any timeframe.

2                    A.   Yes.

3                    Q.   How much have you received?

4                    A.   Roughly...I think there were two

5       examples, maybe 800,000, 900,000, something like

6       that.

7                    Q.   Total?

8                    A.   From my memory, something like

9       that.

10                   Q.   All right.  So the trust was set

11      up; it was funded, and you received money from it,

12      right?

13                   A.   Yes.

14                   Q.   Do you know if there was a formal

15      resolution to set up that trust?

16                   A.   I don't know.

17                   Q.   Was there a formal resolution to

18      fund the trust?

19                   A.   I don't know.

20                   Q.   Now, let's talk about

21      Mr. Erickson's ownership in Rypl.  He didn't

22      originally own stock in Rypl?  Is that correct?

23                   A.   I believe that in 2012, he did

24      not.

25                   Q.   Did he eventually own stock in

1      Rypl?

2                    A.   David Erickson or Halstead Bay

3      Holdings?

4                    Q.   David Erickson.

5                    A.   I don't know if David Erickson,

6      specifically, had stock in it.

7                    Q.   Were there immigration issues, and

8      he needed to get into Canada more easily?

9                    A.   Yes.

10                   Q.   And because of that, he acquired

11     ownership in Rypl?  Is that correct?

12                   A.   I believe that's part of the

13     reason, yes.

14                   Q.   You don't think that David

15     Erickson ever tried to hide his ownership in Rypl?

16                   A.   No.

17                   Q.   Do you recall the circumstances in

18     which David Erickson hired Tony Severin in 2013?

19                   A.   The circumstances?

20                   Q.   Yes.  What was going on at Rypl in

21     2013 that caused the hiring of Tony Severin?

22                   A.   I believe our previous controller

23     had been doing a poor job, and on his exit, we

24     needed a new controller.

25                   Q.   And David Erickson interviewed and

Chad Moldon                                                          May 14, 2025

Page 83

1          hired Tony Severin in 2013 to be the controller of
2          Rypl?
3                    A.   I believe that's accurate, yes.
4                    Q.   And that was a significant
5          improvement to the accounting and running of the
6          business at Rypl, correct?
7                    A.   Yes.
8                    Q.   The previous controller doing the
9          accounting did a very poor job?
10                   A.   Yes.
11                   Q.   And Dave had assisted with that
12         accounting.  Once Tony Severin was involved, most
13         of the company's accounting functions were turned
14         over to Tony?
15                   A.   Yes.
16                   Q.   And Tony Severin was the
17         controller and did the company's accounting
18         functions.  Is that correct?
19                   A.   Yes, Tony did the accounting
20         function.
21                   Q.   Do you remember Erickson hiring a
22         guy named Aron Pervin to help transition the
23         original shareholder group out of operations and
24         into an oversight role?
25                   A.   Yes.

Chad Moldon                                                    May 14, 2025

Page 84

1                    Q.   And when was that, approximately?

2                    A.   I don't recall the year.

3                    Q.   Was that successful to transition

4          the shareholder group, that is, David Erickson,

5          Toine Rodenburg, Richard Burry, and David van der

6          Poel, out of the daily operations and into an

7          oversight role?

8                    A.   Generally, yes.

9                    Q.   Do you agree -- I'm going to

10         switch to Firefly.  Do you agree that the four

11         major shareholders, van der Poel, Burry, Erickson,

12         and Rodenburg, were largely in charge of running

13         Firefly?

14                   A.   Yes.

15                   Q.   Do you agree that decisions at

16         Firefly were often made informally within that

17         Firefly group?

18                   MR. BOURGET:  Objection, asked and

19         answered.

20                   THE WITNESS:  Yes.

21                   BY MR. MAUZY:

22                   Q.   Were you a shareholder in Rypl?

23                   A.   Yes.

24                   Q.   Is it true that no dividends were

25         ever issued from Rypl?

Chad Moldon                                    May 14, 2025

Page 85

 1                      A.   That's true.

 2                      Q.   Is it true in the period of time

 3      2011, 2019 no dividends were issued from Rypl?

 4                      A.   That's true.

 5                      Q.   The first dividend issued from

 6      Rypl was in 2022.  Is that correct?

 7                      A.   From Rypl did you say?

 8                      Q.   I'm sorry, from Firefly, my

 9      mistake.  Let me re-ask the question.

10                      The first dividend from Firefly was in

11      2022?

12                      A.   That's accurate, I believe, yes.

13                      Q.   And you did receive a dividend

14      through the trust in 2022?

15                      A.   Yes.

16                      Q.   And that related to the buyout of

17      Bannister shares in Firefly?

18                      A.   Sorry, could you restate your

19      question?

20                      Q.   Yes.  You got a -- Blue Waters

21      Trust got a dividend in 2022, right?

22                      A.   Yes.

23                      Q.   And that coincided with the buyout

24      of Bannister shares in Firefly by Firefly?

25                      A.   I don't know that it coincided.

Chad Moldon                                          May 14, 2025

Page 86

```
 1                    Q.   Okay.  But you did receive a

 2       dividend in 2022?

 3                    A.   Yes.

 4                    Q.   Okay.  And you recall that being

 5       8, 900,000?

 6                    A.   Yes.

 7                    Q.   So you had a trust set up, the

 8       Blue Waters Trust, in 2012, but you did not receive

 9       a dividend until 2022, correct?

10                    A.   That's accurate.

11                    Q.   And Firefly never issued a

12       dividend between 2011 and 2022, correct?

13                    A.   I don't think they did.  That's

14       accurate.

15                    Q.   And Rypl never issued a dividend

16       to anyone?

17                    A.   Yes, that's true.

18                    Q.   All right.  I want to make this

19       clear: There were no dividends issued by Firefly,

20       to your knowledge, during the period of time of

21       2011 until 2022.  Is that correct?

22                    A.   That's correct.

23                    Q.   Shareholders did get regular

24       payments from Firefly, correct?

25                    A.   I believe so.
```

Chad Moldon                                              May 14, 2025

Page 87

```
 1                    Q.    And these were not dividends?

 2                    A.    No, they were not dividends.

 3                    Q.    Rather, these were an advance in

 4       lieu of a dividend.  Is that correct?

 5                    A.    That's correct.

 6                    Q.    Shareholders took money as an

 7       advance in lieu of Firefly actually paying a

 8       dividend out.  Is that correct?

 9                    A.    That's correct.

10                    Q.    And advances are not dividends?

11                    A.    Yes.

12                    Q.    Advances have to be paid back?

13                    A.    Yes.

14                    Q.    The idea was that the dividends

15       would be paid back by future -- sorry.

16                    The money taken as advances would be

17       paid back by future dividends.  Is that correct?

18                    A.    That's correct.

19                    Q.    There would need a resolution to

20       issue a dividend, correct?

21                    A.    Yes.

22                    Q.    No resolutions were issued between

23       2011 and 2021.  Is that correct?

24                    A.    Yes, that's correct.

25                    Q.    Okay.  You need a resolution to
```

Chad Moldon                                    May 14, 2025

Page 88

1         issue a dividend, correct?

2                    A.   I believe so, yes.

3                    Q.   And no resolutions were issued

4         between 2011 and 2021, correct?

5                    A.   Yes.

6                    Q.   When these advances were made, was

7         there a formal vote of the shareholders?

8                    A.   Per advance you mean?

9                    Q.   For advances, yes.

10                   A.   I don't believe there's a formal

11        vote.

12                   Q.   If there was a request for an

13        advance, an advance was granted to the

14        shareholders?

15                   A.   I think it would depend on some

16        circumstance, but generally, I would say yes.

17                   Q.   So generally, if a shareholder

18        requested an advance, he received the advance he

19        requested, right?

20                   MR. BOURGET:  Objection, personal

21        knowledge.

22                   THE WITNESS:  I can't speak to all

23        examples, but yes.

24                   BY MR. MAUZY:

25                   Q.   Generally, the advances to the

Chad Moldon                                              May 14, 2025

Page 89

1       four major shareholders?

2                   A.   I don't know all of the four major

3       shareholders' requests, but to the tone of your

4       question, I believe that they were able to do so.

5                   Q.   If advances were requested, they

6       were given; they were granted?

7                   A.   Yes.

8                   Q.   I'm going to show you what's been

9       marked as D-1.

10                  EXHIBIT NO. D-1:  An email from Dave

11      Erickson to Chad Moldon, et al, dated May 16th,

12      2014.

13                  BY MR. MAUZY:

14                  Q.   You can recognize this as an email

15      from Dave Erickson that you were copied on dated

16      May 16th, 2014.

17                  A.   Yes, I've read it.

18                  Q.   Thank you.

19                  MR. MAUZY:  We're not going to formally

20      offer any of these at this time.

21                  MR. BOURGET:  Yes, we should just stay

22      on the record --

23                  MR. MAUZY:  Okay.  You can keep that.

24                  BY MR. MAUZY:

25                  Q.   So he indicates he'd "like to

Page 90

1    figure out a way to pay ourselves before paying out

2    more money to charities."

3              A.   Where specifically are you

4    referring to?

5              Q.   The fourth paragraph.

6              A.   Yes.

7              Q.   And it says, "...but any donations

8    should be based on a percent of dividends that we

9    are paid to ourselves."

10             A.   Yes.

11             Q.   So the term "dividend" is used in

12   many of the emails and correspondence, but in fact,

13   when they're talking about dividends, they're

14   talking about advances.  Is that correct?

15             A.   Yes, that's accurate.

16             Q.   Because no dividends were issued

17   between 2011 and 2021?

18             A.   Yes.

19             Q.   So the term "dividend" was loosely

20   used, but you understood it to mean advances?

21             A.   Yes.

22             Q.   I'll show you D-2.

23             A.   Yes.

24             Q.   And this is from you to David

25   Erickson.  You recognize that?

 1                    A.   Yes.

 2                    Q.   That's your email address, and you

 3        recognize that as an email sent to the individuals?

 4                    A.   Yes.

 5                    Q.   And you entitle this, "Dividend

 6        Update," correct?

 7                    A.   Yes, I did.

 8                    Q.   And in the second paragraph, you

 9        refer to increasing the monthly advance from its

10        current level of 120 per month to 375,000 per

11        month.

12                    A.   Yes.

13                    Q.   Okay.  So when you have in the

14        subject line "Dividend Update," this really is

15        advances update, correct?

16                    A.   Yes.

17                    Q.   And you use the term "advances" in

18        the body of the email?

19                    A.   I do.

20                    Q.   So often dividends are used

21        interchangeably with advances but always dividends

22        are, in fact, advances, correct?

23                    A.   Yes, in the timeframe.

24                    Q.   David van der Poel got advances?

25                    A.   Do you mean ever in general?

Chad Moldon                                              May 14, 2025

Page 92

```
 1                    Q.   In that period of time?

 2                    A.   I believe so, yes.

 3                    Q.   In the period of time 2011 to

 4        2021, David van der Poel got advances?

 5                    A.   Yes.

 6                    Q.   Toine Rodenburg got advances?

 7                    A.   Yes.

 8                    Q.   Richard Burry got advances?

 9                    A.   Yes.

10                    Q.   David Erickson got advances?

11                    A.   Yes.

12                    Q.   These advances needed to be paid

13        back, eventually?

14                    A.   Yes, that's the plan.

15                    Q.   And they were, in effect, loans,

16        correct?

17                    A.   Yes.

18                    Q.   So the shareholders during the

19        period of time 2011 to 2019 took out many advances,

20        correct?

21                    A.   Yes.

22                    Q.   And these advances were, in

23        effect, loans, correct?

24                    A.   Yes.

25                    Q.   And sometimes you took out loans?
```

Chad Moldon                                        May 14, 2025

Page 93

1                    A.   Yes.

2                    Q.   Did Firefly group pay your credit

3        cards?

4                    A.   Did Firefly pay my credit card?

5        Yes.

6                    Q.   Did Firefly pay for your personal

7        expenses on credit cards?

8                    A.   Periodically, there would be

9        personal expenses on the credit card.

10                   Q.   They did?

11                   A.   Periodically, yes.

12                   Q.   And sometimes things you bought on

13       these credit cards weren't business expenses,

14       correct?

15                   A.   Yes.

16                   Q.   And those were paid by Firefly?

17                   A.   Yes.

18                   Q.   Did Tony Severin keep track of the

19       amount that Firefly paid on the credit cards for

20       you?

21                   A.   I believe so, yes.

22                   Q.   And these payments, in effect,

23       were loans; were they not?

24                   A.   Yes.

25                   Q.   Did you intend to pay this back?

1              A.   Yes.

2              Q.   Did the shareholders meet and vote

3      and issue a resolution on the loans you took out

4      from Firefly?

5              A.   Sorry, could you ask that question

6      again?

7              Q.   Did the Firefly -- to your

8      knowledge, did the shareholders of Firefly meet and

9      vote and issue a resolution on the loans you took

10     out?

11             A.   I don't believe so.

12             Q.   And Dave Erickson paid for

13     expenses on your behalf on this credit card?

14             A.   Yes.

15             Q.   And this also was a loan, correct?

16             A.   Yes.

17             Q.   I'm going to show you what's been

18     marked as D-3.  It's from David Erickson, Severin,

19     copying you?

20             A.   Yep.

21             Q.   In an email.  Do you recognize

22     that?

23             A.   Yes.

24             Q.   And the subject title is "Loan to

25     Chad."

1              A.    Yes.

2              Q.    And this is a loan in lieu of

3        figuring out a tax-preferred way to pay a bonus?

4              A.    Yes.

5              Q.    So what you received was a loan,

6        correct?

7              A.    Yes.

8              Q.    And it says the bonus deferral

9        earned 8 percent, so the advance must pay the same?

10             A.    That's what it says, yes.

11             Q.    So this money that was advanced to

12       you was a loan?

13             A.    Yes.

14             Q.    And he says, "...make sure to

15       collect the interest annually in case Revenue

16       Canada comes knocking."

17             A.    Yes, that's what it says.

18             Q.    And that loan amount was 150,000?

19             A.    Yes.

20             Q.    All right.  And to be clear, this

21       is a loan from Firefly?

22             A.    Yes.

23             Q.    And since it's a loan from

24       Firefly, it would never be reflected on Rypl's

25       books as loans to shareholders on their tax return?

1              MR. BOURGET:  Objection, personal

2      knowledge.

3              THE WITNESS:  Could you also ask the

4      question again?

5              BY MR. MAUZY:

6         Q.   Yes.  This loan to you of 150,000

7      is from Firefly?

8         A.   Yes.

9         Q.   It is not a loan from Rypl?

10        A.   I don't believe so, yes.

11        Q.   There's no reason to record this

12     loan to you from Firefly on the Rypl books?

13        A.   That's accurate.

14        Q.   It was not a loan from Rypl to a

15     shareholder of Rypl?

16        A.   Yes.

17        Q.   And Erickson on behalf of Firefly

18     is extending a loan to you on behalf of Firefly?

19        A.   Yes.

20        Q.   Do you know how you paid this loan

21     back?

22        A.   It's ten years ago, so I don't

23     know exactly, but reconciliations were made time to

24     time, and any monies that could be paid were

25     eventually settled.  I believe the total was

Chad Moldon                                              May 14, 2025

Page 97

```
1        settled at the time of the dividend payment you

2        referred to earlier.

3                    Q.   So the loan that you received of

4        150,000, the way that it was paid back was in 2022

5        when there was a reconciliation of the books of

6        Firefly?

7                    A.   Yes.

8                    Q.   So the 150,000, in effect, was

9        deducted from the dividends that you received at

10       that time?

11                   A.   That's accurate.

12                   Q.   I'm showing you what's been marked

13       as Defendant's Exhibit 4.

14                   EXHIBIT NO. D-4:  An email from David

15       Erickson to Chad Moldon, et al, dated August 28,

16       2014.

17                   BY MR. MAUZY:

18                   Q.   Do you recognize that as an email

19       from David Erickson from his email address to

20       Amanda, David van der Poel, copying you and Chad

21       [sic]?

22                   A.   Yes.

23                   Q.   Do you recognize that email?

24                   A.   Yes.

25                   Q.   Does this say that "We need to
```

Chad Moldon                                           May 14, 2025

Page 98

```
 1          reconcile all advances to Chad as from 01/01/2011"?
 2                    A.   Yes.
 3                    Q.   Including "any activity between
 4          David and Chad or any other source that may
 5          exist."?
 6                    A.   That's what it says, yeah.
 7                    Q.   All right.  And this was a
 8          reconciliation but not a payment.  Is that correct?
 9                    A.   The email or what's being
10          requested?
11                    Q.   Well, you didn't pay back the
12          advances in 2014, correct?
13                    A.   No, I believe this is requesting a
14          spreadsheet that outlines the reconciliation.
15                    Q.   Right.  It just shows what the
16          advances were?
17                    A.   Yes.
18                    Q.   It accounts for the advances?
19                    A.   That's accurate.
20                    Q.   It's not a payback of the
21          advances, correct?
22                    A.   Yes.
23                    Q.   And you received advances during
24          the period 2011, 2014, right?
25                    A.   Yes.
```

     1                    Q.   These advances are loans?

     2                    A.   Yes.

     3                    Q.   And David here is just -- in the

     4          exhibit is trying to figure out the total amount

     5          you had been advanced, correct?

     6                    A.   Yes, that's correct.

     7                    Q.   And David Erickson assigned Amanda

     8          Zimmerman and Tony to do the calculation?

     9                    A.   Yes.

    10                    Q.   Did you keep track of the money

    11          received on advances?

    12                    A.   Not specifically.

    13                    Q.   Did you depend on Tony and Amanda

    14          to track that amount?

    15                    A.   Yes.

    16                    Q.   Did the shareholders all meet and

    17          vote and formally issue a resolution authorizing

    18          these advances?

    19                    A.   No.

    20                    Q.   And you don't know exactly how

    21          these advances were coded.  Is that correct?

    22                    A.   I do not.

    23                    Q.   But you do know this was Firefly's

    24          money, these advances?

    25                    A.   You mean the ultimate source?

Chad Moldon                                                    May 14, 2025

                                                    Page 100

1                    Q.   Yes.

2                    A.   Yes.

3                    Q.   It certainly wasn't Rypl's money?

4                    A.   No.

5                    Q.   The advances, ultimately, were

6         from Firefly, correct?

7                    A.   I believe so, yes.

8                    Q.   I'm going to show you Defendant's

9         5.

10                   EXHIBIT NO. D-5:  An email from Dave

11        Erickson to Richard Burry dated September 20, 2013.

12                   BY MR. MAUZY:

13                   Q.   It's an email from Dave Erickson

14        to Richard Burry.  Just see if it refreshes your

15        recollection on it.  You were not copied on this.

16                   A.   I've read it, yeah.  Do you want

17        it back?

18                   Q.   No, you can keep that.  So did

19        you -- and this is 2013.  Did you do some home

20        improvement?

21                   A.   I don't have a specific memory of

22        2013's home improvement, but based on the email, it

23        seems reasonably accurate.

24                   Q.   And did you take out a loan from

25        Firefly for that home improvement?

Chad Moldon                                    May 14, 2025

                                                    Page 101

1                    A.    I don't remember, but it's

2        possible.

3                    Q.    Do you know if Ryan Maule received

4        an advance for a down payment on his house?

5                    A.    I don't know, but I believe that's

6        accurate as well.

7                    Q.    And David Erickson added a deck

8        and a pool.  Do you remember that?

9                    A.    Yes.

10                   Q.    And these were all advances,

11       correct?

12                   A.    Yes.

13                   Q.    Paid by Firefly?

14                   A.    That's accurate.

15                   Q.    Since this was a loan, you would

16       have to pay it back at some point, correct?

17                   A.    Are you referring to me?

18                   Q.    Yes.

19                   A.    Yes.

20                   Q.    And the plan was to pay it back

21       with dividends you would receive in the future,

22       correct?

23                   A.    That's accurate.

24                   Q.    Frequently, loans were agreed to

25       by shareholders to help out other shareholders,

 1          correct?

 2                    A.   Say again.

 3                    Q.   Loans would be extended to

 4          shareholders to help other shareholders?

 5                    A.   Yes.

 6                    Q.   And the thought was and the

 7          understanding was the loans would be paid back?

 8                    A.   Yes.

 9                    Q.   And you don't know exactly how any

10          of these loans were coded?

11                    A.   No, I do not.

12                    Q.   But you do know that this was

13          Firefly's monies that did the advances?

14                    A.   Yes.

15                    Q.   In terms of the plan to pay back

16          the loans, the ultimate plan was to someday pay it

17          back out of dividends issued by Firefly, correct?

18                    A.   Again, are you referring to me?

19                    Q.   Yes.

20                    A.   Yes.

21                    Q.   And Firefly started to pay

22          dividends in 2022?

23                    A.   Yes, I believe so.

24                    Q.   One goal of paying dividends to

25          the shareholders was to pay off the outstanding

```
 1          loans?

 2                      A.   Yes.

 3                      Q.   And that, in fact, was done?

 4                      A.   Yes.

 5                      Q.   So dividends were issued --

 6                      MR. BOURGET:  Objection, personal

 7          knowledge as it relates to loans that are not his.

 8                      BY MR. MAUZY:

 9                      Q.   Dividends were issued, and

10          shareholder loans were paid back?

11                      MR. BOURGET:  Same objection.

12                      THE WITNESS:  As it relates to myself,

13          that's accurate.

14                      BY MR. MAUZY:

15                      Q.   And your belief is as to the other

16          shareholders --

17                      A.   I believe that's the case with

18          others too.

19                      Q.   I'm going to hand you 6 and 6a

20          exhibits.

21                      EXHIBIT NO. D-6:  Emails from David

22          Erickson on February 7th and 10th, 2020.

23                      EXHIBIT NO. D-6a:  Notes from 2020

24          Conversations Re: Annual Meeting.

25                      BY MR. MAUZY:
```

Chad Moldon                                                May 14, 2025

Page 104

```
 1                Q.   See if you recognize these as
 2     emails from David Erickson.
 3                A.   Yes, I have read them.
 4                Q.   And these were conversation notes.
 5     Is that right, references conversation notes?
 6                A.   It seems so, yes.
 7                Q.   And it says, "...getting the
 8     Agenda built right and buy-in from Chad.  I'd like
 9     to share these with him."
10                A.   You mean in the email between
11     David Erickson and David van der Poel?  Yes.
12                Q.   And one topic to be discussed at
13     the meeting is the shareholders' plan to create
14     "Cease Cash Advances and Declare Dividends Against
15     Prior Advances," correct?
16                A.   Yes.
17                Q.   That was the plan, correct?
18                A.   Yep, that's what's on here, yes.
19                Q.   And the plan did not go into
20     effect until 2022 when the dividends were issued?
21                A.   Yes, that's accurate.
22                Q.   So there was a plan to stop the
23     cash advances and declare dividends in 2020, but it
24     did not actually happen until 2022?
25                A.   Yes.
```

Chad Moldon                                          May 14, 2025

Page 105

1           Q.   You recently were divorced.  Is
2     that correct?
3           A.   Yes.
4           Q.   Went through a divorce?  What year
5     was that?
6           A.   Well, we got separated in late
7     2018, maybe 2019.
8           Q.   And as part of that divorce, did
9     your wife get 1.6 million dollars from you?
10          A.   Canadian, yes.
11          Q.   Did she receive that from you?
12          A.   Yes.
13          Q.   And what was the source of those
14    funds?
15          A.   I took a loan from Firefly to pay
16    that.
17          Q.   For 1.6 million?
18          A.   I don't believe so.  I believe it
19    was spread out amongst a few entities including
20    Rypl in that particular case, but yes, the total
21    was that amount.
22          Q.   And that was from Firefly?
23          A.   Yes.
24          Q.   And that was done at your request?
25          A.   Yes.

Chad Moldon                                           May 14, 2025

Page 106

1                        Q.   And the shareholders were helping

2         you out by loaning you 1.6 million to settle your

3         divorce?

4                        A.   Yes.

5                        Q.   And you anticipated paying that

6         money back because you anticipated receiving

7         dividends from Firefly?

8                        A.   That's accurate.

9                        Q.   I'm going to show you what's been

10        marked as D-7 and ask if you recognize that as an

11        email from you.

12                       A.   Yes, I've read it.  It's an email

13        I'm included on.

14                       EXHIBIT NO. D-7:  An email chain

15        including Chad Moldon, et al, from January 16th to

16        February 22nd, 2023.

17                       BY MR. MAUZY:

18                       Q.   Pardon me?

19                       A.   You said something about from me;

20        it's an email that I'm on.

21                       Q.   At the top of the first page of

22        D-7, doesn't it say, "From: Chad"?

23                       A.   Sorry, maybe I'm looking at the

24        wrong one.  This one's from Toine Rodenburg.

25                       Q.   It was a chain.  Why don't you

Chad Moldon                                    May 14, 2025

Page 107

1          hand it back to me?

2                         A.   Which part would you like back?

3          All of it?

4                         Q.   Yes.  It's a chain, but the start

5          of it is at the top there "From: Chad."

6                         A.   Yes, accurate, yes.

7                         Q.   And it goes to Ryan Maule, Paul

8          Eidsness, Toine Rodenburg, David van der Poel,

9          Richard Burry, Dave Erickson, Kevin Krieg?

10                        A.   Yes.

11                        Q.   You recognize those as the

12         shareholders of Firefly?

13                        A.   Yes.

14                        Q.   And there is a listing of loans?

15                        A.   You mean in the...

16                        Q.   In the body, yes.

17                        A.   In the body from Toine?

18                        Q.   Yes.

19                        A.   Yes.

20                        Q.   And these are loans to

21         shareholders?  That's the portion of the chain

22         email that's from Rodenburg, correct?

23                        A.   Yes.

24                        Q.   It discusses at the top of the

25         third page there the "1st form of loans...2 sub

Chad Moldon                                                    May 14, 2025

Page 108

1        forms:  a. Straight forward loans (with or without

2        loan agreements)."

3                    A.   Yes.

4                    Q.   So some of the loans didn't have

5        loan agreements?

6                    A.   I'm not sure, but based on the

7        email, yes.

8                    Q.   And the other form of loans would

9        be personal expenses made on Firefly or private

10       credit cards?

11                   A.   Yes.

12                   Q.   And the idea is to pay these loans

13       back?

14                   A.   Yes.

15                   Q.   And it says, "To start clearing up

16       these loans, we could issue this year an extra

17       dividend resolution..."

18                   MR. BOURGET:  Objection.  The question

19       is about an email from Toine.  It's hearsay.

20                   BY MR. MAUZY:

21                   Q.   Well, you were part of this chain,

22       correct, and you were copied on this email?

23                   A.   It does say that in the email, if

24       that's what you're asking.

25                   Q.   And you're familiar with this

Chad Moldon                                                    May 14, 2025

Page 109

```
 1        email?

 2                    A.   Yes.

 3                    Q.   So the thought was that there

 4        would be an extra dividend resolution, correct?

 5                    A.   It's what Toine is suggesting

 6        here.

 7                    Q.   He's suggesting that there would

 8        be, approximately, 3 million to be declared as a

 9        dividend payout.

10                    A.   That's what he suggests, yeah.

11                    Q.   And then he lists a number of

12        loans outstanding to the shareholders?

13                    A.   Yes.

14                    Q.   And he states that:

15                         "So from the declared 3,187,700

16                    USD a total amount of 1,173,594 USD

17                    would actually be paid out and

18                    2,014,106 USD in loans owed by SHs

19                    to FFL would be reduced to 0."

20                    A.   Yes, that's what it says.

21                    Q.   So the idea is that these advances

22        that were made over the years would be paid back by

23        dividends declared by the shareholders?

24                    A.   Yes.

25                    Q.   And also, this could be repeated
```

Chad Moldon                                    May 14, 2025

Page 110

1         in 2024 with an extra dividend resolution in order

2         to bring the loans down as soon as possible?

3                   A.   That is his suggestion.

4                   Q.   So all of these advances were

5         loans.  This is an email showing how these loans

6         were going to be paid back by the issuance of

7         dividends?

8                   A.   Yes, it appears so.

9                   Q.   And that was always the plan?

10                  A.   Yes.

11                  Q.   So Toine Rodenburg was able to

12        review and come up with the dollar amounts for the

13        loans for each shareholder, correct?

14                  A.   He has suggested a certain amount

15        of balances.  I'm not aware of how he determined

16        that amount.

17                  Q.   Okay.  He attaches an executed

18        resolution?

19                  A.   Um...

20                  Q.   The shareholders were asked to

21        vote on the resolution?

22                  A.   Um...where are you in the email?

23                  Q.   From Paul to you, February 22nd,

24        2023, at the top of the page, "Dividend

25        resolution."

Chad Moldon                                                    May 14, 2025

Page 111

1                  A.    Yes.

2                  Q.    It has "4/8 responses."

3                  A.    That's what it says, yeah.

4                  Q.    "...the cost to the company may

5        exceed the amount that triggers the need for a

6        super-majority, please vote yes..."

7                  A.    "...please vote yes or no."  Yes.

8                  Q.    And did you vote yes?

9                  A.    I did.

10                 Q.    So all of the shareholders agreed

11       to the payback of the loans by issuing a resolution

12       and issuing dividends in an amount to pay back the

13       loans?

14                 A.    Yes.  To be fair, it says four of

15       eight at that time.

16                 Q.    Yes, but you agreed?

17                 A.    Yes.

18                 Q.    And the resolution was, in fact,

19       passed?

20                 A.    Yep.

21                 Q.    By a majority of the shareholders?

22                 A.    I don't know if the numbers in

23       Toine's thing are the exact numbers, but yes.

24                 Q.    I'm going to hand you what's been

25       marked as Defendant's Exhibit 8; it's an email from

Page 112

1        Gregory Elias, August 10th, 2023, to Paul Eidsness,

2        and you are copied on that.

3                    A.   Yes.

4                    EXHIBIT NO. D-8:  An email from Gregory

5        Elias on August 10th, 2023, to Paul Eidsness and

6        Chad Moldon.

7                    BY MR. MAUZY:

8                    Q.   And you recognize this email

9        chain?

10                   A.   Yes.

11                   Q.   Greg Elias is at the first page,

12       and this is a chain going backwards.  He says he

13       made some minor corrections, right?

14                   A.   Yes.

15                   Q.   And Greg Elias is the director of

16       Firefly?

17                   A.   That's correct.

18                   Q.   And he is authorized to issue

19       resolutions on behalf of Firefly?

20                   A.   That's correct.

21                   Q.   There is an email on the last page

22       from Paul Eidsness, attorney-at-law, going to

23       Mr. Elias?

24                   A.   Yes.

25                   Q.   And Paul Eidsness is an attorney?

Chad Moldon                                    May 14, 2025

Page 113

1                    A.   Yes.

2                    Q.   And it says, "...please find a

3        draft Resolution of the Managing Director of

4        Firefly," correct?

5                    A.   Yes.

6                    Q.   "This resolution is for the

7        payment of the dividend in the amount of 8m dollars

8        to Firefly's shareholders."

9                    A.   That's what it says, yes.

10                    Q.   And it notes that the resolution

11        is tied to the prior resolution from December 15th,

12        2021, which acknowledged numerous outstanding loans

13        had been provided to shareholders over the course

14        of several years when Firefly was not yet

15        positioned to pay dividends, correct?

16                    A.   That's what it says, yes.

17                    Q.   So now they are positioned to pay

18        dividends; there's a draft resolution with the

19        intent to pay dividends?

20                    A.   Yes.

21                    Q.   And it goes on further to say that

22        many of these loans were "loosely referred to as

23        the 'dividend advance program.'"

24                    Do you agree with that?

25                    A.   That's what it says, yeah.

Chad Moldon                                        May 14, 2025

Page 114

1          Q.   Consists of "regular payments to

2     some of the shareholders."  True?

3          A.   Yes.

4          Q.   And was that consistent with your

5     knowledge at the time?

6          A.   Yes.

7          Q.   "Other shareholders were borrowing

8     money ad hoc during that same period to help them

9     with home purchases, marital dissolutions and the

10    like."

11         A.   That's accurate.

12         Q.   Is that correct?

13         A.   Yes.

14         Q.   And you were aware of that at the

15    time?

16         A.   Yes.

17         Q.   The 12/15/21 resolution

18    acknowledged the need to repay the loans?

19         A.   Yes.

20         Q.   "...in conjunction with the fact

21    that the company has begun to pay dividends, we are

22    making this present Resolution, with the

23    understanding of all the shareholders that those

24    shareholders with outstanding loans will use the

25    proceeds of this dividend to pay down their loan

Chad Moldon                                                    May 14, 2025

Page 115

1      balances."

2                    A.   Yes.

3                    Q.   "While the loan balances will not

4      be fully extinguished in most cases, this is a very

5      good start."

6                    A.   That's what it says, yeah.

7                    Q.   And this was the plan all along,

8      correct?

9                    A.   Yes.

10                   Q.   Advances were taken, and

11     ultimately, a resolution will be passed; dividends

12     would be issued; and the loans would be paid back?

13                   A.   Correct.

14                   Q.   I'm going to hand you Defendant's

15     Exhibit 9, the "Resolution of the Sole Managing

16     Director of Firefly."

17                   A.   Yes.

18                   EXHIBIT NO. D-9:  The Resolution of the

19     Sole Managing Director of Firefly Lane Corporation

20     N.V.

21                   BY MR. MAUZY:

22                   Q.   Do you recognize that resolution?

23                   A.   Yeah.

24                   Q.   Is this resolution -- and you've

25     reviewed it before, correct?

Chad Moldon                                    May 14, 2025

Page 116

1                    A.   Yes.

2                    Q.   You were familiar with it at the

3      time?

4                    A.   Yep.

5                    Q.   And this is the resolution signed

6      by Greg Elias, director of Firefly?

7                    A.   Yes.

8                    Q.   And this resolution recognizes

9      that shareholders have taken out interest-free

10     loans in paragraph 2?

11                   A.   Yes.

12                   Q.   And that the current balances of

13     the outstanding shareholder loans should be repaid

14     over a period of five years?

15                   A.   Yes, that's what it says.

16                   Q.   And does it says that.

17                        "...Pursuant to a discussion

18                        and vote of the Company's

19                        shareholders on August 9 and 10,

20                        2023, it was determined by majority

21                        vote that the Company should declare

22                        a dividend payable to its

23                        shareholders of record in the amount

24                        of Eight Million United States

25                        Dollars..."

Chad Moldon                                                    May 14, 2025

Page 117

1              A.   Yes.

2              Q.   It was resolved that the

3    "...dividend shall be declared and paid out of the

4    unreserved and unrestricted earned surplus of the

5    Company."

6              A.   I don't know what paragraph you're

7    on, but that sounds accurate.

8              Q.   The second of the last full

9    paragraph:

10                  "Resolved, that the appropriate

11                  officers of the Company are hereby

12                  authorized and directed to pay the

13                  amounts described in this Resolution

14                  and to take any and all such actions

15                  as may be necessary or appropriate

16                  to carry out the purpose and intent

17                  of this Resolution."

18             A.   Yes.

19             Q.   And this is to pay a dividend of 8

20   million dollars?

21             A.   Correct.

22             Q.   And prior to this resolution being

23   passed and issued, no dividends were issued by

24   Firefly?

25             A.   In what time period are you

Chad Moldon                                    May 14, 2025

Page 118

1          referring?

2                    Q.   In the time period 2011 to 2021?

3                    A.   I believe that's accurate, yes.

4                    Q.   This was the first time during

5          that time period that dividends were issued?

6                    A.   Yes.

7                    Q.   Furthermore, on that resolution,

8          do you see the section that the resolution resolved

9          to pay down the loans and,

10                        "To the extent any individual

11                        shareholder owes money to the

12                        Company for loans outstanding, that

13                        shareholder's proportion of the

14                        dividend will be used to pay down

15                        that shareholder's debt..."

16                   A.   Could you just point me to where

17         you're reading that in which paragraph?  I see it

18         now.

19                   Q.   It's the third from the bottom.

20                   A.   Yes, that's what it says.

21                   Q.   "...any individual shareholder

22         owes money to the Company for loans outstanding,

23         that shareholder's proportion of the dividend will

24         be used to pay down that shareholder's debt to the

25         company..."

Chad Moldon                                                    May 14, 2025

Page 119

1                       A.   Yes.

2                       Q.   And a journal entry will be made

3          in the company's books and records to reflect that,

4          correct?

5                       A.   That's right.

6                       Q.   And that was the plan all along,

7          correct?

8                       A.   Yes.

9                       Q.   The dividend would be issued to

10         pay back the advances, to pay back the loans,

11         correct?

12                      A.   Yes.

13                      Q.   I'm showing you an exhibit marked

14         D-10, a Purchase Agreement of the outstanding

15         shares of Bannister.

16                      A.   Yes.

17                      EXHIBIT NO. D-10:  A Purchase Agreement

18         of the outstanding shares of Bannister.

19                      BY MR. MAUZY:

20                      Q.   Do you recognize this agreement?

21                      A.   Yep.

22                      Q.   You've reviewed it before?

23                      A.   Yes.

24                      Q.   It's an authentic copy of the

25         Purchase Agreement?

Chad Moldon                                        May 14, 2025

Page 120

```
 1                   A.   I believe so.

 2                   Q.   Let's talk about the Purchase

 3       Agreement.  This Purchase Agreement values the

 4       shares of Bannister at 9,668,100?

 5                   A.   Yes.

 6                   Q.   And he owns 20.25 percent of

 7       Firefly, correct?

 8                   A.   Correct.

 9                   Q.   And if we did the math, that means

10       that Firefly would be worth a little under 50

11       million?

12                   A.   Yes.

13                   Q.   So the valuation that the

14       shareholders put on his interest was 9,668,100?

15                   A.   Yes, that's what it says.

16                   Q.   And that represented 20.25 percent

17       interest of Firefly Lane?

18                   A.   Yes.

19                   Q.   And in paragraph 1, Firefly will

20       apply the sale proceeds to an amount equal to the

21       outstanding debt owed by the seller.  That's

22       Bannister, right?

23                   A.   Mm-hmm.

24                   Q.   And Bannister was David Erickson's

25       company?
```

Chad Moldon                                      May 14, 2025

Page 121

1                    A.   Yes.

2                    Q.   So out of the 9,668,100, the

3        amount of the advances or loans was 5,579,570?

4                    A.   Yes, it appears so here.

5                    Q.   So that portion of the purchase

6        price would be used to pay off all of his loans,

7        correct?

8                    A.   I believe so, yes.

9                    Q.   And that was the intent, right?

10                   A.   Yes.

11                   Q.   So they paid him this sum of

12       9,688,100 and out of that, five and a half million,

13       approximately, would be applied to his loans, and

14       that would cancel his loans, wipe out his loans,

15       and reduce them to zero?

16                   A.   Yes.

17                   Q.   In addition, at paragraph 6, the

18       purchaser and Firefly would pay two and a half

19       million on closing by wire transfer to the Eidsness

20       law firm, and that was for the benefit of David

21       Erickson, correct?

22                   A.   Yes.

23                   Q.   So subtracting the five and a half

24       million, roughly, from the 9.6 million, roughly,

25       leaves about 4.1 million, right?

Chad Moldon                                    May 14, 2025

Page 122

1                      A.   Yes.

2                      Q.   So two and a half million was to

3      be sent to him through the Eidsness law firm trust

4      account to David Erickson, correct?

5                      A.   Yes.

6                      Q.   And in paragraph 7, it will pay

7      the balance -- the purchaser and Firefly shall pay

8      the balance of the purchase price to Bannister,

9      that is, David Erickson in equal monthly

10     installments of $89,583.35 over the 24 months

11     following the closing, correct?

12                     A.   Yes.

13                     Q.   And that would be evidenced by a

14     promissory note?

15                     A.   Yes.

16                     Q.   There are additional terms of this

17     that I'm not going into, but you recognize those as

18     well, right?

19                     A.   Yep.

20                     Q.   And 13, an excluded asset, 13(a),

21     was a "Dividend Receivable from Firefly in favour

22     of Bannister."

23                     A.   Yes.

24                     Q.   So he was -- Bannister was owed

25     money from Firefly in that amount?

Page 123

```
 1                    A.   Yes.

 2                    Q.   And that's deducted from the

 3         purchase price?

 4                    A.   I believe so, yes.

 5                    Q.   I'm going to hand you what's been

 6         marked as Defendant Exhibit 11, and see if you

 7         recognize that as an email from you to Dave

 8         Erickson, David van der Poel, Richard Burry, Toine

 9         Rodenburg, Subject: OMM sept, dated September 23rd,

10         2019.

11                    A.   Yes, I'm familiar with it.

12                    EXHIBIT NO. D-11:  An email from Chad

13         Moldon to Dave Erickson, et al, dated September

14         23rd, 2019, RE: OMM sept.

15                    BY MR. MAUZY:

16                    Q.   And this is a summary of the OMM,

17         which stands for "old man meeting"?

18                    A.   That is what it stands for.

19                    Q.   And who constitutes the "old man

20         meeting"?

21                    A.   Mr. Erickson, Mr. van der Poel,

22         Richard Burry, and Toine Rodenburg.

23                    Q.   And that was in September 2019?

24                    A.   Yes.

25                    Q.   You describe the state of the
```

Chad Moldon                                          May 14, 2025

Page 124

1        company.  You say the top-line revenue is between

2        500 and 600,000 a month.

3                    A.   Sorry, what thing are you

4        referring to?

5                    Q.   The second paragraph.

6                    A.   The number you just referred to is

7        the net profit against the budget?

8                    Q.   Yeah, "...between 550 and 600K in

9        profit against out [sic] 720K budget."

10                   A.   Yes.

11                   Q.   That's profit for Firefly?

12                   A.   It's profit from the platform of

13       CAM4.

14                   Q.   Yeah, which goes to Firefly?

15                   A.   Yes.

16                   Q.   Do you say that you're getting 2

17       million daily users, the third paragraph?

18                   A.   Yes, that's accurate.

19                   Q.   If you go to the third page of

20       that, there's a paragraph that starts, "On a

21       somewhat strange and random note..."

22                   A.   Yep.

23                   Q.   You say you talked to Katy, the

24       COO of Bongacams?

25                   A.   Yes.

Chad Moldon                                    May 14, 2025

Page 125

1           Q.   Is that a competitor?

2           A.   Yes.

3           Q.   They're in the same line of

4      business as Firefly -- or the same line of business

5      as CAM4?

6           A.   That's correct.

7           Q.   And she was a chief operating

8      officer?

9           A.   I believe so, yeah.

10          Q.   And she was inquiring about

11     whether there was a number that CAM4 would be

12     willing to sell?

13          A.   Yes.

14          Q.   And did you say that, "Eventually

15     after some more back and forth," you, "offered up a

16     number of 70-100MM depending on terms."?

17          A.   That's what I wrote, yeah.

18          Q.   Did you feel that CAM4 was fairly

19     valued between 70 and a hundred million at that

20     time?

21          A.   I would argue I was pushing

22     slightly for a number that might be slightly above

23     what I really thought, but it was a sales...

24          Q.   What number would you have said,

25     if you had to valuate?  Clearly here, you're saying

1          you would sell it for between 7 and 800 million.

2                          A.   Yeah.

3                          MR. BOURGET:  Objection, calls for

4          speculation.

5                          BY MR. MAUZY:

6                          Q.   What was your number for the

7          valuation of CAM4 in your mind at that time?

8                          A.   I would argue that it was probably

9          closer to 50 or 60, but I was attempting to get

10         more.

11                         Q.   All right.  I'm going to have you

12         look at Exhibit 12.

13                         EXHIBIT NO. D-12:  An email from Chad

14         Moldon to Dave Erickson, et al, dated February 3rd,

15         2020, RE: OMM Jan.

16                         BY MR. MAUZY:

17                         Q.   This is somewhat similar to my

18         previous question.  Do you see the page where

19         there's a photograph on it?

20                         A.   You'd like me to turn to the page

21         with the photograph on it?

22                         Q.   Yes.

23                         A.   Yes.

24                         Q.   Does that indicate that:

25                         "Previous to the meeting we had

Chad Moldon                                              May 14, 2025

                                                   Page 127

1                    discussed loosely with Stan the

2                    general area that we thought it

3                    would take to buy the business."?

4              A.   You're on the bottom paragraph?

5              Q.   Yes, right under the photograph.

6              A.   Yes.

7              Q.   You recognize this as an email

8       from you February 3rd, 2020, to Dave Erickson,

9       David van der Poel, Richard Burry, Toine Rodenburg?

10             A.   Yes.

11             Q.   Those were the major shareholders?

12             A.   That's correct.

13             Q.   And you indicate that you're

14      summarizing the meeting.  Who is Stan?

15             A.   He's...a guy who runs a company in

16      our space.

17             Q.   Somewhat of a competitor,

18      familiar --

19             A.   Yes.

20             Q.   The same line of business?

21             A.   Yes.

22             Q.   And you discussed with him what it

23      would take to buy the business?

24             A.   Yes.

25             Q.   And the number you gave him was 80

Chad Moldon                                                    May 14, 2025

                                                              Page 128

1            to a hundred million?

2                     A.   Yes.

3                     Q.   So you would have sold the company

4            for between 80 and a hundred million?

5                     A.   Yes.

6                     Q.   Again, you would have sold it for

7            that, and was that a fair valuation of CAM4's

8            business at that time?

9                     A.   The same answer as last time: It's

10           an elevated number.  This was a crypto guy.

11                    Q.   Stan was a crypto guy?

12                    A.    No, no, the guy that Stan had

13           shown some interest in, which is talked about in

14           the photograph above.

15                    Q.   Okay.  And your number that you

16           gave him was 80 to a hundred million?

17                    A.   Yes.

18                    Q.   And you think the actual value

19           that you would have given, in your opinion, was

20           closer to 60?

21                    A.   Yes.

22                    Q.   We looked at the Syntego Purchase

23           Agreement.

24                    A.   Yes.

25                    Q.   When that closed, all of David

Chad Moldon                                    May 14, 2025

Page 129

1          Erickson's loans were paid in full?

2                    MR. BOURGET:  Objection, personal

3          knowledge.

4                    THE WITNESS:  I believe that the loans

5          were paid.  I don't know to all levels.

6                    BY MR. MAUZY:

7                    Q.   That was the intent of the

8          purchase, was to pay all of his loans, correct?

9                    A.   That was the intent of our

10         purchase?

11                   Q.   Yes, the Syntego's purchase of

12         Bannister was to --

13                   A.   Clear up the loans of

14         Mr. Erickson.

15                   Q.   -- clear the loans?

16                   A.   Yes, that was one of the

17         objectives.

18                   Q.   And it cleared with a purchase

19         price awarded to Erickson; it cleared his loans?

20                   A.   Yes.

21                   Q.   Okay.  And going back to that

22         Exhibit 10 there, just to be clear on that, the

23         Purchase Agreement.

24                   A.   Let me get back to that.  Yes.

25                   Q.   And Exhibit 10, the payment of

Chad Moldon                                                    May 14, 2025

                                                    Page 130

1         purchase price.

2                      A.   Yeah, I see it.

3                      Q.   "Firefly shall apply sales

4         proceeds to pay an amount equal to the adjusted

5         outstanding debt owed by Seller and/or Related

6         Entities to Firefly and/or Related Entities."

7         Correct?

8                      A.   Yes.

9                      Q.   So "outstanding debt owed by

10        Seller" means David Erickson and Bannister, his

11        company, correct?

12                     A.   Yes.

13                     Q.   And that's equal to the

14        outstanding debt, correct?

15                     MR. BOURGET:   Objection, personal

16        knowledge.

17                     BY MR. MAUZY:

18                     Q.   Well, I asked from the document.

19                     A.   Yes, that's what the document

20        says.

21                     Q.   And the current unreconciled

22        amount of that outstanding debt was 5,579,570?

23                     A.   Yes, that's what it says.

24                     Q.   And that was deducted from the

25        purchase price?

Chad Moldon                                                    May 14, 2025

Page 131

1                      A.    Yes.

2                      Q.    And that paid off his loans?

3                      A.    Yes.

4                      MR. MAUZY:  I have no further

5      questions.

6                      THE WITNESS:  Okay.  Thank you.

7                      MR. BOURGET:  I'll have some redirect,

8      but let's go off the record and take a break.

9                      THE VIDEOGRAPHER:  This marks the end

10     of media two.  We're going off the record at 11:47

11     a.m.

12                      --- Recess at 11:47 a.m..

13                      --- Resuming at 12:03 p.m..

14                      THE VIDEOGRAPHER:  This marks the

15     beginning of media three, and we're back on the

16     record at 12:04 p.m.

17                      REDIRECT EXAMINATION BY MR. BOURGET:

18                      Q.    All right, Mr. Moldon.  I have

19     some more questions for you.

20                      Mr. Mauzy asked you at the beginning of

21     his cross-examination about whether you wanted to

22     come to the United States, whether you had fears of

23     coming to the United States.  Do you recall that?

24                      A.    Yes.

25                      Q.    In this case, have you ever been

Chad Moldon                                    May 14, 2025

                                                    Page 132

1          informed that you were a target of this

2          investigation?

3                    A.   No.

4                    Q.   Have you ever been informed that

5          you were suspected of committing any crime?

6                    A.   No.

7                    Q.   Now, Mr. Mauzy, moving towards the

8          decision-making process of Firefly and Rypl, you

9          testified that there was some decisions made

10         formally and some decisions made informally.  Is

11         that correct?

12                   A.   Yes.

13                   Q.   Putting the matter of

14         decision-making aside, was it common or appropriate

15         for shareholders to make decisions on behalf of the

16         company without notifying other shareholders?

17                   A.   No.

18                   Q.   That was not common?

19                   A.   I wouldn't say it was common for

20         them to make decisions without notifying other

21         shareholders.

22                   Q.   Would it have been appropriate?

23                   A.   I don't think so.

24                   Q.   Now, you also testified that in

25         your work with Firefly and Rypl, you often spoke

Chad Moldon                                    May 14, 2025

Page 133

1          with David van der Poel and Richard Burry.

2                    A.   Yes.

3                    Q.   And that you communicated with

4          them fairly often.  Is that correct?

5                    A.   Yes.

6                    Q.   Were either of those individuals

7          in charge of the day-to-day financials of either

8          Rypl or Firefly?

9                    A.   No.

10                   Q.   Your previous testimony was that

11         Dave Erickson was in charge of the day-to-day

12         financials for Rypl and Firefly?

13                   A.   Dave Erickson had oversight of the

14         financials, yes.

15                   Q.   And is that because Mr. Erickson

16         has a financial background?

17                   A.   Yes, his expertise is in more

18         financial matters than the other two partners

19         mentioned.

20                   Q.   At the time, were you aware that

21         Mr. Erickson was a certified public accountant?

22                   A.   I believed he was a CPA, yes.

23                   Q.   You believed that at the time?

24                   A.   Yes.

25                   Q.   Was that belief part of the reason

Chad Moldon                                                    May 14, 2025

Page 134

1          why you relied on Mr. Erickson to oversee the

2          day-to-day financials of Rypl and Firefly?

3                    A.   Yes.

4                    Q.   Now, to the terms -- within

5          Firefly, were there two tiers of partners or

6          shareholders?

7                    A.   In terms of ownership?

8                    Q.   Correct.

9                    A.   Yes.

10                   Q.   How would you describe those two

11         tiers?

12                   A.   Senior shareholders and the rest

13         of the people.

14                   Q.   And who were the senior

15         shareholders?

16                   A.   David Erickson, David van der

17         Poel, Toine Rodenburg, Richard Burry.

18                   Q.   And why were they the senior

19         shareholders, if you know?

20                   A.   They were a part of the original

21         group.

22                   Q.   Was it based, in part, on their

23         ownership shares of the company?

24                   A.   Yes, naturally.

25                   Q.   You were asked some questions

Chad Moldon                                    May 14, 2025

Page 135

1        about funds coming through Rypl and Rypl charging a
2        fee on the amounts that come through Rypl.  Do you
3        recall that?
4                    A.   Yes.
5                    Q.   And you were asked about whether
6        the money that Dave Erickson received, whether that
7        came from Rypl or Firefly.  Do you recall that?
8                    A.   Yes.
9                    Q.   Do you recall testifying that all
10       of the money came from Firefly?
11                   A.   Yes.
12                   Q.   And is that because it comes from
13       a Firefly bank account?
14                   A.   Yes.
15                   Q.   Does it get transferred to Rypl
16       before it gets, ultimately, passed on to Halstead
17       Bay Holdings?
18                   A.   I don't know the exact order, but
19       ultimately, yes.
20                   Q.   Now, because of the nature of
21       CAM4's business and the adult nature of the
22       website, was it common for Firefly to have
23       difficulties in finding banking partners?
24                   A.   There are some challenges that
25       exist with adult companies and banking, yes.

Chad Moldon                                                May 14, 2025

Page 136

1                    Q.   Could you explain some of those

2         challenges?

3                    A.   I just mean in general.  I don't

4         know the specifics, but banks have some

5         sensitivities around higher-risk areas.

6                    Q.   And what about CAM4 makes it a

7         high risk?

8                    A.   I think -- I'm not a risk-analysis

9         person from a banking perspective, but I think the

10        general idea is that adult has some risks

11        associated with it from a...

12                   Q.   Are you familiar with the term,

13        "chargeback"?

14                   A.   Yes, of course.

15                   Q.   What is a chargeback?

16                   A.   A chargeback is when a customer

17        disputes a transaction made on their credit card.

18                   Q.   And for an adult website that uses

19        credit card transactions, is there a high rate of

20        chargebacks as compared to other types of websites?

21                   A.   Yes, that's true.

22                   Q.   Do you know why that is?

23                   A.   I could speculate.

24                   Q.   No, we don't need you to

25        speculate.  Now, you were asked some questions

Chad Moldon                                    May 14, 2025

Page 137

1        about whether you coded certain entries -- whether

2        you coded payments either made to Mr. Erickson

3        directly or as a dividend advance or some other

4        payment.  Do you recall that?

5                    A.   Yes.

6                    Q.   And you don't go into the ledger

7        and make coding or accounting entries.  Is that

8        correct?

9                    A.   I do not.

10                   Q.   Is that something that Dave

11       Erickson did?

12                   A.   I believe from an oversight

13       perspective, Dave sees and corrects potential

14       ledger mistakes.  I don't know.

15                   MR. MAUZY:  Objection, foundation,

16       speculation, no personal knowledge.

17                   BY MR. BOURGET:

18                   Q.   As part of his work overseeing the

19       finances of the company, did that include

20       overseeing the coding and ledger entries in the

21       company's records?

22                   MR. MAUZY:  Objection, foundation,

23       speculation, no personal knowledge.

24                   MR. BOURGET:  You can answer.

25                   THE WITNESS:  I believe that that would

Chad Moldon                                    May 14, 2025

Page 138

1          be part of his oversight.

2                    BY MR. BOURGET:

3                    Q.   I want to ask some questions about

4          the advances on dividends that were issued after

5          2021.  Do you recall testifying about that?

6                    A.   After 2021?  Yes.

7                    Q.   And you also testified on cross

8          that there had been no dividends issued before 2021

9          through -- from 2011 through '21?

10                   A.   Yes, I believe that's the case.

11                   Q.   During that time, was Firefly

12         profitable?

13                   A.   In that timeframe?

14                   Q.   Yes.

15                   A.   Yes.

16                   Q.   And was there anything that would

17         have prevented the shareholders from declaring a

18         dividend during that time?

19                   A.   I can't --

20                   MR. MAUZY:  Objection, calling for

21         speculation, no personal knowledge, lay opinion, no

22         expert opinion.

23                   MR. BOURGET:  I'll rephrase.

24                   BY MR. BOURGET:

25                   Q.   Are you aware of anything that

Chad Moldon                                    May 14, 2025

Page 139

1          prevented you and your fellow shareholders from

2          declaring a dividend between 2011 and 2021?

3                    MR. MAUZY:  Same objections.

4                    THE WITNESS:  I'm not aware.

5                    BY MR. BOURGET:

6                    Q.   Now, you testified on direct that

7          a one point, you became aware of an IRS

8          investigation into David Erickson.  Do you recall

9          that?

10                    A.   Yes.

11                    Q.   Do you recall if the dividends

12          that were issued, were those declared before or

13          after you learned of the investigation into David

14          Erickson?

15                    A.   I don't recall, specifically.  I

16          believe the dividend was issued in 2022.  Is that

17          accurate?  I don't recall.

18                    Q.   Do you recall, approximately, when

19          you learned of the investigation into Dave

20          Erickson?

21                    MR. MAUZY:  Objection, asked and

22          answered.

23                    THE WITNESS:  Yeah, it was shortly

24          after the visit from the IRS in Minneapolis.

25                    BY MR. BOURGET:

Chad Moldon                                          May 14, 2025

Page 140

1              Q.   All right.  I'm going to pull up
2       what's been marked as Exhibit D-2.  I believe this
3       exhibit was shown to you on both direct and cross.
4              A.   Yeah, it was.
5              Q.   Now, I want to ask a little bit
6       more about these dividend advances.  As you
7       testified, other shareholders, including yourself,
8       received dividend advances, correct?
9              A.   Yes.
10             Q.   Other than Mr. Erickson, are there
11      any other of the shareholders that are American
12      citizens, if you know?
13             A.   I believe Paul Eidsness is an
14      American citizen and a small shareholder.
15             Q.   Do you have any knowledge, other
16      than your own, of how the shareholders reported
17      their receipt of advance dividends to the tax
18      authorities in whatever jurisdiction they live in?
19             MR. MAUZY:  Objection, calling for
20      speculation, lack of personal knowledge.
21             THE WITNESS:  I do not know how they
22      each show their business.
23             BY MR. BOURGET:
24             Q.   Do you recall testifying on
25      cross-examination about having personal expenses on

 1          a company credit card that you had?

 2                    A.   Yes.

 3                    Q.   Was that a Firefly credit card or

 4          a Rypl credit card?

 5                    A.   It's a Rypl credit card.

 6                    Q.   Is that a card that's issued by

 7          the company?

 8                    A.   Yes.

 9                    Q.   Do other people in the company

10          have access to the statements?

11                    A.   Yes.

12                    Q.   And when you charge personal

13          expenses, are those expenses always added to your

14          shareholder account, or did you ever directly repay

15          them?

16                    MR. MAUZY:  Objection, compound.

17                    THE WITNESS:  Generally, if there was a

18          mistake in terms of the personal use of a card, it

19          would be reconciled and then put as part of the

20          ledger.

21                    BY MR. BOURGET:

22                    Q.   And when you say it's "part of the

23          ledger," you mean added on to your shareholder loan

24          balance?

25                    A.   Yes.

1              Q.   Now, as dividend advances were

2    being issued, did those advances ever result in

3    money in your personal bank account?

4              A.   In what time period?

5              Q.   Let me rephrase.  When there was

6    an advance dividend that was issued, either the

7    monthly dividends or another dividend advance, did

8    those funds get transferred to you?

9              A.   No.

10             Q.   Did they -- was it simply an

11   accounting entry?

12             A.   It was -- yes, a ledger was

13   created for the funds that Blue Waters, in this

14   particular case, would be paid at a certain time.

15             Q.   So did you not receive any funds

16   until after the dividend was formally declared?

17             A.   That's accurate.

18             Q.   I want to direct your attention to

19   what's been marked as Exhibit D-7, and I want to

20   just bring your attention to this.  This is the

21   email from Toine Rodenburg that you're included on

22   from February 19th, 2023.  Do you see that?

23             A.   Yes.

24             Q.   I'm going to go to the second page

25   of that email.  Let me ask you this first: You were

Chad Moldon                                           May 14, 2025

                                                    Page 143

1       asked several questions about that email.  The

2       representations that are made here by

3       Mr. Rodenburg, are you -- did you independently

4       verify what Mr. Rodenburg is representing here?

5                    A.   The only part I would have

6       verified was the one as it relates to my own, to

7       Blue Waters Trust.

8                    Q.   Okay.  Did you have any knowledge,

9       other than what Mr. Rodenburg wrote here, about the

10      balances or the payments given to other

11      shareholders?

12                   A.   I don't know, as it relates to

13      other shareholders, what the state of their ledger

14      is.

15                   Q.   Okay.  I want to just draw your

16      attention to this portion of the email where

17      Mr. Rodenburg lists out loans owed to FFL by

18      shareholders.  Can you just read the amounts that

19      are listed here?

20                   A.   The amounts only?

21                   Q.   Well, starting with 10Q21 and each

22      entity and their amounts.

23                   A.   Yes.

24                        "10Q21 USD 645,502

25                        Waterlily USD 303,401

Chad Moldon                                    May 14, 2025

Page 144

1                    Bannister USD 6,693,977

2                    Smartvu USD 0

3                    Blue Waters USD 338,363

4                    BTFLYGRL, USD 0

5                    Firewall USD 209,381

6                    Tango USD 371,048."

7              Q.   And do you recall testifying that

8        it was your understanding that Bannister was an

9        entity that Dave Erickson controlled?

10             A.   Sorry, could you re-ask that

11       question?

12             Q.   Do you recall testifying that

13       Bannister was an entity that you understood Dave

14       Erickson to control?

15             A.   That's accurate, yes.

16             Q.   So based on this list here, does

17       it appear correct that Bannister owed significantly

18       more back to Firefly than the other entities?

19             A.   Yes, based on Rodenburg's

20       accounting, that's what this shows.

21             Q.   Now, do you know if this amount

22       includes all of the email requests that Dave

23       Erickson made to Amanda Zimmerman and Tony Severin?

24             A.   I don't know how he came about

25       this number.

Chad Moldon                                          May 14, 2025

Page 145

1           Q.   Now, in 2021, when there began to

2      be discussions among you and the other shareholders

3      about declaring dividends, were any of those

4      discussions motivated by the fact that you learned

5      that Dave Erickson was under criminal

6      investigations?

7               MR. MAUZY:   Objection, speculation,

8      403, 404, hearsay.

9               THE WITNESS:   I don't recall whether

10     that's the motivation or not.

11               BY MR. BOURGET:

12           Q.   Now, in this email from Toine

13     Rodenburg, Mr. Rodenburg writes:

14               "This is a way more complex

15               situation to deal with as it also

16               involves DE's peculiar situation."

17           A.   Yes.

18           Q.   What do you understand that to

19     mean?

20           A.   I assume he's referring to the IRS

21     investigation on Mr. Erickson.

22           Q.   Do you agree that the situation

23     was made more complicated by the investigation into

24     Dave Erickson?

25           A.   Yes.

Chad Moldon                                                    May 14, 2025

Page 146

1              Q.   And did those complexities

2        motivate the partners to declare --

3                   MR. MAUZY:  Objection, calling for

4        speculation, lack of personal knowledge.

5                   MR. BOURGET:  You can object, but

6        please let me finish my question.

7                   BY MR. BOURGET:

8              Q.   Was the fact that Dave Erickson

9        was under criminal investigation, did that motivate

10        the shareholders' desire to declare dividends?

11                   MR. MAUZY:  Objection, speculation,

12        lack of personal knowledge.

13                   THE WITNESS:  I can't speak --

14                   MR. MAUZY:  Calling for hearsay.

15                   MR. BOURGET:  Please answer.

16                   THE WITNESS:  I can't speak to the

17        motivations of other shareholders.  The complexity

18        of his situation, I'm sure, was on their minds.

19                   BY MR. BOURGET:

20              Q.   Did the fact that Dave Erickson

21        was under criminal investigation motivate your

22        desire to have dividends declared?

23              A.   I don't particularly -- my voting

24        opinion is not relevant nor did I have a particular

25        motivation to declare a dividend.

Chad Moldon                                      May 14, 2025

                                            Page 147

1              Q.   That wasn't exactly the question I

2        asked.

3              A.   Go ahead.

4              Q.   The question I asked was, Did the

5        fact that Mr. Erickson was under criminal

6        investigation, did that at all affect your desire

7        for the company to declare dividends?

8              A.   Not specifically.

9              Q.   I want to show you what's been

10       marked as Exhibit D-8 -- sorry, I want to show you

11       what's been marked as Exhibit D-9.

12              Do you recall seeing this dividend

13       resolution?

14              A.   Yes.

15              Q.   Now, it was Greg Elias, typically,

16       who signed these declarations.  Is that correct?

17              A.   Yes.

18              Q.   Was Greg Elias authorized, or did

19       he ever issue any kind of declaration on behalf of

20       Firefly without the approval of the Firefly

21       shareholders?

22              A.   I don't know over the course of

23       time, but during this particular case, he was of

24       course...it did come from the other shareholders in

25       this case.

Chad Moldon                                              May 14, 2025

Page 148

```
 1                    Q.   Are you aware of any time where
 2         Greg Elias made any sort of decision on behalf of
 3         the company without agreement from a majority of
 4         the shareholders?
 5                    A.   I'm not specifically aware of an
 6         occasion.
 7                    Q.   All right.   I'm showing you now
 8         what's been marked as Exhibit D-8.   This is the
 9         email you were shown involving Greg Elias and Paul
10         Eidsness.   Do you recall testifying about this
11         document?
12                    A.   Yes.
13                    Q.   This is an email here at the
14         bottom from Paul Eidsness, Thursday, August 10,
15         2023; again, we're at the bottom of the page 2 of
16         Exhibit D-8.   I'm turning now to page 3 which
17         contains the body of the email.
18                    Just generally, who did -- you
19         mentioned that Paul Eidsness was counsel for the
20         company.
21                    A.   Yes.
22                    Q.   Which company did he represent?
23                    A.   Paul has taken a role of
24         representing, I think, different companies at
25         different moments as general legal counsel.   In
```

Chad Moldon                                          May 14, 2025

Page 149

```
 1          this particular case or at least as it relates to
 2          shareholders, I think he's legal counsel for
 3          Firefly.
 4                      Q.   And Mr. Eidsness is also a
 5          shareholder in Firefly?
 6                      A.   He's a minority shareholder, yes.
 7                      Q.   Are you aware that Paul Eidsness
 8          had also represented Mr. Erickson in his individual
 9          capacity previously?
10                      MR. MAUZY:  Objection, speculation,
11          calling for personal knowledge, beyond his personal
12          knowledge.
13                      THE WITNESS:  I am aware, yes.
14                      MR. MAUZY:  Relevance.
15                      BY MR. BOURGET:
16                      Q.   So I want to turn now to Exhibit
17          D-10 which is Syntego Purchase Agreement.  Do you
18          recall discussing this?
19                      A.   Yes.
20                      Q.   Do you know who wrote this
21          document?
22                      A.   Not specifically.
23                      Q.   Do you know who on behalf of
24          Firefly negotiated the terms of this agreement?
25                      MR. MAUZY:  Asked and answered, said he
```

Chad Moldon                                              May 14, 2025

Page 150

```
 1        didn't know.

 2                        THE WITNESS:  I will answer.

 3                        BY MR. BOURGET:

 4                        Q.   Do you know who negotiated this

 5        agreement on behalf of Firefly?

 6                        A.   Yes.

 7                        Q.   Who was that?

 8                        A.   The negotiation was between the

 9        shareholders and Mr. Erickson through Paul

10        Eidsness, in some cases.

11                        Q.   Were you ever directly involved in

12        -- directly present for any of those negotiations?

13                        A.   Yes.

14                        Q.   Do you recall what was discussed?

15                        A.   Yes, a myriad of things were

16        discussed.

17                        Q.   So this agreement, looking at the

18        line that says -- I want to make sure it's zoomed

19        in well.

20                        A.   I can read it.

21                        Q.   Do you see the line where it says

22        "Closing Date"?

23                        A.   Yes.

24                        Q.   Where it says:

25                             "The later of March 28, 2024
```

Chad Moldon                                                    May 14, 2025

                                                        Page 151

1                    and the date on which the Condition

2                    Precedent is met are waived by each

3                    of Counsel to Seller and

4                    Purchaser/Firefly."

5                         Did I read that correctly?

6              A.   Yes.

7              Q.   At some point, do you recall

8         learning about -- do you recall learning that David

9         Erickson was indicted in this case?

10                   MR. MAUZY:  Objection, relevance.

11                   BY MR. BOURGET:

12             Q.   Do you remember when you first

13        learned that he was indicted?

14             A.   Yes.

15             Q.   Was it before March 28th, 2024?

16             A.   Yes.

17             Q.   Was it before negotiations began

18        on this Purchase Agreement?

19                   MR. MAUZY:  Objection, lack of personal

20        knowledge, speculation.

21                   THE WITNESS:  I don't specifically

22        recall if it's before.

23                   BY MR. BOURGET:

24             Q.   Now, again, on that line that

25        says, "Closing Date," it references a Condition

Chad Moldon                                                    May 14, 2025

                                                          Page 152

1          Precedent.  Do you know what that's referring to?

2                         A.    No.

3                         Q.   At this point, why were the

4          shareholders wanting to buyout Dave Erickson?

5                         A.   I can't speak for --

6                         MR. MAUZY:  Calling for speculation; he

7          can testify to his personal knowledge, his personal

8          opinion, not other shareholders.

9                         MR. BOURGET:  Let me rephrase that

10         question.

11                        BY MR. BOURGET:

12                        Q.   What's your understanding of why

13         at this point, you know, as a shareholder, why you

14         were motivated to buyout Dave Erickson?

15                        MR. MAUZY:  Calling for speculation.

16                        THE WITNESS:  I think there's a general

17         sense that one of the partners that was under -- or

18         indicted is problematic for the business as a

19         whole, and we would prefer not to have that.

20                        BY MR. BOURGET:

21                        Q.   You were asked about several of

22         the figures in this agreement including this item 1

23         here.  You were asked about the unreconciled amount

24         of loans owed by Dave Erickson and his company.

25                        Do you have any personal knowledge of

Chad Moldon                                                                May 14, 2025

Page 153

1          the actual amounts that he owed at this time?

2                        A.   Loosely, yes.

3                        Q.   And did you -- the specific number

4          on here?  Are you relying on this number because

5          it's what's in the agreement?

6                        A.   Yes.

7                        Q.   At the beginning of

8          cross-examination, you were asked about your prior

9          meetings with the U.S. government.  Do you recall

10         that?

11                       A.   Yes.

12                       Q.   Do you recall that you've met

13         previously with myself and Ms. Scott and Mr. Kiser?

14                       A.   Yes.

15                       Q.   During those conversations, at any

16         point, did we tell you how to answer any question?

17                       A.   No.

18                       Q.   Do you recall me telling you what

19         the number one rule of testifying is?

20                       A.   I don't recall specifically

21         wording it that way, but yes.

22                       Q.   And what was that rule?

23                       A.   Tell the truth from your

24         perspective.

25                       Q.   Okay.  Thank you.

                                                        Page 154

1                    MR. BOURGET:  Nothing further.

2                    MR. MAUZY:  I just have a few questions

3          for you, Mr. Moldon.

4                    RECROSS-EXAMINATION BY MR. MAUZY:

5                    Q.   You were present with the

6          government agents and attorneys on November 14th,

7          2024, and you gave a memorandum, and they prepared

8          a memorandum of interview, right?

9                    A.   Present?  Yes.

10                   Q.   You were interviewed.  I'm showing

11         you the memo.  I've shown you this before.

12                   A.   Yes.

13                   Q.   That was your interview, and you

14         were shown that when you met with the government

15         agents and lawyers last week, correct?

16                   A.   Yes.

17                   Q.   And when you were interviewed in

18         May of 2024 -- no, I'm sorry, November of 2024, you

19         were asked questions concerning the agreement

20         relating to the 8 million dollar dividend, correct?

21                   A.   Yes.

22                   Q.   You were asked who was involved in

23         the negotiations, and in fact, Charlotte Janssen,

24         representing Rypl, drafted the agreement along with

25         Paul Eidsness, correct?

                                                    Page 155

1               MR. BOURGET:  Objection, lack of

2       personal knowledge, asked and answered.

3               BY MR. MAUZY:

4               Q.   I'm going to show you; look at

5       paragraph 48.

6               A.   It says in 48 that "Janssen

7       stated," which is what the interviewer wrote this

8       down; I assume that's accurate.

9               Q.   All right.  So in the interview

10      that took place in November 2024 relating to this

11      buyout of Erickson, you said you thought Eidsness

12      drafted the Purchase Agreement, and Charlotte

13      Janssen was present at the time of the interview,

14      correct?

15              A.   Yes.

16              Q.   And she said to the government and

17      its agents that she and Eidsness drafted that

18      Purchase Agreement, the Syntego buyout, correct?

19              A.   Based on what it says here, yes.

20              Q.   Well, you were there.

21              A.   You're asking me to recall details

22      of a situation that I'm not entirely sure I

23      remember it, but yes, I think it's accurate.

24              Q.   Well, you reviewed this and

25      determined that everything in it was accurate?

Chad Moldon                                              May 14, 2025

Page 156

1              A.   Yes.

2              Q.   All right.  So Charlotte Janssen

3    in your interview said that she and Paul Eidsness

4    drafted the Syntego Purchase Agreement --

5              MR. BOURGET:  Objection, hearsay.

6              THE WITNESS:  Yes.

7              BY MR. MAUZY:

8              Q.   So there are really two groups of

9    shareholders: the minority shareholders, correct?

10             A.   Yes.

11             Q.   And that included you?

12             A.   Yep.

13             Q.   And a couple others, right?

14             A.   That's accurate.

15             Q.   And you received accruals?

16             A.   That's accurate.

17             Q.   So that was money that you would

18   receive?

19             A.   Yes.

20             Q.   That you would be paid?

21             A.   Yes.

22             Q.   Would be paid in the future?

23             A.   Yes.

24             Q.   The idea from dividends that would

25   be issued in the future?

1                    A.   Yes.

2                    Q.   But the majority shareholders, van

3        der Poel, Erickson, Burry, and Rodenburg got

4        advances?

5                    A.   Yes.

6                    Q.   And advances were funds?

7                    A.   Yes.

8                    Q.   They received money?

9                    A.   That's accurate.

10                   Q.   And the money came from Firefly's

11       money?

12                   A.   Again, I can't speak to exactly

13       which bank accounts, but the concept is correct.

14                   Q.   It was certainly not Rypl's money?

15                   A.   No.

16                   Q.   It was Firefly's money?

17                   A.   Yes.

18                   Q.   And it was not a dividend?

19                   A.   No.

20                   Q.   It was an advance?

21                   A.   Yes.

22                   Q.   And that differs from the minority

23       shareholders who got accruals which would be paid

24       in the future?

25                   A.   Yes.

Chad Moldon                                                    May 14, 2025

Page 158

1                        Q.   So you were asked about

2           shareholders and communications, but it's true that

3           Mr. Erickson as a shareholder could have a

4           conversation with Mr. van der Poel as a

5           shareholder, and they could arrive at an agreement,

6           correct?

7                        A.   Yes.

8                        Q.   And they could arrive at an

9           agreement as to funds being advanced to them?

10                       MR. BOURGET:  Objection, speculation.

11                       THE WITNESS:  I assume they could

12          arrive at any agreement.

13                       BY MR. MAUZY:

14                       Q.   Any agreement at all?

15                       MR. BOURGET:  Objection, speculation.

16                       BY MR. MAUZY:

17                       Q.   Well, they're majority

18          shareholders, and they could arrive at any

19          agreement as majority shareholders relating to

20          Firefly?

21                       MR. BOURGET:  Same objection.

22                       THE WITNESS:  I assume so.

23                       BY MR. MAUZY:

24                       Q.   So if one shareholder talked to

25          another shareholder and that constituted a majority

Chad Moldon                                                    May 14, 2025

                                                    Page 159

1          and it related to interest-free loans, then it

2          would be authorized?

3                    MR. BOURGET:  Objection, speculation.

4                    THE WITNESS:  I think some circumstance

5          might be relevant depending on the scale, but yes.

6                    BY MR. MAUZY:

7                    Q.   And you wouldn't know about them?

8                    A.   I wouldn't know what I don't know

9          about --

10                   Q.   Right.  And when you're asked

11         whether or not it was authorized, it could be

12         authorized if the shareholders communicated among

13         themselves, correct?

14                   A.   It could be.

15                   MR. BOURGET:  Objection, speculation.

16                   BY MR. MAUZY:

17                   Q.   Shareholders -- a majority of the

18         shareholders can authorize funds going to other

19         shareholders?

20                   MR. BOURGET:  Same objection, personal

21         knowledge.

22                   THE WITNESS:  Yes.

23                   MR. MAUZY:  Can I have a moment?

24                   (Conference between counsel)

25                   MR. MAUZY:  No other questions.

Chad Moldon                                    May 14, 2025

Page 160

1                    THE WITNESS:  Thank you.

2                    MR. BOURGET:  Based on that, I want to

3        note just to preserve the objection for the record

4        that the parties had agreed to direct examination,

5        cross-examination, and a redirect.  There was

6        nothing in our agreement about recross.  I

7        understand that that's something that can be

8        briefed later.  I just wanted to note that for the

9        record.

10                    We can go off.

11                    MR. MAUZY:  I'm done.

12                    THE VIDEOGRAPHER:  I'm just wondering,

13       are we ending this witness, or are we just going

14       off the record?

15                    MR. BOURGET:  No, this witness is

16       completed.

17                    THE VIDEOGRAPHER:  Okay.  We are off

18       the record at 12:39 p.m., and this concludes

19       today's testimony given by Chad Moldon.  The total

20       number of media used was three and will be retained

21       by Veritext Legal Solutions.

22                    Thank you.

23   --- Whereupon proceedings adjourned at 12:39 p.m.

24

25

1                    REPORTER'S CERTIFICATE

2

3              I, KIMBERLY A. BARKER, CSR, Certified

4         Shorthand Reporter, certify;

5              That the foregoing proceedings were

6         taken before me at the time and place therein set

7         forth, at which time the witness was put under oath

8         by me;

9              That the testimony of the witness and

10        all objections made at the time of the examination

11        were recorded stenographically by me and were

12        thereafter transcribed at my direction;

13             That the foregoing is a true and

14        correct transcript of my shorthand notes so taken.

15

16

17

18             Dated this 28th day of May, 2025.

19

20

21

22             PER: KIMBERLY BARKER, CSR

23

24

25

Chad Moldon                                    May 14, 2025

Page 162

1                    CERTIFICATE OF REPORTER

2          CANADA                    )

3          PROVINCE OF ONTARIO    )

4

5          I, Kimberly A. Barker, the officer before whom the

6          foregoing deposition was taken, do hereby certify

7          that the witness whose testimony appears in the

8          foregoing deposition was duly sworn by me; that the

9          testimony of said witness was taken by me in

10         shorthand, using Computer Aided Realtime, to the

11         best of my ability and thereafter reduced to

12         written format; that I am neither counsel for,

13         related to, nor employed by any of the parties to

14         the action in which the deposition was taken, and

15         further that I am not related or any employee of

16         any attorney or counsel employed by the parties

17         thereto, nor financially or otherwise interested in

18         the outcome of the action.

19

20

21         Kimberly A. Barker, CSR

22

23         Commissioner for taking

24         Oaths in the Province of Ontario

25

**[0 - 2021]**

| **0** |
|---|
| **0** 109:19 144:2 144:4 |
| **00007** 7:17 |
| **01/01/2011** 98:1 |
| **0:24** 7:17 |

| **1** |
|---|
| **1** 5:21 47:9 89:9,10 120:19 152:22 |
| **1,000** 71:8 |
| **1,173,594** 109:16 |
| **1.6** 105:9,17 106:2 |
| **10** 6:17 63:9 68:8,15,24 69:2,20,22 70:1,9 71:7,14 116:19 119:14 119:17 129:22 129:25 148:14 149:17 |
| **10,000** 71:6 |
| **100** 24:2 |
| **1001** 5:10 26:13,14 |
| **10:12** 55:3,6 |
| **10q21** 78:18 143:21,24 |
| **10th** 6:5,12 103:22 112:1,5 |
| **11** 4:7 6:19 123:6,12 |
| **12** 6:22 126:12 126:13 |

**12/15/21** 114:17
**120** 2:22 91:10
**120,000** 36:21 37:5,6
**120k** 36:10
**125** 35:24
**12:03** 131:13
**12:04** 131:16
**12:39** 160:18 160:23
**13** 122:20,20
**131** 4:9
**13th** 58:2
**14** 1:14,22 7:3 58:18
**14202** 2:22
**14th** 23:6 58:7 58:14 69:12 154:6
**15** 47:5
**150** 2:6
**150,000** 39:11 40:13 95:18 96:6 97:4,8
**150k** 41:7
**154** 4:10
**15th** 5:17 39:18 40:8,14,18 42:20 113:11
**16** 19:10
**16th** 5:17,22 6:9 39:18 40:3 89:11,16 106:15
**17** 18:23 19:5 36:13

**17th** 35:9
**18** 36:15
**19** 18:17
**19th** 18:12 21:8 142:22
**1g4** 2:17
**1st** 47:18 107:25

| **2** |
|---|
| **2** 5:6,13 17:20 17:21 37:18,19 90:22 107:25 116:10 124:16 140:2 148:15 |
| **2,014,106** 109:18 |
| **20** 6:3 25:8 63:12,12,13 100:11 |
| **20.25** 120:6,16 |
| **20.25.** 25:8 |
| **20002** 2:6 |
| **2011** 85:3 86:12,21 87:23 88:4 90:17 92:3,19 98:24 118:2 138:9 139:2 |
| **2012** 13:19 15:21 18:12,17 21:8 30:9 64:14,20 76:11 81:23 86:8 |
| **2013** 6:3 14:12 16:3 19:10,25 30:11,15,25 32:8,12 33:9 |

**34:15 39:9 44:23 49:21 63:7 82:18,21 83:1 100:11,19**
**2013's** 100:22
**2014** 5:23 6:1 70:19 89:12,16 97:16 98:12,24
**2015** 5:18 39:19 40:3,8 40:14
**2017** 5:11,14 18:13 33:18 34:2 36:1 37:20,25
**2018** 105:7
**2019** 6:21 14:12 16:3 20:1 21:9 30:11,15,25 32:8,13 33:9 34:15 39:10 44:23 45:3,7 49:21 64:14,20 85:3 92:19 105:7 123:10 123:14,23
**202** 2:7,7
**2020** 1:21 6:5,6 6:24 103:22,23 104:23 126:15 127:8
**2020-77** 7:19
**2021** 47:5 63:11,15 80:17 87:23 88:4 90:17 92:4 113:12 118:2

[2021 - 9]

| 138:5,6,8 | **3** | **5** | **7** |
|---|---|---|---|
| 139:2 145:1 | **3**  5:8,16 22:13 | **5**  5:19 6:2 41:7 | **7**  6:8 106:10,14 |
| **2022**  5:20 23:6 | 22:16 39:14,17 | 41:10 42:21 | 106:22 122:6 |
| 24:1 46:10,19 | 43:22 94:18 | 46:8,9 47:1 | 126:1 142:19 |
| 47:9,11,18 | 109:8 148:16 | 63:18 100:9,10 | **70**  125:19 |
| 80:17 85:6,11 | **3,187,700** | **5,000,000** | **70-100mm** |
| 85:14,21 86:2 | 109:15 | 47:10 | 125:16 |
| 86:9,12,21 | **30,000**  40:18 | **5,579,570** | **716**  2:23 |
| 97:4 102:22 | 41:9 | 121:3 130:22 | **718-2056**  2:7 |
| 104:20,24 | **303,401**  143:25 | **50**  59:10 | **720k**  124:9 |
| 139:16 | **307-2182**  2:7 | 120:10 126:9 | **77**  1:20 |
| **2023**  6:10,12 | **30th**  34:2 36:1 | **500**  18:19 19:3 | **7th**  6:5 103:22 |
| 106:16 110:24 | **33446**  161:21 | 124:2 | **8** |
| 112:1,5 116:20 | 162:20 | **500,000**  30:7 | |
| 142:22 148:15 | **338,363**  144:3 | **501**  19:2,3 | **8**  5:13 6:11 |
| **2024**  58:7,14 | **35**  59:10 | **55**  4:8 | 37:20 42:5 |
| 58:18 69:12 | **371,048**  144:6 | **550**  124:8 | 43:20 44:9 |
| 110:1 150:25 | **375**  35:24 | **55402**  2:13 | 86:5 95:9 |
| 151:15 154:7 | **375,000**  35:11 | **5th**  12:4 | 111:25 112:4 |
| 154:18,18 | 36:21 91:10 | **6** | 117:19 147:10 |
| 155:10 | **375k**  36:11 | | 148:8,16 |
| **2025**  1:14,22 | **39**  68:21,23 | **6**  5:11 6:4 | 154:20 |
| 7:4 12:4 58:2 | 70:19,20 | 33:15,17,18 | **80**  127:25 |
| 161:18 | **3rd**  6:24 | 103:19,21 | 128:4,16 |
| **209,381**  144:5 | 126:14 127:8 | 121:17 | **800**  126:1 |
| **21**  138:9 | **4** | **6,693,977** | **800,000**  81:5 |
| **22nd**  6:10 | | 144:1 | **849-1333**  2:23 |
| 106:16 110:23 | **4**  5:24 97:13,14 | **60**  5:11 33:16 | **89**  2:17 |
| **23rd**  6:21 | **4.1**  121:25 | 33:18 126:9 | **89,583.35** |
| 123:9,14 | **4/8**  111:2 | 128:20 | 122:10 |
| **24**  122:10 | **403**  145:8 | **600,000**  124:2 | **8m**  113:7 |
| **24-7**  1:3 | **404**  145:8 | **600k**  124:8 | **8th**  37:25 |
| **260**  2:12 | **416**  2:18 | **612**  2:13 | **9** |
| **28**  5:25 69:6 | **42**  2:22 | **645,502**  143:24 | |
| 97:15 150:25 | **48**  155:5,6 | **650**  2:12 | **9**  6:14 115:15 |
| **28th**  151:15 | | **688-1154**  2:13 | 115:18 116:19 |
| 161:18 | | **6a**  6:6 103:19 | 147:11 |
| | | 103:23 | |

**9,668,100**
   120:4,14 121:2
**9,688,100**
   121:12
**9.6**  121:24
**900,000**  81:5
   86:5
**929-1103**  2:18
**98**  15:14
**99**  15:14

**a**

**a.m.**  1:22 7:1,3
   55:1,2,6
   131:11
**a.m..**  55:3
   131:12
**ability**  162:11
**able**  57:15 89:4
   110:11
**above**  1:18
   43:15 125:22
   128:14
**access**  80:20
   141:10
**accompanied**
   8:13
**accordance**
   10:24
**accorded**  10:21
**account**  28:7
   40:18 80:20
   122:4 135:13
   141:14 142:3
**accountant**
   133:21
**accounting**
   13:3,11 50:6

61:18 62:7,11
66:10,13,14,16
67:4,5 74:14
74:16 83:5,9
83:12,13,17,19
137:7 142:11
144:20
**accounts**  50:14
   74:20 98:18
   157:13
**accruals**
   156:15 157:23
**accrued**  36:22
**accurate**  18:11
   25:8 33:25
   34:8 37:24
   40:2 46:21
   58:9 62:19
   63:3,17 66:12
   67:2 68:10
   69:3 70:5
   72:24 73:24
   74:13,18 77:21
   78:14,21 83:3
   85:12 86:10,14
   90:15 96:13
   97:11 98:19
   100:23 101:6
   101:14,23
   103:13 104:21
   106:8 107:6
   114:11 117:7
   118:3 124:18
   139:17 142:17
   144:15 155:8
   155:23,25
   156:14,16
   157:9

**accurately**
   67:21
**acknowledged**
   113:12 114:18
**acquired**  82:10
**act**  9:18
**action**  8:2
   162:14,18
**actions**  117:14
**activity**  98:3
**acts**  74:12
**actual**  128:18
   153:1
**actually**  36:23
   44:13 61:16
   71:21 87:7
   104:24 109:17
**ad**  114:8
**added**  101:7
   141:13,23
**addition**
   121:17
**additional**  19:5
   19:7 76:23
   122:16
**address**  91:2
   97:19
**adequately**
   23:5,23
**adjourned**
   160:23
**adjusted**  130:4
**administer**
   7:25
**administration**
   61:18
**administrative**
   60:3

**admissibility**
   10:22
**adult**  27:1
   135:21,25
   136:10,18
**advance**  32:16
   32:25 33:3
   36:23,25 44:9
   87:3,7 88:8,13
   88:13,18,18
   91:9 95:9
   101:4 113:23
   137:3 140:17
   142:6,7 157:20
**advanced**  5:12
   33:19 95:11
   99:5 158:9
**advances**  33:10
   33:13 87:10,12
   87:16 88:6,9
   88:25 89:5
   90:14,20 91:15
   91:17,21,22,24
   92:4,6,8,10,12
   92:19,22 98:1
   98:12,16,18,21
   98:23 99:1,11
   99:18,21,24
   100:5 101:10
   102:13 104:14
   104:15,23
   109:21 110:4
   115:10 119:10
   121:3 138:4
   140:6,8 142:1
   142:2 157:4,6
**advancing**
   40:13

CASE 0:24-cr-00007-JMB-DLM    Doc. 136-1    Filed 06/27/25    Page 166 of 200
Chad Moldon                                                              May 14, 2025
[advertisers - arts]                                                          Page 4

**advertisers**
 28:15
**advertising**
 27:15 28:10,12
**advice** 31:19
**advise** 31:8,9
 31:11,17 32:4
**advised** 10:18
**affect** 147:6
**affecting** 64:2
**affiliate** 16:2
**affiliations** 8:9
**affirm** 9:8
**affirmed** 1:19
 9:10
**agc** 10:8
**agenda** 104:8
**agents** 57:2,19
 69:25 71:13
 154:6,15
 155:17
**ago** 96:22
**agree** 7:10
 52:16 60:10
 78:1 84:9,10
 84:15 113:24
 145:22
**agreed** 36:9
 70:8,24 101:24
 111:10,16
 160:4
**agreement** 6:17
 10:4 12:5,9,12
 41:1,4 42:9
 44:16 52:15,19
 119:14,17,20
 119:25 120:3,3
 128:23 129:23

 148:3 149:17
 149:24 150:5
 150:17 151:18
 152:22 153:5
 154:19,24
 155:12,18
 156:4 158:5,9
 158:12,14,19
 160:6
**agreements**
 108:2,5
**ah** 34:21
**ahead** 55:7
 147:3
**aided** 162:10
**aiding** 10:16
**aird** 3:6 8:25
 8:25 9:16,20
 11:18
**al** 5:22,25 6:9
 6:20,23 89:11
 97:15 106:15
 123:13 126:14
**allowed** 11:1
**amanda** 2:5
 8:13 11:8 40:7
 50:1 69:10
 97:20 99:7,13
 144:23
**america** 1:6
 7:15
**american** 9:20
 9:24 11:3
 56:20 57:2
 140:11,14
**americans**
 56:19

**amount** 30:8
 37:5,14 47:10
 53:14,19,22
 54:2,7 59:25
 71:14 93:19
 95:18 99:4,14
 105:21 109:16
 110:14,16
 111:5,12 113:7
 116:23 120:20
 121:3 122:25
 130:4,22
 144:21 152:23
**amounts** 38:22
 51:6 53:3,12
 80:16 110:12
 117:13 135:2
 143:18,20,22
 153:1
**analysis** 136:8
**annual** 6:7
 14:18 25:23
 42:21 103:24
**annually** 43:18
 95:15
**answer** 10:11
 53:6 54:13
 57:15 68:10
 128:9 137:24
 146:15 150:2
 153:16
**answered** 53:5
 57:21 71:17,23
 72:5 84:19
 139:22 149:25
 155:2
**anticipated**
 106:5,6

**antonio** 11:7
**appear** 12:2
 18:10 34:7
 37:23 40:1
 46:20 144:17
**appearance** 8:6
**appearances**
 8:8
**appears** 18:18
 34:3 46:18
 110:8 121:4
 162:7
**applied** 121:13
**apply** 120:20
 130:3
**appropriate**
 10:22 14:6
 117:10,15
 132:14,22
**approval** 51:12
 51:15 147:20
**approved**
 79:21
**approximately**
 30:5 39:10
 48:23 84:1
 109:8 121:13
 139:18
**april** 19:10
**area** 127:2
**areas** 136:5
**argue** 125:21
 126:8
**aron** 83:22
**arrive** 60:14
 158:5,8,12,18
**arts** 12:24

Chad Moldon
May 14, 2025

aside 132:14
asked 51:6,20
  53:5 57:20
  71:16,22 72:4
  84:18 110:20
  130:18 131:20
  134:25 135:5
  136:25 139:21
  143:1 147:2,4
  149:25 152:21
  152:23 153:8
  154:19,22
  155:2 158:1
  159:10
asking 68:25
  108:24 155:21
assess 41:2
asset 122:20
assigned 99:7
assistance 9:22
assisted 83:11
associate 20:20
associated
  20:20 136:11
association
  20:23
assume 13:13
  26:10 56:18
  58:25 79:11
  145:20 155:8
  158:11,22
assumption
  27:22 29:18
attaches
  110:17
attempted
  55:13

attempting
  126:9
attend 49:8
attended 49:4
attention 18:15
  19:9 20:16
  23:8 26:16
  28:17 39:21,25
  40:6 41:25
  46:23 142:18
  142:20 143:16
attorney 2:10
  3:6 8:10 9:1,19
  112:22,25
  162:16
attorneys
  154:6
audio 7:9
august 5:25
  6:12 45:3
  97:15 112:1,5
  116:19 148:14
authentic
  119:24
authorities
  140:18
authority 9:23
  79:17,23 80:3
authorize
  159:18
authorized
  7:25 60:17
  112:18 117:12
  147:18 159:2
  159:11,12
authorizing
  99:17

avenue 2:12,22
avoid 12:11
awarded
  129:19
aware 26:11
  50:13 52:14,17
  53:11,16,18,22
  110:15 114:14
  133:20 138:25
  139:4,7 148:1
  148:5 149:7,13
axmith 3:7
  8:23,23

**b**

b.v. 29:24
bachelor 12:24
back 29:13
  41:2 55:5
  87:12,15,17
  92:13 93:25
  96:21 97:4
  98:11 100:17
  101:16,20
  102:7,15,17
  103:10 106:6
  107:1,2 108:13
  109:22 110:6
  111:12 115:12
  119:10,10
  125:15 129:21
  129:24 131:15
  144:18
background
  74:14,17
  133:16
backwards
  112:12

balance 42:22
  122:7,8 141:24
balances
  110:15 115:1,3
  116:12 143:10
bank 28:7 39:6
  74:20 135:13
  142:3 157:13
banking 28:4
  74:2,9 135:23
  135:25 136:9
banks 74:5,7
  136:4
bannister 6:18
  24:17 78:24
  85:17,24
  119:15,18
  120:4,22,24
  122:8,22,24
  129:12 130:10
  144:1,8,13,17
barker 1:24
  7:23 161:3,22
  162:5,21
based 21:2
  31:19 35:10,23
  38:18,25 47:21
  50:6 56:13
  58:14 68:15
  70:5,7 77:1
  90:8 100:22
  108:6 134:22
  144:16,19
  155:19 160:2
basic 22:22
basically 29:6
basis 25:17,23

**bay** 19:11,22 20:17,17 21:4 21:7 82:2 135:17
**began** 145:1 151:17
**beginning** 8:9 37:4 40:19 55:5 131:15,20 153:7
**begun** 114:21
**behalf** 2:3,9,15 2:20 8:12,14 8:16,20 51:21 65:3 67:23 68:7 71:3 73:23 94:13 96:17,18 112:19 132:15 147:19 148:2 149:23 150:5
**belief** 103:15 133:25
**believe** 13:18 18:14 20:9,15 21:10 23:7,25 24:4,16 25:7 26:6 29:11 30:17,19,22 33:1,12 34:17 35:21 36:9,20 37:2,10,15 46:24 47:23 49:15 51:17 52:12 56:8 58:3 59:1 62:4 63:6,17 73:24 75:12 77:25

78:8,14 79:5 79:16 80:2 81:23 82:12,22 83:3 85:12 86:25 88:2,10 89:4 92:2 93:21 94:11 96:10,25 98:13 100:7 101:5 102:23 103:17 105:18,18 118:3 120:1 121:8 123:4 125:9 129:4 137:12,25 138:10 139:16 140:2,13
**believed** 133:22,23
**belonging** 73:8
**beneficiary** 76:8
**benefit** 41:3 121:20
**benefitted** 72:2
**best** 23:21 44:19 62:2 162:11
**better** 68:10
**beyond** 149:11
**bill** 55:11
**billing** 22:9
**billings** 20:25
**bit** 21:11 22:5 33:6 54:10,16 140:5
**block** 48:4

**blue** 15:1 24:6 24:8 25:2 32:11 37:9 62:25 63:2,5,8 76:8 77:2 80:17 85:20 86:8 142:13 143:7 144:3
**board** 14:15 15:7,9
**body** 91:18 107:16,17 148:17
**bongacams** 124:24
**bonus** 44:8,8 95:3,8
**books** 75:7,11 95:25 96:12 97:5 119:3
**border** 56:15 57:14
**boris** 2:4 8:11 69:10
**borrowing** 39:10 114:7
**bottom** 18:22 23:9 26:17,18 28:18 29:21,24 34:10 118:19 127:4 148:14 148:15
**bought** 93:12
**bourget** 2:4,7 4:7,9 8:11,12 9:11 11:16,19 15:3,6 17:23 22:18 26:15

33:20 37:22 39:20 46:11 53:6,9 54:13 54:20 57:9,20 69:11 71:16,22 72:4 78:6,13 78:19 79:3,25 84:18 88:20 89:21 96:1 103:6,11 108:18 126:3 129:2 130:15 131:7,17 137:17,24 138:2,23,24 139:5,25 140:23 141:21 145:11 146:5,7 146:15,19 149:15 150:3 151:11,23 152:9,11,20 154:1 155:1 156:5 158:10 158:15,21 159:3,15,20 160:2,15
**bouts** 40:14
**break** 131:8
**brief** 9:17 13:23
**briefed** 160:8
**bring** 21:16 36:3 46:7 110:2 142:20
**bringing** 38:25
**broadcaster** 27:11 29:13

**broadcasters**
26:25
**brought** 32:19
**btflygrl** 144:4
**budget** 62:21
124:7,9
**budgets** 25:19
**buffalo** 2:22
**built** 104:8
**bunch** 57:15
**burry** 6:3 38:4
62:17 63:18
64:16,23 65:19
78:4 84:5,11
92:8 100:11,14
107:9 123:8,22
127:9 133:1
134:17 157:3
**business** 14:3,5
48:16,19 59:15
67:9 76:18,22
83:6 93:13
125:4,4 127:3
127:20,23
128:8 135:21
140:22 152:18
**businesses**
13:11 21:15
22:10
**buy** 104:8
127:3,23
**buyout** 85:16
85:23 152:4,14
155:11,18
**buys** 61:19

**c**

**c** 2:1 3:1
**calculation**
99:8
**called** 1:17
20:4 32:16
78:5,18,24
**calling** 138:20
140:19 146:3
146:14 149:11
152:6,15
**calls** 126:3
**cam4** 14:2
23:15,16 26:21
26:23,24 27:5
29:5,15 32:1
61:13,15 62:6
65:21 66:14,24
68:4 72:13
124:13 125:5
125:11,18
126:7 136:6
**cam4's** 67:21
128:7 135:21
**cambria** 2:21
**camera** 7:6
**canaccord**
25:18
**canada** 1:13
3:6,7 7:20 9:1
9:13,19,21
41:2 43:19
56:21 57:2
82:8 95:16
162:2
**canadian** 9:23
10:10 30:7

74:7 105:10
**cancel** 121:14
**capacity** 149:9
**card** 27:19,21
28:6,12,25
93:4,9 94:13
136:17,19
141:1,3,4,5,6
141:18
**cards** 27:23
93:3,7,13,19
108:10
**care** 67:3,5
**carry** 117:16
**case** 7:17 14:20
37:8 43:19
62:6 71:12
73:14 95:15
103:17 105:20
131:25 138:10
142:14 147:23
147:25 149:1
151:9
**cases** 28:14
115:4 150:10
**cash** 40:16
77:23 104:14
104:23
**categories**
27:16
**caused** 82:21
**cc'd** 76:2
**cd** 40:13,18
**cease** 104:14
**central** 9:23
**centred** 36:6
**ceo** 13:7,16,23
14:8 15:8,21

17:1 30:2,9
31:7 61:9
**certain** 15:25
27:13 51:6
76:18 110:14
137:1 142:14
**certainly** 80:7
100:3 157:14
**certificate**
161:1 162:1
**certified** 7:21
133:21 161:3
**certify** 161:4
162:6
**cfo** 34:14 49:18
**chad** 1:16 4:4
5:14,22,25 6:8
6:13,19,22
7:13 9:6,6,10
11:6 18:17
36:4 37:20
40:13 41:5
89:11 94:25
97:15,20 98:1
98:4 104:8
106:15,22
107:5 112:6
123:12 126:13
160:19
**chain** 5:16 6:8
34:11 39:17
40:2 106:14,25
107:4,21
108:21 112:9
112:12
**challenges**
135:24 136:2

[change - completed]                                                    Page 8

| | | | |
|---|---|---|---|
| **change**  19:2 | **citizens**  140:12 | **come**  20:22 | **company**  13:8 |
| 36:21 38:24 | **city**  11:20 | 27:18 28:24 | 13:10 14:12,13 |
| **changed**  59:9 | **clear**  67:16 | 41:2 55:21 | 18:9 19:16 |
| **changing**  35:22 | 86:19 95:20 | 56:21 72:11 | 20:4,7,19,24 |
| **characterize** | 129:13,15,22 | 110:12 131:22 | 23:13 28:23 |
| 17:3 | **cleared**  129:18 | 135:2 147:24 | 31:11 33:2 |
| **charge**  67:11 | 129:19 | **comes**  27:21 | 34:20 47:7,12 |
| 69:3 70:1 71:4 | **clearing**  108:15 | 43:19 95:16 | 47:21 54:8 |
| 71:7 84:12 | **clearly**  125:25 | 135:12 | 59:5,6,22,23 |
| 133:7,11 | **client**  14:17 | **coming**  33:4 | 64:2 66:6,10 |
| 141:12 | **closed**  128:25 | 131:23 135:1 | 67:16,17 78:4 |
| **chargeback** | **closer**  126:9 | **commencing** | 78:9,12,17,23 |
| 136:13,15,16 | 128:20 | 1:21 5:16 7:1 | 79:1 111:4 |
| **chargebacks** | **closing**  121:19 | 39:18 | 114:21 116:21 |
| 136:20 | 122:11 150:22 | **commissioner** | 117:5,11 |
| **charged**  69:1 | 151:25 | 162:23 | 118:12,22,25 |
| **charges**  10:15 | **clvs**  3:10 | **committing** | 120:25 124:1 |
| 13:13 67:13 | **cmj**  2:18 | 132:5 | 127:15 128:3 |
| **charging**  69:20 | **code**  74:23 | **common**  48:11 | 130:11 132:16 |
| 69:24 70:9 | **coded**  75:4 | 49:8 132:14,18 | 134:23 137:19 |
| 135:1 | 99:21 102:10 | 132:19 135:22 | 141:1,7,9 |
| **charities**  90:2 | 137:1,2 | **communicate** | 147:7 148:3,20 |
| **charlotte**  2:16 | **coding**  75:13 | 76:1 | 148:22 152:24 |
| 9:2 69:10 | 137:7,20 | **communicated** | **company's** |
| 154:23 155:12 | **coincided** | 38:19 55:14 | 47:4 83:13,17 |
| 156:2 | 85:23,25 | 133:3 159:12 | 116:18 119:3 |
| **chart**  5:9,10 | **colleagues** | **communicati...** | 137:21 |
| 22:17,19,21 | 17:17,18 20:14 | 38:13 42:14 | **compared** |
| 23:3,4,23 | **collect**  28:16 | **communicati...** | 136:20 |
| 26:14,17,19 | 43:18 95:15 | 79:13 | **compelled**  12:2 |
| 28:18 | **collecting**  29:2 | **communicati...** | **compensation** |
| **chief**  125:7 | **collectively** | 158:2 | 30:13 |
| **circumstance** | 20:11 | **companies** | **competitor** |
| 88:16 159:4 | **collects**  28:24 | 20:11 21:23 | 125:1 127:17 |
| **circumstances** | 29:14,17 | 22:24 23:24 | **complete**  12:13 |
| 82:17,19 | **column**  18:18 | 48:10 78:2 | **completed** |
| **citizen**  140:14 | 19:1 | 135:25 148:24 | 160:16 |

**complex**
    145:14
**complexities**
    146:1
**complexity**
    146:17
**compliance**
    10:10
**complicated**
    145:23
**component**
    25:12 27:14
**compound**
    141:16
**computer**
    162:10
**concept** 157:13
**concerning**
    154:19
**concludes**
    160:18
**condition**
    151:1,25
**conduct** 9:24
    17:11
**conducted** 7:5
    10:10 69:9
**conference**
    159:24
**confirm** 11:14
**confirmed** 10:4
**conjunction**
    114:20
**connection** 7:7
**connects** 26:24
**consent** 11:12
**consistent**
    114:4

**consists** 114:1
**constituted**
    63:23 158:25
**constitutes**
    123:19
**cont'd** 3:1
**contact** 65:18
**contains**
    148:17
**content** 66:3,4
**continue** 7:9
**continues** 42:6
**control** 144:14
**controlled**
    144:9
**controller**
    16:23 34:19,22
    34:23 49:17
    74:12 82:22,24
    83:1,8,17
**conversation**
    35:10 36:4
    104:4,5 158:4
**conversations**
    6:6 19:6 75:16
    75:20,21
    103:24 153:15
**coo** 124:24
**copied** 41:15
    89:15 100:15
    108:22 112:2
**copy** 18:11
    33:25 34:8
    37:24 46:21
    119:24
**copying** 94:19
    97:20

**corporate**
    22:23 48:12
**corporation**
    2:16 5:8 6:16
    20:5 22:16
    23:9,10 24:2,3
    24:9,17 29:24
    115:19
**correct** 13:15
    23:16 38:21
    55:19 58:15,16
    58:19,21 59:1
    59:1 60:21
    62:21 63:24,25
    64:17 65:22
    66:5,11 67:17
    69:12 70:8,14
    70:24 72:17
    73:4,10,16,18
    73:21 74:21
    75:5,8,17,21
    76:5,12,24
    77:12,18 81:22
    82:11 83:6,18
    85:6 86:9,12
    86:21,22,24
    87:4,5,8,9,17
    87:18,20,23,24
    88:1,4 90:14
    91:6,15,22
    92:16,20,23
    93:14 94:15
    95:6 98:8,12
    98:21 99:5,6
    99:21 100:6
    101:11,16,22
    102:1,17
    104:15,17

    105:2 107:22
    108:22 109:4
    110:13 112:17
    112:20 113:4
    113:15 114:12
    115:8,13,25
    117:21 119:4,7
    119:11 120:7,8
    121:7,21 122:4
    122:11 125:6
    127:12 129:8
    130:7,11,14
    132:11 133:4
    134:8 137:8
    140:8 144:17
    147:16 154:15
    154:20,25
    155:14,18
    156:9 157:13
    158:6 159:13
    161:14
**corrections**
    58:23 69:17
    112:13
**correctly** 35:17
    36:16 40:9,21
    41:11 42:25
    43:23 44:11
    47:19 151:5
**corrects** 137:13
**corresponden...**
    90:12
**cost** 111:4
**counsel** 1:17
    7:14 8:7,25 9:3
    9:4,9,18 10:3,8
    41:17,20 55:7
    55:18 57:14

148:19,25
149:2 151:3
159:24 162:12
162:16
**country** 27:21
**couple** 156:13
**course** 14:4
15:24 56:2
75:18 113:13
136:14 147:22
147:24
**court** 1:1,2
7:16,23 9:7
11:3
**cpa** 133:22
**cr** 7:17
**create** 25:21
104:13
**created** 142:13
**credit** 27:18,21
27:23 28:6,12
28:25 93:2,4,7
93:9,13,19
94:13 108:10
136:17,19
141:1,3,4,5
**crime** 132:5
**criminal** 1:3
3:5 8:22 9:22
10:23 49:13
145:5 146:9,21
147:5
**cross** 4:8 55:8
131:21 138:7
140:3,25 153:8
160:5
**crypto** 128:10
128:11

**cs7296566** 1:25
**csr** 1:24 161:3
161:22 162:21
**curaçao** 48:9
**current** 35:12
36:10 91:10
116:12 130:21
**currently**
12:16 19:8,24
**customer** 27:10
27:13 28:2,6
66:21,25
136:16
**customers**
26:25 66:18
**cut** 22:14 29:15

**d**

**d** 2:21 4:2 5:13
5:16,21,24 6:2
6:4,6,8,11,14
6:17,19,22
8:16 37:18,19
39:14,17 89:9
89:10 90:22
94:18 97:14
100:10 103:21
103:23 106:10
106:14,22
112:4 115:18
119:14,17
123:12 126:13
140:2 142:19
147:10,11
148:8,16
149:17
**daily** 16:22
84:6 124:17

**date** 23:4 45:5
45:6 58:8
63:14 150:22
151:1,25
**dated** 5:22,25
6:3,20,23
18:16 19:10
40:8 58:18
89:11,15 97:15
100:11 123:9
123:13 126:14
161:18
**dave** 5:21 6:2
6:20,23 20:21
31:15 34:4
35:5,7 36:3
38:3,3 40:7
43:17 44:1
45:18 70:12
83:11 89:10,15
94:12 100:10
100:13 107:9
123:7,13
126:14 127:8
133:11,13
135:6 137:10
137:13 139:19
144:9,13,22
145:5,24 146:8
146:20 152:4
152:14,24
**dave's** 16:18,24
**david** 1:9 2:9
5:24 6:4 7:15
8:16,18,19,19
8:20 10:14
14:20 15:5
55:12 62:17,18

63:11,12,21,22
64:15,17,22,23
65:18 72:18
73:15,17 75:15
75:15,19 76:13
78:11,23 82:2
82:4,5,14,18
82:25 84:4,5
90:24 91:24
92:4,10 94:18
97:14,19,20
98:4 99:3,7
101:7 103:21
104:2,11,11
107:8 120:24
121:20 122:4,9
123:8 127:9
128:25 130:10
133:1 134:16
134:16 139:8
139:13 151:8
**david's** 43:8
**day** 13:24,24
16:17,17 25:10
25:10,12,12
26:5,5 48:16
48:16,18,18
133:7,7,11,11
134:2,2 161:18
**days** 11:7
45:13
**dc** 2:6
**de's** 145:16
**deal** 28:15 68:3
74:1,4 145:15
**deals** 75:24
**dealt** 42:10

**debt** 118:15,24
  120:21 130:5,9
  130:14,22
**debts** 47:13
**dec** 36:13
**december** 47:5
  113:11
**decision** 59:14
  59:18 60:11,14
  60:16 61:3,6
  132:8,14 148:2
**decisions** 48:16
  48:19 59:11
  60:7,19 64:2,5
  64:8,11 65:3
  74:20 76:4
  84:15 132:9,10
  132:15,20
**deck** 101:7
**declaration**
  5:19 46:10,19
  47:25 48:22
  49:2,12 147:19
**declarations**
  48:12 147:16
**declare** 30:23
  47:7 104:14,23
  116:21 146:2
  146:10,25
  147:7
**declared** 33:2
  37:3 109:8,15
  109:23 117:3
  139:12 142:16
  146:22
**declaring** 31:4
  138:17 139:2
  145:3

**deducted** 97:9
  123:2 130:24
**defendant** 1:10
  2:9 14:19 15:5
  15:8,12,22
  16:4,6 17:1,5
  17:12,15 21:3
  24:14 25:6
  26:4 32:3,15
  32:19 34:1
  35:20 43:4
  44:25 45:3,21
  49:3,14 50:22
  50:25 51:8,15
  52:14,23 53:3
  53:11 54:2,7
  123:6
**defendant's**
  17:8 26:1
  97:13 100:8
  111:25 115:14
**deferral** 44:8
  95:8
**define** 60:9
  67:21
**definition** 62:1
**degrees** 12:21
  12:23 13:2
**delaware** 2:22
**demographics**
  28:15
**department**
  2:4 3:7 8:24
  74:10
**depend** 88:15
  99:13
**depending**
  27:21 125:16

159:5
**depends** 7:6
**depict** 22:21
**deposit** 28:2
**depositing** 28:3
  40:17
**deposition** 1:16
  7:4,13,18
  11:13 55:14,17
  162:6,8,14
**depositions**
  9:25 10:5,6,9
  10:13,20 11:9
**deposits** 27:25
**der** 38:3 62:17
  63:11,22 64:16
  64:22 65:19
  75:16 76:13
  78:11 79:14,18
  80:7 84:5,11
  91:24 92:4
  97:20 104:11
  107:8 123:8,21
  127:9 133:1
  134:16 157:3
  158:4
**derived** 39:3
**describe** 14:25
  17:16 59:14
  61:21 123:25
  134:10
**described**
  117:13
**description** 5:4
  62:2
**designate**
  74:25

**desire** 146:10
  146:22 147:6
**details** 29:16
  46:1,3 155:21
**determined**
  47:6 110:15
  116:20 155:25
**dictating** 43:4
**difference**
  32:24
**different** 22:23
  27:20 148:24
  148:25
**differently**
  78:2
**differs** 157:22
**difficulties**
  56:6 135:23
**direct** 4:7
  11:19 14:8
  27:25 28:2,7
  31:7 139:6
  140:3 142:18
  160:4
**directed**
  117:12
**direction** 59:18
  161:12
**directly** 137:3
  141:14 150:11
  150:12
**director** 6:15
  112:15 113:3
  115:16,19
  116:6
**directory** 48:8
**disappointed**
  54:10,11

**disappointing**
54:16
**discomfort**
56:12
**discuss** 32:15
**discussed**
29:23 38:15
48:22 49:16
52:5 54:18
104:12 127:1
127:22 150:14
150:16
**discusses**
107:24
**discussing**
36:19,20 44:1
47:24 149:18
**discussion** 36:6
42:15 43:2
47:3 60:14
116:17
**discussions**
145:2,4
**disputes**
136:17
**dissolutions**
114:9
**distinction**
70:25 71:2
**district** 1:1,2
7:16,16
**divided** 47:15
**dividend** 5:19
30:16,24 31:1
32:24,25 33:1
33:2,3,4,10,12
35:8,12 36:8
36:13,14,22,23

36:25 37:6,13
37:14 38:24
46:9,18 47:8
47:15,22,25
48:22 49:12
85:5,10,13,21
86:2,9,12,15
87:4,8,20 88:1
90:11,19 91:5
91:14 97:1
108:17 109:4,9
110:1,24 113:7
113:23 114:25
116:22 117:3
117:19 118:14
118:23 119:9
122:21 137:3
138:18 139:2
139:16 140:6,8
142:1,6,7,16
146:25 147:12
154:20 157:18
**dividends** 5:12
30:20 31:4,8
31:12,18,21
32:5,8,12,16
33:19 37:2
84:24 85:3
86:19 87:1,2
87:10,14,17
90:8,13,16
91:20,21 97:9
101:21 102:17
102:22,24
103:5,9 104:14
104:20,23
106:7 109:23
110:7 111:12

113:15,18,19
114:21 115:11
117:23 118:5
138:4,8 139:11
140:17 142:7
145:3 146:10
146:22 147:7
156:24
**division** 2:4
**divorce** 105:4,8
106:3
**divorced** 105:1
**dlm** 1:3 7:17
**document**
17:25 46:12,21
47:22 48:4,5
52:22 130:18
130:19 148:11
149:21
**documents**
48:12
**doing** 15:22
82:23 83:8
**dollar** 110:12
154:20
**dollars** 105:9
113:7 116:25
117:20
**donations** 90:7
**dooling** 2:12
8:15,15 55:12
**draft** 113:3,18
**drafted** 154:24
155:12,17
156:4
**draw** 18:15
19:9 26:16
39:25 40:5

41:24 46:23
143:15
**drawing** 23:8
39:21
**due** 56:18
**duly** 1:19 162:8
**duties** 13:24

**e**

**e** 2:1,1 3:1,1
4:2 35:25
38:11
**earlier** 21:18
97:2
**earn** 30:6
**earned** 95:9
117:4
**earning** 63:20
**earns** 44:9
**easily** 82:8
**edges** 22:13
**effect** 77:23
92:15,23 93:22
97:8 104:20
**eidsness** 6:12
38:4 41:14,15
41:25 42:1,14
107:8 112:1,5
112:22,25
121:19 122:3
140:13 148:10
148:14,19
149:4,7 150:10
154:25 155:11
155:17 156:3
**eight** 111:15
116:24

[either - exact]                                                    Page 13

**either** 29:12
32:9 45:18
133:6,7 137:2
142:6
**elevated**
128:10
**elias** 6:11 48:6
48:7,11,15
112:1,5,11,15
112:23 116:6
147:15,18
148:2,9
**email** 5:11,13
5:16,21,24 6:2
6:8,11,19,22
33:19,25 34:8
34:11 35:4,23
36:1 37:19,24
38:13,16,17
39:17,22 40:2
40:7 41:14,25
42:20 43:14,15
50:23,24 52:2
53:13 76:2
89:10,14 91:2
91:3,18 94:21
97:14,18,19,23
98:9 100:10,13
100:22 104:10
106:11,12,14
106:20 107:22
108:7,19,22,23
109:1 110:5,22
111:25 112:4,8
112:21 123:7
123:12 126:13
127:7 142:21
142:25 143:1

143:16 144:22
145:12 148:9
148:13,17
**emails** 6:4 51:4
90:12 103:21
104:2
**employed**
12:16 162:13
162:16
**employee** 52:7
162:15
**employees** 10:2
52:13 59:8,19
59:24,25
**ends** 42:6
**ensure** 10:9,22
**enter** 75:10
**entered** 75:1
**entertainment**
28:19,20
**entirely** 68:9
68:17 79:20
155:22
**entirety** 54:5
**entities** 18:8
22:23 26:18
29:20 105:19
130:6,6 144:18
**entitle** 91:5
**entity** 24:25
29:22,25
143:22 144:9
144:13
**entries** 19:10
137:1,7,20
**entry** 18:16,22
119:2 142:11

**equal** 120:20
122:9 130:4,13
**equity** 43:21
76:18
**erickson** 1:9
2:9 5:21,24 6:2
6:4,20,23 7:15
8:16,18,19,19
8:20 10:14
14:20 15:5
20:21 35:3,5
38:3,6,20 40:7
40:11 42:20
44:5 45:19
51:19 53:19
55:12 62:18
63:12,22 64:17
64:23 68:13
70:12 71:3,6
71:12,20 72:19
72:22 73:15,17
75:15,19 78:23
82:2,4,5,15,18
82:25 83:21
84:4,11 89:11
89:15 90:25
92:10 94:12,18
96:17 97:15,19
99:7 100:11,13
101:7 103:22
104:2,11 107:9
121:21 122:4,9
123:8,13,21
126:14 127:8
129:14,19
130:10 133:11
133:13,15,21
134:1,16 135:6

137:2,11 139:8
139:14,20
140:10 144:9
144:14,23
145:5,21,24
146:8,20 147:5
149:8 150:9
151:9 152:4,14
152:24 155:11
157:3 158:3
**erickson's**
68:18 81:21
120:24 129:1
**esquire** 2:4,5
2:11,12,16,21
**essentially**
76:21
**et** 5:22,25 6:9
6:20,23 89:11
97:15 106:15
123:13 126:14
**evaluated** 17:9
**evaluates** 62:20
**evaluation**
17:12
**evasion** 10:15
**event** 11:11
**eventually**
77:23 81:25
92:13 96:25
125:14
**evidence** 52:23
**evidenced**
122:13
**exact** 15:13
45:5 111:23
135:18

| | | **f** | **fee** 68:16,18 |
|---|---|---|---|

**exactly** 96:23 99:20 102:9 147:1 157:12
**examination** 1:17 4:7,8,9,10 11:19 55:8 131:17,21 140:25 153:8 154:4 160:4,5 161:10
**example** 45:23
**examples** 81:5 88:23
**exceed** 111:5
**excluded** 122:20
**excuse** 34:1
**executed** 110:17
**exhibit** 17:20 17:20,21 22:12 22:16 26:13,14 33:15,15,18 37:17,18,19 39:13,14,17 46:8,9,25 47:1 89:10 97:13,14 99:4 100:10 103:21,23 106:14 111:25 112:4 115:15 115:18 119:13 119:17 123:6 123:12 126:12 126:13 129:22 129:25 140:2,3 142:19 147:10 147:11 148:8

148:16 149:16
**exhibits** 5:1 103:20
**exist** 98:5 135:25
**exit** 82:23
**expected** 36:12
**expenses** 66:7 67:7,14 68:7 69:21 70:9 93:7,9,13 94:13 108:9 140:25 141:13 141:13
**experience** 43:8
**expert** 138:22
**expertise** 22:8 133:17
**explain** 18:5 19:2 22:4 27:7 27:24 28:22 38:12 42:13 136:1
**explained** 57:12
**explanation** 13:24
**extended** 102:3
**extending** 96:18
**extent** 118:10
**extinguished** 115:4
**extra** 108:16 109:4 110:1
**eyes** 16:25

**facilitate** 76:20
**facilitator** 61:22
**fact** 43:3 72:20 77:13 80:5 90:12 91:22 103:3 111:18 114:20 145:4 146:8,20 147:5 154:23
**fair** 29:18 39:4 46:20 111:14 128:7
**fairly** 60:4 125:18 133:4
**falls** 65:21
**false** 10:16,17
**familiar** 16:9 20:4 22:25 24:11 25:9,25 26:2 28:19 29:24 108:25 116:2 123:11 127:18 136:12
**family** 37:9
**far** 52:6 53:2
**favour** 122:21
**fear** 56:9
**fears** 131:22
**feature** 27:2
**features** 27:14
**february** 6:5 6:10,23 103:22 106:16 110:23 126:14 127:8 142:22

**fee** 68:16,18 71:7,11 135:2
**feel** 54:9 68:25 125:18
**fellow** 47:25 139:1
**ffl** 109:19 143:17
**field** 12:25 13:3 38:3
**figure** 90:1 99:4
**figures** 152:22
**figuring** 44:7 95:3
**filed** 7:16
**filing** 10:16
**finally** 44:4
**finance** 13:12
**finances** 61:7 64:6 137:19
**financial** 16:19 26:11 31:16,25 35:22 49:24 51:18 77:19 133:16,18
**financially** 8:2 162:17
**financials** 14:5 133:7,12,14 134:2
**find** 28:14 113:2
**finding** 135:23
**finish** 146:6
**firefly** 5:20 6:15 19:11,14 19:15,20 20:3

Chad Moldon                                                May 14, 2025

[firefly - funds]                                                Page 15

20:5,8,11 21:6
21:12,12,13,17
21:24 23:1,5
24:2,5,9,12,15
25:3,6,10,13
25:14 26:1,3,5
26:7,9 29:13
30:25 31:4,17
32:2,9,12
33:10 38:10
39:11 41:22
43:5 46:10,19
47:23 48:9,16
49:21,23,23
50:16,18 51:16
51:17 52:8,10
59:21,22 61:6
61:17 62:3,8
62:12,13,16,20
62:24 63:9
64:3,6,9,12,15
64:21 65:3
66:1,16,18,20
66:23 67:1,4
67:13,17,20,23
67:25 68:7
69:20 70:9
71:3 72:9,12
72:23 73:2,6
73:12,12,18,23
73:23 76:5
77:17,20,24
78:2 84:10,13
84:16,17 85:8
85:10,17,24,24
86:11,19,24
87:7 93:2,4,6
93:16,19 94:4

94:7,8 95:21
95:24 96:7,12
96:17,18 97:6
100:6,25
101:13 102:17
102:21 105:15
105:22 106:7
107:12 108:9
112:16,19
113:4,14
115:16,19
116:6 117:24
120:7,10,17,19
121:18 122:7
122:21,25
124:11,14
125:4 130:3,6
132:8,25 133:8
133:12 134:2,5
135:7,10,13,22
138:11 141:3
144:18 147:20
147:20 149:3,5
149:24 150:5
151:4 158:20
**firefly's**  14:16
61:6 66:7,10
67:19 72:14,20
99:23 102:13
113:8 157:10
157:16
**firewall**  79:2
144:5
**firm**  7:24
121:20 122:3
**first**  15:11,15
18:16 27:16
35:13 40:7

45:8,15,22
46:25 80:14,16
85:5,10 106:21
112:11 118:4
142:25 151:12
**five**  116:14
121:12,23
**flow**  29:13
40:17
**focus**  14:1
21:14
**focused**  16:1
16:25
**following**
10:15 11:7
36:1 42:19
43:14 122:11
**foregoing**
161:5,13 162:6
162:8
**form**  26:18
30:12 76:17
107:25 108:8
**formal**  13:2
17:11 30:16
31:1 59:6 60:6
60:11,23 81:14
81:17 88:7,10
**formally**  17:9
59:11 89:19
99:17 132:10
142:16
**format**  162:12
**forms**  108:1
**forth**  125:15
161:7
**forward**  25:23
108:1

**foundation**
137:15,22
**four**  64:14,20
64:21 65:12
84:10 89:1,2
111:14
**fourth**  46:24
90:5
**free**  116:9
159:1
**frequently**
101:24
**friday**  5:17
39:18 40:2
**friends**  17:17
17:18
**full**  46:24
53:12,14,19
117:8 129:1
**fully**  44:20
60:16 115:4
**function**  31:24
62:5 83:20
**functions**  66:10
83:13,18
**fund**  47:14
81:18
**funded**  77:5
80:9,15 81:11
**funds**  28:24
29:2 52:16,23
53:1 64:9 65:5
72:11 73:12,18
73:20 76:24
105:14 135:1
142:8,13,15
157:6 158:9
159:18

| further 54:20 | ginter 2:21 9:4 | 55:9,10 115:5 | **h** |
|---|---|---|---|
| 113:21 131:4 | 9:4 10:4 11:17 | goodale 3:10 | |
| 154:1 162:15 | give 12:13 | 7:21 | half 19:15,18 |
| furthermore | 13:23 14:17 | government | 19:19 121:12 |
| 118:7 | 39:14 62:2 | 9:13 12:6 | 121:18,23 |
| future 39:1 | 65:15 77:16 | 57:18 153:9 | 122:2 |
| 76:23 87:15,17 | given 51:17 | 154:6,14 | halstead 19:11 |
| 101:21 156:22 | 89:6 128:19 | 155:16 | 19:22 20:17,17 |
| 156:25 157:24 | 143:10 160:19 | granity 28:19 | 21:4,7 82:2 |

**g**

go 7:10 14:4
54:22 55:7
57:7 59:18
104:19 124:19
131:8 137:6
142:24 147:3
160:10

28:20,23 29:5
29:9,10,14,17
66:4

135:16

hand 19:1 42:2
103:19 107:1
111:24 115:14
123:5

| g 5:6,8,10,11 | | granted 9:24 | handed 69:8 |
|---|---|---|---|
| 5:19 8:16 | goal 102:24 | 88:13 89:6 | handle 54:5 |
| 17:20,21 22:13 | goals 62:21 | green 2:21 | handles 67:14 |
| 22:16 26:13,14 | goes 107:7 | greg 112:11,15 | happen 39:6 |
| 33:15,16,17,18 | 113:21 124:14 | 116:6 147:15 | 104:24 |
| 46:8,9 47:1 | going 7:3 25:22 | 147:18 148:2,9 | happened 46:2 |
| general 3:6 9:1 | 33:14,16 39:13 | gregory 6:11 | 46:4 |
| 9:19 42:15 | 54:25 56:3,7,9 | 48:6,7,8,11 | happening |
| 50:11 91:25 | 56:12,15 71:20 | 112:1,4 | 25:18,19,20 |
| 127:2 136:3,10 | 72:18 77:9 | group 14:2 | 56:25 |
| 148:25 152:16 | 82:20 84:9 | 21:13,18,21,22 | head 58:9 |
| generally 14:13 | 89:8,19 94:17 | 38:10,16 62:14 | 63:19 |
| 16:9,12,18 | 100:8 103:19 | 62:16,24 63:21 | hear 33:7 |
| 18:5 20:10 | 106:9 110:6 | 83:23 84:4,17 | heard 7:8 |
| 22:1,25 23:2 | 111:24 112:12 | 93:2 134:21 | 32:18 45:14 |
| 25:9 34:24 | 112:22 115:14 | groups 156:8 | hearsay 108:19 |
| 84:8 88:16,17 | 122:17 123:5 | grow 14:5 | 145:8 146:14 |
| 88:25 141:17 | 126:11 129:21 | growth 61:15 | 156:5 |
| 148:18 | 131:10 140:1 | guess 44:23 | held 13:20 |
| generate 27:5 | 142:24 155:4 | 45:18 | 18:18,19 19:3 |
| 68:13 | 159:18 160:13 | guidance 39:1 | help 76:19 |
| generated | good 7:2 8:11 | guy 83:22 | 83:22 101:25 |
| 28:11 | 9:11 27:22 | 127:15 128:10 | 102:4 114:8 |
| gentleman | | 128:11,12 | |
| 40:12 | | | |
| getting 104:7 | | | |
| 124:16 | | | |

helping 106:1
hi 35:7 36:3
  43:17
hide 82:15
high 43:20
  136:7,19
higher 136:5
hired 82:18
  83:1
hiring 82:21
  83:21
hmm 120:23
hoc 114:8
hold 24:8 36:12
holdings 19:12
  19:22 20:17,18
  21:4,7 82:3
  135:17
home 43:21
  45:4 100:19,22
  100:25 114:9
hope 77:22
house 46:6
  101:4
hundred
  125:19 128:1,4
  128:16

**i**

idea 56:14
  76:25 77:4
  87:14 108:12
  109:21 136:10
  156:24
identification
  26:13
identified 15:4
  65:13

identifying
  53:25
ijshuis 29:24
immigration
  82:7
immunity 12:5
implication
  35:22
important
  60:19 61:5
improvement
  83:5 100:20,22
  100:25
inception 13:18
include 137:19
included 35:5
  76:5 106:13
  142:21 156:11
includes 40:2
  144:22
including 6:8
  8:7 65:5 98:3
  105:19 106:15
  140:7 152:22
income 68:13
incorporated
  10:1
increase 36:10
  38:23
increasing 36:7
  91:9
independently
  143:3
index 5:1
indicate 126:24
  127:13
indicated 55:20

indicates 11:11
  89:25
indicted 151:9
  151:13 152:18
individual
  63:20 118:10
  118:21 149:8
individuals
  5:15 37:21,25
  38:2,7 91:3
  133:6
inform 69:19
  69:25
informal 60:4,9
informally
  59:12 60:7
  84:16 132:10
informed 71:13
  132:1,4
input 38:23,25
inquiring
  125:10
insight 61:19
installments
  122:10
instance 71:9
intellectual
  23:18
intend 10:19
  93:25
intent 113:19
  117:16 121:9
  129:7,9
interchangea...
  91:21
interest 41:6
  42:5,17,22
  43:18 77:17,24

95:15 116:9
  120:14,17
  128:13 159:1
interested 8:2
  162:17
interests 59:20
intermediary
  61:24 62:1
internal 10:17
international
  74:2,9
internet 7:6
  21:15 22:1,8,9
interview
  55:13 56:21
  58:13,15,18,20
  68:21 69:9
  70:8 154:8,13
  155:9,13 156:3
interviewed
  45:3 55:16
  57:1 58:6
  82:25 154:10
  154:17
interviewer
  155:7
interviews 57:4
introduce
  10:19
introduced
  11:5
investigated
  44:25
investigation
  3:5 8:22 45:9
  45:16,25 49:13
  53:23 132:2
  139:8,13,19

145:21,23
146:9,21 147:6
**investigations**
145:6
**investigators**
56:21
**investment**
14:2 19:16
21:13,18,24
59:23
**investments**
66:23
**invests** 22:1
**involved** 26:4
48:15,18 80:7
83:12 150:11
154:22
**involves** 145:16
**involving** 148:9
**ip** 23:14,17
65:24
**irs** 3:5 8:21
44:25 45:4,9
45:13 46:5
53:23 139:7,24
145:20
**issuance** 110:6
**issue** 31:8,18
31:21 32:4
33:12 51:18
87:20 88:1
94:3,9 99:17
108:16 112:18
147:19
**issued** 31:12
33:10 49:12
84:25 85:3,5
86:11,15,19

87:22 88:3
90:16 102:17
103:5,9 104:20
115:12 117:23
117:23 118:5
119:9 138:4,8
139:12,16
141:6 142:2,6
156:25
**issues** 74:2
82:7
**issuing** 30:20
47:22 111:11
111:12
**item** 152:22

**j**

**j** 2:11
**jacket** 15:1
**jan** 6:24 126:15
**janssen** 2:16,16
2:18 9:2,2
69:10 154:23
155:6,13 156:2
**january** 5:17
5:17 6:9 39:18
39:18 40:3,8
42:20 47:9,18
106:15
**jginter** 2:23
**jmb** 1:3 7:17
**job** 1:25 39:4
65:11 82:23
83:9
**john** 69:11
**journal** 119:2
**jurisdiction**
140:18

**justice** 2:4 3:7
8:24
**justin** 2:21 9:4
10:3

**k**

**kandia** 3:6
8:25 9:19
**katy** 124:23
**keep** 89:23
93:18 99:10
100:18
**kevin** 38:5
107:9
**kim** 7:23
**kimberly** 1:24
161:3,22 162:5
162:21
**kind** 13:8
15:21 21:23
26:8,22 29:21
52:15 147:19
**kinds** 52:8
**king** 1:20 7:19
**kiser** 3:5 8:21
8:21 69:11
153:13
**knocking** 43:19
95:16
**know** 14:19
15:13 17:5,10
17:15 19:4
22:14 23:10
25:5,12 26:8
29:16 35:15
37:4,12,15
38:12 41:15
42:2 45:5,22

48:5 50:1,4,9
50:10 51:19
52:6,25 53:2,7
53:14 54:1,1
56:16 58:8
60:5 61:25
63:20 66:15,22
66:23 69:4
74:19,22 75:3
75:13,17,18,24
80:19,22 81:14
81:16,19 82:5
85:25 89:2
96:20,23 99:20
99:23 101:3,5
102:9,12
111:22 117:6
129:5 134:19
135:18 136:4
136:22 137:14
140:12,21
143:12 144:21
144:24 147:22
149:20,23
150:1,4 152:1
152:13 159:7,8
159:8
**knowledge**
21:2 23:22
44:19 51:14
78:7 79:4 80:1
86:20 88:21
94:8 96:2
103:7 114:5
129:3 130:16
137:16,23
138:21 140:15
140:20 143:8

CASE 0:24-cr-00007-JMB-DLM    Doc. 136-1    Filed 06/27/25    Page 181 of 200
Chad Moldon    May 14, 2025
[knowledge - lynne]    Page 19

146:4,12
149:11,12
151:20 152:7
152:25 155:2
159:21
**krieg** 38:5
107:9

**l**

**l** 8:16
**lack** 140:20
146:4,12
151:19 155:1
**lady** 40:12
**lane** 6:15 19:11
19:14 20:3,5,8
21:6 24:2,9
115:19 120:17
**largely** 84:12
**largest** 14:16
**late** 105:6
**law** 2:10,16
10:11 11:2
112:22 121:20
122:3
**law.com** 2:18
**lawyer** 69:10
**lawyers** 154:15
**lay** 138:21
**layers** 66:22
**learn** 44:24
45:2
**learned** 45:9
49:13 54:6
139:13,19
145:4 151:13
**learning** 50:22
50:24 151:8,8

**leaves** 121:25
**ledger** 137:6,14
137:20 141:20
141:23 142:12
143:13
**ledgers** 75:1
**left** 18:23 23:9
28:18 40:6
**legal** 1:20 7:22
7:22,24 9:21
40:25 41:17,20
55:18 57:14
148:25 149:2
160:21
**level** 91:10
**levels** 129:5
**leverage** 22:2,6
**lglaw.com** 2:23
**liberty** 35:7
**licences** 66:4
**lieu** 33:4 44:6
48:13 87:4,7
95:2
**light** 53:24
**likely** 15:17
**limited** 19:11
19:14 20:4,8
21:7 28:19
**line** 91:14
124:1 125:3,4
127:20 150:18
150:21 151:24
**lipsitz** 2:21
**list** 144:16
**listed** 22:24
23:22,24 24:7
38:22 143:19

**listing** 107:14
**lists** 109:11
143:17
**little** 21:11
22:4,14 33:6
63:7 120:10
140:5
**live** 11:20 27:2
27:11 140:18
**lloydsville**
78:12
**loan** 41:1,4,7
42:4,8,16 43:5
43:21 44:2,6
44:14,20 52:3
52:18 70:11,15
71:2 72:22,23
72:25 73:11,14
94:15,24 95:2
95:5,12,18,21
95:23 96:6,9
96:12,14,18,20
97:3 100:24
101:15 105:15
108:2,5 114:25
115:3 141:23
**loaned** 33:3
**loaning** 106:2
**loans** 42:10
65:9 73:15,17
73:22 92:15,23
92:25 93:23
94:3,9 95:25
99:1 101:24
102:3,7,10,16
103:1,7,10
107:14,20,25
108:1,4,8,12

108:16 109:12
109:18 110:2,5
110:5,13
111:11,13
113:12,22
114:18,24
115:12 116:10
116:13 118:9
118:12,22
119:10 121:3,6
121:13,14,14
129:1,4,8,13
129:15,19
131:2 143:17
152:24 159:1
**local** 40:17
74:4
**location** 7:18
**long** 12:10
13:16
**longer** 11:12
**look** 14:5 16:21
25:22 31:25
34:10 35:24
42:17 126:12
155:4
**looked** 36:14
43:10 128:22
**looking** 18:22
33:24 106:23
150:17
**loosely** 90:19
113:22 127:1
153:2
**loud** 68:22
**lynne** 3:7 8:23
8:23

| m | | | |
|---|---|---|---|
| **m**  2:6 | 64:2,5,8,11 | 94:18 97:12 | 112:7 115:21 |
| **m5r**  2:17 | 65:2 68:6 | 106:10 111:25 | 119:19 123:15 |
| **made**  42:5,16 | 69:23 70:13 | 119:13 123:6 | 126:5,16 129:6 |
| 51:8,25 53:3 | 71:21 75:24 | 140:2 142:19 | 130:17 131:4 |
| 58:23 60:7,20 | 76:4 86:18 | 147:10,11 | 131:20 132:7 |
| 68:12,18 69:17 | 95:14 132:15 | 148:8 | 137:15,22 |
| 71:1,3,6 72:22 | 132:20 137:7 | **market**  41:6 | 138:20 139:3 |
| 73:23 74:19 | 150:18 | 43:20 | 139:21 140:19 |
| 84:16 88:6 | **makes**  27:7,11 | **marketing** | 141:16 145:7 |
| 96:23 108:9 | 56:16 69:20 | 13:12 16:1 | 146:3,11,14 |
| 109:22 112:13 | 70:8 136:6 | 61:19 68:4 | 149:10,14,25 |
| 119:2 132:9,10 | **making**  10:17 | **marks**  54:24 | 151:10,19 |
| 136:17 137:2 | 28:1 51:12,16 | 55:4 131:9,14 | 152:6,15 154:2 |
| 143:2 144:23 | 53:11 59:14 | **markup**  68:19 | 154:4 155:3 |
| 145:23 148:2 | 71:1 114:22 | **master**  42:8 | 156:7 158:13 |
| 161:10 | 132:8,14 | **math**  120:9 | 158:16,23 |
| **madrid**  36:15 | **man**  123:17,19 | **matter**  1:18 | 159:6,16,23,25 |
| **mail**  35:25 | **manage**  14:6 | 7:14 9:22 | 160:11 |
| 38:11 | 67:4,19,21 | 132:13 | **maximize**  39:7 |
| **major**  84:11 | **managed**  13:10 | **matters**  11:2 | 61:14 62:5 |
| 89:1,2 127:11 | 72:19 73:5 | 43:9 133:18 | **mean**  22:6 |
| **majority**  47:6 | **management** | **maturity**  42:22 | 23:18 31:23,24 |
| 60:13,17 63:23 | 68:16 71:7 | **maule**  38:5 | 46:4 61:25 |
| 64:1,24,25 | **manages**  66:7 | 79:1 101:3 | 88:8 90:20 |
| 65:2 111:6,21 | 66:10 | 107:7 | 91:25 99:25 |
| 116:20 148:3 | **managing**  6:15 | **mauzy**  2:10,11 | 104:10 107:15 |
| 157:2 158:17 | 67:25 113:3 | 4:8,10 8:17,17 | 136:3 141:23 |
| 158:19,25 | 115:15,19 | 53:5 54:12 | 145:19 |
| 159:17 | **mar**  36:15 | 55:8,11 57:10 | **means**  22:5 |
| **make**  9:13 22:9 | **march**  23:6 | 57:23 71:18,25 | 27:25 42:3 |
| 22:15,23 33:6 | 24:1 150:25 | 72:7 78:10,16 | 120:9 130:10 |
| 39:5,6 42:23 | 151:15 | 78:22 79:6 | **meant**  41:8 |
| 43:17 46:25 | **marital**  114:9 | 80:4 84:21 | **media**  7:12 |
| 51:20,22 52:2 | **marked**  5:2 | 88:24 89:13,19 | 54:25 55:5 |
| 52:8,11 59:11 | 17:20 22:12 | 89:23,24 96:5 | 61:19 131:10 |
| 59:17 61:2 | 26:13 33:15 | 97:17 100:12 | 131:15 160:20 |
|  | 37:18 39:14 | 103:8,14,25 | **meet**  15:11 |
|  | 46:8 89:9 | 106:17 108:20 | 57:24 58:1,4 |

62:21 94:2,8
99:16
**meeting**  6:7
14:18 25:24
36:15 48:24
49:4,7 60:11
60:24 103:24
104:13 123:17
123:20 126:25
127:14
**meetings**  15:18
49:9 60:20,22
153:9
**member**  62:23
**members**  25:13
52:11
**membership**
27:13,17
**memberships**
27:12
**memo**  58:17
70:19 154:11
**memorandum**
58:13 68:21
69:9 70:4,6,7
70:23 154:7,8
**memory**  81:8
100:21
**men**  65:12
**mention**  34:18
**mentioned**
1:18 13:5 15:7
15:20 21:18,25
26:21 27:17
34:12 43:8
45:6 48:21
133:19 148:19

**met**  15:15,23
57:18 58:12
151:2 153:12
154:14
**methods**  27:24
**mic**  33:7
**million**  105:9
105:17 106:2
109:8 116:24
117:20 120:11
121:12,19,24
121:24,25
122:2 124:17
125:19 126:1
128:1,4,16
154:20
**mind**  126:7
**minds**  146:18
**minimal**  59:25
**minimum**
47:14
**minneapolis**
2:13 45:13
139:24
**minnesota**  1:2
2:13 7:17
**minor**  112:13
**minority**  149:6
156:9 157:22
**mistake**  85:9
141:18
**mistakes**
137:14
**mix**  27:20
**mm**  120:23
**moldon**  1:16
4:4 5:14,22,25
6:9,13,19,22

7:13 9:5,6,6,10
11:6,20 17:24
18:17 37:20
55:9 89:11
97:15 106:15
112:6 123:13
126:14 131:18
154:3 160:19
**moment**  159:23
**moments**
148:25
**money**  25:20
25:20 27:8
28:3,8,16
29:17 33:3
39:5 51:7
68:19 69:20,23
70:9,13 71:1
71:10,11,21
72:8,14,16,18
72:20,20 73:2
73:3,5,8 74:20
77:6 80:24
81:11 87:6,16
90:2 95:11
99:10,24 100:3
106:6 114:8
118:11,22
122:25 135:6
135:10 142:3
156:17 157:8
157:10,11,14
157:16
**monies**  29:12
96:24 102:13
**month**  36:11
36:21,21 37:5
37:6 40:19

49:1 91:10,11
124:2
**monthly**  14:18
25:17 35:12
36:7 37:14
38:24 47:16
65:12 91:9
122:9 142:7
**months**  41:10
122:10
**morning**  7:2
8:11 9:11 55:9
55:10
**motivate**  146:2
146:9,21
**motivated**
145:4 152:14
**motivation**
145:10 146:25
**motivations**
146:17
**move**  28:8
**moved**  71:10
**movement**
68:19 71:11
**moving**  132:7
**multiple**  22:10
28:5
**mutual**  9:21
**myriad**  150:15

**n**

**n**  2:1 3:1 4:2
8:16
**n.v.**  5:8 6:16
22:17 23:10
115:20

**name** 7:21 9:19
18:17 34:12
**named** 50:1
79:1 83:22
**naturally**
134:24
**nature** 26:10
27:1 135:20,21
**ne** 2:6
**necessarily**
60:20 75:16,21
**necessary**
79:11 117:15
**need** 9:13
40:25 41:6
87:19,25 97:25
111:5 114:18
136:24
**needed** 82:8,24
92:12
**negotiated**
149:24 150:4
**negotiation**
43:11 150:8
**negotiations**
150:12 151:17
154:23
**neither** 162:12
**net** 124:7
**never** 86:11,15
95:24
**new** 2:22 35:13
82:24
**note** 7:4 15:3
44:17 52:15,19
122:14 124:21
160:3,8

**noted** 11:9
**notes** 6:6 42:9
42:24 103:23
104:4,5 113:10
161:14
**noticing** 8:10
**notify** 51:9
**notifying**
132:16,20
**nov** 36:11
**november** 5:11
5:13 18:12,17
21:8 33:18
34:1 35:9
37:20,25 58:7
58:14 69:12
154:6,18
155:10
**number** 5:4
18:19 47:1
54:15 69:1,2,3
69:23 109:11
124:6 125:11
125:16,22,24
126:6 127:25
128:10,15
144:25 153:3,4
153:19 160:20
**numbers** 39:2
53:25 54:17
111:22,23
**numerous**
113:12

**o**

**o** 8:16,16
**oath** 8:1 161:7

**oaths** 162:24
**object** 146:5
**objection** 54:12
57:9,20 71:16
71:22 72:4
78:6,13,19
79:3,25 84:18
88:20 96:1
103:6,11
108:18 126:3
129:2 130:15
137:15,22
138:20 139:21
140:19 141:16
145:7 146:3,11
149:10 151:10
151:19 155:1
156:5 158:10
158:15,21
159:3,15,20
160:3
**objections** 8:4
11:1 139:3
161:10
**objectives**
129:17
**obviously**
17:15 38:5
**occasion** 148:6
**october** 34:2
36:1
**offer** 89:20
**offered** 125:15
**offhand** 50:10
54:3 80:19
**officer** 125:8
162:5

**officers** 117:11
**official** 16:13
33:2 37:2
**officials** 9:24
10:18,24
**okay** 17:19
19:22 22:4
24:18 27:2
29:8 33:22
35:4,15 36:24
37:12 38:17
40:5,23 41:21
46:13 54:20
56:6 57:1
58:17 63:21
66:20 67:23
69:5 70:18,23
71:13 79:13
86:1,4 87:25
89:23 91:13
110:17 128:15
129:21 131:6
143:8,15
153:25 160:17
**old** 37:5 123:17
123:19
**omm** 6:21,24
123:9,14,16
126:15
**once** 53:23
83:12
**one's** 106:24
**ontario** 1:13,21
2:17 7:19,20
162:3,24
**onward** 63:11
**operate** 14:17

operated  20:21
26:22
operates  41:17
41:20
operating
125:7
operations
25:10 26:5
83:23 84:6
opinion  128:19
138:21,22
146:24 152:8
opportunity
39:22
order  76:19
110:1 135:18
organization
60:4
organizational
5:10 26:14
original  83:23
134:20
originally
81:22
outcome  8:3
162:18
outline  31:25
42:16
outlines  18:7
98:14
outputs  31:19
31:22 61:14
62:5
outside  14:13
outstanding
6:18 102:25
109:12 113:12
114:24 116:13

118:12,22
119:14,18
120:21 130:5,9
130:14,22
overall  42:15
overlap  21:15
22:9
oversee  134:1
overseeing
137:18,20
oversight  16:18
26:11 31:16
35:2 43:9
83:24 84:7
133:13 137:12
138:1
owed  109:18
120:21 122:24
130:5,9 143:17
144:17 152:24
153:1
owes  118:11,22
own  18:8 24:24
81:22,25
140:16 143:6
owned  63:12
63:12,13,18
owner  19:15,19
19:23 21:4
24:2 78:1
owners  21:8
64:15,21,24
77:9
ownership  23:1
23:23 25:3
81:21 82:11,15
134:7,23

owns  23:13
25:1,6 65:23
66:3 120:6

**p**

p  2:1,1 3:1,1
p.m.  131:16
160:18,23
p.m..  131:13
page  4:5 5:4
46:25 48:4
106:21 107:25
110:24 112:11
112:21 124:19
126:18,20
142:24 148:15
148:16
pages  39:15
paid  29:12 41:7
47:11,13,16
51:7 52:1 68:8
69:21 70:11,15
72:3,8,12 73:2
87:12,15,17
90:9 92:12
93:16,19 94:12
96:20,24 97:4
101:13 102:7
103:10 109:17
109:22 110:6
115:12 117:3
121:11 129:1,5
131:2 142:14
156:20,22
157:23
paragraph
42:7,12 46:24
68:20,23 69:6

70:19 90:5
91:8 116:10
117:6,9 118:17
120:19 121:17
122:6 124:5,17
124:20 127:4
155:5
paralegal  8:23
pardon  106:18
part  15:8 35:23
65:11 68:4
75:21 80:8
82:12 105:8
107:2 108:21
133:25 134:20
134:22 137:18
138:1 141:19
141:22 143:5
participants
7:7
participate
10:5
particular  37:8
62:6 105:20
142:14 146:24
147:23 149:1
particularly
146:23
parties  7:10
10:25 11:4,11
80:6 160:4
162:13,16
partner  41:22
partners  33:11
38:9,12 41:16
41:19 60:3
133:18 134:5
135:23 146:2

152:17
party 8:1 28:7
pass 9:14
passed 111:19
  115:11 117:23
  135:16
paul 6:12 38:4
  41:4,13,14,15
  107:7 110:23
  112:1,5,22,25
  140:13 148:9
  148:14,19,23
  149:7 150:9
  154:25 156:3
pay 44:8,9 68:6
  90:1 93:2,4,6
  93:25 95:3,9
  98:11 101:16
  101:20 102:15
  102:16,21,25
  105:15 108:12
  111:12 113:15
  113:17,19
  114:21,25
  117:12,19
  118:9,14,24
  119:10,10
  121:6,18 122:6
  122:7 129:8
  130:4
payable 47:8
  50:14 116:22
payback 98:20
  111:11
paying 51:18
  87:7 90:1
  102:24 106:5

payment 27:24
  28:1 29:18
  50:25 68:6
  70:13,16 71:3
  71:6,20,21
  97:1 98:8
  101:4 113:7
  129:25 137:4
payments 39:6
  42:21 47:16
  50:14 51:20
  52:20 64:12
  65:7 67:19,22
  68:1,12 72:1
  86:24 93:22
  114:1 137:2
  143:10
payout 35:8,13
  42:18 109:9
pays 29:10
  67:25
peculiar
  145:16
people 28:11
  59:19 64:15,21
  64:22 79:8,9
  79:10 134:13
  141:9
percent 24:2
  25:3,4,5,8 63:9
  63:12,13,13,18
  67:14 68:8,16
  68:25 69:2,20
  69:22 70:1,9
  71:7,14 90:8
  95:9 120:6,16
percentage
  63:8,20 68:18

69:3 71:4
percentages
  23:22
performance
  17:8,12
performances
  27:3
period 14:11
  30:14,18,21
  31:5 34:22
  51:24 85:2
  86:20 92:1,3
  92:19 98:24
  114:8 116:14
  117:25 118:2,5
  142:4
periodically
  93:8,11
permission
  9:24 10:21
  51:11
person 79:12
  136:9
personal 78:6
  79:3,25 88:20
  93:6,9 96:1
  103:6 108:9
  129:2 130:15
  137:16,23
  138:21 140:20
  140:25 141:12
  141:18 142:3
  146:4,12
  149:11,11
  151:19 152:7,7
  152:25 155:2
  159:20

personally 32:7
  62:9 74:1
  80:24
perspective
  14:16 16:19
  31:13 54:16
  136:9 137:13
  153:24
pervin 83:22
peter 3:10 7:21
ph 69:11
philosophy
  13:1
phone 61:2
photograph
  126:19,21
  127:5 128:14
pick 61:1
piece 28:10
place 7:10 41:1
  41:5 155:10
  161:6
plaintiff 1:7,18
  7:14
plaintiffs 2:3
plan 92:14
  101:20 102:15
  102:16 104:13
  104:17,19,22
  110:9 115:7
  119:6
plans 14:3
platform 14:2
  23:14 25:18
  26:22,24 29:11
  31:20,23 32:1
  72:13 124:12

platforms 28:8
please 7:4 8:5
   9:8 64:19
   111:6,7 113:2
   146:6,15
pleased 10:11
poel 38:3 62:17
   63:12,22 64:16
   64:22 65:19
   75:16 76:13
   78:11 79:14,18
   80:7 84:6,11
   91:24 92:4
   97:20 104:11
   107:8 123:8,21
   127:9 133:1
   134:17 157:3
   158:4
point 14:24
   44:22,24 45:2
   50:21 53:18
   68:24 76:22
   77:6 101:16
   118:16 139:7
   151:7 152:3,13
   153:16
policy 30:16
   31:1
polson 69:11
pool 101:8
poor 82:23
   83:9
portfolio 43:12
portion 107:21
   121:5 143:16
position 57:14
positioned
   113:15,17

possible 51:25
   101:2 110:2
post 12:20
potential 26:25
   37:11 39:7
   73:13 76:18
   137:13
potentially
   15:18 28:1
   49:7 56:16
   77:19
practice 16:22
precedent
   151:2 152:1
predictions
   25:21
prefer 152:19
preferred 44:7
   95:3
prepared 58:14
   154:7
preparing
   10:16
present 3:3 8:7
   10:8 114:22
   150:12 154:5,9
   155:13
presentation
   65:16
preserve 160:3
president 61:9
prevented
   30:20 31:4
   138:17 139:1
previous 35:23
   37:1 38:9,16
   57:13 82:22
   83:8 126:18,25

133:10
previously 5:2
   25:16 26:21
   34:18 35:2
   38:18 49:16
   66:9 149:9
   153:13
price 121:6
   122:8 123:3
   129:19 130:1
   130:25
primarily
   16:25 25:16
   27:18 62:16
   74:4,6
primary 14:1
   27:9 31:24
   62:4 65:18
prior 24:19
   47:11 56:24
   104:15 113:11
   117:22 153:8
private 108:9
probably 15:14
   41:8 126:8
problem 56:17
problematic
   56:16 152:18
problems 56:3
proceed 9:9
   10:9
proceeding 8:5
   10:23 11:6
proceedings
   1:23 160:23
   161:5
proceeds
   114:25 120:20

130:4
process 28:16
   59:15 132:8
processes 28:9
product 16:2
   61:15,19
products 62:6
professional
   2:16
proffer 55:20
profit 67:9
   124:7,9,11,12
profitable
   47:13 138:12
program
   113:23
projections
   49:24
projects 59:17
promised
   77:10
promissory
   42:9 44:17
   52:15,19
   122:14
proper 40:25
properties 67:6
property 23:18
proportion
   118:13,23
prosecution
   10:14 12:11
provide 13:11
   71:11 76:17
provided 47:12
   113:13
provides 62:11

[province - reconcile]

**province** 162:3
162:24
**public** 133:21
**pull** 35:25 36:5
140:1
**purchase** 6:17
28:11 119:14
119:17,25
120:2,3 121:5
122:8 123:3
128:22 129:8
129:10,11,18
129:23 130:1
130:25 149:17
151:18 155:12
155:18 156:4
**purchaser**
121:18 122:7
151:4
**purchases**
27:13 114:9
**purpose** 117:16
**pursuant** 47:3
116:17
**pushing** 125:21
**put** 53:24 54:4
120:14 141:19
161:7
**puts** 49:24
**putting** 35:8
132:13

**q**

**quality** 7:5,6
**quarterly**
36:13
**question** 36:14
50:23 51:24

57:13 59:10,13
64:18 68:11,25
85:9,19 89:4
94:5 96:4
108:18 126:18
144:11 146:6
147:1,4 152:10
153:16
**questioning**
9:12
**questions**
10:11 11:12
54:21 56:19
57:15 131:5,19
134:25 136:25
138:3 143:1
154:2,19
159:25

**r**

**r** 2:1,5 3:1
**raise** 42:2
**random** 124:21
**rate** 41:6 43:20
43:21 136:19
**rather** 87:3
**read** 35:17
36:16 40:9,21
41:11 42:11,25
43:23 44:11
47:19 68:22
89:17 100:16
104:3 106:12
143:18 150:20
151:5
**reading** 42:12
70:3 118:17

**really** 91:14
125:23 156:8
**realtime**
162:10
**reason** 30:23
49:6 57:16
82:13 96:11
133:25
**reasonably**
100:23
**recall** 15:13,15
19:6 30:19
31:3,6 32:7,11
32:22 33:10
37:5 39:10
44:16 45:8,15
45:20,24 47:24
48:23 49:11
50:21,24 51:3
53:21 69:22
82:17 84:2
86:4 131:23
135:3,7,9
137:4 138:5
139:8,11,15,17
139:18 140:24
144:7,12 145:9
147:12 148:10
149:18 150:14
151:7,8,22
153:9,12,18,20
155:21
**receipt** 140:17
**receivable**
122:21
**receive** 30:2,12
44:13 71:8
76:23 85:13

86:1,8 101:21
105:11 142:15
156:18
**received** 32:12
33:25 52:24
53:19 54:8
80:23,24 81:3
81:11 88:18
95:5 97:3,9
98:23 99:11
101:3 135:6
140:8 156:15
157:8
**receiving** 19:7
32:8 37:6,13
53:13 106:6
**recently** 57:24
105:1
**recess** 55:2
131:12
**recipient** 24:6
37:9
**recognize**
17:24 26:17
46:15 89:14
90:25 91:3
94:21 97:18,23
104:1 106:10
107:11 112:8
115:22 119:20
122:17 123:7
127:7
**recognizes**
116:8
**recollection**
68:23 100:15
**reconcile** 98:1

reconciled
  141:19
reconciliation
  97:5 98:8,14
reconciliations
  96:23
record  7:3,11
  8:9 9:14 11:1
  15:4 47:1,9,18
  54:22,25 55:5
  89:22 96:11
  116:23 131:8
  131:10,16
  160:3,9,14,18
recorded  7:9
  7:13 10:6 75:6
  161:11
recording  7:5,9
records  119:3
  137:21
recross  4:10
  154:4 160:6
redirect  4:9
  131:7,17 160:5
reduce  121:15
reduced  109:19
  162:11
refer  20:10
  91:9
reference  37:11
references
  104:5 151:25
referred  97:2
  113:22 124:6
referring  41:13
  80:12 90:4
  101:17 102:18
  118:1 124:4

  145:20 152:1
reflect  119:3
reflected  95:24
refresh  68:22
refreshes
  100:14
refused  55:16
regard  10:12
regarding  5:12
  33:19
register  5:6
  17:22 18:3,6,7
  18:12
regular  32:24
  33:1 86:23
  114:1
related  8:1
  21:15 22:1
  24:17 52:19
  85:16 130:5,6
  159:1 162:13
  162:15
relates  25:15
  59:16 67:6
  103:7,12 143:6
  143:12 149:1
relating  11:2
  61:6 67:7
  74:20 154:20
  155:10 158:19
relation  9:20
relationship
  17:16 25:19,20
  29:5,7,8 61:12
  62:3
relevance
  54:12 149:14
  151:10

relevant
  146:24 159:5
relied  31:11
  134:1
rely  32:3 49:23
relying  153:4
remaining
  29:12
remember
  45:17 49:3,5
  70:2 83:21
  101:1,8 151:12
  155:23
remotely  8:8
repaid  52:23
  52:25 116:13
repay  44:20
  52:16 114:18
  141:14
repayment
  53:3
repeat  41:18
  64:18
repeated
  109:25
rephrase  50:23
  138:23 142:5
  152:9
reply  11:12
report  14:15
  15:8 17:2
  25:17 34:24
  62:13 65:12
reported  14:14
  17:6 21:19
  35:1 140:16
reporter  7:23
  9:8 161:4

  162:1
reporter's
  161:1
represent  23:5
  23:23 55:12
  59:20 148:22
representations
  143:2
representatives
  9:12 10:25
represented
  120:16 149:8
representing
  7:22 8:17
  143:4 148:24
  154:24
request  9:21
  10:25 51:25
  88:12 105:24
requested  53:4
  54:2,7 88:18
  88:19 89:5
  98:10
requesting
  51:15 53:12
  98:13
requests  50:22
  50:25 51:4,5,9
  51:12,16,23
  52:3,8,11,12
  53:11,13 54:8
  89:3 144:22
requires  12:13
reserve  47:14
resolution  6:14
  11:3 81:15,17
  87:19,25 94:3
  94:9 99:17

108:17 109:4
110:1,18,21,25
111:11,18
113:3,6,10,11
113:18 114:17
114:22 115:11
115:15,18,22
115:24 116:5,8
117:13,17,22
118:7,8 147:13
**resolutions**
87:22 88:3
112:19
**resolved**  117:2
117:10 118:8
**resources**
40:20
**respect**  10:13
**respecting**  11:2
**responds**  40:24
42:20 44:5
**response**  42:1
43:16
**responses**
111:2
**responsibilities**
13:25 16:10,17
**responsibility**
75:10
**responsible**
62:7
**rest**  134:12
**restate**  85:18
**result**  142:2
**resuming**  55:3
131:13
**retained**
160:20

**return**  95:25
**returns**  10:16
**revenue**  10:17
27:5,15,18
28:11 29:14,15
39:8 41:1
43:19 95:15
124:1
**revenues**  39:2
**review**  39:22
68:20 69:5
70:18 110:12
**reviewed**  58:13
58:21 69:14
115:25 119:22
155:24
**reward**  77:20
**richard**  6:3
38:4 62:17
63:18 64:16,23
65:19 78:4
84:5 92:8
100:11,14
107:9 123:8,22
127:9 133:1
134:17
**richard's**  63:20
**right**  19:1
22:11 34:5
39:9 41:24
54:3 59:2,4
66:17 70:3
71:5 72:2,23
76:7 77:11
81:10,12 85:21
86:18 88:19
95:20 98:7,15
98:24 104:5,8

112:13 119:5
120:22 121:9
121:25 122:18
126:11 127:5
131:18 140:1
148:7 154:8
155:9 156:2,13
159:10
**risk**  136:5,7,8
**risks**  136:10
**rodenburg**
38:4 62:17
63:13,22 64:16
64:22 75:20
78:17 84:5,12
92:6 106:24
107:8,22
110:11 123:9
123:22 127:9
134:17 142:21
143:3,4,9,17
145:13,13
157:3
**rodenburg's**
144:19
**role**  16:24
25:14 29:1
49:17,20,23
50:11,15 61:14
83:24 84:7
148:23
**roles**  16:10
**room**  14:22
**roughly**  30:7,9
30:10 59:10
81:4 121:24,24
**rule**  153:19,22

**run**  29:21
59:15
**running**  83:5
84:12
**runs**  127:15
**rusty**  3:5 8:21
8:21 69:11
**ryan**  38:4 79:1
101:3 107:7
**rypl**  2:15 9:3
12:19 13:6,6,9
13:13,17,21
15:21 16:4,7
16:10,14 17:6
18:11,20 19:7
19:16,17,23
20:14 21:1,8
25:15 26:3
28:14 30:2,15
30:17,20,23
31:8,9,10 32:9
34:14,25 41:5
44:23 48:19
49:17,24 50:5
50:8,12 51:16
51:20 52:7,12
59:5,15,20
61:10,16,22
62:10,11,13
66:6,13,17,21
66:25 67:9,13
68:7,13 69:19
69:21 70:8,11
70:13 71:20
72:2,19,19,25
73:3,9 81:21
81:22 82:1,11
82:15,20 83:2

83:6 84:22,25
85:3,6,7 86:15
96:9,12,14,15
105:20 132:8
132:25 133:8
133:12 134:2
135:1,1,2,7,15
141:4,5 154:24
**rypl's** 25:11
31:13 62:4
67:16 72:16,20
73:3,20 75:1,7
95:24 100:3
157:14
**rypl.com** 5:7
10:1 17:22
18:4

**s**

**s** 2:1 3:1
**salary** 30:3,12
**sale** 120:20
**sales** 16:1
125:23 130:3
**savings** 40:18
**saying** 71:1
125:25
**says** 18:23 19:2
19:11 23:9
28:18 35:6
40:11,24 43:16
47:2 90:7 95:8
95:10,14,17
98:6 104:7
108:15 109:20
111:3,14
112:12 113:2,9
113:16,25

115:6 116:15
116:16 118:20
120:15 130:20
130:23 150:18
150:21,24
151:25 155:6
155:19
**scale** 54:14,17
159:5
**scime** 2:21
**scollard** 2:17
**scott** 2:5,7 8:13
8:13 69:10
153:13
**screen** 7:8
22:13 33:21
39:16 40:6
46:13
**scrutiny** 53:24
**second** 16:24
35:14 39:15
48:3 54:23
91:8 117:8
124:5 142:24
**secondary**
12:20
**section** 118:8
**see** 18:24 19:12
23:3 33:21
46:12 100:14
104:1 118:8,17
123:6 126:18
130:2 142:22
150:21
**seeing** 147:12
**seemed** 54:17
**seems** 29:17
42:16 43:20

70:5 100:23
104:6
**seen** 7:7 22:19
52:18,21,22
**sees** 137:13
**sell** 125:12
126:1
**seller** 120:21
130:5,10 151:3
**send** 65:12
**sending** 38:18
**senior** 134:12
134:14,18
**sense** 22:15
152:17
**sensitivities**
136:5
**sent** 5:13 20:25
37:19 50:22,25
52:16 91:3
122:3
**separate** 20:7
**separated**
105:6
**sept** 6:21 123:9
123:14
**september** 6:3
6:20 18:12,23
100:11 123:9
123:13,23
**service** 10:18
**services** 13:12
13:14 29:19
50:7 62:11
66:14,15 67:11
**set** 16:24 28:15
39:2 63:6
76:10,13,16,19

77:4,10 78:2,4
78:11,17 79:11
79:17,23 81:10
81:15 86:7
161:6
**setting** 79:8,9
79:14,19
**settle** 106:2
**settled** 96:25
97:1
**several** 56:23
113:14 143:1
152:21
**severin** 11:7
16:23 32:4
34:11,14,24
35:5 36:2,19
38:19 40:8,24
41:13 43:15
45:18 49:17
50:19 51:1,23
52:8 68:10
74:12 82:18,21
83:1,12,16
93:18 94:18
144:23
**severin's** 74:10
75:9
**share** 19:5,7
60:5 104:9
**shareholder**
24:5,14,22
41:22 49:9
52:7 60:24
61:1,2 63:1,5
70:12,13,16
73:11 76:22
83:23 84:4,22

88:17 96:15
103:10 110:13
116:13 118:11
118:21 140:14
141:14,23
149:5,6 152:13
158:3,5,24,25
**shareholder's**
118:13,15,23
118:24
**shareholders**
5:6 17:21 18:3
18:6,7,11
24:12 31:12
32:3 37:11,13
47:4,8,17,17
48:1,13,23
60:10,13,17
63:23 64:1,12
65:5,7,9 72:2,9
72:12 73:3,22
75:23 77:13,23
79:21 84:11
86:23 87:6
88:7,14 89:1,3
92:18 94:2,8
95:25 99:16
101:25,25
102:4,4,25
103:16 104:13
106:1 107:12
107:21 109:12
109:23 110:20
111:10,21
113:8,13 114:2
114:7,23,24
116:9,19,23
120:14 127:11

132:15,16,21
134:6,12,15,19
138:17 139:1
140:7,11,16
143:11,13,18
145:2 146:10
146:17 147:21
147:24 148:4
149:2 150:9
152:4,8 156:9
156:9 157:2,23
158:2,18,19
159:12,17,18
159:19
**shares** 6:18
18:8,18,19
19:3 23:24
24:9,24 25:1
77:2 85:17,24
119:15,18
120:4 134:23
**sheet** 22:24
24:7,16 35:13
**shirt** 15:2
**shorthand**
161:4,14
162:10
**shortly** 45:6
139:23
**show** 17:19
22:11 26:12
27:11 33:14
37:17 39:13
58:17 68:21
89:8 90:22
94:17 100:8
106:9 140:22
147:9,10 155:4

**showing** 22:12
35:21 97:12
110:5 119:13
148:7 154:10
**shown** 24:16
24:18 25:7
38:8,8 128:13
140:3 148:9
154:11,14
**shows** 98:15
144:20
**shrink** 14:6
**shs** 109:18
**sic** 70:19 97:21
124:9
**side** 16:1 25:11
**sign** 12:4 48:12
**signature** 48:4
161:21 162:20
**signed** 48:5
116:5 147:16
**significant** 83:4
**significantly**
144:17
**signing** 44:16
52:15
**similar** 13:3
26:10 28:4,15
51:22 126:17
**simply** 142:10
**single** 14:17
**site** 27:14
**situation**
145:15,16,22
146:18 155:22
**six** 60:2
**slightly** 125:22
125:22

**small** 28:14
140:14
**smartvu** 78:5
144:2
**smooth** 40:16
**sold** 128:3,6
**sole** 6:14
115:15,19
**solutions** 1:20
7:23,24 13:10
160:21
**someday**
102:16
**somewhat**
124:21 126:17
127:17
**soon** 110:2
**sorry** 33:16
41:18 66:8
70:20 72:10
85:8,18 87:15
94:5 106:23
124:3 144:10
147:10 154:18
**sort** 17:11
43:11 148:2
**sounds** 58:9
117:7
**source** 98:4
99:25 105:13
**sources** 27:10
**south** 2:12
**space** 27:1
127:16
**speak** 25:11,21
33:5 52:10
66:24 73:13
88:22 146:13

Chad Moldon
May 14, 2025

**[speak - surely]**

Page 31

146:16 152:5
157:12
**speaking** 37:10
45:20
**speaks** 66:13
**specific** 30:22
49:20,22 50:15
100:21 153:3
**specifically**
10:1 14:10
15:17 19:4
31:6,20 39:3
45:10,17 48:25
51:6 66:14,24
82:6 90:3
99:12 139:15
147:8 148:5
149:22 151:21
153:20
**specificity** 69:1
**specifics** 136:4
**speculate**
136:23,25
**speculation**
126:4 137:16
137:23 138:21
140:20 145:7
146:4,11
149:10 151:20
152:6,15
158:10,15
159:3,15
**spoke** 21:11
45:23 79:18
132:25
**sponsoring**
68:4

**spread** 105:19
**spreadsheet**
35:9 98:14
**spreadsheets**
54:4
**staff** 60:3
**stan** 127:1,14
128:11,12
**standard** 42:23
**stands** 123:17
123:18
**start** 59:4
107:4 108:15
115:5
**started** 15:20
30:9 102:21
**starting** 35:9
36:11 143:21
**starts** 124:20
**state** 8:5,8 11:1
123:25 143:13
**stated** 9:18
21:19 25:17
35:2 155:7
**statement** 9:14
37:1
**statements**
10:17 141:10
**states** 1:1,6
7:15,16 8:12
8:14 12:5 20:3
55:21,24 56:1
56:4,7,10,12
57:8 109:14
116:24 131:22
131:23
**status** 65:12

**stay** 89:21
**stayed** 30:8
**stenographic...**
161:11
**stenotype** 1:23
**steps** 10:21
14:6
**stock** 81:22,25
82:6
**stop** 30:23
104:22
**straight** 71:5
108:1
**strange** 124:21
**street** 1:20 2:6
2:17 7:19
**strictly** 17:17
**strike** 58:10
**structure** 5:9
22:17,22 23:1
23:5
**structures** 28:4
**study** 12:25
**sub** 107:25
**subject** 91:14
94:24 123:9
**subpoenaed**
12:1
**subsidiary**
65:25
**subtracting**
121:23
**success** 21:16
**successful** 84:3
**succinct** 38:15
**suggested**
110:14

**suggesting**
109:5,7
**suggestion**
110:3
**suggests**
109:10
**suite** 1:21 2:12
2:22
**sum** 121:11
**summarize**
25:24
**summarizes**
38:14
**summarizing**
127:14
**summary**
123:16
**super** 111:6
**supervisor**
14:9
**sure** 27:9 31:2
33:6,8 35:25
38:14 39:5
43:17 46:25
49:1 51:25
52:5 68:9,17
69:2 70:17
71:9 80:6
95:14 108:6
146:18 150:18
155:22
**surecom** 5:8
22:16 23:9,10
23:13 24:3
29:9,10 65:21
65:23,25 66:3
**surely** 31:16

surplus 117:4
surprised
 54:10
suspect 28:5
suspected
 132:5
swear 9:8
switch 84:10
sworn 162:8
syntego 128:22
 149:17 155:18
 156:4
syntego's
 129:11

**t**

table 15:2
take 7:10 10:21
 29:15,18 67:3
 67:5 100:24
 117:14 127:3
 127:23 131:8
taken 1:19,23
 7:13 87:16
 115:10 116:9
 148:23 161:6
 161:14 162:6,9
 162:14
talk 59:21 61:2
 81:20 120:2
talked 38:5
 124:23 128:13
 158:24
talking 59:4
 90:13,14
tango 144:6
target 132:1

tasks 16:22
 61:20
tax 2:4 10:15
 10:16 13:3
 44:7 95:3,25
 140:17
taxable 41:3
technology
 23:19 29:11
 65:23
tell 57:7 153:16
 153:23
telling 153:18
ten 25:4 67:13
 96:22
term 32:18
 90:11,19 91:17
 136:12
terms 16:22
 22:5 39:1
 42:17,23 43:4
 43:12 44:1
 102:15 122:16
 125:16 134:4,7
 141:18 149:24
testified 132:9
 132:24 138:7
 139:6 140:7
testify 55:22
 152:7
testifying 11:23
 135:9 138:5
 140:24 144:7
 144:12 148:10
 153:19
testimony
 10:19,23 11:6
 12:14 21:19

34:19 133:10
 160:19 161:9
 162:7,9
thank 9:16
 11:18 89:18
 131:6 153:25
 160:1,22
thereto 162:17
thing 111:23
 124:3
things 20:25
 22:2,2,7,9
 93:12 150:15
think 14:3
 16:24 17:7
 22:13 25:21
 29:22 35:22
 36:23,24 38:14
 41:8 49:22
 50:17 52:5
 54:15 59:18
 66:12 70:25
 78:20 79:19,22
 80:16 81:4
 82:14 86:13
 88:15 128:18
 132:23 136:8,9
 148:24 149:2
 152:16 155:23
 159:4
third 2:12 28:7
 29:23 107:25
 118:19 124:17
 124:19
thought 57:12
 102:6 109:3
 125:23 127:2
 155:11

three 26:18
 27:9 29:20
 131:15 160:20
thursday
 148:14
tied 113:11
tiers 134:5,11
time 8:5 13:21
 14:11 15:22,25
 16:24 18:20
 30:14,18,21
 31:5 34:22
 37:7 43:3 49:1
 51:24 53:10,15
 76:18,23 77:6
 85:2 86:20
 89:20 92:1,3
 92:19 96:23,24
 97:1,10 111:15
 114:5,15 116:3
 117:25 118:2,4
 118:5 125:20
 126:7 128:8,9
 133:20,23
 138:11,18
 142:4,14
 147:23 148:1
 153:1 155:13
 161:6,7,10
timeframe
 32:10 37:3
 42:18 80:12,14
 80:25 81:1
 91:23 138:13
timeframes
 25:22
times 56:23
 60:8

Chad Moldon                                      May 14, 2025

**[tip - ultimate]**                                      Page 33

| | | | |
|---|---|---|---|
| **tip** 27:11 | 75:9 82:18,21 | **transcribed** | 80:24 81:10,15 |
| **tipping** 27:10 | 83:1,12,14,16 | 1:23 10:7 | 81:18 85:14,21 |
| 27:17 | 83:19 93:18 | 161:12 | 86:7,8 122:3 |
| **title** 13:6 16:13 | 99:8,13 144:23 | **transcript** | 143:7 |
| 34:16 50:8 | **took** 35:7 87:6 | 161:14 | **truth** 153:23 |
| 94:24 | 92:19,25 94:3 | **transfer** 121:19 | **truthful** 12:10 |
| **titles** 13:20 | 94:9 105:15 | **transferred** | 12:13 |
| **today** 11:5,24 | 155:10 | 74:21 135:15 | **try** 33:16 39:15 |
| 12:2,14 14:22 | **top** 18:16 33:24 | 142:8 | 54:4 |
| 36:6 40:20 | 40:1 44:4 58:8 | **transition** | **trying** 99:4 |
| **today's** 160:19 | 63:19 106:21 | 83:22 84:3 | **turn** 28:17 48:3 |
| **together** 35:8 | 107:5,24 | **transparency** | 126:20 149:16 |
| 49:24 53:24 | 110:24 124:1 | 54:15,19 | **turned** 83:13 |
| 54:4 59:19 | **topic** 104:12 | **treaty** 9:21 | **turning** 20:16 |
| **toine** 38:4 | **toronto** 1:13,21 | **trial** 10:20 | 148:16 |
| 62:17 63:13,22 | 2:17 7:20 8:24 | 55:22,23 56:11 | **two** 15:22 |
| 64:16,22 75:19 | 9:25 11:22 | 56:18 57:11 | 19:10 27:16 |
| 78:17 84:5 | 15:18 | **triangle** 26:18 | 39:15 55:5 |
| 92:6 106:24 | **total** 54:2,7,15 | **tried** 82:15 | 81:4 121:18 |
| 107:8,17 | 80:21 81:7 | **triggers** 111:5 | 122:2 131:10 |
| 108:19 109:5 | 96:25 99:4 | **trounces** 41:8 | 133:18 134:5 |
| 110:11 123:8 | 105:20 109:16 | **true** 18:10 | 134:10 156:8 |
| 123:22 127:9 | 160:19 | 24:23 33:25 | **type** 22:1 43:9 |
| 134:17 142:21 | **towards** 132:7 | 34:7,21 37:23 | 59:5,22 |
| 145:12 | **track** 93:18 | 40:1 71:10 | **types** 13:12 |
| **toine's** 111:23 | 99:10,14 | 73:14 84:24 | 136:20 |
| **told** 45:15,19 | **traffic** 22:8 | 85:1,2,4 86:17 | **typically** 21:14 |
| 45:24 71:19 | **training** 13:3 | 114:2 136:21 | 28:13,14 50:13 |
| 77:9 | **trajectory** | 158:2 161:13 | 147:15 |
| **tone** 89:3 | 61:15 | **trust** 24:7,8 | |
| **tony** 16:23 | **tranches** 41:9 | 25:2 32:11 | **u** |
| 31:15 32:3 | **transaction** | 37:9 48:10 | |
| 34:3,11,14,24 | 136:17 | 62:25 63:2,5,6 | **u.s** 28:5 |
| 35:4,20 36:5 | **transactions** | 63:9 76:8,19 | **u.s.** 10:18,20,23 |
| 40:8,23 43:15 | 27:19 28:25 | 77:2,5,5,7,10 | 10:24 11:2 |
| 44:1 45:18 | 74:23 75:4,10 | 79:9,11,14,17 | 153:9 |
| 49:16 50:5 | 136:19 | 79:19,24 80:7 | **ultimate** 99:25 |
| 68:10 74:9 | | 80:8,9,11,20 | 102:16 |

CASE 0:24-cr-00007-JMB-DLM    Doc. 136-1    Filed 06/27/25    Page 196 of 200
Chad Moldon                                                    May 14, 2025
[ultimately - wanted]                                         Page 34

**ultimately**
100:5 115:11
135:16,19
**um** 110:19,22
**under** 14:17
18:18 65:21
120:10 127:5
145:5 146:9,21
147:5 152:17
161:7
**understand**
10:15 11:5
12:12 42:4
59:13 145:18
160:7
**understanding**
11:15 12:8
21:3,5 24:19
24:20 32:23
35:19 36:18
42:13 102:7
114:23 144:8
152:12
**understood**
11:10 90:20
144:13
**unfamiliar**
79:10
**unit** 7:12
**united** 1:1,6
7:15,16 8:12
8:14 12:5
48:10 55:21,24
55:25 56:4,7
56:10,12 57:8
116:24 131:22
131:23

**unreconciled**
130:21 152:23
**unreserved**
117:4
**unrestricted**
117:4
**unsure** 25:1
**unusual** 43:3,6
43:7 44:1
**update** 91:6,14
91:15
**updates** 14:18
**usd** 109:16,16
109:18 143:24
143:25 144:1,2
144:3,4,5,6
**use** 28:5 29:10
91:17 114:24
141:18
**used** 20:25
27:24 90:11,20
91:20 118:14
118:24 121:6
160:20
**users** 124:17
**uses** 136:18
**using** 28:12
162:10
**utilized** 16:19

**v**

**v** 1:8,9 2:9 7:15
**valuate** 125:25
**valuation**
120:13 126:7
128:7
**value** 128:18

**valued** 125:19
**values** 120:3
**van** 38:3 62:17
63:11,21 64:16
64:22 65:18
75:15 76:13
78:11 79:14,18
80:7 84:5,11
91:24 92:4
97:20 104:11
107:8 123:8,21
127:9 133:1
134:16 157:2
158:4
**variations**
15:25
**variety** 50:6
51:5 61:19
**various** 5:14
23:24 37:20,24
**verified** 143:6
**verify** 143:4
**veritext** 1:20
7:19,22,24
160:21
**versus** 7:15
**video** 7:9,13
10:6
**videographer**
3:9 7:2,22 9:7
54:24 55:4
131:9,14
160:12,17
**videotaped**
1:16
**vincent** 10:14
**virtually** 7:5

**visit** 15:19
139:24
**visited** 45:13
46:5
**voluntarily**
10:5,9 11:23
57:5
**voluntary** 9:25
10:6 11:10,13
**vote** 47:4,6
88:7,11 94:2,9
99:17 110:21
111:6,7,8
116:18,21
**voting** 146:23

**w**

**waived** 151:2
**want** 15:3
17:19 18:15
19:9 22:11
26:12,16 28:17
29:21 30:23
33:6 34:10
37:17 39:15
40:5 41:24
46:7,23,25
48:3 55:21
56:14 57:7,13
70:18 86:18
100:16 138:3
140:5 142:18
142:19 143:15
147:9,10
149:16 150:18
160:2
**wanted** 36:3
131:21 160:8

Chad Moldon

[wanting - zoomed]

**wanting** 152:4
**washington** 2:6
**waterlily** 143:25
**waters** 24:6,8 25:2 32:11 37:9 62:25 63:2,5,8 76:8 77:2 80:17 85:20 86:8 142:13 143:7 144:3
**way** 38:15 44:7 49:25 50:19 56:15 77:5 90:1 95:3 97:4 145:14 153:21
**ways** 27:20 28:6
**we've** 29:22 38:5
**wearing** 14:25 15:1
**web** 67:6
**website** 26:23 28:3 135:22 136:18
**websites** 136:20
**wednesday** 1:14,22
**week** 58:4,12 69:15 154:15
**weeks** 45:12
**went** 80:11,17 105:4
**west** 1:20 7:19

**white** 15:2
**wife** 105:9
**william** 2:10,11 2:12 8:15,17
**willing** 125:12
**wipe** 121:14
**wire** 121:19
**wise** 49:1 62:1
**wishes** 40:15
**witness** 1:17,19 2:20 4:4 7:8 9:6,8 11:11 15:4 53:7 54:14 57:11,22 71:24 72:6 78:8,14,20 79:5 80:2 84:20 88:22 96:3 103:12 129:4 131:6 137:25 139:4 139:23 140:21 141:17 145:9 146:13,16 149:13 150:2 151:21 152:16 156:6 158:11 158:22 159:4 159:22 160:1 160:13,15 161:7,9 162:7 162:9
**witnesses** 10:1 10:3
**wondering** 160:12
**wording** 153:21

**words** 36:22
**work** 12:18 13:5,9 14:2,15 15:21 16:4,6 25:24 26:1,2,3 26:6,8 50:18 132:25 137:18
**worked** 16:11 16:16,20 17:14
**working** 44:22 59:17
**works** 19:16 50:5
**worth** 120:10
**worthwhile** 22:10
**writes** 36:2 42:1 145:13
**writing** 35:20
**written** 162:12
**wrong** 106:24
**wrote** 125:17 143:9 149:20 155:7

**x**

**x** 1:5,11 4:2

**y**

**yeah** 98:6 100:16 109:10 111:3 113:25 115:6,23 124:8 124:14 125:9 125:17 126:2 130:2 139:23 140:4
**year** 14:4 15:14 17:9 30:6

31:25 51:19 65:15 84:2 105:4 108:16
**yearly** 14:3,18 25:23 47:7
**years** 15:24 19:25 42:21 44:23 59:9 96:22 109:22 113:14 116:14
**yep** 94:20 104:18 111:20 116:4 119:21 122:19 124:22 156:12
**york** 2:22

**z**

**zero** 121:15
**zimmerman** 11:8 40:7 50:2 51:1,23 52:9 99:8 144:23
**zoom** 33:16
**zoomed** 150:18

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.