Page 1

1                UNITED STATES DISTRICT COURT

2                DISTRICT COURT OF MINNESOTA

3                Criminal No. 24-7  (JMB/DLM)

4

5       ----------------------------------X

6       UNITED STATES OF AMERICA,          :

7                      Plaintiff,          :

8       V.                                 :

9       DAVID V. ERICKSON,                 :

10                     Defendant           :

11      ----------------------------------X

12

13                 Toronto, Ontario, Canada

14                 Thursday, May 15, 2025

15

16                 Videotaped Deposition of AMANDA ZIMMERMAN,

17      a witness herein, called for examination by counsel

18      for the Plaintiff, in the above-mentioned matter,

19      the witness having been duly sworn, taken at

20      Veritext Legal Solutions, 77 King Street West,

21      Suite 2020, Toronto, Ontario, commencing at 9:07

22      a.m. on Thursday, May 15, 2025, and the proceedings

23      taken down by Stenotype and transcribed by

24      JUDITH M. CAPUTO, RPR, CSR, CRR.

25      Job No. CS7296586

Amanda Zimmerman                                    May 15, 2025

```
                                            Page 2

 1                  A P P E A R A N C E S:

 2

 3    On Behalf of the Plaintiffs:

 4    DEPARTMENT OF JUSTICE, TAX DIVISION
      BY:  BORIS BOURGET, Esquire

 5             - AND -
           AMANDA R. SCOTT, Esquire

 6    150 M Street NE
      Washington, DC  20002

 7    (202) 307-2182 (Bourget)
      (202) 718-2056 (Scott)

 8

 9    On Behalf of the Defendant,
      David V. Erickson:

10
      WILLIAM MAUZY ATTORNEY AT LAW

11    BY:  WILLIAM J. MAUZY, Esquire
                - and -

12         WILLIAM DOOLING, Esquire
      650 Third Avenue South, Suite 260

13    Minneapolis, Minnesota 55402
      (612) 688-1154

14

15    On Behalf of Rypl:

16    JANSSEN LAW PROFESSIONAL CORPORATION
      BY: CHARLOTTE JANSSEN, Esquire

17    89 Scollard Street
      Toronto, Ontario M5R 1G4

18    (416) 929-1103
      cmj@janssen-law.com

19

20    On Behalf of the Witness:

21    LIPSITZ GREEN SCIME CAMBRIA
      BY: JUSTIN D. GINTER, Esquire

22    42 Delaware Avenue, Suite 120
      Buffalo, New York 14202

23    (716) 849-1333
      jginter@lglaw.com

24

25
```

Amanda Zimmerman                                    May 15, 2025

                                                    Page 3

1   A P P E A R A N C E S (cont'd):

2

3   ALSO PRESENT:

4

5   Rusty Kiser, IRS Criminal Investigation

6   Adrienne Rice, Department of Justice Canada

7

8   VIDEOGRAPHER:

9   Peter Goodale, CLVS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Amanda Zimmerman                                    May 15, 2025

                                          Page 4

1                          I N D E X

2

3    WITNESS:    AMANDA ZIMMERMAN

4                                                PAGE

5

6    DIRECT EXAMINATION BY MR. BOURGET............ 11

7    CROSS-EXAMINATION BY MR. MAUZY............... 59

8    RE-EXAMINATION BY MR. BOURGET............... 122

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                INDEX OF EXHIBITS

2                (PREVIOUSLY MARKED)

3

4    NUMBER/DESCRIPTION                        PAGE NO.

5

6    G-1001:  Organizational Chart            16

7    G-7:  E-mail Chain from D. Erickson to   22

8    A. Zimmerman, et al dated November 6,

9    2012, RE: Cam4 Pay.

10   G-8:  E-mail Chain from D. Erickson to   29

11   R. Burry dated March 12, 2013.

12   10:  E-mail Chain from D. Erickson to    32

13   G. Elias, et al, dated January 4, 2018.

14   11:  E-mail Chain from D. Erickson to    33

15   A. Zimmerman, et al, dated August 28,

16   2014 Re: Advances to Chad.

17   12:  E-mail Chain from D. Erickson to    35

18   A. Zimmerman, et al, dated February

19   23, 2016, Re: Toine's cash advances

20   13:  E-mail from D. Erickson to          37

21   A. Zimmerman, et al, dated January 6,

22   2015 Re: Tax Payments

23   15:  E-mail from D. Erickson to A.       39

24   Zimmerman, et al, dated April 18, 2016

25   Re: Loan.

Amanda Zimmerman                                    May 15, 2025

Page 6

1   17:  E-mail from D. Erickson              41

2   to A. Zimmerman, et al, dated May 3,

3   2017 Re: Loan

4   18:  E-mail from D. Erickson              42

5   to A. Zimmerman, et al, dated November

6   3, 2017 Re: Loan

7   19:  E-mail from D. Erickson              45

8   to A. Zimmerman, et al, dated June 12,

9   2017 Re: Loan to Halstead

10  20:  E-mail from D. Erickson             47

11  to A. Zimmerman, et al, dated October

12  17, 2018 Re: Short Term Loan

13  16:  E-mail Chain from D. Erickson to    48

14  A. Zimmerman, et al, dated December

15  28, 2016 Re: Transfer 112368

16  14:  E-mail from D. Erickson to          56

17  A. Zimmerman, et al, dated January 21,

18  2015 Re: Amex.

19  21:  E-mail from D. Erickson            108

20  et al, to T. Severin dated May 30,

21  2018, Re: Transfer.

22  22:  E-mail Chain from D. Erickson to   111

23  A. Zimmerman, et al, dated August 27,

24  2014, Re: Loan.

25

Amanda Zimmerman                                    May 15, 2025

                                              Page 7

1   23:  E-mail from D. Erickson              114

2   to A. Zimmerman, et al, dated

3   September 29, 2016 Re: Loan

4   D-50:  Firefly Lane, LTD., Shareholders    117

5   Agreement dated July 1, 2009

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Amanda Zimmerman                                    May 15, 2025

Page 8

1   -- Upon commencing at 9:07 a.m.

2

3              THE VIDEOGRAPHER:  We are going on the

4   record at 9:07 a.m. on May 15, 2025.

5              Please note that this deposition is

6   being conducted virtually.  Quality of recording

7   depends on the quality of camera and internet

8   connection of participants.  What is seen from the

9   witness and heard on screen is what will be

10  recorded.  Audio and video recording will continue

11  to take place unless all parties agree to go off

12  the record.

13             This is media unit one of the

14  video-recorded deposition of Amanda Zimmerman,

15  taken by counsel for the Plaintiff in the matter

16  of:  United States of America vs. David V.

17  Erickson, filed in the United States District

18  Court, District of Minnesota.  Case No.

19  0:24-CR-0007-JMB-DLM.

20             The location of the deposition is

21  Veritext Ontario, 2020-77 King Street West,

22  Toronto, Ontario, Canada.

23             My name is Peter Goodale, certified

24  legal videographer representing Veritext Legal

25  Solutions.  The court reporter is Judith Caputo,

```
 1   also from the firm Veritext Legal Solutions.

 2              I am not authorized to administer an

 3   oath.  I am not related to any party in this

 4   action, nor am I financially interested in the

 5   outcome.

 6              If there are any objections to

 7   proceeding, please state them at the time of your

 8   appearance.

 9              Counsel and all present, including

10   remotely, will now state their appearances and

11   affiliations for the record, beginning with the

12   noticing attorney.

13              MR. BOURGET:  Good morning.  Boris

14   Bourget on behalf of the United States.

15              MS. SCOTT:  Along with Amanda Scott on

16   behalf of the United States.

17              MR. DOOLING:  William Dooling on behalf

18   of the Defendant, David Erickson.

19              MR. MAUZY:  William Mauzy on behalf of

20   David Erickson.

21              MR. ERICKSON:  David Erickson.

22              MR. KISER:  Rusty Kiser, IRS Criminal

23   Investigation.

24              MS. RICE:  Adrienne Rice, Attorney

25   General of Canada.
```

Amanda Zimmerman                                    May 15, 2025

Page 10

```
 1                   MS. JANSSEN:  Charlotte Janssen,
 2     counsel to Rypl.
 3                   MR. GINTER:  Justin Ginter on behalf of
 4     Ms. Zimmerman.
 5                   THE WITNESS:  Amanda Zimmerman.
 6                   THE VIDEOGRAPHER:  Will the court
 7     reporter please swear in or affirm the witness, and
 8     then counsel may proceed.
 9                       AMANDA ZIMMERMAN,
10     having been duly affirmed testified on her oath as
11     follows.
12                   MR. BOURGET:  Okay.  Before we get to
13     questioning, the parties have just discussed off
14     the record something we want to put on the record
15     related to the admission of exhibits.
16                   This deposition is being taken pursuant
17     to United States Federal Rule Criminal Procedure 15
18     and a joint deposition protocol that was agreed to
19     by the parties and adopted by the Court.
20                   Missing from that protocol is how to
21     handle the admission of exhibits.  The parties have
22     agreed that we will not formally move to admit
23     exhibits during the depositions but will do so
24     during the briefing process that's set out in the
25     deposition protocol.
```

Amanda Zimmerman                                    May 15, 2025

Page 11

1                    Mr. Mauzy, any objections to that?

2                    MR. MAUZY:  No.  That is our agreement.

3                    MR. BOURGET:  Okay.  Ms. Rice, did you

4    have any statement or anything that you needed to

5    put on the record before we get started?

6                    MS. RICE:  I just would like to confirm

7    with Ms. Zimmerman and Mr. Ginter that they

8    understand -- their understanding that it is a

9    voluntary deposition.

10                   MR. GINTER:  We understand.

11                       DIRECT EXAMINATION

12   BY MR. BOURGET:

13                   Q.   All right.  Ms. Zimmerman, what

14   city do you live in?

15                   A.   I live in St. Catharines.

16                   Q.   Is that in Ontario?

17                   A.   Yes.

18                   Q.   Are you testifying voluntarily

19   today?

20                   A.   Yes.

21                   Q.   Have you been subpoenaed or

22   compelled to appear here today?

23                   A.   No.

24                   Q.   On May 5th, 2025, did you sign an

25   immunity agreement with the United States

```
 1   Government?
 2              A.   Yes.
 3              Q.   Do you understand that that
 4   agreement requires you to give complete and
 5   truthful testimony today?
 6              A.   Yes.
 7              Q.   And do you understand that if you
 8   give true and complete testimony today, the U.S.
 9   government has agreed not to use any statements you
10   make today against you?
11              A.   Yes.
12              Q.   Are you currently employed?
13              A.   Yes.
14              Q.   Where do you work?
15              A.   At Rypl.com Inc.
16              Q.   What's -- I'm sorry?
17              A.   That's okay.  Rypl.com Inc.
18              Q.   What is the highest level of
19   schooling that you've completed?
20              A.   High school.
21              Q.   Have you received any formal
22   training or education in tax or accounting or a
23   related field?
24              A.   Just a high school class.
25              Q.   So, at Rypl, what is your title?
```

Amanda Zimmerman                                    May 15, 2025

Page 13

1             A.    Assistant controller.

2             Q.    And how long have you worked at

3    Rypl?

4             A.    I've worked for the company since

5    2007.

6             Q.    Okay.  And did the Rypl business

7    previously operate under different names?

8             A.    Yes.

9             Q.    And what were those?

10            A.    I started in 2007 at Guayaca

11   Financial Services.

12            Q.    Can you spell that?

13            A.    G-U-A-Y-A-C-A.  And then I also

14   worked for Webkrew Inc.

15            Q.    And were you an assistant

16   controller at those companies as well?

17            A.    No.

18            Q.    What were your -- or what was your

19   title at those companies?

20            A.    Most of the time -- AP clerk, and

21   I think AP manager.

22            Q.    What does "AP" stand for?

23            A.    Accounts payable, sorry.

24            Q.    So, as an assistant controller at

25   Rypl, what are your day-to-day duties and

Amanda Zimmerman                                    May 15, 2025

Page 14

1    responsibilities?

2              A.   Making all payments, payments to

3    our broadcasters, operational payments like rent,

4    utility bills.  I also reconcile bank accounts.  I

5    assist Tony Severin with his duties as well.

6              Q.   And who's Tony Severin?

7              A.   He's the -- the CFO.

8              Q.   Now, prior to working for Rypl or

9    Webkrew, Guayaca -- or Guayaca, did you have any

10   work experience in bookkeeping or accounting?

11             A.   No.

12             Q.   Did you primarily learn what you

13   now know on the job that you have?

14             A.   Yes.

15             Q.   Do you know the Defendant, David

16   Erickson?

17             A.   Yes.

18             Q.   Is he in the room today?

19             A.   Yes, he is.

20             Q.   And can you point him out and

21   describe what he's wearing?

22             A.   He is wearing a navy jacket and --

23   yeah, and a white shirt and jeans.

24             Q.   All right.  I'll note for the

25   record that the witness has identified the

Amanda Zimmerman                                    May 15, 2025

Page 15

1    Defendant, David Erickson.

2                 When did you first meet the Defendant?

3                 A.    Maybe around 2010.

4                 Q.    Do you recall how you first met

5    him?

6                 A.    He would have come to the office.

7                 Q.    And where was the office located?

8                 A.    At that time it was in Liberty

9    Village at 107 Atlantic.

10                Q.    Is that in Toronto?

11                A.    In Toronto.

12                Q.    Does Rypl still have a physical

13   office building?

14                A.    Not one that we work out of, no.

15                Q.    Is the company primarily remote?

16                A.    Yes.

17                Q.    Now, while you worked with the

18   Defendant at Rypl, what was your understanding of

19   his day-to-day role within the company?

20                A.    I knew him as a partner.  He

21   wasn't really involved day to day.

22                Q.    Was there a part of the business

23   that he was primarily responsible for?

24                A.    He oversaw the finance, accounting

25   sometimes.

Amanda Zimmerman                                           May 15, 2025

Page 16

1                    Q.    Did you consider him to be your

2      boss?

3                    A.    Yes.

4                    Q.    Okay.  I want to now show you

5      what's been marked for identification as

6      Government's Exhibit 1001.

7                    EXHIBIT NO. G-1001:  Organizational Chart.

8      BY MR. BOURGET:

9                    Q.    Ms. Zimmerman, reviewing this

10     chart, do you recognize the entities that are

11     listed here?

12                   A.    Yes, I do.

13                   Q.    Are there any that you do not

14     recognize?

15                   A.    No.

16                   Q.    Do you have an ownership interest

17     in any of these entities?

18                   A.    No, I do not.

19                   Q.    Starting at the bottom right with

20     Cam4, can you describe what Cam4 is?

21                   A.    Yeah.  So it's an online live cam

22     service, yeah.

23                   Q.    For someone who isn't familiar,

24     what's -- what's a live cam service, you know,

25     what --

Page 17

```
 1              A.   Sure.  So we host, people in their
 2    homes can make money by being online, yeah.
 3              Q.   So this is where people are live
 4    streaming using a webcam?
 5              A.   Yes.
 6              Q.   Are the performances on the
 7    website generally sexually explicit in nature?
 8              A.   Probably most.
 9              MR. MAUZY:  Objection, 403 and 404(b).
10    BY MR. BOURGET:
11              Q.   Is this a website that someone
12    under 18 should access?
13              A.   No.
14              Q.   Does Cam4 generate revenue?
15              A.   Yes.
16              Q.   How does Cam4 make money?
17              A.   Through the sale of tokens which
18    users can purchase and tip their favorite
19    performers, as well as memberships.
20              Q.   Now, looking at this chart, do you
21    have an understanding of how the revenue generated
22    by Cam4, if it does, gets passed through the rest
23    of the structure?
24              A.   Somewhat.
25              Q.   Starting at the bottom, can you
```

Page 18

1   explain the relationship, if any, between Cam4 and

2   Granity Entertainment Limited?

3            A.   Yes.  So, Granity Entertainment

4   manages Cam4.  They purchase or -- sorry.  So,

5   Granity holds the credit card billing accounts.  I

6   don't know what you want me to explain.  Sorry,

7   could you...

8            Q.   Sure, I can rephrase.  So, you

9   mentioned that Granity manages Cam4.  So what does

10  that look like on a day-to-day basis?

11           A.   Well, Cam4 is just the product,

12  right?  So Granity is the company that manages

13  Cam4.  So they provide the payouts for the

14  performers, once the performers earn money.  And,

15  yeah...

16           Q.   When a customer or -- customer on

17  Cam4 buys tokens --

18           A.   Uhm-hmm.

19           Q.   -- what bank account does that --

20           A.   The Granity bank account.

21           Q.   And so what's the relationship

22  between Surecom and Cam4?

23           A.   Surecom owns the licensing --

24           Q.   Okay.

25           A.   -- for Cam4.

Page 19

```
 1              Q.   And what's the relationship

 2    between Surecom and Granity Entertainment?

 3              A.   License agreement as well.

 4              Q.   Okay.  So, when Granity collects

 5    revenue from Cam4, does that revenue get passed on

 6    to other entities in this structure?

 7              A.   Yes.

 8              Q.   Can you explain generally how that

 9    works?

10              A.   I mean, I don't have a very clear

11    understanding.

12              Q.   And I'm only asking what you know.

13              A.   Right.  So, I mean, Surecom bills

14    Granity for the licensing.

15              Q.   Okay.  Does the revenue from Cam4

16    eventually get passed up to the box that says

17    FireFly Lane and FireFly Lane Corporation?

18              A.   Yes.

19              Q.   Okay.  And was that the case for

20    the time period between 2013 and 2019?

21              A.   I believe so.

22              Q.   Do you recall where -- well, let

23    me take a step back.  FireFly Lane and FireFly --

24    FireFly Lane Ltd. and Firefly Lane Corporation are

25    two different companies; is that correct?
```

Amanda Zimmerman                                        May 15, 2025

Page 20

```
 1                 A.    Yes.

 2                 Q.    Do you generally refer to those

 3     two companies collectively as "FireFly"?

 4                 A.    Yes.  I mean, FireFly Limited/Ltd.

 5     doesn't exist anymore, but...

 6                 Q.    Okay.  So, between 2013 and 2019,

 7     did Firefly have bank accounts?

 8                 A.    Yes.

 9                 Q.    Do you recall where those bank

10     accounts were?

11                 A.    At United Bank in Curacao.  And I

12     believe Firefly Lane Corporation had one at

13     Alexandria bank as well.

14                 Q.    Did you have access to those bank

15     accounts?

16                 A.    Yes.

17                 Q.    Were you able to view the

18     statements showing the transactions coming in and

19     out of those accounts?

20                 A.    Yes.

21                 Q.    Were you able to execute transfers

22     out of those --

23                 A.    Yes.

24                 Q.    -- accounts?

25                 Were you the one who decided when to
```

Amanda Zimmerman                                    May 15, 2025

Page 21

 1  send money out of those accounts?

 2              A.   No.

 3              Q.   Did someone else typically direct

 4  you as to when to execute transfers out of those

 5  accounts?

 6              A.   Yes.

 7              Q.   Now, from 2013 to 2019, who

 8  typically directed you as to where to send funds

 9  from the Firefly accounts?

10              A.   Usually Tony Severin.

11              Q.   Did David Erickson ever direct you

12  to send funds from Firefly accounts?

13              A.   Yes.

14              Q.   Did Rypl have its own bank

15  accounts?

16              A.   Yes.

17              Q.   And do you recall where Rypl

18  banked between 2013 and 2019?

19              A.   I believe at Royal Bank Canada.

20              Q.   And did you have access -- I'm

21  sorry?

22              A.   No, excuse me.  I think -- I think

23  it was at TD Bank.

24              Q.   Is that a Canadian bank?

25              A.   Yes.

Amanda Zimmerman                              May 15, 2025

                                                    Page 22

1              Q.   Did you have access to those Rypl

2    bank accounts as well?

3              A.   Yes.

4              Q.   Were you able to execute transfers

5    out of those accounts?

6              A.   Yes.

7              Q.   And like Firefly, did both

8    Mr. Severin and the Defendant typically direct you

9    where to send money out of those accounts?

10             A.   Yes.

11             MR. MAUZY:  Objection as compound.

12   BY MR. BOURGET:

13             Q.   Did Tony Severin direct you on

14   where to send money out of those accounts?

15             A.   Yes.

16             Q.   Did the Defendant direct you where

17   to send money out of those accounts?

18             A.   Yes.

19             Q.   Okay.  I want to show you now what

20   has been marked as Exhibit G-7.

21             EXHIBIT NO. G-7:  E-mail Chain from

22             D. Erickson to A. Zimmerman, et al

23             dated November 6, 2012, RE: Cam4 Pay.

24             BY MR. BOURGET:

25             Q.   Now, the e-mail at the top appears

Page 23

1    to be an e-mail from Dave Erickson to you, with

2    Johnny Chang copied, on November 6, 2012; does that

3    appear correct to you?

4              A.   Yes.

5              Q.   Does that appear to be a true and

6    accurate copy of that e-mail?

7              A.   Yes.

8              Q.   And here at the time, was this

9    your work e-mail address, Amandawkrew.com?

10             A.   Yes.

11             Q.   I want to go to the bottom of this

12   chain, starting with the first e-mail here from you

13   to someone named Dana Eisner, dated August 29,

14   2012.  Did I read that correctly?

15             A.   Yes.

16             Q.   Now, this e-mail says -- you

17   write:

18                  "Dear Dana,

19                  Currently, we fund our Payoneer

20                  account from a bank here in Canada

21                  however, in the next few days, we

22                  will be closing this bank account.

23                  Can you please send me whatever

24                  forms are necessary for us to fill

25                  out for Payoneer to accept funding

Amanda Zimmerman                                    May 15, 2025

Page 24

1                   from our new account?"

2                   Did I read that correctly?

3                   A.   Yes.

4                   Q.   So, first things:   What is

5       Payoneer?

6                   A.   Payoneer is a third party payment

7       provider.   They facilitate payments through their

8       service.

9                   Q.   Can you just explain in your own

10      words what exactly you're requesting here?

11                  A.   It looks like we're probably

12      switching companies or bank accounts, so I'm

13      requesting the paperwork from her to get that

14      rolling.

15                  Q.   Okay.   After a little back and

16      forth, there's another e-mail here that I'll put

17      up, an e-mail from you to Ms. Eisner, dated

18      September 4th, 2012.   Does that appear correct to

19      you?

20                  A.   Yes.

21                  Q.   You said:

22                       "Dana, the funds will be coming

23                       from the following account in the

24                       future..."

25                  So, here are you just forwarding the

Amanda Zimmerman                                    May 15, 2025

Page 25

1    details for the new bank account?

2                    A.   Yes.

3                    Q.   Okay.  Then there's a little bit

4    more back and forth, but I want to focus on this

5    e-mail here from October 10th, 2012, e-mail from

6    Dana Eisner to you, where Ms. Eisner says:

7                    "Sorry to bug you again but

8                    compliance is being a stickler.

9                    It's really important for us to know

10                   the exact source of the funds in

11                   order to insure the security of all

12                   our partners and their payees that

13                   is why we are so thorough.

14                   We need the names of the people

15                   behind the Corporations listed in

16                   the Firefly lane Stock register pdf.

17                   Major shareholder per corporation."

18                   Did I read that correctly?

19                   A.   Yes.

20                   Q.   Again, you know, obviously this --

21   the e-mail is on the screen, but can you just

22   explain in your own words what you understood

23   Ms. Eisner to be asking for here?

24                   A.   I'm assuming that we sent her the

25   -- I'm assuming we sent her the stock register for

Amanda Zimmerman                                   May 15, 2025

Page 26

1   Sure -- maybe we sent her the ownership for Surecom

2   and she's asking for the stock register for

3   Firefly.

4                Q.   During this time, was it common

5   for, you know, the -- your company's banking

6   partners to ask for information regarding the

7   individual owners of --

8                A.   Yes.

9                Q.   -- the various corporations that

10  are involved?

11               A.   Yes.

12               Q.   Then the next e-mail I want to

13  show you is again on this chain, but it's another

14  e-mail from Dana Eisner to you, dated November 6,

15  2012, where Ms. Eisner says:

16                    "Thank you very much for

17                    getting back to me.  Before I even

18                    pass this on I do know what the

19                    compliance will come back and say.

20                    Ultimately we just need to know who

21                    the actual person is that owns the

22                    companies, a physical person that

23                    will be accountable at the end of

24                    the day.  Right now I just see

25                    cooperation names."

Amanda Zimmerman                                    May 15, 2025

Page 27

```
 1              Is it likely she meant "corporation"
 2    there?
 3              A.   Correct.
 4              Q.   "While you guys are ok to
 5              continue to fund and make payments I
 6              know my compliance department is
 7              going to give me a hard time about
 8              getting this info."
 9              Did I read that correctly?
10              A.   Yes.
11              Q.   So the bank here is really, they
12    want to know who the individual physical people are
13    who own the company?
14              A.   Yes.
15              Q.   Is that what she's asking for?
16              A.   Yes.
17              Q.   Following that e-mail, you write
18    to the Defendant, and I believe Johnny Chang, where
19    you say here at the bottom:
20              "Can someone please provide
21              this information asap as we need to
22              fund Payoneer from Surecom in the
23              next few days and they won't accept
24              payment from Surecom until this is
25              sorted."
```

1           Did I read that correctly?

2           A.   Yes.

3           Q.   And the Defendant responds on

4    November 6, 2012, saying:

5                "No one is ever authorized to

6                send stock registers anywhere.  Greg

7                Elias stands up for all Firefly

8                matters."

9           Did I read that correctly?

10          A.   Yes.

11          Q.   Who is Greg Elias?

12          A.   Greg Elias, he -- I don't know

13   what his role is at the bank, but it's -- I believe

14   he manages the United Bank, where the bank accounts

15   are hold that -- held that we're speaking of, the

16   Surecom and Firefly bank accounts.

17          Q.   Okay.  Based on your

18   understanding, did he have any control over the

19   day-to-day decisions of FireFly?

20          A.   I don't know that.

21          Q.   Okay.  Did he have any control

22   over the day-to-day decision making at Rypl?

23          A.   No.

24          Q.   What did you understand "Greg

25   Elias stands up for all Firefly matters" to mean?

Amanda Zimmerman                                    May 15, 2025

                                                    Page 29

 1                A.   That he is the person to go to for

 2      Firefly-related matters.

 3                Q.   Has Greg Elias ever directed you

 4      regarding where to send funds from Firefly bank

 5      accounts?

 6                A.   No.

 7                Q.   Has he ever directed you where to

 8      send funds on behalf of any company that you've

 9      worked for?

10                A.   No.

11                Q.   I want to show you now what's been

12      marked as Government's Exhibit 8.

13                     EXHIBIT NO. G-8:  E-mail Chain from

14                     D. Erickson to R. Burry dated March 12,

15                     2013, Re: HSBC bank wire.

16      BY MR. BOURGET:

17                Q.   I want to start with the second

18      e-mail -- I'm sorry, the bottom e-mail here.  This

19      is an e-mail -- you're on this chain later on.

20      This is an e-mail from Richard Burry to Dave

21      Erickson dated March 11, 2013.  Who is Richard

22      Burry?

23                A.   He's another partner.

24                Q.   Mr. Burry writes:

25                     "Dave, if they can transfer

```
 1                    $100k to the same HSBC account in

 2                    Panama that I get my other

 3                    dividends, that would be great.

 4                    Details are..."

 5             And then he provides some bank account

 6    information.  Did I read that correctly?

 7             A.   Yes.

 8             Q.   Now I want to focus on the

 9    following two e-mails right above that.  From --

10    Dave Erickson writes on March 12th, 2013:

11                    "Please send Richard this money

12                    and code it to his

13                    payable/receivable."

14             Did I read that correctly?

15             A.   Yes.

16             Q.   And then above that, you ask:

17                    "From Firefly or Surecom?"

18             Is that correct?

19             A.   Yes.

20             Q.   And Dave Erickson responds:

21                    "Firefly please."

22             Did I read that correctly?

23             A.   Yes.

24             Q.   Was it unusual for the Defendant

25    to be directing transactions in this way?
```

Amanda Zimmerman                                May 15, 2025

Page 31

1                    A.    Yes -- oh, sorry?

2                    Q.    Was it unusual --

3                    A.    No.

4                    Q.    -- for the Defendant --

5                    A.    No.

6                    Q.    -- to be directing?

7                    A.    Not unusual.

8                    Q.    And just as a reminder, since we

9     have a court reporter here, it's -- usually, when

10    two people are speaking, we kind of talk over each

11    other and that's how a normal conversation works.

12    If you could just let me finish my question before

13    you answer and I will wait until you finish your

14    answer before I ask my next question.

15                    And when the Defendant made -- gave you

16    directions like this, did you generally follow his

17    instructions?

18                    A.    Yes.

19                    Q.    Can you recall an instance where a

20    partner or shareholder within Firefly or Rypl,

21    other than the Defendant, directed you to send out

22    what they called the dividend?

23                    A.    I can't recall any time.

24                    Q.    I want to show you now what's been

25    marked as Government's Exhibit 10.

Amanda Zimmerman                                    May 15, 2025

Page 32

```
 1

 2                    EXHIBIT NO. G-10:  E-mail Chain from

 3                    D. Erickson to G. Elias, et al, dated

 4                    January 4, 2018, Re: Housekeeping.

 5    BY MR. BOURGET:

 6                    Q.   And I just want to draw your

 7    attention to the e-mail at the bottom of the page,

 8    an e-mail from the Defendant to you and Tony

 9    Severin on January 4th, 2018.  Does that appear to

10    be a fair and accurate copy of that e-mail?

11                    A.   Yes.

12                    Q.   So the Defendant writes:

13                    "I've just finished attending

14                    various meetings in Curacao and have

15                    been asked to pass along some

16                    housekeeping items.

17                        Firstly, transfers that are

18                    Shareholder Advances have the word

19                    'Dividend' in the Reference Field.

20                    This should be corrected going

21                    forward and until such time as

22                    formal Dividends are declared by the

23                    Directors."

24                    Did I read that correctly?

25                    A.   Yes.
```

Amanda Zimmerman                                    May 15, 2025

                                                    Page 33

1            Q.   And, again, was it unusual for the

2    Defendant to be providing directions on how to code

3    transactions in this way?

4            A.   Can you repeat that again?

5            Q.   Was it unusual for the

6    Defendant --

7            A.   Not unusual, sorry.

8            Q.   Okay.

9            A.   Not unusual.

10           Q.   Now, for the jury's information,

11   when we refer to coding, is that a reference to how

12   a transaction is categorized or described in the

13   company's books and records?

14           A.   Yes.

15           Q.   I want to show you now Exhibit 11

16   that's been marked for identification.

17           EXHIBIT NO. G-11:  E-mail Chain from

18           D. Erickson to A. Zimmerman, et al,

19           dated August 28, 2014 Re: Advances to Chad.

20           BY MR. BOURGET:

21           Q.   It appears to be an e-mail from

22   the Defendant to you and David van der Poel, with

23   Tony Severin and Chad Moldon cc on August 28th,

24   2014.  Did I read that correctly?

25           A.   Yes.

Amanda Zimmerman                                    May 15, 2025

Page 34

```
 1                    Q.    Does that appear to be a fair and
 2      accurate copy of that e-mail?
 3                    A.    Yes.
 4                    Q.    So, first, who is David van der
 5      Poel?
 6                    A.    He is another partner.
 7                    Q.    A partner at Firefly?
 8                    A.    Yes.
 9                    Q.    Now, the Defendant writes here:
10                          "All,
11                           We need to reconcile all advances
12                    to Chad as from 01/01/2011."
13                    What did you understand that to be
14      referring to?
15                    A.    That he needs a list of money
16      that's been advanced to either David or Chad.
17                    Q.    Okay.  And, again, was it unusual
18      for the Defendant to be tracking any company
19      advances made to other shareholders?
20                    A.    Not unusual.
21                    Q.    Do you recall ever receiving
22      similar requests or e-mails from other shareholders
23      regarding any payments or advances made to the
24      Defendant?
25                    A.    No.
```

Amanda Zimmerman                                    May 15, 2025

Page 35

```
 1                  Q.   Now I want to show you what's been
 2     marked for identification as exhibit --
 3     Government's Exhibit 12.
 4                  EXHIBIT NO. G-12:  E-mail Chain from
 5                  D. Erickson to A. Zimmerman, et al,
 6                  dated February 23, 2016, Re:  Toine's
 7                  cash advances.
 8                  BY MR. BOURGET:
 9                  Q.   And this appears to be an e-mail
10     from Dave Erickson to you, with Tony Severin copied
11     on February 23rd, 2016?  Did I read that correctly?
12                  A.   Yes.
13                  Q.   Does that is appear to be a fair
14     and accurate copy of that e-mail?
15                  A.   Yes.
16                  Q.   Now, here the Defendant mentions:
17                  "Toine is making an investment
18                  in Spain by taking cash advances
19                  from a corporate card.  As you see
20                  these, please code them to his
21                  partner loan account and pay it back
22                  from his dividends from April
23                  through December of this year."
24                  So, first, do you know who Toine is?
25                  A.   Yes.
```

Amanda Zimmerman                                    May 15, 2025

                                                    Page 36

1                Q.    Who is Toine?

2                A.    Another partner.

3                Q.    What's Toine's last name?

4                A.    Rodenburg.

5                Q.    And is the Defendant making a

6    similar request in this e-mail as the one we just

7    looked at in Exhibit 11 regarding advances to Chad

8    Moldon?

9                A.    Similar.

10               Q.    So while you worked at Rypl and

11   Firefly, did the Defendant have some kind of

12   regular compensation?

13               A.    Yes.

14               Q.    Do you recall how much

15   approximately he earned, if you know?

16               A.    I believe it was around 36,000 a

17   month.

18               Q.    A month?

19               A.    Yeah.

20               Q.    Do you recall if he received that

21   money directly or was it paid through another

22   entity?

23               A.    It would have been Halstead Bay

24   Holdings.

25               Q.    Now, between 2013 and 2019, do you

Amanda Zimmerman                                    May 15, 2025

Page 37

1   recall receiving a request from the Defendant to

2   transfer funds to Halstead Bay Holdings beyond his

3   regular monthly payments?

4            A.   Yes.

5            Q.   Did Halstead Bay Holdings have its

6   own bank accounts?

7            A.   Yes.

8            Q.   And so that -- during that same

9   period of time, 2013, did you execute payments to

10  Halstead Bay Holdings accounts from either Firefly

11  or Rypl accounts at the Defendant's request?

12           A.   I believe so.

13           MR. MAUZY:   Objection as compound.

14  BY MR. BOURGET:

15           Q.   I want to show you now what's been

16  marked as Government's Exhibit 13 for

17  identification.

18           EXHIBIT NO. G-13:   E-mail from

19           D. Erickson to A. Zimmerman, et al,

20           dated January 6, 2015 Re: Tax Payments.

21  BY MR. BOURGET:

22           Q.   And now looking at this e-mail --

23  I won't read the entire thing -- can you just

24  explain to us what you understood this e-mail to

25  be?

Amanda Zimmerman                                          May 15, 2025

                                                    Page 38

 1                   A.   Yes.   It's Mr. Erickson needed to
 2     make tax payments.
 3                   Q.   Were these tax payments for
 4     Halstead Bay Holdings?
 5                   A.   I'm -- I'm not aware.
 6                   Q.   Was this amount that he requested
 7     -- well, first, he says in this e-mail:
 8                        "I need to make tax payments
 9                   totalling $72,056.24 by 1/14/15."
10                   Then he says:
11                        "Please amortize $60,000 over
12                   the period of January 1, 2015 to
13                   December 31, 2015.
14                        Please amortize $12,056.24 over
15                   the period January 1, 2015 to
16                   March 31, 2015."
17                   Did I read that correctly?
18                   A.   Yes.
19                   Q.   And so the Defendant is asking you
20     to amortize these payments.   Can you just explain
21     what that means?
22                   A.   Sure.   I mean, the $60,000 was for
23     what looks like the entire year of 2015, covering
24     the entire year.   And then the rest was for three
25     months.

Amanda Zimmerman                                    May 15, 2025

Page 39

1                    Q.    What does it mean to amortize a

2      payment?

3                    A.    You're spreading it out, dividing

4      it up.

5                    Q.    Did you send these funds to

6      Halstead Bay as requested?

7                    A.    Yes.

8                    Q.    Now, before making this transfer

9      to Halstead Bay, did you have to get approval from

10     anyone else at Rypl?

11                   A.    No.

12                   Q.    Did you have to get approval from

13     anyone else at Firefly?

14                   A.    No.

15                   Q.    Did you have to get approval from

16     Greg Elias?

17                   A.    No.

18                   Q.    I want to show you now what's been

19     marked as Government's Exhibit 15.

20                   EXHIBIT NO. G-15:  E-mail from

21                   D. Erickson to A. Zimmerman, et al,

22                   dated April 18, 2016 Re: Loan.

23     BY MR. BOURGET:

24                   Q.    This appears to be an e-mail from

25     the Defendant to you and Tony Severin copied on

Amanda Zimmerman                              May 15, 2025

                                            Page 40

1    April 18th, 2016.  Did I read that correctly?

2                 A.    Yes.

3                 Q.    What's the subject line of this

4    e-mail?

5                 A.    "Loan."

6                 Q.    In this e-mail he, the Defendant,

7    asks you:

8                       "Amanda,

9                       Please send Halstead $65,871.18

10               at your earliest convenience.

11                      Loan to me."

12               Did I read that correctly?

13                A.    Yes.

14                Q.    When he says "loan to me," what

15   did you understand that to mean?

16                A.    It was a loan to Halstead or

17   Mr. Erickson.

18                Q.    Was it common for the Defendant to

19   send you general loan requests like this?

20                A.    Yes.

21                Q.    And after receiving one, did you

22   typically execute the transfers that he was

23   requesting?

24                A.    Yes.

25                Q.    Did you consult with any of the

Amanda Zimmerman                                    May 15, 2025

Page 41

1    other partners or shareholders before doing so?

2                A.    No.

3                Q.    Did you need to consult or get

4    approval from Greg Elias?

5                A.    No.

6                Q.    Did the Defendant ever explain to

7    you what, you know, what he refers to as a loan was

8    for?

9                A.    I don't remember.

10               Q.    I'm showing you now what's been

11   marked for identification as Government's

12   Exhibit 17.

13               EXHIBIT NO. G-17:  E-mail from D. Erickson

14               to A. Zimmerman, et al, dated May 3,

15               2017 Re: Loan.

16   BY MR. BOURGET:

17               Q.    It appears to be an e-mail from

18   Dave Erickson to you and Tony Severin dated

19   May 3rd, 2017.  Did I read that correctly?

20               A.    Yes.

21               Q.    Does this appear to be a fair and

22   accurate copy of that e-mail?

23               A.    Yes.

24               Q.    What's the subject line of this

25   e-mail?

Amanda Zimmerman                                    May 15, 2025

                                                    Page 42

1              A.    "Loan."

2              Q.    Now, in this the Defendant writes:

3                    "Please send $75,000 to

4              Halstead as a loan when you have the

5              funds available."

6                    Again, as far as you recall, did you

7    execute this transfer?

8              A.    Yes.

9              Q.    Did you have to get approval from

10   anyone before doing so?

11             A.    No.

12             Q.    Can you recall a time at any point

13   where you refused to make a transfer that the

14   Defendant requested like this?

15             A.    No.

16             Q.    I'm showing you now what's been

17   marked as Government's Exhibit 18.

18                   EXHIBIT NO. G-18:  E-mail from D. Erickson

19                   to A. Zimmerman, et al, dated November

20                   3, 2017 Re: Loan.

21   BY MR. BOURGET:

22             Q.    And I'll start at the bottom

23   e-mail of this chain here, which appears to be an

24   e-mail from the Defendant to you, with Tony Severin

25   copied, dated November 2nd, 2017.  Did I read that

Amanda Zimmerman                                    May 15, 2025

Page 43

1    correctly?

2                 A.    Yes.

3                 Q.    Does this appear to be a fair and

4    accurate copy of that e-mail?

5                 A.    Yes.

6                 Q.    What's the subject line of this

7    e-mail?

8                 A.    "Loan."

9                 Q.    What's the Defendant requesting in

10   this e-mail?

11                A.    $30,000.

12                Q.    And he says there:

13                      "I need to make a wire from

14                Halstead tomorrow for a deal."

15                Did I read that correctly?

16                A.    Yes.

17                Q.    Do you recall what the deal was

18   that the Defendant was referring to?

19                A.    I do not.

20                Q.    Do you recall if he told you?

21                A.    I do not.

22                Q.    I'm going to move now up to the

23   second e-mail from the bottom in the chain, which

24   appears to be an e-mail from Tony Severin to you

25   and the Defendant, where he responds:

Amanda Zimmerman                                    May 15, 2025

Page 44

```
 1                    "Hi Dave,

 2                     We don't have $30,000 USD in Rypl

 3               currently.  We had month-end salary

 4               and rent so running short on USD

 5               until we get some in for Monday.

 6                     So can this wait til Monday?  For

 7               GL coding purposes what is the deal

 8               for??"

 9               Do you know what Mr. Severin is

10      referring to when he says "GL coding"?

11                    A.   Yeah, the general letter --

12      ledger.

13                    Q.   Again, for somebody who doesn't

14      know, what's a general ledger?

15                    A.   It's all the account numbers held

16      for the accounting purposes.

17                    Q.   Sorry, can you speak up just a

18      little bit?

19                    A.   Sorry.  It's all the account

20      numbers.  It's for the, uh, accounting software,

21      accounting service.

22                    Q.   Is that where all -- is that where

23      transactions are recorded for the company?

24                    A.   Yes.

25                    Q.   So let me move a little further up
```

Amanda Zimmerman                                    May 15, 2025

Page 45

1    the chain here.  You follow up on November 3rd,

2    2017, saying:

3                    "Hi Dave,

4                     Funds came in late this afternoon

5                and your wire is set to go out as

6                soon as the bank opens Monday."

7                He responds in the e-mail at the top,

8    "Thanks."  Did I read that correctly?

9                A.   Yes.

10               Q.   Does this all seem to be a true

11   and accurate copy of this e-mail chain?

12               A.   Yes.

13               Q.   Now, when -- in the prior e-mail

14   when Tony Severin asks what the deal is for, do you

15   recall if the Defendant provided any information

16   about the deal he was referring to?

17               A.   I don't know.

18               Q.   I'm showing you now what's been

19   marked as Government's Exhibit 19.

20               EXHIBIT NO. G-19:  E-mail from D. Erickson

21               to A. Zimmerman, et al, dated June 12,

22               2017 Re: Loan to Halstead.

23   BY MR. BOURGET:

24               Q.   This appears to be an e-mail from

25   the Defendant to you, with Tony Severin copied,

Amanda Zimmerman                                    May 15, 2025

Page 46

1   dated June 12, 2017.  What's the subject line of

2   this e-mail?

3                A.    "Loan to Halstead."

4                Q.    And does this appear to be a true

5   and accurate copy of that e-mail?

6                A.    Yes.

7                Q.    The body of the e-mail just says,

8   "$25,000."  What did you understand that to mean?

9                A.    That he, Mr. Erickson, is

10  requesting a $25,000 loan to Halstead.

11               Q.    Was it common for the Defendant to

12  send you, you know, short e-mails like this with

13  just a number figure?

14               A.    Yes.

15               MR. BOURGET:  Can we go off the record

16  for just two minutes.

17               THE VIDEOGRAPHER:  Off the record at

18  9:45 a.m.

19               -- RECESS TAKEN AT 9:45 A.M. --

20               -- UPON RESUMING AT 9:50 A.M. --

21               THE VIDEOGRAPHER:  We're back on the

22  record at 9:50 a.m.  Go ahead.

23  BY MR. BOURGET:

24               Q.    Okay, Ms. Zimmerman, I'm showing

25  you what we've noted as Government's Exhibit 20.

Amanda Zimmerman                                    May 15, 2025

Page 47

```
 1   There isn't an exhibit sticker on this quite yet,
 2   but...
 3                  EXHIBIT NO. G-20:  E-mail from D. Erickson
 4                  to A. Zimmerman, et al, dated October
 5                  17, 2018 Re: Short Term Loan.
 6   BY MR. BOURGET:
 7                  Q.   This e-mail appears to be from
 8   Dave Erickson to you and Tony Severin, dated
 9   October 17th, 2018.  Does that appear to be correct
10   -- oh, sorry --
11                  A.   Yes, yeah.
12                  Q.   And the subject line is "Short
13   term loan"; is that correct?
14                  A.   Yes, yes.
15                  Q.   Here the Defendant writes:
16                  "I need $30,000 for 90 days.
17                  Please transfer it.  I'll pay it
18                  back by year end."
19                  Did I read that correctly?
20                  A.   Yes.
21                  Q.   As far as you remember, did you
22   execute this transfer?
23                  A.   Yes.
24                  Q.   When the Defendant says, "I'll pay
25   it back by year end," do you recall whether the
```

Amanda Zimmerman                                    May 15, 2025

Page 48

1    Defendant repaid this amount?

2              A.   I do not recall.

3              Q.   Do you recall ever seeing

4    accounting entries or other evidence that the

5    Defendant was repaying the amounts that he was

6    directing you to loan to Halstead?

7              A.   I don't recall seeing it.

8              Q.   I'm showing you now what's marked

9    as Exhibit 16.

10             EXHIBIT NO. G-16:  E-mail Chain from D.

11             Erickson to A. Zimmerman, et al, dated

12             December 28, 2016 Re: Transfer 112368.

13   BY MR. BOURGET:

14             Q.   Now I want to move to the very

15   bottom.  There's actually two sets of e-mails here,

16   so I'm going to start with the second set that's on

17   page 5 of the exhibit.  And let me -- okay.  I'll

18   try to bring this up on the screen so that it's

19   easier to see.

20             Okay.  So this appears to be an e-mail

21   from you to Greg Elias and Rebecca Luis dated

22   December 28, 2016.  Does that appear to be correct?

23             A.   Yes.

24             Q.   So we've established who Greg

25   Elias is.  Who's Rebecca Luis?

Amanda Zimmerman                                    May 15, 2025

                                        Page 49

1              A.   At the time she worked for the

2    bank.

3              Q.   Okay.

4              A.   United Bank.

5              Q.   You write:

6                   "Happy Holidays to you and your

7              family..."

8              And at the next line, you write:

9                   "Can you please urgently

10             process the following request for me

11             and let me know when it has been

12             sent?  The Euro equivalent of U.S.

13             $435,000.00 from Lloydsville

14             Corporation N.V. to:  Paul T.

15             Eidsness and Associates..."

16             And then there's some banking

17   information.

18             And at the bottom reads:

19                  "The reference for this is

20             'Real Estate Purchase'."

21             Did I read that correctly?

22             A.   Yes.

23             Q.   So, to start with, Lloydsville

24   Corporation NV, what is that entity?

25             A.   It belongs to David van der Poel.

Amanda Zimmerman                          May 15, 2025

Page 50

```
 1              Q.   Now, you mentioned that the
 2   reference for this is real estate purchase.  Do you
 3   recall anything else about this transaction?
 4              A.   No, not specifically.
 5              Q.   Okay, I want to now move up to...
 6   So now I want to show you, it looks like it's an
 7   e-mail that's forwarded to you between Poppy
 8   Hodge-Carol and Ms. Luis.  Is Ms. Hodge-Carol
 9   someone else who worked for the bank?
10              A.   Yes.
11              Q.   She writes to Rebecca Luis:
12                   "Please be informed that below
13                   transaction has been released.  We
14                   kindly request you to provide us
15                   with the following information
16                   and/or documents:
17                   Where is the real estate located.
18                   Is the real estate for personal use or
19                   commercial.
20                   Provide supporting documents."
21                   Did I read that correctly?
22              A.   Yes.
23              Q.   And now, following that, here you
24   forward those questions to Defendant and Paul
25   Eidsness; is that correct?
```

Amanda Zimmerman                                  May 15, 2025

                                                    Page 51

1                   A.    Yes.

2                   Q.    You say:

3                         "[...] please provide the

4                   following for the bank, as you know

5                   they are very nosy."

6                   And you have the same three questions.

7    Did I read that correctly?

8                   A.    Yes.

9                   Q.    Was it common for the bank to

10   request information about transactions like this?

11                  A.    Yes.

12                  Q.    So you send that e-mail to

13   Defendant and Paul Eidsness, and the Defendant

14   responds on December 28, 2016:

15                        "Real Estate is located in MN."

16                  Minnesota.

17                        "It is rental real estate.

18                  Docs to follow after closing."

19                  Did I read that correctly?

20                  A.    Yes.

21                  Q.    Now, at the time, did you know

22   which property was the subject of this transaction?

23                  A.    No.  But I knew the address, but

24   that was it.

25                  Q.    Okay.  And was the address

Amanda Zimmerman                                    May 15, 2025

Page 52

1  familiar to you at the time?

2              A.   No, but I knew it from this

3  transaction.

4              Q.   Okay.  Do you now know which

5  property was subject to this transaction?

6              A.   Yes.

7              Q.   And what property was that?

8              A.   The property that Mr. Erickson was

9  living in.

10             Q.   Now, at the bottom of the e-mail

11 from the Defendant here, he says, "Docs to follow

12 after closing."

13             Do you recall ever receiving any

14 further documentation to provide to the bank?

15             A.   I don't recall.

16             Q.   So, changing subjects slightly, I

17 want to talk to you a little bit about company

18 credit cards.

19             Did Firefly issue credit cards to its

20 partners for business expenses?

21             A.   Yes.  Not all of them, but yes.

22             Q.   Did Rypl issue credit cards to

23 various employees for business expenses?

24             A.   Yes.

25             Q.   Were you responsible for paying

Amanda Zimmerman                                May 15, 2025

Page 53

1    the balances on these credit cards?

2                   A.    Yes.

3                   Q.    Did you have access to the monthly

4    statements?

5                   A.    Yes.

6                   Q.    And occasionally did some partners

7    or employees use the credit cards for miscellaneous

8    personal expenses?

9                   A.    Yes.

10                  Q.    And in reviewing those statements,

11   were you able to determine which expenses were

12   business-related and which were personal?

13                  A.    I would speak to them first.

14                  Q.    If the expenses were personal,

15   were the card holders generally required to

16   reimburse the company?

17                  A.    Yes.  Not right away, but yes.

18                  Q.    What do you mean by "not right

19   away"?

20                  A.    There would be usually a

21   reconciliation of transactions after a few months,

22   whenever we got around to it -- not got around to

23   it, but...

24                  Q.    You weren't showing up at people's

25   doors to --

Amanda Zimmerman                                    May 15, 2025

Page 54

```
 1              A.   No, no.

 2              Q.   -- collect?

 3              Now, is Ryan Maule a Firefly

 4    shareholder?

 5              A.   No.

 6              Q.   Was Ryan Maule issued a Rypl

 7    credit card?

 8              A.   Yes.

 9              Q.   Is Kevin Krieg a Firefly

10    shareholder?

11              A.   No, I don't think so.

12              Q.   Was Kevin Krieg issued a Rypl

13    credit card?

14              A.   Yes.

15              Q.   Was Chad Moldon issued a Rypl

16    credit card?

17              A.   Yes.

18              Q.   Was Tony Severin issued a Rypl

19    credit card?

20              A.   Yes.

21              Q.   Was David van der Poel issued a

22    Firefly credit card?

23              A.   Yes.

24              Q.   Was Toine Rodenburg issued a

25    Firefly credit card?
```

Amanda Zimmerman                                    May 15, 2025

Page 55

 1                A.    Yes.

 2                Q.    Did David Erickson have either a

 3     Rypl or a Firefly card?

 4                A.    No.

 5                Q.    What did he use, if anything, for

 6     his business expenses?  How did he pay for them?

 7                A.    I only know of an Amex.

 8                Q.    Was that a personal card?

 9                A.    I am unaware.

10                Q.    Was it a card that was issued by

11     Rypl?

12                A.    No.

13                Q.    Was it a card that was issued by

14     Firefly?

15                A.    No.

16                Q.    Did you have access to the monthly

17     statements for that card?

18                A.    No.

19                Q.    Did you ever ask him to provide

20     copies of those statements?

21                A.    Yes.

22                Q.    And did he provide them?

23                A.    No.

24                Q.    I want to show you what's been

25     marked as Government's Exhibit 14.

Amanda Zimmerman                              May 15, 2025

Page 56

1                 EXHIBIT NO. G-14:  E-mail from D. Erickson to

2                 A. Zimmerman, et al, dated January 21,

3                 2015 Re: Amex.

4                 BY MR. BOURGET:

5                 Q.   Here is an e-mail from Defendant

6     to you, Tony Severin copied, on January 21st, 2015.

7     Did I read that correctly?

8                 A.   Yes.

9                 Q.   And the subject line is "Amex,"

10    correct?

11                A.   Yes.

12                Q.   What do you understand "Amex" to

13    refer to?

14                A.   The American Express card that

15    Mr. Erickson holds.

16                Q.   Now, can you explain what you

17    understood the Defendant to be requesting in this

18    e-mail?

19                A.   Yes.  It is -- is requesting the

20    amount sent to Halstead bank.

21                Q.   And was that for the purpose of

22    paying off the credit card?

23                A.   Yes.

24                Q.   And this amount here, $158,460.78,

25    was that a monthly balance?  If you know.

1                 A.    These requests came monthly, yes.

2                 [Reporter sought clarification].

3                 THE WITNESS:   Requests came monthly.

4      BY MR. BOURGET:

5                 Q.    So, if you didn't have access to

6      his credit card statements, how did you know which

7      expenses on -- in these monthly amounts -- how did

8      you know what expenses to record as

9      business-related and which to record as personal?

10                A.    I did not.

11                Q.    So how were those transactions

12     recorded in the company's records?

13                A.    I believe that they were recorded

14     either by Tony Severin or Mr. Erickson.

15                Q.    Okay.  Did any other shareholders

16     of Rypl or Firefly record or categorize their own

17     credit card transactions?

18                A.    When I would show them the

19     statements, they would tell me if it...

20                Q.    But did any other shareholder --

21                A.    But not physically.

22                Q.    I'm sorry, I didn't mean to

23     interrupt.  Let me ask the question again.

24                Did any other shareholders of Rypl or

25     Firefly actually go into the company's ledgers to

Amanda Zimmerman                                    May 15, 2025

Page 58

1    categorize their expenses as business or personal?

2              A.   No.

3              Q.   So, we just went through, you

4    know, several e-mail requests from the Defendant to

5    you.  How often, you know, between 2013 and 2019

6    did you receive requests for a payment or a loan to

7    Halstead Bay Holdings?

8              A.   I mean, I can't remember exactly.

9    At least monthly.

10             Q.   Now, do you recall at any point

11   seeing any indication in the company's books and

12   records that the Defendant had repaid any of the

13   money that he had received?

14             A.   Not that I'm aware of.

15             Q.   Do you recall ever seeing a

16   promissory note or a loan agreement indicating that

17   the Defendant had agreed to repay these amounts?

18             A.   No, I haven't seen anything.

19             Q.   As far as you know, was the

20   Defendant charged interest on any of the loans that

21   were sent to Halstead Bay?

22             A.   I'm not aware of any.

23             Q.   As far as you know, was any kind

24   of repayment schedule established?

25             A.   I'm not aware.

Amanda Zimmerman                                May 15, 2025

Page 59

```
 1                MR. BOURGET:  Okay, nothing further.
 2                MR. MAUZY:  Why don't we take a short
 3   break so I can get organized?
 4                MR. BOURGET:  Yeah.  We'll go off the
 5   record.
 6                THE VIDEOGRAPHER:  Okay, one moment,
 7   please.
 8                This marks the end of media one and
 9   we're going off the record at 10:02 a.m.
10                -- RECESS TAKEN AT 10:02 A.M. --
11                -- UPON RESUMING AT 10:09 A.M. --
12                THE VIDEOGRAPHER:  This marks the
13   beginning of media unit two.  We're back on the
14   record at 10:09 a.m.  Go ahead, Counsel.
15                     CROSS-EXAMINATION
16   BY MR. MAUZY:
17          Q.   Good morning, Ms. Zimmerman.  My
18   name is Bill Mauzy, with Will Dooling, and we
19   represent David Erickson.
20          A.   Good morning.
21          Q.   You were interviewed by the
22   government on December 14th, 2024; is that correct?
23          A.   Yes, I believe so.
24          Q.   And you were interviewed again on
25   May 8th, 2025?
```

Amanda Zimmerman                                   May 15, 2025

Page 60

1                 A.    Yes.

2                 Q.    Last week.  At that interview you

3     were asked to review the memorandum of interview

4     prepared by the agents and asked if you make any

5     corrections; is that correct?

6                 A.    Yes.

7                 Q.    And you made some corrections?

8                 A.    Yes.

9                 Q.    And I can assume that if you

10    didn't make corrections, then you stand by the

11    assertions made in the interview and summarized in

12    that memorandum?

13                A.    Yes.

14                Q.    Correct?

15                A.    Yes.

16                Q.    Okay.  You indicated as part of

17    your proffer that you didn't want to go to the

18    United States; is that correct?

19                A.    Yes.

20                Q.    Have you ever been to the United

21    States before?

22                A.    Yes.

23                Q.    Have you ever had any problems

24    going to the United States?

25                A.    No.

Amanda Zimmerman                              May 15, 2025

Page 61

```
 1                Q.   What is the reason you did not
 2   want to go to the United States for the trial?
 3                A.   I was advised by my lawyer that --
 4                Q.   What was the reason?
 5                MR. BOURGET:  Objection.
 6   BY MR. MAUZY:
 7                Q.   Well, do you have a reason not to
 8   go?
 9                A.   Yes.
10                Q.   What is the reason?
11                A.   I was told that there was a
12   criminal court case.
13                Q.   At the trial, you're refusing to
14   go to the trial?
15                A.   No, it was just -- it was advised
16   by my lawyer that I was not --
17                Q.   If you went to the trial, would
18   you give truthful testimony at the trial?
19                A.   Yes.
20                Q.   Do you have any concerns about
21   going to the United States of America?
22                A.   Now?  Yes.
23                Q.   What are those concerns?
24                A.   Just governmental concerns.
25                Q.   What kind of governmental
```

Amanda Zimmerman                                    May 15, 2025

Page 62

```
 1   concerns?
 2              A.   Tourists being searched at the
 3   border.
 4              Q.   Was that the case on
 5   December 14th, 2024?
 6              A.   No.
 7              MR. BOURGET:  Can I just note for the
 8   record I believe that the interview was on
 9   November 14, 2024.
10   BY MR. MAUZY:
11              Q.   I'm sorry.  November 14th, 2024,
12   you didn't have those problems, correct?
13              A.   I don't believe so.
14              Q.   Those are -- you're talking about
15   current problems?
16              A.   Yes.
17              Q.   Current-day problems in 2025?
18              A.   Yes.
19              Q.   You didn't have those problems on
20   December 14th, 2024?
21              A.   No.
22              Q.   Correct?
23              A.   Correct.
24              Q.   Okay.  Have you met with the
25   government again after your meeting last week?
```

Amanda Zimmerman                                    May 15, 2025

Page 63

1              A.   No.  No.

2              Q.   Did you talk to them yesterday?

3              A.   No.

4              Q.   Has anyone talked to you about the

5    deposition of Chad Moldon?

6              A.   How so?  I'm aware of it.

7              Q.   All right.  You knew he was

8    deposed.  Did you know anything about the questions

9    that he was asked or the answers he gave at the

10   deposition?

11             A.   No.

12             Q.   You're the assistant controller at

13   Rypl; is that correct?

14             A.   Yes.

15             Q.   And you report to Tony Severin,

16   who's the controller, correct?

17             A.   Yes.

18             Q.   He is your boss?

19             A.   My direct boss, yes.

20             Q.   Your direct boss?

21             A.   Uhm-hmm.

22             Q.   You report directly to Tony

23   Severin?

24             A.   Yes.

25             Q.   Correct?

Amanda Zimmerman                                    May 15, 2025

Page 64

1            A.   Yes.

2            Q.   All right.  I'm going to use my

3    copy of Government exhibits.  Are you able to put

4    those up if I make that request?

5            MR. DOOLING:  I'm happy to, sure.  I

6    just need the cable.

7            Can we go off the record briefly?

8            Thank you.

9            THE VIDEOGRAPHER:  Off the record at

10   10:13 a.m.

11           -- RECESS TAKEN AT 10:13 A.M. --

12           -- UPON RESUMING AT 10:14 A.M. --

13           THE VIDEOGRAPHER:  We're back on the

14   record at 10:14 a.m.  Go ahead, Counsel.

15   BY MR. MAUZY:

16           Q.   I'm asking you again to look at

17   Government Exhibit 7.  This is from Dave Erickson

18   to you and Johnny Chang.

19           A.   Yes.

20           Q.   Was Johnny Chang the controller at

21   that time in 2012?

22           A.   Yes, he was.

23           Q.   Did you report to him?

24           A.   Technically, yes.

25           MR. MAUZY:  Exhibit 10, please.

Amanda Zimmerman                                    May 15, 2025

Page 65

1    BY MR. MAUZY:

2                Q.    Again, in the middle of the page,

3    is this from Dave to you and Tony Severin?

4                A.    Yes.

5                Q.    Tony Severin is your boss?

6                A.    Yes.

7                Q.    Did you discuss this request with

8    your boss?

9                A.    I don't remember that.

10               Q.    Did you usually discuss requests

11   with your boss?

12               A.    Not for Mr. Erickson.

13               Q.    Did Tony Severin ever disapprove

14   of any requests from Mr. Erickson?

15               A.    Not that I'm aware of.

16               Q.    He was clearly copied on every

17   request?

18               A.    Yes.

19               Q.    All right.  Did you discuss the

20   request with Tony Severin?

21               A.    Not that I remember.

22               Q.    Did he ever object to the request?

23               A.    Not that I remember.

24               Q.    And if he objected to the request,

25   you would not have honored the request; is that

Amanda Zimmerman                                    May 15, 2025

Page 66

1    correct?

2              A.    I would have honored it, yes.

3              Q.    If Tony Severin said not to honor

4    it?

5              A.    Yes.

6              Q.    Did that ever happen?

7              A.    No, not that I can remember.

8              Q.    All right.  Let's look at

9    Government Exhibit 12, please, an e-mail from Dave

10   Erickson.  Was that to you and Tony Severin?

11             A.    Yes.

12             Q.    Tony Severin is your boss?

13             A.    Yes.

14             Q.    You received a copy of this

15   e-mail?

16             A.    Yes.

17             Q.    And this is a request for cash

18   advances from a corporate card, correct?

19             A.    Correct, yes.

20             Q.    And he received that, correct?

21             A.    Who?

22             Q.    Tony Severin.

23             A.    Received this e-mail, yes.  He's

24   cc'd on it.

25             Q.    He's copied on it, right?  Did he

Amanda Zimmerman                                    May 15, 2025

Page 67

1    object to the payment?

2              A.   Not that I remember.

3              Q.   Exhibit -- Government Exhibit 13.

4    This is an e-mail from Dave relating to tax

5    payments, January 6th, 2015.  Is Tony Severin

6    copied on this e-mail to you?

7              A.   Yes, he is.

8              Q.   Did he object to this payment?

9              A.   Not that I remember.

10             Q.   He's your boss?

11             A.   My direct boss, yes.

12             Q.   Exhibit 15, please.

13             This is an e-mail from Dave Erickson to

14   you, and Tony Severin is copied on it.  The subject

15   is a loan, correct?

16             A.   Yes.

17             Q.   Did Tony Severin object to the

18   issuing funds for a loan to Dave Erickson?

19             A.   Not that I remember.

20             Q.   Government's 17, e-mail May 3rd,

21   2017, referencing a loan from Dave Erickson to you

22   and Tony Severin.

23             A.   Yes.

24             Q.   Is that correct?

25             A.   Yes.

Amanda Zimmerman                                    May 15, 2025

Page 68

```
 1                Q.   Tony Severin received a copy of
 2   that as well as you?
 3                A.   Yes.
 4                Q.   Did he object to the transfer of
 5   75,000 as a loan?
 6                A.   Not that I remember.
 7                Q.   Tony Severin was your direct boss?
 8                A.   Yes.
 9                Q.   Now looking at Government 18.
10   This is an e-mail from Dave Erickson dated
11   November 3rd, 2017, subject is "Loan," sent to you
12   and Tony Severin, correct?
13                A.   Correct.
14                Q.   And this is a request for a loan?
15                A.   Yes.
16                Q.   Did Tony Severin object to the
17   transfer of funds as a loan to Dave Erickson?
18                A.   Not that I remember.
19                Q.   Looking at Government Exhibit 19,
20   Dave Erickson e-mail to you and Tony Severin, dated
21   June 12th, 2017, subject:  "Loan to Halstead"; do
22   you see that?
23                A.   Yes.
24                Q.   Did Tony Severin object to the
25   loan to Halstead and the transfer of the money?
```

Amanda Zimmerman                                    May 15, 2025

Page 69

1              A.    Not that I remember.

2              Q.    Looking at Exhibit 20, Government

3    Exhibit 20.

4              This is an e-mail from Dave Erickson

5    dated October 17, 2018, to Tony Severin and to you,

6    correct?

7              A.    Yes.

8              Q.    He refers to it as a "short term

9    loan," correct?

10             A.    Yes.

11             Q.    Did Tony Severin object to you

12   providing a loan to Dave Erickson for $30,000?

13             A.    Not that I remember.

14             Q.    So the typical procedure was Dave

15   would request -- Dave Erickson would request a loan

16   or payments for credit card to you and Tony.  You

17   would comply with his request?

18             A.    Yes.

19             Q.    Tony Severin never objected to

20   those requests?

21             A.    Not that I can remember.

22             Q.    Tony Severin always, as we've

23   seen, was copied and informed about those requests

24   from David Erickson, correct?

25             A.    Yes.

Amanda Zimmerman                                                May 15, 2025

Page 70

 1                Q.    He was the controller?

 2                A.    Yes.

 3                Q.    He was your boss?

 4                A.    Direct boss, yes.

 5                Q.    And the funds that were utilized

 6      for these payments to Dave Erickson that we looked

 7      at through these exhibits were all funds from

 8      Firefly; is that correct?

 9                A.    No, I believe that Rypl as well.

10                Q.    Which ones were from Rypl?

11                A.    I -- I wouldn't know by these

12      e-mails.

13                Q.    Would the records reflect which of

14      these loans were from Firefly?

15                A.    Which records?  Our records?

16                Q.    Yeah.

17                A.    Yeah, the accounting system.

18                Q.    Are you saying that loans to Dave

19      Erickson came from Rypl funds?

20                A.    I -- I believe so.  Sometimes,

21      yeah.

22                Q.    When?

23                A.    I don't have specific dates.

24                Q.    But the funds that were utilized

25      to transfer to the shareholders from Firefly were

Amanda Zimmerman                                    May 15, 2025

Page 71

```
 1   Firefly funds?
 2              A.   The Amex payments were not.
 3              Q.   Right.  But the funds were all
 4   from Firefly funds?
 5              A.   I'm not sure what you mean by "the
 6   funds."
 7              Q.   Well, all of the loans that we
 8   just reviewed, and I can go back through them one
 9   by one --
10              A.   I don't believe they're all
11   Firefly, no.  But I can't tell you which
12   specifically are Firefly versus Rypl, based on
13   these e-mails.
14              Q.   What would you have to do to
15   determine they're from Firefly?
16              A.   I would have to go into our old
17   accounting software.
18              Q.   To get funds from Firefly, you had
19   signature authority for that, correct?
20              A.   I had one of two signatures, yes.
21              Q.   And you had to get a second
22   signature from someone from United International
23   Bank?
24              A.   Yes.
25              Q.   Always, correct?
```

1              A.   Yes.

2              Q.   So to look at the funds received,

3    there would be records of those loans kept by

4    Firefly, correct?

5              A.   I'm unaware of what was kept.

6              Q.   You say you don't remember which

7    funds came from Firefly.  But there would be

8    records at Rypl showing that the funds came from

9    Firefly when they came from Firefly, correct?

10             A.   Yes.

11             Q.   And you don't recall which, if

12   any, of these actually came from Rypl funds?

13             A.   I mean, no, not based on these

14   e-mails.

15             Q.   So you have the ability to

16   transfer money within the Firefly organization,

17   correct?

18             A.   Currently, no.

19             Q.   Pardon?

20             A.   Currently, no.

21             Q.   Between the period of time 2011 to

22   2021?

23             A.   Not 2021.

24             Q.   All right.  What years did you

25   have the ability to transfer money within the

Amanda Zimmerman                                    May 15, 2025

Page 73

1   entire Firefly organization?

2              A.   I would say prior to 2020.

3              Q.   Okay.  And when did you start

4   having that authorization?

5              A.   I would have -- I would only be

6   guessing.

7              Q.   Did you have it in 2011?

8              A.   I don't know that.

9              Q.   With these loans that we've looked

10  at, you clearly had the ability to transfer money

11  within the Firefly organization at that time?

12             A.   Okay.

13             Q.   Correct?

14             A.   Again, I don't remember the exact

15  date.

16             Q.   When you had control of these

17  accounts, you could authorize the transfer of funds

18  from the Firefly accounts for payments to Dave

19  Erickson and other shareholders, as long as there

20  was a second signature from an employee of United

21  International Bank; is that correct?

22             A.   Yes.

23             Q.   You always needed a second

24  signature to transfer funds from the Firefly

25  accounts, correct?

```
 1              A.   Correct.
 2              Q.   And that person was authorized to
 3    transfer the funds?
 4              A.   Right.  I assume so.
 5              Q.   And in what bank accounts was the
 6    Firefly money held?
 7              A.   The accounts at United.
 8              Q.   United National Bank?
 9              A.   Yeah.
10              Q.   And Greg Elias is the owner of
11    that bank?
12              A.   I'm -- I'm not sure what his
13    position is.
14              Q.   It's his bank?
15              A.   Are you telling me?
16              Q.   Is he affiliated with United
17    International Bank?
18              A.   Yes.
19              Q.   And you know that he's the owner
20    of that bank?
21              A.   I don't know that he's the owner
22    of that bank.
23              Q.   In your May 8th, 2025 interview,
24    did you tell the agents in the presence of your
25    lawyer, Charlotte Janssen, Amanda Scott, Boris
```

1    Bourget, Rusty Kiser, that Elias was the owner of

2    United International Bank?

3              A.    I might have.

4              Q.    All right.  I'm handing you the

5    memorandum of interview dated May 8th, 2025, and

6    direct your attention to paragraph 2, please.

7              A.    (Witness reviews document).

8              Q.    Did you state:  "The agent said

9    Elias was the owner of United International Bank"?

10             A.    I must have.

11             Q.    You did state that?

12             A.    Okay.

13             Q.    Well...

14             A.    I mean, I don't -- I honestly

15    don't know if he owns it or he manages it.

16             Q.    All right.  You -- you were asked

17    to review your previous statement --

18             A.    Yeah.

19             Q.    -- where you said that he was the

20    owner of United International Bank.  And then in

21    your statement on May 8th, 2025 -- I hand it to you

22    again -- at paragraph 2, you stated that he was the

23    owner of the bank.

24             A.    Okay.

25             Q.    Well, is that correct?

Amanda Zimmerman                                    May 15, 2025

Page 76

```
1              A.   It's correct that it's written

2   there.  I don't recall saying that but I must have

3   said it.

4              Q.   All right.  Do you deny saying

5   that to the agent?

6              A.   No, I just don't remember saying

7   it.

8              Q.   Is it true that he was the owner

9   of the bank?

10             MR. BOURGET:  Objection, asked and

11   answered.

12   BY MR. MAUZY:

13             Q.   Well, she hasn't answered it.

14             A.   I'm unaware of his affiliation

15   with the bank.

16             Q.   Why would you tell the agents that

17   he was the owner of the bank if you didn't know?

18             MR. BOURGET:  Objection, asked and

19   answered.

20             THE WITNESS:  Again, I don't

21   specifically remember saying that line.

22   BY MR. MAUZY:

23             Q.   Okay.

24             A.   He's a manager of some sort.  I've

25   never met him.  I don't know.
```

Amanda Zimmerman                                          May 15, 2025

Page 77

1              Q.   All right.  Let me show you your

2    -- show you your interview on October 14th, 2025,

3    and ask you to turn to paragraph 17.

4              A.   Did you get the date wrong there?

5    I don't think it's -- 2024.

6              Q.   Yeah, thank you.

7              A.   Sorry, which paragraph, sir?

8              Q.   17.

9              A.   17.  (Witness reviews document).

10             Sure.

11             Q.   All right.  It's easy to confuse

12   dates, but this is an interview on November 14th,

13   2024.  I handed you a memorandum of interview and

14   you reviewed it.  And at paragraph 17 you stated to

15   the agents that Gregory Elias works for United

16   International Trust and also owns United

17   International Trust -- UIB, United International

18   Bank?

19             MR. BOURGET:  Objection.  Improper

20   impeachment.

21   BY MR. MAUZY:

22             Q.   Did you state on November 14th,

23   2025, to the agents interviewing you in the

24   presence of your lawyer, November 14th, 2024,

25   government lawyers, your lawyer, Charlotte Janssen,

Amanda Zimmerman                                    May 15, 2025

Page 78

1   all of those people, did you state Gregory Elias

2   works for United International Trust -- that's

3   UIT -- and also owns UIB?

4                A.   I don't specifically recall saying

5   that.

6                Q.   When you were interviewed on

7   May 8th, 2025, you were asked to review your

8   statement that you gave, as recorded in the

9   memorandum of interview, November 14th, 2024, and

10  make any corrections.  You did not make that

11  correction.  Are you saying you don't remember

12  saying that on November 14th, 2024?

13               A.   No, I don't remember saying that.

14               Q.   All right.  And on May 8th, 2025,

15  you were asked to review this memorandum and make

16  corrections?

17               MR. BOURGET:  Objection, asked and

18  answered.

19  BY MR. MAUZY:

20               Q.   Did you make corrections?

21               MR. BOURGET:  Objection, asked and

22  answered.

23

24

25

Amanda Zimmerman                                    May 15, 2025

                                            Page 79

1              THE WITNESS:  There were corrections

2     made, yes.

3     BY MR. MAUZY:

4              Q.   Did you make corrections as to

5     paragraph 17 about Gregory Elias working for United

6     International Trust and also owning UIB?

7              A.   No, I did not correct that.

8              Q.   And not only did you not correct

9     it, but in paragraph 2 of the May 8th, 2025

10    interview, you stated Elias was the owner of UIB.

11    Did you say that?

12             MR. BOURGET:  Objection, asked and

13    answered.  Improper impeachment.

14             THE WITNESS:  I don't -- I'm sorry.

15    BY MR. MAUZY:

16             Q.   Can you answer that?

17             A.   I don't recall saying that.  But

18    if it says it there and I didn't correct it,

19    then...

20             Q.   Then you said it?

21             A.   Yes, I must have said it.

22             Q.   And did you say -- make the

23    statement on May 8th, 2025, that Elias was the

24    owner of UIB?

25             A.   I don't remember stating that.

Amanda Zimmerman                              May 15, 2025

                                                    Page 80

1              THE VIDEOGRAPHER:  Excuse me for

2     interrupting.  Ms. Zimmerman, can you keep your

3     voice up, please.

4              THE WITNESS:  Yes, sorry.

5              THE VIDEOGRAPHER:  Thank you.

6     BY MR. MAUZY:

7         Q.   And, generally, you were the

8     person requesting permission from UIB in Curacao to

9     transfer funds to Firefly shareholders, correct?

10        A.   Would you repeat that, please?

11        Q.   If a request came in from a

12    shareholder of Firefly, you usually were the one

13    requesting permission to move the money from United

14    International Bank in Curacao to the Firefly

15    shareholder?

16        A.   I wasn't requesting permission.

17        Q.   You had to get a second signature?

18        A.   Yes.

19        Q.   Without the second signature, you

20    could not move the money?

21        A.   Correct.

22        Q.   You had to have a second signature

23    from an employee with authority at United

24    International Bank?

25        A.   I am not sure about the status of

Amanda Zimmerman                                    May 15, 2025

                                                    Page 81

 1   who was --

 2              Q.   If you didn't get a second

 3   signature, you could not move the money from United

 4   International Bank; isn't that correct?

 5              A.   Correct.

 6              Q.   And in terms of which bank account

 7   was being utilized to transfer the funds to the

 8   shareholder, it was you that made the decision

 9   which bank account to use?

10              A.   No.

11              Q.   Who made the decision?

12              A.   Are we talking about Mr. Erickson

13   specifically?

14              Q.   If a shareholder said he wanted a

15   loan, and you were going to United International

16   Bank, you knew which account to utilize for a

17   transfer of funds from Firefly?

18              A.   Yes.

19              Q.   No one had to direct you which

20   bank to go to?

21              A.   No.

22              Q.   And you weren't directed which

23   bank to go to?

24              A.   Sometimes.

25              Q.   You knew which bank to go to for

Amanda Zimmerman                                    May 15, 2025

Page 82

```
 1    the funds, there's only one bank, United
 2    International Bank, correct?
 3              A.   There was also a bank called
 4    Alexandria.  I'm not sure where it was, though.  We
 5    had it for a short period of time.
 6              Q.   And then that was closed?
 7              A.   It was closed a while ago, yes.
 8              Q.   So all of the funds from Firefly,
 9    funds that were transferred to shareholders, came
10    from the accounts in Curacao in United
11    International Bank; isn't that correct?
12              A.   If it was a Firefly matter, yes.
13              Q.   If it was Firefly funds, it came
14    from United International Bank, correct?
15              A.   Yes.
16              Q.   Dave Erickson does not have
17    signature authority on that Firefly account?
18              A.   Is that a question?
19              Q.   Yes.
20              A.   I don't have any idea about that.
21              Q.   That's your answer, right?
22              A.   Yeah.
23              Q.   Does Erickson have signing
24    authority on Rypl bank accounts?
25              A.   No.
```

Amanda Zimmerman                                    May 15, 2025

Page 83

1              Q.   To obtain any money from Rypl, if

2    he did, he couldn't transfer it on his own

3    signature, correct?

4              A.   Correct.

5              Q.   You, in fact, had a lot of

6    communications with Gregory Elias because you

7    needed two signatures to move money out of

8    UIB account; is that correct?

9              A.   No.

10             Q.   You needed two signatures to move

11   money out of the UIB account?

12             A.   Yes.

13             Q.   And the other signature was an

14   employee of Greg Elias, correct?

15             A.   Yes.

16             Q.   And it was the UIB account that

17   the shareholder advances that you've talked about

18   came out of; is that correct?

19             A.   Yes.

20             Q.   Yes?

21             A.   Yes.

22             Q.   You had the ability to review the

23   balances in Bannister's account, correct?

24             A.   I am not sure about that.

25             Q.   I'm asking if you could view the

Amanda Zimmerman                                    May 15, 2025

Page 84

1    accounts.

2                    A.    Right.  I believe it's set up,

3    yes.

4                    Q.    Let me show you your

5    November 14th, 2025 (verbatim) interview and ask

6    you to look at paragraph 14 relating to Bannister.

7                    A.    (Witness reviews document).  I

8    believe I have viewing ability on all of the

9    accounts that are at...

10                   Q.    You had viewing ability of all of

11   the accounts at United International Bank?

12                   A.    I mean, not all the accounts but a

13   number of accounts.

14                   Q.    Relating to Firefly?

15                   A.    I believe so.

16                   Q.    Okay.  Before Tony Severin became

17   controller, was Dave Erickson more involved day to

18   day with Rypl than after Tony Severin came on

19   board?

20                   A.    Yes.

21                   Q.    The accounting situation was, to

22   describe it charitably, a bit of a mess when Tony

23   was hired?

24                   A.    Yes.

25                   Q.    And it took Tony some time to

Amanda Zimmerman                                    May 15, 2025

Page 85

1    untangle the mess?

2                    A.    I believe so.

3                    Q.    And he was able to straighten out

4    the accounting and records at Rypl?

5                    A.    I'm not sure what he did.

6                    Q.    But he was able to straighten out

7    the accounting?

8                    MR. BOURGET:  Objection, asked and

9    answered.  Lack of personal knowledge.

10   BY MR. MAUZY:

11                   Q.    Was the accounting in better shape

12   after Tony Severin took over than it was before

13   Tony Severin took over?

14                   A.    Yes.

15                   Q.    And became much more orderly after

16   he took over?

17                   A.    When we got the new software, yes.

18                   Q.    With the new software, it became

19   much more orderly?

20                   A.    Yes.

21                   Q.    And you were able to do a better

22   job of accounting?

23                   A.    Yes.

24                   Q.    Better job of recordkeeping?

25                   A.    Yes.

Amanda Zimmerman                                      May 15, 2025

Page 86

1                Q.    When Tony Severin came on board at

2    Rypl, you reported directly to him?

3                A.    Yes.

4                Q.    He is the controller of the

5    company?

6                A.    Yes.

7                Q.    He is your direct boss?

8                A.    Yes.

9                Q.    He could override any decision

10   that you made?

11               A.    I don't really make decisions, but

12   yes.

13               Q.    Do you make any accounting

14   decisions?

15               A.    As far as transferring funds?

16               Q.    Yes.

17               A.    No.

18               Q.    You're simply a person who carries

19   out instructions?

20               A.    Mostly, yes.

21               Q.    You do not have a decision-making

22   role; is that correct?

23               A.    Correct.

24               Q.    You do have the responsibility,

25   though, to record those transfers?

Amanda Zimmerman                                    May 15, 2025

Page 87

1              A.   Yes, in most cases.

2              Q.   And all of these transfers, in

3    fact, were recorded on the books of Rypl?

4              A.   I am not aware.

5              Q.   You would -- if a shareholder

6    asked you for a loan, you would record that

7    transaction if a loan was made?

8              A.   If I was doing that job at the

9    time, yes.

10             Q.   Yeah, yeah, if it came to you.  If

11   you got an e-mail from a shareholder saying he

12   wanted a loan --

13             A.   Uhm-hmm.

14             Q.   -- and you transferred funds from

15   United International Bank to pay for that loan, you

16   would record that transaction?

17             A.   We had AP clerks to do that.

18             Q.   But that transaction was recorded?

19             A.   I mean, I would assume so.

20             Q.   You would ask them to record it,

21   correct?

22             A.   I'm not their boss.

23             Q.   Who's their boss?

24             A.   Tony Severin was the accounting

25   boss.

Amanda Zimmerman                                        May 15, 2025

Page 88

1              Q.    All right.  So Tony Severin would

2    make sure that the loans were recorded properly,

3    correct?

4              A.    I -- I wouldn't know.

5              Q.    Well, who would know?  Tony

6    Severin?

7              A.    Yes.

8              Q.    Is Firefly Rypl's only customer?

9              A.    No.

10             Q.    What other customers do you have?

11             A.    Granity Entertainment.

12             Q.    And that's associated with

13   Firefly?

14             A.    Yes.

15             Q.    What other customers?

16             A.    Then, at that time?  I don't have

17   memory back that far.

18             Q.    Tony Severin, as controller of the

19   company, is responsible for the accounting,

20   correct?

21             A.    Yes.

22             Q.    He is responsible for making sure

23   that any payments of expenses are made, are taken

24   care of and properly recorded?

25             A.    I -- that would be a question for

Amanda Zimmerman                                    May 15, 2025

Page 89

1    Tony.

2              Q.   Is that your belief?  If anyone is

3    responsible at Rypl, it would be Tony Severin,

4    responsible for taking -- keeping track of these

5    payments that were made to shareholders, correct?

6              A.   Yes.

7              Q.   Ultimately, he's the person

8    responsible for coding these transactions; that is,

9    whatever they are, are they loans?  Are they

10   payment of credit cards?

11             A.   He would review the statements at

12   the end of the month.

13             Q.   Okay.  So all of the payments that

14   were made, he would review at the end of the month?

15             MR. BOURGET:  Objection, lack of

16   personal knowledge.

17   BY MR. MAUZY:

18             Q.   Is that your belief?

19             MR. BOURGET:  You can answer.

20             THE WITNESS:  Yeah.  Yes, he created

21   the financial statements.

22   BY MR. MAUZY:

23             Q.   Right.  So he would review the

24   payments of expenses, and keep track of that each

25   month, correct?

Page 90

```
 1                    A.    I would assume so.

 2                    Q.    That's his job as controller?

 3                    A.    Yes.

 4                    Q.    He's in charge of accounting.

 5                    You are not responsible to determine

 6     whether any of these loans to shareholders were

 7     approved?

 8                    A.    Correct.

 9                    Q.    Dave Erickson frequently requested

10     money from Firefly, correct?

11                    A.    Yes, he has, yes.

12                    Q.    I'm going to show you Defense

13     Exhibit 13.  Would you review that, please?

14                    A.    Okay.

15                    Q.    Do you recognize this as an e-mail

16     from Dave Erickson to you and Tony Severin, dated

17     December 5th, 2017?  It references a loan to

18     Halstead.

19                    A.    Yes.

20                    Q.    And you frequently received this

21     type of request?

22                    A.    Correct.

23                    Q.    You would have received this

24     request?

25                    A.    Yes.
```

Amanda Zimmerman                                    May 15, 2025

Page 91

1              Q.   And after you received the
2    request, what would you do mechanically?  What did
3    you do?
4              A.   I would execute the payment from
5    the bank account.
6              Q.   Okay.  In United International
7    Bank account?
8              A.   It doesn't specifically say on
9    that e-mail, so I wouldn't remember.
10             Q.   Okay.  There's no direction to you
11   on this e-mail?
12             A.   Correct.
13             Q.   Generally, you would utilize
14   United International Bank to transfer funds; is
15   that fair to say?
16             A.   And Rypl as well, yes.
17             Q.   But you don't remember on this
18   one?
19             A.   No.
20             Q.   I'm showing you 14, Defense
21   Exhibit 14.
22             Is this an e-mail from Dave Erickson to
23   you and Tony Severin, May 3rd, 2017, with the
24   subject, "Loan"?
25             A.   Yes.

Page 92

1          Q.   And does he request sending 75,000

2     to Halstead as a loan when you have the funds

3     available?

4          A.   Yes.

5          Q.   Were these funds transferred?

6          A.   I believe they would have been,

7     yeah.

8          Q.   And were they transferred from

9     United International Bank?

10         A.   I -- I don't have any recollection

11    of where they were specifically.

12         Q.   But Tony Severin would know that,

13    correct?

14         A.   Yes.

15         Q.   When you paid money on behalf of

16    Firefly, Firefly paid Rypl for your services,

17    correct?

18         A.   Sorry, could you repeat...

19         Q.   Yeah.  Did Rypl pay you when you

20    paid the expenses of Firefly?

21         A.   I'm not sure what that means.  Did

22    Rypl...

23         Q.   Were you compensated by Firefly?

24         A.   As in my payroll?  I worked for

25    Rypl.

 1              Q.   Was Rypl -- yeah, was Rypl

 2    compensated by Firefly?

 3              A.   I'm not sure.

 4              Q.   All right.  I'm going to show you

 5    Defendant's Exhibit 15.

 6              A.   Okay.

 7              Q.   Is this an e-mail from Dave

 8    Erickson on March 7th, 2017 to you, copy to Tony

 9    Severin, subject is a "Loan," with a request to

10    send 50,000 to Halstead Bay as a loan?

11              A.   Yes.

12              Q.   And you recognize that, do you?

13              A.   Not specifically, but yes.

14              Q.   You know you would have received

15    that?

16              A.   Yes.

17              Q.   All right.  What did you do after

18    receiving that e-mail?

19              A.   I would have executed the payment.

20              Q.   All right.  And that would have

21    come from United International Bank?

22              A.   I'm not sure.

23              Q.   You don't remember?

24              A.   No.

25              Q.   I'm showing you Defense

Amanda Zimmerman                                    May 15, 2025

Page 94

1    Exhibit 16, an e-mail from Dave Erickson,

2    October 10th, 2019, to Tony Severin and Amanda,

3    reference "Advance For Legal Costs"?

4              A.   Sorry, I think this is the wrong

5    -- oh, it's double-sided, okay.  Sorry, go ahead.

6              Q.   Do you have Defendant's 16 in

7    front of you?

8              A.   Yes.

9              Q.   Is this an e-mail from Dave

10   Erickson, October 10th, 2019, to Tony Severin and

11   you?

12             A.   Yes.

13             Q.   Referencing "Advance For Legal

14   Costs"?

15             A.   Yes.

16             Q.   And asking, "Please send $10,000

17   to Halstead"?

18             A.   Yes.

19             Q.   And you recall that?

20             A.   No.

21             Q.   Did you follow -- you recognize

22   that as something you would have received then?

23             A.   I recognize that, yes, yes.

24             Q.   And did you follow up?  Did you

25   send 10,000 to Halstead?

Page 95

1                    A.    I would have, yes.

2                    Q.    Did that money come from United

3    International Bank?

4                    A.    I'm not aware of which account.

5                    Q.    I'm going to show you what's been

6    marked as Defendant's Exhibit D-17, and ask you if

7    that is an e-mail from Dave Erickson,

8    February 25th, 2018, to Tony Severin and to you,

9    regarding Amex, with a request to send another

10   25,000 as a loan.

11                   A.    Yes.

12                   Q.    All right.  And this would have

13   been received by you?

14                   A.    Yes.

15                   Q.    All right.  And did you follow

16   that request by Dave Erickson for the 25,000 as a

17   loan?

18                   A.    Yes, I would have.

19                   Q.    And that would have been from

20   United International Bank?

21                   A.    If it's Amex-related, it would

22   have been from Rypl.

23                   Q.    Okay.  And how did that work, from

24   Rypl?

25                   A.    What part?

Amanda Zimmerman                                    May 15, 2025

Page 96

1           Q.   How did the payment work from

2    Rypl?

3           A.   I had online access to the

4    commercial banking, so payment would be sent to

5    them.

6           Q.   And you would send this money from

7    Rypl?

8           A.   Amex-related, I know always came

9    from Rypl.

10          Q.   Okay.  Amex was always from Rypl?

11          A.   Yes.

12          Q.   Okay.  Did David send you -- David

13   Erickson send you a spreadsheet at the end of the

14   month, identifying business expenses?

15          A.   No.

16          Q.   You never received a spreadsheet

17   from him?

18          A.   Me, personally?

19          Q.   Yeah.

20          A.   I don't believe so.

21          Q.   Did Tony Severin receive it?

22          A.   I'm not sure what Tony received.

23          Q.   So you don't know if Tony

24   Severin received --

25          A.   Correct.

Amanda Zimmerman                                    May 15, 2025

Page 97

```
 1                  Q.   -- any sort of spreadsheet from
 2    David on his expenses?
 3                  A.   Correct.
 4                  Q.   I show you Defense Exhibit 18;
 5    it's an e-mail from Dave Erickson to Tony Severin.
 6    You were copied on it.  It's February 26th, 2018,
 7    regarding Amex.
 8                  A.   (Witness reviews document).
 9    Uhm-hmm.
10                  Q.   And you would have received that,
11    correct?
12                  A.   Yes.
13                  Q.   You recognize that?
14                  A.   Yes.
15                  Q.   There's a reference to a Pierre.
16    Do you know who Pierre is?
17                  A.   Yeah.  He worked for the outside
18    accounting firm.
19                  Q.   Okay.  Is he a tax specialist in
20    Canada?
21                  A.   I'm not sure what his...
22                  Q.   Was he an accountant?
23                  A.   Yes.
24                  Q.   Okay.  So he is an accountant who
25    worked for Rypl as an outside accountant?
```

Amanda Zimmerman                                    May 15, 2025

Page 98

```
 1              A.   Yes.

 2              Q.   Is that correct?

 3              A.   Yes.

 4              Q.   Also:

 5                   "Hi Amanda."

 6                It says:

 7                   "Please pay from Rypl and code

 8              to new account..."

 9              This is from Tony to you?

10              A.   Uhm-hmm.

11              Q.   "Please pay from Rypl and code

12              to new account 14360 and Shareholder

13              Advance."

14              A.   Yes.

15              Q.   Did you do that?

16              A.   I, or one of the clerks, would

17    have probably done that, yes.

18              Q.   So this would have gone as a

19    shareholder advance, correct?

20              A.   I mean, that's what it says here.

21    I'm not -- off the top of my head, I don't know

22    what that code is for.

23              Q.   Do you know what the new account,

24    14360, references?

25              A.   No.
```

Amanda Zimmerman                                May 15, 2025

Page 99

1            Q.   You talked about the shareholders
2    for Firefly.  Do you recognize the four major
3    shareholders as David van der Poel, David Erickson,
4    Toine Rodenburg, Richard Burry?  And those were the
5    four main ones:  van der Poel, Erickson, Rodenburg
6    and Burry, correct?
7            A.   I believe so, yes.
8            Q.   And also, shareholders at some
9    point, Chad Moldon, Paul Eidsness, Ryan Maule and
10   Kevin Krieg?
11           A.   Yes, I believe so.
12           Q.   And those were sort of the
13   minority shareholders?
14           A.   Correct.
15           Q.   Major shareholders were the four
16   that I listed at first, correct?
17           A.   Yes.
18           Q.   And the so-called shareholder
19   dividends, those were generally advances, treated
20   as advances, correct?
21           A.   Correct.
22           Q.   And advances are something that
23   has to be paid back eventually, correct?
24           A.   If they were advances on
25   dividends, yes, they would have been.

Amanda Zimmerman                                          May 15, 2025

Page 100

1                    Q.   All right.  And you understood

2       that advances on dividends needed to be paid back

3       eventually?

4                    A.   They would have been taken from

5       dividends, once they were declared, yes.

6                    Q.   So the shareholder advances would

7       be paid from dividends, once dividends were

8       declared?

9                    A.   The dividend advances, yes.

10                   Q.   And to your knowledge, there was

11      no dividend declared during the period of time when

12      you were actively involved, before 2019?

13                   A.   I'm not sure.

14                   Q.   You don't know or you have to...

15                   A.   I don't know.  I wouldn't have

16      been involved in that part.

17                   Q.   Okay.  You were out of the loop on

18      that?

19                   A.   Right.  I mean, I don't calculate

20      the dividends for the company.

21                   Q.   Okay.  You don't know if there

22      were any dividends issued during that time period?

23                   A.   I do not, no.

24                   Q.   You don't know if there were any

25      resolutions --

Amanda Zimmerman                                    May 15, 2025

Page 101

1              A.   No.

2              Q.   -- at that time?

3              A.   I don't remember any.

4              Q.   Is it fair to say that you use the

5    term "advances on dividends" and "advances" as

6    being the same thing?

7              A.   No.

8              Q.   What's the difference between the

9    two?

10             A.   "Advances on dividends" I would

11   understand to be deducted from the dividends, once

12   they were declared.

13             Just regular advances, I am not aware

14   of what happened with those.

15             Q.   Are advances loans?

16             A.   Yes.

17             Q.   I'm going to show you Defense

18   Exhibit 19.  Do you recognize this as an e-mail

19   from Dave Erickson to you and to Tony Severin,

20   dated August 27th, 2014?

21             A.   (Witness reviews document).  Yes.

22             Q.   And this relates to payments to

23   Richard Burry?

24             A.   Yes.

25             Q.   And Richard Burry was one of the

Amanda Zimmerman                                    May 15, 2025

Page 102

1    major shareholders?

2                    A.    Yes.

3                    Q.    And does Dave say he's "reviewed

4    Richard's payments and have the following

5    requests"?

6                    A.    Yes.

7                    Q.    "...stop paying him $10,000

8                    wire to SmartVu"?

9                    A.    Yes.

10                   Q.    "Please send me the account

11                   name that you have been using to

12                   book his advances"?

13                   A.    Yes.

14                   Q.    So you had an account that would

15   book Richard Burry's advances?

16                   A.    I believe it would be booked to

17   his -- I can't remember, sorry.

18                   Q.    All right.  But that's what he

19   asked you, he'd been using to book his advances?

20                   A.    Yes.

21                   Q.    And he asks you to confirm that

22   SmartVu has received only $10,000 each month and no

23   Euro payments?

24                   A.    Correct.

25                   Q.    And he asked you to confirm that

Amanda Zimmerman                                    May 15, 2025

Page 103

1    the total of these payments since February 2013 is

2    160,000?

3              A.   Yes.

4              Q.   All right.  In your recordkeeping

5    at Rypl, you were able to respond to this request

6    by Dave, were you not?

7              A.   I believe so, yeah.

8              Q.   So you kept records, right?

9              A.   Yes.

10             Q.   I'm showing you Defendant's

11   Exhibit 4.  Do you recognize this as an e-mail from

12   Dave Erickson to you and David van der Poel, Tony

13   Severin and Chad Moldon, dated August 28th, 2014,

14   "Subject: Advances to Chad"?

15             A.   Yes.

16             Q.   Do you recognize this document?

17             A.   Not specifically but, yes.

18             Q.   This is the type of document --

19             A.   Yes.

20             Q.   -- that you did receive --

21             A.   Yes.

22             Q.   -- and would have been kept as a

23   business record, correct?

24             A.   Yes.

25             Q.   And Dave asks you to reconcile

Amanda Zimmerman                                    May 15, 2025

                                                    Page 104

1    advances to Chad, correct?

2                  A.    Yes.

3                  Q.    Including any activity between

4    David and Chad or any other source?

5                  A.    Correct.

6                  Q.    He says:

7                        "I leave it to you all.  Please

8                  send me a copy of the final

9                  spreadsheet."

10                 A.    Yes.

11                 Q.    So somewhere within Rypl, there

12   was an account that reconciled and recorded all of

13   the advances that were transferred from Firefly to

14   Chad, correct?

15                 A.    No.  This would have been in

16   reference to Chad's credit card with Rypl being

17   used.

18                 Q.    Okay.  Was there a record kept of

19   his credit card being used?

20                 A.    Yes.

21                 Q.    All right.  And that was kept

22   within Rypl?

23                 A.    Yes.

24                 Q.    So where would you have looked for

25   the credit card records?

Amanda Zimmerman                              May 15, 2025

                                             Page 105

1                    A.    I'm not sure what you mean.

2                    Q.    Well, he's asking you to reconcile

3      the advances to Chad.  Where would you or Tony look

4      to accomplish the task of reconciling?

5                    A.    Chad has a shareholder ledger

6      account that his personal expenses would be coded

7      to.

8                    Q.    Okay.  And that's a shareholder

9      account for Firefly?

10                   A.    No, Rypl.

11                   Q.    For Rypl?

12                   A.    Yes.

13                   Q.    Okay.  And there would be a record

14     of all of the advances from Rypl to him, including

15     credit cards?

16                   A.    Yes.

17                   Q.    Did he have a shareholder account

18     relating to Firefly?

19                   A.    I don't believe -- I'm not sure.

20                   Q.    All right.  Tony Severin would

21     know that?

22                   A.    Yes, I would believe so.

23                   Q.    And Chad also -- Chad Moldon also

24     got advances from Firefly; is that correct?

25                   A.    No, I don't believe he was ever

1  advanced from Firefly.

2            Q.   You know that?

3            A.   No, I don't know that 100 percent.

4  But that would be atypical.

5            Q.   Okay.  Would Tony Severin know

6  that?

7            A.   Yes.

8            Q.   Would Chad Moldon know that?

9            A.   Perhaps.

10           MR. BOURGET:  Objection, personal knowledge.

11  BY MR. MAUZY:

12           Q.   You would assume Chad Moldon would

13  know his own advances, right?

14           MR. BOURGET:  Same objection.

15  BY MR. MAUZY:

16           Q.   Is that correct?

17           A.   Would he know which bank it was

18  sent from?

19           Q.   No, would he --

20           A.   I -- I don't believe so.

21           Q.   Would he know when he received an

22  advance?

23           A.   Of course, yes.

24           Q.   In terms of shareholder requests,

25  we looked at a number of shareholder requests

Amanda Zimmerman                          May 15, 2025

Page 107

1   directly from David Erickson, correct?

2            A.   Yes.

3            Q.   Did other shareholders make

4   similar requests?

5            A.   Not directly to me.

6            Q.   I'm going to show you Defense

7   Exhibit 20.  Do you recognize this as an e-mail

8   from Toine Rodenburg dated June 16th, 2016,

9   regarding an invoice payment by Firefly to you,

10  copying Dave Erickson?

11           A.   Yes.

12           Q.   And you send Mr. Rodenburg an

13  e-mail saying:

14                "I will let you know if the

15                bank requires any additional

16                [information] from you"?

17           A.   Correct.

18           Q.   And he -- turn the page over, he

19  is asking you to pay the attached invoice from

20  Firefly?

21           A.   Correct.

22           Q.   So Firefly funds would be utilized

23  to pay that invoice?

24           A.   Yes.

25           Q.   All right.  And this type of

Amanda Zimmerman                                    May 15, 2025

                                                    Page 108

1    request from Mr. Rodenburg was not unusual; am I

2    correct?

3                A.   It was unusual, yes.

4                Q.   But you received other requests

5    from Mr. Rodenburg for advances?

6                A.   Very rare --

7                MR. BOURGET:  Objection,

8    mischaracterizes the testimony.  I don't think

9    there was any testimony these were advances.

10               MR. MAUZY:  Is that a speaking

11   objection?  I object to your speaking objection.

12   BY MR. MAUZY:

13               Q.   Were there advances to Toine Rodenburg?

14               A.   Yes.

15               Q.   And those advances were from

16   Firefly?

17               A.   From the Firefly credit card, yes.

18               Q.   I show you what's been marked as

19   Defendant's Exhibit 21.

20               EXHIBIT NO. D-21:  E-mail from D. Erickson

21               et al, to T. Severin dated May 30,

22               2018, Re: Transfer.

23   BY MR. MAUZY:

24               Q.   This is a couple of e-mails, an

25   e-mail from Dave Erickson to Tony Severin and you,

Amanda Zimmerman                                          May 15, 2025

Page 109

1    related to a transfer dated May 29th, 2018.  And

2    then a response e-mail from Tony to Dave dated

3    May 30th, 2018, which you are copied on.  I ask you

4    to take a look at that.

5              A.   (Witness reviews document).  Okay.

6              Q.   Is that a request to transfer a

7    hundred thousand from Lloydsville?

8              A.   Yes.

9              Q.   To transfer a hundred thousand

10   from Firefly to Lloydsville?

11             A.   (Witness reviews document).  Yes.

12             Q.   And it references a loan?

13             A.   Yes.

14             Q.   And Lloydsville is associated with

15   David van der Poel?

16             A.   Correct.

17             Q.   This would be a loan to his

18   company, Lloydsville, correct?

19             A.   I don't know the -- from this

20   e-mail, it seems that the loan was between

21   Lloydsville and 10Q21.

22             Q.   And 10Q21 is Toine Rodenburg?

23             A.   Yes.

24             Q.   So this is a request to transfer

25   from Lloydsville associated with David van der Poel

Amanda Zimmerman                                         May 15, 2025

                                          Page 110

1    to 10Q21 associated with Toine Rodenburg?

2                  A.    Correct.

3                  Q.    And the reference is a loan?

4                  A.    Yes.

5                  Q.    And at the bottom of the page, it

6    says:

7                        "Then we need to get 100k from

8                  Firefly to Lloydsville..."

9                  Correct?

10                 A.    Yes.

11                 Q.    And does Tony say to Dave:

12                       "Okay, we can do this..."?

13                 A.    Yes.

14                 Q.    And he says:

15                       "Please send the money

16                 immediately."

17                 Correct?

18                 A.    (Witness reviews document).  Yes.

19                 Q.    So in this case, this is a request

20   for a transfer from one shareholder to another

21   shareholder, from Firefly funds?

22                 A.    Yes.

23                 Q.    And that was a hundred thousand

24   dollars?

25                 A.    Yes.

Amanda Zimmerman                                    May 15, 2025

Page 111

1                 Q.   I'm going to show you what's been

2    marked as Defendant's Exhibit 22, it's exactly four

3    pages.  If you can review that.

4                 EXHIBIT NO. D-22:  E-mail Chain from

5                 D. Erickson to A. Zimmerman, et al, dated

6                 August 27, 2014, Re: Loan.

7    BY MR. MAUZY:

8                 Q.   We start at page 3, Paul

9    Eidsness's e-mail, bottom of page 3.

10                A.   Yeah.

11                Q.   He says -- Paul Eidsness was a

12   shareholder?

13                A.   Yeah, I believe so.

14                Q.   Of Firefly?

15                A.   Yes.

16                Q.   And you recognize these e-mails,

17   correct?

18                A.   Yes.

19                Q.   You would have received these in

20   the normal course of business?

21                A.   Yes.

22                Q.   Paul Eidsness requests a hundred

23   and twenty-five thousand dollar advance for the

24   purchase of a house?

25                A.   Yes.

Amanda Zimmerman                                    May 15, 2025

                                              Page 112

1                  Q.   He was a shareholder of Firefly?

2                  A.   I'm not sure about this timing.

3       I'm unsure when he became a partner.

4                  Q.   And the next e-mail in the chain

5       is from Dave Erickson to Paul Eidsness?

6                  A.   Yes.

7                  Q.   And Dave Erickson says:

8                       "Cool.  We have the old guys

9                       meeting tomorrow.  I'll ask for an

10                      approval."

11                      Does he say that?

12                 A.   Yes.

13                 Q.   Do you know who the "old guys"

14      are?

15                 A.   No.

16                 Q.   Are the "old guys" David van der

17      Poel, Dave Erickson, Toine Rodenburg and Richard

18      Burry?

19                 MR. BOURGET:  Objection, personal

20      knowledge.  She's already said she doesn't know.

21      BY MR. MAUZY:

22                 Q.   You can answer.

23                 A.   They're old people.  I don't know

24      if they're part of this.

25                 Q.   You don't know who he's referring

Amanda Zimmerman                                    May 15, 2025

Page 113

1    to?

2                A.   Correct.

3                Q.   But he's asking for a meeting of

4    "old guys" and "I'll ask for an approval"?

5                A.   Yes.

6                Q.   Or "ask for approval."  All right.

7                Now, Paul's response in that e-mail

8    chain, regarding "Advance" that he sent from Paul

9    Eidsness to Dave Erickson.  He says:

10                    "Thank you kindly.  I have my

11                    house in Excelsior to sell in the

12                    Spring, after the lease is up."

13                    He says:

14                    "I have 200k in equity [...]

15                    at today's prices."

16                    That's from Paul Eidsness, correct?

17                A.   Yes.

18                Q.   Dave Erickson on August 27th, 2014

19    states to Paul Eidsness:

20                    "This is approved.  Please send

21                    wire instructions."

22                A.   Yes.

23                Q.   And that's August 27th?

24                A.   Yes.

25                Q.   And that's the day after the

Amanda Zimmerman                                          May 15, 2025

                                                       Page 114

1    August 26th e-mail where Dave Erickson says he'll

2    have an "old guys" meeting tomorrow, which would

3    have been August 27th, correct?

4              A.   Yes.

5              Q.   And he says it at -- in the

6    August 27th e-mail, it's been approved?

7              A.   Okay.  I mean, I'm not copied on

8    any of these so...

9              Q.   Right.  Look at the first page of

10   the chain.

11             A.   Yes, yeah, right.

12             Q.   The first page of the chain --

13             A.   Yes.

14             Q.   -- Dave Erickson to you, Tony

15   Severin and Paul Eidsness, regarding loan, from

16   Dave, says:

17                  "Please send Paul $125,000 to

18                  the account that he will advise you

19                  of."

20                  The reference is "Loan," correct?

21             A.   Correct.

22             Q.   I'm going to hand you Defense

23   Exhibit 23.

24                  EXHIBIT NO. D-23:  E-mail from D. Erickson

25                  to A. Zimmerman, et al, dated September

Amanda Zimmerman                              May 15, 2025

                                              Page 115

1                29, 2016 Re: Loan.

2      BY MR. MAUZY:

3                Q.   An e-mail from Dave Erickson,

4      dated September 29th, 2016, to you and to Tony

5      Severin.  The subject is a "Loan."

6                A.   Yes.

7                Q.   Correct?

8                A.   Yes.

9                Q.   You recognize this?

10               A.   Yes.

11               Q.   Asks you to send $6,000 to

12     Halstead.  It says:

13                    "It is a loan.  More divorce

14               legal fees."

15               Correct?

16               A.   Correct.

17               Q.   And was that money sent?

18               A.   I believe it would have been.

19               Q.   And was that from United

20     International Bank?

21               A.   I'm not sure where it would have

22     come from.

23               Q.   Tony -- Tony Severin would know?

24               A.   Yes.

25               Q.   Pardon?

Amanda Zimmerman                                   May 15, 2025

                                        Page 116

1                    A.   Yes.

2                    Q.   That wasn't your job?

3                    A.   No.

4                    Q.   True?

5                    A.   What wasn't my job?

6                    Q.   The coding, coding.

7                    A.   Coding?  Sometimes, yes.

8                    Q.   All right.  Was it your job to

9    determine -- when I asked you the question relating

10   to Defendant's Exhibit 23, "Please send 6,000 to

11   Halstead," you assume that you would have gotten

12   that from United International Bank transfer?

13                   A.   No, I said I don't remember where

14   that would come from.

15                   Q.   And Tony Severin would know?

16                   A.   I would assume so.

17                   Q.   And he would be in charge of the

18   accounting for that transfer?

19                   A.   Yes.

20                   Q.   All right.  You're not a

21   shareholder of Rypl?

22                   A.   No, I'm not.

23                   Q.   You're not a shareholder of

24   Firefly?

25                   A.   No.

Amanda Zimmerman                                           May 15, 2025

Page 117

1              Q.   You have never reviewed the

2    Firefly shareholder agreement?

3              A.   I'm sure I've seen it.

4              Q.   The shareholder agreement?

5              A.   I'm sure at some point I have seen

6    it, yes.

7              EXHIBIT NO. D-50:  Firefly Lane, LTD.,

8              Shareholders Agreement dated July 1, 2009.

9    BY MR. MAUZY:

10             Q.   I'm going to hand you what's been

11   marked as Defendant's Exhibit 50, and ask you if

12   you recognize that as a shareholder agreement.

13             A.   It looks like a shareholder's

14   agreement.

15             Q.   And that's a shareholder agreement

16   you're referring to?

17             A.   I -- I don't remember --

18             Q.   All right.

19             A.   -- which one I've seen.

20             Q.   All right.  You saw a shareholder

21   agreement?

22             A.   I'm sure I would have, yes.

23             Q.   Okay.

24             A.   At some point in my 20 years.

25             Q.   Right.  In your 20 years, you

Amanda Zimmerman                                    May 15, 2025

Page 118

1   would have reviewed that shareholder agreement,

2   correct?

3              A.   I would have seen it, yes.

4              Q.   You would have seen it?

5              A.   Yes.

6              Q.   Okay.  Well, let's talk about the

7   shareholder agreement.

8              Were you aware that in the shareholder

9   agreement, the shareholders were authorized to take

10  interest-free loans?

11             MR. BOURGET:  Objection, personal

12  knowledge.

13             When I make an objection, you can feel

14  free to answer.  I'm just preserving it for the

15  record.

16             THE WITNESS:  Oh, I see.  Sorry.  Can

17  you repeat the question?

18  BY MR. MAUZY:

19             Q.   Yes.  In the shareholder agreement

20  that you would have seen at Rypl, that's a Firefly

21  Lane shareholder agreement, were you aware that the

22  shareholders were authorized to take shareholder

23  loans?

24             MR. BOURGET:  Same objection.

25             THE WITNESS:  Not aware of anything

Amanda Zimmerman                                    May 15, 2025

Page 119

1    specific in the shareholder agreements.  I don't

2    remember anything about that.

3    BY MR. MAUZY:

4              Q.   Looking at Section 9.5 of

5    Defendant's Exhibit 50, I ask you to review that

6    and see if there's a reference to a shareholder

7    agreement.

8              A.   (Witness reviews document).

9              Sorry, this whole section here?

10             Q.   9.5.

11             A.   Oh, 9.5, okay.  Okay.

12             Q.   Does that reference interest-free

13   loans?

14             A.   Yes.

15             Q.   And this was an agreement that was

16   at Rypl, correct?

17             A.   What do you mean?

18             Q.   Well, it was part of the records

19   of Rypl that you were able to review?

20             A.   At one point, I'm sure, yes.  I

21   don't specifically remember.

22             Q.   But you saw it at Rypl?

23             A.   I don't specifically remember

24   seeing that.

25             Q.   But you believe you've reviewed

Amanda Zimmerman                                    May 15, 2025

Page 120

1   it, looked at it?

2              A.   I believe I probably would have

3   forwarded it to a bank or something.

4              Q.   Correct.

5              A.   Yeah.

6              Q.   So -- but to forward it to a bank,

7   you'd have to have it in the Rypl records, correct?

8              A.   Yes.

9              Q.   So it was in the Rypl records?

10             A.   I would guess so, yes.

11             Q.   And you don't personally know what

12  shareholders agree to when you're not present --

13             A.   Correct.

14             Q.   -- correct?

15             You did not attend any shareholder

16  meetings?

17             A.   No, I did not.

18             Q.   You're not on every e-mail that

19  the shareholders exchange among themselves?

20             A.   Correct.

21             Q.   So, in terms of who authorized the

22  loans to Dave Erickson, you have no personal

23  knowledge, correct?

24             A.   Correct.

25             Q.   And in terms of who authorized the

Amanda Zimmerman                                    May 15, 2025

Page 121

1   loans to other shareholders, you have no personal
2   knowledge of that as well?
3               A.   I mean, most of the other partner
4   loans would come through Mr. Erickson.
5               Q.   And do you know if other
6   shareholders authorized them or not?  Do you have
7   personal knowledge of that?
8               A.   I do not.
9               Q.   And in terms of how the other
10  shareholders or all the shareholders were going to
11  repay their loans, you have no way of knowing that,
12  then?
13              A.   No.
14              MR. MAUZY:   I have no other questions.
15              MR. BOURGET:   Can we take a restroom
16  break?  We'll go off the record just for a few
17  minutes.
18              THE VIDEOGRAPHER:   This marks the end
19  of media number three -- excuse me, media number
20  two.  We are off the record at 11:24 a.m.
21              -- RECESS TAKEN AT 11:24 A.M. --
22              -- UPON RESUMING AT 11:35 A.M. --
23              THE VIDEOGRAPHER:   This marks the
24  beginning of media number three and we're back on
25  the record at 11:35 a.m.

Amanda Zimmerman                                    May 15, 2025

                                        Page 122

1              Go ahead, Counsel.

2              MR. BOURGET:  Ms. Zimmerman, I just

3    have -- I have some more questions for you.

4                    RE-EXAMINATION

5    BY MR. BOURGET:

6              Q.   Mr. Mauzy asked you several

7    questions about whether Mr. Severin was your boss

8    and how that related to the Defendant being your

9    boss.  Do you recall that line of questioning?

10             A.   Yes.

11             Q.   You mentioned that Tony Severin

12   was your direct supervisor?

13             A.   Yes.

14             Q.   Did Tony Severin report to the

15   Defendant?

16             A.   Yes.

17             Q.   Was Dave Erickson Tony Severin's

18   boss?

19             A.   Yes.

20             Q.   In terms of the requests for

21   payments that we've been discussing, at any point

22   did Tony Severin ever overrule Defendant's

23   requests?

24             A.   I can't recall a time.

25             Q.   Would it have been unusual for him

Amanda Zimmerman                                    May 15, 2025

                                            Page 123

1   to do so?

2               A.   Yes.

3               Q.   Now, you were asked several

4   questions about your prior meetings with the

5   government and the ownership of United

6   International Bank; do you remember that?

7               A.   Yes.

8               Q.   Do you recall that you met with

9   the government last -- last week, on May 8th; do

10  you recall that?

11              A.   Yes.

12              Q.   And previously we met in November

13  of 2024, correct?

14              A.   Yes.

15              Q.   You had an opportunity to review

16  the first memorandum of interview that was prepared

17  from the November 2024 meeting?

18              A.   Yes.

19              Q.   After the May 8th meeting, did you

20  have an opportunity to review that memorandum of

21  interview?

22              A.   Yes.

23              Q.   The May 8th one?

24              A.   No, no.  What --

25              Q.   You recall that we met in

Amanda Zimmerman                                           May 15, 2025

                                                    Page 124

1    November?

2              A.   Yes.

3              Q.   And prior to our May 8th meeting,

4    the government provided your attorney with a copy

5    of that memo?

6              A.   Yes.

7              Q.   And that one was provided to you?

8              A.   Yes.

9              Q.   Do you recall -- or not "do you

10   recall."  Did you receive a second memorandum of

11   interview from the May 8th meeting?

12             A.   I don't believe so.

13             Q.   Okay.  Did you review that first

14   memorandum to the best of your ability?

15             A.   Yes.

16             Q.   Did you intentionally fail to make

17   any corrections?

18             A.   No.

19             Q.   Sitting here today, is it correct

20   that Gregory Elias is the owner of United

21   International Bank?

22             A.   I mean, I -- I don't honestly

23   know, but if I said it in the memo and it didn't

24   stick out to me as to correct it, then I would go

25   with that, yes.

Amanda Zimmerman                                        May 15, 2025

                                                    Page 125

1              Q.   Okay.  Well, I'm not asking

2    whether you said it in that first meeting.  I'm

3    asking --

4              MR. MAUZY:  Objection, asked and

5    answered.  Leading.

6              MR. BOURGET:  Let me finish my question

7    before you object.

8    BY MR. BOURGET:

9              Q.   I'm not asking about what you said

10   in a previous meeting.  I'm asking, sitting here

11   today, is it your understanding, is Gregory Elias

12   the owner of United International Bank, based on

13   what you know?

14             MR. MAUZY:  Asked and answered.

15   Leading.

16             THE WITNESS:  Again, I don't -- I don't

17   know if he is, but... I'm sorry, I don't -- I don't

18   know.

19   BY MR. BOURGET:

20             Q.   You were asked some questions

21   about the signature process at United International

22   Bank for sending out a payment, the second

23   signature requirement.  Do you recall that?

24             A.   Yes.

25             Q.   As far as the payments that were

Amanda Zimmerman                              May 15, 2025

Page 126

1  sent to Halstead Bay Holdings, did anyone from

2  United International Bank ever fail to provide that

3  second signature?

4            A.   I don't recall a time.

5            Q.   Can you recall any time where

6  someone from United International Bank either

7  refused to provide the second signature or wanted

8  more information before doing so?

9            A.   I don't -- yes, I mean, the house

10 part just that we discussed today were them asking

11 for additional information.

12           Q.   Let me put that up on the screen.

13 So you're referring to Government's Exhibit 16, and

14 this was the exhibit I showed you previously

15 involving the real estate purchase?

16           A.   Yes.

17           Q.   So these three questions that you

18 received from United International Bank --

19           A.   Yes.

20           Q.   -- and that were -- that you

21 forwarded to Dave Erickson and Paul Eidsness, are

22 these questions that the bank had before they would

23 agree to provide the second signature?

24           A.   I don't know what their process

25 is.

Amanda Zimmerman                                May 15, 2025

Page 127

1                Q.   Do you recall that, once you've
2   provided this information, that they provide a
3   second signature for that payment?
4                A.   I believe so.
5                Q.   Okay.  I first show you, this is a
6   copy of Defendant's Exhibit 18, and the e-mail here
7   at the bottom from Tony to you, dated
8   February 26th, 2018.  Do you see that?
9                A.   Yes.
10               Q.   He asks for you to pay from Rypl
11  and code to new account 14360 and shareholder
12  advance, and he says:
13                    ""Dave" -- who's copied on this
14               e-mail -- "we are all caught up on
15               our tax filings for Rypl."
16               He explains a little bit about those
17  tax filings.  And then at the bottom, Tony states:
18                    "So on the advance, can I get
19               Paul E. to do some paperwork for the
20               advance.  Term, interest rate,
21               etc??"
22               Did I read that correctly?
23               A.   Yes.
24               Q.   And Dave Erickson's response is:
25                    "Cool!  Call me today regarding

Amanda Zimmerman                                          May 15, 2025

Page 128

1                    documentation."

2               Did I read that correctly?

3          A.   Yes.

4          Q.   Were you part of any phone call

5  with Dave Erickson after this e-mail chain?

6          A.   No, I was not.

7          Q.   Okay.  Do you recall if you ever

8  received any paperwork related to this transaction?

9          A.   I -- I don't recall.

10         Q.   Now, when Defendant would provide

11  you or e-mail you his, you know, loan or payment

12  requests, did he ever signal to you that there was

13  going to be documentation drawn up memorializing

14  those requests?

15         A.   I'm not aware of anything.

16         Q.   I want to show you now Defendant's

17  Exhibit 21, and I want to draw your attention to

18  the e-mails at the bottom of the first page.

19              Starting with the one at the bottom, an

20  e-mail from Dave Erickson to Tony Severin, where

21  you're copied, dated May 29th, 2018.  Subject is

22  "Transfer."

23              This is -- you were asked about this

24  e-mail.  This is about a transfer from Lloydsville

25  to 10Q21.  Do you recall --

Page 129

1             A.    Yes.

2             Q.    -- reviewing this e-mail?

3             A.    Yes.

4             Q.    On May 30th, 2018, Tony responds:

5                   "Hi Dave.  Okay, we can do

6             this, but United will want to see a

7             copy of the loan agreement before

8             the money gets moved.  Can we get

9             Paul E. and Toine to work on that??"

10            Did I read that correctly?

11            A.    Yes.

12            Q.    And then at the top e-mail, the

13      Defendant responds:

14                  "Please send the money

15            immediately.  We'll deal as we go."

16            Did I read that correctly?

17            A.    Yes.

18            Q.    I want to show you now a copy of

19      Defendant's Exhibit 4.  This was also a Government

20      Exhibit that I showed you on direct examination.

21      Do you recall this e-mail?

22            A.    Yes.

23            Q.    Now, in this e-mail, Defendant is

24      asking you to reconcile advances to Chad Moldon,

25      right?

Amanda Zimmerman                                May 15, 2025

                                        Page 130

```
 1                A.   Yes.

 2                Q.   At any point, did the Defendant

 3   ever ask you to reconcile advances that he

 4   received?

 5                A.   I don't believe so.

 6                Q.   I'm going to show you a copy of

 7   Defendant's Exhibit 20.  You were also shown this

 8   e-mail.  I'll move to the second page.

 9                Do you recall this e-mail from -- or

10   testifying about this e-mail regarding Toine

11   Rodenburg?

12                A.   Yes.

13                Q.   And Toine asked you:

14                     "Can you please pay attached

15                     invoice from FireFly asap and send

16                     me the wire confirmation?"

17                Did I read that correctly?

18                A.   Yes, correct.

19                Q.   And at the bottom he says:

20                     "Dave, I will call you tomorrow

21                     about this one (can't be paid from

22                     10q21 due to company profile issues

23                     at the bank)."

24                Did I read that correctly?

25                A.   Yes.
```

Amanda Zimmerman                                    May 15, 2025

Page 131

1             Q.   Toine is letting the Defendant

2    know about his request?

3             A.   Yes.

4             Q.   I show you now a copy of

5    Defendant's Exhibit 22.  This is -- this the e-mail

6    regarding the loan to Paul Eidsness for the house

7    purchase.  Do you recall testifying about that?

8             A.   Yes.

9             Q.   I want to note just for -- just

10   for the record that the testimony was that these

11   were, and the questioning suggested that this was

12   all part of one e-mail chain that Ms. Zimmerman was

13   on.  That doesn't seem to be accurate, just

14   signaled by the bold line at the top of both page 1

15   and page 2, signifying the end of the chain.  I

16   just want to note that for the record.

17             But putting that aside, Ms. Zimmerman,

18   you testified that you didn't recall if

19   Mr. Eidsness was a partner, a FireFly partner, in

20   2014; do you recall that?

21             A.   Correct.

22             Q.   Now, the formalities here that the

23   Defendant explains in this e-mail, where he says:

24                  "Please use this template and

25                  insert your terms."

Amanda Zimmerman                                    May 15, 2025

                                                    Page 132

1                    Above that, he says:

2                         "As well, you will need short

3                    loan agreement to protect yourself

4                    tax-wise."

5                    Did I read that correctly?

6                    A.   Yes.

7                    Q.   Would it have been unusual for

8     Firefly to loan money to someone who was not a

9     partner of the company?

10                   A.   I'm not sure.

11                   Q.   I want to show you now a copy of

12    Defendant's Exhibit 50.  This is the shareholders'

13    agreement that you looked at.  Do you recall that?

14                   A.   Yes.

15                   Q.   I want to draw your attention to

16    Section 9.5 that you were asked about, which

17    states:

18                         "Interest-free loans to

19                    Shareholders may be made by the

20                    Company subject to paragraph 3.6, up

21                    to One Hundred percent (100%) of the

22                    Liquidation Value pursuant to

23                    paragraph 6.1."

24                    So I want to take a look now at

25    paragraph 3.6, that this specific provision is

Amanda Zimmerman                                    May 15, 2025

                                        Page 133

1    subject to.

2                 Now, looking here at paragraph 3.6, it

3    states:

4                      "Subject to paragraph 3.7, all

5                 decisions relating to the management

6                 and control of the business of the

7                 Company shall be determined by the

8                 Managing Director of the Company,

9                 provided always that the following

10                matters shall be determined by a

11                majority vote of the Shareholders:"

12                And if you look at the bullet (m) as in

13   Mary, down at the bottom, it says, "the lending of

14   money by the Company."

15                Did I read that correctly?

16                A.    Yes.

17                Q.    When the Defendant made his e-mail

18   requests to you, did you ever have to get

19   permission from the Managing Director of Firefly?

20                A.    No.

21                Q.    Do you know who the Managing

22   Director of Firefly is?

23                A.    No.

24                Q.    Did you ever have to get

25   permission from Greg Elias?

Page 134

1           A.   No.

2           Q.   Were you ever informed that the

3    shareholders had voted on the e-mail requests that

4    the Defendant sent you for transfers of money to

5    Halstead Bay Holdings?

6           A.   No.

7           MR. BOURGET:  I have nothing further.

8           MR. MAUZY:  No questions.

9           THE VIDEOGRAPHER:  Are we done for

10   today, Counsel?

11          MR. BOURGET:  We have another witness

12   today, but we are done with this witness.

13          THE VIDEOGRAPHER:  Okay, thank you.

14          We are off the record at 11:48 a.m.

15   This concludes today's testimony given by Amanda

16   Zimmerman.  The number of media used was three and

17   will be retained by Veritext Legal Solutions.

18

19   -- Adjourned at 11:48 a.m.

20

21

22

23

24

25

Amanda Zimmerman                                    May 15, 2025

Page 135

1                      REPORTER'S CERTIFICATE

2

3             I, JUDITH M. CAPUTO, RPR, CSR, CRR,

4    Registered Professional Reporter, certify;

5             That the foregoing proceedings were

6    taken before me at the time and place therein set

7    forth, at which time the witness was put under oath

8    by me;

9             That the testimony of the witness and

10   all objections made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed at my direction;

13            That the foregoing is a true and

14   correct transcript of my shorthand notes so taken.

15

16

17

18            Dated this 30th day of May, 2025.

19

20            _____

21

22            PER: JUDITH CAPUTO, RPR, CSR, CRR

23

24

25

Amanda Zimmerman                                      May 15, 2025

Page 136

1                  CERTIFICATE OF REPORTER

2      CANADA                    )

3      PROVINCE OF ONTARIO    )

4

5      I, Judith M. Caputo, the officer before whom the

6      foregoing deposition was taken, do hereby certify

7      that the witness whose testimony appears in the

8      foregoing deposition was duly sworn by me; that the

9      testimony of said witness was taken by me in

10     shorthand, using Computer Aided Realtime, to the

11     best of my ability and thereafter reduced to

12     written format; that I am neither counsel for,

13     related to, nor employed by any of the parties to

14     the action in which the deposition was taken, and

15     further that I am not related or any employee of

16     any attorney or counsel employed by the parties

17     thereto, nor financially or otherwise interested in

18     the outcome of the action.

19

20

21     Judith M. Caputo, RPR, CSR, CRR

22

23     Commissioner for taking

24     Oaths in the Province of Ontario

25

| **0** |
| --- |

**0007** 8:19
**01/01/2011**
34:12
**0:24** 8:19

| **1** |
| --- |

**1** 7:5 38:12,15
117:8 131:14
**1/14/15** 38:9
**10** 5:12 31:25
32:2 64:25
**10,000** 94:16
94:25 102:7,22
**100** 106:3
132:21
**1001** 5:6 16:6,7
**100k** 30:1
110:7
**107** 15:9
**108** 6:19
**10:02** 59:9,10
**10:09** 59:11,14
**10:13** 64:10,11
**10:14** 64:12,14
**10q21** 109:21
109:22 110:1
128:25 130:22
**10th** 25:5 94:2
94:10
**11** 4:6 5:14
29:21 33:15,17
36:7
**111** 6:22
**112368** 6:15
48:12
**114** 7:1

**117** 7:4
**11:24** 121:20
121:21
**11:35** 121:22
121:25
**11:48** 134:14
134:19
**12** 5:11,17 6:8
29:14 35:3,4
45:21 46:1
66:9
**12,056.24**
38:14
**120** 2:22
**122** 4:8
**125,000** 114:17
**12th** 30:10
68:21
**13** 5:20 37:16
37:18 67:3
90:13
**14** 6:16 55:25
56:1 62:9 84:6
91:20,21
**14202** 2:22
**14360** 98:12,24
127:11
**14th** 59:22 62:5
62:11,20 77:2
77:12,22,24
78:9,12 84:5
**15** 1:14,22 5:23
8:4 10:17
39:19,20 67:12
93:5
**150** 2:6
**158,460.78**
56:24

**16** 5:6 6:13
48:9,10 94:1,6
126:13
**160,000** 103:2
**16th** 107:8
**17** 6:1,12 41:12
41:13 47:5
67:20 69:5
77:3,8,9,14
79:5 95:6
**17th** 47:9
**18** 5:24 6:4
17:12 39:22
42:17,18 68:9
97:4 127:6
**18th** 40:1
**19** 6:7 45:19,20
68:19 101:18
**1g4** 2:17

| **2** |
| --- |

**2** 75:6,22 79:9
131:15
**20** 6:10 46:25
47:3 69:2,3
107:7 117:24
117:25 130:7
**20002** 2:6
**2007** 13:5,10
**2009** 7:5 117:8
**200k** 113:14
**2010** 15:3
**2011** 72:21
73:7
**2012** 5:9 22:23
23:2,14 24:18
25:5 26:15
28:4 64:21

**2013** 5:11
19:20 20:6
21:7,18 29:15
29:21 30:10
36:25 37:9
58:5 103:1
**2014** 5:16 6:24
33:19,24
101:20 103:13
111:6 113:18
131:20
**2015** 5:22 6:18
37:20 38:12,13
38:15,16,23
56:3,6 67:5
**2016** 5:19,24
6:15 7:3 35:6
35:11 39:22
40:1 48:12,22
51:14 107:8
115:1,4
**2017** 6:3,6,9
41:15,19 42:20
42:25 45:2,22
46:1 67:21
68:11,21 90:17
91:23 93:8
**2018** 5:13 6:12
6:21 32:4,9
47:5,9 69:5
95:8 97:6
108:22 109:1,3
127:8 128:21
129:4
**2019** 19:20
20:6 21:7,18
36:25 58:5
94:2,10 100:12

**202**  2:7,7
**2020**  1:21 73:2
**2020-77**  8:21
**2021**  72:22,23
**2024**  59:22
  62:5,9,11,20
  77:5,13,24
  78:9,12 123:13
  123:17
**2025**  1:14,22
  8:4 11:24
  59:25 62:17
  74:23 75:5,21
  77:2,23 78:7
  78:14 79:9,23
  84:5 135:18
**21**  6:17,19 56:2
  108:19,20
  128:17
**21st**  56:6
**22**  5:7 6:22
  111:2,4 131:5
**23**  5:19 7:1
  35:6 114:23,24
  116:10
**23rd**  35:11
**24-7**  1:3
**25,000**  46:8,10
  95:10,16
**25th**  95:8
**260**  2:12
**26th**  97:6 114:1
  127:8
**27**  6:23 111:6
**27th**  101:20
  113:18,23
  114:3,6

**28**  5:15 6:15
  33:19 48:12,22
  51:14
**28th**  33:23
  103:13
**29**  5:10 7:3
  23:13 115:1
**29088**  135:21
  136:20
**29th**  109:1
  115:4 128:21
**2nd**  42:25

**3**

**3**  6:2,6 41:14
  42:20 111:8,9
**3.6**  132:20,25
  133:2
**3.7**  133:4
**30**  6:20 108:21
**30,000**  43:11
  44:2 47:16
  69:12
**307-2182**  2:7
**30th**  109:3
  129:4 135:18
**31**  38:13,16
**32**  5:12
**33**  5:14
**35**  5:17
**36,000**  36:16
**37**  5:20
**39**  5:23
**3rd**  41:19 45:1
  67:20 68:11
  91:23

**4**

**4**  5:13 32:4
  103:11 129:19
**403**  17:9
**404**  17:9
**41**  6:1
**416**  2:18
**42**  2:22 6:4
**435,000.00**
  49:13
**45**  6:7
**47**  6:10
**48**  6:13
**4th**  24:18 32:9

**5**

**5**  48:17
**50**  7:4 117:7,11
  119:5 132:12
**50,000**  93:10
**55402**  2:13
**56**  6:16
**59**  4:7
**5th**  11:24 90:17

**6**

**6**  5:8,21 22:23
  23:2 26:14
  28:4 37:20
**6,000**  115:11
  116:10
**6.1.**  132:23
**60,000**  38:11
  38:22
**612**  2:13
**65,871.18**  40:9
**650**  2:12

**688-1154**  2:13
**6th**  67:5

**7**

**7**  5:7 22:20,21
  64:17
**716**  2:23
**718-2056**  2:7
**72,056.24**  38:9
**75,000**  42:3
  68:5 92:1
**77**  1:20
**7th**  93:8

**8**

**8**  5:10 29:12,13
**849-1333**  2:23
**89**  2:17
**8th**  59:25 74:23
  75:5,21 78:7
  78:14 79:9,23
  123:9,19,23
  124:3,11

**9**

**9.5**  119:4,11
  132:16
**9.5.**  119:10
**90**  47:16
**929-1103**  2:18
**9:45**  46:18,19
**9:50**  46:20,22

**a**

**a.m.**  1:22 8:1,4
  46:18,19,20,22
  59:9,10,11,14
  64:10,11,12,14
  121:20,21,22
  121:25 134:14

CASE 0:24-cr-00007-JMB-DLM    Doc. 136-2    Filed 06/27/25    Page 139 of 167
Amanda Zimmerman                                                May 15, 2025
[a.m. - al]                                                        Page 3

134:19
**ability**  72:15
  72:25 73:10
  83:22 84:8,10
  124:14 136:11
**able**  20:17,21
  22:4 53:11
  64:3 85:3,6,21
  103:5 119:19
**above**  1:18
  30:9,16 132:1
**accept**  23:25
  27:23
**access**  17:12
  20:14 21:20
  22:1 53:3
  55:16 57:5
  96:3
**accomplish**
  105:4
**account**  18:19
  18:20 23:20,22
  24:1,23 25:1
  30:1,5 35:21
  44:15,19 81:6
  81:9,16 82:17
  83:8,11,16,23
  91:5,7 95:4
  98:8,12,23
  102:10,14
  104:12 105:6,9
  105:17 114:18
  127:11
**accountable**
  26:23
**accountant**
  97:22,24,25

**accounting**
  12:22 14:10
  15:24 44:16,20
  44:21 48:4
  70:17 71:17
  84:21 85:4,7
  85:11,22 86:13
  87:24 88:19
  90:4 97:18
  116:18
**accounts**  13:23
  14:4 18:5 20:7
  20:10,15,19,24
  21:1,5,9,12,15
  22:2,5,9,14,17
  24:12 28:14,16
  29:5 37:6,10
  37:11 73:17,18
  73:25 74:5,7
  82:10,24 84:1
  84:9,11,12,13
**accurate**  23:6
  32:10 34:2
  35:14 41:22
  43:4 45:11
  46:5 131:13
**action**  9:4
  136:14,18
**actively**  100:12
**activity**  104:3
**actual**  26:21
**actually**  48:15
  57:25 72:12
**additional**
  107:15 126:11
**address**  23:9
  51:23,25

**adjourned**
  134:19
**administer**  9:2
**admission**
  10:15,21
**admit**  10:22
**adopted**  10:19
**adrienne**  3:6
  9:24
**advance**  94:3
  94:13 98:13,19
  106:22 111:23
  113:8 127:12
  127:18,20
**advanced**
  34:16 106:1
**advances**  5:16
  5:19 32:18
  33:19 34:11,19
  34:23 35:7,18
  36:7 66:18
  83:17 99:19,20
  99:22,24 100:2
  100:6,9 101:5
  101:5,10,13,15
  102:12,15,19
  103:14 104:1
  104:13 105:3
  105:14,24
  106:13 108:5,9
  108:13,15
  129:24 130:3
**advise**  114:18
**advised**  61:3
  61:15
**affiliated**  74:16
**affiliation**
  76:14

**affiliations**
  9:11
**affirm**  10:7
**affirmed**  10:10
**afternoon**  45:4
**agent**  75:8 76:5
**agents**  60:4
  74:24 76:16
  77:15,23
**ago**  82:7
**agree**  8:11
  120:12 126:23
**agreed**  10:18
  10:22 12:9
  58:17
**agreement**  7:5
  11:2,25 12:4
  19:3 58:16
  117:2,4,8,12
  117:14,15,21
  118:1,7,9,19
  118:21 119:7
  119:15 129:7
  132:3,13
**agreements**
  119:1
**ahead**  46:22
  59:14 64:14
  94:5 122:1
**aided**  136:10
**al**  5:8,13,15,18
  5:21,24 6:2,5,8
  6:11,14,17,20
  6:23 7:2 22:22
  32:3 33:18
  35:5 37:19
  39:21 41:14
  42:19 45:21

47:4 48:11
56:2 108:21
111:5 114:25
**alexandria**
20:13 82:4
**amanda** 1:16
2:5 4:3 8:14
9:15 10:5,9
40:8 74:25
94:2 98:5
134:15
**amandawkre...**
23:9
**america** 1:6
8:16 61:21
**american**
56:14
**amex** 6:18 55:7
56:3,9,12 71:2
95:9,21 96:8
96:10 97:7
**amortize** 38:11
38:14,20 39:1
**amount** 38:6
48:1 56:20,24
**amounts** 48:5
57:7 58:17
**answer** 31:13
31:14 79:16
82:21 89:19
112:22 118:14
**answered**
76:11,13,19
78:18,22 79:13
85:9 125:5,14
**answers** 63:9
**anymore** 20:5

**ap** 13:20,21,22
87:17
**appear** 11:22
23:3,5 24:18
32:9 34:1
35:13 41:21
43:3 46:4 47:9
48:22
**appearance** 9:8
**appearances**
9:10
**appears** 22:25
33:21 35:9
39:24 41:17
42:23 43:24
45:24 47:7
48:20 136:7
**approval** 39:9
39:12,15 41:4
42:9 112:10
113:4,6
**approved** 90:7
113:20 114:6
**approximately**
36:15
**april** 5:24
35:22 39:22
40:1
**asap** 27:21
130:15
**aside** 131:17
**asked** 32:15
60:3,4 63:9
75:16 76:10,18
78:7,15,17,21
79:12 85:8
87:6 102:19,25
116:9 122:6

123:3 125:4,14
125:20 128:23
130:13 132:16
**asking** 19:12
25:23 26:2
27:15 38:19
64:16 83:25
94:16 105:2
107:19 113:3
125:1,3,9,10
126:10 129:24
**asks** 40:7 45:14
102:21 103:25
115:11 127:10
**assertions**
60:11
**assist** 14:5
**assistant** 13:1
13:15,24 63:12
**associated**
88:12 109:14
109:25 110:1
**associates**
49:15
**assume** 60:9
74:4 87:19
90:1 106:12
116:11,16
**assuming**
25:24,25
**atlantic** 15:9
**attached**
107:19 130:14
**attend** 120:15
**attending**
32:13
**attention** 32:7
75:6 128:17

132:15
**attorney** 2:10
9:12,24 124:4
136:16
**atypical** 106:4
**audio** 8:10
**august** 5:15
6:23 23:13
33:19,23
101:20 103:13
111:6 113:18
113:23 114:1,3
114:6
**authority**
71:19 80:23
82:17,24
**authorization**
73:4
**authorize**
73:17
**authorized** 9:2
28:5 74:2
118:9,22
120:21,25
121:6
**available** 42:5
92:3
**avenue** 2:12,22
**aware** 38:5
58:14,22,25
63:6 65:15
87:4 95:4
101:13 118:8
118:21,25
128:15

| | | | |
|---|---|---|---|
| **b** | 91:14 92:9 | 84:2,8,15 85:2 | 67:10,11 68:7 |
| **b** 17:9 | 93:21 95:3,20 | 92:6 96:20 | 70:3,4 86:7 |
| **back** 19:23 | 106:17 107:15 | 99:7,11 102:16 | 87:22,23,25 |
| 24:15 25:4 | 115:20 116:12 | 103:7 105:19 | 122:7,9,18 |
| 26:17,19 35:21 | 120:3,6 123:6 | 105:22,25 | **bottom** 16:19 |
| 46:21 47:18,25 | 124:21 125:12 | 106:20 111:13 | 17:25 23:11 |
| 59:13 64:13 | 125:22 126:2,6 | 115:18 119:25 | 27:19 29:18 |
| 71:8 88:17 | 126:18,22 | 120:2 124:12 | 32:7 42:22 |
| 99:23 100:2 | 130:23 | 127:4 130:5 | 43:23 48:15 |
| 121:24 | **banked** 21:18 | **belongs** 49:25 | 49:18 52:10 |
| **balance** 56:25 | **banking** 26:5 | **best** 124:14 | 110:5 111:9 |
| **balances** 53:1 | 49:16 96:4 | 136:11 | 127:7,17 |
| 83:23 | **bannister** 84:6 | **better** 85:11,21 | 128:18,19 |
| **bank** 14:4 | **bannister's** | 85:24 | 130:19 133:13 |
| 18:19,20 20:7 | 83:23 | **beyond** 37:2 | **bourget** 2:4,7 |
| 20:9,11,13,14 | **based** 28:17 | **bill** 59:18 | 4:6,8 9:13,14 |
| 21:14,19,23,24 | 71:12 72:13 | **billing** 18:5 | 10:12 11:3,12 |
| 22:2 23:20,22 | 125:12 | **bills** 14:4 19:13 | 16:8 17:10 |
| 24:12 25:1 | **basis** 18:10 | **bit** 25:3 44:18 | 22:12,24 29:16 |
| 27:11 28:13,14 | **bay** 36:23 37:2 | 52:17 84:22 | 32:5 33:20 |
| 28:14,16 29:4 | 37:5,10 38:4 | 127:16 | 35:8 37:14,21 |
| 29:15 30:5 | 39:6,9 58:7,21 | **board** 84:19 | 39:23 41:16 |
| 37:6 45:6 49:2 | 93:10 126:1 | 86:1 | 42:21 45:23 |
| 49:4 50:9 51:4 | 134:5 | **body** 46:7 | 46:15,23 47:6 |
| 51:9 52:14 | **beginning** 9:11 | **bold** 131:14 | 48:13 56:4 |
| 56:20 71:23 | 59:13 121:24 | **book** 102:12,15 | 57:4 59:1,4 |
| 73:21 74:5,8 | **behalf** 2:3,9,15 | 102:19 | 61:5 62:7 75:1 |
| 74:11,14,17,20 | 2:20 9:14,16 | **booked** 102:16 | 76:10,18 77:19 |
| 74:22 75:2,9 | 9:17,19 10:3 | **bookkeeping** | 78:17,21 79:12 |
| 75:20,23 76:9 | 29:8 92:15 | 14:10 | 85:8 89:15,19 |
| 76:15,17 77:18 | **belief** 89:2,18 | **books** 33:13 | 106:10,14 |
| 80:14,24 81:4 | **believe** 19:21 | 58:11 87:3 | 108:7 112:19 |
| 81:6,9,16,20 | 20:12 21:19 | **border** 62:3 | 118:11,24 |
| 81:23,25 82:1 | 27:18 28:13 | **boris** 2:4 9:13 | 121:15 122:2,5 |
| 82:2,3,11,14 | 36:16 37:12 | 74:25 | 125:6,8,19 |
| 82:24 84:11 | 57:13 59:23 | **boss** 16:2 63:18 | 134:7,11 |
| 87:15 91:5,7 | 62:8,13 70:9 | 63:19,20 65:5 | **box** 19:16 |
| | 70:20 71:10 | 65:8,11 66:12 | |

break 59:3
121:16
briefing 10:24
briefly 64:7
bring 48:18
broadcasters
14:3
buffalo 2:22
bug 25:7
building 15:13
bullet 133:12
burry 5:11
29:14,20,22,24
99:4,6 101:23
101:25 112:18
burry's 102:15
business 13:6
15:22 52:20,23
53:12 55:6
57:9 58:1
96:14 103:23
111:20 133:6
buys 18:17

**c**

c 2:1 3:1 13:13
cable 64:6
calculate
100:19
call 127:25
128:4 130:20
called 1:17
31:22 82:3
99:18
cam 16:21,24
cam4 5:9 16:20
16:20 17:14,16
17:22 18:1,4,9

18:11,13,17,22
18:25 19:5,15
22:23
cambria 2:21
camera 8:7
canada 1:13
3:6 8:22 9:25
21:19 23:20
97:20 136:2
canadian 21:24
caputo 1:24
8:25 135:3,22
136:5,21
card 18:5
35:19 53:15
54:7,13,16,19
54:22,25 55:3
55:8,10,13,17
56:14,22 57:6
57:17 66:18
69:16 104:16
104:19,25
108:17
cards 52:18,19
52:22 53:1,7
89:10 105:15
care 88:24
carol 50:8,8
carries 86:18
case 8:18 19:19
61:12 62:4
110:19
cases 87:1
cash 5:19 35:7
35:18 66:17
categorize
57:16 58:1

categorized
33:12
catharines
11:15
caught 127:14
cc 33:23
cc'd 66:24
certificate
135:1 136:1
certified 8:23
certify 135:4
136:6
cfo 14:7
chad 5:16
33:19,23 34:12
34:16 36:7
54:15 63:5
99:9 103:13,14
104:1,4,14
105:3,5,23,23
106:8,12
129:24
chad's 104:16
chain 5:7,10,12
5:14,17 6:13
6:22 22:21
23:12 26:13
29:13,19 32:2
33:17 35:4
42:23 43:23
45:1,11 48:10
111:4 112:4
113:8 114:10
114:12 128:5
131:12,15
chang 23:2
27:18 64:18,20

changing 52:16
charge 90:4
116:17
charged 58:20
charitably
84:22
charlotte 2:16
10:1 74:25
77:25
chart 5:6 16:7
16:10 17:20
city 11:14
clarification
57:2
class 12:24
clear 19:10
clearly 65:16
73:10
clerk 13:20
clerks 87:17
98:16
closed 82:6,7
closing 23:22
51:18 52:12
clvs 3:9
cmj 2:18
code 30:12
33:2 35:20
98:7,11,22
127:11
coded 105:6
coding 33:11
44:7,10 89:8
116:6,6,7
collect 54:2
collectively
20:3

collects  19:4
come  15:6
   26:19 93:21
   95:2 115:22
   116:14 121:4
coming  20:18
   24:22
commencing
   1:21 8:1
commercial
   50:19 96:4
commissioner
   136:23
common  26:4
   40:18 46:11
   51:9
communicati...
   83:6
companies
   13:16,19 19:25
   20:3 24:12
   26:22
company  13:4
   15:15,19 18:12
   27:13 29:8
   34:18 44:23
   52:17 53:16
   86:5 88:19
   100:20 109:18
   130:22 132:9
   132:20 133:7,8
   133:14
company's
   26:5 33:13
   57:12,25 58:11
compelled
   11:22

compensated
   92:23 93:2
compensation
   36:12
complete  12:4
   12:8
completed
   12:19
compliance
   25:8 26:19
   27:6
comply  69:17
compound
   22:11 37:13
computer
   136:10
concerns  61:20
   61:23,24 62:1
concludes
   134:15
conducted  8:6
confirm  11:6
   102:21,25
confirmation
   130:16
confuse  77:11
connection  8:8
consider  16:1
consult  40:25
   41:3
cont'd  3:1
continue  8:10
   27:5
control  28:18
   28:21 73:16
   133:6
controller  13:1
   13:16,24 63:12

63:16 64:20
   70:1 84:17
   86:4 88:18
   90:2
convenience
   40:10
conversation
   31:11
cool  112:8
   127:25
cooperation
   26:25
copied  23:2
   35:10 39:25
   42:25 45:25
   56:6 65:16
   66:25 67:6,14
   69:23 97:6
   109:3 114:7
   127:13 128:21
copies  55:20
copy  23:6
   32:10 34:2
   35:14 41:22
   43:4 45:11
   46:5 64:3
   66:14 68:1
   93:8 104:8
   124:4 127:6
   129:7,18 130:6
   131:4 132:11
copying  107:10
corporate
   35:19 66:18
corporation
   2:16 19:17,24
   20:12 25:17
   27:1 49:14,24

corporations
   25:15 26:9
correct  19:25
   23:3 24:18
   27:3 30:18
   47:9,13 48:22
   50:25 56:10
   59:22 60:5,14
   60:18 62:12,22
   62:23 63:13,16
   63:25 66:1,18
   66:19,20 67:15
   67:24 68:12,13
   69:6,9,24 70:8
   71:19,25 72:4
   72:9,17 73:13
   73:21,25 74:1
   75:25 76:1
   79:7,8,18 80:9
   80:21 81:4,5
   82:2,11,14
   83:3,4,8,14,18
   83:23 86:22,23
   87:21 88:3,20
   89:5,25 90:8
   90:10,22 91:12
   92:13,17 96:25
   97:3,11 98:2
   98:19 99:6,14
   99:16,20,21,23
   102:24 103:23
   104:1,5,14
   105:24 106:16
   107:1,17,21
   108:2 109:16
   109:18 110:2,9
   110:17 111:17
   113:2,16 114:3

Amanda Zimmerman                                              May 15, 2025

[correct - david]                                                        Page 8

114:20,21
115:7,15,16
118:2 119:16
120:4,7,13,14
120:20,23,24
123:13 124:19
124:24 130:18
131:21 135:14
**corrected**
32:20
**correction**
78:11
**corrections**
60:5,7,10
78:10,16,20
79:1,4 124:17
**correctly** 23:14
24:2 25:18
27:9 28:1,9
30:6,14,22
32:24 33:24
35:11 38:17
40:1,12 41:19
43:1,15 45:8
47:19 49:21
50:21 51:7,19
56:7 127:22
128:2 129:10
129:16 130:17
130:24 132:5
133:15
**costs** 94:3,14
**counsel** 1:17
8:15 9:9 10:2,8
59:14 64:14
122:1 134:10
136:12,16

**couple** 108:24
**course** 106:23
111:20
**court** 1:1,2
8:18,25 10:6
10:19 31:9
61:12
**covering** 38:23
**cr** 8:19
**created** 89:20
**credit** 18:5
52:18,19,22
53:1,7 54:7,13
54:16,19,22,25
56:22 57:6,17
69:16 89:10
104:16,19,25
105:15 108:17
**criminal** 1:3
3:5 9:22 10:17
61:12
**cross** 4:7 59:15
**crr** 1:24 135:3
135:22 136:21
**cs7296586** 1:25
**csr** 1:24 135:3
135:22 136:21
**curacao** 20:11
32:14 80:8,14
82:10
**current** 62:15
62:17
**currently**
12:12 23:19
44:3 72:18,20
**customer** 18:16
18:16 88:8

**customers**
88:10,15

**d**

**d** 2:21 4:1 5:7
5:10,12,14,17
5:20,23 6:1,4,7
6:10,13,16,19
6:22 7:1,4
22:22 29:14
32:3 33:18
35:5 37:19
39:21 41:13
42:18 45:20
47:3 48:10
56:1 95:6
108:20,20
111:4,5 114:24
114:24 117:7
**dana** 23:13,18
24:22 25:6
26:14
**date** 73:15 77:4
**dated** 5:8,11,13
5:15,18,21,24
6:2,5,8,11,14
6:17,20,23 7:2
7:5 22:23
23:13 24:17
26:14 29:14,21
32:3 33:19
35:6 37:20
39:22 41:14,18
42:19,25 45:21
46:1 47:4,8
48:11,21 56:2
68:10,20 69:5
75:5 90:16

101:20 103:13
107:8 108:21
109:1,2 111:5
114:25 115:4
117:8 127:7
128:21 135:18
**dates** 70:23
77:12
**dave** 23:1
29:20,25 30:10
30:20 35:10
41:18 44:1
45:3 47:8
64:17 65:3
66:9 67:4,13
67:18,21 68:10
68:17,20 69:4
69:12,14,15
70:6,18 73:18
82:16 84:17
90:9,16 91:22
93:7 94:1,9
95:7,16 97:5
101:19 102:3
103:6,12,25
107:10 108:25
109:2 110:11
112:5,7,17
113:9,18 114:1
114:14,16
115:3 120:22
122:17 126:21
127:13,24
128:5,20 129:5
130:20
**david** 1:9 2:9
8:16 9:18,20
9:21 14:15

15:1 21:11
33:22 34:4,16
49:25 54:21
55:2 59:19
69:24 96:12,12
97:2 99:3,3
103:12 104:4
107:1 109:15
109:25 112:16
**day** 13:25,25
15:19,19,21,21
18:10,10 26:24
28:19,19,22,22
62:17 84:17,18
113:25 135:18
**days** 23:21
27:23 47:16
**dc** 2:6
**deal** 43:14,17
44:7 45:14,16
129:15
**dear** 23:18
**december** 6:14
35:23 38:13
48:12,22 51:14
59:22 62:5,20
90:17
**decided** 20:25
**decision** 28:22
81:8,11 86:9
86:21
**decisions** 28:19
86:11,14 133:5
**declared** 32:22
100:5,8,11
101:12
**deducted**
101:11

**defendant** 1:10
2:9 9:18 14:15
15:1,2,18 22:8
22:16 27:18
28:3 30:24
31:4,15,21
32:8,12 33:2,6
33:22 34:9,18
34:24 35:16
36:5,11 37:1
38:19 39:25
40:6,18 41:6
42:2,14,24
43:9,18,25
45:15,25 46:11
47:15,24 48:1
48:5 50:24
51:13,13 52:11
56:5,17 58:4
58:12,17,20
122:8,15
128:10 129:13
129:23 130:2
131:1,23
133:17 134:4
**defendant's**
37:11 93:5
94:6 95:6
103:10 108:19
111:2 116:10
117:11 119:5
122:22 127:6
128:16 129:19
130:7 131:5
132:12
**defense** 90:12
91:20 93:25
97:4 101:17

107:6 114:22
**delaware** 2:22
**deny** 76:4
**department**
2:4 3:6 27:6
**depends** 8:7
**deposed** 63:8
**deposition** 1:16
8:5,14,20
10:16,18,25
11:9 63:5,10
136:6,8,14
**depositions**
10:23
**der** 33:22 34:4
49:25 54:21
99:3,5 103:12
109:15,25
112:16
**describe** 14:21
16:20 84:22
**described**
33:12
**description** 5:4
**details** 25:1
30:4
**determine**
53:11 71:15
90:5 116:9
**determined**
133:7,10
**difference**
101:8
**different** 13:7
19:25
**direct** 4:6
11:11 21:3,11
22:8,13,16

63:19,20 67:11
68:7 70:4 75:6
81:19 86:7
122:12 129:20
**directed** 21:8
29:3,7 31:21
81:22
**directing** 30:25
31:6 48:6
**direction** 91:10
135:12
**directions**
31:16 33:2
**directly** 36:21
63:22 86:2
107:1,5
**director** 133:8
133:19,22
**directors** 32:23
**disapprove**
65:13
**discuss** 65:7,10
65:19
**discussed**
10:13 126:10
**discussing**
122:21
**district** 1:1,2
8:17,18
**dividend** 31:22
32:19 100:9,11
**dividends** 30:3
32:22 35:22
99:19,25 100:2
100:5,7,7,20
100:22 101:5
101:10,11

Amanda Zimmerman                                    May 15, 2025

| | | | |
|---|---|---|---|
| **dividing** 39:3 | 5:14,17,20,23 | 108:24,25 | 39:16 41:4 |
| **division** 2:4 | 6:1,4,7,10,13 | 109:2,20 111:4 | 48:21,25 74:10 |
| **divorce** 115:13 | 6:16,19,22 7:1 | 111:9,16 112:4 | 75:1,9 77:15 |
| **dlm** 1:3 8:19 | 22:21,25 23:1 | 113:7 114:1,6 | 78:1 79:5,10 |
| **docs** 51:18 | 23:6,9,12,16 | 114:24 115:3 | 79:23 83:6,14 |
| 52:11 | 24:16,17 25:5 | 120:18 127:6 | 124:20 125:11 |
| **document** 75:7 | 25:5,21 26:12 | 127:14,19 | 133:25 |
| 77:9 84:7 97:8 | 26:14 27:17 | 128:5,11,18,20 | **employed** |
| 101:21 103:16 | 29:13,18,18,19 | 128:24 129:2,9 | 12:12 136:13 |
| 103:18 109:5 | 29:20 30:9 | 129:12,21,23 | 136:16 |
| 109:11 110:18 | 32:2,7,8,10 | 130:8,9,10 | **employee** |
| 119:8 | 33:17,21 34:2 | 131:5,12,23 | 73:20 80:23 |
| **documentation** | 34:22 35:4,9 | 133:17 134:3 | 83:14 136:15 |
| 52:14 128:1,13 | 35:14 36:6 | **earliest** 40:10 | **employees** |
| **documents** | 37:18,22,24 | **earn** 18:14 | 52:23 53:7 |
| 50:16,20 | 38:7 39:20,24 | **earned** 36:15 | **entertainment** |
| **doing** 41:1 | 40:4,6 41:13 | **easier** 48:19 | 18:2,3 19:2 |
| 42:10 87:8 | 41:17,22,25 | **easy** 77:11 | 88:11 |
| 126:8 | 42:18,23,24 | **education** | **entire** 37:23 |
| **dollar** 111:23 | 43:4,7,10,23 | 12:22 | 38:23,24 73:1 |
| **dollars** 110:24 | 43:24 45:7,11 | **eidsness** 49:15 | **entities** 16:10 |
| **dooling** 2:12 | 45:13,20,24 | 50:25 51:13 | 16:17 19:6 |
| 9:17,17 59:18 | 46:2,5,7,12 | 99:9 111:11,22 | **entity** 36:22 |
| 64:5 | 47:3,7 48:10 | 112:5 113:9,16 | 49:24 |
| **doors** 53:25 | 48:15,20 50:7 | 113:19 114:15 | **entries** 48:4 |
| **double** 94:5 | 51:12 52:10 | 126:21 131:6 | **equity** 113:14 |
| **draw** 32:6 | 56:1,5,18 58:4 | 131:19 | **equivalent** |
| 128:17 132:15 | 66:9,15,23 | **eidsness's** | 49:12 |
| **drawn** 128:13 | 67:4,6,13,20 | 111:9 | **erickson** 1:9 |
| **due** 130:22 | 68:10,20 69:4 | **eisner** 23:13 | 2:9 5:7,10,12 |
| **duly** 1:19 10:10 | 70:12 71:13 | 24:17 25:6,6 | 5:14,17,20,23 |
| 136:8 | 72:14 87:11 | 25:23 26:14,15 | 6:1,4,7,10,13 |
| **duties** 13:25 | 90:15 91:9,11 | **either** 34:16 | 6:16,19,22 7:1 |
| 14:5 | 91:22 93:7,18 | 37:10 55:2 | 8:17 9:18,20 |
| | 94:1,9 95:7 | 57:14 126:6 | 9:21,21 14:16 |
| **e** | 97:5 101:18 | **elias** 5:13 28:7 | 15:1 21:11 |
| **e** 2:1,1 3:1,1 | 103:11 107:7 | 28:11,12,25 | 22:22 23:1 |
| 4:1 5:7,10,12 | 107:13 108:20 | 29:3 32:3 | 29:14,21 30:10 |

30:20 32:3
33:18 35:5,10
37:19 38:1
39:21 40:17
41:13,18 42:18
45:20 46:9
47:3,8 48:11
52:8 55:2 56:1
56:15 57:14
59:19 64:17
65:12,14 66:10
67:13,18,21
68:10,17,20
69:4,12,15,24
70:6,19 73:19
81:12 82:16,23
84:17 90:9,16
91:22 93:8
94:1,10 95:7
95:16 96:13
97:5 99:3,5
101:19 103:12
107:1,10
108:20,25
111:5 112:5,7
112:17 113:9
113:18 114:1
114:14,24
115:3 120:22
121:4 122:17
126:21 128:5
128:20
**erickson's**
127:24
**esquire**  2:4,5
2:11,12,16,21
**established**
48:24 58:24

**estate**  49:20
50:2,17,18
51:15,17
126:15
**et**  5:8,13,15,18
5:21,24 6:2,5,8
6:11,14,17,20
6:23 7:2 22:22
32:3 33:18
35:5 37:19
39:21 41:14
42:19 45:21
47:4 48:11
56:2 108:21
111:5 114:25
**euro**  49:12
102:23
**eventually**
19:16 99:23
100:3
**evidence**  48:4
**exact**  25:10
73:14
**exactly**  24:10
58:8 111:2
**examination**
1:17 4:6,7,8
11:11 59:15
122:4 129:20
135:10
**excelsior**
113:11
**exchange**
120:19
**excuse**  21:22
80:1 121:19
**execute**  20:21
21:4 22:4 37:9

40:22 42:7
47:22 91:4
**executed**  93:19
**exhibit**  16:6,7
22:20,21 29:12
29:13 31:25
32:2 33:15,17
35:2,3,4 36:7
37:16,18 39:19
39:20 41:12,13
42:17,18 45:19
45:20 46:25
47:1,3 48:9,10
48:17 55:25
56:1 64:17,25
66:9 67:3,3,12
68:19 69:2,3
90:13 91:21
93:5 94:1 95:6
97:4 101:18
103:11 107:7
108:19,20
111:2,4 114:23
114:24 116:10
117:7,11 119:5
126:13,14
127:6 128:17
129:19,20
130:7 131:5
132:12
**exhibits**  5:1
10:15,21,23
64:3 70:7
**exist**  20:5
**expenses**  52:20
52:23 53:8,11
53:14 55:6
57:7,8 58:1

88:23 89:24
92:20 96:14
97:2 105:6
**experience**
14:10
**explain**  18:1,6
19:8 24:9
25:22 37:24
38:20 41:6
56:16
**explains**
127:16 131:23
**explicit**  17:7
**express**  56:14

**f**

**facilitate**  24:7
**fact**  83:5 87:3
**fail**  124:16
126:2
**fair**  32:10 34:1
35:13 41:21
43:3 91:15
101:4
**familiar**  16:23
52:1
**family**  49:7
**far**  42:6 47:21
58:19,23 86:15
88:17 125:25
**favorite**  17:18
**february**  5:18
35:6,11 95:8
97:6 103:1
127:8
**federal**  10:17
**feel**  118:13

[fees - given]                                                          Page 12

**fees** 115:14
**field** 12:23
  32:19
**figure** 46:13
**filed** 8:17
**filings** 127:15
  127:17
**fill** 23:24
**final** 104:8
**finance** 15:24
**financial** 13:11
  89:21
**financially** 9:4
  136:17
**finish** 31:12,13
  125:6
**finished** 32:13
**firefly** 7:4
  19:17,17,23,23
  19:24,24 20:3
  20:4,7,12 21:9
  21:12 22:7
  25:16 26:3
  28:7,16,19,25
  29:2,4 30:17
  30:21 31:20
  34:7 36:11
  37:10 39:13
  52:19 54:3,9
  54:22,25 55:3
  55:14 57:16,25
  70:8,14,25
  71:1,4,11,12
  71:15,18 72:4
  72:7,9,9,16
  73:1,11,18,24
  74:6 80:9,12
  80:14 81:17

82:8,12,13,17
84:14 88:8,13
90:10 92:16,16
92:20,23 93:2
99:2 104:13
105:9,18,24
106:1 107:9,20
107:22 108:16
108:17 109:10
110:8,21
111:14 112:1
116:24 117:2,7
118:20 130:15
131:19 132:8
133:19,22
**firm** 9:1 97:18
**first** 15:2,4
  23:12 24:4
  34:4 35:24
  38:7 53:13
  99:16 114:9,12
  123:16 124:13
  125:2 127:5
  128:18
**firstly** 32:17
**five** 111:23
**focus** 25:4 30:8
**follow** 31:16
  45:1 51:18
  52:11 94:21,24
  95:15
**following**
  24:23 27:17
  30:9 49:10
  50:15,23 51:4
  102:4 133:9
**follows** 10:11

**foregoing**
  135:5,13 136:6
  136:8
**formal** 12:21
  32:22
**formalities**
  131:22
**formally** 10:22
**format** 136:12
**forms** 23:24
**forth** 24:16
  25:4 135:7
**forward** 32:21
  50:24 120:6
**forwarded**
  50:7 120:3
  126:21
**forwarding**
  24:25
**four** 99:2,5,15
  111:2
**free** 118:10,14
  119:12 132:18
**frequently** 90:9
  90:20
**front** 94:7
**fund** 23:19
  27:5,22
**funding** 23:25
**funds** 21:8,12
  24:22 25:10
  29:4,8 37:2
  39:5 42:5 45:4
  67:18 68:17
  70:5,7,19,24
  71:1,3,4,6,18
  72:2,7,8,12
  73:17,24 74:3

80:9 81:7,17
82:1,8,9,13
86:15 87:14
91:14 92:2,5
107:22 110:21
**further** 44:25
  52:14 59:1
  134:7 136:15
**future** 24:24

**g**

**g** 5:6,7,10,13
  13:13 16:7
  22:20,21 29:13
  32:2,3 33:17
  35:4 37:18
  39:20 41:13
  42:18 45:20
  47:3 48:10
  56:1
**general** 9:25
  40:19 44:11,14
**generally** 17:7
  19:8 20:2
  31:16 53:15
  80:7 91:13
  99:19
**generate** 17:14
**generated**
  17:21
**getting** 26:17
  27:8
**ginter** 2:21
  10:3,3 11:7,10
**give** 12:4,8
  27:7 61:18
**given** 134:15

Amanda Zimmerman                                           May 15, 2025

**[gl - improper]**                                                Page 13

gl  44:7,10
go  8:11 23:11
  29:1 45:5
  46:15,22 57:25
  59:4,14 60:17
  61:2,8,14 64:7
  64:14 71:8,16
  81:20,23,25
  94:5 121:16
  122:1 124:24
  129:15
going  8:3 27:7
  32:20 43:22
  48:16 59:9
  60:24 61:21
  64:2 81:15
  90:12 93:4
  95:5 101:17
  107:6 111:1
  114:22 117:10
  121:10 128:13
  130:6
good  9:13
  59:17,20
goodale  3:9
  8:23
gotten  116:11
government
  12:1,9 59:22
  62:25 64:3,17
  66:9 67:3 68:9
  68:19 69:2
  77:25 123:5,9
  124:4 129:19
government's
  16:6 29:12
  31:25 35:3
  37:16 39:19

41:11 42:17
  45:19 46:25
  55:25 67:20
  126:13
governmental
  61:24,25
granity  18:2,3
  18:5,9,12,20
  19:2,4,14
  88:11
great  30:3
green  2:21
greg  28:6,11,12
  28:24 29:3
  39:16 41:4
  48:21,24 74:10
  83:14 133:25
gregory  77:15
  78:1 79:5 83:6
  124:20 125:11
guayaca  13:10
  14:9,9
guess  120:10
guessing  73:6
guys  27:4
  112:8,13,16
  113:4 114:2

**h**

halstead  6:9
  36:23 37:2,5
  37:10 38:4
  39:6,9 40:9,16
  42:4 43:14
  45:22 46:3,10
  48:6 56:20
  58:7,21 68:21
  68:25 90:18

92:2 93:10
  94:17,25
  115:12 116:11
  126:1 134:5
hand  75:21
  114:22 117:10
handed  77:13
handing  75:4
handle  10:21
happen  66:6
happened
  101:14
happy  49:6
  64:5
hard  27:7
he'll  114:1
head  98:21
heard  8:9
held  28:15
  44:15 74:6
hi  44:1 45:3
  98:5 129:5
high  12:20,24
highest  12:18
hired  84:23
hmm  18:18
  63:21 87:13
  97:9 98:10
hodge  50:8,8
hold  28:15
holders  53:15
holdings  36:24
  37:2,5,10 38:4
  58:7 126:1
  134:5
holds  18:5
  56:15

holidays  49:6
homes  17:2
honestly  75:14
  124:22
honor  66:3
honored  65:25
  66:2
host  17:1
house  111:24
  113:11 126:9
  131:6
housekeeping
  32:4,16
hsbc  29:15
  30:1
hundred  109:7
  109:9 110:23
  111:22 132:21

**i**

idea  82:20
identification
  16:5 33:16
  35:2 37:17
  41:11
identified
  14:25
identifying
  96:14
immediately
  110:16 129:15
immunity
  11:25
impeachment
  77:20 79:13
important  25:9
improper
  77:19 79:13

including 9:9
104:3 105:14
index 5:1
indicated 60:16
indicating
58:16
indication
58:11
individual 26:7
27:12
info 27:8
information
26:6 27:21
30:6 33:10
45:15 49:17
50:15 51:10
107:16 126:8
126:11 127:2
informed 50:12
69:23 134:2
insert 131:25
instance 31:19
instructions
31:17 86:19
113:21
insure 25:11
intentionally
124:16
interest 16:16
58:20 118:10
119:12 127:20
132:18
interested 9:4
136:17
international
71:22 73:21
74:17 75:2,9
75:20 77:16,17

77:17 78:2
79:6 80:14,24
81:4,15 82:2
82:11,14 84:11
87:15 91:6,14
92:9 93:21
95:3,20 115:20
116:12 123:6
124:21 125:12
125:21 126:2,6
126:18
internet 8:7
interrupt 57:23
interrupting
80:2
interview 60:2
60:3,11 62:8
74:23 75:5
77:2,12,13
78:9 79:10
84:5 123:16,21
124:11
interviewed
59:21,24 78:6
interviewing
77:23
investigation
3:5 9:23
investment
35:17
invoice 107:9
107:19,23
130:15
involved 15:21
26:10 84:17
100:12,16
involving
126:15

irs 3:5 9:22
issue 52:19,22
issued 54:6,12
54:15,18,21,24
55:10,13
100:22
issues 130:22
issuing 67:18
items 32:16

j

j 2:11
jacket 14:22
janssen 2:16,16
2:18 10:1,1
74:25 77:25
january 5:13
5:21 6:17 32:4
32:9 37:20
38:12,15 56:2
56:6 67:5
jeans 14:23
jginter 2:23
jmb 1:3 8:19
job 1:25 14:13
85:22,24 87:8
90:2 116:2,5,8
johnny 23:2
27:18 64:18,20
joint 10:18
judith 1:24
8:25 135:3,22
136:5,21
july 7:5 117:8
june 6:8 45:21
46:1 68:21
107:8

jury's 33:10
justice 2:4 3:6
justin 2:21
10:3

k

keep 80:2
89:24
keeping 89:4
kept 72:3,5
103:8,22
104:18,21
kevin 54:9,12
99:10
kind 31:10
36:11 58:23
61:25
kindly 50:14
113:10
king 1:20 8:21
kiser 3:5 9:22
9:22 75:1
knew 15:20
51:23 52:2
63:7 81:16,25
know 14:13,15
16:24 18:6
19:12 25:9,20
26:5,18,20
27:6,12 28:12
28:20 35:24
36:15 41:7
44:9,14 45:17
46:12 49:11
51:4,21 52:4
55:7 56:25
57:6,8 58:4,5
58:19,23 63:8

Amanda Zimmerman

May 15, 2025

**[know - made]**

Page 15

70:11 73:8
74:19,21 75:15
76:17,25 88:4
88:5 92:12
93:14 96:8,23
97:16 98:21,23
100:14,15,21
100:24 105:21
106:2,3,5,8,13
106:17,21
107:14 109:19
112:13,20,23
112:25 115:23
116:15 120:11
121:5 124:23
125:13,17,18
126:24 128:11
131:2 133:21
**knowing**
121:11
**knowledge**
85:9 89:16
100:10 106:10
112:20 118:12
120:23 121:2,7
**krieg** 54:9,12
99:10

**l**

**lack** 85:9 89:15
**lane** 7:4 19:17
19:17,23,24,24
20:12 25:16
117:7 118:21
**late** 45:4
**law** 2:10,16
**law.com** 2:18

**lawyer** 61:3,16
74:25 77:24,25
**lawyers** 77:25
**leading** 125:5
125:15
**learn** 14:12
**lease** 113:12
**leave** 104:7
**ledger** 44:12,14
105:5
**ledgers** 57:25
**legal** 1:20 8:24
8:24 9:1 94:3
94:13 115:14
134:17
**lending** 133:13
**letter** 44:11
**letting** 131:1
**level** 12:18
**lglaw.com** 2:23
**liberty** 15:8
**license** 19:3
**licensing** 18:23
19:14
**likely** 27:1
**limited** 18:2
20:4
**line** 40:3 41:24
43:6 46:1
47:12 49:8
56:9 76:21
122:9 131:14
**lipsitz** 2:21
**liquidation**
132:22
**list** 34:15
**listed** 16:11
25:15 99:16

**little** 24:15
25:3 44:18,25
52:17 127:16
**live** 11:14,15
16:21,24 17:3
**living** 52:9
**lloydsville**
49:13,23 109:7
109:10,14,18
109:21,25
110:8 128:24
**loan** 5:25 6:3,6
6:9,12,24 7:3
35:21 39:22
40:5,11,14,16
40:19 41:7,15
42:1,4,20 43:8
45:22 46:3,10
47:5,13 48:6
58:6,16 67:15
67:18,21 68:5
68:11,14,17,21
68:25 69:9,12
69:15 81:15
87:6,7,12,15
90:17 91:24
92:2 93:9,10
95:10,17
109:12,17,20
110:3 111:6
114:15,20
115:1,5,13
128:11 129:7
131:6 132:3,8
**loans** 58:20
70:14,18 71:7
72:3 73:9 88:2
89:9 90:6

101:15 118:10
118:23 119:13
120:22 121:1,4
121:11 132:18
**located** 15:7
50:17 51:15
**location** 8:20
**long** 13:2 73:19
**look** 18:10
64:16 66:8
72:2 84:6
105:3 109:4
114:9 132:24
133:12
**looked** 36:7
70:6 73:9
104:24 106:25
120:1 132:13
**looking** 17:20
37:22 68:9,19
69:2 119:4
133:2
**looks** 24:11
38:23 50:6
117:13
**loop** 100:17
**lot** 83:5
**luis** 48:21,25
50:8,11

**m**

**m** 1:24 2:6
133:12 135:3
136:5,21
**m5r** 2:17
**made** 31:15
34:19,23 60:7
60:11 79:2

81:8,11 86:10
87:7 88:23
89:5,14 132:19
133:17 135:10
**mail** 5:7,10,12
5:14,17,20,23
6:1,4,7,10,13
6:16,19,22 7:1
22:21,25 23:1
23:6,9,12,16
24:16,17 25:5
25:5,21 26:12
26:14 27:17
29:13,18,18,19
29:20 32:2,7,8
32:10 33:17,21
34:2 35:4,9,14
36:6 37:18,22
37:24 38:7
39:20,24 40:4
40:6 41:13,17
41:22,25 42:18
42:23,24 43:4
43:7,10,23,24
45:7,11,13,20
45:24 46:2,5,7
47:3,7 48:10
48:20 50:7
51:12 52:10
56:1,5,18 58:4
66:9,15,23
67:4,6,13,20
68:10,20 69:4
87:11 90:15
91:9,11,22
93:7,18 94:1,9
95:7 97:5
101:18 103:11

107:7,13
108:20,25
109:2,20 111:4
111:9 112:4
113:7 114:1,6
114:24 115:3
120:18 127:6
127:14 128:5
128:11,20,24
129:2,12,21,23
130:8,9,10
131:5,12,23
133:17 134:3
**mails** 30:9
34:22 46:12
48:15 70:12
71:13 72:14
108:24 111:16
128:18
**main** 99:5
**major** 25:17
99:2,15 102:1
**majority**
133:11
**make** 12:10
17:2,16 27:5
38:2,8 42:13
43:13 60:4,10
64:4 78:10,10
78:15,20 79:4
79:22 86:11,13
88:2 107:3
118:13 124:16
**making** 14:2
28:22 35:17
36:5 39:8
86:21 88:22

**management**
133:5
**manager** 13:21
76:24
**manages** 18:4,9
18:12 28:14
75:15
**managing**
133:8,19,21
**march** 5:11
29:14,21 30:10
38:16 93:8
**marked** 5:2
16:5 22:20
29:12 31:25
33:16 35:2
37:16 39:19
41:11 42:17
45:19 48:8
55:25 95:6
108:18 111:2
117:11
**marks** 59:8,12
121:18,23
**mary** 133:13
**matter** 1:18
8:15 82:12
**matters** 28:8
28:25 29:2
133:10
**maule** 54:3,6
99:9
**mauzy** 2:10,11
4:7 9:19,19
11:1,2 17:9
22:11 37:13
59:2,16,18
61:6 62:10

64:15,25 65:1
76:12,22 77:21
78:19 79:3,15
80:6 85:10
89:17,22
106:11,15
108:10,12,23
111:7 112:21
115:2 117:9
118:18 119:3
121:14 122:6
125:4,14 134:8
**mean** 19:10,13
20:4 28:25
38:22 39:1
40:15 46:8
53:18 57:22
58:8 71:5
72:13 75:14
84:12 87:19
98:20 100:19
105:1 114:7
119:17 121:3
124:22 126:9
**means** 38:21
92:21
**meant** 27:1
**mechanically**
91:2
**media** 8:13
59:8,13 121:19
121:19,24
134:16
**meet** 15:2
**meeting** 62:25
112:9 113:3
114:2 123:17
123:19 124:3

124:11 125:2
125:10
**meetings** 32:14
120:16 123:4
**memberships**
17:19
**memo** 124:5,23
**memorandum**
60:3,12 75:5
77:13 78:9,15
123:16,20
124:10,14
**memorializing**
128:13
**memory** 88:17
**mentioned**
1:18 18:9 50:1
122:11
**mentions** 35:16
**mess** 84:22
85:1
**met** 15:4 62:24
76:25 123:8,12
123:25
**middle** 65:2
**minneapolis**
2:13
**minnesota** 1:2
2:13 8:18
51:16
**minority** 99:13
**minutes** 46:16
121:17
**miscellaneous**
53:7
**mischaracteri...**
108:8

**missing** 10:20
**mn** 51:15
**moldon** 33:23
36:8 54:15
63:5 99:9
103:13 105:23
106:8,12
129:24
**moment** 59:6
**monday** 44:5,6
45:6
**money** 17:2,16
18:14 21:1
22:9,14,17
30:11 34:15
36:21 58:13
68:25 72:16,25
73:10 74:6
80:13,20 81:3
83:1,7,11
90:10 92:15
95:2 96:6
110:15 115:17
129:8,14 132:8
133:14 134:4
**month** 36:17
36:18 44:3
89:12,14,25
96:14 102:22
**monthly** 37:3
53:3 55:16
56:25 57:1,3,7
58:9
**months** 38:25
53:21
**morning** 9:13
59:17,20

**move** 10:22
43:22 44:25
48:14 50:5
80:13,20 81:3
83:7,10 130:8
**moved** 129:8

**n**

**n** 2:1 3:1 4:1
**n.v.** 49:14
**name** 8:23 36:3
59:18 102:11
**named** 23:13
**names** 13:7
25:14 26:25
**national** 74:8
**nature** 17:7
**navy** 14:22
**ne** 2:6
**necessary**
23:24
**need** 25:14
26:20 27:21
34:11 38:8
41:3 43:13
47:16 64:6
110:7 132:2
**needed** 11:4
38:1 73:23
83:7,10 100:2
**needs** 34:15
**neither** 136:12
**never** 69:19
76:25 96:16
117:1
**new** 2:22 24:1
25:1 85:17,18
98:8,12,23

127:11
**normal** 31:11
111:20
**nosy** 51:5
**note** 8:5 14:24
58:16 62:7
131:9,16
**noted** 46:25
**notes** 135:14
**noticing** 9:12
**november** 5:8
6:5 22:23 23:2
26:14 28:4
42:19,25 45:1
62:9,11 68:11
77:12,22,24
78:9,12 84:5
123:12,17
124:1
**number** 5:4
46:13 84:13
106:25 121:19
121:19,24
134:16
**numbers** 44:15
44:20
**nv** 49:24

**o**

**oath** 9:3 10:10
135:7
**oaths** 136:24
**object** 65:22
67:1,8,17 68:4
68:16,24 69:11
108:11 125:7
**objected** 65:24
69:19

objection  17:9
  22:11 37:13
  61:5 76:10,18
  77:19 78:17,21
  79:12 85:8
  89:15 106:10
  106:14 108:7
  108:11,11
  112:19 118:11
  118:13,24
  125:4
objections  9:6
  11:1 135:10
obtain  83:1
obviously
  25:20
occasionally
  53:6
october  6:11
  25:5 47:4,9
  69:5 77:2 94:2
  94:10
office  15:6,7,13
officer  136:5
oh  31:1 47:10
  94:5 118:16
  119:11
ok  27:4
okay  10:12
  11:3 12:17
  13:6 16:4
  18:24 19:4,15
  19:19 20:6
  22:19 24:15
  25:3 28:17,21
  33:8 34:17
  46:24 48:17,20
  49:3 50:5

51:25 52:4
  57:15 59:1,6
  60:16 62:24
  73:3,12 75:12
  75:24 76:23
  84:16 89:13
  90:14 91:6,10
  93:6 94:5
  95:23 96:10,12
  97:19,24
  100:17,21
  104:18 105:8
  105:13 106:5
  109:5 110:12
  114:7 117:23
  118:6 119:11
  119:11 124:13
  125:1 127:5
  128:7 129:5
  134:13
old  71:16 112:8
  112:13,16,23
  113:4 114:2
once  18:14
  100:5,7 101:11
  127:1
ones  70:10 99:5
online  16:21
  17:2 96:3
ontario  1:13,21
  2:17 8:21,22
  11:16 136:3,24
opens  45:6
operate  13:7
operational
  14:3
opportunity
  123:15,20

order  25:11
orderly  85:15
  85:19
organization
  72:16 73:1,11
organizational
  5:6 16:7
organized  59:3
outcome  9:5
  136:18
outside  97:17
  97:25
override  86:9
overrule
  122:22
oversaw  15:24
own  21:14 24:9
  25:22 27:13
  37:6 57:16
  83:2 106:13
owner  74:10,19
  74:21 75:1,9
  75:20,23 76:8
  76:17 79:10,24
  124:20 125:12
owners  26:7
ownership
  16:16 26:1
  123:5
owning  79:6
owns  18:23
  26:21 75:15
  77:16 78:3

**p**

p  2:1,1 3:1,1
page  4:4 5:4
  32:7 48:17

65:2 107:18
  110:5 111:8,9
  114:9,12
  128:18 130:8
  131:14,15
pages  111:3
paid  36:21
  92:15,16,20
  99:23 100:2,7
  130:21
panama  30:2
paperwork
  24:13 127:19
  128:8
paragraph
  75:6,22 77:3,7
  77:14 79:5,9
  84:6 132:20,23
  132:25 133:2,4
pardon  72:19
  115:25
part  15:22
  60:16 95:25
  100:16 112:24
  119:18 126:10
  128:4 131:12
participants
  8:8
parties  8:11
  10:13,19,21
  136:13,16
partner  15:20
  29:23 31:20
  34:6,7 35:21
  36:2 112:3
  121:3 131:19
  131:19 132:9

[partners - proceed]

**partners** 25:12
26:6 41:1
52:20 53:6
**party** 9:3 24:6
**pass** 26:18
32:15
**passed** 17:22
19:5,16
**paul** 49:14
50:24 51:13
99:9 111:8,11
111:22 112:5
113:8,16,19
114:15,17
126:21 127:19
129:9 131:6
**paul's** 113:7
**pay** 5:9 22:23
35:21 47:17,24
55:6 87:15
92:19 98:7,11
107:19,23
127:10 130:14
**payable** 13:23
30:13
**payees** 25:12
**paying** 52:25
56:22 102:7
**payment** 24:6
27:24 39:2
58:6 67:1,8
89:10 91:4
93:19 96:1,4
107:9 125:22
127:3 128:11
**payments** 5:22
14:2,2,3 24:7
27:5 34:23

37:3,9,20 38:2
38:3,8,20 67:5
69:16 70:6
71:2 73:18
88:23 89:5,13
89:24 101:22
102:4,23 103:1
122:21 125:25
**payoneer** 23:19
23:25 24:5,6
27:22
**payouts** 18:13
**payroll** 92:24
**pdf** 25:16
**people** 17:1,3
25:14 27:12
31:10 78:1
112:23
**people's** 53:24
**percent** 106:3
132:21
**performances**
17:6
**performers**
17:19 18:14,14
**period** 19:20
37:9 38:12,15
72:21 82:5
100:11,22
**permission**
80:8,13,16
133:19,25
**person** 26:21
26:22 29:1
74:2 80:8
86:18 89:7
**personal** 50:18
53:8,12,14

55:8 57:9 58:1
85:9 89:16
105:6 106:10
112:19 118:11
120:22 121:1,7
**personally**
96:18 120:11
**peter** 3:9 8:23
**phone** 128:4
**physical** 15:12
26:22 27:12
**physically**
57:21
**pierre** 97:15,16
**place** 8:11
135:6
**plaintiff** 1:7,18
8:15
**plaintiffs** 2:3
**please** 8:5 9:7
10:7 23:23
27:20 30:11,21
35:20 38:11,14
40:9 42:3
47:17 49:9
50:12 51:3
59:7 64:25
66:9 67:12
75:6 80:3,10
90:13 94:16
98:7,11 102:10
104:7 110:15
113:20 114:17
116:10 129:14
130:14 131:24
**poel** 33:22 34:5
49:25 54:21
99:3,5 103:12

109:15,25
112:17
**point** 14:20
42:12 58:10
99:9 117:5,24
119:20 122:21
130:2
**poppy** 50:7
**position** 74:13
**prepared** 60:4
123:16
**presence** 74:24
77:24
**present** 3:3 9:9
120:12
**preserving**
118:14
**previous** 75:17
125:10
**previously** 5:2
13:7 123:12
126:14
**prices** 113:15
**primarily**
14:12 15:15,23
**prior** 14:8
45:13 73:2
123:4 124:3
**probably** 17:8
24:11 98:17
120:2
**problems**
60:23 62:12,15
62:17,19
**procedure**
10:17 69:14
**proceed** 10:8

[proceeding - recognize]                                          Page 20

| | | | |
|---|---|---|---|
| **proceeding** 9:7 | **purchase** 17:18 | 27:9 28:1,9 | 122:9,24 123:8 |
| **proceedings** | 18:4 49:20 | 30:6,14,22 | 123:10,25 |
| 1:22 135:5 | 50:2 111:24 | 32:24 33:24 | 124:9,10 |
| **process** 10:24 | 126:15 131:7 | 35:11 37:23 | 125:23 126:4,5 |
| 49:10 125:21 | **purpose** 56:21 | 38:17 40:1,12 | 127:1 128:7,9 |
| 126:24 | **purposes** 44:7 | 41:19 42:25 | 128:25 129:21 |
| **product** 18:11 | 44:16 | 43:15 45:8 | 130:9 131:7,18 |
| **professional** | **pursuant** 10:16 | 47:19 49:21 | 131:20 132:13 |
| 2:16 135:4 | 132:22 | 50:21 51:7,19 | **receivable** |
| **proffer** 60:17 | **put** 10:14 11:5 | 56:7 127:22 | 30:13 |
| **profile** 130:22 | 24:16 64:3 | 128:2 129:10 | **receive** 58:6 |
| **promissory** | 126:12 135:7 | 129:16 130:17 | 96:21 103:20 |
| 58:16 | **putting** 131:17 | 130:24 132:5 | 124:10 |
| **properly** 88:2 | | 133:15 | **received** 12:21 |
| 88:24 | **q** | **reads** 49:18 | 36:20 58:13 |
| **property** 51:22 | **quality** 8:6,7 | **real** 49:20 50:2 | 66:14,20,23 |
| 52:5,7,8 | **question** 31:12 | 50:17,18 51:15 | 68:1 72:2 |
| **protect** 132:3 | 31:14 57:23 | 51:17 126:15 | 90:20,23 91:1 |
| **protocol** 10:18 | 82:18 88:25 | **really** 15:21 | 93:14 94:22 |
| 10:20,25 | 116:9 118:17 | 25:9 27:11 | 95:13 96:16,22 |
| **provide** 18:13 | 125:6 | 86:11 | 96:24 97:10 |
| 27:20 50:14,20 | **questioning** | **realtime** | 102:22 106:21 |
| 51:3 52:14 | 10:13 122:9 | 136:10 | 108:4 111:19 |
| 55:19,22 126:2 | 131:11 | **reason** 61:1,4,7 | 126:18 128:8 |
| 126:7,23 127:2 | **questions** | 61:10 | 130:4 |
| 128:10 | 50:24 51:6 | **rebecca** 48:21 | **receiving** 34:21 |
| **provided** 45:15 | 63:8 121:14 | 48:25 50:11 | 37:1 40:21 |
| 124:4,7 127:2 | 122:3,7 123:4 | **recall** 15:4 | 52:13 93:18 |
| 133:9 | 125:20 126:17 | 19:22 20:9 | **recess** 46:19 |
| **provider** 24:7 | 126:22 134:8 | 21:17 31:19,23 | 59:10 64:11 |
| **provides** 30:5 | **quite** 47:1 | 34:21 36:14,20 | 121:21 |
| **providing** 33:2 | **r** | 37:1 42:6,12 | **recognize** |
| 69:12 | **r** 2:1,5 3:1 5:11 | 43:17,20 45:15 | 16:10,14 90:15 |
| **province** 136:3 | 29:14 | 47:25 48:2,3,7 | 93:12 94:21,23 |
| 136:24 | **rare** 108:6 | 50:3 52:13,15 | 97:13 99:2 |
| **provision** | **rate** 127:20 | 58:10,15 72:11 | 101:18 103:11 |
| 132:25 | **read** 23:14 | 76:2 78:4 | 103:16 107:7 |
| | 24:2 25:18 | 79:17 94:19 | 111:16 115:9 |

Amanda Zimmerman                                                          May 15, 2025

[recognize - request]                                                    Page 21

117:12
recollection
92:10
reconcile 14:4
34:11 103:25
105:2 129:24
130:3
reconciled
104:12
reconciliation
53:21
reconciling
105:4
record 8:4,12
9:11 10:14,14
11:5 14:25
46:15,17,22
57:8,9,16 59:5
59:9,14 62:8
64:7,9,14
86:25 87:6,16
87:20 103:23
104:18 105:13
118:15 121:16
121:20,25
131:10,16
134:14
recorded 8:10
8:14 44:23
57:12,13 78:8
87:3,18 88:2
88:24 104:12
135:11
recording 8:6
8:10
recordkeeping
85:24 103:4

records 33:13
57:12 58:12
70:13,15,15
72:3,8 85:4
103:8 104:25
119:18 120:7,9
reduced 136:11
refer 20:2
33:11 56:13
reference 32:19
33:11 49:19
50:2 94:3
97:15 104:16
110:3 114:20
119:6,12
references
90:17 98:24
109:12
referencing
67:21 94:13
referring 34:14
43:18 44:10
45:16 112:25
117:16 126:13
refers 41:7
69:8
reflect 70:13
refused 42:13
126:7
refusing 61:13
regarding 26:6
29:4 34:23
36:7 95:9 97:7
107:9 113:8
114:15 127:25
130:10 131:6
register 25:16
25:25 26:2

registered
135:4
registers 28:6
regular 36:12
37:3 101:13
reimburse
53:16
related 9:3
10:15 12:23
29:2 53:12
57:9 95:21
96:8 109:1
122:8 128:8
136:13,15
relates 101:22
relating 67:4
84:6,14 105:18
116:9 133:5
relationship
18:1,21 19:1
released 50:13
remember 41:9
47:21 58:8
65:9,21,23
66:7 67:2,9,19
68:6,18 69:1
69:13,21 72:6
73:14 76:6,21
78:11,13 79:25
91:9,17 93:23
101:3 102:17
116:13 117:17
119:2,21,23
123:6
reminder 31:8
remote 15:15
remotely 9:10

rent 14:3 44:4
rental 51:17
repaid 48:1
58:12
repay 58:17
121:11
repaying 48:5
repayment
58:24
repeat 33:4
80:10 92:18
118:17
rephrase 18:8
report 63:15,22
64:23 122:14
reported 86:2
reporter 8:25
10:7 31:9 57:2
135:4 136:1
reporter's
135:1
represent
59:19
representing
8:24
request 36:6
37:1,11 49:10
50:14 51:10
64:4 65:7,17
65:20,22,24,25
66:17 68:14
69:15,15,17
80:11 90:21,24
91:2 92:1 93:9
95:9,16 103:5
108:1 109:6,24
110:19 131:2

**requested** 38:6
39:6 42:14
90:9
**requesting**
24:10,13 40:23
43:9 46:10
56:17,19 80:8
80:13,16
**requests** 34:22
40:19 57:1,3
58:4,6 65:10
65:14 69:20,23
102:5 106:24
106:25 107:4
108:4 111:22
122:20,23
128:12,14
133:18 134:3
**required** 53:15
**requirement**
125:23
**requires** 12:4
107:15
**resolutions**
100:25
**respond** 103:5
**responds** 28:3
30:20 43:25
45:7 51:14
129:4,13
**response** 109:2
113:7 127:24
**responsibilities**
14:1
**responsibility**
86:24
**responsible**
15:23 52:25

88:19,22 89:3
89:4,8 90:5
**rest** 17:22
38:24
**restroom**
121:15
**resuming**
46:20 59:11
64:12 121:22
**retained**
134:17
**revenue** 17:14
17:21 19:5,5
19:15
**review** 60:3
75:17 78:7,15
83:22 89:11,14
89:23 90:13
111:3 119:5,19
123:15,20
124:13
**reviewed** 71:8
77:14 102:3
117:1 118:1
119:25
**reviewing** 16:9
53:10 129:2
**reviews** 75:7
77:9 84:7 97:8
101:21 109:5
109:11 110:18
119:8
**rice** 3:6 9:24,24
11:3,6
**richard** 29:20
29:21 30:11
99:4 101:23,25
102:15 112:17

**richard's** 102:4
**right** 11:13
14:24 16:19
18:12 19:13
26:24 30:9
53:17,18 63:7
64:2 65:19
66:8,25 71:3
72:24 74:4
75:4,16 76:4
77:1,11 78:14
82:21 84:2
88:1 89:23
93:4,17,20
95:12,15 100:1
100:19 102:18
103:4,8 104:21
105:20 106:13
107:25 113:6
114:9,11 116:8
116:20 117:18
117:20,25
129:25
**rodenburg**
36:4 54:24
99:4,5 107:8
107:12 108:1,5
108:13 109:22
110:1 112:17
130:11
**role** 15:19
28:13 86:22
**rolling** 24:14
**room** 14:18
**royal** 21:19
**rpr** 1:24 135:3
135:22 136:21

**rule** 10:17
**running** 44:4
**rusty** 3:5 9:22
75:1
**ryan** 54:3,6
99:9
**rypl** 2:15 10:2
12:25 13:3,6
13:25 14:8
15:12,18 21:14
21:17 22:1
28:22 31:20
36:10 37:11
39:10 44:2
52:22 54:6,12
54:15,18 55:3
55:11 57:16,24
63:13 70:9,10
70:19 71:12
72:8,12 82:24
83:1 84:18
85:4 86:2 87:3
89:3 91:16
92:16,19,22,25
93:1,1 95:22
95:24 96:2,7,9
96:10 97:25
98:7,11 103:5
104:11,16,22
105:10,11,14
116:21 118:20
119:16,19,22
120:7,9 127:10
127:15
**rypl's** 88:8
**rypl.com** 12:15
12:17

| s | | | |
|---|---|---|---|
| **s**  2:1 3:1 | searched  62:2 | 110:15 113:20 | 66:3,10,12,22 |
| **salary**  44:3 | second  29:17 | 114:17 115:11 | 67:5,14,17,22 |
| **sale**  17:17 | 43:23 48:16 | 116:10 129:14 | 68:1,7,12,16 |
| **saw**  117:20 | 71:21 73:20,23 | 130:15 | 68:20,24 69:5 |
| 119:22 | 80:17,19,22 | **sending**  92:1 | 69:11,19,22 |
| **saying**  28:4 | 81:2 124:10 | 125:22 | 84:16,18 85:12 |
| 45:2 70:18 | 125:22 126:3,7 | **sent**  25:24,25 | 85:13 86:1 |
| 76:2,4,6,21 | 126:23 127:3 | 26:1 49:12 | 87:24 88:1,6 |
| 78:4,11,12,13 | 130:8 | 56:20 58:21 | 88:18 89:3 |
| 79:17 87:11 | **section**  119:4,9 | 68:11 96:4 | 90:16 91:23 |
| 107:13 | 132:16 | 106:18 113:8 | 92:12 93:9 |
| **says**  19:16 | **security**  25:11 | 115:17 126:1 | 94:2,10 95:8 |
| 23:16 25:6 | **see**  26:24 35:19 | 134:4 | 96:21,24 97:5 |
| 26:15 38:7,10 | 48:19 68:22 | **september**  7:3 | 101:19 103:13 |
| 40:14 43:12 | 118:16 119:6 | 24:18 114:25 | 105:20 106:5 |
| 44:10 46:7 | 127:8 129:6 | 115:4 | 108:21,25 |
| 47:24 52:11 | **seeing**  48:3,7 | **service**  16:22 | 114:15 115:5 |
| 79:18 98:6,20 | 58:11,15 | 16:24 24:8 | 115:23 116:15 |
| 104:6 110:6,14 | 119:24 | 44:21 | 122:7,11,14,22 |
| 111:11 112:7 | **seem**  45:10 | **services**  13:11 | 128:20 |
| 113:9,13 114:1 | 131:13 | 92:16 | **severin's** |
| 114:5,16 | **seems**  109:20 | **set**  10:24 45:5 | 122:17 |
| 115:12 127:12 | **seen**  8:8 58:18 | 48:16 84:2 | **sexually**  17:7 |
| 130:19 131:23 | 69:23 117:3,5 | 135:6 | **shape**  85:11 |
| 132:1 133:13 | 117:19 118:3,4 | **sets**  48:15 | **shareholder** |
| **schedule**  58:24 | 118:20 | **several**  58:4 | 25:17 31:20 |
| **school**  12:20,24 | **sell**  113:11 | 122:6 123:3 | 32:18 54:4,10 |
| **schooling** | **send**  21:1,8,12 | **severin**  6:20 | 57:20 80:12,15 |
| 12:19 | 22:9,14,17 | 14:5,6 21:10 | 81:8,14 83:17 |
| **scime**  2:21 | 23:23 28:6 | 22:8,13 32:9 | 87:5,11 98:12 |
| **scollard**  2:17 | 29:4,8 30:11 | 33:23 35:10 | 98:19 99:18 |
| **scott**  2:5,7 9:15 | 31:21 39:5 | 39:25 41:18 | 100:6 105:5,8 |
| 9:15 74:25 | 40:9,19 42:3 | 42:24 43:24 | 105:17 106:24 |
| **screen**  8:9 | 46:12 51:12 | 44:9 45:14,25 | 106:25 110:20 |
| 25:21 48:18 | 93:10 94:16,25 | 47:8 54:18 | 110:21 111:12 |
| 126:12 | 95:9 96:6,12 | 56:6 57:14 | 112:1 116:21 |
| | 96:13 102:10 | 63:15,23 65:3 | 116:23 117:2,4 |
| | 104:8 107:12 | 65:5,13,20 | 117:12,15,20 |

118:1,7,8,19
118:21,22
119:1,6 120:15
127:11
**shareholder's**
117:13
**shareholders**
7:4 34:19,22
41:1 57:15,24
70:25 73:19
80:9 82:9 89:5
90:6 99:1,3,8
99:13,15 102:1
107:3 117:8
118:9,22
120:12,19
121:1,6,10,10
132:12,19
133:11 134:3
**shirt** 14:23
**short** 6:12 44:4
46:12 47:5,12
59:2 69:8 82:5
132:2
**shorthand**
135:14 136:10
**show** 16:4
22:19 26:13
29:11 31:24
33:15 35:1
37:15 39:18
50:6 55:24
57:18 77:1,2
84:4 90:12
93:4 95:5 97:4
101:17 107:6
108:18 111:1
127:5 128:16

129:18 130:6
131:4 132:11
**showed** 126:14
129:20
**showing** 20:18
41:10 42:16
45:18 46:24
48:8 53:24
72:8 91:20
93:25 103:10
**shown** 130:7
**sided** 94:5
**sign** 11:24
**signal** 128:12
**signaled**
131:14
**signature**
71:19,22 73:20
73:24 80:17,19
80:22 81:3
82:17 83:3,13
125:21,23
126:3,7,23
127:3 135:21
136:20
**signatures**
71:20 83:7,10
**signifying**
131:15
**signing** 82:23
**similar** 34:22
36:6,9 107:4
**simply** 86:18
**sir** 77:7
**sitting** 124:19
125:10
**situation** 84:21

**slightly** 52:16
**smartvu** 102:8
102:22
**software** 44:20
71:17 85:17,18
**solutions** 1:20
8:25 9:1
134:17
**somebody**
44:13
**somewhat**
17:24
**soon** 45:6
**sorry** 12:16
13:23 18:4,6
21:21 25:7
29:18 31:1
33:7 44:17,19
47:10 57:22
62:11 77:7
79:14 80:4
92:18 94:4,5
102:17 118:16
119:9 125:17
**sort** 76:24 97:1
99:12
**sorted** 27:25
**sought** 57:2
**source** 25:10
104:4
**south** 2:12
**spain** 35:18
**speak** 44:17
53:13
**speaking** 28:15
31:10 108:10
108:11

**specialist** 97:19
**specific** 70:23
119:1 132:25
**specifically**
50:4 71:12
76:21 78:4
81:13 91:8
92:11 93:13
103:17 119:21
119:23
**spell** 13:12
**spreading** 39:3
**spreadsheet**
96:13,16 97:1
104:9
**spring** 113:12
**st** 11:15
**stand** 13:22
60:10
**stands** 28:7,25
**start** 29:17
42:22 48:16
49:23 73:3
111:8
**started** 11:5
13:10
**starting** 16:19
17:25 23:12
128:19
**state** 9:7,10
75:8,11 77:22
78:1
**stated** 75:22
77:14 79:10
**statement** 11:4
75:17,21 78:8
79:23

**statements**
12:9 20:18
53:4,10 55:17
55:20 57:6,19
89:11,21
**states** 1:1,6
8:16,17 9:14
9:16 10:17
11:25 60:18,21
60:24 61:2,21
113:19 127:17
132:17 133:3
**stating** 79:25
**status** 80:25
**stenographic...**
135:11
**stenotype** 1:23
**step** 19:23
**stick** 124:24
**sticker** 47:1
**stickler** 25:8
**stock** 25:16,25
26:2 28:6
**stop** 102:7
**straighten** 85:3
85:6
**streaming** 17:4
**street** 1:20 2:6
2:17 8:21
**structure** 17:23
19:6
**subject** 40:3
41:24 43:6
46:1 47:12
51:22 52:5
56:9 67:14
68:11,21 91:24
93:9 103:14

115:5 128:21
132:20 133:1,4
**subjects** 52:16
**subpoenaed**
11:21
**suggested**
131:11
**suite** 1:21 2:12
2:22
**summarized**
60:11
**supervisor**
122:12
**supporting**
50:20
**sure** 17:1 18:8
26:1 38:22
64:5 71:5
74:12 77:10
80:25 82:4
83:24 85:5
88:2,22 92:21
93:3,22 96:22
97:21 100:13
105:1,19 112:2
115:21 117:3,5
117:22 119:20
132:10
**surecom** 18:22
18:23 19:2,13
26:1 27:22,24
28:16 30:17
**swear** 10:7
**switching**
24:12
**sworn** 1:19
136:8

**system** 70:17

**t**

**t** 6:20 49:14
108:21
**take** 8:11 19:23
59:2 109:4
118:9,22
121:15 132:24
**taken** 1:19,23
8:15 10:16
46:19 59:10
64:11 88:23
100:4 121:21
135:6,14 136:6
136:9,14
**talk** 31:10
52:17 63:2
118:6
**talked** 63:4
83:17 99:1
**talking** 62:14
81:12
**task** 105:4
**tax** 2:4 5:22
12:22 37:20
38:2,3,8 67:4
97:19 127:15
127:17 132:4
**td** 21:23
**technically**
64:24
**tell** 57:19 71:11
74:24 76:16
**telling** 74:15
**template**
131:24

**term** 6:12 47:5
47:13 69:8
101:5 127:20
**terms** 81:6
106:24 120:21
120:25 121:9
122:20 131:25
**testified** 10:10
131:18
**testifying** 11:18
130:10 131:7
**testimony** 12:5
12:8 61:18
108:8,9 131:10
134:15 135:9
136:7,9
**thank** 26:16
64:8 77:6 80:5
113:10 134:13
**thanks** 45:8
**thereto** 136:17
**thing** 37:23
101:6
**things** 24:4
**think** 13:21
21:22,22 54:11
77:5 94:4
108:8
**third** 2:12 24:6
**thorough** 25:13
**thousand** 109:7
109:9 110:23
111:23
**three** 38:24
51:6 121:19,24
126:17 134:16
**thursday** 1:14
1:22

**time** 9:7 13:20
  15:8 19:20
  23:8 26:4 27:7
  31:23 32:21
  37:9 42:12
  49:1 51:21
  52:1 64:21
  72:21 73:11
  82:5 84:25
  87:9 88:16
  100:11,22
  101:2 122:24
  126:4,5 135:6
  135:7,10
**timing** 112:2
**tip** 17:18
**title** 12:25
  13:19
**today** 11:19,22
  12:5,8,10
  14:18 124:19
  125:11 126:10
  127:25 134:10
  134:12
**today's** 113:15
  134:15
**toine** 35:17,24
  36:1 54:24
  99:4 107:8
  108:13 109:22
  110:1 112:17
  129:9 130:10
  130:13 131:1
**toine's** 5:19
  35:6 36:3
**tokens** 17:17
  18:17

**told** 43:20
  61:11
**tomorrow**
  43:14 112:9
  114:2 130:20
**tony** 14:5,6
  21:10 22:13
  32:8 33:23
  35:10 39:25
  41:18 42:24
  43:24 45:14,25
  47:8 54:18
  56:6 57:14
  63:15,22 65:3
  65:5,13,20
  66:3,10,12,22
  67:5,14,17,22
  68:1,7,12,16
  68:20,24 69:5
  69:11,16,19,22
  84:16,18,22,25
  85:12,13 86:1
  87:24 88:1,5
  88:18 89:1,3
  90:16 91:23
  92:12 93:8
  94:2,10 95:8
  96:21,22,23
  97:5 98:9
  101:19 103:12
  105:3,20 106:5
  108:25 109:2
  110:11 114:14
  115:4,23,23
  116:15 122:11
  122:14,17,22
  127:7,17
  128:20 129:4

**took** 84:25
  85:12,13,16
**top** 22:25 45:7
  98:21 129:12
  131:14
**toronto** 1:13,21
  2:17 8:22
  15:10,11
**total** 103:1
**totalling** 38:9
**tourists** 62:2
**track** 89:4,24
**tracking** 34:18
**training** 12:22
**transaction**
  33:12 50:3,13
  51:22 52:3,5
  87:7,16,18
  128:8
**transactions**
  20:18 30:25
  33:3 44:23
  51:10 53:21
  57:11,17 89:8
**transcribed**
  1:23 135:12
**transcript**
  135:14
**transfer** 6:15
  6:21 29:25
  37:2 39:8 42:7
  42:13 47:17,22
  48:12 68:4,17
  68:25 70:25
  72:16,25 73:10
  73:17,24 74:3
  80:9 81:7,17
  83:2 91:14

  108:22 109:1,6
  109:9,24
  110:20 116:12
  116:18 128:22
  128:24
**transferred**
  82:9 87:14
  92:5,8 104:13
**transferring**
  86:15
**transfers** 20:21
  21:4 22:4
  32:17 40:22
  86:25 87:2
  134:4
**treated** 99:19
**trial** 61:2,13,14
  61:17,18
**true** 12:8 23:5
  45:10 46:4
  76:8 116:4
  135:13
**trust** 77:16,17
  78:2 79:6
**truthful** 12:5
  61:18
**try** 48:18
**turn** 77:3
  107:18
**twenty** 111:23
**two** 19:25 20:3
  30:9 31:10
  46:16 48:15
  59:13 71:20
  83:7,10 101:9
  121:20
**type** 90:21
  103:18 107:25

Amanda Zimmerman
May 15, 2025

**[typical - wearing]**

Page 27

typical 69:14
typically 21:3,8
  22:8 40:22

**u**

u 13:13
u.s. 12:8 49:12
uh 44:20
uhm 18:18
  63:21 87:13
  97:9 98:10
uib 77:17 78:3
  79:6,10,24
  80:8 83:8,11
  83:16
uit 78:3
ultimately
  26:20 89:7
unaware 55:9
  72:5 76:14
under 13:7
  17:12 135:7
understand
  11:8,10 12:3,7
  28:24 34:13
  40:15 46:8
  56:12 101:11
understanding
  11:8 15:18
  17:21 19:11
  28:18 125:11
understood
  25:22 37:24
  56:17 100:1
unit 8:13 59:13
united 1:1,6
  8:16,17 9:14
  9:16 10:17

11:25 20:11
28:14 49:4
60:18,20,24
61:2,21 71:22
73:20 74:7,8
74:16 75:2,9
75:20 77:15,16
77:17 78:2
79:5 80:13,23
81:3,15 82:1
82:10,14 84:11
87:15 91:6,14
92:9 93:21
95:2,20 115:19
116:12 123:5
124:20 125:12
125:21 126:2,6
126:18 129:6
unsure 112:3
untangle 85:1
unusual 30:24
  31:2,7 33:1,5,7
  33:9 34:17,20
  108:1,3 122:25
  132:7
urgently 49:9
usd 44:2,4
use 12:9 50:18
  53:7 55:5 64:2
  81:9 101:4
  131:24
used 104:17,19
  134:16
users 17:18
using 17:4
  102:11,19
  136:10

usually 21:10
  31:9 53:20
  65:10 80:12
utility 14:4
utilize 81:16
  91:13
utilized 70:5,24
  81:7 107:22

**v**

v 1:8,9 2:9 8:16
value 132:22
van 33:22 34:4
  49:25 54:21
  99:3,5 103:12
  109:15,25
  112:16
various 26:9
  32:14 52:23
verbatim 84:5
veritext 1:20
  8:21,24 9:1
  134:17
versus 71:12
video 8:10,14
videographer
  3:8 8:3,24 10:6
  46:17,21 59:6
  59:12 64:9,13
  80:1,5 121:18
  121:23 134:9
  134:13
videotaped
  1:16
view 20:17
  83:25
viewing 84:8
  84:10

village 15:9
virtually 8:6
voice 80:3
voluntarily
  11:18
voluntary 11:9
vote 133:11
voted 134:3
vs 8:16

**w**

wait 31:13 44:6
want 10:14
  16:4 18:6
  22:19 23:11
  25:4 26:12
  27:12 29:11,17
  30:8 31:24
  32:6 33:15
  35:1 37:15
  39:18 48:14
  50:5,6 52:17
  55:24 60:17
  61:2 128:16,17
  129:6,18 131:9
  131:16 132:11
  132:15,24
wanted 81:14
  87:12 126:7
washington 2:6
way 30:25 33:3
  121:11
we've 46:25
  48:24 69:22
  73:9 122:21
wearing 14:21
  14:22

Amanda Zimmerman
May 15, 2025

**[webcam - zimmerman]**

Page 28

webcam  17:4
webkrew  13:14
  14:9
website  17:7,11
week  60:2
  62:25 123:9
went  58:3
  61:17
west  1:20 8:21
white  14:23
william  2:10,11
  2:12 9:17,19
wire  29:15
  43:13 45:5
  102:8 113:21
  130:16
wise  132:4
witness  1:17,19
  2:20 4:3 8:9
  10:5,7 14:25
  57:3 75:7
  76:20 77:9
  79:1,14 80:4
  84:7 89:20
  97:8 101:21
  109:5,11
  110:18 118:16
  118:25 119:8
  125:16 134:11
  134:12 135:7,9
  136:7,9
word  32:18
words  24:10
  25:22
work  12:14
  14:10 15:14
  23:9 95:23
  96:1 129:9

worked  13:2,4
  13:14 15:17
  29:9 36:10
  49:1 50:9
  92:24 97:17,25
working  14:8
  79:5
works  19:9
  31:11 77:15
  78:2
write  23:17
  27:17 49:5,8
writes  29:24
  30:10 32:12
  34:9 42:2
  47:15 50:11
written  76:1
  136:12
wrong  77:4
  94:4

**x**

x  1:5,11 4:1

**y**

y  13:13
yeah  14:23
  16:21,22 17:2
  18:15 36:19
  44:11 47:11
  59:4 70:16,17
  70:21 74:9
  75:18 77:6
  82:22 87:10,10
  89:20 92:7,19
  93:1 96:19
  97:17 103:7
  111:10,13
  114:11 120:5

year  35:23
  38:23,24 47:18
  47:25
years  72:24
  117:24,25
yesterday  63:2
york  2:22

**z**

zimmerman
  1:16 4:3 5:8,15
  5:18,21,24 6:2
  6:5,8,11,14,17
  6:23 7:2 8:14
  10:4,5,9 11:7
  11:13 16:9
  22:22 33:18
  35:5 37:19
  39:21 41:14
  42:19 45:21
  46:24 47:4
  48:11 56:2
  59:17 80:2
  111:5 114:25
  122:2 131:12
  131:17 134:16

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.