Page 1

1              UNITED STATES DISTRICT COURT

2              DISTRICT COURT OF MINNESOTA

3              Criminal No. 24-7  (JMB/DLM)

4

5    -----------------------------------X

6    UNITED STATES OF AMERICA,          :

7                    Plaintiff,         :

8    V.                                 :

9    DAVID V. ERICKSON,                 :

10                   Defendant          :

11   -----------------------------------X

12

13              Toronto, Ontario, Canada

14              Thursday, May 15, 2025

15                   Volume I

16

17        Videotaped Deposition of ANTONIO SEVERIN,

18   a witness herein, called for examination by counsel

19   for the Plaintiff, in the above-mentioned matter,

20   the witness having been duly sworn, taken at

21   Veritext Legal Solutions, 77 King Street West,

22   Suite 2020, Toronto, Ontario, commencing at 1:00

23   p.m. on Thursday, May 15, 2025, and the proceedings

24   taken down by Stenotype and transcribed by

25   JUDITH M. CAPUTO, RPR, CSR, CRR.

     Job No. CS7296586

Page 2

```
 1                A P P E A R A N C E S:

 2

 3   On Behalf of the Plaintiffs:

 4   DEPARTMENT OF JUSTICE, TAX DIVISION
     BY:  BORIS BOURGET, Esquire
 5          - AND -
         AMANDA R. SCOTT, Esquire
 6   150 M Street NE
     Washington, DC  20002
 7   (202) 307-2182 (Bourget)
     (202) 718-2056 (Scott)

 8

 9   On Behalf of the Defendant,
     David V. Erickson:

10
     WILLIAM MAUZY ATTORNEY AT LAW
11   BY:  WILLIAM J. MAUZY, Esquire
             - and -
12         WILLIAM DOOLING, Esquire
     650 Third Avenue South, Suite 260
13   Minneapolis, Minnesota 55402
     (612) 688-1154

14
15   On Behalf of Rypl:

16   JANSSEN LAW PROFESSIONAL CORPORATION
     BY: CHARLOTTE JANSSEN, Esquire
17   89 Scollard Street
     Toronto, Ontario M5R 1G4
18   (416) 929-1103
     cmj@janssen-law.com

19
20   On Behalf of the Witness:

21   LIPSITZ GREEN SCIME CAMBRIA
     BY: JUSTIN D. GINTER, Esquire
22   42 Delaware Avenue, Suite 120
     Buffalo, New York 14202
23   (716) 849-1333
     jginter@lglaw.com

24
25
```

Antonio Severin , Vol 1                    May 15, 2025

Page 3

1  ALSO PRESENT:

2

3  Rusty Kiser, IRS Criminal Investigation

4  Adrienne Rice, Department of Justice Canada

5

6  VIDEOGRAPHER:

7  Peter Goodale, CLVS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Antonio Severin , Vol 1                                    May 15, 2025

Page 4

```
 1                    I N D E X

 2

 3  WITNESS:    ANTONIO SEVERIN

 4                                              PAGE

 5  DIRECT EXAMINATION BY MS. SCOTT............ 10

 6

 7

 8

 9

10

11

12                  INDEX OF EXHIBITS

13                 (PREVIOUSLY MARKED)

14

15  NUMBER/DESCRIPTION                    PAGE NO.

16

17  G-58:  E-Mail from. D. Erickson        32

18  to T. Severin dated July 18, 2017,

19  Re: Firefly Overview.

20  G-59:  Firefly Lane Business History   34

21  and Overview.

22  G-1001:  Organizational Chart          44

23  G-24:  E-Mail Chain from D. Erickson to  78

24  T. Severin, R. Burry dated August 28,

25  2014, Re: Corporate Accounts.
```

                                                    Page 5

1   G-26:  E-Mail Chain from D. Erickson to      81

2   T. Severin, R. Burry dated June 14,

3   2017, Re: Contact Details.

4   G-21:  E-Mail Chain from D. Erickson to      85

5   T. Severin, et al, dated July 28,

6   2014, Re: Material for Meeting

7   G-27:  G-27:  E-mail Chain between T.        89

8   Severin, D. Erickson and Mr. Moldon,

9   dated February 20, 2014.

10  G-29:  E-Mail Chain from                     90

11  D. Erickson to T. Severin dated May 29,

12  2014, Re: Partner Payments

13  G-28:  E-Mail from T. Severin                96

14  to D. Erickson dated October 7, 2015

15  G-30:  E-Mail from D. Erickson to            105

16  A. Zimmerman, et al, dated May 15,

17  2017, Re: New Monthly Wire .

18  G-31:  New Monthly Wire Effective            106

19  June 1, 2017.

20  G-32:  E-Mail dated D. Erickson to           108

21  T. Severin dated July 24, 2019,

22  Re: Change in monthly payment.

23  G-33:  E-Mail from T. Severin                129

24  to D. Erickson dated June 19, 2014,

25  Re: One time and new monthly recurring payments.

Page 6

1    G-37:  E-mail from D. Erickson to          133
2    T. Severin dated August 20, 2015,
3    Re: Dividend Sheet.
4    G-39:  E-mail from D. Erickson to          135
5    T. Severin dated August 9, 2016,
6    Re: Dividend.
7    G-41:  E-mail from D. Erickson to          138
8    T. Severin dated September 12, 2017,
9    Re: Cash Balance as of Aug-17.
10   G-42:  E-Mail Chain from T. Severin to     140
11   D. Erickson, October 22, 2018,
12   Re: Last wire.
13   G-43:  E-Mail Chain from D. Erickson to    157
14   T. Severin, et al, dated January 31,
15   2017, Re: Granity Payments to Red Rock.
16   G-44:  E-Mail Chain from D. Erickson to    158
17   T. Severin, et al, dated February 14,
18   2018, Re: Info Needed - PDQ.
19   G-45:  E-Mail Chain from D. Erickson to    163
20   T. Severin, et al, dated February 26,
21   2018, Re: Amex.
22   D-46A:  Resolutions of the Sole Managing   169
23   Director of Firefly Lane Corporation.
24   G-57:  Resolutions of the Sole Managing    171
25   Director of Firefly Lane Corporation

Antonio Severin , Vol 1                    May 15, 2025

Page 7

1    G-64:   Raindrop, LLC, Promissory Note        177

2    dated February 23, 2022.

3    G-67:   E-Mail from T. Severin to             178

4    A. Agarwal dated April 4, 2024, Re:

5    Bannister Dividend Reconciliation.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Antonio Severin , Vol I                                    May 15, 2025

Page 8

1    -- Upon commencing at 1:00 p.m.

2

3

4              THE VIDEOGRAPHER:  Good afternoon.  We

5    are going on the record at 1:00 p.m. on May 15,

6    2025.  Please note that this deposition is being

7    conducted virtually.  The quality of recording

8    depends on the quality of camera and internet

9    connection to participants.  What is seen for the

10   witness and what is heard on screen is what will be

11   recorded.  Audio and video recording will continue

12   to take place unless all parties agree to go off

13   the record.

14             This is media unit one of the video

15   recorded deposition of Antonio Severin, taken by

16   counsel for Plaintiff in the matter of United

17   States of America versus David V. Erickson, filed

18   in the United States District Court, District of

19   Minnesota.  Case number 0:24-CR-00007-JMB-DLM.

20             The location of this deposition is

21   Veritext Ontario, 2020-77 King Street West,

22   Toronto, Ontario, Canada.

23             My name is Peter Goodale, certified

24   legal videographer, representing Veritext Legal

25   Solutions.  The court reporter is Judith Caputo,

Page 9

1   also from the firm Veritext Legal Solutions.

2              I am not authorized to administer an

3   oath.  I am not related to any party in this

4   action, nor am I financially interested in the

5   outcome.

6              If there are any objections to

7   proceeding, please state them at the time of your

8   appearance.  Counsel, and all present, including

9   remotely, will now state their appearances and

10  affiliations for the record, beginning with

11  noticing attorney.

12             MS. SCOTT:  Good afternoon.  Amanda

13  Scott on behalf of the United States.

14             MR. BOURGET:  Boris Bourget on behalf

15  of the United States.

16             MR. MAUZY:  Bill Mauzy on behalf of

17  David Erickson.

18             MR. DOOLING:  William Dooling on behalf

19  of David Erickson.

20             MR. ERICKSON:  David Erickson.

21             MR. KISER:  Rusty Kiser with IRS

22  Criminal Investigation.

23             MS. RICE:  Adrienne Rice, counsel for

24  the Attorney General of Canada.

25             MS. JANSSEN:  Charlotte Janssen,

Antonio Severin , Vol I                                          May 15, 2025

Page 10

1    counsel for Rypl.

2                    MR. GINTER:  Justin Ginter on behalf of

3    Mr. Severin.

4                    THE WITNESS:  Antonio Severin.

5                    THE VIDEOGRAPHER:  Very good.  Will the

6    court reporter please swear in or affirm the

7    witness, and then counsel may proceed.

8                    THE REPORTER:  Could you please state

9    your full name for the record, spelling your last?

10                   THE WITNESS:  Antonio Severin,

11   S-E-V-E-R-I-N.

12                   THE REPORTER:  Thank you.

13                   ANTONIO SEVERIN, having been duly

14   affirmed testified on his oath as follows:

15                   MS. SCOTT:  Before we begin, Ms. Rice,

16   would you like to put any statements on the record?

17                   MS. RICE:  Yes, I would just like to

18   confirm with the witness, Mr. Severin, his

19   understanding that he's participating voluntarily

20   in this deposition.

21                   THE WITNESS:  Yes.

22                   MS. RICE:  Thank you.

23                   MS. SCOTT:  Thank you, Mr. Severin.

24                        DIRECT EXAMINATION

25   BY MS. SCOTT:

1                Q.   You just explained to the court

2    reporter that you go by the name "Antonio Severin."

3                Do you go by any other names?

4                A.   Typically "Tony."

5                Q.   And to confirm, are you testifying

6    voluntarily today?

7                A.   Yes, I am.

8                Q.   Before appearing here today, did

9    you receive a letter from the United States

10   Government, dated May 2nd of 2025, which offered

11   you immunity regarding statements you may make

12   today?

13               A.   Yes, I did.

14               Q.   Did you review that letter with

15   your attorney?

16               A.   Yes, I did.

17               Q.   Did you sign it?

18               A.   Yes.

19               Q.   What is your understanding of that

20   agreement?

21               A.   That I'm a subject in this

22   particular proceeding, and that I have immunity if

23   I don't lie, if I'm truthful.

24               Q.   And before today, have you met

25   with government officials to make statements that

1    might be covered by your testimony today?

2                A.   Yes.

3                Q.   When was the first time that you

4    met with the government?

5                A.   The proffer meeting was November

6    of 2024.

7                Q.   And have you met with the

8    government on another occasion related to this

9    matter?

10               A.   Only by video.

11               Q.   And when was that?

12               A.   That was a -- it was a few days

13   ago and then also yesterday.

14               Q.   Mr. Severin, are you a citizen of

15   Canada?

16               A.   Yes.

17               Q.   And do you reside in Canada?

18               A.   Yes.

19               Q.   In which city and province?

20               A.   I reside in Grimsby, Ontario.

21               Q.   Is that near Toronto, Ontario?

22               A.   Yes.

23               Q.   How long have you lived in the

24   Toronto area?

25               A.   Since I was born.

Antonio Severin , Vol 1                    May 15, 2025

Page 13

1              Q.    Did you ever leave Toronto?

2              A.    Yes.

3              Q.    Where did you move?

4              A.    Moved to Dallas, Texas.

5              Q.    And around what time period was

6     that?

7              A.    It would have been 1991 to 1994.

8              Q.    And did you eventually move back?

9              A.    Yes, I did.

10             Q.    And when did that take place?

11             A.    1994.

12             Q.    Can you please describe your

13    educational background for us?

14             A.    Yes.  High school, grade 13 here,

15    so graduated that.  I went to Ryerson University,

16    now called Toronto Metropolitan University,

17    graduated with a Bachelor -- Bachelor of Finance

18    there.

19             And then became a CMA, which has now

20    been transitioned to a CPA.

21             Q.    First, do you recall what year you

22    earned your Bachelor's in Finance?

23             A.    That would have been in -- the

24    actual -- the degree is in Bachelor of Business,

25    actually.  And that would have been in 1983.

1              Q.    And you mentioned a CMA or a CPA.

2    What do those terms refer to?

3              A.    At the time there was an

4    accounting designation called a Canadian management

5    accountant.  So I was able to -- I was passed all

6    my qualifications to become a -- to get that

7    designation.

8              And then, at some point in time, the

9    accounting bodies which included a CPA, at the time

10   there was a -- it was called CA, chartered

11   accountants, CMA, Canadian management accountants.

12   And I think there was also another designation

13   called Canadian general accountants.  They all

14   bridged together and everybody became a CPA.

15             Q.    And what does CPA stand for?

16             A.    It's a Canadian professional

17   accountant.

18             Q.    How does one become a CPA?

19             A.    You have to have the right

20   education, so accounting, finance background, and

21   then you have to take some standardized tests to

22   become designated as a CPA.

23             Q.    And when did you first receive

24   your CMA certification?

25             A.    It would have been about 1989, if

Page 15

1    I remember correctly.

2              Q.    Are you currently employed?

3              A.    I am.

4              Q.    Where?

5              A.    Company is called Rypl.com Inc.

6              Q.    And generally speaking, what is

7    Rypl.com Inc.?

8              A.    It's a -- Rypl is a manage service

9    provider.  So it provides services such as

10   management, finance, administration, to other

11   associated companies.

12             Q.    Going forward, I will refer to

13   Rypl.com Inc. as "Rypl," okay?

14             A.    Okay.

15             Q.    Where is Rypl headquartered?

16             A.    It's in Toronto.

17             Q.    And when did you first start

18   working for Rypl?

19             A.    September of 2013.

20             Q.    Does it currently have an office

21   space?

22             A.    We sublease a small office at 2700

23   Dufferin Street in Toronto.

24             Q.    Has Rypl used any other brick and

25   mortar locations?

Page 16

1                    A.   Yes.  It had a facility at 171

2    Liberty Street in Toronto.  And then, in 2019, I

3    believe, we moved to a facility on Queen Street

4    West, 621 Queen Street West.

5                    Q.   You mentioned a Liberty Street

6    address.  Do you recall the time period that Rypl

7    used that address?

8                    A.   It was there before I joined.  So

9    I'm not a hundred percent sure exactly when they

10   were provided.  But, for my time, they were at 171

11   Liberty Street.

12                   Q.   And when did it move to Queen

13   Street?

14                   A.   20 -- it was either 2018 or 2019.

15   2019, I believe.

16                   Q.   And when did it stop using the

17   Queen Street address?

18                   A.   Five years later.  So, as the

19   five-year lease came up, then we became fully

20   remote and just had a -- had a small, subleased

21   office at 2700 Dufferin Street.

22                   Q.   What is your current title with

23   Rypl?

24                   A.   I'm the Director of Finance.

25                   Q.   What are your general

Page 17

1   responsibilities as the Director of Finance?

2              A.   Right now, just manage all the

3   finances of the company, and, you know, produce

4   financial statements, supervise company audits,

5   review company financials, work with external

6   accountants to prepare tax returns.  And manage six

7   people.

8              Q.   In your role as Director of

9   Finance, are you also responsible for managing

10  banking relationships of Rypl?

11             A.   Yes.

12             Q.   Do you also manage banking

13  relationships with the associated companies of

14  Rypl?

15             A.   Yes.

16             Q.   How long have you been in the

17  position of Director of Finance?

18             A.   I think I became Director of

19  Finance in 2017.

20             Q.   And who do you report to in this

21  current role?

22             A.   Chad Moldon.

23             Q.   Do you receive performance

24  evaluations?

25             A.   I have not, no.

 1                 Q.    Have you ever held any other

 2     titles at Rypl?

 3                 A.    The initial title was Controller.

 4                 Q.    And when did you hold that title?

 5                 A.    From 2013 to 2017.

 6                 Q.    How, if at all, did your

 7     responsibilities as Controller differ from your

 8     responsibilities as Director of Finance?

 9                 A.    Very little.  There was no

10     additional duties provided or anything, just a --

11     it was a better title.

12                 Q.    Do you receive compensation from

13     Rypl?

14                 A.    Yes, I do.

15                 Q.    How are you paid?

16                 A.    Salary.

17                 Q.    Has that ever changed?

18                 A.    Yes.

19                 Q.    I'm going to rephrase the

20     question.  Has the form of your compensation ever

21     changed?

22                 A.    No.

23                 Q.    What are you currently paid?

24                 A.    I'm paid 180,000 Canadian per

25     year.

Antonio Severin , Vol 1                                    May 15, 2025

Page 19

1              Q.    And has that amount ever changed?

2              A.    Yes, it has.

3              Q.    What was your starting salary?

4              A.    120.

5              Q.    Do you own any portion of Rypl?

6              A.    No, I do not.

7              Q.    Is your salary based on the

8       profits of Rypl?

9              A.    No, it's not.

10             Q.    Do you receive any profit share of

11      Rypl?

12             A.    No.

13             Q.    Before you began working at Rypl,

14      what did you do for employment?

15             A.    I was Director of Finance for a

16      company, also in Toronto, called First Media Group.

17             Q.    And what kind of services did

18      First Media Group offer?

19             A.    We offered chat line services, so

20      dating chat lines, sometimes referred to as 1-900

21      numbers.

22             Q.    And when were you employed by

23      First Media?

24             A.    From 1999 to 2013.

25             Q.    In your impression, did you feel

Antonio Severin , Vol 1                                    May 15, 2025

Page 20

```
 1   well-qualified for the Rypl job from your prior

 2   experience with First Media?

 3              A.   Yes.

 4              Q.   Mr. Severin, are you familiar with

 5   an individual named David Erickson?

 6              A.   Yes.

 7              Q.   How do you know him?

 8              A.   He hired me at Rypl.com.  And

 9   we've worked together ever since.

10              Q.   When did you first meet him?

11              A.   At the initial interview, which

12   was September of 2013.

13              Q.   And that was your initial

14   interview for the job at Rypl, correct?

15              A.   Correct.

16              Q.   Have you met Mr. Erickson in

17   person?

18              A.   Yes.

19              Q.   Do you recognize him in this room

20   today?

21              A.   Yes.

22              Q.   Can you please identify him by an

23   article of clothing that he's wearing?

24              A.   So, the nice jacket, with the open

25   -- the open shirt and a pocket kerchief.
```

1                    Q.   And what color is that jacket?

2                    A.   I want to say grey, but I'm color

3    blind here.

4                    MS. SCOTT:  I'll let the record reflect

5    that the witness has identified the Defendant.

6    BY MS. SCOTT:

7                    Q.   Mr. Severin, going forward, I will

8    refer to Mr. Erickson as the Defendant, okay?

9                    A.   Okay.

10                   Q.   So you testified that in September

11   of 2013, you had a job interview for the job at

12   Rypl.  Can you explain how you learned about that

13   job opportunity?

14                   A.   Yes.  I had seen an ad in

15   LinkedIn.

16                   Q.   And where did your interview

17   occur?

18                   A.   It occurred at the office of

19   Rypl.com on -- on Liberty Street.

20                   Q.   Who interviewed you?

21                   A.   That would have been the

22   Defendant.

23                   Q.   Was anyone else present for that

24   interview?

25                   A.   During the interview, no.

Antonio Severin , Vol I                                    May 15, 2025

Page 22

1              Q.   What is your understanding of why

2    the Defendant versus someone else affiliated with

3    Rypl was the individual who interviewed you?

4              A.   My understanding at the time was

5    that he was the head of finance area for large

6    companies.

7              Q.   And during the interview, how well

8    did the Defendant describe the job that you had

9    applied for?

10             A.   He said it was a general

11   accounting job, that he needed somebody strong to

12   run the department, and that, you know, that it

13   needed certain skills.  He showed me some of the

14   financial reporting and, basically, you know, kind

15   of outlined it that way.

16             Q.   And eventually you were offered a

17   job; is that right?

18             A.   Correct.

19             Q.   Who notified you that you were

20   hired?

21             A.   Frances, so Frances Moldon.  So

22   she's an outside HR consultant for Rypl.com.

23             Q.   During the interview, did you feel

24   that it went well?

25             A.   Yes, yes.  The Defendant -- the

Page 23

```
 1   Defendant seemed very enthusiastic about what I

 2   brought to the table, my skill set and my

 3   experience.  And kind of, I don't know, jokingly

 4   but offered me the job on the spot.

 5              MR. BOURGET:  Do you mind speaking up

 6   just slightly?

 7              THE WITNESS:  Sure.

 8   BY MS. SCOTT:

 9         Q.   Around the time you were hired,

10   did the Defendant tell you who you would report to

11   as Rypl's Controller?

12         A.   Yes.  He said that officially it

13   would be Chad Moldon, but for the most part, I

14   would be reporting to the Defendant.

15         Q.   And who is Chad Moldon?

16         A.   Chad Moldon is the President of

17   Rypl.

18         Q.   When you were first hired, what,

19   if any, priorities did you have upon starting in

20   this role?

21         A.   Well, when I started, their

22   accounting system was -- they were using a small

23   accounting system, like a single company, single

24   currency type of accounting system by the name of

25   Peachtree.
```

Antonio Severin , Vol 1                           May 15, 2025

                                              Page 24

1            They did realize that this was not able

2   to handle their accounting needs going forward, so

3   they had already purchased an ERP system, which is

4   a more robust accounting system, by the name of

5   Sage 300.  And the first role was for -- for me to

6   start implementation of that particular accounting

7   software package.

8            Q.   You described the new software

9   package that they had purchased as ERP.  Do you

10  know what that stands for?

11           A.   Yeah, it's a -- it's an old term,

12  I guess.  Enterprise requirement planning system.

13           Q.   When you were implementing that

14  new accounting software, did you work with the

15  Defendant?

16           A.   Yes.

17           Q.   In what capacity?

18           A.   He had a -- he had already

19  developed the accounting system that they were

20  working on, the Peachtree system, so a lot of the

21  chartered accounts and a lot of the templates, I

22  asked him about just so that we could replicate

23  what we were already doing.

24           Q.   And you testified that before you

25  started, the ERP program had already been

Page 25

1    purchased.  Did you have any conversations with the

2    Defendant about any shortcomings that he had

3    perceived in the accounting system at the time, the

4    -- pardon me, let me clarify.

5              The prior accounting system, Peachtree?

6              A.   With Peachtree?  Again, it's meant

7    for small business, and we were, you know, a good

8    size by that time.  And it did not handle all the

9    different companies we had and all the different

10   currencies we were dealing with.

11             Q.   And did the Defendant seem to be

12   aware of that?

13             A.   Yes.

14             Q.   How often would you meet with the

15   Defendant?

16             A.   Early on, quite often.

17             Q.   Did he come into the office?

18             A.   Yes.

19             Q.   Did he have an office?

20             A.   Yes, he did.

21             Q.   Did you have an office?

22             A.   Yes.

23             Q.   Were they nearby?

24             A.   They were right beside each other.

25             Q.   Did the Defendant live in Toronto?

Antonio Severin , Vol 1                        May 15, 2025

Page 26

```
 1                 A.    No.
 2                 Q.    And about how often, in your
 3   recollection, would he come to Toronto to the
 4   office?
 5                 A.    Early on, he would commute --
 6   commute quite often; I would say a week a month.
 7                 Q.    And after the new accounting
 8   system was implemented, did that frequency change?
 9                 A.    It would get less.  Yes, it got
10   less.
11                 Q.    What would you describe your
12   primary methods of communication with the
13   Defendant?
14                 A.    There was some e-mail and,
15   obviously, when he was in the office, I would go
16   into his office and speak to him directly.
17                 Q.    Around the time you were first
18   getting started, what did the Defendant's general
19   responsibilities include?
20                 A.    He basically was the finance guy
21   for the Board, for the investor group.  And so he
22   would basically, you know, help provide all the
23   financials for that, for that level of reporting.
24                 Q.    You referred to a board and an
25   investment group.  Does that go by a certain
```

Page 27

1   business name?

2                A.   Firefly.

3                Q.   Is that the full name?

4                A.   It is now called Firefly Lane

5   Corporation NV.

6                Q.   Do you have any personal knowledge

7   of whether the Defendant helped manage any banking

8   relationships on behalf of Rypl?

9                A.   On behalf of Rypl?  Not that I was

10  aware of, no.

11               Q.   Are you aware of whether Defendant

12  had any relationship -- if he had any role in

13  building relationships with banks for the

14  investment group Firefly Lane?

15               A.   Yes.

16               Q.   Did he review any of the work

17  product that you created?

18               A.   Yes.

19               Q.   Can you describe that a little?

20               A.   Over time, he had a report called

21  the MOM report, the month-over-month report, that

22  he kept up since 20 -- I think he developed it in

23  2010.  It goes back to 2010.  It's really a monthly

24  reporting of all the expenses and -- and revenue

25  for all the entities, all the SBUs.

Page 28

1              And so, over time, I started doing

2      those and took that over from him.  And we do it to

3      this day.

4              Q.   Was that MOM report distributed to

5      other members within this organization?

6              A.   Yes.  The MOM report would go to

7      all the shareholders of Firefly.

8              Q.   And before it was shared with all

9      of the shareholders, did you ever have to send it

10     to the Defendant for his review first?

11             A.   Yes.  Once I started doing it, I

12     would send the monthly, in a draft format, I would

13     send it to the Defendant.  And then he would review

14     it, make -- may or may not have made some comments,

15     and returned it back so I could finalize.

16             Q.   And when you mentioned the MOM

17     report, there appeared to be a lot of acronyms.

18     You used the acronym "SBU."  What does that stand

19     for?

20             A.   It is the business units.

21             Q.   And what is a business unit?

22             A.   A business unit is, basically --

23     could be a brand, could be just, you know, we have

24     -- we have various websites and various investments

25     that Firefly would get into.  So those -- those are

Page 29

1   all kind of accounted for separately as its own

2   business unit.

3           Q.   Would you ever ask the Defendant

4   questions about how to best do your job?

5           A.   Occasionally.

6           Q.   Was he generally able to answer

7   your questions?

8           A.   Yes.

9           Q.   Did he ever provide you with any

10  template accounting materials to do in carrying out

11  your responsibilities?

12          A.   Yes.

13          Q.   And did you find those templates

14  useful?

15          A.   Yes.

16          Q.   What is your understanding of the

17  Defendant's professional background?

18          A.   I assumed he was a CPA.

19          Q.   What is that assumption based on?

20          A.   His years of experience and his

21  skills with accounting, and the fact that he was

22  basically the -- the financial head of quite a

23  large entity.

24          Q.   And did you have occasion to

25  assess the Defendant's on-the-ground abilities in

Page 30

1  accounting practices while you worked with him?

2              A.   Yes.

3              Q.   Did you generally find him

4  sophisticated regarding tax and accounting matters?

5              A.   Certainly on accounting matters,

6  yes.  Although the accounting system, the previous

7  one, was small, it was -- you know, it was doing

8  the job.  It just wouldn't be able to do the job

9  going forward.  But my understanding was he had

10  developed that and the chart of accounts and all --

11  all the things that went into the accounting

12  system.

13             Q.   Was your relationship strictly

14  professional?

15             A.   Yes.  We did have some -- some --

16  we would occasionally get together or at dinner.

17             Q.   Did you consider the Defendant a

18  friend of yours?

19             A.   Yes.

20             Q.   I'd like to switch gears and talk

21  a little bit more about this structure.  You've

22  mentioned several entities by now.

23             In your role as Controller and Director

24  of Finance of Rypl, did you become familiar with

25  the greater organizational structure?

Antonio Severin , Vol 1                                    May 15, 2025

Page 31

1               A.   Yes.

2               Q.   Did that structure include other

3     business entities?

4               A.   Yes.

5               Q.   To your knowledge, what does the

6     phrase "Firefly Group" mean?

7               A.   Firefly Group was a bit of an

8     acronym to encompass all the companies, all the

9     associated companies that kind of directly reported

10    into this investment group.

11              Q.   Would that include Rypl?

12              A.   Correct.

13              Q.   What does the phrase "holding

14    company" mean to you?

15              A.   Holding company, to me, it refers

16    to Firefly Lane Corporation and the actual

17    investment company itself.

18              Q.   And what is your understanding of

19    the purpose of a holding company?

20              A.   To hold investments in other

21    companies.

22              Q.   Are you familiar with the phrase

23    "operating company"?

24              A.   Yes.

25              Q.   How does that differ from a

Page 32

1  holding company?

2              A.   Operating company is the actual

3  company that produces the revenue and expenses and

4  income.

5              Q.   Did the Firefly Group have

6  associated operating companies?

7              A.   Yes.

8              Q.   Can you please identify those

9  companies by name?

10             A.   Sure.  The operating companies

11 were Granity, Granity Entertainment DAC, which is

12 an Irish company; Granity Media Inc., which is a

13 Canadian company.

14             Q.   Are you familiar with the name

15 Surecom?

16             A.   Surecom, correct, yes.  That would

17 also be an operating company.

18             Q.   I'm going to show you what has

19 been marked as Government Exhibit 58.

20             EXHIBIT NO. G-58:  E-Mail from. D. Erickson

21             to T. Severin dated July 18, 2017, Re:

22             Firefly overview.

23 BY MS. SCOTT:

24             Q.   And I'm going to zoom in on the

25 top half of this page.  What does this appear to

Antonio Severin , Vol 1                         May 15, 2025

                                                    Page 33

1   be, Mr. Severin?

2               A.   I -- I sent an e-mail to Dave,

3   dated July 17th:

4                    "Here is the overview that you

5               can send over.  I will respond

6               directly to the specific questions

7               Gejo was asking."

8               Q.   Mr. Severin, can I first direct

9   your attention to the top of the page?  Do you

10  recognize the name in the "To" line?

11              A.   That's me.

12              Q.   What about the name in the "From"

13  line?

14              A.   Dave Erickson.

15              Q.   Does this appear to be a true and

16  accurate copy of an e-mail that you received from

17  the Defendant around July 18th of 2017?

18              A.   Yes.

19              Q.   In this top e-mail, did the

20  Defendant send you an attachment?

21              A.   I believe so.

22              Q.   Can you read what the title of

23  that attachment is?

24              A.   The attachment reads, "Firefly

25  Group Business Overview - July 18, 2017."

 1                   EXHIBIT NO. 59:  Firefly Lane Business

 2                   History and Overview.

 3     BY MS. SCOTT:

 4                   Q.   I'm now going to show you what's

 5     been marked as Government Exhibit 59.  Do you

 6     recognize this document?

 7                   A.   Yes.

 8                   Q.   Do you know who created it?

 9                   A.   The Defendant.

10                   Q.   And what was the purpose of

11     creating this document?

12                   A.   The purpose behind it was to

13     basically provide an RFP or request for proposal

14     for banking, the banking needs of the Firefly

15     Group.

16                   Q.   Under what circumstances would an

17     RFP be given to a bank?

18                   A.   Typically if you're looking for

19     banking.

20                   Q.   For example, to open an account?

21                   A.   To open operating accounts,

22     correct.

23                   Q.   Does this appear to be a true and

24     accurate copy of the document that the Defendant

25     had e-mailed you from the previous Government

Page 35

1  Exhibit?

2              A.   Yes.

3              Q.   I'm going to direct your attention

4  to page 2, and I'm going to zoom in in the text

5  section.

6              Will you please read for the record the

7  highlighted language in the second paragraph?

8              A.   Sure.

9                   "David Erickson was a pioneer

10                  in internet transaction processing

11                  and A.T.A. Rodenburg and David van

12                  der Poel were likewise in streaming

13                  video."

14             Q.   I'd like to ask you about some of

15  these names.  First, who is A.T.A. Rodenburg

16  referring to?

17             A.   That is Toine Rodenburg, also one

18  of the senior -- senior shareholders.

19             Q.   Have you ever met Mr. Rodenburg?

20             A.   Yes, I have.

21             Q.   Who is Mr. David van der Poel?

22             A.   He is also a senior investor or

23  shareholder.

24             Q.   Have you ever met Mr. van der

25  Poel?

Antonio Severin , Vol 1                     May 15, 2025

Page 36

1              A.   Yes.

2              Q.   Among Mr. Rodenburg, Mr. van der

3    Poel and the Defendant, did the Defendant have a

4    particular specialty or background among the

5    shareholders?

6              A.   The Defendant?  The Defendant ran

7    an internet transaction company that Mr. Rodenburg

8    and Mr. van der Poel's company was using, so they

9    had the video -- the streaming video company, and

10   they were using the services of the Defendant's

11   transaction processing, credit card processing

12   company.

13             Q.   Based on your familiarity with

14   Mr. Rodenburg, does he have a background in

15   finances?

16             A.   Not that I know of.

17             Q.   A background in accounting?

18             A.   No, not that I know of.

19             Q.   Based on your familiarity with

20   Mr. van der Poel, does he a background in finances?

21             A.   Not that I know of.

22             Q.   A background in accounting?

23             A.   Not that I know of.

24             Q.   I'd now like to ask you to read

25   the last paragraph in this document, which I've

Page 37

1   also highlighted.

2               A.   "Subsequently, key employees

3                    have been retained and rewarded with

4                    shares in the company but control

5                    continues to rest with the

6                    Founders."

7               Q.   Can you please explain your

8   understanding of this sentence?

9               A.   Yes.  So, the founders would have

10  been those -- the three individuals named in the

11  second paragraph.  The key employees that were

12  retained and rewarded with shares would be Chad

13  Moldon, Ryan Maule, Kevin Krieg, Paul Eidsness.

14              Q.   Do you recall roughly when those

15  key employees obtained minor ownership interests in

16  Firefly Lane?

17              A.   It would have been 2012.

18              Q.   And after that happened, did the

19  founders continue to exert control over Firefly

20  Lane?

21              A.   Yes.

22              Q.   I'm now going to direct your

23  attention to page 3.  You testified earlier that

24  you were familiar with a company called Firefly

25  Lane Corporation NV.  At the top of this page, a

Antonio Severin , Vol 1                    May 15, 2025

Page 38

1    company is listed called Firefly Lane Ltd.

2              What, if any, difference is there

3    between those two entity names?

4              A.   Well, at -- the Firefly Lane Ltd.

5    is an Anguilla company and it was a precursor to

6    Firefly Lane Corporation NV.

7              Q.   How, if at all, did the operations

8    of those two companies differ?

9              A.   One was incorporated -- Firefly

10   Lane Ltd. was incorporated in Anguilla, and Firefly

11   Lane Corporation NV was incorporated in Curacao.

12             Q.   Were the day-to-day operations of

13   each similar?

14             A.   Yes, they were.

15             Q.   In the middle of this page,

16   there's a heading titled, "Company Director."  Who

17   is identified underneath that heading?

18             A.   Gregory Elias.

19             Q.   Who is Gregory Elias?

20             A.   Gregory Elias is the founder of a

21   company called United International Trust.

22             Q.   Have you ever met Mr. Elias in

23   person?

24             A.   I have never meet Mr. Elias in

25   person.

1               Q.   There is also a heading underneath

2      that section titled, "Majority Shareholders."  Can

3      you please identify the shareholders listed?

4               A.   Yes.  10Q21 Corporation NV,

5      Bannister Corporation NV, the Prism Trust.

6               Q.   Are you familiar with the phrase

7      "ultimate beneficial owner"?

8               A.   Yes.

9               Q.   In your understanding, what does

10     that phrase mean?

11              A.   The ultimate beneficial owner is

12     the person, individual, who actually owns the

13     shares.

14              Q.   And does that phrase -- strike

15     that.

16              Is -- is an ultimate beneficial owner

17     sometimes referred to as a UBO?

18              A.   UBO, correct.

19              Q.   What is your understanding of who

20     the UBO of 10Q21 Corporation was?

21              A.   UBO for 10Q21 Corporation NV was

22     Toine Rodenburg.

23              Q.   What about Bannister Corporation?

24              A.   At this time the UBO was David

25     Erickson.

Antonio Severin , Vol 1                              May 15, 2025

Page 40

1                      Q.    And for Prism Trust?

2                      A.    That was a trust controlled by

3      David van der Poel.

4                      Q.    I'm now going to page 4 and I'm

5      going to blow up the section that is text.  Can you

6      see that okay?

7                      A.    Yes.

8                      Q.    What is the name of the entity at

9      the top of this page?

10                     A.    This is Surecom Corporation NV.

11                     Q.    And who is listed as the company

12     director?

13                     A.    The company director is Gregory

14     Elias.

15                     Q.    Is that the same individual as --

16     who was listed as the director of Firefly Lane?

17                     A.    Yes.

18                     Q.    And who are listed as the majority

19     shareholders?

20                     A.    Firefly Lane Ltd.

21                     Q.    And what is your understanding of

22     who the beneficial owners of Firefly Lane Ltd. were

23     at the time in 2017?

24                     A.    That would have been -- there

25     would have been eight shareholders.

Antonio Severin , Vol 1                    May 15, 2025

Page 41

```
 1                    Q.    Can you please list them by name.

 2                    A.    Sure.   The ultimate, the UBO?

 3                    Q.    Yes.

 4                    A.    So this would be the UBO.   This

 5      would be Toine Rodenburg, David Erickson, David van

 6      der Poel, Richard Burry, Chad Moldon, Ryan Maule,

 7      Kevin Krieg, Paul Eidsness.

 8                    Q.    Underneath the phrase "Firefly

 9      Lane Ltd.," it states, "Annual sales from operating

10      Cam4 (TTM)."  Did I read that correctly?

11                    A.    Yes, you read it, but I'm not sure

12      what "TTM" means, if that's the question.

13                    Q.    Are you familiar with Cam4?

14                    A.    Yes.

15                    Q.    What is Cam4?

16                    A.    Cam4 is a website, Cam4.com.

17                    Q.    What content is listed on that

18      website?

19                    A.    It's a live streaming, adult

20      entertainment, live streaming.

21                    Q.    Next to Cam4 there appears to be a

22      figure.   What is that figure?

23                    A.    That is $60 million.

24                    Q.    And what -- what is that referring

25      to?
```

Antonio Severin , Vol 1                           May 15, 2025

Page 42

```
 1                 A.    That's the annualized sales.

 2                 Q.    And, in general, how did Cam4 make

 3       money from sales?

 4                 A.    So the revenue was -- basically

 5       from three categories:  The sale of memberships,

 6       which would allow a user add additional features on

 7       the website; tokens, so you could buy tokens, the

 8       consumer, which they could use on site for various

 9       tipping and other type of features with the cam,

10       with the webcam; and then also advertising.  So

11       they would sell advertising on the site to other

12       companies.

13                 Q.    I'm going to blow this up a

14       little.  I'm going to blow up the bottom half.

15       There's a title, a subheading, for "Company

16       Overview."  Based on this document, when did Cam4

17       first get started?

18                 A.    On this document, started -- Cam4

19       was started in 2006.

20                 Q.    And on page 5, I'm going to blow

21       up the top half where the text shows and -- scratch

22       that.

23                 Are you familiar with the name

24       "Granity"?

25                 A.    Yes.
```

Page 43

1              Q.   How is Granity related to Surecom?

2              A.   It has a contractual agreement

3     where Granity uses the platform that is owned by

4     Surecom Corporation NV.

5              Q.   And how does that relate, if at

6     all, to the operation of Cam4?

7              A.   So, basically, the Cam4 site is on

8     the Surecom platform, operates on that.  And

9     Granity operates that particular site, collects all

10    the money, pays out all the broadcasters, and

11    operates the actual business itself.

12             Q.   Still on Government Exhibit 59,

13    I'm now turning to the last page, page 6.  The

14    title of this page lists Rypl.com Inc.; is that

15    right?

16             A.   Correct.

17             Q.   Could you please identify the

18    shareholders of Rypl.com?

19             A.   Major shareholders:  Chad Moldon,

20    Firefly Lane Ltd., Halstead Bay Holdings Inc.

21             Q.   And you've described Chad Moldon

22    and Firefly Lane Ltd., but let's talk about

23    Halstead Bay Holdings.  Are you familiar with the

24    UBO of Halstead Bay Holdings?

25             A.   Yes.

Antonio Severin , Vol 1                    May 15, 2025

                                                Page 44

1              Q.   Have you ever heard Halstead Bay

2     Holdings be referred to as HBH?

3              A.   Yes.

4              Q.   I am now showing you what has been

5     marked as Government Exhibit 1001.

6              EXHIBIT NO. 1001:  Organizational Chart.

7     BY MS. SCOTT:

8              Q.   Have you seen this before?

9              A.   I have.

10             Q.   What does it appear to show?

11             A.   It's an org chart.

12             Q.   And do you recognize each entity

13    listed in this org chart?

14             A.   Yes.

15             Q.   Does it fairly and accurately

16    depict part of the organizational structure of the

17    Firefly Group around the years 2014 through 2018?

18             A.   Yes.

19             Q.   You've explained briefly the

20    relationship between Surecom, Granity and Cam4, but

21    I'd like some more detail.

22             Can you please -- are there any

23    agreements between these three companies?

24             A.   Between Surecom and Granity?

25             Q.   And Cam4, yes, correct.

Antonio Severin , Vol I                    May 15, 2025

                                                    Page 45

 1                   A.    Okay.  So Cam4 is not a

 2      corporation, it's the actual brand.  So, as far as

 3      a domain, it might be referring to the domain

 4      Cam4.com, which is owned by Surecom Corporation.

 5      And the actual licence agreement between Granity

 6      and Surecom, yes, I -- I do know that.

 7                   Q.    Can you briefly describe the main

 8      terms of that licence agreement between Surecom and

 9      Granity?

10                   A.    The main terms were that Granity

11      would collect the money and operate the site, and

12      then, at this particular time, would pay a

13      licensing fee to Surecom for the use of the

14      software.

15                   Q.    Do you hold any role at Surecom?

16                   A.    I do not.

17                   Q.    Do you hold any role with Granity?

18                   A.    I do.  I'm a director of Granity

19      Entertainment DAC in Ireland.

20                   Q.    When did you become a director?

21                   A.    It was 20 -- I want to say 2014.

22                   Q.    You provided some information

23      about the salary you received from Rypl.  Do you

24      receive any additional compensation for your role

25      as director of Granity Entertainment?

Antonio Severin , Vol 1                                    May 15, 2025

Page 46

```
 1                 A.    Yes, I do.

 2                 Q.    How much?

 3                 A.    It's 36,000 Euros a year.

 4                 Q.    Do you hold any ownership in

 5      Granity?

 6                 A.    No, I do not.

 7                 Q.    Is your compensation from Granity

 8      based on the profits of the company?

 9                 A.    No, it's not.

10                 Q.    Currently, who is listed as the

11      UBO of Granity?

12                 A.    It is Lee James White.

13                 Q.    Do you have any understanding as

14      to how Mr. White became owner of that company?

15                 A.    Yes.

16                 Q.    Can you please describe.

17                 A.    Yes.  He, Mr. White, became

18      shareholder after the previous shareholder left.

19      And Mr. White works for a company called Hamble

20      that's owned by Mark Quirk.

21                 Q.    What kind of services did Hamble

22      offer?

23                 A.    Hamble offers nominee services.

24                 Q.    Can you explain what that means?

25                 A.    Nominee services would be people
```

```
 1   that Mark, Hamble, would provide to be directors,

 2   and I guess UBOs, for companies.

 3              Q.   Are you aware of any relationship

 4   between the Defendant and Mr. Quirk?

 5              A.   I knew -- they knew each other.

 6   So Mr. -- Mr. Quirk, Hamble, was a well-known

 7   company to provide these types of services.

 8              Q.   How do you know that they worked

 9   together?

10              A.   I believe I was introduced by Dave

11   to Mr. Quirk.

12              Q.   And you mentioned that Mr. White

13   became the owner after the previous one left.  What

14   was the name of the previous owner?

15              A.   The shareholder before Mr. White

16   was Iain McLaughlin.

17              Q.   Do you know why he left?

18              A.   I think he had a falling-out with

19   Mr. Quirk.

20              Q.   Do you know whether it was his

21   decision to sell the shares?

22              A.   Yes.  Yes, he said that he wanted

23   to sell his shares.

24              Q.   Over the years, did you have an

25   opportunity to observe how much day-to-day control
```

Page 48

1    over Granity that its UBO possessed?

2                  A.    Very little.

3                  Q.    I'm going to turn to Surecom now.

4    Do you know who the UBO of Surecom is?

5                  A.    That is Firefly.

6                  Q.    And are you familiar with the name

7    Brittanyville Corporation?

8                  A.    Yes.

9                  Q.    Can you tell us about

10   Brittanyville?

11                 A.    I don't know what it did before,

12   but there was a company that -- that Gregory Elias

13   was a director for called Brittanyville and it

14   became -- it was renamed Firefly Lane

15   Corporation NV in 2017.

16                 Q.    You mentioned earlier that the

17   purpose of Firefly Lane was as an investment group.

18   Are you aware of any other services that it

19   provided?

20                 A.    It is -- well, it would provide

21   consulting services, basically, to the companies.

22                 Q.    Please tell me if this means

23   anything to you:  consulting owners versus

24   operational owners.

25                 A.    Yes, yes.

Page 49

1            Q.   Can you tell me what your

2   understanding of an operational shareholder is in

3   respect to the entity structure shown in Government

4   Exhibit 1001?

5            A.   Yes.  The operating shareholders

6   were those key employees mentioned earlier.  So

7   those were active in the business, full-time active

8   in the business.  So that would be Mr. Moldon,

9   Mr. Maule, Mr. Krieg and Mr. Eidsness.

10           Q.   And in reference to this

11  structure, what is a consulting shareholder, in

12  your understanding?

13           A.   There was the senior -- the

14  founders, basically, were considered the consulting

15  owners.

16           Q.   From your perspective, did the

17  consulting shareholders dictate the direction of

18  Firefly Lane?

19           A.   Yes.

20           Q.   What was the Defendant's role

21  within Firefly Lane?

22           A.   He was -- he was the founder and

23  basically provided the financial expertise for the

24  -- for that board or for that group.

25           Q.   And if you had a question about

1    Firefly Lane's finances, who would your primary

2    contact be?

3                A.    That would be the Defendant.

4                Q.    Next up in the structure -- we'll

5    come back to Rypl a little bit.  Would you agree

6    that -- scratch that.

7                You described Rypl earlier as a

8    management services company.  Can you provide --

9    can you explain a little bit more about what that

10   means?

11               A.    Yeah.  Management services would

12   be services I would provide, right?  So the

13   accounting services.  You know, Chad Moldon would

14   -- had, you know, strategy.  Ryan would be product.

15   Kevin Krieg would be, you know, IT.  So those are

16   the kind of services that would be considering

17   managed services.

18               Q.    And focusing primarily on the

19   timeframe 2013 when you started, through around

20   2018, did Rypl have any major clients?

21               A.    Its clients really were Granity.

22               Q.    And who is treated as the UBO of

23   Rypl?

24               A.    UBO of Rypl is the shareholder, so

25   Chad Moldon.

Antonio Severin , Vol 1                    May 15, 2025

Page 51

1          Q.   Has the Defendant held shares?

2          A.   Yes, yes.  The Defendant being

3   Halstead Bay; so Halstead Bay owned shares.

4          Q.   What is your understanding of how

5   Halstead Bay became a shareholder in Rypl?

6          A.   My understanding was that the

7   Defendant was having issues with immigration,

8   because he was coming to Toronto a lot.  And that

9   one of the ways that, to prevent these issues at

10   the border, was for Halstead Bay to became a

11   shareholder.

12          Q.   Did he tell you that?

13          A.   I don't know if he told me that,

14   or -- yeah, I don't know exactly how that came to

15   be.  It's just -- it's kind of how -- how it

16   worked.

17          Q.   Now, I understand that you are the

18   Controller and Director of Finances of Rypl.  If

19   you had a question about Rypl's finances, though,

20   who would you turn to?

21          A.   Well, it would be -- depending on

22   the question, I'm going to ask the -- ask -- as far

23   as the finances, at that point in time I had all

24   the contact anyway so typically it would be me that

25   would answer the questions generally for Rypl.

1                 Q.    Who provided you those contacts?

2                 A.    Some of the more, like just, you

3      know, part of the -- part of osmosis of, you

4      know -- you know, kind of working that day.  Some

5      of them were provided by the Defendant as well.

6                 Q.    And what about if you had a

7      question about finances, would you turn to anyone?

8                 A.    The Defendant.

9                 Q.    Is Rypl a for-profit company?

10                A.    It is profitable, yes.

11                Q.    How does Rypl make money?

12                A.    Through its providing management

13     services to the other associated companies.

14                Q.    And can you describe the mechanics

15     of that?  In what form does that take shape?

16                A.    There's an agreement between Rypl

17     and Granity, and Granity is charged for a -- based

18     on a cost plus managed service model.  So the

19     expenses are tracked and then an invoice, a monthly

20     invoice, is sent to Granity.

21                Q.    And when you refer to "cost plus,"

22     can you say a little bit more about what that

23     actually means?

24                A.    Yeah.  Cost plus is what it costs

25     Rypl, and then there's a profit that is added on to

Antonio Severin , Vol 1                           May 15, 2025

Page 53

1   it.  So it's cost plus a profit percentage.

2               Q.   Based on your understanding, are

3   there any management agreements between Rypl and

4   Surecom?

5               A.   Yes, yes.  It was initially Rypl

6   and Surecom that was the agreement.

7               Q.   How, if at all, does the agreement

8   between Surecom and Rypl differ from the agreement

9   between Surecom and Granity?

10              A.   They are similar agreements.  But

11  the service was being consumed by Granity at a

12  certain point in time, where before it used to be

13  the services would be provided to Surecom.

14              Q.   And did those services include

15  administration and accounting?

16              A.   And management.

17              Q.   I'm looking at about the centre of

18  the page.  Are you familiar with the name

19  "Bannister Corporation"?

20              A.   Yes.

21              Q.   Based on your understanding, what

22  is the purpose of Bannister?

23              A.   It is the shareholder.  It is a

24  shareholder of -- of Firefly Lane Corporation NV.

25              Q.   And what is the Defendant's role

Page 54

1    with Bannister?

2                  A.   He is the UBO.

3                  Q.   If you had a question about the

4    business operations of Bannister, who would your

5    primary contact be?

6                  A.   It would be either the Defendant

7    or Gregory Elias, who was the director for

8    Bannister Corporation NV.

9                  Q.   Did you ever have the opportunity

10   to observe the Defendant and Mr. Elias interact?

11                 A.   There was -- interact, not many

12   times.  There might have been a -- a couple of

13   video calls.

14                 Q.   Turning now to financial matters.

15   If you had a question about the finances of

16   Bannister, who would you contact?

17                 A.   That would -- I would contact

18   Gregory Elias, United Trust.

19                 Q.   Would you ever direct those

20   questions to the Defendant?

21                 A.   No.

22                 Q.   Why not?

23                 A.   He didn't -- as far as I know, he

24   didn't have that information.  So the financial

25   statements were prepared by United Trust.

1              Q.   Moving up one, are you familiar
2    with the name Ijshuis Corporation?
3              A.   I am familiar with it, yes.
4              Q.   Based on your understanding, did
5    it provide any services?
6              A.   Not that I am aware of.
7              Q.   What is your understanding of the
8    purpose of Ijshuis?
9              A.   I'm not really sure.  It was a --
10   it was a company that's incorporated in
11   The Netherlands, and as far as I know, the UBO was
12   the Defendant.
13             Q.   And I'm going to go back a little
14   bit.  Bannister Corporation, where is Bannister
15   Corporation headquartered?
16             A.   It's incorporated in Curacao.
17             Q.   What about Firefly Lane
18   Corporation?
19             A.   It is -- Firefly Lane Corporation
20   NV is incorporated in Curacao.
21             Q.   And Surecom Corporation?
22             A.   It's incorporated in Curacao.
23             Q.   What is your understanding of who
24   the UBO of Ijshuis Corporation was?
25             A.   My understanding, it's the

Antonio Severin , Vol 1                                    May 15, 2025

Page 56

1   Defendant.

2              Q.   If you had a question about the

3   financial matters of Ijshuis, who would you turn

4   to?

5              A.   The Defendant.

6              Q.   Based on your understanding, what

7   is the purpose of Halstead Bay Holdings?

8              A.   My understanding is it's a

9   personal holding company for the Defendant.

10             Q.   Do you know where it was located?

11             A.   My understanding, it's

12   incorporated in the state of Minneapolis.

13             Q.   Do you know who the UBO of

14   Halstead Bay Holdings is?

15             A.   Yes, it's the Defendant.

16             Q.   If you had a question about the

17   business operations of Halstead Bay, who would your

18   contact be?

19             A.   It would be the Defendant.

20             Q.   What about for financial matters?

21             A.   Yeah, I wouldn't really need -- I

22   didn't have any questions.  But if -- if I did, it

23   would be the Defendant.

24             Q.   Have you ever seen a consulting or

25   a management agreement between Bannister and Rypl?

```
 1                    A.    No.

 2                    Q.    What about Bannister and Firefly

 3    Lane?

 4                    A.    No.

 5                    Q.    Bannister and Surecom?

 6                    A.    No.

 7                    Q.    Bannister and Granity

 8    Entertainment DAC?

 9                    A.    No.

10                    Q.    Bannister and Granity Media?

11                    A.    No.

12                    Q.    What about Granity Entertainment

13    Ltd.?

14                    A.    No.

15                    Q.    Have you ever seen a consulting or

16    a management agreement between Ijshuis and Rypl?

17                    A.    No.

18                    Q.    Ijshuis and Firefly Lane?

19                    A.    No.

20                    Q.    Ijshuis and Surecom?

21                    A.    No.

22                    Q.    Ijshuis and any Granity entity?

23                    A.    No.

24                    Q.    Have you ever seen a consulting or

25    a management agreement between Halstead Bay
```

1    Holdings and Rypl?

2                    A.    No.

3                    Q.    Halstead Bay Holdings and Firefly

4    Lane?

5                    A.    No.

6                    Q.    Halstead Bay Holdings and Surecom?

7                    A.    No.

8                    Q.    Halstead Bay Holdings and any

9    entity by the name "Granity"?

10                   A.    No.

11                   Q.    When you were first hired, was the

12   general structure shown in Government Exhibit 1001

13   already in place?

14                   A.    I'm not sure.  But Ijshuis itself,

15   I know of Ijshuis.  I'm not sure exactly the

16   corporation date or how it fit into the structure.

17   But everything else was, yes, in place.

18                   Q.    Are you aware of who originally

19   set this structure up?

20                   A.    My understanding, it was the

21   Board, and specifically the Defendant.

22                   Q.    And how do you know that?

23                   A.    Because those type of decisions

24   would be at the Board level.

25                   Q.    I'm going to direct your attention

Antonio Severin , Vol 1                              May 15, 2025

Page 59

1   now to the movement of money amongst the entities

2   depicted here.

3                In your role as Controller and Director

4   of Finance -- of Finances, are you currently aware

5   of Rypl -- Rypl's finances?

6                A.   Yes.

7                Q.   Its associated companies'

8   finances?

9                A.   Yes.

10               Q.   Does that include visibility into

11  the bank accounts of these entities?

12               A.   Yes.

13               Q.   The expenses of these entities?

14               A.   Yes.

15               Q.   What about any payments that are

16  made to partners of these entities?

17               A.   Specifically partners of which

18  entity -- of Rypl?

19               Q.   Of Rypl.

20               A.   Yes.

21               Q.   What about Firefly Lane?

22               A.   Yes.

23               Q.   What about Surecom?

24               A.   Yes.

25               Q.   Granity?

Antonio Severin , Vol I                    May 15, 2025

Page 60

```
 1                    A.    Yes.

 2                    Q.    Halstead Bay Holdings?

 3                    A.    No.   Payments to Halstead Bay

 4    Holdings, yes, not payments of Halstead Bay

 5    Holdings.

 6                    Q.    Between 2012 through 2018, did the

 7    Defendant ever direct Rypl to send Halstead Bay

 8    Holdings money?

 9                    A.    Yes.

10                    Q.    Did that happen once?

11                    A.    On -- there was -- there was a lot

12    of payments directed to Halstead Bay Holdings.

13                    Q.    Did Defendant ever direct payments

14    to Halstead Bay Holdings from Firefly Lane?

15                    A.    Yes.

16                    Q.    Did that happen once?

17                    A.    No.   On many occasions.

18                    Q.    Were you involved in those

19    payments?

20                    A.    No.

21                    Q.    Did you have any involvement in

22    carrying out the Defendant's instructions regarding

23    those payments?

24                    A.    Yes.

25                    Q.    Are you aware of where the money
```

1    ultimately came from that was transferred to

2    Halstead Bay Holdings?

3              A.   It would be generated from

4    operations.

5              Q.   And operations of what?

6              A.   Operations of basically Granity.

7    That would eventually make its way to Surecom,

8    which would eventually make its way to Firefly, or

9    eventually make its way to Rypl.  And so that's

10   where the funds were generated to pay all the

11   expenses of -- all the payments of Rypl and

12   Firefly.

13             Q.   And between 2013 through 2018, was

14   the website Cam4 the primary source of revenue for

15   those entities you just listed?

16             A.   Yes.

17             Q.   I'm going to ask you about some of

18   the specifics mechanics, not all.  But before, I

19   would like you to define some terms.  What is a

20   credit card processor?

21             A.   A credit card processor is an

22   entity, a licensed entity, that has been approved

23   by Visa and MasterCard to process individual credit

24   cards.

25             Q.   In this context, what does a

Antonio Severin , Vol 1                                May 15, 2025

Page 62

1   merchant mean?

2              A.   A merchant would be a Granity;

3   Granity would be a merchant.  They have the ability

4   to take credit card, you know, payments as a

5   merchant to pay for their services.

6              Q.   Is it fair to say that a merchant

7   is another word for a customer?

8              A.   You could say that.

9              Q.   And lastly, what is a settlement

10  in this context?

11             A.   A settlement would be a monetary

12  deposit that the merchant processor, the processor

13  itself, would accumulate all the various credit

14  card charges, group them together, take off their

15  fee, and then sent the merchant the remain -- the

16  remainder.

17             Q.   Are you aware of any credit card

18  processing companies that have had a relationship

19  to Cam4?

20             A.   Our credit card merchant

21  processors are -- for Granity, currently are

22  SitePay, I think it's called SitePay Merchant

23  Services; Epoch, E-P-O-C-H, Merchant Services, and

24  DialXS, D-I-A-L-X-S.

25             Q.   And whose name is listed on those

Antonio Severin , Vol 1                           May 15, 2025

Page 63

1  accounts?

2            A.   Granity.

3            Q.   And does Cam4 -- scratch that.

4            Are customers of Cam4 provided an

5  opportunity to enter their credit card information

6  on the site?

7            A.   Yes.

8            Q.   After a customer provides credit

9  card information, what happens to that transaction?

10           A.   So, depending on the merchant

11 processor where we sent that transaction, the

12 process -- let's say it's SitePay.  They track it.

13 Let's say it's $50.  And then they put it into the

14 Granity account and they have a weekly settlement;

15 they send that $50, less their fees, to Granity.

16           Q.   And would that amount be batched

17 with other payments?

18           A.   Yes, it would be like all credit

19 cards processed on a weekly basis.

20           Q.   Have you been involved in the

21 creation and maintenance of bank accounts for

22 Granity over the years?

23           A.   Yes.

24           Q.   What is your role specifically in

25 that regard?

Page 64

 1                A.   To obtain banks that would be able
 2    to settle these particular settlements.
 3                Q.   I'm going to list some banks.  I'd
 4    like you to please confirm "yes" or "no" whether
 5    Granity has ever had a banking relationship with
 6    the bank.
 7                A.   Okay.
 8                Q.   AIB Bank --
 9                A.   Yes.
10                Q.   -- in Ireland?
11                A.   Yes.
12                Q.   TDI Bank in Bulgaria?
13                A.   Yes.
14                Q.   Catella in Luxembourg?
15                A.   Yes.
16                Q.   Wirecard in Germany?
17                A.   Yes.
18                Q.   Paxum in Dominica?
19                A.   Yes.
20                Q.   Fio Banka in Czech Republic?
21                A.   Yes.
22                Q.   Are you aware of any other major
23    bank accounts that Granity has held over the years?
24                A.   Currently we have a bank called
25    Yoursafe, Yoursafe Financials, in the Netherlands,

Page 65

1    Yoursafe.  That's our main one right now.

2                    Q.   And --

3                    A.   And, also, there's -- there's

4    another one called Bioveil (ph).  They just

5    re-branded, Buy -- BuyVeil Bank (ph).  And then

6    also TrustPay Bank.

7                    Q.   Has Granity changed bank accounts

8    often?

9                    A.   Yes, it has.

10                   Q.   What's your understanding of why?

11                   A.   Since Granity operates in the

12   adult entertainment area, protocol, it is

13   considered high risk by many banks.  So there's

14   only so -- so many banks that will let the bank,

15   Granity.  And so -- and some of those banks that

16   want to bank in Granity then change their minds and

17   decide not to bank adult entertainment.  And -- and

18   that's been the case for many of the banks, that

19   they've either gotten acquired or there's been a

20   change in the type of customer that they're willing

21   to service.

22                   Q.   And can you tell us about the

23   individuals who have viewing access to Granity bank

24   accounts?

25                   A.   The viewing access would be myself

Page 66

1   and Amanda.

2               Q.   And who do you refer to when you

3   say "Amanda"?

4               A.   Amanda Zimmerman.

5               Q.   What is Ms. Zimmerman's

6   profession?

7               A.   She's the assistant controller.

8               Q.   At what company?

9               A.   For Rypl.com Inc.

10              Q.   Do you supervise her?

11              A.   Yes, I do.

12              Q.   Have you generally found her to be

13  a reliable employee?

14              A.   Yes.

15              Q.   Who has signing authority on these

16  accounts?

17              A.   The signing authority would be

18  myself, as a director, Brian Hanlon, as a director,

19  and also the UBO Lee James White.

20              [Reporter intervened for clarification

21  purposes].

22              THE WITNESS:  Lee James White.

23  BY MS. SCOTT:

24              Q.   What is the primary source of

25  deposits into Granity bank accounts?

```
 1               A.    The settlement that we discussed.

 2               Q.    What are Granity's major expenses

 3     or withdrawals that would leave the account?

 4               A.    The withdrawals -- really, the

 5     main one are the broadcaster payments.  So the

 6     broadcasters do get paid a percentage of any tips

 7     in the form of tokens that they receive, and that's

 8     tracked on site.  And then they can cash out at any

 9     time.  So that's the main one.

10               Other type of expenses are consulting

11     expenses for marketing people.  There's four or

12     five employees.  And so -- and then the marketing

13     spend itself for advertising.  There's also

14     computer technical type of services that Granity

15     pays for.

16               There's a wide range of withdrawals.

17               Q.    Okay.  I'm going to go back to

18     something you said earlier there.  You've mentioned

19     the phrase "broadcaster."  Is a broadcaster an

20     individual who would stream content over Cam4.com?

21               A.    Yes.

22               Q.    Is there ever any movement of

23     money between Granity and Rypl?

24               A.    Granity pays Rypl for the

25     management service -- the managed services that
```

1    Rypl provides to Granity.

2                Q.   And over the years, has one of

3    Granity's expenses been licence fees to Surecom?

4                A.   Yes.

5                Q.   Over the years, where has Surecom

6    banked?

7                A.   Surecom banked primarily with

8    United Bank in Curacao.  And now United Bank did

9    terminate that particular bank account because of

10   identity -- the adult entertainment nature of the

11   business.  And is now currently -- so Surecom is

12   currently banking with Yoursafe.

13               Q.   Are you aware of any banking

14   relationship between Surecom and Alexandria Bank in

15   the Cayman Islands?

16               A.   Yes.  At one time Surecom did bank

17   with Alexandria Bank in the Cayman Islands.

18               Q.   Are you aware of when Surecom's

19   banking relationship with United Bank in Curacao

20   was terminated?

21               A.   I want to say 2016, around there.

22               Q.   Who has, over the years, had

23   viewing access to Surecom's bank accounts?

24               A.   For United Bank?

25               Q.   Yes.

Page 69

1          A.    For United Bank, Amanda Zimmerman.

2    I believe that might have been it.  I'm not

3    100 percent sure.

4          Q.    What about any members affiliated

5    with United International Trust?

6          A.    Oh, yes, yes.  So, as directors,

7    they do have viewing rights for those bank

8    accounts.

9          Q.    Let's continue to focus with

10   United Bank.  Who had signing authority over those

11   accounts?

12         A.    My understanding is that, as you

13   mentioned, the directors, and at some point -- at

14   one point in time, I believe the Defendant had

15   rights, and Amanda Zimmerman has rights.

16         Q.    Are you -- what is your

17   understanding of when the Defendant may have had

18   rights to that account?

19         A.    I believe early on, but I'm not a

20   hundred percent sure on that one.

21         Q.    Can you explain any differences in

22   the viewers of Surecom's other bank accounts?  You

23   mentioned Alexandria or Yoursafe.

24         A.    Yeah, typically the viewing rights

25   for those would be with Amanda Zimmerman.

Antonio Severin , Vol 1                              May 15, 2025

Page 70

1               Q.   And signing authority as well?

2               A.   Signing authority would rest with

3    the directors, so Gregory Elias and United Trust.

4               Q.   Does that mark a difference

5    between the Surecom's bank accounts with United

6    Bank?

7               A.   Not really, no.

8               Q.   Let me rephrase that question as

9    well.

10              Did Amanda Zimmerman have signing

11   authority over the Clare's -- Yoursafe bank

12   accounts for Surecom?

13              A.   Did she have signing authority?

14              Q.   Correct.

15              A.   Yes, yes.

16              Q.   What is the primary source of

17   deposits into Surecom's bank account?

18              A.   The Surecom bank, that would

19   typically come from Granity.

20              Q.   Are you aware of Surecom's major

21   expenses or bank withdrawals?

22              A.   Yes.  Its major expense was

23   another associated company called Smart-X Net Apps,

24   which is a Romanian company, that provides all the

25   development and all the IT to -- to -- for the

Page 71

1  platform itself that is owned by Surecom.

2            Q.   Between the years 2013 and 2018,

3  are you aware of whether Surecom was generally

4  profitable?

5            A.   Yes.

6            Q.   Did residual profits remain in

7  Surecom's bank accounts?

8            A.   No.  Surecom would send those to

9  its shareholder of Surecom, which is Firefly.

10           Q.   And over the years, where has

11 Firefly banked?

12           A.   Firefly banks -- currently has

13 banks at United Bank and Yoursafe.

14           Q.   And who has viewing access to

15 those accounts?

16           A.   Amanda Zimmerman.

17           Q.   Anyone else?

18           A.   I cannot -- I have viewing rights

19 on this, on the Yoursafe account.

20           [Reporter intervened for clarification

21 purposes].

22           THE WITNESS:  On the Yoursafe account,

23 I have viewing rights.

24 BY MS. SCOTT:

25           Q.   What about any individuals

Antonio Severin , Vol 1                                    May 15, 2025

Page 72

1    associated with United International Trust?

2                    A.   And they also -- sorry -- as

3    directors, they always have viewing rights.

4                    [Reporter intervened for clarification

5    purposes].

6                    THE WITNESS:  Sorry, I'll speak louder.

7                    As directors, yes, the United Trust

8    also has viewing rights.

9    BY MS. SCOTT:

10                    Q.   Who has signing rights?

11                    A.   My understanding on the signing

12   rights is it is United Trust.

13                    Q.   Has Amanda Zimmerman ever held

14   signing rights?

15                    A.   Again, I'm not 100 percent sure.

16   I -- I assume so.

17                    Q.   What is that assumption based on?

18                    A.   Just all the -- basically, she

19   does all the transactions.  At the time anyways,

20   she was doing all of the transactions through those

21   bank accounts.

22                    Q.   Are you familiar with the process

23   in which -- that would need to be followed in order

24   to create a wire transfer out of Firefly's bank

25   account?

Page 73

1             A.   I believe, early on, Amanda could

2   go in and make the payments that were requested of

3   her to be made.

4             Q.   Did that ever change?

5             A.   We -- now we kind of send the

6   information to the directors and have them enter in

7   the information and do the transfers.

8             Q.   Focusing on a single wire

9   transaction, how many signatures, unique

10  signatures, would be required in order to move

11  money out of the account?

12            A.   One.

13            Q.   Are you aware of any time in which

14  two signatures were required?

15            A.   I don't -- I don't recall.

16            Q.   What's your understanding of the

17  primary source of deposits into Firefly bank

18  accounts?

19            A.   Those are from Surecom.

20            Q.   What about Firefly Lane's major

21  expenses or withdrawals?

22            A.   Typically, the consulting to the

23  shareholders.  Also, any advances, loans, anything

24  to do with payments to the investors.  There was

25  also a payment to one of the other individuals, a

Page 74

1    consultant, Lemona, who was a consultant.

2              Q.    Would you agree that the primary

3    expenses of Firefly Lane related to payments to its

4    shareholders over the years?

5              A.    Yes.

6              Q.    Lastly I'd like to ask you about

7    the banking relation -- banking practices of Rypl.

8              Over the years we've been discussing,

9    where has Rypl banked?

10             A.    Rypl banks at TD Bank.

11             Q.    Are you aware of any accounts it's

12   held with Royal Bank of Canada?

13             A.    Rypl has never had accounts with

14   Royal Bank of Canada.

15             Q.    What's your understanding of who

16   has viewing rights to Rypl's bank accounts?

17             A.    That would have been Amanda.

18             Q.    Anyone else?

19             A.    I have viewing rights as well,

20   yes.

21             Q.    What about signing rights?

22             A.    Signing rights, Amanda has signing

23   rights, and I believe I have, although I've never

24   -- I've never sent anything or signed -- well, I

25   did sign.  Yes, I'm a -- I'm a signer, but I've

Page 75

1   never sent any money.

2                Q.   Who handles the payables of Rypl?

3                A.   Who handles the payable of Rypl?

4                They are typically sent to Amanda.

5                Q.   And can you describe the typical

6   process of that transaction?

7                A.   Sure.  You know, the payables will

8   come from one of the -- the managers.  They

9   typically approve them, send it off to Amanda, and

10  then Amanda sends out the payment.

11               Q.   Have you ever heard Rypl be

12  referred to as a facilitation business?

13               A.   I guess it's the same thing as

14  management service business.

15               Q.   Based on your role within these

16  entities, do you know whether the Defendant was

17  ever personally responsible for opening and

18  maintaining accounts for Granity?

19               A.   For Granity, no.

20               Q.   What about for Rypl?

21               A.   For Rypl, yes.  Yes.  My

22  understanding is, on the signature card at the

23  opening with the TD Bank in 2012, he was a signer

24  on it.

25               Q.   Was his signing authority removed

1    at some point?

2               A.   I don't -- I don't believe so.

3    Maybe we did do new sign -- signatures at some

4    point in time.  So, at this point in time, he's not

5    a signer on that account.

6               Q.   Do you know whether the Defendant

7    was ever personally responsible for opening and

8    maintaining bank accounts for Firefly Lane?

9               A.   My understanding is that he was

10   the one responsible for the opening of the accounts

11   initially at United Bank.

12              Q.   As you got more established in

13   your position, did you assume a greater

14   responsibility in managing the banking

15   relationships of these companies?

16              A.   Yes, because the banks were

17   changing, so as new ones came on, usually they came

18   through some -- some contacts that I had in the

19   industry.  And so that's how that came to be.  So I

20   became much more involved in acquiring bank

21   accounts.

22              Q.   As you did work to acquire bank

23   accounts, did you keep the Defendant informed as to

24   the current banking relationships of these

25   companies?

Antonio Severin , Vol 1                          May 15, 2025

Page 77

1                    A.    Yes.

2                    Q.    From your perspective, did he seem

3     interested in that type of information?

4                    A.    Yes.

5                    Q.    What gave you that impression?

6                    A.    Well, banking was so important to

7     our business, to make sure that the -- you know,

8     that the business operated and that the funds

9     flowed, it was very important to get our

10    broadcaster paid and all of that.  So, given all of

11    the issues with our banking, he was interested in

12    obviously helping any way he could to facilitate

13    getting new bank accounts.

14                   Q.    Have you ever exchanged e-mails

15    with the Defendant about the corporate finances and

16    banking of these companies?

17                   A.    Yes.

18                   Q.    Has the Defendant ever advised you

19    over e-mail how to move money relating to Surecom?

20                   A.    Not specifically.  "Move money"

21    meaning...?

22                   Q.    Money that was held in Surecom

23    bank accounts.

24                   A.    Move them to...?  I don't

25    remember.  It might -- it might have happened, but

Antonio Severin , Vol 1                    May 15, 2025

Page 78

1    I don't remember right now.

2              Q.   I'm going to show you what's been

3    marked as Government Exhibit 24.

4              EXHIBIT NO. G-24:  E-Mail Chain from

5              D. Erickson to T. Severin, R. Burry dated

6              August 28, 2014, Re: Corporate

7              Accounts.

8    BY MS. SCOTT:

9              Q.   I'm going to zoom in on the top

10   half of the first page.  Does this appear to be a

11   true and accurate copy of an e-mail between you and

12   the Defendant regarding corporate accounts, from

13   August 28th, 2014?

14             A.   Yes.

15             Q.   I'm now going to turn to page 2

16   and I'm going to direct your attention to the

17   bottom half of this e-mail.

18             At the top there's an e-mail dated

19   August 23rd, 2014.  I read the "from" line as

20   "TransferWise support."  Are you familiar with what

21   TransferWise is?

22             A.   TransferWise is a fintech.  I

23   think they now go by the name of "Wise".

24             Q.   Can you please explain what a

25   "fintech" is?

Antonio Severin , Vol 1                     May 15, 2025

Page 79

1                    A.   Oh, it's like a bank but not as

2       heavily regulated as a bank.  More --- more like an

3       internet bank.

4                    Q.   Can you please describe what is

5       going on in these e-mails that are on the screen?

6                    A.   So, looks like Sandra Linnasmagi

7       from TransferWise is responding to Dave's request

8       for a corporate account.

9                    Q.   And I'm now going to draw your --

10      your attention to the top half of page 2.  I'm

11      going to go to the very bottom page of 1 first.  At

12      the bottom of this, who appears as the sender of

13      this e-mail, timestamp 2:00 p.m.?

14                   A.   The Defendant.

15                   Q.   And returning to page 2, what did

16      the Defendant state in this e-mail?

17                   A.   He says:

18                        "Thanks!  I have copied Tony

19                        Severin here who can provide you the

20                        business details.  Do you have a

21                        listing of all the countries and

22                        currencies that you offer?"

23                   Q.   After the Defendant provided you

24      as a point of contact to TransferWise, how did you

25      respond?

1              A.    I asked for which companies.

2              Q.    And for which companies relating

3    to who would hold the account?

4              A.    Correct.

5              Q.    And how did Dave Erickson, the

6    Defendant, respond?

7              A.    And the Defendant responded with

8    Surecom.

9              Q.    I'm going to zoom back in in the

10   middle of this first page.  This appears to be an

11   e-mail sent from you, and on the second full

12   sentence, it states:

13                   "We would need Gregory to sign

14              the contract."

15              Did I read that correctly?

16              A.    Yes.

17              Q.    Who is "Gregory" referring to?

18              A.    Gregory Elias of United Trust.

19              Q.    To your knowledge, did Mr. Elias's

20   role as managing director include the

21   responsibility to act on shareholders'

22   instructions?

23              A.    Yes.

24              Q.    Are you aware of any instances in

25   which, when prompted, Mr. Elias refused to sign

Page 81

1    paperwork?

2                  MR. MAUZY:  Objection, lack of personal

3    knowledge.

4    BY MS. SCOTT:

5                  Q.   You may answer.

6                  A.   Not that I'm aware of.

7                  EXHIBIT NO. G-26:  E-Mail Chain from

8                  D. Erickson to T. Severin, R. Burry

9                  dated June 14, 2017, Re: Contact

10                 Details.

11   BY MS. SCOTT:

12                 Q.   I am now going to show you what

13   has been marked as Government Exhibit G-26.

14                 Does this appear to be -- I will zoom

15   in on this header information at the top of the

16   page.  Does this appear to be a true and accurate

17   copy of an e-mail between you and the Defendant

18   regarding the ownership of Rypl, from June 14th of

19   2017?

20                 A.   Yes.

21                 Q.   I'm going to highlight in section

22   -- one moment.

23                 Can you please read for me the

24   highlighted section in the middle of this page?

25                 A.   Yes.

Antonio Severin , Vol 1                                    May 15, 2025

                                                        Page 82

 1                  "Hi Dave, I wanted to talk to
 2              you about the share ownership of
 3              Rypl.  Anytime Rypl applies for bank
 4              accounts, Amex credit cards or
 5              exchange rate service like the one
 6              below, they always ask for,
 7                  1. Articles of incorporation that
 8              clearly indicate information as to
 9              beneficial owners with 25% or more
10              ownership."
11          Q.    Who wrote this?
12          A.    I did.
13          Q.    Based on this situation, did you
14   have a proposal for the Defendant?
15          A.    Yes.
16          Q.    Can you describe what that
17   proposal was?
18          A.    The proposal would mean -- would
19   basically, because it would be difficult,
20   especially on the Firefly side, getting all eight
21   shareholders in this situation to come to Toronto
22   to the bank branch to sign for the account, my
23   proposal was for Firefly and for Halstead Bay to
24   have reduced -- to have ownership reduced to less
25   than 25 percent.

1          Q.   And how did the Defendant respond?

2          A.   I think he was -- yeah, he was

3     obviously -- he liked the idea.

4          Q.   And why did you go to the

5     Defendant with this proposal?

6          A.   Because, you know, the Defendant

7     was the finance person and I thought it would be

8     good to hear the -- to hear the actual information

9     regarding how bank accounts require.

10         Q.   Is there any reason why you didn't

11    take it to the Board for Firefly Lane?

12         A.   I always took it to Dave.  There

13    was no really situation where there was a board

14    that I could take it to.

15         Q.   Did you need to ask for

16    Mr. Moldon's approval as the majority shareholder

17    before bringing a proposal like this to the

18    Defendant?

19         A.   No.

20         Q.   What's your understanding of why

21    not?

22         A.   Because Defendant really was

23    running most of the information, or we got most of

24    our advice on financials from the Defendant.

25         Q.   You have testified that the

Antonio Severin , Vol 1                         May 15, 2025

Page 84

1    Defendant was responsible for financial oversight

2    of these companies.  In that role, did he have any

3    involvement in communicating the financial

4    condition to Firefly Lane's shareholders?

5                    A.    Yes.

6                    Q.    Can you describe that role?

7                    A.    The -- what the Defendant would do

8    as far as providing the information?

9                    Q.    Yes, please.

10                   A.    So they would have a monthly

11   meeting.  I was not part of that meeting.  They

12   refer to it as the OMM meeting, old man meeting.

13   And my understanding was that financials that I

14   would have sent out would be discussed at that

15   meeting, and questions would be asked of Dave in

16   regards to any financials at that monthly meeting,

17   at the Board meeting.

18                   MS. SCOTT:  I -- a brief question:  Is

19   everyone still okay?  Does anyone need a break?

20   Yes.

21                   Mr. Reporter, reporter, can we please

22   take a brief moment off the record.

23                   THE VIDEOGRAPHER:  Okay.  One moment,

24   please.

25                   This marks the end of media one, and

Page 85

1    we're going off the record at 2.30 p.m.

2              -- RECESS TAKEN AT 2:30 P.M. --

3              -- UPON RESUMING AT 2:40 P.M. --

4              THE VIDEOGRAPHER:  This marks the

5    beginning of media number two and we're back on the

6    record at 2:40 p.m.  Go ahead, Counsel.

7              MS. SCOTT:  Thank you.

8    BY MS. SCOTT:

9              Q.   Mr. Severin, I'm now going to -- I

10   will take one step back.

11             Before we took a break, you testified

12   that the Defendant had some responsibility in

13   communicating the finances of the companies to the

14   Firefly Lane shareholders; is that correct?

15             A.   Correct.

16             Q.   Would he distribute such

17   information over e-mail?

18             A.   At one point in time, he was, but

19   when I started distributing, I would distribute the

20   monthly report to the shareholders, and then my

21   understanding was that they would discuss it at

22   their monthly call.

23             Q.   I'm now going to show you what's

24   been marked as Government Exhibit G-21.

25             EXHIBIT NO. G-21:  E-Mail Chain from

Page 86

```
 1              D. Erickson to T. Severin, et al, dated

 2              July 28, 2014, Re: Material for

 3              Meeting.

 4     BY MS. SCOTT:

 5              Q.   Does this appear to be a true and

 6     accurate copy of an e-mail between you and the

 7     Defendant from July 28th of 2014?

 8              A.   Yes.

 9              Q.   I want to blow up the middle of

10     this page.

11              At the top of the highlighted section,

12     it says Dave Erickson is sending an e-mail at

13     July 26, 2014, at 4:14 p.m.

14              Would you agree with that statement?

15              A.   Yes.

16              Q.   Can you -- can you please read for

17     me the highlighted text at the beginning of this

18     portion?

19              A.   "I feel that some of this

20              material is inappropriate for staff

21              members.  Particularly the

22              cash/debt/etc portions."

23                   "In the future, I would like us

24              all to review every page before we

25              send it out as a mass mailing."
```

Antonio Severin , Vol 1                    May 15, 2025

Page 87

```
 1                Q.   Are you aware of what the
 2      Defendant is referring to here when he says
 3      "material"?
 4                A.   I cannot remember on this one.
 5                Q.   Would you agree that the material
 6      discussed the cash and debt --
 7                MR. MAUZY:  Objection as leading, asked
 8      and answered.
 9                MS. SCOTT:  I'll rephrase.
10      BY MS. SCOTT:
11                Q.   Mr. Severin, can you please reread
12      the second sentence of this e-mail?
13                A.   The highlighted portion?
14                Q.   Yes, please.
15                A.   Yeah.
16                     "Particularly the cash/debt/etc
17                portions."
18                Q.   Based on your familiarity with the
19      Defendant, did he bear any responsibility in
20      tracking the cash reserves of the Firefly Group?
21                A.   At that time, yes.
22                Q.   Did he have any responsibility in
23      tracking the debts of the company?
24                A.   I believe the shareholder, if
25      there was any shareholder debt or perceived
```

Antonio Severin , Vol 1                           May 15, 2025

Page 88

1    shareholder debt, yes.

2                Q.   I'm highlighting a section closer

3    to the top.  Did you respond to that e-mail?

4                A.   Yes.

5                Q.   And how did you respond?

6                A.   I wrote:

7                     "This is a good point.  My

8                     perspective was that I was

9                     presenting this to the partners only

10                    plus directors."

11               Q.   Who do you refer to when you say

12   "directors"?

13               A.   I believe the directors would be

14   Gregory Elias.

15               Q.   And would you generally defer to

16   the Defendant's decision-making on a topic like

17   this?

18               A.   Definitely, yes.

19               Q.   Can you explain why?

20               A.   Well, I didn't want sensitive

21   information going to other parties within the

22   company in, you know, that -- that the Defendant

23   didn't want me to send it to.

24               Q.   Based on your role, do you know

25   whether Firefly Lane was generally profitable in

Page 89

1    the years of 2013 through 2018?

2              A.   Yes.

3              Q.   In relation to that time period,

4    did you ever discuss budgetary matters pertaining

5    to the company with the Defendant?

6              A.   Yes.

7              Q.   Did you ever discuss potential

8    avenues to cut business expenses with the

9    Defendant?

10             A.   There was times when there was --

11   it was necessary to do some cost cutting or, you

12   know, get cost efficiencies.

13             Q.   I am now showing you what's been

14   marked as Government Exhibit G-27.

15             EXHIBIT NO. G-27:  E-mail Chain between

16             T. Severin, D. Erickson and Mr. Moldon,

17             dated February 20, 2014.

18             BY MS. SCOTT:

19             Q.   Does this appear to be a true and

20   accurate copy of an e-mail between you, the

21   Defendant, and Mr. Moldon, from February 20th of

22   2014?

23             A.   Yes.

24             Q.   Who sent this e-mail?

25             A.   The Defendant.

1                    Q.   And I'm going to zoom in on the

2      centre of the page.  Can you please read the

3      highlighted portion?

4                    A.   Yes.

5                         "As a first step I would like

6                    you to sit with Tony and come up

7                    with a big list of cost cuts for

8                    discussion at the old guy meeting on

9                    February 27th.

10                        "Secondly, I would like you to

11                   provide as much assistance and

12                   urgency as you can in order to

13                   support the budgeting effort."

14                   [as read].

15                   Q.   What is your understanding of

16     which company the Defendant is referring to when

17     discussing the budget?

18                   A.   This would have been all the

19     companies.

20                   Q.   I -- I'm now showing you what's

21     been marked as Government Exhibit G-29.  I'll zoom

22     in on this header for you.

23                   EXHIBIT NO. G-29:  E-Mail Chain from

24                   D. Erickson to T. Severin dated May 29,

25                   2014, Re: Partner Payments.

Antonio Severin , Vol 1                    May 15, 2025

Page 91

1  BY MS. SCOTT:

2           Q.   Does this appear to be a true and

3  accurate copy of an e-mail between you and the

4  Defendant on May 29th of 2014 about partner

5  payments?

6           A.   Yes, it does.

7           Q.   Who sent this e-mail?

8           A.   The Defendant.

9           Q.   I'm now going to direct your

10 attention to the bottom half of page 2.  Who sent

11 this e-mail?

12          A.   I did.

13          Q.   Can you please describe what

14 you're referring to in this e-mail?

15          A.   I'm referring to presentation of

16 -- of the financial results.

17          Q.   Did that relate specifically to

18 payments to partners?

19          A.   That was a component of the

20 expenses that related to payment to partners.

21          Q.   What was your goal in collecting

22 this data?

23          A.   Just to identify how much of the

24 expenses went to shareholders.

25          Q.   Can you describe, if any, business

Page 92

1   interests that Rypl had in determining the

2   profitability of Cam4 before partner payments were

3   made?

4              A.   That was some that I discussed

5   because basically, from my background, I would do

6   up the financial results based on operating

7   profits, which would be before payments to

8   shareholders, items like that.  And that would

9   reflect on the management of the company; me being

10  a manager, that would be something I would want to

11  be held accountable for.

12             Q.   I'm now going to return to page 2,

13  and I'm highlighting that top e-mail that you have

14  already discussed that the Defendant sent.

15             A.   Uhm-hmm.

16             Q.   What was the Defendant's reaction

17  to your attempt to calculate the amount of partner

18  payments in 2014?

19             A.   That -- well, it sounded to me

20  like they had -- they had kind of looked into this

21  in the past and it was not -- it was not thought of

22  well at the partner level.

23             Q.   And when you refer to "they," it

24  had come up for them in the past, who are you

25  referring to?

Antonio Severin, Vol 1                    May 15, 2025

Page 93

```
 1                    A.    The Board.

 2                    Q.    Of Firefly Lane?

 3                    A.    Correct.

 4                    Q.    Can you please read the

 5   highlighted portion?

 6                    A.    Yeah.

 7                          "I have had many discussions

 8                    over the years about 'normalizing'

 9                    the expenses.  They tend to the

10                    political and have no useful

11                    application that I have ever seen,

12                    unless one is planning on selling

13                    the business and wants to up the

14                    bottom line."

15                    Q.    And the second section that I

16   highlighted later in the e-mail?

17                    A.    "I can tell you after the

18                    partner meetings we have had that

19                    there is no impetus for cutting

20                    partner compensation and as such,

21                    these 'partner payments' are indeed

22                    payroll costs and not distributions

23                    of profit."

24                    Q.    Did you -- at the time, did you

25   agree with that statement?
```

Page 94

1              A.   I didn't really think of it as

2    leaning to.  I just -- that's -- that's what the

3    decision was, so...  I didn't move forward with the

4    -- changing the financials.

5              Q.   Did you defer to the Defendant

6    when it came to partner payments?

7              A.   Yes.

8              Q.   Based on your experience, though,

9    as Controller and Director of Finances, what did

10   you agree that the partner payments you had

11   identified were in fact payroll costs?

12             A.   It wasn't a matter of payroll

13   costs.  To me, it was more of a matter of what we

14   would hold our management accountable for, the

15   numbers they would be accountable for, so...  And I

16   think the Defendant was more interested as far as

17   the cash component of it all.  So he did want to

18   see the -- the partner -- the shareholder payments

19   there.

20             Q.   Okay.  In your estimation, would

21   the partner payments reflect operational costs?

22             A.   Some of them would and some of

23   them wouldn't.  If they were active in the business

24   and paid a competitive rate, then I would consider

25   those as operational expenses.

1              Q.    Could you control the cost of
2    partner payments?
3              A.    No.
4              Q.    Who was in control of costs for
5    partner payments?
6              A.    That is the Defendant.
7              Q.    From your role as controller of
8    Rypl, did you ever get the impression that Firefly
9    Lane partners prioritized their own payments over
10   the interest of the company?
11             A.    I wouldn't say over the interest
12   of the company.  If the company did well -- they
13   were very interested in the company doing well so
14   that they could increase their shareholder
15   distributions.
16             Q.    From your view, did the partners
17   seem interested in the payments that they were
18   receiving?
19             A.    They were very interested in the
20   payments they were receiving, correct.
21             Q.    Over time, did the payments to
22   shareholders increase or decrease?
23             A.    They increased.
24             Q.    I am now going to show you what's
25   been marked as Government Exhibit G-28.  I'm going

Page 96

1   to highlight the header.

2                EXHIBIT NO. G-28:  E-Mail from T. Severin

3                to D. Erickson dated October 7, 2015.

4   BY MS. SCOTT:

5                Q.   What is the subject line of this

6   e-mail?

7                A.   The subject line is "MOM report."

8                Q.   Does that refer to the

9   month-over-month report you described earlier?

10               A.   It does, yes.

11               Q.   Who sent this e-mail?

12               A.   I did.

13               Q.   To whom?

14               A.   To the Defendant.

15               Q.   Does this appear to be a true and

16   accurate copy of the e-mail between the two of you

17   from October 7th of 2015?

18               A.   Yes.

19               Q.   I'm going to back out of this

20   section and highlight a later section.

21               Later in this thread, who is sending

22   this e-mail?

23               A.   The Defendant.

24               Q.   Can you please read the final two

25   sentences, which I have highlighted.

1                    A.    "Our biggest manageable

2                          expenses are Media 600k, Performers

3                          100k and Wages/Consulting 800k.

4                          That's $1.5 million per month in

5                          total on line -- in total on 3 line

6                          items."

7                    Q.    Based on your understanding, which

8       entity is the Defendant referring to in regard to

9       these expenses?

10                   A.    All of them.

11                   Q.    You stated that the Defendant was

12      describing manageable expenses.  What is your

13      understanding of his use of the word "manageable"?

14                   A.    Basically non-partner payout

15      expenses.

16                   Q.    How did you respond?

17                   A.    I just corrected him on the

18      manageable portion of the wages and consulting.

19                   Q.    At this time, was there an effort

20      to reduce manageable expenses?

21                   A.    Yes, there was.

22                   Q.    Was there any appetite in 2015 to

23      reduce partner expenses?

24                   A.    No.

25                   Q.    I'd like to focus a little bit in

1    on those partner payments now.

2              A.    Uhm-hmm.

3              Q.    When you were first getting

4    started with Rypl, how involved were you in making

5    partner payments to Firefly Lane shareholders?

6              A.    I was not involved.

7              Q.    Based on your understanding, who

8    was making those calls?

9              A.    That would be Amanda would

10   actually physically make the -- the payments, based

11   on notifications, e-mails, that she would receive

12   from the Defendant.

13             Q.    From what you have seen, did the

14   Defendant make determinations about payments to all

15   Firefly Lane shareholders?

16             A.    That was my understanding, but

17   probably in consultation with those board members,

18   but my understanding is that he was the major

19   decisionmaker on that.

20             Q.    Did you ever observe Ms. Zimmerman

21   deny a request made by the Defendant to pay a

22   Firefly Lane partner?

23             A.    No.

24             Q.    Between the years of 2013 and

25   2018, did the Firefly Lane partners consistently

Antonio Severin , Vol I                          May 15, 2025

Page 99

1   receive payments from the companies?

2              A.   Yes.

3              Q.   In general, how were those partner

4   payments tracked for accounting purposes?

5              A.   They were entered into the

6   accounting system and tracked as payments that way.

7              Q.   And what type of information would

8   be entered into the accounting system?

9              A.   It would be just a general

10  description, I believe based on maybe an e-mail

11  that the Defendant would have sent Amanda, and then

12  she would put -- enter something in description.

13             Q.   Would the amount be captured of

14  the payment?

15             A.   In the tracking of the -- on the

16  accounting system?  Yes.

17             Q.   What about the payor of the

18  expense?

19             A.   Yes.

20             Q.   The beneficiary of the expense?

21             A.   The beneficiary would be the

22  payee.

23             Q.   And would that information be

24  captured in the accounting?

25             A.   Yes.  There's -- typically would

Antonio Severin, Vol I                    May 15, 2025

                                        Page 100

1    be a vendor I.D. that would be set up, and that

2    would indicate which vendor was paid.

3              Q.   And who was responsible for

4    inputting that information?

5              A.   At that point in time, it was

6    Amanda Zimmerman.

7              Q.   Have you ever had involvement in

8    inputting that information into the accounting

9    software?

10             A.   About the partner payments, not

11   really, no, no.

12             Q.   Were there anyone other than

13   Ms. Zimmerman who was responsible for inputting

14   that data?

15             A.   Now we use kind of an external

16   source to enter that information.  So we use a --

17   an outsource company out of -- out of India to

18   enter all the payables information.

19             Q.   Do you recall when that changed?

20             A.   It would have been maybe about six

21   years ago.

22             Q.   How, if at all, was the Defendant

23   involved in accounting for partner payments?

24             A.   He would send Amanda, at that

25   point in time, the information on the amount of the

Antonio Severin, Vol I                    May 15, 2025

Page 101

1    payment, who to be paid, and what they were for.

2                    Q.    Did Firefly Lane ever make

3    payments to its partners related to their

4    individual tax bills?

5                    A.    There was payments indicated as

6    tax installments that were made.

7                    Q.    What was the purpose of those

8    payments?

9                    A.    My understanding was that the

10   partners had agreed that they would get a net

11   consulting amount paid to them that would be --

12   that would be -- so, if the amount was 30,000 that

13   they would receive net, but based on the country

14   that they were working in, that could mean, you

15   know, an additional amount in taxes.  So, it might

16   be, you know, if they were getting 30,000 in the

17   U.S., in a month, net, that would have been, you

18   know -- could have been a gross amount of 45,000 or

19   whatever.  And that's what the -- kind of the

20   top-up, so the company would pay 45,000 so they

21   could net 30,000.  That was the objective.

22                    Q.    Were you ever personally

23   responsible for executing payments to Firefly Lane

24   shareholders related to tax payments?

25                    A.    No.

Antonio Severin, Vol I                          May 15, 2025

Page 102

1              Q.   Who would be involved in that?

2              A.   That was the Defendant.

3              Q.   Could you describe what his role

4    was?

5              A.   He would just send the

6    notification.  I remember at one point in time it

7    was in the form of a -- because the tax laws

8    changed in the U.S. at some point in time, and he

9    sent a spreadsheet, and on that spreadsheet was a

10   list of the payments for taxes that would be paid

11   to Halstead Bay.

12             Q.   And was Ms. Zimmerman responsible

13   for making those payments?

14             A.   Yes, she was.

15             Q.   From what you could see, did

16   Ms. Zimmerman faithfully follow the Defendant's

17   instructions?

18             A.   Yes.

19             Q.   Is there any situation in which a

20   partner -- or a payment to a partner for the

21   purpose of paying taxes would be coded as a loan to

22   the shareholder?

23             A.   I don't believe so, no.

24             Q.   Between the years 2013 and 2018,

25   did the Firefly Lane partners consistently receive

Antonio Severin, Vol I                                    May 15, 2025

Page 103

1    consulting payments?

2                A.    From, sorry, what year?

3                Q.    2013 to 2018.

4                A.    Yes.

5                Q.    Did that include Mr. Rodenburg?

6                A.    Yes.

7                Q.    Mr. Burry?

8                A.    Yes.

9                Q.    Mr. van der Poel?

10               A.    Yes.

11               Q.    The Defendant?

12               A.    Yes.

13               Q.    From your perspective, were there

14   any differences in how the shareholders' consulting

15   fees were processed?

16               A.    For the consulting?

17               Q.    Yes.

18               A.    During that time, no.

19               Q.    Around this time, how much was the

20   consulting fee?

21               A.    It was 30,000 plus some incidental

22   type of cost, like a car allowance, things like

23   that.

24               Q.    And to your knowledge, who set

25   that consulting fee amount?

Page 104

1              A.   My understanding was that it was

2    set at the Board level.

3              Q.   Was it general practice for an

4    invoice to be sent to Firefly Lane before any such

5    consulting payments were made?

6              A.   No, they were pretty standard.

7              Q.   And you -- you testified that the

8    Defendant was one shareholder who received those

9    consulting payments.  Would you consider those fees

10   as in exchange for services that were performed by

11   the shareholders?

12             A.   Yes.

13             Q.   Focusing on the Defendant in

14   particular, how would -- scratch that.  One

15   question first.

16             Who was responsible for making the

17   actual consulting payments out to shareholders?

18             A.   That would be Amanda Zimmerman.

19             Q.   Are you aware of how Ms. Zimmerman

20   knew what bank account to transfer those payments

21   to?

22             A.   I think the individual shareholder

23   would communicate that to her.

24             Q.   You explained that the consulting

25   fee was typically around 30,000 plus incidentals.

Antonio Severin , Vol I                                    May 15, 2025

                                              Page 105

1    Did that amount ever increase for the Defendant?

2                   A.    Yes.

3                   Q.    Who informed you that it

4    increased?

5                   A.    The Defendant.

6                   Q.    When you received that request,

7    did you feel that you had the authority to tell him

8    no?

9                   A.    No.

10                  Q.    I'm going to show you what's been

11   marked as Government Exhibit G-30, and I'm going to

12   zoom in the text at the top of this page.

13                  EXHIBIT NO. G-30:  E-Mail from

14                  D. Erickson to A. Zimmerman, et al,

15                  dated May 15, 2017, Re: New Monthly

16                  Wire.

17                  BY MS. SCOTT:

18                  Q.    Does this appear to be a true and

19   accurate copy of an e-mail that you received from

20   the Defendant, along with Ms. Zimmerman, on

21   May 15th of 2017?

22                  A.    Yes.

23                  Q.    Can you please read the first

24   complete sentence which I have highlighted in the

25   body of the e-mail?

Antonio Severin, Vol 1                                      May 15, 2025

Page 106

```
 1              A.   "Effective with the wire sent out
 2    the end of the" -- of -- sorry.
 3                   "Effective with the wire sent
 4              out the end of this month for June,
 5              and going forward, you will need to
 6              send the following amount."
 7              Q.   And what's the last full sentence?
 8              A.   "The amount and coding are
 9              attached."
10              Q.   Did the Defendant send you a
11    document along with this e-mail?
12              A.   If I remember correctly, yes.
13              Q.   According to this exhibit, what is
14    the title of that document?
15              A.   "Halstead - New Monthly Wire
16              060117."
17              Q.   Okay.  I am now going to show you
18    what is marked as Government -- what I have marked
19    for identification as Government Exhibit G-31.
20                   For the record, this record does not
21    currently have an exhibit sticker attached to it.
22                   EXHIBIT NO. G-31:  New Monthly Wire
23                   Effective June 1, 2017.
24    BY MS. SCOTT:
25              Q.   Mr. Severin, can you -- can you
```

Antonio Severin, Vol I                                May 15, 2025

Page 107

1    read this?

2                A.    Yes.

3                Q.    What does this document appear to

4    be?

5                A.    It is a breakdown of --

6                MR. MAUZY:  I'm sorry, what -- we don't

7    have an exhibit number?

8                MS. SCOTT:  It's G- 31.

9                MR. BOURGET:  We don't have a sticker.

10   BY MS. SCOTT:

11               Q.    Pardon me, Mr. Severin, what does

12   this document appear to be?

13               A.    This is -- it is a breakdown of

14   the $58,650 request.

15               Q.    Are you aware of who created this

16   document?

17               A.    Yes, the Defendant.

18               Q.    Does this appear to be a true and

19   accurate copy of the monthly wire instructions that

20   the Defendant sent you in that previous exhibit I

21   showed you?

22               A.    Yes.

23               Q.    Who is making the coding

24   decisions, according to this record?

25               A.    This is -- this spreadsheet is

Antonio Severin, Vol I                                    May 15, 2025

Page 108

1    from the Defendant.  So he's providing the

2    information.

3              Q.   In the middle of this chart,

4    roughly, there's a line that reads under the "Item"

5    column, "Dividend Advance."  Can you please read

6    the amount next to that section?

7              A.   Yes.  It's 20,000.

8              Q.   And how did the Defendant direct

9    that that payment be coded?

10             A.   As a loan to shareholder.

11             Q.   Do you know what that payment is

12   for?

13             A.   Specifically for?  No, I don't.

14             Q.   Some of these other line items

15   direct that the payment be coded to "Firefly -

16   Facilitation."  What does that mean?

17             A.   This would be -- so, the way that

18   the reporting was set up, there would be, like,

19   management type of expenses which would be

20   classified as facilitation, versus product type of

21   expenses that would be coded to the actual SBU.

22             Q.   I am now going to show you what's

23   been marked as Government Exhibit G-32.

24             EXHIBIT NO. G-32:  E-Mail dated

25             D. Erickson to T. Severin dated July

Antonio Severin , Vol I                    May 15, 2025

Page 109

1              24, 2019, Re: Change in monthly payment.

2     BY MS. SCOTT:

3              Q.   And I'm first going to direct your

4     attention to page 2, and blow up the top portion.

5              Does this appear to be a true and

6     accurate copy -- pardon me.  I'm going to go back

7     to page 1.

8              A.   Okay.

9              Q.   And focus at the very bottom.  Can

10    you please read the name that appears next to the

11    "From" line?

12             A.   "From: Dave Erickson."

13             Q.   I will now turn to page 2 and

14    highlight the remainder.

15             When was this e-mail sent?

16             A.   On July 18th, 2019.

17             Q.   To whom was it sent?

18             A.   To me.

19             Q.   And what is the Defendant

20    instructing in this e-mail?

21             A.   It indicates that:

22                  "[...] stop paying the $6,600

23                  per month to the bank and instead

24                  add that amount to my monthly

25                  Consulting wire.  Coding remains the

Antonio Severin , Vol I                          May 15, 2025

Page 110

1                    same.  I also need you to start

2                    sending the monthly tax deposit per

3                    the spreadsheet.  Next month." [As read]

4            Q.    Earlier you referred to a record

5    you recalled receiving from the Defendant related

6    to tax payments.  Does this sound familiar to you?

7            A.    Yes.

8            Q.    When you received this e-mail, did

9    you feel that you had the authority to code the

10   payment differently than instructed?

11           A.    No.

12           Q.    Why not?

13           A.    Because it was coming from the

14   Board and the Defendant was a financial guy on the

15   Board.  And this was concerning partner payments.

16           Q.    I would now like to talk about a

17   different form of partner payments.

18                    Between the years 2013 and 2018, are

19   you aware of whether Firefly Lane paid for credit

20   card bills related to the partners?

21           A.    Yes.

22           Q.    Did Firefly Lane pay for credit

23   card bills related to Mr. Rodenburg?

24           A.    Yes.

25           Q.    Mr. Burry?

Antonio Severin , Vol I                                    May 15, 2025

Page 111

1                    A.   Not Mr. Burry, no.

2                    Q.   Mr. van der Poel?

3                    A.   Yes.

4                    Q.   And the Defendant?

5                    A.   Yes.

6                    Q.   Was the purpose of those payments

7    to repay any business expenses that may have been

8    incurred by the respective shareholder?

9                    A.   The purpose of the credit card was

10   to, yes, to pay business expenses of the company.

11                   Q.   Did Firefly Lane issue a credit

12   card to Mr. Rodenburg?

13                   A.   Yes.

14                   Q.   To Mr. van der Poel?

15                   A.   Yes.

16                   Q.   To the Defendant?

17                   A.   There was no Firefly credit card

18   for the Defendant.

19                   Q.   Did Rypl issue a credit card in

20   the name of Mr. Rodenburg?

21                   A.   No.

22                   Q.   Mr. Burry?

23                   A.   No.

24                   Q.   Mr. van der Poel?

25                   A.   No.

Page 112

1          Q.   The Defendant?

2          A.   No.

3          Q.   Was there any associated company

4    with Firefly Lane that had issued a credit card to

5    the Defendant in his name?

6          A.   No.

7          Q.   What credit card, based on your

8    understanding, was Firefly Lane making

9    reimbursements to him for?

10         A.   He mentioned Amex.  So I assume it

11   was an Amex, and I assume it's his personal Amex.

12         Q.   Is it your understanding that

13   business and personal expenses may be made on the

14   Defendant's credit card in particular?

15         A.   Yes.

16         Q.   What about for the other

17   shareholders that you mentioned have Firefly Lane

18   credit cards, would it be unusual for them to pay

19   for a personal expense on the Firefly Lane credit

20   card?

21         A.   Not unusual.  They did it, yeah.

22         Q.   Was there any -- referring

23   specifically to the Firefly Lane issued credit

24   cards --

25         A.   Uhm-hmm.

Page 113

1          Q.   -- how were business expenses

2     treated relative to any personal expense that might

3     be paid?

4          A.   Personal expenses were tracked as

5     shareholder -- shareholder amounts.

6          Q.   And would those amounts be

7     reimbursed?

8          A.   Yes.

9          Q.   What about any personal expenses

10    that were made?

11         A.   Sorry.  Backtrack.

12              So the personal expenses were tracked

13    as shareholder loans, yeah, shareholder amounts.

14         Q.   Did you say "shareholder loans"

15    first?

16         A.   Yeah, I think they were -- they

17    were more triggered as shareholder advances

18    basically, yeah, shareholder amounts.

19         Q.   Would those amounts need to be

20    repaid?

21         A.   They would be reimbursed, correct,

22    yeah.

23         Q.   The personal expenses would be

24    reimbursed; what do you mean by that?

25         A.   They would typically be deducted

Antonio Severin, Vol I                                              May 15, 2025

Page 114

1    from either -- you know, some partner payment.

2                  Q.   Did you have any visibility into

3    the credit card statements belonging to or

4    associated with Mr. Rodenburg's Firefly Lane credit

5    card?

6                  A.   Yes, we would get a copy of the

7    statement.

8                  Q.   What Mr. van der Poel's Firefly

9    Lane credit card?

10                 A.   Yes, we would get a copy of the

11   statement.

12                 Q.   Did you have viewing authority to

13   the credit card statements related to the

14   Defendant's Amex?

15                 A.   No.

16                 Q.   Are you aware of whether the

17   Defendant was ever asked to provide credit card

18   statements?

19                 A.   We did ask for receipts, yes.

20                 Q.   Did he ever provide them?

21                 A.   We never received any receipts,

22   no.

23                 Q.   From what bank account, if you

24   know, were the Defendant's credit card expenses

25   paid from, typically?

Antonio Severin, Vol I                                    May 15, 2025

Page 115

1              A.    Typically, it would be paid during

2     this time from Rypl.  So the Rypl USD bank account.

3              Q.    How did Rypl know how much money

4     to send the Defendant to pay for his credit card

5     statement?

6              A.    The Defendant would send an amount

7     on a monthly basis.

8              Q.    Who was responsible for

9     determining which expenses incurred by the

10    Defendant were business-related and which were

11    personal?

12             A.    The Defendant.

13             Q.    Did he provide any type of

14    documentation accounting for those determinations?

15             A.    He would send a spreadsheet.

16             Q.    From your perspective, were there

17    any differences in how Firefly Lane shareholders'

18    credit card payments were treated?

19             A.    They were just -- they were just

20    treated differently, just because the -- part of it

21    was the amount, because the Firefly credit cards

22    did have credit limits on them, whereas the

23    Defendant's Amex was -- I guess didn't have --

24    Amex, I guess, don't have credit limits, so the

25    amounts of the reimbursements were quite large in

Antonio Severin, Vol I                                    May 15, 2025

Page 116

1    some months.

2                Q.   I'll ask you to continue to speak

3    up, Mr. Severin.

4                A.   Okay, sure.

5                Q.   In general, were the amounts of

6    the Defendant's monthly credit card payments higher

7    than that of Mr. Rodenburg?

8                A.   Yes.

9                Q.   Higher than that of Mr. van der

10   Poel?

11               A.   Yes.

12               Q.   And you mentioned earlier that any

13   personal expenses that might be incurred on one of

14   these credit cards would be accounted for as a

15   loan; is that correct?

16               A.   As a shareholder amount, yes.  Due

17   from -- on the books, I think it was called "due

18   from shareholder."

19               Q.   And who was responsible for

20   inputting that information into the books?

21               A.   We would enter it into the

22   accounting system.

23               Q.   Who is "we"?

24               A.   Typically, at one point in time,

25   it was Amanda, and then, like I said, we outsourced

Antonio Severin, Vol I                    May 15, 2025

Page 117

1   a lot of the inputting the entries to a company in

2   India.

3            Q.   And for the Defendant, where would

4   that information come from that was eventually

5   inputted into the accounting system?

6            A.   Where would it come from?  Sorry?

7   He would provide it, and then we would enter it.

8            Q.   Did Rypl rely on the Defendant to

9   provide truthful information regarding the coding

10  of personal versus business expenses on his credit

11  card?

12           A.   Yes.

13           Q.   I'd like to switch gears now a

14  little bit.  And, first, if you could just provide

15  some background.

16           Can you explain what a dividend is?

17           A.   A dividend is distributable

18  after-tax profits of a company.

19           Q.   Are dividends guaranteed?

20           A.   No.

21           Q.   In order for a company, any

22  company, company in general, to issue a dividend,

23  what is the standard mechanism for doing so?

24           A.   A Board resolution.  So, at the

25  Board level, they declared a dividend and do a

Antonio Severin , Vol I                    May 15, 2025

Page 118

1    dividend resolution.

2              Q.   If the shareholders of a company,

3    or whomever was responsible for declaring a

4    dividend, desired, could that authority issue a

5    one-time dividend?

6              A.   Yes.

7              Q.   When you first started working for

8    Rypl, were you aware of any formal dividend

9    policies in place related to Rypl?

10             A.   To Rypl?  No.

11             Q.   Were you made aware of any formal

12   dividend policies in place related to Firefly Lane?

13             A.   Firefly Lane, again, I was not

14   aware of any formal procedure for the issuing of

15   dividends.

16             Q.   Okay.  And between the years of

17   2013 and 2018, are you aware of any formal

18   dividends that were declared by Firefly Lane

19   Corporation?

20             A.   There was no formal dividends

21   declared from Firefly between those years.

22             Q.   What about Firefly Lane Ltd.?

23             A.   No.

24             Q.   What about Rypl?

25             A.   No.

Antonio Severin , Vol I                    May 15, 2025

                                        Page 119

1                 Q.   During those years, though, was

2    Firefly Lane generally profitable?

3                 A.   Yes.

4                 Q.   Was Firefly Lane Ltd. generally

5    profitable when it existed?

6                 A.   Yes.

7                 Q.   Was Rypl generally profitable?

8                 A.   Yes.

9                 Q.   Because those entities had

10   profits, could the entities have issued dividends,

11   if declared?

12                MR. MAUZY:  Objection, calling for an

13   opinion outside the witness's scope of knowledge.

14   BY MS SCOTT:

15                Q.   You may answer.

16                A.   They could have.

17                Q.   As the controller, are you aware

18   of any circumstances during this time period that

19   would have precluded the partners from asking that

20   declaration paperwork be drawn up?

21                A.   I was not aware of any of it, no.

22                Q.   Have you ever heard the phrase

23   "advance dividend"?

24                A.   Only when it came to the payments

25   that were being made to the shareholders.

Antonio Severin, Vol I                    May 15, 2025

                                        Page 120

1              Q.    Do you recall when you first heard
2       that phrase?
3              A.    Not really.  Not really.  Not --
4       no.  I don't really want to guess on that one.
5              Q.    That's okay.  Do you recall from
6       whom you first heard the phrase used?
7              A.    It might have been from the
8       Defendant.
9              Q.    What's your understanding of an
10      advance dividend?
11             A.    Yeah, I've not heard of that term
12      before.  It was kind of brought up at -- yeah, on
13      these particular instances, and, to me, it's a
14      loan, it's a shareholder loan.
15             Q.    Can you describe any difference
16      between an advance dividend and a dividend?
17             A.    No.  Well, there's no -- it's
18      called a dividend, it's declared as a dividend, and
19      there's resolutions in as a dividend, and it's --
20      that's the dividend --
21             [Reporter intervened for clarification
22      purposes].
23             THE WITNESS:  Yeah, there's no --
24      there's a -- there's no such thing, really, as an
25      advance dividend.  You get the dividend, and that

Antonio Severin, Vol I                                    May 15, 2025

                                                    Page 121

1    dividend comes with a dividend resolution.

2    BY MS. SCOTT:

3              Q.   From your perspective, was the

4    main differentiating factor between an advance

5    dividend and a dividend the existence of a

6    declaration?

7              A.   Correct, a declaration signed by

8    the Board saying a dividend is being declared to

9    these shareholders on this date.

10             Q.   You say that you were not aware of

11   any formal dividend policies during this time, but

12   what is your understanding of who could propose a

13   dividend on behalf of Firefly Lane?

14             A.   My understanding was the Board

15   could -- would be the ones doing that.

16             Q.   And did that include the

17   Defendant?

18             A.   Yes.

19             Q.   As well as other shareholders?

20             A.   Correct.

21             Q.   You compared an advance to a loan.

22   Can you please explain more the similarities or

23   differences between advances and loans?

24             A.   Advance would be something that

25   you could -- you would have repaid relatively

Page 122

1    quickly.  So, if I get a payroll advance, you know,

2    there would be some documentation saying I will

3    repay it, you know, for the next six months.

4              A loan comes with interest and a due

5    date.

6              So those are typically the major

7    differences that -- in my view.

8              Q.   And that answer that you just

9    gave, are you describing advances and loans

10   generally or in relation to actual payments made by

11   Firefly Lane?

12             A.   That would be my general response.

13             Q.   Turning to -- pardon me one

14   moment.

15             Between the years 2012 and 2018, are

16   you aware of whether Firefly Lane paid any advance

17   dividends to its shareholders?

18             A.   Yes.

19             Q.   Who was eligible to get an

20   advance?

21             A.   I don't know who is eligible, but

22   the advance on dividend program, which it became

23   known as, was paid to some of the senior

24   shareholders.

25             Q.   Was there a formal program in

Antonio Severin , Vol I                                    May 15, 2025

                                              Page  123

1   place?

2                A.   It wasn't formal, but there was a

3   spreadsheet that would list out who would get paid

4   at what time.

5                Q.   Who created that spreadsheet?

6                A.   The Defendant.

7                Q.   Did the Defendant send you that

8   spreadsheet?

9                A.   Yes.

10               Q.   Upon receiving a spreadsheet like

11  that, what would happen next?

12               A.   Depending on the -- well,

13  depending on the amount, Amanda would also get the

14  spreadsheet, and then she would note the -- you

15  know, the amounts to be paid and when those

16  payments were to be issued.

17               Q.   You stated that would -- that

18  treatment would depend on the amount.  What role

19  did the amount play and who was handling the

20  request?

21               A.   No.  Depending on -- well, sorry,

22  I misspoke then.  It doesn't matter the amount.  So

23  if it came with the spreadsheet, then we'd have

24  actioned what was on the spreadsheet.

25               Q.   When you received spreadsheets

Antonio Severin , Vol 1                                    May 15, 2025

Page 124

1    like that, did you feel that you had the authority

2    to not comply with the directions contained

3    therein?

4               A.    No.

5               Q.    Why not?

6               A.    Again, these were Board's decision

7    and -- so I did not have a -- I did not have a say

8    in that, any of that matter.

9               Q.    Apart from receiving the

10   spreadsheet, how were the advanced dividends

11   otherwise documented?

12              A.    They were -- they were documented,

13   they were accounted for, as advances, as loans,

14   basically.

15              Q.    Within the accounting software?

16              A.    Correct.

17              Q.    Did you ever review any promissory

18   notes signed between Firefly Lane and its

19   respective shareholders related to advance

20   dividends?

21              A.    Promissory notes?  I don't

22   remember.  I don't recall.

23              Q.    Do you recall reviewing any other

24   documents formalizing a Firefly shareholders'

25   agreement to repay the amounts?

Page 125

1                   A.    I do not.  I do not recall ever

2       seeing such a document.

3                   Q.    Did Firefly Lane ever charge the

4       shareholder interest on advance dividends?

5                   A.    On these particular dividends, no.

6                   Q.    When the advance dividends were

7       paid out, did you ever see any repayment schedules?

8                   A.    No.

9                   Q.    Based on your understanding, did

10      the Defendant -- was the Defendant required to get

11      approval from anywhere before sending you a

12      spreadsheet with these advance dividend

13      instructions?

14                  MR. MAUZY:  Objection, foundation.

15      BY MS. SCOTT:

16                  Q.    You may answer.

17                  A.    My understanding is that it was

18      agreed to at the Board meetings and then forwarded

19      to us.

20                  Q.    Did you attend Board meetings?

21                  A.    I think I attended two over my

22      time.

23                  Q.    Do you recall when those meetings

24      were?

25                  A.    Could have been -- I think one was

Antonio Severin, Vol I                                           May 15, 2025

Page 126

1   in Madrid.  And when I say "Board meetings," these

2   are the annual, the AGM meetings that the partners

3   would have, or the shareholders would have.  I

4   think I went to one in Lisbon and one in Madrid.

5   But typically not, I would not attend.  Most of the

6   time, I would not attend.

7                Q.   So there's another acronym there.

8   Can you tell me what "AGM" stands for?

9                A.   Annual General Meeting.

10               Q.   At the AGMs you did attend, do you

11  recall hearing anything about partner payments?

12               A.   No.

13               Q.   Do you recall, at the AGMs that

14  you attended, whether the Defendant ever sought

15  approval from other Board members before sending

16  himself a payment?

17               MR. MAUZY:  Objection, foundation.

18  BY MS. SCOTT:

19               Q.   You may answer.

20               A.   Okay.  The only one I kind of

21  remember is there was an AGM in Toronto, and in the

22  Board meeting -- the boardroom in our offices, in

23  the Rypl offices.  I did not attend that one, but I

24  was in my office and the Defendant did approach me

25  to ask if those -- about the cash availability and

Page 127

1    cash reserves in order to pay a -- these

2    shareholder payments.  So I assume from that that

3    there was -- they were discussing the dividend at

4    that point in time.

5              Q.   But it was the Defendant who came

6    to you to seek information about --

7              A.   Correct.

8              Q.   -- that?

9              MR. MAUZY:  Object as repetitious.

10   BY MS. SCOTT:

11             Q.   What type of information would you

12   provide the Defendant if he was asking about the

13   capabilities of making an advance dividend?

14             MR. MAUZY:  Objection, calling for

15   speculation.

16   BY MS. SCOTT:

17             Q.   Mr. Severin, I'll rephrase that

18   question.

19             A.   Okay.

20             Q.   Based on your role as the

21   controller/director of finance of Rypl, what type

22   of information would you provide the Defendant

23   about the financial condition of those companies

24   when asked about making advance dividends?

25             MR. MAUZY:  Objection as vague and no

Page 128

1   foundation.

2   BY MS. SCOTT:

3              Q.   You may answer.

4              A.   Okay.  Part of my role at that

5   point in time was also doing monthly cash

6   statements or cash amounts.  So it would just list

7   the amount of cash the company had.  So, based on

8   that and based on our investment, because Firefly

9   had other investments that were using some of the

10  cash, so based on that, there was some advice from

11  the market, some thinking as to what could be, you

12  know, able -- able to be dividended out.

13             Q.   Do you ever recall a scenario in

14  which the Defendant instructed you to make an

15  advance dividend payment and you were unable to

16  comply with that request?

17             A.   No, no.

18             Q.   And did any shareholder, other

19  than Erickson, convey to you instructions regarding

20  the payment of dividends?

21             A.   Sorry?  What was that question,

22  sorry?

23             Q.   I'll repeat.

24             To your recollection, did any

25  shareholder of Firefly Lane, apart from the

Antonio Severin, Vol 1                                    May 15, 2025

Page 129

1    Defendant, provide you instructions about paying

2    dividends?

3                   A.   No.

4                   Q.   Did any other Firefly shareholder

5    other than the Defendant provide you instructions

6    with how to pay dividend advances?

7                   A.   No.

8                   Q.   I'm going to show you Government

9    Exhibit G-23 (verbatim).

10                  I'm going to blow up the -- 33, yes --

11   the middle of the page which shows the second

12   e-mail in this chain.

13                  EXHIBIT NO. G-33:  E-Mail from T. Severin

14                  to D. Erickson dated June 19, 2014, Re:

15                  One time and new monthly recurring

16                  payments.

17   BY MS. SCOTT:

18                  Q.   Who is this an e-mail from?

19                  A.   From the Defendant.

20                  Q.   To whom?

21                  A.   To myself.

22                  Q.   And what's the date?

23                  A.   The date is June 19th, 2014.

24                  Q.   Does this appear to be a true and

25   accurate copy of the e-mail you received from the

Antonio Severin, Vol I                                    May 15, 2025

                                                    Page 130

 1    Defendant on that date?

 2              A.   Yes.

 3              Q.   I am going to flip to -- actually,

 4    the bottom of page 1, and I'm scrolling down a

 5    little bit.  Is this an e-mail from earlier in that

 6    e-mail chain?

 7              A.   It appears to be, yes.

 8              Q.   And who sent this e-mail I'm

 9    showing you at the bottom of page 1?

10              A.   The Defendant.

11              Q.   Can you please read the

12    highlighted section that I've highlighted in the

13    body?

14              A.   Yes.

15                   "All of the prior monthly

16                   recurring debt payments should be

17                   stopped as of this month.  What a

18                   great milestone.  Next week, we will

19                   have a" -- "we will have a some

20                   catch up payments under a dividend

21                   program.  They need to be received

22                   by the end of June."

23              Q.   I'd like to focus first on the

24    statement you read, "What a great milestone."

25                   From your perspective, did this

Antonio Severin , Vol I                                    May 15, 2025

Page 131

1    milestone -- scratch.

2              What, if anything, did this milestone

3    mean regarding the success of the Firefly Lane

4    group?

5              A.   This was just -- I think was

6    showing that the company was generating the cash

7    required to pay these old debt payments.

8              Q.   And when those recurring debt

9    payments were no longer required, then did the

10   company have profits to pay out to its shareholders

11   as dividends?

12             MR. MAUZY:  Objection, compound and

13   vague.  Foundation.

14             THE WITNESS:  Yes, they did.

15   BY MS. SCOTT:

16             Q.   I'm going to turn to the second

17   page, which is a continuation.  What is the

18   Defendant instructing here?

19             A.   He is instructing on payments to

20   the various shareholders.

21             Q.   And would these be payments

22   related to a so-called dividend program?

23             A.   Yes.

24             Q.   There are two sets of bullets.

25   Let's look at the first set of bullets closer to

Antonio Severin, Vol I                          May 15, 2025

Page 132

1    the top.

2                 Did these bullets list Firefly Lane

3    shareholders?

4                 A.   Yes.

5                 Q.   At this time, was Bannister a

6    Firefly Lane shareholder?

7                 A.   Yes.

8                 Q.   Do you -- based on your own

9    personal knowledge, do you have any understanding

10   of why Bannister is not listed among the other

11   shareholders?

12                A.   No.

13                Q.   Can you please read the

14   second-to-last complete sentence near the bottom

15   which I have highlighted?

16                A.   "Please note as the reference

17                     for each wire 'Dividend'."

18                Q.   Based on your understanding, would

19   this request be acted on by Rypl?

20                A.   Yes.

21                Q.   And who is making the call here

22   about how the payments as instructed should be

23   coded?

24                A.   The Defendant.

25                Q.   I am now on page 1, and I have

Antonio Severin, Vol I                                    May 15, 2025

Page 133

1    highlighted near the top of a sentence.  Above that

2    highlighted section, can you tell me who sent this

3    e-mail?

4                A.    The Defendant.

5                Q.    Can you please read the

6    highlighted section?

7                A.    Yes.

8                      "As per our prior discussions,

9                we do not need any special tracking

10               of these payments."

11               Q.    What is he referring to when he

12   mentions "these payments"?

13               A.    The dividend payments.

14               Q.    I am now going to show you what's

15   been marked as Government Exhibit G-37.

16               EXHIBIT NO. G-37:  E-mail from

17               D. Erickson to T. Severin dated August

18               20, 2015, Re: Dividend Sheet.

19   BY MS. SCOTT:

20               Q.    Here, I'll highlight the top

21   portion.

22               Can you please tell me the date of this

23   e-mail?

24               A.    The date is August the 20th, 2015.

25               Q.    And who sent the e-mail?

Antonio Severin, Vol I                              May 15, 2025

                                              Page 134

1                A.    The Defendant.

2                Q.    To whom?

3                A.    To myself.

4                Q.    What is the subject line?

5                A.    "Firefly Group Dividend

6                Distribution Effective 040114."

7                Q.    My apologies, I believe that you

8       read the section next to "Attachments."

9                A.    Oh, sorry.  The subject is

10      "Dividend Sheet."

11               Q.    Does this appear to be a true and

12      accurate copy of an e-mail you received from the

13      Defendant in August of 2015 about dividend payments

14      for Firefly?

15               A.    Yes.

16               Q.    Can you tell me what the Defendant

17      is doing in this e-mail?

18               A.    He is sending this attachment in

19      regards to the dividend distributions that would

20      start on April 2014.

21               Q.    Would you take any action upon

22      receiving this spreadsheet?

23               A.    Yes.

24               Q.    What would happen next?

25               A.    I would -- I'd probably be -- have

Page 135

1   forwarded it to Amanda to set up these payments.

2                  Q.   I'm now going to show you what is

3   marked as Government's Exhibit G-39, and I will

4   highlight the header of the top e-mail.

5                  EXHIBIT NO. G-39:  E-mail from

6                  D. Erickson to T. Severin dated August

7                  9, 2016, Re: Dividend.

8   BY MS. SCOTT:

9                  Q.   Who is this e-mail from?

10                 A.   The Defendant.

11                 Q.   To whom?

12                 A.   To myself.

13                 Q.   And what's the date that it was

14  sent?

15                 A.   This was August 9th of 2016.

16                 Q.   And what's the subject line read?

17                 A.   "Dividend."

18                 Q.   Does this appear to be a true and

19  accurate copy of an e-mail you received from the

20  Defendant about dividends on August 9th of 2016?

21                 A.   Yes.

22                 Q.   I am now going to highlight the

23  bottom half of page 1 here.

24                 Is this an e-mail earlier in the same

25  chain?

Antonio Severin , Vol I                                    May 15, 2025

Page 136

1              A.   Yes.

2              Q.   Is it from the Defendant?

3              A.   Yes.

4              Q.   Can you please read the

5    highlighted section in the body of this e-mail?

6              A.   Yes.

7                   "The dividend must first be

8                   paid by Surecom to Richard and

9                   Firefly.  Then on from Firefly."

10             Q.   First, who do you understand

11   Richard to refer to?

12             A.   That would be Richard Burry.

13             Q.   And he was one of the Firefly

14   shareholders?

15             A.   He is the -- he was the UBO of

16   SmartVu, one of the shareholders of Firefly, and at

17   this particular time also a shareholder of Surecom.

18             Q.   I'm now going to highlight the

19   earlier section again.

20                  Did you respond to this e-mail?

21             A.   Yes.

22             Q.   I'll direct your attention to the

23   last full sentence.  Can you please read that

24   section which I'm highlighting now?

25             A.   Yes.

Antonio Severin, Vol I                        May 15, 2025

Page 137

1                    "Question is that I assume

2              there will need to have some

3              paperwork (ie: board resolutions) to

4              go with declaring and paying the

5              dividends so just wanted to make

6              sure the resolutions are detailing

7              the money movement."

8         Q.   Is this a statement you made to

9    the Defendant?

10        A.   Yes.

11        Q.   In response to your request for

12   paperwork for these dividend payments, how did the

13   Defendant respond?

14        A.   The response up top, you say?  Do

15   you want me to just read it or...

16        Q.   Yes -- no.  I'll rephrase.

17        In response to your request for

18   paperwork regarding a resolution for declaring the

19   dividends, did the Defendant provide you with any

20   paperwork?

21        A.   There was no Board resolution to

22   this particular payment.

23        Q.   And I am now highlighting the last

24   sentence in this top e-mail sent by the Defendant.

25   Can you please read it?

Antonio Severin, Vol I                                    May 15, 2025

Page 138

```
 1              A.   Yes.
 2                   "All we need to do is note
 3              'Dividend' in the reference."
 4              Q.   Do you understand this to be a
 5   coding instruction that the Defendant made to you?
 6              A.   Yes.
 7              Q.   When you received this, did you
 8   feel that you had the authority to code the payment
 9   in any other way?
10              A.   Did I receive -- sorry?
11              Q.   When you received this e-mail
12   instruction, did you feel that you had the
13   authority to code the payments in any other way?
14              A.   No.
15              Q.    I am now showing you what has been
16   marked as Government Exhibit G-41.
17              EXHIBIT NO. G-41:  E-mail from
18              D. Erickson to T. Severin dated
19              September 12, 2017, Re: Cash Balance as
20              of Aug-17.
21   BY MS. SCOTT:
22              Q.   Does this appear to be a true and
23   accurate copy of an e-mail that you received from
24   the Defendant in September of 2017?
25              A.   Yes.
```

Antonio Severin , Vol I                    May 15, 2025

                                          Page 139

1                    Q.   I am going to highlight a section

2    in -- or I should say blow up a section in the

3    middle.  Does this appear to be an e-mail that the

4    Defendant sent to you on September 12th of that

5    year?

6                    A.   Yes.

7                    Q.   Can you please read the last full

8    sentence for me?

9                    A.   Yes.

10                        "Just to confirm, total extra

11                   dividends paid out during August was

12                   $1,068,755."

13                   Q.   Are you aware of what company he

14   is referring to here that paid out dividends in

15   August of 2017?

16                   A.   Firefly.

17                   Q.   Having reviewed these exhibits, is

18   it fair to conclude that the Defendant, during the

19   years 2014 through 2017, referred to payments made

20   to Firefly shareholders using the term "dividend"?

21                   A.   Yes.

22                   MR. MAUZY:  Objection as vague,

23   non-specific, no foundation.

24   BY MS. SCOTT:

25                   Q.   Mr. Severin, can you please repeat

Antonio Severin , Vol I                    May 15, 2025

Page 140

1   your answer to that question?

2               A.   Yes, they were referred to as

3   dividends.

4               Q.   I am now going to direct your

5   attention to Government Exhibit G-42.  I will blow

6   up the top portion of page 1.

7               EXHIBIT NO. G-42:  E-Mail Chain from

8               T. Severin to D. Erickson, October 22,

9               2018, Re: Last wire.

10  BY MS. SCOTT:

11              Q.   Does this appear to be an e-mail

12  chain between you and the Defendant from October of

13  2018?

14              A.   Yes.

15              Q.   Does it appear to be a true and

16  accurate copy of that e-mail?

17              A.   Yes.

18              Q.   I am going to turn to page 2, and

19  I'm going to highlight -- I'm going to blow up the

20  bottom half of page 2.

21              First, looking towards the bottom half

22  of this e-mail, did you receive an e-mail from

23  Toine Rodenburg?

24              A.   Yes.

25              Q.   What is Mr. Rodenburg asking of

Antonio Severin, Vol I                              May 15, 2025

Page 141

1    you in this e-mail?

2              A.   He was asking for the payment plan

3    moving forward in regards to the payments of his --

4    he's -- he's the UBO of 10Q21.

5              Q.   And would those be payments coming

6    from Firefly Lane?

7              A.   Correct.

8              Q.   I have highlighted a section in

9    the e-mail chain above that.  For the portion that

10   I have highlighted, is this an e-mail that you sent

11   in response to Mr. Rodenburg's question?

12             A.   Correct.

13             Q.   Can you please read the

14   highlighted sentence?

15             A.   Yes.

16                  "The 'advance' are now

17                  Dividends and will need to be

18                  declared by Gregory before they can

19                  be paid."

20             Q.   And now I am going to blow up the

21   top half of page 2.  Can you please tell me who

22   sent the e-mail listed at the top of this page?

23             A.   The Defendant.

24             Q.   To who?

25             A.   To myself.

Antonio Severin, Vol I                                    May 15, 2025

Page 142

1                Q.   And what did the Defendant tell

2    you in this e-mail?  Please read it.

3                A.   "I'm unaware that we are paying

4                Dividends as yet."

5                Q.   I'm going to turn to page 1, and

6    I'm going to highlight the bottom half of

7    Government Exhibit G-42.

8                On the bottom line, it appears that you

9    sent an e-mail in response on October 19th of 2018

10   at 7:51 a.m.  Can you please read the highlighted

11   section?

12               A.   Sure.

13               "I thought once the new bank

14               accounts were set-up, we would start

15               doing dividends.  When do you want

16               to start doing dividends?  The

17               advances are just going to get us

18               into trouble."

19               Q.   What are you referring to when you

20   say, "The advances are just going to get us into

21   trouble"?

22               A.   I think -- at this point in time,

23   I think we were getting a new bank, Alexandria bank

24   in the Cayman Islands, and we had instructed the

25   bank that payments would -- payments that would be

Page 143

1   coming out would be dividends.  So we had provided

2   the share register and all that for these upcoming

3   payments.

4                   So it would get us in trouble if all of

5   a sudden we changed that to advances.

6                   Q.   What is your understanding, if

7   any, of why the bank was interested in whether or

8   not the company was issuing dividends before

9   opening an account?

10                  A.   Because that's what we told them

11  that it was for.  It was for -- money would come in

12  from Surecom and then it would go out, and

13  typically in dividends.

14                  Q.   And why did you tell that

15  information to the bank?

16                  A.   Because I -- I think I thought --

17  I thought that we were going to start doing

18  dividends.

19                  Q.   Do you recall what that belief was

20  based on?

21                  A.   An understanding that, at some

22  point in time, these would have to turn into

23  dividends.

24                  Q.   Looking above that e-mail, did

25  Dave Erickson, the Defendant, respond to you?

Antonio Severin, Vol I                                          May 15, 2025

Page 144

1                    A.    Yes.

2                    Q.    The section that I highlighted, is

3      that part of his response?

4                    A.    Yes.

5                    Q.    Can you please read it out loud?

6                    A.    "Its Advances until we have a

7                    plan."

8                    Q.    And did you respond to that

9      statement?

10                   A.    Yes.

11                   Q.    How did you respond?

12                   A.    I said:

13                          "Oh no.  Don't say that.  Then

14                   I would need to produce all the

15                   shareholder agreements to the bank.

16                   I'm around in the afternoon."

17                   Q.    Did you have any concern about

18     having to produce shareholder agreements to the

19     bank?

20                   A.    Yes.

21                   Q.    Why?

22                   A.    I didn't have a copy of the

23     shareholder agreements.

24                   Q.    Did you ever ask for a copy?

25                   A.    I believe I did.

Antonio Severin , Vol I                    May 15, 2025

Page 145

1              Q.    Who do you remember asking for it?

2              A.    Probably the lawyer, Paul

3    Eidsness.

4              Q.    When you sent this e-mail, do you

5    recall how you were feeling?

6              A.    Around this?  I just wanted to,

7    you know, get these bank accounts set up because we

8    were having some issues with moving money around to

9    the suppliers and to partners and...

10             Q.    And in your role as controller and

11   director of finances of the company, would it have

12   been in the business's best financial interest to

13   be able to pay its suppliers?

14             A.    Yes.

15             MR. MAUZY:  Objection, calling for

16   speculation, opinion.

17             THE WITNESS:  Yes.

18   BY MS. SCOTT:

19             Q.    Let's switch gears a little bit

20   more.  So I want to talk about a different category

21   of partner payments.

22             Between 2012 and 2018, did the Firefly

23   Lane partners make ad hoc requests for payments

24   related to any personal expenses?

25             A.    Ad hoc expense to us?

Antonio Severin , Vol I                                    May 15, 2025

Page 146

1                    Q.    Yes.  Rephrase.

2                    A.    Okay.

3                    Q.    Did the partners make any ad hoc

4     requests for payments from Firefly Lane to pay for

5     their own personal expenses?

6                    A.    Not directly to us, no.

7                    Q.    Are you aware of any such

8     requests?

9                    A.    I believe Toine -- I remember him

10    having a couple of loans.  Those particular loans

11    would have -- we would have been notified by the

12    Defendant to pay those.

13                   I believe the lawyer, Paul Eidsness,

14    also received a loan.

15                   And so, again, that would have come

16    probably from the Defendant notifying us to pay

17    that.

18                   Q.    Was it typical for the Defendant

19    to communicate to you the financial desires of

20    other Firefly Lane shareholders?

21                   A.    Yes.

22                   Q.    You stated that, based on your

23    recollection during this period, Mr. Rodenburg,

24    through the Defendant, had asked for a loan, as

25    well as Mr. Eidsness.  Are you aware whether

Antonio Severin, Vol I                                    May 15, 2025

Page 147

1    Mr. van der Poel ever sought a loan from Firefly

2    Lane?

3              A.    Not that I can recall, no.

4              Q.    Are you aware of any requests made

5    by the Defendant for a loan from Firefly Lane?

6              A.    During that time, the Defendant

7    was being paid by Rypl, so he would send

8    notification asking for amounts to be paid to

9    Halstead Bay and to be classified as a loan, or it

10   might say advance.

11             Q.    Did any of the other shareholders

12   during this time seek loans paid by Rypl?

13             A.    No.

14             Q.    How were these requests that you

15   just described by the Defendant typically made?

16             A.    By e-mail.

17             Q.    And how were such payments, in

18   fact, coded for accounting purposes?

19             A.    They would be code -- because they

20   were paid by Rypl, they were coded as amounts paid

21   on Firefly's behalf.

22             Q.    Can you please explain why an

23   amount paid by Rypl would be coded on behalf of

24   Firefly?

25             A.    These particular payments were for

Page 148

1   Firefly, but at that time, Firefly did not have a

2   USD bank account, and the Defendant requested that

3   the payments be made by Rypl.

4              Q.   And was the -- scratch that.

5              Are you aware of whether or not Rypl

6   received any revenue for making such loan payments

7   to Halstead Bay Holdings on the behalf of Firefly

8   Lane?

9              A.   Yes.  As part of -- as part of the

10  agreement, any amounts that Rypl paid on behalf of

11  the other companies would be charged to -- on

12  behalf of Firefly, would be charged back to Firefly

13  with, again, part of the cost-plus formula.

14             Q.   And you stated that the payments

15  were accounted for -- my apologies, can you please

16  state one more -- more time, for my own reference,

17  how the payments were coded for accounting

18  purposes?

19             A.   So, since they were paid by Rypl,

20  and Firefly was a shareholder of Rypl, the amount

21  that was paid on behalf of Firefly would -- would

22  charge Firefly, and as part of the cost-plus

23  formula agreement that they had.

24             Q.   Are you aware of the bookkeeping

25  practices of United International Trust Company?

Antonio Severin, Vol 1                                   May 15, 2025

Page 149

1              A.    Yes.

2              Q.    In instances like this, when Rypl

3     would facilitate a loan payment to Halstead Bay

4     Holdings on behalf of Firefly Lane, do you know how

5     those payments, if at all, would be entered into

6     the books of Firefly Lane?

7              A.    My understanding was that they

8     were entered into the books of Firefly Lane.

9              Q.    At whose instruction?

10             A.    I believe -- well, the accountant

11    there at the time was Karen Wattel, and so on her

12    instructions.

13             Q.    Who would provide Karen Wattel

14    with information about payments that Rypl made?

15             MR. MAUZY:   Objection, leading, asked

16    and answered, calls for speculation.

17             MS. SCOTT:   I would respectfully ask

18    that you allow me to finish the question before

19    objections.

20             And I'll repeat.

21    BY MS. SCOTT:

22             Q.    Who was responsible for informing

23    United International Trust that Rypl had made a

24    payment to Halstead Bay Holdings on behalf of

25    Firefly Lane?

Antonio Severin , Vol I                    May 15, 2025

                                        Page 150

1                    A.   I believe that --

2                    MR. MAUZY:  Objection, speculation,

3       foundation, calling for hearsay.

4       BY MS. SCOTT:

5                    Q.   You may answer.

6                    A.   Okay.  Yeah, I believe that Amanda

7       sent that info.

8                    Q.   Are you aware of where Amanda

9       would receive the information?

10                   A.   I believe she would have got it

11      from the books and records --

12                   MR. MAUZY:  Objection, foundation, lack

13      of personal knowledge.

14      BY MS. SCOTT:

15                   Q.   Mr. Severin, can you please repeat

16      your answer?

17                   A.   She would have received -- she

18      would have got that information from the books and

19      records of Rypl.

20                   Q.   And you stated before that the

21      Defendants made requests for loans via e-mail.

22      What is your understanding of how, if at all,

23      Ms. Zimmerman would record in the books and records

24      information contained in the e-mails from

25      Mr. Erickson?

Antonio Severin, Vol I                                    May 15, 2025

                                                    Page 151

1                MR. MAUZY:  Objection, calling for

2       speculation.  Objection, foundation.

3       BY MS. SCOTT:

4                Q.   You may answer.

5                A.   Right.  We would record them as,

6       you know -- if it was an advance, it would be

7       "Advance, Halstead Bay."

8                Q.   I'm going to take you back in time

9       to when you first started working for Rypl.  At

10      that point, were you aware of any formal loan

11      policy that Rypl had relating to its shareholders?

12               A.   No.

13               Q.   At that time, were you made aware

14      of any formal loan policy that Firefly Lane had

15      implemented in relation to its shareholders?

16               A.   My understanding was that there

17      was a shareholder agreement, although I've never

18      seen that.  And in that shareholder agreement,

19      there was a provision where shareholders could

20      request loans.

21               Q.   Based on your understanding of

22      that policy, did a shareholder have to get approval

23      before any such loan was extended?

24               A.   Again, I didn't -- never seen the

25      actual shareholder agreement itself, so I can't

Antonio Severin, Vol I                          May 15, 2025

Page 152

1    really speak to that.

2                Q.    When the Defendant sent requests

3    for a loan, did you ever personally observe him

4    seek any outside approval before making the

5    request?

6                A.    We never received any indication

7    of that.

8                Q.    Did Mr. Elias, the managing

9    director of Firefly Lane, ever instruct you to send

10   a loan to Halstead Bay Holdings?

11               A.    No, he did not.

12               Q.    Did Mr. Elias ever instruct you to

13   send a loan from Rypl to Halstead Bay Holdings?

14               A.    No, he did not.

15               Q.    When the Defendant sought a loan,

16   who determined the amount of the loan?

17               A.    The Defendant.

18               Q.    When the Defendant made the

19   request for the loan, did you see any documentation

20   regarding a promise to repay?

21               A.    No.

22               Q.    At the time you received such

23   requests, did the Defendant tell you whether he put

24   up any collateral in regard to the loan?

25               A.    No.

Antonio Severin, Vol I                                    May 15, 2025

                                                        Page 153

1                Q.   And as a preliminary question,

2    what is collateral?

3                A.   Collateral is, you know, something

4    you put up that, if you don't pay back the loan,

5    the -- the entity that loaned you the money can get

6    the collateral, can make a claim on the collateral.

7                Q.   At the time that the Defendant

8    would make a request for a loan, did he tell you

9    whether any interest would be charged?

10               A.   My understanding is that these

11   loans came with zero interest.

12               Q.   Where does that understanding come

13   from?

14               A.   I think -- I believe the Defendant

15   told me that.

16               Q.   And you stated that other Firefly

17   Lane shareholders have also received loans from the

18   company; is that correct?

19               A.   That is correct.

20               Q.   From your perspective as the

21   controller and Director of Finance of Rypl, did you

22   observe any different treatment between shareholder

23   loans made to the Defendant as opposed to the other

24   shareholders?

25               A.   The Defendant would only --  he

Antonio Severin , Vol I                          May 15, 2025

                                        Page 154

1   would only -- he didn't have -- he wasn't part of

2   that advance of dividend program.  So all his

3   requests were loans, basically.  Or he -- the

4   requests would come, like, monthly, as far as loans

5   or advances.

6            Q.   At that time, had any other

7   Firefly Lane shareholder opted out of the dividend

8   advance program?

9            A.   No.

10           Q.   When the Defendant sent a request

11  for a loan, did you ever say no?

12           A.   No.

13           Q.   Did you ever observe Ms. Zimmerman

14  say no?

15           A.   No.

16           Q.   Did you ever push back at the

17  request?

18           A.   No.

19           MR. MAUZY:  Objection to this line of

20  questioning as repetitious, already been asked and

21  answered.

22  BY MS. SCOTT:

23           Q.   When the Defendant requested

24  payments from Firefly Lane, what is your

25  understanding, if any, of why those payments were

Antonio Severin , Vol I                                    May 15, 2025

Page 155

1    not paid to Bannister?

2                A.   Yeah, I don't know.

3                Q.   When such a request was made, did

4    you ever ask for loan paperwork?

5                MR. MAUZY:  Objection, repetitious.

6                THE WITNESS:  Yeah, I don't remember.

7                MR. MAUZY:  Cumulative.

8    BY MS. SCOTT:

9                Q.   You may answer.

10                A.   Yeah, I don't remember ever asking

11   the Defendant for paperwork.

12                Q.   And between the years of 2013 and

13   2018, did you ever see any repayments made by the

14   Defendant to Rypl?

15                A.   No.

16                MR. MAUZY:  Objection, cumulative,

17   asked and answered.

18   BY MS. SCOTT:

19                Q.   Did you ever see any repayments

20   from the Defendant to Firefly Lane?

21                MR. MAUZY:  Objection, asked and

22   answered, cumulative, 403.

23   BY MS. SCOTT:

24                Q.   You may answer.

25                A.   No.

Antonio Severin, Vol I                                May 15, 2025

                                                  Page 156

1                    Q.   Did you ever see any repayments

2       from Halstead Bay Holdings to Rypl?

3                    MR. MAUZY:  Objection, asked and

4       answered, cumulative, 403.

5       BY MS. SCOTT:

6                    Q.   You may answer.

7                    A.   No.

8                    Q.   Did you ever see any repayments

9       from Halstead Bay Holdings to Firefly Lane?

10                   MR. MAUZY:  Objection, asked and

11      answered, cumulative, 403.

12      BY MS. SCOTT:

13                   Q.   You may answer.

14                   A.   No.

15                   Q.   Did the Defendant ever seek a loan

16      related to other business ventures he was involved

17      in?

18                   A.   Yes.

19                   MR. MAUZY:  Objection, vague,

20      foundation.

21      BY MS. SCOTT:

22                   Q.   You may answer.

23                   A.   Yes.

24                   Q.   I am now showing you what has been

25      marked as Government Exhibit 43.

Antonio Severin, Vol I                              May 15, 2025

Page 157

```
 1                 EXHIBIT NO. G-43:  E-Mail Chain from

 2                 D. Erickson to T. Severin, et al, dated

 3                 January 31, 2017, Re: Granity Payments

 4                 to Red Rock.

 5     BY MS. SCOTT:

 6                 Q.   At the top of this page, can you

 7     please tell me who sent this e-mail?

 8                 A.   This is from the Defendant.

 9                 Q.   To whom?

10                 A.   To myself.

11                 Q.   And what is the subject line

12     titled?

13                 A.   Subject line, it says, "Granity

14     payment to Red Rock."

15                 Q.   Does this appear to be a true and

16     accurate copy of an e-mail that you received from

17     the Defendant regarding such Granity payment to Red

18     Rock in January 2017?

19                 A.   Yes.

20                 Q.   Do you recall what Red Rock is?

21                 MR. MAUZY:  I'm going to object to this

22     line of questioning, under 403 and 404(b).

23     BY MS. SCOTT:

24                 Q.   You may answer the question.

25                 A.   This is in relation to an
```

Antonio Severin , Vol I                    May 15, 2025

Page 158

1  investment that the Defendant and Mr. van der Poel

2  did together in relation to something called "buddy

3  loans."

4           Q.   And I have highlighted the first

5  three -- the first four, correction, sentences in

6  this e-mail.  Can you please read the entire

7  highlighted section for the record?

8           A.   Sure.

9                "Please pay 700,000 Pounds from

10               funds on deposit at Catella to Red

11               Rock (info below).  It's important

12               that the funds are received by Red

13               Rock tomorrow.  Set it up as a loan.

14               It will be repaid within the month."

15           Q.   I am now going to show you what's

16  been marked as Government's Exhibit G-44.  And I'm

17  going to just blow up the first half of this

18  e-mail.

19               EXHIBIT NO. G-44:  E-Mail Chain from

20               D. Erickson to T. Severin, et al, dated

21               February 14, 2018, Re: Info Needed - PDQ.

22  BY MS. SCOTT:

23           Q.   Looking at the top, does this is

24  appear to be an e-mail sent by the Defendant?

25           A.   Yes.

Page 159

1              Q.   Who is the e-mail sent to?

2              A.   To myself.

3              Q.   And let's look down at the bottom

4    half of the e-mail chain.  Does this appear to be a

5    part of that e-mail chain in which you sent an

6    e-mail to the Defendant?

7              A.   Yes.

8              Q.   Is the date of these e-mails

9    February 14th, 2018?

10             A.   Yes.

11             Q.   Is this date approximately one

12   year after the date of the exhibit that was

13   previously shown to you?

14             A.   Sorry?  That, I don't know -- I've

15   forgotten the date there.

16             MR. MAUZY:  I continue my objection

17   under 404(b) and 403, the reference to Red Rock.

18             THE WITNESS:  Okay, it's about a year

19   later, okay.  Yes.

20   BY MS. SCOTT:

21             Q.   And Mr. Severin, so the record is

22   clear, I just switched to Government G-43.  Can you

23   please confirm the date this e-mail was sent?

24             A.   Let's see.  Would that have been

25   -- oh, January 31st, 2017.

Antonio Severin, Vol I                                    May 15, 2025

                                                    Page 160

1              Q.   And I'm now switching back to

2    Government Exhibit G-44.

3              MR. MAUZY:   Same objection to both

4    exhibits.

5              THE WITNESS:   And that is

6    February 14th, 2018.

7    BY MS. SCOTT:

8              Q.   Does this appear to be a true and

9    accurate copy of an e-mail you received from the

10   Defendant regarding a payment to Red Rock in

11   February of 2018?

12             A.   Yes.

13             Q.   In the bottom half of this e-mail,

14   can you please read the highlighted --

15             MR. MAUZY:   Sorry, can we have a moment

16   here?  Yeah, off the record.

17             MS. SCOTT:   Can we please go off the

18   record, Mr. Court Reporter?

19             THE VIDEOGRAPHER:   One moment, please.

20   Off the record.

21             This marks the end of media two, off

22   the record at 4:13 p.m.

23             -- RECESS TAKEN AT 4:13 P.M. --

24             -- UPON RESUMING AT 4:21 P.M. --

25             THE VIDEOGRAPHER:   This is the

Antonio Severin , Vol I                                    May 15, 2025

                                                    Page 161

1    beginning of media three, and we are back on the

2    record at 4:21 p.m.

3    BY MS. SCOTT:

4              Q.    Mr. Severin, before we went off

5    the record, we were discussing Government Exhibit

6    G-44.

7              A.    Yes.

8              Q.    In the middle of this e-mail that

9    is shown, can you please read the statement that

10   you said to the Defendant in February of 2018?

11             A.    "Of bigger concern for me is

12                   how to show the 700,000 GBP",

13                   Pounds, "we sent from Catella

14                   (Granity) to Red Rock in

15                   February-17."

16             Q.    Did the Defendant respond?

17             A.    Yes.

18             Q.    What did he say?

19             A.    "The transfer from Granity to

20                   Red Rock is a loan.  Will be repaid.

21                   Can you tell me how it came about in

22                   a phone call?"

23             Q.    I'd like to focus on the line

24   "Will be repaid."

25             In the previous exhibit that was shown

                                              Page 162

1   to you, Government Exhibit G-43, the Defendant

2   stated that this payment would be repaid within one

3   month.

4             Did that happen?

5             A.   No.

6             Q.   The Defendant told you that the

7   payment was a loan, but did that seem to be

8   accurate to you?

9             MR. MAUZY:  Objection, calling for

10  conclusion, speculation.

11  BY MS. SCOTT:

12            Q.   Mr. Severin, I will rephrase my

13  question.

14            A.   Yeah.

15            Q.   Based on your years of experience

16  as a controller, did the -- the Defendant told you

17  it was a loan, but did that seem accurate to you?

18            MR. MAUZY:  Objection, foundation,

19  calling for an opinion.

20  BY MS. SCOTT:

21            Q.   You may answer.

22            A.   Yeah.  To me, this would have been

23  -- I considered it a loan from Granity to Firefly.

24            Q.   I am now showing you what's been

25  marked as Government Exhibit G-45.

Antonio Severin, Vol I                                    May 15, 2025

                                                  Page 163

1                    EXHIBIT NO. G-45:  E-Mail Chain from

2                    D. Erickson to T. Severin, et al, dated

3                    February 26, 2018, Re: Amex.

4       BY MS. SCOTT:

5                    Q.   I'm just going to blow up the top

6       two-thirds of this e-mail.

7                    Does this appear to be a true and

8       accurate copy of the e-mail that you shared with

9       the Defendant on -- in February 2018?

10                   A.   Yes.

11                   Q.   At the bottom of the e-mail, can

12      you please read the highlighted sentence?

13                   A.   "Please send another $25k as

14                   Loan."

15                   Q.   Whose statement is this?

16                   A.   That is from the Defendant.

17                   Q.   And did you respond to the e-mail?

18                   A.   I responded to Amanda in regards

19      to this e-mail.

20                   Q.   Can you please summarize the

21      highlighted section at the bottom of your response?

22                   A.   "So on the advance, can I

23                   get Paul --" Eidsness, the lawyer --

24                   "to do some paperwork for the

25                   advance.  Terms, interest rate,

Antonio Severin , Vol I                    May 15, 2025

Page 164

1              etc??"

2              Q.   Did you ever receive any loan

3    paperwork in response?

4              A.   No.

5              Q.   Mr. Severin, was there ever a

6    point where you considered quitting as the

7    controller or Director of Finance of Rypl?

8              MR. MAUZY:  Objection, relevance, 403.

9    BY MS. SCOTT:

10             Q.   You may answer.

11             A.   Yes, I did resign in 2019.

12             Q.   What, if any, role did Firefly

13   partner payments play in that resignation?

14             A.   It was just a -- a number of

15   things that was starting to stress me out, and

16   includes -- and also I had another opportunity.  So

17   it became some -- a situation where there was some

18   frustrations in my job and I had -- I thought I'd

19   be able to transition to another company or

20   opportunity.

21             Q.   Did you end up rescinding your

22   resignation?

23             A.   I did.

24             Q.   Why?

25             A.   I resigned, and then the Defendant

1    did fly to Toronto to meet with me, asked me a

2    number of questions as to why the resignation.  I

3    told him there was some frustrations, primarily a

4    lot of it was the extra workload.  We were going

5    through some audits, specifically a CRA audit with

6    Rypl, so I had some frustrations about that.  And

7    so I told him and he said -- very cordial, and he

8    kind of suggested that we come up with a

9    win-win-win and that I could -- I should go back

10   and, you know, lay out why I resigned, what

11   situations that I could foresee that could turn the

12   situation into a win-win-win.  And so I did --

13   responded to Chad and -- and the Defendant and we

14   worked something out.

15              Q.   First, there's another acronym.

16   You referred to CRA.  Can you please tell me what

17   that refers to?

18              A.   Oh, Canada Revenue Agency.

19              Q.   And did the Defendant accept your

20   win-win-win proposal?

21              A.   For the most part, yes, yes.

22              Q.   Based on this interaction, did you

23   perceive personally that the Defendant valued your

24   role as the Director of Finance in Rypl?

25              A.   Yes.

Antonio Severin , Vol I                                    May 15, 2025

Page 166

1              Q.   I'd like to direct your attention
2    to some tax returns now.  Were you involved in the
3    preparation of Rypl's tax returns?
4              A.   The tax returns are actually done
5    by Pierre Janelle.
6              Q.   Who is Pierre Janelle?
7              A.   Pierre Janelle is the external
8    accountant for Rypl.com.
9              Q.   Did you have any role in reviewing
10   returns that were prepared by Mr. Janelle?
11             A.   Yes.
12             Q.   Have you received any training or
13   education based on Canada tax filing requirements
14   generally?
15             A.   Yes.
16             Q.   In Canada -- actually, scratch
17   that question.
18             Have you received any training or
19   education on U.S. tax filing requirements?
20             A.   No.
21             Q.   Did the Defendant ever discuss his
22   personal income taxes with you?
23             A.   No.
24             Q.   Did the Defendant ever ask you for
25   assistance in preparing his U.S. tax returns?

Antonio Severin , Vol I                    May 15, 2025

Page 167

1              A.    No.

2              Q.    Do you have any personal knowledge

3    as to whether the Defendant filed U.S. tax returns

4    for the years 2014 through 2018?

5              MR. MAUZY:  Objection, relevance and

6    403.

7              THE WITNESS:  No.

8    BY MS. SCOTT:

9              Q.    Hypothetically, if you learned

10   that the Defendant reported $730,000 -- rephrase.

11             If you had learned that the Defendant

12   reported $730,344 in outstanding loans due from

13   Halstead Bay Holdings to Rypl on his 2014 tax

14   return, would that be true or false, from your

15   perspective as Rypl's --

16             MR. MAUZY:  Objection, calling for

17   speculation.  Objection, relevance.  Objection,

18   403, 404(b), lack of foundation, calling for a

19   legal conclusion.

20             MS. SCOTT:  Mr. Mauzy, please let me

21   finish the questions, particularly in the interest

22   of time.

23             MR. MAUZY:  It seemed like you were

24   finished to me.

25

Antonio Severin , Vol I                                    May 15, 2025

Page 168

1   BY MS. SCOTT:

2            Q.   I'm going to repeat my question,

3   Mr. Severin.

4            Hypothetically, if you learned that the

5   Defendant reported $730,344 in outstanding loans

6   due from Halstead Bay Holdings to Rypl on his U.S.

7   tax return, would that be true or false, from your

8   perspective as the controller of Rypl?

9            MR. MAUZY:  Objection, foundation,

10  calling for speculation, irrelevant, 403, 404(b).

11  He's not -- he has disqualified himself from

12  knowledge of U.S. tax law.

13           THE WITNESS:  Yeah, I don't -- I don't

14  know.  I can't really answer that question.

15  BY MS. SCOTT:

16           Q.   Based on your review of Rypl's tax

17  returns it filed with the Canada Revenue Agency, in

18  20 -- as to the year 2018, did Rypl report over

19  $4.1 million in outstanding loans due to the

20  company from Halstead Bay Holdings?

21           MR. MAUZY:  Objection, foundation.

22  Objection, 403, 404(b).

23  BY MS. SCOTT:

24           Q.   You may answer.

25           A.   I don't believe that we did show

Antonio Severin, Vol I                                    May 15, 2025

                                              Page 169

1    that.

2              Q.   Mr. Severin, at some point did you

3    come to learn that the Defendant was under

4    investigation by the IRS?

5              A.   Yes.

6              Q.   How did you learn that?

7              MR. MAUZY:  Objection, relevance, 403,

8    foundation, calling for hearsay.

9    BY MS. SCOTT:

10             Q.   You may respond.

11             A.   I believe I heard it through Chad

12   Moldon.

13             Q.   Do you recall roughly when you

14   learned?

15             A.   It was in 2019.

16             Q.   I'm showing you what has been

17   marked as Gov -- or I'm sorry, as Defense Exhibit

18   D46(a).

19             EXHIBIT NO. D-46A:  Resolutions of the

20             Sole Managing Director of Firefly Lane

21             Corporation.

22   BY MS. SCOTT:

23             Q.   The title of this document is,

24   "Resolutions of the Sole Managing Director of

25   Firefly Lane Corporation."

Antonio Severin , Vol I                    May 15, 2025

Page 170

1                    Have you seen this before?

2                    A.   Yes, I have, yup.

3                    Q.   I'm going to direct your attention

4     to paragraph 3.  This statement says that:

5                         "Pursuant to a discussion and

6                    vote of the company's shareholders

7                    on December 15th, 2021, it was

8                    determined by a majority vote that

9                    the current balances of the

10                   outstanding shareholder loans should

11                   be repaid to the company over a

12                   period of five years.  To the extent

13                   possible, and provided the company

14                   is profitable, has paid its debt,

15                   and has a minimum reserve fund,

16                   shareholders may satisfy outstanding

17                   loan balances with dividend payments

18                   to be made by the company." [As read].

19                   Did I read that correctly?

20                   A.   Yes.

21                   Q.   Was this document executed before

22    or after that you learned the Defendant was under

23    investigation by the IRS in 2019?

24                   A.   Well, it looks like it was done

25    after.

Antonio Severin, Vol I                                        May 15, 2025

Page 171

1              Q.   At any point between December 2021

2    and December 2023, did the Defendant receive his

3    share of the dividends discussed in this

4    resolution?

5              A.   The dividend discussed in the

6    resolution was the amount of that one there --

7              Q.   Oh, no --

8              A.   -- yes, yes.  He did.  Bannister

9    did.

10             Q.   Okay.  Thank you.  After December

11   of 2021, did you attempt to reconcile the Firefly

12   Lane shareholder accounts?

13             A.   Yes.

14             Q.   I'm going to show you what does

15   not have an exhibit sticker but is marked as

16   Government's Exhibit G-57.

17                  EXHIBIT NO. G-57:  Resolutions of the

18                  Sole Managing Director of Firefly Lane

19                  Corporation N.V. for 3 million.

20   BY MS. SCOTT:

21             Q.   Are you familiar with this record?

22             A.   That is a spreadsheet that I

23   produced, correct, yup.

24             Q.   What is this spreadsheet

25   summarizing?

Page 172

1          A.   Basically summarizes -- it's kind

2    of like a partnership reporting.  Basically

3    outlines the net income that the company had over

4    the last, looks like ten years, from November 12th

5    to 2021, how much of that could have been

6    distributed, and then basically, from there,

7    there's a calculation to kind of basically remove

8    the draws or the advances or the advance -- loans

9    that each of the shareholders received.

10         Q.   I'm going to direct your attention

11   to columns C through J in the upper portion.  It

12   lists Waterlily/Lloydsville, Bannister, 10Q21,

13   etcetera.  Are these the names of Firefly Lane

14   shareholders?

15         A.   Yes.

16         Q.   The information underneath those

17   names, does this summarize payments that were made

18   to the shareholders based on the information

19   available to you at the time?

20         A.   Correct.

21         Q.   On the left-hand bottom corner,

22   there are three lines titled, "Loans/advances from

23   Rypl, Loans/advances from Granity Media, and

24   Loans/advances from Firefly."  Did I read that

25   correctly?

Antonio Severin, Vol I                                    May 15, 2025

Page 173

```
 1              A.    Yes.

 2              Q.    During these years, November 12th,

 3     2012, through December of 2021, can you please

 4     describe -- can you please list which shareholders,

 5     if any, received loans/advances?

 6              A.    Loans/advances?  Well, the lines

 7     before that also list advances, right?  "Advance on

 8     dividends" is what they called them, or they were

 9     called.

10              Q.    Mr. Severin, my apologies.  Let's

11     focus on the lines that I just read, the

12     loans/advances from Rypl, Granity Media and

13     Firefly.

14              A.    Yes.

15              Q.    Are there any amounts related to

16     these lines listed under Waterlily/Lloydsville?

17              A.    No.

18              Q.    Are there any amounts listed under

19     10Q21?

20              A.    No.

21              Q.    Are there any amounts listed under

22     SmartVu?

23              A.    No.

24              Q.    Are there any amounts listed under

25     Butterflygirl, "BTFYLGRL"?
```

Antonio Severin, Vol I                          May 15, 2025

Page 174

1              A.   Not under -- no, not under

2    "BTFYLGRL," no.

3              Q.   Are there any amounts listed under

4    Tango Pilot?

5              A.   No.

6              Q.   Are there any amounts listed under

7    Firewall?

8              A.   No.

9              Q.   Are there any amounts listed under

10   Blue Waters?

11             A.   Yes.

12             Q.   How much is listed under Blue

13   Waters?

14             A.   1,229,762.

15             Q.   Are there any amounts listed under

16   Bannister?

17             A.   Yes.

18             Q.   Can you roughly estimate how much?

19             A.   Looks like 5 million, just over 5

20   million.

21             Q.   In column A, the term "loan" is

22   used more than once.  Who came up with that

23   characterization?

24             A.   As far as the advance on dividend

25   or loans or --

Antonio Severin, Vol I                                    May 15, 2025

Page 175

1              Q.   The terminology, "loan," was that

2     your determination?

3              A.   No, those would be provided by the

4     Defendant when requesting the payments.

5              Q.   I am now going to direct your

6     attention to Defense Exhibit 9.

7              The title of this document appears to

8     be, "Resolutions of the Sole Managing Director of

9     Firefly Lane Corporation."

10             Does that appear accurate?

11             A.   Yes.

12             Q.   I'm going to read the third

13    section to you:

14                  "Whereas, pursuant to a

15                  discussion and vote of the Company's

16                  shareholders on August 9 and 10,

17                  2023, it was determined by majority

18                  vote that the Company should declare

19                  a dividend payable to its

20                  shareholders of record in the amount

21                  of Eight Million United States

22                  Dollars, provided that the Company

23                  is profitable, has paid its debts,

24                  and has a minimum reserve fund."

25                  Did I read that correctly?

Antonio Severin, Vol I                                    May 15, 2025

                                              Page 176

1                    A.   Yes.

2                    Q.   At the time of August of 2023,

3        were there any outstanding amounts owed from

4        Halstead Bay Holdings to Rypl which were coded as

5        "loans"?

6                    A.   Yes.

7                    Q.   At the time of August 2023, were

8        there any outstanding amounts owing to Firefly Lane

9        from Halstead Bay Holdings and coded as "loans"?

10                   A.   Yes.

11                   Q.   Are you familiar with an entity

12       called Raindrop, LLC?

13                   A.   Yes.

14                   Q.   Who is the UBO of Raindrop, LLC?

15                   MR. MAUZY:   I'm going to object,

16       relevance under 403 and 404(b).

17       BY MS. SCOTT:

18                   Q.   Mr. Severin, I will repeat my

19       question.

20                   Can you please answer, to your

21       understanding, who is the beneficial owner of

22       Raindrop, LLC?

23                   A.   The Defendant.

24                   MR. MAUZY:   Same objections.

25       BY MS. SCOTT:

Antonio Severin , Vol 1                                    May 15, 2025

Page 177

```
 1                   Q.    You may answer.

 2                   A.    The Defendant.

 3                   Q.    Based on your understanding, where

 4      was that entity based?

 5                   A.    In Puerto Rico.

 6                   Q.    Based on your understanding, did

 7      Firefly Lane ever loan money to Raindrop LLC

 8      between the years 2021 and 2024?

 9                   A.    Yes.

10                   Q.    Were those payments documented?

11                   A.    Yes.

12                   Q.    I'm going to show you what has

13      been marked as Government Exhibit G-64.

14                   EXHIBIT NO. G-64:  Raindrop, LLC,

15                   Promissory Note dated February 23,

16                   2022.

17      BY MS. SCOTT:

18                   Q.    The title of this document is

19      "Promissory Note" and it shows the date

20      February 23, 2022.  Did I read that correctly?

21                   A.    Yes.

22                   Q.    Have you seen this document

23      before?

24                   A.    Yes, yes.

25                   Q.    And the top half of the e-mail
```

Page 178

```
 1    listed next to "Principal Amount," how much is
 2    listed?
 3                   A.   160,000 USD.
 4                   Q.   Does this appear to be a true and
 5    accurate copy of a promissory note documenting a
 6    loan between Raindrop and Firefly Lane?
 7                   A.   Yes.
 8                   Q.   Was this document executed before
 9    or after you learned that the Defendant was under
10    criminal investigation by the IRS?
11                   A.   After.
12                   Q.   I'm going to direct your attention
13    back to August, 2023.  At that time, were there any
14    outstanding amounts owed to Firefly Lane from
15    Raindrop, LLC?
16                   A.   At 2023, I'm not a hundred percent
17    sure.  I don't know.
18                   Q.   Mr. Severin, I'm going to show you
19    what's been marked -- brief pause, thank you.
20                   (Brief pause in the proceedings).
21    BY MS. SCOTT:
22                   Q.   Mr. Severin, I'm now going to show
23    you what's been marked as Government Exhibit G-67.
24                   EXHIBIT NO. G-67:  E-Mail from
25                   T. Severin to A. Agarwal dated April 4,
```

Page 179

1              2024, Re: Bannister Dividend

2              Reconciliation.

3    BY MS. SCOTT:

4              Q.   Is this a fair and accurate copy

5    of an e-mail you sent in April 2024?

6              A.   Yes.

7              Q.   In the middle of this page, who

8    are you e-mailing?

9              A.   Paul Eidsness.

10             Q.   Can you please summarize what this

11   e-mail is conveying to Mr. Eidsness?

12             A.   This is -- it's part of that

13   8 million dividend, and where, how much -- it looks

14   like -- that's a listing of the dividend payments

15   made to Bannister, declared four annual.  The

16   shares of the annual -- that should be --

17             So this is a listing of the share --

18   the dividends that have been declared, and how much

19   of it went to Bannister.

20             Q.   And how much did go to Bannister?

21             A.   The total would have been

22   $2,150,500.

23             Q.   I'm scrolling down to page 2 on

24   this.  In this e-mail, did you attach Firefly bank

25   statements showing payments made from Firefly Lane

Antonio Severin , Vol I                                      May 15, 2025

Page 180

1    and Bannister to document these dividends?

2                    A.    I did.  I did.

3                    Q.    And scrolling down to the next

4    page, to page 5 in this exhibit, does this appear

5    to be one of those bank statements that was

6    attached to that e-mail?

7                    A.    Yes.

8                    Q.    Based on what you can see in this

9    e-mail, in this exhibit -- I am on page 4 -- were

10   dividends/payments that were declared by Firefly

11   Lane offset against the amount of outstanding debt

12   that Raindrop, LLC owed to the company during this

13   period?

14                   A.    Yes.

15                   Q.    During this period, did the

16   Defendant also receive additional dividends in cash

17   payments from Firefly Lane?

18                   A.    The Bannister did receive dividend

19   payments after the Raindrop loan was paid.

20                   Q.    And I will direct your attention

21   back to Defense Exhibit D-9, which we just

22   reviewed.  Here, I am going to read the --

23                   Pardon me.  Mr. Severin, can you please

24   confirm that you can view Exhibit D-9?

25                   A.    Yes.

 1                    Q.   I'm going to read the

 2      fifth-to-last section, which begins:

 3                         "Resolved, that the Company pay

 4                    dividends of Eight Million United

 5                    States Dollars as soon as practical,

 6                    to its shareholders of record..."

 7                    Skipping to the next sentence:

 8                         "To the extent any individual

 9                    shareholder owes money to the

10                    Company for loans outstanding, that

11                    shareholder's proportion of the

12                    dividend will be used to pay down

13                    that shareholder's debt to the

14                    Company, by a journal entry in the

15                    Company books and records."

16                    Did I read that correctly?

17                    A.   Yes.

18                    Q.   Earlier you testified, however, at

19      the time of August 23, the -- that Halstead Bay

20      Holdings owed amounts outstanding to both Firefly

21      Lane and Rypl?

22                    A.   Yes.

23                    Q.   Based on your understanding, why

24      weren't those payouts applied against the

25      outstanding amounts due from Halstead Bay Holdings?

Page 182

1              MR. MAUZY:  Question assumes facts not

2    in evidence, assuming that they weren't paid out.

3    BY MS. SCOTT:

4              Q.   Mr. Severin, in August of 2023 --

5    in August of 2023, following this dividend

6    resolution, was any portion of that dividend

7    resolution applied against outstanding amounts that

8    Halstead Bay Holdings owed to either Rypl or

9    Firefly Lane?

10             A.   Yes.

11             Q.   I'm going to direct you back to

12   Exhibit G-57.

13             A.   Uhm-hmm.

14             Q.   67, my apologies.

15             This is page 4.  Does this appear to be

16   a copy of journal entries from the Firefly Group's

17   accounting?

18             A.   Yes.

19             Q.   Can you please summarize the 2.5

20   -- $2.15 million?

21             A.   These are dividend payments from

22   various dividends that were declared from this pay

23   period.  So there was -- looks like four -- one,

24   two, three, four dividends declared.  The one that

25   you referenced, that fifth one, the 8 million, was

Page 183

1    never paid out to Bannister.  That was withheld and

2    applied against an advanced amount.

3              Q.   And to clarify your testimony, it

4    was your testimony that the $8 million resolution,

5    some amount of that was applied against the

6    outstanding amount that Halstead Bay Holdings owed?

7              A.   Correct.

8              Q.   Do you recall how much?

9              A.   1,620,000.

10             Q.   At the time, were there additional

11   amounts due from Halstead Bay Holdings?

12             A.   Yes.

13             Q.   During the years 2021 and 2024,

14   were dividends paid out in cash from Bannister --

15   I'm sorry, from Firefly Lane to Bannister before

16   offsetting the remainder that Halstead Bay Holdings

17   owed?

18             A.   Yes.

19             Q.   I'll put that exhibit down.

20             One moment.

21             (Brief pause in the proceedings).

22   BY MS. SCOTT:

23             Q.   Mr. Severin, I have no further

24   questions for you.

25             MS. SCOTT:  Mr. Court Reporter, given

Antonio Severin, Vol 1                          May 15, 2025

Page 184

1    the time, and that we will be kicked out of the

2    building in approximately 12 minutes, this will

3    conclude today's testimony.  We will pick up with

4    the cross-examination of Mr. Severin tomorrow

5    morning.

6                    THE VIDEOGRAPHER:  Very good.  We are

7    off the record at 4:49 p.m.

8                    This concludes today's testimony --

9                    MR. MAUZY:  I didn't hear you ask me if

10   I wanted to go forward.

11                   UNKNOWN SPEAKER:  You have the -- you

12   have the ten minutes.

13                   THE VIDEOGRAPHER:  -- today's testimony

14   given by Antonio Severin.

15                   The number of media used was three, and

16   will be retained by Veritext Legal Solutions.

17                   MR. BOURGET:  Okay, just to be clear,

18   this is not the end of the deposition.

19                   THE VIDEOGRAPHER:  No, it's just the

20   end of today's deposition.

21

22   -- Deposition adjourned at 4:49 p.m.

23

24

25

Antonio Severin , Vol I                                    May 15, 2025

Page 185

1                    REPORTER'S CERTIFICATE

2

3              I, JUDITH M. CAPUTO, RPR, CSR, CRR,

4    Registered Professional Reporter, certify;

5              That the foregoing proceedings were

6    taken before me at the time and place therein set

7    forth, at which time the witness was put under oath

8    by me;

9              That the testimony of the witness and

10   all objections made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed;

13             That the foregoing is a true and

14   correct transcript of my shorthand notes so taken.

15

16

17

18             Dated this 30th day of May, 2025.

19

20

21

22             PER: JUDITH CAPUTO, RPR, CSR, CRR

23

24

25

Page 186

1                    CERTIFICATE OF REPORTER

2

3    CANADA                    )

4    PROVINCE OF ONTARIO    )

5

6    I, Judith M. Caputo, the officer before whom the

7    foregoing deposition was taken, do hereby certify

8    that the witness whose testimony appears in the

9    foregoing deposition was duly sworn by me; that the

10   testimony of said witness was taken by me in

11   shorthand, using Computer Aided Realtime, to the

12   best of my ability and thereafter reduced to

13   written format; that I am neither counsel for,

14   related to, nor employed by any of the parties to

15   the action in which the deposition was taken, and

16   further that I am not related or any employee of

17   any attorney or counsel employed by the parties

18   thereto, nor financially or otherwise interested in

19   the outcome of the action.

20   *[signature]*

21

22   Judith M. Caputo, RPR, CSR, CRR

23

24   Commissioner for taking

25   Oaths in the Province of Ontario

**0**

**00007**   8:19
**040114**   134:6
**060117**   106:16
**0:24**   8:19

**1**

**1**   5:19 79:11
  82:7 106:23
  109:7 130:4,9
  132:25 135:23
  140:6 142:5
**1,068,755**
  139:12
**1,229,762**
  174:14
**1,620,000**
  183:9
**1-900**   19:20
**1.5**   97:4
**10**   4:5 175:16
**100**   69:3 72:15
**1001**   4:22 44:5
  44:6 49:4
  58:12
**100k**   97:3
**105**   5:15
**106**   5:18
**108**   5:20
**10q21**   39:4,20
  39:21 141:4
  172:12 173:19
**12**   6:8 138:19
  184:2
**120**   2:22 19:4
**129**   5:23
**12th**   139:4
  172:4 173:2

**13**   13:14
**133**   6:1
**135**   6:4
**138**   6:7
**14**   5:2 6:17
  81:9 158:21
**140**   6:10
**14202**   2:22
**14th**   81:18
  159:9 160:6
**15**   1:14,23 5:16
  8:5 105:15
**150**   2:6
**157**   6:13
**158**   6:16
**15th**   105:21
  170:7
**160,000**   178:3
**163**   6:19
**169**   6:22
**17**   6:9 138:20
  161:15
**171**   6:24 16:1
  16:10
**177**   7:1
**178**   7:3
**17th**   33:3
**18**   4:18 32:21
  33:25
**180,000**   18:24
**18th**   33:17
  109:16
**19**   5:24 129:14
**1983**   13:25
**1989**   14:25
**1991**   13:7
**1994**   13:7,11

**1999**   19:24
**19th**   129:23
  142:9
**1g4**   2:17

**2**

**2**   35:4 78:15
  79:10,15 91:10
  92:12 109:4,13
  140:18,20
  141:21 179:23
**2,150,500**
  179:22
**2.15**   182:20
**2.30**   85:1
**2.5**   182:19
**20**   5:9 6:2
  16:14 27:22
  45:21 89:17
  133:18 168:18
**20,000**   108:7
**20002**   2:6
**2006**   42:19
**2010**   27:23,23
**2012**   37:17
  60:6 75:23
  122:15 145:22
  173:3
**2013**   15:19
  18:5 19:24
  20:12 21:11
  50:19 61:13
  71:2 89:1
  98:24 102:24
  103:3 110:18
  118:17 155:12
**2014**   4:25 5:6,9
  5:12,24 44:17

**45:21 78:6,13
  78:19 86:2,7
  86:13 89:17,22
  90:25 91:4
  92:18 129:14
  129:23 134:20
  139:19 167:4
  167:13
**2015**   5:14 6:2
  96:3,17 97:22
  133:18,24
  134:13
**2016**   6:5 68:21
  135:7,15,20
**2017**   4:18 5:3
  5:17,19 6:8,15
  17:19 18:5
  32:21 33:17,25
  40:23 48:15
  81:9,19 105:15
  105:21 106:23
  138:19,24
  139:15,19
  157:3,18
  159:25
**2018**   6:11,18
  6:21 16:14
  44:17 50:20
  60:6 61:13
  71:2 89:1
  98:25 102:24
  103:3 110:18
  118:17 122:15
  140:9,13 142:9
  145:22 155:13
  158:21 159:9
  160:6,11
  161:10 163:3,9

167:4 168:18
**2019**   5:21 16:2
16:14,15 109:1
109:16 164:11
169:15 170:23
**202**   2:7,7
**2020**   1:22
**2020-77**   8:21
**2021**   170:7
171:1,11 172:5
173:3 177:8
183:13
**2022**   7:2
177:16,20
**2023**   171:2
175:17 176:2,7
178:13,16
182:4,5
**2024**   7:4 12:6
177:8 179:1,5
183:13
**2025**   1:14,23
8:6 11:10
185:18
**20th**   89:21
133:24
**21**   5:4 85:24,25
**22**   6:11 140:8
**23**   7:2 129:9
177:15,20
181:19
**23rd**   78:19
**24**   4:23 5:21
78:3,4 109:1
**24-7**   1:3
**25**   82:9,25
**25k**   163:13

**26**   5:1 6:20
81:7,13 86:13
163:3
**260**   2:12
**27**   5:7,7 89:14
89:15
**2700**   15:22
16:21
**27th**   90:9
**28**   4:24 5:5,13
78:6 86:2
95:25 96:2
**28th**   78:13 86:7
**29**   5:10,11
90:21,23,24
**29088**   185:21
186:21
**29th**   91:4
**2:00**   79:13
**2:30**   85:2
**2:40**   85:3,6
**2nd**   11:10

**3**

**3**   37:23 97:5
170:4 171:19
**30**   5:15 105:11
105:13
**30,000**   101:12
101:16,21
103:21 104:25
**300**   24:5
**307-2182**   2:7
**30th**   185:18
**31**   5:18 6:14
106:19,22
107:8 157:3

**31st**   159:25
**32**   4:17 5:20
108:23,24
**33**   5:23 129:10
129:13
**34**   4:20
**36,000**   46:3
**37**   6:1 133:15
133:16
**39**   6:4 135:3,5

**4**

**4**   7:4 40:4
178:25 180:9
182:15
**4.1**   168:19
**403**   155:22
156:4,11
157:22 159:17
164:8 167:6,18
168:10,22
169:7 176:16
**404**   157:22
159:17 167:18
168:10,22
176:16
**41**   6:7 138:16
138:17
**416**   2:18
**42**   2:22 6:10
140:5,7 142:7
**43**   6:13 156:25
157:1 159:22
162:1
**44**   4:22 6:16
158:16,19
160:2 161:6

**45**   6:19 162:25
163:1
**45,000**   101:18
101:20
**46a**   6:22
169:19
**4:13**   160:22,23
**4:14**   86:13
**4:21**   160:24
161:2
**4:49**   184:7,22

**5**

**5**   42:20 174:19
174:19 180:4
**50**   63:13,15
**55402**   2:13
**57**   6:24 171:16
171:17 182:12
**58**   4:17 32:19
32:20
**58,650**   107:14
**59**   4:20 34:1,5
43:12

**6**

**6**   43:13
**6,600**   109:22
**60**   41:23
**600k**   97:2
**612**   2:13
**621**   16:4
**64**   7:1 177:13
177:14
**650**   2:12
**67**   7:3 178:23
178:24 182:14
**688-1154**   2:13

**[7 - additional]**

| **7** |
|---|
| **7**   5:14 96:3 |
| **700,000**   158:9 |
| 161:12 |
| **716**   2:23 |
| **718-2056**   2:7 |
| **730,000**   167:10 |
| **730,344**   167:12 |
| 168:5 |
| **77**   1:21 |
| **78**   4:23 |
| **7:51**   142:10 |
| **7th**   96:17 |

| **8** |
|---|
| **8**   179:13 |
| 182:25 183:4 |
| **800k**   97:3 |
| **81**   5:1 |
| **849-1333**   2:23 |
| **85**   5:4 |
| **89**   2:17 5:7 |

| **9** |
|---|
| **9**   6:5 135:7 |
| 175:6,16 |
| 180:21,24 |
| **90**   5:10 |
| **929-1103**   2:18 |
| **96**   5:13 |
| **9th**   135:15,20 |

| **a** |
|---|
| **a.m.**   142:10 |
| **a.t.a.**   35:11,15 |
| **abilities**   29:25 |
| **ability**   62:3 |
| 186:12 |

**able**   14:5 24:1
29:6 30:8 64:1
128:12,12
145:13 164:19
**above**   1:19
133:1 141:9
143:24
**accept**   165:19
**access**   65:23,25
68:23 71:14
**account**   34:20
63:14 67:3
68:9 69:18
70:17 71:19,22
72:25 73:11
76:5 79:8 80:3
82:22 104:20
114:23 115:2
143:9 148:2
**accountable**
92:11 94:14,15
**accountant**
14:5,17 149:10
166:8
**accountants**
14:11,11,13
17:6
**accounted**   29:1
116:14 124:13
148:15
**accounting**
14:4,9,20
22:11 23:22,23
23:24 24:2,4,6
24:14,19 25:3
25:5 26:7
29:10,21 30:1
30:4,5,6,11

36:17,22 50:13
53:15 99:4,6,8
99:16,24 100:8
100:23 115:14
116:22 117:5
124:15 147:18
148:17 182:17
**accounts**   4:25
24:21 30:10
34:21 59:11
63:1,21 64:23
65:7,24 66:16
66:25 68:23
69:8,11,22
70:5,12 71:7
71:15 72:21
73:18 74:11,13
74:16 75:18
76:8,10,21,23
77:13,23 78:7
78:12 82:4
83:9 142:14
145:7 171:12
**accumulate**
62:13
**accurate**   33:16
34:24 78:11
81:16 86:6
89:20 91:3
96:16 105:19
107:19 109:6
129:25 134:12
135:19 138:23
140:16 157:16
160:9 162:8,17
163:8 175:10
178:5 179:4

**accurately**
44:15
**acquire**   76:22
**acquired**   65:19
**acquiring**
76:20
**acronym**   28:18
31:8 126:7
165:15
**acronyms**
28:17
**act**   80:21
**acted**   132:19
**action**   9:4
134:21 186:15
186:19
**actioned**
123:24
**active**   49:7,7
94:23
**actual**   13:24
31:16 32:2
43:11 45:2,5
83:8 104:17
108:21 122:10
151:25
**actually**   13:25
39:12 52:23
98:10 130:3
166:4,16
**ad**   21:14
145:23,25
146:3
**add**   42:6
109:24
**added**   52:25
**additional**
18:10 42:6

CASE 0:24-cr-00007-JMB-DLM   Doc. 136-3   Filed 06/27/25   Page 190 of 231
Antonio Severin , Vol I                                    May 15, 2025
[additional - answer]                                                Page 4

45:24 101:15
180:16 183:10
**address** 16:6,7
16:17
**adjourned**
184:22
**administer** 9:2
**administration**
15:10 53:15
**adrienne** 3:4
9:23
**adult** 41:19
65:12,17 68:10
**advance** 108:5
119:23 120:10
120:16,25
121:4,21,24
122:1,16,20,22
124:19 125:4,6
125:12 127:13
127:24 128:15
141:16 147:10
151:6,7 154:2
154:8 163:22
163:25 172:8
173:7 174:24
**advanced**
124:10 183:2
**advances** 73:23
113:17 121:23
122:9 124:13
129:6 142:17
142:20 143:5
144:6 154:5
172:8,22,23,24
173:5,6,7,12
**advertising**
42:10,11 67:13

**advice** 83:24
128:10
**advised** 77:18
**affiliated** 22:2
69:4
**affiliations**
9:10
**affirm** 10:6
**affirmed** 10:14
**afternoon** 8:4
9:12 144:16
**agarwal** 7:4
178:25
**agency** 165:18
168:17
**agm** 126:2,8,21
**agms** 126:10,13
**ago** 12:13
100:21
**agree** 8:12 50:5
74:2 86:14
87:5 93:25
94:10
**agreed** 101:10
125:18
**agreement**
11:20 43:2
45:5,8 52:16
53:6,7,8 56:25
57:16,25
124:25 148:10
148:23 151:17
151:18,25
**agreements**
44:23 53:3,10
144:15,18,23
**ahead** 85:6

**aib** 64:8
**aided** 186:11
**al** 5:5,16 6:14
6:17,20 86:1
105:14 157:2
158:20 163:2
**alexandria**
68:14,17 69:23
142:23
**allow** 42:6
149:18
**allowance**
103:22
**amanda** 2:5
9:12 66:1,3,4
69:1,15,25
70:10 71:16
72:13 73:1
74:17,22 75:4
75:9,10 98:9
99:11 100:6,24
104:18 116:25
123:13 135:1
150:6,8 163:18
**america** 1:6
8:17
**amex** 6:21 82:4
112:10,11,11
114:14 115:23
115:24 163:3
**amount** 19:1
63:16 92:17
99:13 100:25
101:11,12,15
101:18 103:25
105:1 106:6,8
108:6 109:24
115:6,21

116:16 123:13
123:18,19,22
128:7 147:23
148:20 152:16
171:6 175:20
178:1 180:11
183:2,5,6
**amounts** 113:5
113:6,13,18,19
115:25 116:5
123:15 124:25
128:6 147:8,20
148:10 173:15
173:18,21,24
174:3,6,9,15
176:3,8 178:14
181:20,25
182:7 183:11
**anguilla** 38:5
38:10
**annual** 41:9
126:2,9 179:15
179:16
**annualized**
42:1
**answer** 29:6
51:25 81:5
119:15 122:8
125:16 126:19
128:3 140:1
150:5,16 151:4
155:9,24 156:6
156:13,22
157:24 162:21
164:10 168:14
168:24 176:20
177:1

**answered** 87:8
  149:16 154:21
  155:17,22
  156:4,11
**antonio** 1:17
  4:3 8:15 10:4
  10:10,13 11:2
  184:14
**anytime** 82:3
**anyway** 51:24
**anyways** 72:19
**apart** 124:9
  128:25
**apologies** 134:7
  148:15 173:10
  182:14
**appear** 32:25
  33:15 34:23
  44:10 78:10
  81:14,16 86:5
  89:19 91:2
  96:15 105:18
  107:3,12,18
  109:5 129:24
  134:11 135:18
  138:22 139:3
  140:11,15
  157:15 158:24
  159:4 160:8
  163:7 175:10
  178:4 180:4
  182:15
**appearance** 9:8
**appearances**
  9:9
**appeared**
  28:17

**appearing** 11:8
**appears** 41:21
  79:12 80:10
  109:10 130:7
  142:8 175:7
  186:8
**appetite** 97:22
**application**
  93:11
**applied** 22:9
  181:24 182:7
  183:2,5
**applies** 82:3
**approach**
  126:24
**approval** 83:16
  125:11 126:15
  151:22 152:4
**approve** 75:9
**approved**
  61:22
**approximately**
  159:11 184:2
**apps** 70:23
**april** 7:4
  134:20 178:25
  179:5
**area** 12:24 22:5
  65:12
**article** 20:23
**articles** 82:7
**asked** 24:22
  80:1 84:15
  87:7 114:17
  127:24 146:24
  149:15 154:20
  155:17,21
  156:3,10 165:1

**asking** 33:7
  119:19 127:12
  140:25 141:2
  145:1 147:8
  155:10
**assess** 29:25
**assistance**
  90:11 166:25
**assistant** 66:7
**associated**
  15:11 17:13
  31:9 32:6
  52:13 59:7
  70:23 72:1
  112:3 114:4
**assume** 72:16
  76:13 112:10
  112:11 127:2
  137:1
**assumed** 29:18
**assumes** 182:1
**assuming**
  182:2
**assumption**
  29:19 72:17
**attach** 179:24
**attached** 106:9
  106:21 180:6
**attachment**
  33:20,23,24
  134:18
**attachments**
  134:8
**attempt** 92:17
  171:11
**attend** 125:20
  126:5,6,10,23

**attended**
  125:21 126:14
**attention** 33:9
  35:3 37:23
  58:25 78:16
  79:10 91:10
  109:4 136:22
  140:5 166:1
  170:3 172:10
  175:6 178:12
  180:20
**attorney** 2:10
  9:11,24 11:15
  186:17
**audio** 8:11
**audit** 165:5
**audits** 17:4
  165:5
**aug** 6:9 138:20
**august** 4:24 6:2
  6:5 78:6,13,19
  133:17,24
  134:13 135:6
  135:15,20
  139:11,15
  175:16 176:2,7
  178:13 181:19
  182:4,5
**authority**
  66:15,17 69:10
  70:1,2,11,13
  75:25 105:7
  110:9 114:12
  118:4 124:1
  138:8,13
**authorized** 9:2
**availability**
  126:25

Antonio Severin , Vol I

May 15, 2025

**[available - bay]**

Page 6

**available**
172:19
**avenue** 2:12,22
**avenues** 89:8
**aware** 25:12
27:10,11 47:3
48:18 55:6
58:18 59:4
60:25 62:17
64:22 68:13,18
70:20 71:3
73:13 74:11
80:24 81:6
87:1 104:19
107:15 110:19
114:16 118:8
118:11,14,17
119:17,21
121:10 122:16
139:13 146:7
146:25 147:4
148:5,24 150:8
151:10,13

**b**

**b** 157:22
159:17 167:18
168:10,22
176:16
**bachelor** 13:17
13:17,24
**bachelor's**
13:22
**back** 13:8
27:23 28:15
50:5 55:13
67:17 80:9
85:5,10 96:19

109:6 148:12
151:8 153:4
154:16 160:1
161:1 165:9
178:13 180:21
182:11
**background**
13:13 14:20
29:17 36:4,14
36:17,20,22
92:5 117:15
**backtrack**
113:11
**balance** 6:9
138:19
**balances** 170:9
170:17
**bank** 34:17
59:11 63:21
64:6,8,12,23
64:24 65:5,6,7
65:14,16,17,23
66:25 68:8,8,9
68:14,16,17,19
68:23,24 69:1
69:7,10,22
70:5,6,11,17
70:18,21 71:7
71:13 72:21,24
73:17 74:10,12
74:14,16 75:23
76:8,11,20,22
77:13,23 79:1
79:2,3 82:3,22
83:9 104:20
109:23 114:23
115:2 142:13
142:23,23,25

143:7,15
144:15,19
145:7 148:2
179:24 180:5
**banka** 64:20
**banked** 68:6,7
71:11 74:9
**banking** 17:10
17:12 27:7
34:14,14,19
64:5 68:12,13
68:19 74:7,7
76:14,24 77:6
77:11,16
**banks** 27:13
64:1,3 65:13
65:14,15,18
71:12,13 74:10
76:16
**bannister** 7:5
39:5,23 53:19
53:22 54:1,4,8
54:16 55:14,14
56:25 57:2,5,7
57:10 132:5,10
155:1 171:8
172:12 174:16
179:1,15,19,20
180:1,18 183:1
183:14,15
**based** 19:7
29:19 36:13,19
42:16 46:8
52:17 53:2,21
55:4 56:6
72:17 75:15
82:13 87:18
88:24 92:6

94:8 97:7 98:7
98:10 99:10
101:13 112:7
125:9 127:20
128:7,8,10
132:8,18
143:20 146:22
151:21 162:15
165:22 166:13
168:16 172:18
177:3,4,6
180:8 181:23
**basically** 22:14
26:20,22 28:22
29:22 34:13
42:4 43:7
48:21 49:14,23
61:6 72:18
82:19 92:5
97:14 113:18
124:14 154:3
172:1,2,6,7
**basis** 63:19
115:7
**batched** 63:16
**bay** 43:20,23
43:24 44:1
51:3,3,5,10
56:7,14,17
57:25 58:3,6,8
60:2,3,4,7,12
60:14 61:2
82:23 102:11
147:9 148:7
149:3,24 151:7
152:10,13
156:2,9 167:13
168:6,20 176:4

176:9 181:19
181:25 182:8
183:6,11,16
**bear**  87:19
**began**  19:13
**beginning**  9:10
85:5 86:17
161:1
**begins**  181:2
**behalf**  2:3,9,15
2:20 9:13,14
9:16,18 10:2
27:8,9 121:13
147:21,23
148:7,10,12,21
149:4,24
**belief**  143:19
**believe**  16:3,15
33:21 47:10
69:2,14,19
73:1 74:23
76:2 87:24
88:13 99:10
102:23 134:7
144:25 146:9
146:13 149:10
150:1,6,10
153:14 168:25
169:11
**belonging**
114:3
**beneficial**  39:7
39:11,16 40:22
82:9 176:21
**beneficiary**
99:20,21
**best**  29:4
145:12 186:12

**better**  18:11
**big**  90:7
**bigger**  161:11
**biggest**  97:1
**bill**  9:16
**bills**  101:4
110:20,23
**bioveil**  65:4
**bit**  30:21 31:7
50:5,9 52:22
55:14 97:25
117:14 130:5
145:19
**blind**  21:3
**blow**  40:5
42:13,14,20
86:9 109:4
129:10 139:2
140:5,19
141:20 158:17
163:5
**blue**  174:10,12
**board**  26:21,24
49:24 58:21,24
83:11,13 84:17
93:1 98:17
104:2 110:14
110:15 117:24
117:25 121:8
121:14 125:18
125:20 126:1
126:15,22
137:3,21
**board's**  124:6
**boardroom**
126:22
**bodies**  14:9

**body**  105:25
130:13 136:5
**bookkeeping**
148:24
**books**  116:17
116:20 149:6,8
150:11,18,23
181:15
**border**  51:10
**boris**  2:4 9:14
**born**  12:25
**bottom**  42:14
78:17 79:11,12
91:10 93:14
109:9 130:4,9
132:14 135:23
140:20,21
142:6,8 159:3
160:13 163:11
163:21 172:21
**bourget**  2:4,7
9:14,14 23:5
107:9 184:17
**branch**  82:22
**brand**  28:23
45:2
**branded**  65:5
**break**  84:19
85:11
**breakdown**
107:5,13
**brian**  66:18
**brick**  15:24
**bridged**  14:14
**brief**  84:18,22
178:19,20
183:21

**briefly**  44:19
45:7
**bringing**  83:17
**brittanyville**
48:7,10,13
**broadcaster**
67:5,19,19
77:10
**broadcasters**
43:10 67:6
**brought**  23:2
120:12
**btfylgrl**  173:25
174:2
**buddy**  158:2
**budget**  90:17
**budgetary**  89:4
**budgeting**
90:13
**buffalo**  2:22
**building**  27:13
184:2
**bulgaria**  64:12
**bullets**  131:24
131:25 132:2
**burry**  4:24 5:2
41:6 78:5 81:8
103:7 110:25
111:1,22
136:12
**business**  4:20
13:24 25:7
27:1 28:20,21
28:22 29:2
31:3 33:25
34:1 43:11
49:7,8 54:4
56:17 68:11

75:12,14 77:7
77:8 79:20
89:8 91:25
93:13 94:23
111:7,10
112:13 113:1
115:10 117:10
156:16
**business's**
145:12
**butterflygirl**
173:25
**buy** 42:7 65:5
**buyveil** 65:5

**c**

**c** 2:1 62:23
172:11
**ca** 14:10
**calculate** 92:17
**calculation**
172:7
**call** 85:22
132:21 161:22
**called** 1:18
13:16 14:4,10
14:13 15:5
19:16 27:4,20
37:24 38:1,21
46:19 48:13
62:22 64:24
65:4 70:23
116:17 120:18
131:22 158:2
173:8,9 176:12
**calling** 119:12
127:14 145:15
150:3 151:1

162:9,19
167:16,18
168:10 169:8
**calls** 54:13 98:8
149:16
**cam** 42:9
**cam4** 41:10,13
41:15,16,21
42:2,16,18
43:6,7 44:20
44:25 45:1
61:14 62:19
63:3,4 92:2
**cam4.com** 45:4
67:20
**cam4.com.**
41:16
**cambria** 2:21
**camera** 8:8
**canada** 1:13
3:4 8:22 9:24
12:15,17 74:12
74:14 165:18
166:13,16
168:17 186:3
**canadian** 14:4
14:11,13,16
18:24 32:13
**capabilities**
127:13
**capacity** 24:17
**captured** 99:13
99:24
**caputo** 1:25
8:25 185:3,22
186:6,22
**car** 103:22

**card** 36:11
61:20,21 62:4
62:14,17,20
63:5,9 75:22
110:20,23
111:9,12,17,19
112:4,7,14,20
114:3,5,9,13
114:17,24
115:4,18 116:6
117:11
**cards** 61:24
63:19 82:4
112:18,24
115:21 116:14
**carrying** 29:10
60:22
**case** 8:19 65:18
**cash** 6:9 67:8
86:22 87:6,16
87:20 94:17
126:25 127:1
128:5,6,7,10
131:6 138:19
180:16 183:14
**catch** 130:20
**categories** 42:5
**category**
145:20
**catella** 64:14
158:10 161:13
**cayman** 68:15
68:17 142:24
**centre** 53:17
90:2
**certain** 22:13
26:25 53:12

**certainly** 30:5
**certificate**
185:1 186:1
**certification**
14:24
**certified** 8:23
**certify** 185:4
186:7
**chad** 17:22
23:13,15,16
37:12 41:6
43:19,21 50:13
50:25 165:13
169:11
**chain** 4:23 5:1
5:4,7,10 6:10
6:13,16,19
78:4 81:7
85:25 89:15
90:23 129:12
130:6 135:25
140:7,12 141:9
157:1 158:19
159:4,5 163:1
**change** 5:22
26:8 65:16,20
73:4 109:1
**changed** 18:17
18:21 19:1
65:7 100:19
102:8 143:5
**changing** 76:17
94:4
**characterizati...**
174:23
**charge** 125:3
148:22

charged  52:17
  148:11,12
  153:9
charges  62:14
charlotte  2:16
  9:25
chart  4:22
  30:10 44:6,11
  44:13 108:3
chartered
  14:10 24:21
chat  19:19,20
circumstances
  34:16 119:18
citizen  12:14
city  12:19
claim  153:6
clare's  70:11
clarification
  66:20 71:20
  72:4 120:21
clarify  25:4
  183:3
classified
  108:20 147:9
clear  159:22
  184:17
clearly  82:8
clients  50:20
  50:21
closer  88:2
  131:25
clothing  20:23
clvs  3:7
cma  13:19 14:1
  14:11,24
cmj  2:18

code  110:9
  138:8,13
  147:19
coded  102:21
  108:9,15,21
  132:23 147:18
  147:20,23
  148:17 176:4,9
coding  106:8
  107:23 109:25
  117:9 138:5
collateral
  152:24 153:2,3
  153:6,6
collect  45:11
collecting
  91:21
collects  43:9
color  21:1,2
column  108:5
  174:21
columns
  172:11
come  25:17
  26:3 50:5
  70:19 75:8
  82:21 90:6
  92:24 117:4,6
  143:11 146:15
  153:12 154:4
  165:8 169:3
comes  121:1
  122:4
coming  51:8
  110:13 141:5
  143:1
commencing
  1:22 8:1

comments
  28:14
commissioner
  186:24
communicate
  104:23 146:19
communicati...
  84:3 85:13
communicati...
  26:12
commute  26:5
  26:6
companies
  15:11 17:13
  22:6 25:9 31:8
  31:9,21 32:6,9
  32:10 38:8
  42:12 44:23
  47:2 48:21
  52:13 59:7
  62:18 76:15,25
  77:16 80:1,2
  84:2 85:13
  90:19 99:1
  127:23 148:11
company  15:5
  17:3,4,5 19:16
  23:23 31:14,15
  31:17,19,23
  32:1,2,3,12,13
  32:17 36:7,8,9
  36:12 37:4,24
  38:1,5,16,21
  40:11,13 42:15
  46:8,14,19
  47:7 48:12
  50:8 52:9
  55:10 56:9

66:8 70:23,24
  87:23 88:22
  89:5 90:16
  92:9 95:10,12
  95:12,13
  100:17 101:20
  111:10 112:3
  117:1,18,21,22
  117:22 118:2
  128:7 131:6,10
  139:13 143:8
  145:11 148:25
  153:18 164:19
  168:20 170:11
  170:13,18
  172:3 175:18
  175:22 180:12
  181:3,10,14,15
company's
  170:6 175:15
compared
  121:21
compensation
  18:12,20 45:24
  46:7 93:20
competitive
  94:24
complete
  105:24 132:14
comply  124:2
  128:16
component
  91:19 94:17
compound
  131:12
computer
  67:14 186:11

concern  144:17
161:11
concerning
110:15
conclude
139:18 184:3
concludes
184:8
conclusion
162:10 167:19
condition  84:4
127:23
conducted  8:7
confirm  10:18
11:5 64:4
139:10 159:23
180:24
connection  8:9
consider  30:17
94:24 104:9
considered
49:14 65:13
162:23 164:6
considering
50:16
consistently
98:25 102:25
consultant
22:22 74:1,1
consultation
98:17
consulting
48:21,23 49:11
49:14,17 56:24
57:15,24 67:10
73:22 97:3,18
101:11 103:1
103:14,16,20

103:25 104:5,9
104:17,24
109:25
consumed
53:11
consumer  42:8
contact  5:3
50:2 51:24
54:5,16,17
56:18 79:24
81:9
contacts  52:1
76:18
contained
124:2 150:24
content  41:17
67:20
context  61:25
62:10
continuation
131:17
continue  8:11
37:19 69:9
116:2 159:16
continues  37:5
contract  80:14
contractual
43:2
control  37:4,19
47:25 95:1,4
controlled  40:2
controller  18:3
18:7 23:11
30:23 51:18
59:3 66:7 94:9
95:7 119:17
127:21 145:10
153:21 162:16

164:7 168:8
conversations
25:1
convey  128:19
conveying
179:11
copied  79:18
copy  33:16
34:24 78:11
81:17 86:6
89:20 91:3
96:16 105:19
107:19 109:6
114:6,10
129:25 134:12
135:19 138:23
140:16 144:22
144:24 157:16
160:9 163:8
178:5 179:4
182:16
cordial  165:7
corner  172:21
corporate  4:25
77:15 78:6,12
79:8
corporation
2:16 6:23,25
27:5 31:16
37:25 38:6,11
39:4,5,20,21
39:23 40:10
43:4 45:2,4
48:7,15 53:19
53:24 54:8
55:2,14,15,18
55:19,21,24
58:16 118:19

169:21,25
171:19 175:9
correct  20:14
20:15 22:18
31:12 32:16
34:22 39:18
43:16 44:25
70:14 80:4
85:14,15 93:3
95:20 113:21
116:15 121:7
121:20 124:16
127:7 141:7,12
153:18,19
171:23 172:20
183:7 185:14
corrected
97:17
correction
158:5
correctly  15:1
41:10 80:15
106:12 170:19
172:25 175:25
177:20 181:16
cost  52:18,21
52:24 53:1
89:11,12 90:7
95:1 103:22
148:13,22
costs  52:24
93:22 94:11,13
94:21 95:4
counsel  1:18
8:16 9:8,23
10:1,7 85:6
186:13,17

Antonio Severin , Vol 1                                          May 15, 2025

| | | | |
|---|---|---|---|
| **countries** 79:21 | **crr** 1:25 185:3 | 32:20 62:24 | 178:25 185:18 |
| **country** 101:13 | 185:22 186:22 | 78:5 81:8 86:1 | **dating** 19:20 |
| **couple** 54:12 | **cs7296586** 1:25 | 89:16 90:24 | **dave** 33:2,14 |
| 146:10 | **csr** 1:25 185:3 | 96:3 105:14 | 47:10 80:5 |
| **court** 1:1,2 | 185:22 186:22 | 108:25 129:14 | 82:1 83:12 |
| 8:18,25 10:6 | **cumulative** | 133:17 135:6 | 84:15 86:12 |
| 11:1 160:18 | 155:7,16,22 | 138:18 140:8 | 109:12 143:25 |
| 183:25 | 156:4,11 | 157:2 158:20 | **dave's** 79:7 |
| **covered** 12:1 | **curacao** 38:11 | 163:2 169:19 | **david** 1:9 2:9 |
| **cpa** 13:20 14:1 | 55:16,20,22 | 180:21,24 | 8:17 9:17,19 |
| 14:9,14,15,18 | 68:8,19 | **d46** 169:18 | 9:20 20:5 35:9 |
| 14:22 29:18 | **currencies** | **dac** 32:11 | 35:11,21 39:24 |
| **cr** 8:19 | 25:10 79:22 | 45:19 57:8 | 40:3 41:5,5 |
| **cra** 165:5,16 | **currency** 23:24 | **dallas** 13:4 | **day** 28:3 38:12 |
| **create** 72:24 | **current** 16:22 | **data** 91:22 | 38:12 47:25,25 |
| **created** 27:17 | 17:21 76:24 | 100:14 | 52:4 185:18 |
| 34:8 107:15 | 170:9 | **date** 58:16 | **days** 12:12 |
| 123:5 | **currently** 15:2 | 121:9 122:5 | **dc** 2:6 |
| **creating** 34:11 | 15:20 18:23 | 129:22,23 | **dealing** 25:10 |
| **creation** 63:21 | 46:10 59:4 | 130:1 133:22 | **debt** 86:22 87:6 |
| **credit** 36:11 | 62:21 64:24 | 133:24 135:13 | 87:16,25 88:1 |
| 61:20,21,23 | 68:11,12 71:12 | 159:8,11,12,15 | 130:16 131:7,8 |
| 62:4,13,17,20 | 106:21 | 159:23 177:19 | 170:14 180:11 |
| 63:5,8,18 82:4 | **customer** 62:7 | **dated** 4:18,24 | 181:13 |
| 110:19,22 | 63:8 65:20 | 5:2,5,9,11,14 | **debts** 87:23 |
| 111:9,11,17,19 | **customers** 63:4 | 5:16,20,21,24 | 175:23 |
| 112:4,7,14,18 | **cut** 89:8 | 6:2,5,8,14,17 | **december** |
| 112:19,23 | **cuts** 90:7 | 6:20 7:2,4 | 170:7 171:1,2 |
| 114:3,4,9,13 | **cutting** 89:11 | 11:10 32:21 | 171:10 173:3 |
| 114:17,24 | 93:19 | 33:3 78:5,18 | **decide** 65:17 |
| 115:4,18,21,22 | **czech** 64:20 | 81:9 86:1 | **decision** 47:21 |
| 115:24 116:6 | | 89:17 90:24 | 88:16 94:3 |
| 116:14 117:10 | **d** | 96:3 105:15 | 124:6 |
| **criminal** 1:3 | | 108:24,25 | **decisionmaker** |
| 3:3 9:22 | **d** 2:21 4:1,17 | 129:14 133:17 | 98:19 |
| 178:10 | 4:23 5:1,4,8,11 | 135:6 138:18 | **decisions** 58:23 |
| **cross** 184:4 | 5:14,15,20,24 | 157:2 158:20 | 107:24 |
| | 6:1,4,7,11,13 | 163:2 177:15 | |
| | 6:16,19,22 | | |

**declaration**
119:20 121:6,7
**declare** 175:18
**declared**
117:25 118:18
118:21 119:11
120:18 121:8
141:18 179:15
179:18 180:10
182:22,24
**declaring**
118:3 137:4,18
**decrease** 95:22
**deducted**
113:25
**defendant** 1:10
2:9 21:5,8,22
22:2,8,25 23:1
23:10,14 24:15
25:2,11,15,25
26:13 27:7,11
28:10,13 29:3
30:17 33:17,20
34:9,24 36:3,3
36:6,6 47:4
50:3 51:1,2,7
52:5,8 54:6,10
54:20 55:12
56:1,5,9,15,19
56:23 58:21
60:7,13 69:14
69:17 75:16
76:6,23 77:15
77:18 78:12
79:14,16,23
80:6,7 81:17
82:14 83:1,5,6
83:18,22,24

84:1,7 85:12
86:7 87:2,19
88:22 89:5,9
89:21,25 90:16
91:4,8 92:14
94:5,16 95:6
96:14,23 97:8
97:11 98:12,14
98:21 99:11
100:22 102:2
103:11 104:8
104:13 105:1,5
105:20 106:10
107:17,20
108:1,8 109:19
110:5,14 111:4
111:16,18
112:1,5 114:17
115:4,6,10,12
117:3,8 120:8
121:17 123:6,7
125:10,10
126:14,24
127:5,12,22
128:14 129:1,5
129:19 130:1
130:10 131:18
132:24 133:4
134:1,13,16
135:10,20
136:2 137:9,13
137:19,24
138:5,24 139:4
139:18 140:12
141:23 142:1
143:25 146:12
146:16,18,24
147:5,6,15

148:2 152:2,15
152:17,18,23
153:7,14,23,25
154:10,23
155:11,14,20
156:15 157:8
157:17 158:1
158:24 159:6
160:10 161:10
161:16 162:1,6
162:16 163:9
163:16 164:25
165:13,19,23
166:21,24
167:3,10,11
168:5 169:3
170:22 171:2
175:4 176:23
177:2 178:9
180:16
**defendant's**
26:18 29:17,25
36:10 49:20
53:25 60:22
88:16 92:16
102:16 112:14
114:14,24
115:23 116:6
**defendants**
150:21
**defense** 169:17
175:6 180:21
**defer** 88:15
94:5
**define** 61:19
**definitely**
88:18

**degree** 13:24
**delaware** 2:22
**deny** 98:21
**department**
2:4 3:4 22:12
**depend** 123:18
**depending**
51:21 63:10
123:12,13,21
**depends** 8:8
**depict** 44:16
**depicted** 59:2
**deposit** 62:12
110:2 158:10
**deposition** 1:17
8:6,15,20
10:20 184:18
184:20,22
186:7,9,15
**deposits** 66:25
70:17 73:17
**der** 35:12,21,24
36:2,8,20 40:3
41:6 103:9
111:2,14,24
114:8 116:9
147:1 158:1
**describe** 13:12
22:8 26:11
27:19 45:7
46:16 52:14
75:5 79:4
82:16 84:6
91:13,25 102:3
120:15 173:4
**described** 24:8
43:21 50:7
96:9 147:15

describing
97:12 122:9
description
4:15 99:10,12
designated
14:22
designation
14:4,7,12
desired 118:4
desires 146:19
detail 44:21
detailing 137:6
details 5:3
79:20 81:10
determination
175:2
determinations
98:14 115:14
determined
152:16 170:8
175:17
determining
92:1 115:9
developed
24:19 27:22
30:10
development
70:25
dialxs 62:24
dictate 49:17
differ 18:7
31:25 38:8
53:8
difference 38:2
70:4 120:15
differences
69:21 103:14
115:17 121:23

122:7
different 25:9,9
110:17 145:20
153:22
differentiating
121:4
differently
110:10 115:20
difficult 82:19
dinner 30:16
direct 4:5
10:24 33:8
35:3 37:22
54:19 58:25
60:7,13 78:16
91:9 108:8,15
109:3 136:22
140:4 166:1
170:3 172:10
175:5 178:12
180:20 182:11
directed 60:12
direction 49:17
directions
124:2
directly 26:16
31:9 33:6
146:6
director 6:23
6:25 16:24
17:1,8,17,18
18:8 19:15
30:23 38:16
40:12,13,16
45:18,20,25
48:13 51:18
54:7 59:3
66:18,18 80:20

94:9 127:21
145:11 152:9
153:21 164:7
165:24 169:20
169:24 171:18
175:8
directors 47:1
69:6,13 70:3
72:3,7 73:6
88:10,12,13
discuss 85:21
89:4,7 166:21
discussed 67:1
84:14 87:6
92:4,14 171:3
171:5
discussing 74:8
90:17 127:3
161:5
discussion 90:8
170:5 175:15
discussions
93:7 133:8
disqualified
168:11
distributable
117:17
distribute
85:16,19
distributed
28:4 172:6
distributing
85:19
distribution
134:6
distributions
93:22 95:15
134:19

district 1:1,2
8:18,18
dividend 6:3,6
7:5 108:5
117:16,17,22
117:25 118:1,4
118:5,8,12
119:23 120:10
120:16,16,18
120:18,19,20
120:25,25
121:1,1,5,5,8
121:11,13
122:22 125:12
127:3,13
128:15 129:6
130:20 131:22
132:17 133:13
133:18 134:5
134:10,13,19
135:7,17 136:7
137:12 138:3
139:20 154:2,7
170:17 171:5
174:24 175:19
179:1,13,14
180:18 181:12
182:5,6,21
dividended
128:12
dividends
117:19 118:15
118:18,20
119:10 122:17
124:10,20
125:4,5,6
127:24 128:20
129:2 131:11

135:20 137:5
137:19 139:11
139:14 140:3
141:17 142:4
142:15,16
143:1,8,13,18
143:23 171:3
173:8 179:18
180:1,10,16
181:4 182:22
182:24 183:14
**division**  2:4
**dlm**  1:3 8:19
**document**  34:6
34:11,24 36:25
42:16,18
106:11,14
107:3,12,16
125:2 169:23
170:21 175:7
177:18,22
178:8 180:1
**documentation**
115:14 122:2
152:19
**documented**
124:11,12
177:10
**documenting**
178:5
**documents**
124:24
**doing**  24:23
28:1,11 30:7
72:20 95:13
117:23 121:15
128:5 134:17
142:15,16

143:17
**dollars**  175:22
181:5
**domain**  45:3,3
**dominica**  64:18
**dooling**  2:12
9:18,18
**draft**  28:12
**draw**  79:9
**drawn**  119:20
**draws**  172:8
**due**  116:16,17
122:4 167:12
168:6,19
181:25 183:11
**dufferin**  15:23
16:21
**duly**  1:20 10:13
186:9
**duties**  18:10

**e**

**e**  2:1,1 4:1,17
4:23 5:1,4,7,10
5:13,15,20,23
6:1,4,7,10,13
6:16,19 7:3
10:11,11 26:14
32:20 33:2,16
33:19 34:25
62:23 77:14,19
78:4,11,17,18
79:5,13,16
80:11 81:7,17
85:17,25 86:6
86:12 87:12
88:3 89:15,20
89:24 90:23

91:3,7,11,14
92:13 93:16
96:2,6,11,16
96:22 98:11
99:10 105:13
105:19,25
106:11 108:24
109:15,20
110:8 129:12
129:13,18,25
130:5,6,8
133:3,16,23,25
134:12,17
135:4,5,9,19
135:24 136:5
136:20 137:24
138:11,17,23
139:3 140:7,11
140:16,22,22
141:1,9,10,22
142:2,9 143:24
145:4 147:16
150:21,24
157:1,7,16
158:6,18,19,24
159:1,4,5,6,8
159:23 160:9
160:13 161:8
163:1,6,8,11
163:17,19
177:25 178:24
179:5,8,11,24
180:6,9
**earlier**  37:23
48:16 49:6
50:7 67:18
96:9 110:4
116:12 130:5

135:24 136:19
181:18
**early**  25:16
26:5 69:19
73:1
**earned**  13:22
**education**
14:20 166:13
166:19
**educational**
13:13
**effective**  5:18
106:1,3,23
134:6
**efficiencies**
89:12
**effort**  90:13
97:19
**eidsness**  37:13
41:7 49:9
145:3 146:13
146:25 163:23
179:9,11
**eight**  40:25
82:20 175:21
181:4
**either**  16:14
54:6 65:19
114:1 182:8
**elias**  38:18,19
38:20,22,24
40:14 48:12
54:7,10,18
70:3 80:18,25
88:14 152:8,12
**elias's**  80:19
**eligible**  122:19
122:21

employed  15:2
  19:22 186:14
  186:17
employee
  66:13 186:16
employees  37:2
  37:11,15 49:6
  67:12
employment
  19:14
encompass
  31:8
enter  63:5 73:6
  99:12 100:16
  100:18 116:21
  117:7
entered  99:5,8
  149:5,8
enterprise
  24:12
entertainment
  32:11 41:20
  45:19,25 57:8
  57:12 65:12,17
  68:10
enthusiastic
  23:1
entire  158:6
entities  27:25
  30:22 31:3
  59:1,11,13,16
  61:15 75:16
  119:9,10
entity  29:23
  38:3 40:8
  44:12 49:3
  57:22 58:9
  59:18 61:22,22

97:8 153:5
  176:11 177:4
entries  117:1
  182:16
entry  181:14
epoch  62:23
erickson  1:9
  2:9 4:17,23 5:1
  5:4,8,11,14,15
  5:20,24 6:1,4,7
  6:11,13,16,19
  8:17 9:17,19
  9:20,20 20:5
  20:16 21:8
  32:20 33:14
  35:9 39:25
  41:5 78:5 80:5
  81:8 86:1,12
  89:16 90:24
  96:3 105:14
  108:25 109:12
  128:19 129:14
  133:17 135:6
  138:18 140:8
  143:25 150:25
  157:2 158:20
  163:2
erp  24:3,9,25
especially
  82:20
esquire  2:4,5
  2:11,12,16,21
established
  76:12
estimate
  174:18
estimation
  94:20

et  5:5,16 6:14
  6:17,20 86:1
  105:14 157:2
  158:20 163:2
etcetera  172:13
euros  46:3
evaluations
  17:24
eventually  13:8
  22:16 61:7,8,9
  117:4
everybody
  14:14
evidence  182:2
exactly  16:9
  51:14 58:15
examination
  1:18 4:5 10:24
  184:4 185:10
example  34:20
exchange  82:5
  104:10
exchanged
  77:14
executed
  170:21 178:8
executing
  101:23
exert  37:19
exhibit  32:19
  32:20 34:1,5
  35:1 43:12
  44:5,6 49:4
  58:12 78:3,4
  81:7,13 85:24
  85:25 89:14,15
  90:21,23 95:25
  96:2 105:11,13

106:13,19,21
  106:22 107:7
  107:20 108:23
  108:24 129:9
  129:13 133:15
  133:16 135:3,5
  138:16,17
  140:5,7 142:7
  156:25 157:1
  158:16,19
  159:12 160:2
  161:5,25 162:1
  162:25 163:1
  169:17,19
  171:15,16,17
  175:6 177:13
  177:14 178:23
  178:24 180:4,9
  180:21,24
  182:12 183:19
exhibits  4:12
  139:17 160:4
existed  119:5
existence  121:5
expense  70:22
  99:18,20
  112:19 113:2
  145:25
expenses  27:24
  32:3 52:19
  59:13 61:11
  67:2,10,11
  68:3 70:21
  73:21 74:3
  89:8 91:20,24
  93:9 94:25
  97:2,9,12,15
  97:20,23

108:19,21
111:7,10
112:13 113:1,4
113:9,12,23
114:24 115:9
116:13 117:10
145:24 146:5
**experience**
20:2 23:3
29:20 94:8
162:15
**expertise** 49:23
**explain** 21:12
37:7 46:24
50:9 69:21
78:24 88:19
117:16 121:22
147:22
**explained** 11:1
44:19 104:24
**extended**
151:23
**extent** 170:12
181:8
**external** 17:5
100:15 166:7
**extra** 139:10
165:4

**f**

**facilitate** 77:12
149:3
**facilitation**
75:12 108:16
108:20
**facility** 16:1,3
**fact** 29:21
94:11 147:18

**factor** 121:4
**facts** 182:1
**fair** 62:6
139:18 179:4
**fairly** 44:15
**faithfully**
102:16
**falling** 47:18
**false** 167:14
168:7
**familiar** 20:4
30:24 31:22
32:14 37:24
39:6 41:13
42:23 43:23
48:6 53:18
55:1,3 72:22
78:20 110:6
171:21 176:11
**familiarity**
36:13,19 87:18
**far** 45:2 51:22
54:23 55:11
84:8 94:16
154:4 174:24
**features** 42:6,9
**february** 5:9
6:17,20 7:2
89:17,21 90:9
158:21 159:9
160:6,11
161:10,15
163:3,9 177:15
177:20
**fee** 45:13 62:15
103:20,25
104:25

**feel** 19:25
22:23 86:19
105:7 110:9
124:1 138:8,12
**feeling** 145:5
**fees** 63:15 68:3
103:15 104:9
**fifth** 181:2
182:25
**figure** 41:22,22
**filed** 8:17 167:3
168:17
**filing** 166:13
166:19
**final** 96:24
**finalize** 28:15
**finance** 13:17
13:22 14:20
15:10 16:24
17:1,9,17,19
18:8 19:15
22:5 26:20
30:24 59:4
83:7 127:21
153:21 164:7
165:24
**finances** 17:3
36:15,20 50:1
51:18,19,23
52:7 54:15
59:4,5,8 77:15
85:13 94:9
145:11
**financial** 17:4
22:14 29:22
49:23 54:14,24
56:3,20 84:1,3
91:16 92:6

110:14 127:23
145:12 146:19
**financially** 9:4
186:18
**financials** 17:5
26:23 64:25
83:24 84:13,16
94:4
**find** 29:13 30:3
**finish** 149:18
167:21
**finished** 167:24
**fintech** 78:22
78:25
**fio** 64:20
**firefly** 4:19,20
6:23,25 27:2,4
27:14 28:7,25
31:6,7,16 32:5
32:22 33:24
34:1,14 37:16
37:19,24 38:1
38:4,6,9,10
40:16,20,22
41:8 43:20,22
44:17 48:5,14
48:17 49:18,21
50:1 53:24
55:17,19 57:2
57:18 58:3
59:21 60:14
61:8,12 71:9
71:11,12 73:17
73:20 74:3
76:8 82:20,23
83:11 84:4
85:14 87:20
88:25 93:2

95:8 98:5,15
98:22,25 101:2
101:23 102:25
104:4 108:15
110:19,22
111:11,17
112:4,8,17,19
112:23 114:4,8
115:17,21
118:12,13,18
118:21,22
119:2,4 121:13
122:11,16
124:18,24
125:3 128:8,25
129:4 131:3
132:2,6 134:5
134:14 136:9,9
136:13,16
139:16,20
141:6 145:22
146:4,20 147:1
147:5,24 148:1
148:1,7,12,12
148:20,21,22
149:4,6,8,25
151:14 152:9
153:16 154:7
154:24 155:20
156:9 162:23
164:12 169:20
169:25 171:11
171:18 172:13
172:24 173:13
175:9 176:8
177:7 178:6,14
179:24,25
180:10,17

181:20 182:9
182:16 183:15
**firefly's** 72:24
147:21
**firewall** 174:7
**firm** 9:1
**first** 12:3 13:21
14:23 15:17
19:16,18,23
20:2,10 23:18
24:5 26:17
28:10 33:8
35:15 42:17
58:11 78:10
79:11 80:10
90:5 98:3
104:15 105:23
109:3 113:15
117:14 118:7
120:1,6 130:23
131:25 136:7
136:10 140:21
151:9 158:4,5
158:17 165:15
**fit** 58:16
**five** 16:18,19
67:12 170:12
**flip** 130:3
**flowed** 77:9
**fly** 165:1
**focus** 69:9
97:25 109:9
130:23 161:23
173:11
**focusing** 50:18
73:8 104:13
**follow** 102:16

**followed** 72:23
**following**
106:6 182:5
**follows** 10:14
**foregoing**
185:5,13 186:7
186:9
**foresee** 165:11
**forgotten**
159:15
**form** 18:20
52:15 67:7
102:7 110:17
**formal** 118:8
118:11,14,17
118:20 121:11
122:25 123:2
151:10,14
**formalizing**
124:24
**format** 28:12
186:13
**formula** 148:13
148:23
**forth** 185:7
**forward** 15:12
21:7 24:2 30:9
94:3 106:5
141:3 184:10
**forwarded**
125:18 135:1
**found** 66:12
**foundation**
125:14 126:17
128:1 131:13
139:23 150:3
150:12 151:2
156:20 162:18

167:18 168:9
168:21 169:8
**founder** 38:20
49:22
**founders** 37:6
37:9,19 49:14
**four** 67:11
158:5 179:15
182:23,24
**frances** 22:21
22:21
**frequency** 26:8
**friend** 30:18
**frustrations**
164:18 165:3,6
**full** 10:9 27:3
49:7 80:11
106:7 136:23
139:7
**fully** 16:19
**fund** 170:15
175:24
**funds** 61:10
77:8 158:10,12
**further** 183:23
186:16
**future** 86:23

| g |
| :-: |

**g** 4:17,20,22,23
5:1,4,7,7,10,13
5:15,18,20,23
6:1,4,7,10,13
6:16,19,24 7:1
7:3 32:20 78:4
81:7,13 85:24
85:25 89:14,15
90:21,23 95:25

96:2 105:11,13
106:19,22
107:8 108:23
108:24 129:9
129:13 133:15
133:16 135:3,5
138:16,17
140:5,7 142:7
157:1 158:16
158:19 159:22
160:2 161:6
162:1,25 163:1
171:16,17
177:13,14
178:23,24
182:12
**gbp** 161:12
**gears** 30:20
117:13 145:19
**gejo** 33:7
**general** 9:24
14:13 16:25
22:10 26:18
42:2 58:12
99:3,9 104:3
116:5 117:22
122:12 126:9
**generally** 15:6
29:6 30:3
51:25 66:12
71:3 88:15,25
119:2,4,7
122:10 166:14
**generated** 61:3
61:10
**generating**
131:6

**germany** 64:16
**getting** 26:18
77:13 82:20
98:3 101:16
142:23
**ginter** 2:21
10:2,2
**given** 34:17
77:10 183:25
184:14
**go** 8:12 11:2,3
26:15,25 28:6
55:13 67:17
73:2 78:23
79:11 83:4
85:6 109:6
137:4 143:12
160:17 165:9
179:20 184:10
**goal** 91:21
**goes** 27:23
**going** 8:5 15:12
18:19 21:7
24:2 30:9
32:18,24 34:4
35:3,4 37:22
40:4,5 42:13
42:14,20 48:3
51:22 55:13
58:25 61:17
64:3 67:17
78:2,9,15,16
79:5,9,11 80:9
81:12,21 85:1
85:9,23 88:21
90:1 91:9
92:12 95:24,25
96:19 105:10

105:11 106:5
106:17 108:22
109:3,6 129:8
129:10 130:3
131:16 133:14
135:2,22
136:18 139:1
140:4,18,19,19
141:20 142:5,6
142:17,20
143:17 151:8
157:21 158:15
158:17 163:5
165:4 168:2
170:3 171:14
172:10 175:5
175:12 176:15
177:12 178:12
178:18,22
180:22 181:1
182:11
**good** 8:4 9:12
10:5 25:7 83:8
88:7 184:6
**goodale** 3:7
8:23
**gotten** 65:19
**gov** 169:17
**government**
11:10,25 12:4
12:8 32:19
34:5,25 43:12
44:5 49:3
58:12 78:3
81:13 85:24
89:14 90:21
95:25 105:11
106:18,19

108:23 129:8
133:15 138:16
140:5 142:7
156:25 159:22
160:2 161:5
162:1,25
177:13 178:23
**government's**
135:3 158:16
171:16
**grade** 13:14
**graduated**
13:15,17
**granity** 6:15
32:11,11,12
42:24 43:1,3,9
44:20,24 45:5
45:9,10,17,18
45:25 46:5,7
46:11 48:1
50:21 52:17,17
52:20 53:9,11
57:7,10,12,22
58:9 59:25
61:6 62:2,3,21
63:2,14,15,22
64:5,23 65:7
65:11,15,16,23
66:25 67:14,23
67:24 68:1
70:19 75:18,19
157:3,13,17
161:14,19
162:23 172:23
173:12
**granity's** 67:2
68:3

**great** 130:18
  130:24
**greater** 30:25
  76:13
**green** 2:21
**gregory** 38:18
  38:19,20 40:13
  48:12 54:7,18
  70:3 80:13,17
  80:18 88:14
  141:18
**grey** 21:2
**grimsby** 12:20
**gross** 101:18
**ground** 29:25
**group** 19:16,18
  26:21,25 27:14
  31:6,7,10 32:5
  33:25 34:15
  44:17 48:17
  49:24 62:14
  87:20 131:4
  134:5
**group's** 182:16
**guaranteed**
  117:19
**guess** 24:12
  47:2 75:13
  115:23,24
  120:4
**guy** 26:20 90:8
  110:14

**h**

**h** 62:23
**half** 32:25
  42:14,21 78:10
  78:17 79:10

91:10 135:23
140:20,21
141:21 142:6
158:17 159:4
160:13 177:25
**halstead** 43:20
  43:23,24 44:1
  51:3,3,5,10
  56:7,14,17
  57:25 58:3,6,8
  60:2,3,4,7,12
  60:14 61:2
  82:23 102:11
  106:15 147:9
  148:7 149:3,24
  151:7 152:10
  152:13 156:2,9
  167:13 168:6
  168:20 176:4,9
  181:19,25
  182:8 183:6,11
  183:16
**hamble** 46:19
  46:21,23 47:1
  47:6
**hand** 172:21
**handle** 24:2
  25:8
**handles** 75:2,3
**handling**
  123:19
**hanlon** 66:18
**happen** 60:10
  60:16 123:11
  134:24 162:4
**happened**
  37:18 77:25

**happens** 63:9
**hbh** 44:2
**head** 22:5
  29:22
**header** 81:15
  90:22 96:1
  135:4
**heading** 38:16
  38:17 39:1
**headquartered**
  15:15 55:15
**hear** 83:8,8
  184:9
**heard** 8:10
  44:1 75:11
  119:22 120:1,6
  120:11 169:11
**hearing** 126:11
**hearsay** 150:3
  169:8
**heavily** 79:2
**held** 18:1 51:1
  64:23 72:13
  74:12 77:22
  92:11
**help** 26:22
**helped** 27:7
**helping** 77:12
**hi** 82:1
**high** 13:14
  65:13
**higher** 116:6,9
**highlight** 81:21
  96:1,20 109:14
  133:20 135:4
  135:22 136:18
  139:1 140:19
  142:6

**highlighted**
  35:7 37:1
  81:24 86:11,17
  87:13 90:3
  93:5,16 96:25
  105:24 130:12
  130:12 132:15
  133:1,2,6
  136:5 141:8,10
  141:14 142:10
  144:2 158:4,7
  160:14 163:12
  163:21
**highlighting**
  88:2 92:13
  136:24 137:23
**hired** 20:8
  22:20 23:9,18
  58:11
**history** 4:20
  34:2
**hmm** 92:15
  98:2 112:25
  182:13
**hoc** 145:23,25
  146:3
**hold** 18:4 31:20
  45:15,17 46:4
  80:3 94:14
**holding** 31:13
  31:15,19 32:1
  56:9
**holdings** 43:20
  43:23,24 44:2
  56:7,14 58:1,3
  58:6,8 60:2,4,5
  60:8,12,14
  61:2 148:7

149:4,24
152:10,13
156:2,9 167:13
168:6,20 176:4
176:9 181:20
181:25 182:8
183:6,11,16
**hr** 22:22
**hundred** 16:9
69:20 178:16
**hypothetically**
167:9 168:4

**i**

**i.d.** 100:1
**iain** 47:16
**idea** 83:3
**identification**
106:19
**identified** 21:5
38:17 94:11
**identify** 20:22
32:8 39:3
43:17 91:23
**identity** 68:10
**ijshuis** 55:2,8
55:24 56:3
57:16,18,20,22
58:14,15
**immigration**
51:7
**immunity**
11:11,22
**impetus** 93:19
**implementati...**
24:6
**implemented**
26:8 151:15

**implementing**
24:13
**important** 77:6
77:9 158:11
**impression**
19:25 77:5
95:8
**inappropriate**
86:20
**incidental**
103:21
**incidentals**
104:25
**include** 26:19
31:2,11 53:14
59:10 80:20
103:5 121:16
**included** 14:9
**includes**
164:16
**including** 9:8
**income** 32:4
166:22 172:3
**incorporated**
38:9,10,11
55:10,16,20,22
56:12
**incorporation**
82:7
**increase** 95:14
95:22 105:1
**increased**
95:23 105:4
**incurred** 111:8
115:9 116:13
**index** 4:12
**india** 100:17
117:2

**indicate** 82:8
100:2
**indicated** 101:5
**indicates**
109:21
**indication**
152:6
**individual** 20:5
22:3 39:12
40:15 61:23
67:20 101:4
104:22 181:8
**individuals**
37:10 65:23
71:25 73:25
**industry** 76:19
**info** 6:18 150:7
158:11,21
**information**
45:22 54:24
63:5,9 73:6,7
77:3 81:15
82:8 83:8,23
84:8 85:17
88:21 99:7,23
100:4,8,16,18
100:25 108:2
116:20 117:4,9
127:6,11,22
143:15 149:14
150:9,18,24
172:16,18
**informed** 76:23
105:3
**informing**
149:22
**initial** 18:3
20:11,13

**initially** 53:5
76:11
**inputted** 117:5
**inputting** 100:4
100:8,13
116:20 117:1
**installments**
101:6
**instances** 80:24
120:13 149:2
**instruct** 152:9
152:12
**instructed**
110:10 128:14
132:22 142:24
**instructing**
109:20 131:18
131:19
**instruction**
138:5,12 149:9
**instructions**
60:22 80:22
102:17 107:19
125:13 128:19
129:1,5 149:12
**interact** 54:10
54:11
**interaction**
165:22
**interest** 95:10
95:11 122:4
125:4 145:12
153:9,11
163:25 167:21
**interested** 9:4
77:3,11 94:16
95:13,17,19
143:7 186:18

**interests** 37:15 92:1
**international** 38:21 69:5 72:1 148:25 149:23
**internet** 8:8 35:10 36:7 79:3
**intervened** 66:20 71:20 72:4 120:21
**interview** 20:11,14 21:11 21:16,24,25 22:7,23
**interviewed** 21:20 22:3
**introduced** 47:10
**investigation** 3:3 9:22 169:4 170:23 178:10
**investment** 26:25 27:14 31:10,17 48:17 128:8 158:1
**investments** 28:24 31:20 128:9
**investor** 26:21 35:22
**investors** 73:24
**invoice** 52:19 52:20 104:4
**involved** 60:18 63:20 76:20 98:4,6 100:23

102:1 156:16 166:2
**involvement** 60:21 84:3 100:7
**ireland** 45:19 64:10
**irish** 32:12
**irrelevant** 168:10
**irs** 3:3 9:21 169:4 170:23 178:10
**islands** 68:15 68:17 142:24
**issue** 111:11,19 117:22 118:4
**issued** 112:4,23 119:10 123:16
**issues** 51:7,9 77:11 145:8
**issuing** 118:14 143:8
**item** 108:4
**items** 92:8 97:6 108:14

## j

**j** 2:11 172:11
**jacket** 20:24 21:1
**james** 46:12 66:19,22
**janelle** 166:5,6 166:7,10
**janssen** 2:16,16 2:18 9:25,25

**january** 6:14 157:3,18 159:25
**jginter** 2:23
**jmb** 1:3 8:19
**job** 1:25 20:1 20:14 21:11,11 21:13 22:8,11 22:17 23:4 29:4 30:8,8 164:18
**joined** 16:8
**jokingly** 23:3
**journal** 181:14 182:16
**judith** 1:25 8:25 185:3,22 186:6,22
**july** 4:18 5:5,21 32:21 33:3,17 33:25 86:2,7 86:13 108:25 109:16
**june** 5:2,19,24 81:9,18 106:4 106:23 129:14 129:23 130:22
**justice** 2:4 3:4
**justin** 2:21 10:2

## k

**karen** 149:11 149:13
**keep** 76:23
**kept** 27:22
**kerchief** 20:25

**kevin** 37:13 41:7 50:15
**key** 37:2,11,15 49:6
**kicked** 184:1
**kind** 19:17 22:14 23:3 29:1 31:9 46:21 50:16 51:15 52:4 73:5 92:20 100:15 101:19 120:12 126:20 165:8 172:1,7
**king** 1:21 8:21
**kiser** 3:3 9:21 9:21
**knew** 47:5,5 104:20
**know** 17:3 20:7 22:12,14 23:3 24:10 25:7 26:22 28:23 30:7 34:8 36:16,18,21,23 45:6 47:8,17 47:20 48:4,11 50:13,14,15 51:13,14 52:3 52:4,4 54:23 55:11 56:10,13 58:15,22 62:4 75:7,16 76:6 77:7 83:6 88:22,24 89:12 101:15,16,18 108:11 114:1 114:24 115:3

Antonio Severin , Vol I

May 15, 2025

**[know - little]**

Page 22

122:1,3,21
123:15 128:12
145:7 149:4
151:6 153:3
155:2 159:14
165:10 168:14
178:17
**knowledge**
27:6 31:5
80:19 81:3
103:24 119:13
132:9 150:13
167:2 168:12
**known** 47:6
122:23
**krieg** 37:13
41:7 49:9
50:15

**l**

**l** 62:24
**lack** 81:2
150:12 167:18
**lane** 4:20 6:23
6:25 27:4,14
31:16 34:1
37:16,20,25
38:1,4,6,10,11
40:16,20,22
41:9 43:20,22
48:14,17 49:18
49:21 53:24
55:17,19 57:3
57:18 58:4
59:21 60:14
74:3 76:8
83:11 85:14
88:25 93:2

95:9 98:5,15
98:22,25 101:2
101:23 102:25
104:4 110:19
110:22 111:11
112:4,8,17,19
112:23 114:4,9
115:17 118:12
118:13,18,22
119:2,4 121:13
122:11,16
124:18 125:3
128:25 131:3
132:2,6 141:6
145:23 146:4
146:20 147:2,5
148:8 149:4,6
149:8,25
151:14 152:9
153:17 154:7
154:24 155:20
156:9 169:20
169:25 171:12
171:18 172:13
175:9 176:8
177:7 178:6,14
179:25 180:11
180:17 181:21
182:9 183:15
**lane's** 50:1
73:20 84:4
**language** 35:7
**large** 22:5
29:23 115:25
**lastly** 62:9 74:6
**law** 2:10,16
168:12

**law.com** 2:18
**laws** 102:7
**lawyer** 145:2
146:13 163:23
**lay** 165:10
**leading** 87:7
149:15
**leaning** 94:2
**learn** 169:3,6
**learned** 21:12
167:9,11 168:4
169:14 170:22
178:9
**lease** 16:19
**leave** 13:1 67:3
**lee** 46:12 66:19
66:22
**left** 46:18 47:13
47:17 172:21
**legal** 1:21 8:24
8:24 9:1
167:19 184:16
**lemona** 74:1
**letter** 11:9,14
**level** 26:23
58:24 92:22
104:2 117:25
**lglaw.com** 2:23
**liberty** 16:2,5
16:11 21:19
**licence** 45:5,8
68:3
**licensed** 61:22
**licensing** 45:13
**lie** 11:23
**liked** 83:3
**likewise** 35:12

**limits** 115:22
115:24
**line** 19:19
33:10,13 78:19
93:14 96:5,7
97:5,5 108:4
108:14 109:11
134:4 135:16
142:8 154:19
157:11,13,22
161:23
**lines** 19:20
172:22 173:6
173:11,16
**linkedin** 21:15
**linnasmagi**
79:6
**lipsitz** 2:21
**lisbon** 126:4
**list** 41:1 64:3
90:7 102:10
123:3 128:6
132:2 173:4,7
**listed** 38:1 39:3
40:11,16,18
41:17 44:13
46:10 61:15
62:25 132:10
141:22 173:16
173:18,21,24
174:3,6,9,12
174:15 178:1,2
**listing** 79:21
179:14,17
**lists** 43:14
172:12
**little** 18:9
27:19 30:21

42:14 48:2
50:5,9 52:22
55:13 97:25
117:14 130:5
145:19
**live** 25:25
41:19,20
**lived** 12:23
**llc** 7:1 176:12
176:14,22
177:7,14
178:15 180:12
**lloydsville**
172:12 173:16
**loan** 102:21
108:10 116:15
120:14,14
121:21 122:4
146:14,24
147:1,5,9
148:6 149:3
151:10,14,23
152:3,10,13,15
152:16,19,24
153:4,8 154:11
155:4 156:15
158:13 161:20
162:7,17,23
163:14 164:2
170:17 174:21
175:1 177:7
178:6 180:19
**loaned** 153:5
**loans** 73:23
113:13,14
121:23 122:9
124:13 146:10
146:10 147:12

150:21 151:20
153:11,17,23
154:3,4 158:3
167:12 168:5
168:19 170:10
172:8,22,23,24
173:5,6,12
174:25 176:5,9
181:10
**located** 56:10
**location** 8:20
**locations** 15:25
**long** 12:23
17:16
**longer** 131:9
**look** 131:25
159:3
**looked** 92:20
**looking** 34:18
53:17 140:21
143:24 158:23
**looks** 79:6
170:24 172:4
174:19 179:13
182:23
**lot** 24:20,21
28:17 51:8
60:11 117:1
165:4
**loud** 144:5
**louder** 72:6
**luxembourg**
64:14

| m |
|---|

**m** 1:25 2:6
185:3 186:6,22

**m5r** 2:17
**made** 28:14
59:16 73:3
92:3 98:21
101:6 104:5
112:13 113:10
118:11 119:25
122:10 137:8
138:5 139:19
147:4,15 148:3
149:14,23
150:21 151:13
152:18 153:23
155:3,13
170:18 172:17
179:15,25
185:10
**madrid** 126:1,4
**mail** 4:17,23
5:1,4,7,10,13
5:15,20,23 6:1
6:4,7,10,13,16
6:19 7:3 26:14
32:20 33:2,16
33:19 77:19
78:4,11,17,18
79:13,16 80:11
81:7,17 85:17
85:25 86:6,12
87:12 88:3
89:15,20,24
90:23 91:3,7
91:11,14 92:13
93:16 96:2,6
96:11,16,22
99:10 105:13
105:19,25
106:11 108:24

109:15,20
110:8 129:12
129:13,18,25
130:5,6,8
133:3,16,23,25
134:12,17
135:4,5,9,19
135:24 136:5
136:20 137:24
138:11,17,23
139:3 140:7,11
140:16,22,22
141:1,9,10,22
142:2,9 143:24
145:4 147:16
150:21 157:1,7
157:16 158:6
158:18,19,24
159:1,4,5,6,23
160:9,13 161:8
163:1,6,8,11
163:17,19
177:25 178:24
179:5,11,24
180:6,9
**mailed** 34:25
**mailing** 86:25
179:8
**mails** 77:14
79:5 98:11
150:24 159:8
**main** 45:7,10
65:1 67:5,9
121:4
**maintaining**
75:18 76:8
**maintenance**
63:21

**major** 43:19
50:20 64:22
67:2 70:20,22
73:20 98:18
122:6
**majority** 39:2
40:18 83:16
170:8 175:17
**make** 11:11,25
28:14 42:2
52:11 61:7,8,9
73:2 77:7
98:10,14 101:2
128:14 137:5
145:23 146:3
153:6,8
**making** 88:16
98:4,8 102:13
104:16 107:23
112:8 127:13
127:24 132:21
148:6 152:4
**man** 84:12
**manage** 15:8
17:2,6,12 27:7
**manageable**
97:1,12,13,18
97:20
**managed** 50:17
52:18 67:25
**management**
14:4,11 15:10
50:8,11 52:12
53:3,16 56:25
57:16,25 67:25
75:14 92:9
94:14 108:19

**manager** 92:10
**managers** 75:8
**managing** 6:22
6:24 17:9
76:14 80:20
152:8 169:20
169:24 171:18
175:8
**mark** 46:20
47:1 70:4
**marked** 4:13
32:19 34:5
44:5 78:3
81:13 85:24
89:14 90:21
95:25 105:11
106:18,18
108:23 133:15
135:3 138:16
156:25 158:16
162:25 169:17
171:15 177:13
178:19,23
**market** 128:11
**marketing**
67:11,12
**marks** 84:25
85:4 160:21
**mass** 86:25
**mastercard**
61:23
**material** 5:6
86:2,20 87:3,5
**materials**
29:10
**matter** 1:19
8:16 12:9
94:12,13

123:22 124:8
**matters** 30:4,5
54:14 56:3,20
89:4
**maule** 37:13
41:6 49:9
**mauzy** 2:10,11
9:16,16 81:2
87:7 107:6
119:12 125:14
126:17 127:9
127:14,25
131:12 139:22
145:15 149:15
150:2,12 151:1
154:19 155:5,7
155:16,21
156:3,10,19
157:21 159:16
160:3,15 162:9
162:18 164:8
167:5,16,20,23
168:9,21 169:7
176:15,24
182:1 184:9
**mclaughlin**
47:16
**mean** 31:6,14
39:10 62:1
82:18 101:14
108:16 113:24
131:3
**meaning** 77:21
**means** 41:12
46:24 48:22
50:10 52:23
**meant** 25:6

**mechanics**
52:14 61:18
**mechanism**
117:23
**media** 8:14
19:16,18,23
20:2 32:12
57:10 84:25
85:5 97:2
160:21 161:1
172:23 173:12
184:15
**meet** 20:10
25:14 38:24
165:1
**meeting** 5:6
12:5 84:11,11
84:12,12,15,16
84:17 86:3
90:8 126:9,22
**meetings** 93:18
125:18,20,23
126:1,2
**members** 28:5
69:4 86:21
98:17 126:15
**memberships**
42:5
**mentioned**
1:19 14:1 16:5
28:16 30:22
47:12 48:16
49:6 67:18
69:13,23
112:10,17
116:12
**mentions**
133:12

merchant  62:1
  62:2,3,5,6,12
  62:15,20,22,23
  63:10
met  11:24 12:4
  12:7 20:16
  35:19,24 38:22
methods  26:12
metropolitan
  13:16
middle  38:15
  80:10 81:24
  86:9 108:3
  129:11 139:3
  161:8 179:7
milestone
  130:18,24
  131:1,2
million  41:23
  97:4 168:19
  171:19 174:19
  174:20 175:21
  179:13 181:4
  182:20,25
  183:4
mind  23:5
minds  65:16
minimum
  170:15 175:24
minneapolis
  2:13 56:12
minnesota  1:2
  2:13 8:19
minor  37:15
minutes  184:2
  184:12
misspoke
  123:22

model  52:18
moldon  5:8
  17:22 22:21
  23:13,15,16
  37:13 41:6
  43:19,21 49:8
  50:13,25 89:16
  89:21 169:12
moldon's  83:16
mom  27:21
  28:4,6,16 96:7
moment  81:22
  84:22,23
  122:14 160:15
  160:19 183:20
monetary
  62:11
money  42:3
  43:10 45:11
  52:11 59:1
  60:8,25 67:23
  73:11 75:1
  77:19,20,22
  115:3 137:7
  143:11 145:8
  153:5 177:7
  181:9
month  26:6
  27:21,21 96:9
  96:9 97:4
  101:17 106:4
  109:23 110:3
  130:17 158:14
  162:3
monthly  5:17
  5:18,22,25
  27:23 28:12
  52:19 84:10,16

85:20,22
  105:15 106:15
  106:22 107:19
  109:1,24 110:2
  115:7 116:6
  128:5 129:15
  130:15 154:4
months  116:1
  122:3
morning  184:5
mortar  15:25
move  13:3,8
  16:12 73:10
  77:19,20,24
  94:3
moved  13:4
  16:3
movement  59:1
  67:22 137:7
moving  55:1
  141:3 145:8

**n**

n  2:1 4:1 10:11
n.v.  171:19
name  8:23 10:9
  11:2 23:24
  24:4 27:1,3
  32:9,14 33:10
  33:12 40:8
  41:1 42:23
  47:14 48:6
  53:18 55:2
  58:9 62:25
  78:23 109:10
  111:20 112:5
named  20:5
  37:10

names  11:3
  35:15 38:3
  172:13,17
nature  68:10
ne  2:6
near  12:21
  132:14 133:1
nearby  25:23
necessary
  89:11
need  56:21
  72:23 80:13
  83:15 84:19
  106:5 110:1
  113:19 130:21
  133:9 137:2
  138:2 141:17
  144:14
needed  6:18
  22:11,13
  158:21
needs  24:2
  34:14
neither  186:13
net  70:23
  101:10,13,17
  101:21 172:3
netherlands
  55:11 64:25
never  38:24
  74:13,23,24
  75:1 114:21
  151:17,24
  152:6 183:1
new  2:22 5:17
  5:18,25 24:8
  24:14 26:7
  76:3,17 77:13

105:15 106:15
106:22 129:15
142:13,23
**nice** 20:24
**nominee** 46:23
46:25
**non** 97:14
139:23
**normalizing**
93:8
**note** 7:1 8:6
123:14 132:16
138:2 177:15
177:19 178:5
**notes** 124:18
124:21 185:14
**noticing** 9:11
**notification**
102:6 147:8
**notifications**
98:11
**notified** 22:19
146:11
**notifying**
146:16
**november** 12:5
172:4 173:2
**number** 4:15
8:19 85:5
107:7 164:14
165:2 184:15
**numbers** 19:21
94:15
**nv** 27:5 37:25
38:6,11 39:4,5
39:21 40:10
43:4 48:15
53:24 54:8

55:20

**o**

**o** 62:23
**oath** 9:3 10:14
185:7
**oaths** 186:25
**object** 127:9
157:21 176:15
**objection** 81:2
87:7 119:12
125:14 126:17
127:14,25
131:12 139:22
145:15 149:15
150:2,12 151:1
151:2 154:19
155:5,16,21
156:3,10,19
159:16 160:3
162:9,18 164:8
167:5,16,17,17
168:9,21,22
169:7
**objections** 9:6
149:19 176:24
185:10
**objective**
101:21
**observe** 47:25
54:10 98:20
152:3 153:22
154:13
**obtain** 64:1
**obtained** 37:15
**obviously**
26:15 77:12
83:3

**occasion** 12:8
29:24
**occasionally**
29:5 30:16
**occasions**
60:17
**occur** 21:17
**occurred** 21:18
**october** 5:14
6:11 96:3,17
140:8,12 142:9
**offer** 19:18
46:22 79:22
**offered** 11:10
19:19 22:16
23:4
**offers** 46:23
**office** 15:20,22
16:21 21:18
25:17,19,21
26:4,15,16
126:24
**officer** 186:6
**offices** 126:22
126:23
**officially** 23:12
**officials** 11:25
**offset** 180:11
**offsetting**
183:16
**oh** 69:6 79:1
134:9 144:13
159:25 165:18
171:7
**okay** 15:13,14
21:8,9 40:6
45:1 64:7
67:17 84:19,23

94:20 106:17
109:8 116:4
118:16 120:5
126:20 127:19
128:4 146:2
150:6 159:18
159:19 171:10
184:17
**old** 24:11 84:12
90:8 131:7
**omm** 84:12
**once** 28:11
60:10,16
142:13 174:22
**ones** 76:17
121:15
**ontario** 1:13,22
2:17 8:21,22
12:20,21 186:4
186:25
**open** 20:24,25
34:20,21
**opening** 75:17
75:23 76:7,10
143:9
**operate** 45:11
**operated** 77:8
**operates** 43:8,9
43:11 65:11
**operating**
31:23 32:2,6
32:10,17 34:21
41:9 49:5 92:6
**operation** 43:6
**operational**
48:24 49:2
94:21,25

CASE 0:24-cr-00007-JMB-DLM    Doc. 136-3    Filed 06/27/25    Page 213 of 231
Antonio Severin , Vol I                                          May 15, 2025
[operations - parties]                                              Page 27

**operations**
38:7,12 54:4
56:17 61:4,5,6
**opinion** 119:13
145:16 162:19
**opportunity**
21:13 47:25
54:9 63:5
164:16,20
**opposed**
153:23
**opted** 154:7
**order** 72:23
73:10 90:12
117:21 127:1
**org** 44:11,13
**organization**
28:5
**organizational**
4:22 30:25
44:6,16
**originally**
58:18
**osmosis** 52:3
**outcome** 9:5
186:19
**outlined** 22:15
**outlines** 172:3
**outside** 22:22
119:13 152:4
**outsource**
100:17
**outsourced**
116:25
**outstanding**
167:12 168:5
168:19 170:10
170:16 176:3,8

178:14 180:11
181:10,20,25
182:7 183:6
**oversight** 84:1
**overview** 4:19
4:21 32:22
33:4,25 34:2
42:16
**owed** 176:3
178:14 180:12
181:20 182:8
183:6,17
**owes** 181:9
**owing** 176:8
**own** 19:5 29:1
95:9 132:8
146:5 148:16
**owned** 43:3
45:4 46:20
51:3 71:1
**owner** 39:7,11
39:16 46:14
47:13,14
176:21
**owners** 40:22
48:23,24 49:15
82:9
**ownership**
37:15 46:4
81:18 82:2,10
82:24
**owns** 39:12

**p**

**p** 2:1,1 62:23
**p.m.** 1:23 8:1,5
79:13 85:1,2,3
85:6 86:13

160:22,23,24
161:2 184:7,22
**package** 24:7,9
**page** 4:4,15
32:25 33:9
35:4 37:23,25
38:15 40:4,9
42:20 43:13,13
43:14 53:18
78:10,15 79:10
79:11,15 80:10
81:16,24 86:10
86:24 90:2
91:10 92:12
105:12 109:4,7
109:13 129:11
130:4,9 131:17
132:25 135:23
140:6,18,20
141:21,22
142:5 157:6
179:7,23 180:4
180:4,9 182:15
**paid** 18:15,23
18:24 67:6
77:10 94:24
100:2 101:1,11
102:10 110:19
113:3 114:25
115:1 122:16
122:23 123:3
123:15 125:7
136:8 139:11
139:14 141:19
147:7,8,12,20
147:20,23
148:10,19,21
155:1 170:14

175:23 180:19
182:2 183:1,14
**paperwork**
81:1 119:20
137:3,12,18,20
155:4,11
163:24 164:3
**paragraph**
35:7 36:25
37:11 170:4
**pardon** 25:4
107:11 109:6
122:13 180:23
**part** 23:13
44:16 52:3,3
84:11 115:20
128:4 144:3
148:9,9,13,22
154:1 159:5
165:21 179:12
**participants**
8:9
**participating**
10:19
**particular**
11:22 24:6
36:4 43:9
45:12 64:2
68:9 104:14
112:14 120:13
125:5 136:17
137:22 146:10
147:25
**particularly**
86:21 87:16
167:21
**parties** 8:12
88:21 186:14

186:17
**partner** 5:12
90:25 91:4
92:2,17,22
93:18,20,21
94:6,10,18,21
95:2,5 97:14
97:23 98:1,5
98:22 99:3
100:10,23
102:20,20
110:15,17
114:1 126:11
145:21 164:13
**partners** 59:16
59:17 88:9
91:18,20 95:9
95:16 98:25
101:3,10
102:25 110:20
119:19 126:2
145:9,23 146:3
**partnership**
172:2
**party** 9:3
**passed** 14:5
**past** 92:21,24
**paul** 37:13 41:7
145:2 146:13
163:23 179:9
**pause** 178:19
178:20 183:21
**paxum** 64:18
**pay** 45:12
61:10 62:5
98:21 101:20
110:22 111:10
112:18 115:4

127:1 129:6
131:7,10
145:13 146:4
146:12,16
153:4 158:9
181:3,12
182:22
**payable** 75:3
175:19
**payables** 75:2
75:7 100:18
**payee** 99:22
**paying** 102:21
109:22 129:1
137:4 142:3
**payment** 5:22
73:25 75:10
91:20 99:14
101:1 102:20
108:9,11,15
109:1 110:10
114:1 126:16
128:15,20
137:22 138:8
141:2 149:3,24
157:14,17
160:10 162:2,7
**payments** 5:12
5:25 6:15
59:15 60:3,4
60:12,13,19,23
61:11 62:4
63:17 67:5
73:2,24 74:3
90:25 91:5,18
92:2,7,18
93:21 94:6,10
94:18,21 95:2

95:5,9,17,20
95:21 98:1,5
98:10,14 99:1
99:4,6 100:10
100:23 101:3,5
101:8,23,24
102:10,13
103:1 104:5,9
104:17,20
110:6,15,17
111:6 115:18
116:6 119:24
122:10 123:16
126:11 127:2
129:16 130:16
130:20 131:7,9
131:19,21
132:22 133:10
133:12,13
134:13 135:1
137:12 138:13
139:19 141:3,5
142:25,25
143:3 145:21
145:23 146:4
147:17,25
148:3,6,14,17
149:5,14
154:24,25
157:3 164:13
170:17 172:17
175:4 177:10
179:14,25
180:10,17,19
182:21
**payor** 99:17
**payout** 97:14

**payouts** 181:24
**payroll** 93:22
94:11,12 122:1
**pays** 43:10
67:15,24
**pdq** 6:18
158:21
**peachtree**
23:25 24:20
25:5,6
**people** 17:7
46:25 67:11
**perceive**
165:23
**perceived** 25:3
87:25
**percent** 16:9
69:3,20 72:15
82:25 178:16
**percentage**
53:1 67:6
**performance**
17:23
**performed**
104:10
**performers**
97:2
**period** 13:5
16:6 89:3
119:18 146:23
170:12 180:13
180:15 182:23
**person** 20:17
38:23,25 39:12
83:7
**personal** 27:6
56:9 81:2
112:11,13,19

113:2,4,9,12
113:23 115:11
116:13 117:10
132:9 145:24
146:5 150:13
166:22 167:2
**personally**
75:17 76:7
101:22 152:3
165:23
**perspective**
49:16 77:2
88:8 103:13
115:16 121:3
130:25 153:20
167:15 168:8
**pertaining** 89:4
**peter** 3:7 8:23
**ph** 65:4,5
**phone** 161:22
**phrase** 31:6,13
31:22 39:6,10
39:14 41:8
67:19 119:22
120:2,6
**physically**
98:10
**pick** 184:3
**pierre** 166:5,6
166:7
**pilot** 174:4
**pioneer** 35:9
**place** 8:12
13:10 58:13,17
118:9,12 123:1
185:6
**plaintiff** 1:7,19
8:16

**plaintiffs** 2:3
**plan** 141:2
144:7
**planning** 24:12
93:12
**platform** 43:3
43:8 71:1
**play** 123:19
164:13
**please** 8:6 9:7
10:6,8 13:12
20:22 32:8
35:6 37:7 39:3
41:1 43:17
44:22 46:16
48:22 64:4
78:24 79:4
81:23 84:9,21
84:24 86:16
87:11,14 90:2
91:13 93:4
96:24 105:23
108:5 109:10
121:22 130:11
132:13,16
133:5,22 136:4
136:23 137:25
139:7,25
141:13,21
142:2,10 144:5
147:22 148:15
150:15 157:7
158:6,9 159:23
160:14,17,19
161:9 163:12
163:13,20
165:16 167:20
173:3,4 176:20

179:10 180:23
182:19
**plus** 52:18,21
52:24 53:1
88:10 103:21
104:25 148:13
148:22
**pocket** 20:25
**poel** 35:12,21
35:25 36:3,20
40:3 41:6
103:9 111:2,14
111:24 116:10
147:1 158:1
**poel's** 36:8
114:8
**point** 14:8
51:23 53:12
69:13,14 76:1
76:4,4 79:24
85:18 88:7
100:5,25 102:6
102:8 116:24
127:4 128:5
142:22 143:22
151:10 164:6
169:2 171:1
**policies** 118:9
118:12 121:11
**policy** 151:11
151:14,22
**political** 93:10
**portion** 19:5
86:18 87:13
90:3 93:5
97:18 109:4
133:21 140:6
141:9 172:11

182:6
**portions** 86:22
87:17
**position** 17:17
76:13
**possessed** 48:1
**possible** 170:13
**potential** 89:7
**pounds** 158:9
161:13
**practical** 181:5
**practice** 104:3
**practices** 30:1
74:7 148:25
**precluded**
119:19
**precursor** 38:5
**preliminary**
153:1
**preparation**
166:3
**prepare** 17:6
**prepared** 54:25
166:10
**preparing**
166:25
**present** 3:1 9:8
21:23
**presentation**
91:15
**presenting**
88:9
**president**
23:16
**pretty** 104:6
**prevent** 51:9
**previous** 30:6
34:25 46:18

47:13,14
107:20 161:25
**previously** 4:13
159:13
**primarily**
50:18 68:7
165:3
**primary** 26:12
50:1 54:5
61:14 66:24
70:16 73:17
74:2
**principal** 178:1
**prior** 20:1 25:5
130:15 133:8
**priorities** 23:19
**prioritized**
95:9
**prism** 39:5
40:1
**probably** 98:17
134:25 145:2
146:16
**procedure**
118:14
**proceed** 10:7
**proceeding** 9:7
11:22
**proceedings**
1:23 178:20
183:21 185:5
**process** 61:23
63:12 72:22
75:6
**processed**
63:19 103:15
**processing**
35:10 36:11,11

62:18
**processor**
61:20,21 62:12
62:12 63:11
**processors**
62:21
**produce** 17:3
144:14,18
**produced**
171:23
**produces** 32:3
**product** 27:17
50:14 108:20
**profession** 66:6
**professional**
2:16 14:16
29:17 30:14
185:4
**proffer** 12:5
**profit** 19:10
52:9,25 53:1
93:23
**profitability**
92:2
**profitable**
52:10 71:4
88:25 119:2,5
119:7 170:14
175:23
**profits** 19:8
46:8 71:6 92:7
117:18 119:10
131:10
**program** 24:25
122:22,25
130:21 131:22
154:2,8

**promise** 152:20
**promissory** 7:1
124:17,21
177:15,19
178:5
**prompted**
80:25
**proportion**
181:11
**proposal** 34:13
82:14,17,18,23
83:5,17 165:20
**propose** 121:12
**protocol** 65:12
**provide** 26:22
29:9 34:13
47:1,7 48:20
50:8,12 55:5
79:19 90:11
114:17,20
115:13 117:7,9
117:14 127:12
127:22 129:1,5
137:19 149:13
**provided** 16:10
18:10 45:22
48:19 49:23
52:1,5 53:13
63:4 79:23
143:1 170:13
175:3,22
**provider** 15:9
**provides** 15:9
63:8 68:1
70:24
**providing**
52:12 84:8
108:1

**province** 12:19
186:4,25
**provision**
151:19
**puerto** 177:5
**purchased** 24:3
24:9 25:1
**purpose** 31:19
34:10,12 48:17
53:22 55:8
56:7 101:7
102:21 111:6,9
**purposes** 66:21
71:21 72:5
99:4 120:22
147:18 148:18
**pursuant** 170:5
175:14
**push** 154:16
**put** 10:16
63:13 99:12
152:23 153:4
183:19 185:7

**q**

**qualifications**
14:6
**qualified** 20:1
**quality** 8:7,8
**queen** 16:3,4
16:12,17
**question** 18:20
41:12 49:25
51:19,22 52:7
54:3,15 56:2
56:16 70:8
84:18 104:15
127:18 128:21

137:1 140:1
141:11 149:18
153:1 157:24
162:13 166:17
168:2,14
176:19 182:1
**questioning**
154:20 157:22
**questions**  29:4
29:7 33:6
51:25 54:20
56:22 84:15
165:2 167:21
183:24
**quickly**  122:1
**quirk**  46:20
47:4,6,11,19
**quite**  25:16
26:6 29:22
115:25
**quitting**  164:6

**r**

**r**  2:1,5 4:24 5:2
10:11 78:5
81:8
**raindrop**  7:1
176:12,14,22
177:7,14 178:6
178:15 180:12
180:19
**ran**  36:6
**range**  67:16
**rate**  82:5 94:24
163:25
**reaction**  92:16
**read**  33:22
35:6 36:24

41:10,11 78:19
80:15 81:23
86:16 90:2,14
93:4 96:24
105:23 107:1
108:5 109:10
110:3 130:11
130:24 132:13
133:5 134:8
135:16 136:4
136:23 137:15
137:25 139:7
141:13 142:2
142:10 144:5
158:6 160:14
161:9 163:12
170:18,19
172:24 173:11
175:12,25
177:20 180:22
181:1,16
**reads**  33:24
108:4
**realize**  24:1
**really**  27:23
50:21 55:9
56:21 67:4
70:7 83:13,22
94:1 100:11
120:3,3,4,24
152:1 168:14
**realtime**
186:11
**reason**  83:10
**recall**  13:21
16:6 37:14
73:15 100:19
120:1,5 124:22

124:23 125:1
125:23 126:11
126:13 128:13
143:19 145:5
147:3 157:20
169:13 183:8
**recalled**  110:5
**receipts**  114:19
114:21
**receive**  11:9
14:23 17:23
18:12 19:10
45:24 67:7
98:11 99:1
101:13 102:25
138:10 140:22
150:9 164:2
171:2 180:16
180:18
**received**  33:16
45:23 104:8
105:6,19 110:8
114:21 123:25
129:25 130:21
134:12 135:19
138:7,11,23
146:14 148:6
150:17 152:6
152:22 153:17
157:16 158:12
160:9 166:12
166:18 172:9
173:5
**receiving**  95:18
95:20 110:5
123:10 124:9
134:22

**recess**  85:2
160:23
**recognize**
20:19 33:10
34:6 44:12
**recollection**
26:3 128:24
146:23
**reconcile**
171:11
**reconciliation**
7:5 179:2
**record**  8:5,13
9:10 10:9,16
21:4 35:6
84:22 85:1,6
106:20,20
107:24 110:4
150:23 151:5
158:7 159:21
160:16,18,20
160:22 161:2,5
171:21 175:20
181:6 184:7
**recorded**  8:11
8:15 185:11
**recording**  8:7
8:11
**records**  150:11
150:19,23
181:15
**recurring**  5:25
129:15 130:16
131:8
**red**  6:15 157:4
157:14,17,20
158:10,12
159:17 160:10

161:14,20
**reduce** 97:20
97:23
**reduced** 82:24
82:24 186:12
**refer** 14:2
15:12 21:8
52:21 66:2
84:12 88:11
92:23 96:8
136:11
**reference** 49:10
132:16 138:3
148:16 159:17
**referenced**
182:25
**referred** 19:20
26:24 39:17
44:2 75:12
110:4 139:19
140:2 165:16
**referring** 35:16
41:24 45:3
80:17 87:2
90:16 91:14,15
92:25 97:8
112:22 133:11
139:14 142:19
**refers** 31:15
165:17
**reflect** 21:4
92:9 94:21
**refused** 80:25
**regard** 63:25
97:8 152:24
**regarding**
11:11 30:4
60:22 78:12

81:18 83:9
117:9 128:19
131:3 137:18
152:20 157:17
160:10
**regards** 84:16
134:19 141:3
163:18
**register** 143:2
**registered**
185:4
**regulated** 79:2
**reimbursed**
113:7,21,24
**reimburseme...**
112:9 115:25
**relate** 43:5
91:17
**related** 9:3
12:8 43:1 74:3
91:20 101:3,24
110:5,20,23
114:13 115:10
118:9,12
124:19 131:22
145:24 156:16
173:15 186:14
186:16
**relating** 77:19
80:2 151:11
**relation** 74:7
89:3 122:10
151:15 157:25
158:2
**relationship**
27:12 30:13
44:20 47:3
62:18 64:5

68:14,19
**relationships**
17:10,13 27:8
27:13 76:15,24
**relative** 113:2
**relatively**
121:25
**relevance**
164:8 167:5,17
169:7 176:16
**reliable** 66:13
**rely** 117:8
**remain** 62:15
71:6
**remainder**
62:16 109:14
183:16
**remains** 109:25
**remember** 15:1
77:25 78:1
87:4 102:6
106:12 124:22
126:21 145:1
146:9 155:6,10
**remote** 16:20
**remotely** 9:9
**remove** 172:7
**removed** 75:25
**renamed** 48:14
**repaid** 113:20
121:25 158:14
161:20,24
162:2 170:11
**repay** 111:7
122:3 124:25
152:20
**repayment**
125:7

**repayments**
155:13,19
156:1,8
**repeat** 128:23
139:25 149:20
150:15 168:2
176:18
**repetitious**
127:9 154:20
155:5
**rephrase** 18:19
70:8 87:9
127:17 137:16
146:1 162:12
167:10
**replicate** 24:22
**report** 17:20
23:10 27:20,21
27:21 28:4,6
28:17 85:20
96:7,9 168:18
**reported** 31:9
167:10,12
168:5
**reporter** 8:25
10:6,8,12 11:2
66:20 71:20
72:4 84:21,21
120:21 160:18
183:25 185:4
186:1
**reporter's**
185:1
**reporting**
22:14 23:14
26:23 27:24
108:18 172:2

**representing** 8:24

**republic** 64:20

**request** 34:13 79:7 98:21 105:6 107:14 123:20 128:16 132:19 137:11 137:17 151:20 152:5,19 153:8 155:3

**requested** 73:2 148:2 154:23

**requesting** 175:4

**requests** 145:23 146:4,8 147:4,14 150:21 152:2 152:23 154:3,4

**require** 83:9

**required** 73:10 73:14 125:10 131:7,9

**requirement** 24:12

**requirements** 166:13,19

**reread** 87:11

**rescinding** 164:21

**reserve** 170:15 175:24

**reserves** 87:20 127:1

**reside** 12:17,20

**residual** 71:6

**resign** 164:11

**resignation** 164:13,22 165:2

**resigned** 164:25 165:10

**resolution** 117:24 118:1 121:1 137:18 137:21 171:4,6 182:6,7 183:4

**resolutions** 6:22,24 120:19 137:3,6 169:19 169:24 171:17 175:8

**resolved** 181:3

**respect** 49:3

**respectfully** 149:17

**respective** 111:8 124:19

**respond** 33:5 79:25 80:6 83:1 88:3,5 97:16 136:20 137:13 143:25 144:8,11 161:16 163:17 169:10

**responded** 80:7 163:18 165:13

**responding** 79:7

**response** 122:12 137:11 137:14,17

141:11 142:9 144:3 163:21 164:3

**responsibilities** 17:1 18:7,8 26:19 29:11

**responsibility** 76:14 80:21 85:12 87:19,22

**responsible** 17:9 75:17 76:7,10 84:1 100:3,13 101:23 102:12 104:16 115:8 116:19 118:3 149:22

**rest** 37:5 70:2

**results** 91:16 92:6

**resuming** 85:3 160:24

**retained** 37:3 37:12 184:16

**return** 92:12 167:14 168:7

**returned** 28:15

**returning** 79:15

**returns** 17:6 166:2,3,4,10 166:25 167:3 168:17

**revenue** 27:24 32:3 42:4 61:14 148:6 165:18 168:17

**review** 11:14 17:5 27:16 28:10,13 86:24 124:17 168:16

**reviewed** 139:17 180:22

**reviewing** 124:23 166:9

**rewarded** 37:3 37:12

**rfp** 34:13,17

**rice** 3:4 9:23,23 10:15,17,22

**richard** 41:6 136:8,11,12

**rico** 177:5

**right** 14:19 17:2 22:17 25:24 43:15 50:12 65:1 78:1 151:5 173:7

**rights** 69:7,15 69:15,18,24 71:18,23 72:3 72:8,10,12,14 74:16,19,21,22 74:23

**risk** 65:13

**robust** 24:4

**rock** 6:15 157:4 157:14,18,20 158:11,13 159:17 160:10 161:14,20

**rodenburg** 35:11,15,17,19 36:2,7,14

39:22 41:5
103:5 110:23
111:12,20
116:7 140:23
140:25 146:23
**rodenburg's**
114:4 141:11
**role**  17:8,21
23:20 24:5
27:12 30:23
45:15,17,24
49:20 53:25
59:3 63:24
75:15 80:20
84:2,6 88:24
95:7 102:3
123:18 127:20
128:4 145:10
164:12 165:24
166:9
**romanian**
70:24
**room**  20:19
**roughly**  37:14
108:4 169:13
174:18
**royal**  74:12,14
**rpr**  1:25 185:3
185:22 186:22
**run**  22:12
**running**  83:23
**rusty**  3:3 9:21
**ryan**  37:13
41:6 50:14
**ryerson**  13:15
**rypl**  2:15 10:1
15:8,13,15,18
15:24 16:6,23

17:10,14 18:2
18:13 19:5,8
19:11,13 20:1
20:14 21:12
22:3 23:17
27:8,9 30:24
31:11 45:23
50:5,7,20,23
50:24 51:5,18
51:25 52:9,11
52:16,25 53:3
53:5,8 56:25
57:16 58:1
59:5,18,19
60:7 61:9,11
67:23,24 68:1
74:7,9,10,13
75:2,3,11,20
75:21 81:18
82:3,3 92:1
95:8 98:4
111:19 115:2,2
115:3 117:8
118:8,9,10,24
119:7 126:23
127:21 132:19
147:7,12,20,23
148:3,5,10,19
148:20 149:2
149:14,23
150:19 151:9
151:11 152:13
153:21 155:14
156:2 164:7
165:6,24
167:13 168:6,8
168:18 172:23
173:12 176:4

181:21 182:8
**rypl's**  23:11
51:19 59:5
74:16 166:3
167:15 168:16
**rypl.com**  15:5
15:7,13 21:19
43:14,18 66:9
**rypl.com.**  20:8
22:22 166:8

**s**

**s**  2:1 10:11
62:24
**sage**  24:5
**salary**  18:16
19:3,7 45:23
**sale**  42:5
**sales**  41:9 42:1
42:3
**sandra**  79:6
**satisfy**  170:16
**saying**  121:8
122:2
**says**  79:17
86:12 87:2
157:13 170:4
**sbu**  28:18
108:21
**sbus**  27:25
**scenario**
128:13
**schedules**
125:7
**school**  13:14
**scime**  2:21
**scollard**  2:17

**scope**  119:13
**scott**  2:5,7 4:5
9:12,13 10:15
10:23,25 21:4
21:6 23:8
32:23 34:3
44:7 66:23
71:24 72:9
78:8 81:4,11
84:18 85:7,8
86:4 87:9,10
89:18 91:1
96:4 105:17
106:24 107:8
107:10 109:2
119:14 121:2
125:15 126:18
127:10,16
128:2 129:17
131:15 133:19
135:8 138:21
139:24 140:10
145:18 149:17
149:21 150:4
150:14 151:3
154:22 155:8
155:18,23
156:5,12,21
157:5,23
158:22 159:20
160:7,17 161:3
162:11,20
163:4 164:9
167:8,20 168:1
168:15,23
169:9,22
171:20 176:17
176:25 177:17

178:21 179:3
182:3 183:22
183:25
**scratch** 42:21
50:6 63:3
104:14 131:1
148:4 166:16
**screen** 8:10
79:5
**scrolling** 130:4
179:23 180:3
**second** 35:7
37:11 80:11
87:12 93:15
129:11 131:16
132:14
**secondly** 90:10
**section** 35:5
39:2 40:5
81:21,24 86:11
88:2 93:15
96:20,20 108:6
130:12 133:2,6
134:8 136:5,19
136:24 139:1,2
141:8 142:11
144:2 158:7
163:21 175:13
181:2
**see** 40:6 94:18
102:15 125:7
152:19 155:13
155:19 156:1,8
159:24 180:8
**seeing** 125:2
**seek** 127:6
147:12 152:4
156:15

**seem** 25:11
77:2 95:17
162:7,17
**seemed** 23:1
167:23
**seen** 8:9 21:14
44:8 56:24
57:15,24 93:11
98:13 151:18
151:24 170:1
177:22
**sell** 42:11 47:21
47:23
**selling** 93:12
**send** 28:9,12,13
33:5,20 60:7
63:15 71:8
73:5 75:9
86:25 88:23
100:24 102:5
106:6,10 115:4
115:6,15 123:7
147:7 152:9,13
163:13
**sender** 79:12
**sending** 86:12
96:21 110:2
125:11 126:15
134:18
**sends** 75:10
**senior** 35:18,18
35:22 49:13
122:23
**sensitive** 88:20
**sent** 33:2 52:20
62:15 63:11
74:24 75:1,4
80:11 84:14

89:24 91:7,10
92:14 96:11
99:11 102:9
104:4 106:1,3
107:20 109:15
109:17 130:8
133:2,25
135:14 137:24
139:4 141:10
141:22 142:9
145:4 150:7
152:2 154:10
157:7 158:24
159:1,5,23
161:13 179:5
**sentence** 37:8
80:12 87:12
105:24 106:7
132:14 133:1
136:23 137:24
139:8 141:14
163:12 181:7
**sentences**
96:25 158:5
**separately** 29:1
**september** 6:8
15:19 20:12
21:10 138:19
138:24 139:4
**service** 15:8
52:18 53:11
65:21 67:25
75:14 82:5
**services** 15:9
19:17,19 36:10
46:21,23,25
47:7 48:18,21
50:8,11,12,13

50:16,17 52:13
53:13,14 55:5
62:5,23,23
67:14,25
104:10
**set** 23:2 58:19
100:1 103:24
104:2 108:18
131:25 135:1
142:14 145:7
158:13 185:6
**sets** 131:24
**settle** 64:2
**settlement** 62:9
62:11 63:14
67:1
**settlements**
64:2
**several** 30:22
**severin** 1:17
4:3,18,24 5:2,5
5:8,11,13,21
5:23 6:2,5,8,10
6:14,17,20 7:3
8:15 10:3,4,10
10:13,18,23
11:2 12:14
20:4 21:7
32:21 33:1,8
78:5 79:19
81:8 85:9 86:1
87:11 89:16
90:24 96:2
106:25 107:11
108:25 116:3
127:17 129:13
133:17 135:6
138:18 139:25

140:8 150:15
157:2 158:20
159:21 161:4
162:12 163:2
164:5 168:3
169:2 173:10
176:18 178:18
178:22,25
180:23 182:4
183:23 184:4
184:14
**shape** 52:15
**share** 19:10
82:2 143:2
171:3 179:17
**shared** 28:8
163:8
**shareholder**
35:23 46:18,18
47:15 49:2,11
50:24 51:5,11
53:23,24 71:9
83:16 87:24,25
88:1 94:18
95:14 102:22
104:8,22
108:10 111:8
113:5,5,13,13
113:14,17,18
116:16,18
120:14 125:4
127:2 128:18
128:25 129:4
132:6 136:17
144:15,18,23
148:20 151:17
151:18,22,25
153:22 154:7

170:10 171:12
181:9
**shareholder's**
181:11,13
**shareholders**
28:7,9 35:18
36:5 39:2,3
40:19,25 43:18
43:19 49:5,17
73:23 74:4
80:21 82:21
84:4 85:14,20
91:24 92:8
95:22 98:5,15
101:24 103:14
104:11,17
112:17 115:17
118:2 119:25
121:9,19
122:17,24
124:19,24
126:3 131:10
131:20 132:3
132:11 136:14
136:16 139:20
146:20 147:11
151:11,15,19
153:17,24
170:6,16 172:9
172:14,18
173:4 175:16
175:20 181:6
**shares** 37:4,12
39:13 47:21,23
51:1,3 179:16
**sheet** 6:3
133:18 134:10

**shirt** 20:25
**shortcomings**
25:2
**shorthand**
185:14 186:11
**show** 32:18
34:4 44:10
78:2 81:12
85:23 95:24
105:10 106:17
108:22 129:8
133:14 135:2
158:15 161:12
168:25 171:14
177:12 178:18
178:22
**showed** 22:13
107:21
**showing** 44:4
89:13 90:20
130:9 131:6
138:15 156:24
162:24 169:16
179:25
**shown** 49:3
58:12 159:13
161:9,25
**shows** 42:21
129:11 177:19
**side** 82:20
**sign** 11:17
74:25 76:3
80:13,25 82:22
**signature**
75:22 185:21
186:21
**signatures** 73:9
73:10,14 76:3

**signed** 74:24
121:7 124:18
**signer** 74:25
75:23 76:5
**signing** 66:15
66:17 69:10
70:1,2,10,13
72:10,11,14
74:21,22,22
75:25
**similar** 38:13
53:10
**similarities**
121:22
**single** 23:23,23
73:8
**sit** 90:6
**site** 42:8,11
43:7,9 45:11
63:6 67:8
**sitepay** 62:22
62:22 63:12
**situation** 82:13
82:21 83:13
102:19 164:17
165:12
**situations**
165:11
**six** 17:6 100:20
122:3
**size** 25:8
**skill** 23:2
**skills** 22:13
29:21
**skipping** 181:7
**slightly** 23:6
**small** 15:22
16:20 23:22

25:7 30:7
smart 70:23
smartvu
  136:16 173:22
software 24:7,8
  24:14 45:14
  100:9 124:15
sole 6:22,24
  169:20,24
  171:18 175:8
solutions 1:21
  8:25 9:1
  184:16
somebody
  22:11
soon 181:5
sophisticated
  30:4
sorry 72:2,6
  103:2 106:2
  107:6 113:11
  117:6 123:21
  128:21,22
  134:9 138:10
  159:14 160:15
  169:17 183:15
sought 126:14
  147:1 152:15
sound 110:6
sounded 92:19
source 61:14
  66:24 70:16
  73:17 100:16
south 2:12
space 15:21
speak 26:16
  72:6 116:2
  152:1

speaker 184:11
speaking 15:6
  23:5
special 133:9
specialty 36:4
specific 33:6
  139:23
specifically
  58:21 59:17
  63:24 77:20
  91:17 108:13
  112:23 165:5
specifics 61:18
speculation
  127:15 145:16
  149:16 150:2
  151:2 162:10
  167:17 168:10
spelling 10:9
spend 67:13
spot 23:4
spreadsheet
  102:9,9 107:25
  110:3 115:15
  123:3,5,8,10
  123:14,23,24
  124:10 125:12
  134:22 171:22
  171:24
spreadsheets
  123:25
staff 86:20
stand 14:15
  28:18
standard 104:6
  117:23
standardized
  14:21

stands 24:10
  126:8
start 15:17
  24:6 110:1
  134:20 142:14
  142:16 143:17
started 23:21
  24:25 26:18
  28:1,11 42:17
  42:18,19 50:19
  85:19 98:4
  118:7 151:9
starting 19:3
  23:19 164:15
state 9:7,9 10:8
  56:12 79:16
  148:16
stated 97:11
  123:17 146:22
  148:14 150:20
  153:16 162:2
statement
  86:14 93:25
  114:7,11 115:5
  130:24 137:8
  144:9 161:9
  163:15 170:4
statements
  10:16 11:11,25
  17:4 54:25
  114:3,13,18
  128:6 179:25
  180:5
states 1:1,6
  8:17,18 9:13
  9:15 11:9 41:9
  80:12 175:21
  181:5

stenographic...
  185:11
stenotype 1:24
step 85:10 90:5
sticker 106:21
  107:9 171:15
stop 16:16
  109:22
stopped 130:17
strategy 50:14
stream 67:20
streaming
  35:12 36:9
  41:19,20
street 1:21 2:6
  2:17 8:21
  15:23 16:2,3,4
  16:5,11,13,17
  16:21 21:19
stress 164:15
strictly 30:13
strike 39:14
strong 22:11
structure 30:21
  30:25 31:2
  44:16 49:3,11
  50:4 58:12,16
  58:19
subheading
  42:15
subject 11:21
  96:5,7 134:4,9
  135:16 157:11
  157:13
sublease 15:22
subleased
  16:20

subsequently
  37:2
success   131:3
sudden   143:5
suggested
  165:8
suite   1:22 2:12
  2:22
summarize
  163:20 172:17
  179:10 182:19
summarizes
  172:1
summarizing
  171:25
supervise   17:4
  66:10
suppliers   145:9
  145:13
support   78:20
  90:13
sure   16:9 23:7
  32:10 35:8
  41:2,11 55:9
  58:14,15 69:3
  69:20 72:15
  75:7 77:7
  116:4 137:6
  142:12 158:8
  178:17
surecom   32:15
  32:16 40:10
  43:1,4,8 44:20
  44:24 45:4,6,8
  45:13,15 48:3
  48:4 53:4,6,8,9
  53:13 55:21
  57:5,20 58:6

59:23 61:7
68:3,5,7,11,14
68:16 70:12,18
71:1,3,8,9
73:19 77:19,22
80:8 136:8,17
143:12
surecom's
  68:18,23 69:22
  70:5,17,20
  71:7
swear   10:6
switch   30:20
  117:13 145:19
switched
  159:22
switching
  160:1
sworn   1:20
  186:9
system   23:22
  23:23,24 24:3
  24:4,12,19,20
  25:3,5 26:8
  30:6,12 99:6,8
  99:16 116:22
  117:5

t

t   4:18,24 5:2,5
  5:7,11,13,21
  5:23 6:2,5,8,10
  6:14,17,20 7:3
  32:21 78:5
  81:8 86:1
  89:16 90:24
  96:2 108:25
  129:13 133:17

135:6 138:18
140:8 157:2
158:20 163:2
178:25
table   23:2
take   8:12 13:10
  14:21 52:15
  62:4,14 83:11
  83:14 84:22
  85:10 134:21
  151:8
taken   1:20,24
  8:15 85:2
  160:23 185:6
  185:14 186:7
  186:10,15
talk   30:20
  43:22 82:1
  110:16 145:20
tango   174:4
tax   2:4 17:6
  30:4 101:4,6
  101:24 102:7
  110:2,6 117:18
  166:2,3,4,13
  166:19,25
  167:3,13 168:7
  168:12,16
taxes   101:15
  102:10,21
  166:22
td   74:10 75:23
tdi   64:12
technical   67:14
tell   23:10 48:9
  48:22 49:1
  51:12 65:22
  93:17 105:7

126:8 133:2,22
134:16 141:21
142:1 143:14
152:23 153:8
157:7 161:21
165:16
template   29:10
templates
  24:21 29:13
ten   172:4
  184:12
tend   93:9
term   24:11
  120:11 139:20
  174:21
terminate   68:9
terminated
  68:20
terminology
  175:1
terms   14:2 45:8
  45:10 61:19
  163:25
testified   10:14
  21:10 24:24
  37:23 83:25
  85:11 104:7
  181:18
testifying   11:5
testimony   12:1
  183:3,4 184:3
  184:8,13 185:9
  186:8,10
tests   14:21
texas   13:4
text   35:4 40:5
  42:21 86:17
  105:12

**thank** 10:12,22
  10:23 85:7
  171:10 178:19
**thanks** 79:18
**thereto** 186:18
**thing** 75:13
  120:24
**things** 30:11
  103:22 164:15
**think** 14:12
  17:18 27:22
  47:18 62:22
  78:23 83:2
  94:1,16 104:22
  113:16 116:17
  125:21,25
  126:4 131:5
  142:22,23
  143:16 153:14
**thinking**
  128:11
**third** 2:12
  175:12
**thirds** 163:6
**thought** 83:7
  92:21 142:13
  143:16,17
  164:18
**thread** 96:21
**three** 37:10
  42:5 44:23
  158:5 161:1
  172:22 182:24
  184:15
**thursday** 1:14
  1:23
**time** 5:25 9:7
  12:3 13:5 14:3

14:8,9 16:6,10
22:4 23:9 25:3
25:8 26:17
27:20 28:1
39:24 40:23
45:12 49:7
51:23 53:12
67:9 68:16
69:14 72:19
73:13 76:4,4
85:18 87:21
89:3 93:24
95:21 97:19
100:5,25 102:6
102:8 103:18
103:19 115:2
116:24 118:5
119:18 121:11
123:4 125:22
126:6 127:4
128:5 129:15
132:5 136:17
142:22 143:22
147:6,12 148:1
148:16 149:11
151:8,13
152:22 153:7
154:6 167:22
172:19 176:2,7
178:13 181:19
183:10 184:1
185:6,7,10
**timeframe**
  50:19
**times** 54:12
  89:10
**timestamp**
  79:13

**tipping** 42:9
**tips** 67:6
**title** 16:22 18:3
  18:4,11 33:22
  42:15 43:14
  106:14 169:23
  175:7 177:18
**titled** 38:16
  39:2 157:12
  172:22
**titles** 18:2
**today** 11:6,8,12
  11:24 12:1
  20:20
**today's** 184:3,8
  184:13,20
**together** 14:14
  20:9 30:16
  47:9 62:14
  158:2
**toine** 35:17
  39:22 41:5
  140:23 146:9
**tokens** 42:7,7
  67:7
**told** 51:13
  143:10 153:15
  162:6,16 165:3
  165:7
**tomorrow**
  158:13 184:4
**tony** 11:4 79:18
  90:6
**took** 28:2 83:12
  85:11
**top** 32:25 33:9
  33:19 37:25
  40:9 42:21

78:9,18 79:10
81:15 86:11
88:3 92:13
101:20 105:12
109:4 132:1
133:1,20 135:4
137:14,24
140:6 141:21
141:22 157:6
158:23 163:5
177:25
**topic** 88:16
**toronto** 1:13,22
  2:17 8:22
  12:21,24 13:1
  13:16 15:16,23
  16:2 19:16
  25:25 26:3
  51:8 82:21
  126:21 165:1
**total** 97:5,5
  139:10 179:21
**towards** 140:21
**track** 63:12
**tracked** 52:19
  67:8 99:4,6
  113:4,12
**tracking** 87:20
  87:23 99:15
  133:9
**training** 166:12
  166:18
**transaction**
  35:10 36:7,11
  63:9,11 73:9
  75:6
**transactions**
  72:19,20

transcribed
1:24 185:12
transcript
185:14
transfer 72:24
104:20 161:19
transferred
61:1
transfers 73:7
transferwise
78:20,21,22
79:7,24
transition
164:19
transitioned
13:20
treated 50:22
113:2 115:18
115:20
treatment
123:18 153:22
triggered
113:17
trouble 142:18
142:21 143:4
true 33:15
34:23 78:11
81:16 86:5
89:19 91:2
96:15 105:18
107:18 109:5
129:24 134:11
135:18 138:22
140:15 157:15
160:8 163:7
167:14 168:7
178:4 185:13

trust 38:21
39:5 40:1,2
54:18,25 69:5
70:3 72:1,7,12
80:18 148:25
149:23
trustpay 65:6
truthful 11:23
117:9
ttm 41:10,12
turn 48:3 51:20
52:7 56:3
78:15 109:13
131:16 140:18
142:5 143:22
165:11
turning 43:13
54:14 122:13
two 38:3,8
73:14 85:5
96:16,24
125:21 131:24
160:21 163:6
182:24
type 23:24 42:9
58:23 65:20
67:10,14 77:3
99:7 103:22
108:19,20
115:13 127:11
127:21
types 47:7
typical 75:5
146:18
typically 11:4
34:18 51:24
69:24 70:19
73:22 75:4,9

99:25 104:25
113:25 114:25
115:1 116:24
122:6 126:5
143:13 147:15

**u**

u.s. 101:17
102:8 166:19
166:25 167:3
168:6,12
ubo 39:17,18
39:20,21,24
41:2,4 43:24
46:11 48:1,4
50:22,24 54:2
55:11,24 56:13
66:19 136:15
141:4 176:14
ubos 47:2
uhm 92:15 98:2
112:25 182:13
ultimate 39:7
39:11,16 41:2
ultimately 61:1
unable 128:15
unaware 142:3
under 34:16
108:4 130:20
157:22 159:17
169:3 170:22
173:16,18,21
173:24 174:1,1
174:3,6,9,12
174:15 176:16
178:9 185:7
underneath
38:17 39:1

41:8 172:16
understand
51:17 136:10
138:4
understanding
10:19 11:19
22:1,4 29:16
30:9 31:18
37:8 39:9,19
40:21 46:13
49:2,12 51:4,6
53:2,21 55:4,7
55:23,25 56:6
56:8,11 58:20
65:10 69:12,17
72:11 73:16
74:15 75:22
76:9 83:20
84:13 85:21
90:15 97:7,13
98:7,16,18
101:9 104:1
112:8,12 120:9
121:12,14
125:9,17 132:9
132:18 143:6
143:21 149:7
150:22 151:16
151:21 153:10
153:12 154:25
176:21 177:3,6
181:23
unique 73:9
unit 8:14 28:21
28:22 29:2
united 1:1,6
8:16,18 9:13
9:15 11:9

38:21 54:18,25
68:8,8,19,24
69:1,5,10 70:3
70:5 71:13
72:1,7,12
76:11 80:18
148:25 149:23
175:21 181:4
**units**  28:20
**university**
13:15,16
**unknown**
184:11
**unusual**  112:18
112:21
**upcoming**
143:2
**upper**  172:11
**urgency**  90:12
**usd**  115:2
148:2 178:3
**use**  42:8 45:13
97:13 100:15
100:16
**used**  15:24
16:7 28:18
53:12 120:6
174:22 181:12
184:15
**useful**  29:14
93:10
**user**  42:6
**uses**  43:3
**using**  16:16
23:22 36:8,10
128:9 139:20
186:11

**usually**  76:17

**v**

**v**  1:8,9 2:9 8:17
10:11
**vague**  127:25
131:13 139:22
156:19
**valued**  165:23
**van**  35:11,21
35:24 36:2,8
36:20 40:3
41:5 103:9
111:2,14,24
114:8 116:9
147:1 158:1
**various**  28:24
28:24 42:8
62:13 131:20
182:22
**vendor**  100:1,2
**ventures**
156:16
**verbatim**  129:9
**veritext**  1:21
8:21,24 9:1
184:16
**versus**  8:17
22:2 48:23
108:20 117:10
**video**  8:11,14
12:10 35:13
36:9,9 54:13
**videographer**
3:6 8:4,24 10:5
84:23 85:4
160:19,25
184:6,13,19

**videotaped**
1:17
**view**  95:16
122:7 180:24
**viewers**  69:22
**viewing**  65:23
65:25 68:23
69:7,24 71:14
71:18,23 72:3
72:8 74:16,19
114:12
**virtually**  8:7
**visa**  61:23
**visibility**  59:10
114:2
**volume**  1:15
**voluntarily**
10:19 11:6
**vote**  170:6,8
175:15,18

**w**

**wages**  97:3,18
**want**  21:2
45:21 65:16
68:21 86:9
88:20,23 92:10
94:17 120:4
137:15 142:15
145:20
**wanted**  47:22
82:1 137:5
145:6 184:10
**wants**  93:13
**washington**  2:6
**waterlily**
172:12 173:16

**waters**  174:10
174:13
**wattel**  149:11
149:13
**way**  22:15 61:7
61:8,9 77:12
99:6 108:17
138:9,13
**ways**  51:9
**we've**  20:9 74:8
**wearing**  20:23
**webcam**  42:10
**website**  41:16
41:18 42:7
61:14
**websites**  28:24
**week**  26:6
130:18
**weekly**  63:14
63:19
**went**  13:15
22:24 30:11
91:24 126:4
161:4 179:19
**west**  1:21 8:21
16:4,4
**white**  46:12,14
46:17,19 47:12
47:15 66:19,22
**wide**  67:16
**william**  2:10,11
2:12 9:18
**willing**  65:20
**win**  165:9,9,9
165:12,12,12
165:20,20,20
**wire**  5:17,18
6:12 72:24

73:8 105:16
106:1,3,15,22
107:19 109:25
132:17 140:9
**wirecard** 64:16
**wise** 78:23
**withdrawals**
67:3,4,16
70:21 73:21
**withheld** 183:1
**witness** 1:18,20
2:20 4:3 8:10
10:4,7,10,18
10:21 21:5
23:7 66:22
71:22 72:6
120:23 131:14
145:17 155:6
159:18 160:5
167:7 168:13
185:7,9 186:8
186:10
**witness's**
119:13
**word** 62:7
97:13
**work** 17:5
24:14 27:16
76:22
**worked** 20:9
30:1 47:8
51:16 165:14
**working** 15:18
19:13 24:20
52:4 101:14
118:7 151:9
**workload**
165:4

**works** 46:19
**written** 186:13
**wrote** 82:11
88:6

| **x** |
|---|

**x** 1:5,11 4:1
62:24 70:23

| **y** |
|---|

**yeah** 24:11
50:11 51:14
52:24 56:21
69:24 83:2
87:15 93:6
112:21 113:13
113:16,18,22
120:11,12,23
150:6 155:2,6
155:10 160:16
162:14,22
168:13
**year** 13:21
16:19 18:25
46:3 103:2
139:5 159:12
159:18 168:18
**years** 16:18
29:20 44:17
47:24 63:22
64:23 68:2,5
68:22 71:2,10
74:4,8 89:1
93:8 98:24
100:21 102:24
110:18 118:16
118:21 119:1
122:15 139:19
155:12 162:15

167:4 170:12
172:4 173:2
177:8 183:13
**yesterday**
12:13
**york** 2:22
**yoursafe** 64:25
64:25 65:1
68:12 69:23
70:11 71:13,19
71:22
**yup** 170:2
171:23

| **z** |
|---|

**zero** 153:11
**zimmerman**
5:16 66:4 69:1
69:15,25 70:10
71:16 72:13
98:20 100:6,13
102:12,16
104:18,19
105:14,20
150:23 154:13
**zimmerman's**
66:5
**zoom** 32:24
35:4 78:9 80:9
81:14 90:1,21
105:12

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.