```
                                          Page 189

 1                UNITED STATES DISTRICT COURT

 2                DISTRICT COURT OF MINNESOTA

 3                Criminal No. 24-7  (JMB/DLM)

 4

 5     ----------------------------------X

 6     UNITED STATES OF AMERICA,         :

 7                    Plaintiff,         :

 8     V.                                :

 9     DAVID V. ERICKSON,                :

10                    Defendant         :

11     ----------------------------------X

12

13                Toronto, Ontario, Canada

14                 Friday, May 16, 2024

15                     Volume II

16

17           Continued Videotaped Deposition of

18     ANTONIO SEVERIN, a witness herein, called for

19     examination by counsel for the Plaintiff, in the

20     above-mentioned matter, the witness having been

21     duly sworn, taken at Veritext Legal Solutions,

22     77 King Street West, Suite 2020, Toronto, Ontario,

23     commencing at 8:59 a.m. on Friday, May 16, 2025,

24     and the proceedings taken down by Stenotype by

25     JUDITH M. CAPUTO, RPR, CSR, CRR.

     Job No. CS7296587
```

```
 1                A P P E A R A N C E S:
 2
 3      On Behalf of the Plaintiffs:
 4      DEPARTMENT OF JUSTICE, TAX DIVISION
        BY:  BORIS BOURGET, Esquire
 5              - AND -
            AMANDA R. SCOTT, Esquire
 6      150 M Street NE
        Washington, DC  20002
 7      (202) 307-2182 (Bourget)
        (202) 718-2056 (Scott)
 8
 9      On Behalf of the Defendant,
        David V. Erickson:
10
        WILLIAM MAUZY ATTORNEY AT LAW
11      BY:  WILLIAM J. MAUZY, Esquire
               - and -
12          WILLIAM DOOLING, Esquire
        650 Third Avenue South, Suite 260
13      Minneapolis, Minnesota 55402
        (612) 688-1154
14
15      On Behalf of Rypl:
16      JANSSEN LAW PROFESSIONAL CORPORATION
        BY: CHARLOTTE JANSSEN, Esquire
17      89 Scollard Street
        Toronto, Ontario M5R 1G4
18      (416) 929-1103
        cmj@janssen-law.com
19
20      On Behalf of the Witness:
21      LIPSITZ GREEN SCIME CAMBRIA
        BY: JUSTIN D. GINTER, Esquire
22      42 Delaware Avenue, Suite 120
        Buffalo, New York 14202
23      (716) 849-1333
        jginter@lglaw.com
24
25
```

Antonio Severin                                              May 16, 2025

Page 191

1    ALSO PRESENT:

2

3    Rusty Kiser, IRS Criminal Investigation

4    Kandia Aird, Department of Justice Canada

5

6    VIDEOGRAPHER:

7    Peter Goodale, CLVS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Antonio Severin                                             May 16, 2025

                                                    Page 192

1                         I N D E X

2

3       WITNESS:    ANTONIO SEVERIN

4                                                    PAGE

5       CROSS-EXAMINATION BY MR. MAUZY............  196

6       REDIRECT EXAMINATION BY MS. SCOTT........  376

7

8

9

10

11

12                      INDEX OF EXHIBITS

13                      (PREVIOUSLY MARKED)

14

15      NUMBER/DESCRIPTION                  PAGE/LINE NO.

16      D-9:  Resolutions of the Sole Managing      227

17      Director of Firefly Lane Corporation N.V.

18      D-10:  Syntego Bay Purchase Agreement       231

19      adopted March 28, 2024.

20      D-56:  Resolution of the Sole Managing      236

21      Director of Firefly Corporation N.V.

22      adopted December 15, 2021 (USAProd00403432).

23      53:  E-mail from Dave Erickson             276

24      to Simon Dowson, Mark Quirk,

25      (USAProd-00544843).

Page 193

1    D-14:  E-mail from D. Erickson to          305

2    A. Zimmerman, T. Severin, et al, dated

3    May 3, 2018, "Loan".

4    D-15:  E-mail from D. Erickson to A.        307

5    Zimmerman, et al, dated March 7, 2017,

6    Re: Loan.

7    D-16: E-mail from D. Erickson to T.         309

8    Severin, et al, dated October 10, 2019

9    Re: Advance for Legal Costs.

10   D-17:  E-mail from D. Erickson to A.        310

11   Zimmerman, et al, dated February 25,

12   2018, Re: Amex.

13   D-18:  E-mail from D. Erickson to          314

14   T. Severin, A. Zimmerman dated

15   February 26, 2018, Re: Amex

16   (USAProd00544949).

17   D-20:  E-mail from T. Rodenburg            318

18   to A. Zimmerman & D. Erickson dated

19   June 16, 2016, Re: Invoice Payment by FFL

20   D-21:  E-mail from D. Erickson to T.       319

21   Severin, A. Zimmerman dated May 30,

22   2018 (USAProd-00001058).

23   D-30:  E-Mail Chain from T. Rosenburg      321

24   to T. Severin & D. Erickson Re: Regular

25   payments (USAProd-00544952).

Antonio Severin                                    May 16, 2025

Page 194

1    D-32:  E-Mail Chain from D. Erickson to    326

2    T. Severin dated May 29, 2014, Re:

3    Partner Payments (USAProd00544934).

4    D-33:  E-Mail from T. Severin              330

5    to D. Erickson dated March 29, 2016,

6    Re: Feb-16 (USAProd-00259268).

7    D-34:  E-Mail from T. Severin to D.        332

8    Erickson dated March 23, 2016 Re: Amex

9    (USAFilterProd-00001070).

10   D-35:  E-Mail from T. Severin to D.        334

11   Erickson dated November 15, 2017, Re:

12   FW:  Cash Balance at end of October

13   (USAFilterProd-00001102).

14   D-36: E-Mail from T. Severin to D.         335

15   Erickson dated September 23, 2016, Re:

16   Accounting (USAFilterProd-00001035).

17   D-40:  E-Mail from T. Severin to G.        339

18   Elias, et al, dated September 24,

19   2018, Re: Surecom/Firefly

20   advances/dividends and accounting.

21   D-41: E-mail from T. Severin to            340

22   D. Erickson dated February 13, 2017,

23   Re:  Cash position at end of Jan-17

24   (USAProd-00263403).

25

Page 195

```
 1      G-41:  E-mail from D. Erickson to T.       343

 2      Severin dated September 12, 2017, Re:

 3      341 Cash Balance as of Aug-17, Amex

 4      and Chad's SH.

 5      D-42:  E-mail from T. Severin to D.        346

 6      Erickson dated October 22, 2018, Re:

 7      Last wire.

 8      D-43:  E-mail from D. Erickson to          349

 9      T. Severin dated February 27, 2020,

10      Re: Shareholder balances.

11      D-45:  E-mail from T. Severin dated        351

12      July 18, 2022 "Ledgers Reconciliation".

13      D-46:  E-Mail from Paul Eidsness to        359

14      T. Severin dated March 15, 2021.

15      D-47:  E-mail from G. Elias to T. Severin  362

16      et al, dated August 10, 2023, Re: Firefly

17      Corporation Resolution 8/10/2023.

18      D-49:  E-Mail from T. Severin to B.        367

19      Granity, et al, dated June 22, 2023,

20      Re: RE: Dave Erickson due To/From

21      Balances and Dividends received June 21, 2023.

22      G-40:  E-mail from T. Severin to D.        342

23      Erickson dated August 8, 2017, Re:

24      August dividend.

25
```

Antonio Severin                                        May 16, 2025

                                              Page 196

1      --  Upon commencing at 8:59 a.m.

2

3              THE VIDEOGRAPHER:  Good morning.  We

4      are going on the record at 8:59 a.m. on May 16,

5      2025.  This is Volume 2, media unit one, of the

6      video recorded deposition of Anthony Severin, taken

7      by counsel for the Plaintiff in the matter of

8      United States of America versus David V. Erickson.

9              My name is Peter Goodale, certified

10     legal videographer representing Veritext Legal

11     Solutions.  The court reporter is Judith Caputo,

12     also from the firm Veritext Legal Solutions.

13             All who were present on May 15, 2025,

14     are present today.

15             Mr. Severin, you are reminded that you

16     are still under oath.  Please begin.

17             MR. MAUZY:  Thank you.

18             ANTHONY SEVERIN, PREVIOUSLY AFFIRMED.

19                  CROSS-EXAMINATION

20     BY MR. MAUZY (CONT'D):

21             Q.  Good morning, Mr. Severin.  I'm

22     Bill Mauzy, representing David Erickson.  I'm here

23     with Will Dooling, who also represents

24     Mr. Erickson.

25             I'm going to start with questioning you

Antonio Severin                                    May 16, 2025

Page 197

1        about the times that you met with the government to

2        be interviewed.  So, the first time, August 24th --

3        I'm sorry, November 15th, 2024?

4                    A.   Correct.

5                    Q.   And how long was that interview?

6                    A.   It went over two days.

7                    Q.   Two days?

8                    A.   Yeah.  I think it was the 14th and

9        15th, or 15th and 16th.

10                   Q.   And on May 8th, 2025, you were

11       interviewed again; is that correct?

12                   A.   By video.

13                   Q.   And that was an interview?

14                   A.   I'm not sure if it was an

15       interview per se.  It was a discussion.

16                   Q.   Did they ask you questions?

17                   A.   Yes.

18                   Q.   And was that Rusty Kiser?

19                   A.   He was part of that, yes.

20                   Q.   Yeah.  And Shauna Turner, the

21       other special agent?

22                   A.   I don't remember Shauna Turner.

23                   Q.   Okay.  But they asked you

24       questions?

25                   A.   That was with Amanda and Boris as

Antonio Severin                                    May 16, 2025

                                                        Page 198

1    well.

2                Q.   Okay.  They were on the video?

3                A.   Correct.

4                Q.   Okay.  And that was -- it was

5    August 28th, 2019?

6                A.   Sorry, I'm getting confused.  What

7    date are you referring to --

8                Q.   Okay.

9                A.   -- the May 8th?

10               Q.   Yeah.  You met with them on

11   May 8th, 2025?

12               A.   Oh, that was --

13               Q.   Sorry?

14               A.   Yes.

15               Q.   Okay.  A week ago, right?

16               A.   Correct.

17               Q.   Okay.

18               A.   I did, yeah.

19               Q.   And you were also interviewed by

20   them last year, correct?

21               A.   On November 15th.

22               Q.   Okay.  And did you talk to them

23   this week?

24               A.   Yes.

25               Q.   Were you aware that Chad Moldon

Antonio Severin                                    May 16, 2025

Page 199

1    testified in a deposition this week?

2                    A.    I was aware.

3                    Q.    And you were asked questions,

4    again by Rusty Kiser, concerning Rypl and Firefly?

5                    A.    The discussion this week?

6                    Q.    Yes.

7                    A.    By video?  No, it was more about

8    the process.

9                    Q.    What questions did they ask you?

10                   A.    They just asked -- they just told

11   me exactly how the process would work, reminded me

12   that I would be under oath, that I would -- I

13   would -- you know, to be truthful, to keep to the

14   point.

15                   Q.    Did they ask you any substantive

16   questions?

17                   A.    No.

18                   Q.    At one point when you met with

19   them, did you review your November 2024 memorandum

20   of interview that Rusty Kiser prepared?

21                   A.    Yes.  That would have been on the

22   May 8th, this -- mid year.

23                   Q.    And were you asked to make any

24   corrections?

25                   A.    I did ask to have some

Antonio Severin

Page 200

1    corrections.

2                    Q.    Okay.  So it was the

3    November 13th, 2024 interview summary?

4                    A.    Correct.

5                    Q.    Okay.  I'm going to put that in

6    front of you because I'll be asking you questions

7    from it.  I'm not going to introduce it into

8    evidence, but for convenience sake.

9                    A.    I'll take it.

10                   Q.    It will speed things along.

11                   A.    Is it okay, Bill, if I take this?

12                   Q.    Yes.

13                   A.    Okay.

14                   Q.    You recognize that as a memorandum

15   of interview, November 2024?

16                   A.    Yes.

17                   Q.    And you reviewed that when you met

18   with them last week, correct?

19                   A.    Correct.

20                   Q.    And you were asked to make any

21   corrections?

22                   A.    Correct.

23                   Q.    Did you make any corrections?

24                   A.    Yes.

25                   Q.    What were the corrections?

1                    A.    I remember one of the corrections

2     being, I think it was maybe on -- let me see.

3                    Okay.   Yeah, on 25, or at 25, the

4     question has not been made on this particular --

5                    Q.    No.

6                    A.    -- form here.   But, on 25, I think

7     the fourth line.   Granity's office is located at 23

8     Seafield.   That's actually spelled S-E-A; it's not

9     the letter "C".

10                    Q.    Yeah.   What other corrections did

11    you make?

12                    A.    In Dublin.

13                    I remember making a correction.   Let's

14    see here.   I remember making the correction that

15    the actual legal firm that we used in The

16    Netherlands, they -- it was written up as "Tax",

17    T-A-X, and the word "and".   It's actually "Taxand,"

18    it's just one word.   I remember making that

19    correction.   And I think there was another one, but

20    I just -- I can't seem to find it right now.

21                    Q.    Fairly minor corrections?

22                    A.    Correct, yes.   Yeah, they were

23    minor.

24                    Q.    Okay.   Other than that, the

25    summary is a correct and accurate summary?

Antonio Severin                                    May 16, 2025

Page 202

1                  A.    Yes.

2                  Q.    All right.  When you talked to

3      Agent Kiser on Wednesday afternoon, along with

4      Amanda Scott and Boris Bourget, they actually did

5      ask you significant questions, did they not?

6                  A.    They did show me some documents.

7                  Q.    Yeah.

8                  A.    I don't remember them being

9      significant.

10                 Q.    Did they ask you that from the

11     notes that we were given relating to that

12     interview?  Notes say, "paying 90,000 a month and

13     still paying him now."

14                 Who were you paying 90,000 a month?

15                 A.    That's part of the deal agreement

16     with Bannister.

17                 Q.    Okay.

18                 A.    And we are paying the Defendant.

19                 Q.    The Syntego Buyout?

20                 A.    Correct.

21                 Q.    Okay.  You're still paying him on

22     that behalf?

23                 A.    Correct.

24                 Q.    And the Syntego Buyout purpose was

25     to cancel out, eliminate, all of Mr. Erickson's and

Antonio Severin                                    May 16, 2025

Page 203

1      Bannister's loans; is that correct?

2                  A.    My understanding is -- was that

3      that particular agreement was to buy out the

4      Defendant --

5                  Q.    Yeah.

6                  A.    -- his ownership stake in the

7      company.

8                  Q.    Buy out Bannister?

9                  A.    Correct.

10                 Q.    And in the process, that he was

11     paid some money but he also -- it was deducted from

12     the money owed, the loans that he had with Firefly?

13                 A.    That is my understanding.

14     Correct, yeah, my understanding.

15                 Q.    So, the point of it was to get him

16     some of money and to pay off all of his loans that

17     he had outstanding at Firefly, correct?

18                 MS. SCOTT:  Objection, compound.

19                 THE WITNESS:  That was my understanding

20     of what they were trying to do.  I was not party to

21     the actual agreement itself.

22     BY MR. MAUZY:

23                 Q.    Yeah.  But the agreement itself

24     accomplished paying off all of Bannister, that is

25     Mr. Erickson's loans to Firefly?

Antonio Severin                                    May 16, 2025

                                                    Page  204

1                  A.    That's my understanding, correct.

2                  Q.    You were asked questions about a

3       Sage 300?

4                  A.    Correct.

5                  Q.    And Sage 300 was a software

6       program?

7                  A.    It's an accounting software

8       program, correct.

9                  Q.    And Mr. Erickson and you were

10      responsible for implementing Sage 300, the

11      accounting software?

12                 A.    When I was hired, the decision to

13      go forward with Sage 300 had already been made and,

14      yes, myself and the Defendant integrated it -- or

15      implemented it.

16                 Q.    So Dave Erickson was responsible

17      for introducing the Sage 300 accounting software?

18                 A.    Yes.

19                 Q.    And that greatly increased the

20      ability of Rypl to keep track of accounting; is

21      that correct?

22                 A.    Yes.  It was a much more robust

23      accounting system, and we were able to have

24      multi-company, multi-currency reporting.

25                 Q.    What impact did that have on the

Antonio Severin                                    May 16, 2025

Page 205

1    running of Rypl and keeping track of all of the

2    companies associated with Firefly?

3              A.   We were able to, you know, better

4    produce much -- much easier to produce financial

5    statements per company, much easier to get all the

6    -- all the GL codes implemented that we need.  We

7    needed also to track divisions, departmental

8    reporting.  And consolidate -- primarily, the

9    consolidated statements were much easier to be done

10   with a more robust accounting system.

11             Q.   And so that was a huge

12   improvement?

13             A.   It was, yes.

14             Q.   Yes.  Huge improvement to Rypl and

15   to Firefly to keep track of records?

16             A.   For the Firefly Group of

17   companies --

18             Q.   Yes.

19             A.   -- correct.

20             Q.   So, it was complicated to have

21   numerous entities, but Sage 300 enabled you to keep

22   better track of the finances of all of those

23   companies, correct?

24             A.   That is correct.

25             Q.   You were asked about Brian Hanlon?

Antonio Severin                                    May 16, 2025

Page 206

1                    A.    Correct.

2                    Q.    Who is he?

3                    A.    He's a director, managing

4         director, for Granity Dublin.

5                    Q.    You were asked the question if he

6         was ever involved with any of Dave Erickson's

7         payments, and you said he was not?

8                    A.    He is not, no.

9                    Q.    You were asked questions about the

10        United Trust Dashboard.  Can you identify that,

11        please?

12                   A.    There was a United Trust

13        Dashboard.  So, within Sage 300, one of the

14        limiting factors of Sage 300 is -- it's a

15        reporting.  So what we do is use a database, a

16        Microsoft database, called Power BI.  And so the

17        information from Sage 300 goes into the database,

18        where we can do better reporting.

19                   Brian Hanlon has experience with

20        project management, so I tasked him with doing

21        reports, and the reports would be these partnership

22        reporting type of reports.  And those reports went

23        into a folder called United Trust Dashboard.

24                   Q.    Okay.  So, with the implementation

25        of Sage 300, it was much easier to keep track of

Antonio Severin                                    May 16, 2025

Page 207

1    expenses?

2                    A.    They were easy to -- it was

3    better, for sure, yeah.

4                    Q.    An improvement?

5                    A.    An improvement, correct, to find

6    them.

7                    Q.    And were you able to track

8    expenses of these various entities?

9                    A.    Correct.

10                   Q.    You were able to keep track of

11   payments to shareholders?

12                   A.    Correct.

13                   Q.    And you did keep track of payments

14   to shareholders?

15                   A.    The payments to shareholders were

16   in the ledgers, correct.

17                   Q.    And including payments to Dave

18   Erickson?

19                   A.    Including payments to Halstead

20   Bay.

21                   Q.    Halstead Bay, yeah.  Thank you.

22                   You were also asked questions about

23   United, the United Trust Dashboard?

24                   MS. SCOTT:  Objection, asked and

25   answered.

Antonio Severin                                          May 16, 2025

Page 208

1    BY MR. MAUZY:

2              Q.   Go ahead.

3              A.   Oh, yes.

4              Q.   I just want to clear that up.

5              A.   Okay.

6              Q.   Tell me about the United Trust

7    Dashboard.  How was that accessed?

8              A.   It was just a report on the Power

9    BI reporting tool.  And when you say "United Trust

10   Dashboard," it's a dashboard, it would be a listing

11   of reports.

12             Q.   Okay, a listing of reports.  Did

13   you have access to that?

14             A.   Yes.

15             Q.   What would be listed on those

16   reports?

17             A.   You could list payments per

18   partner, per shareholder.

19             Q.   So you could see the payments to

20   the shareholders on the United Trust Dashboard?

21             A.   Correct.

22             Q.   And including payments to David

23   Erickson?

24             A.   To Halstead Bay.

25             Q.   Halstead.  I'm sorry, I'll keep

Antonio Severin                                    May 16, 2025

Page 209

1    making that mistake.  Thank you.

2                    A.    And Bannister.

3                    Q.    To Bannister and Halstead Bay?

4                    A.    Correct.

5                    Q.    Thank you.

6                    A.    Plus all the other shareholders.

7                    Q.    All the other shareholders, okay.

8                    Sage 300 had information going back to

9    2015?

10                   A.    We started -- we implemented

11   Sage 300 on January 1st, 2015.

12                   Q.    So you -- just to be clear, I

13   mean, this was Wednesday night, you were asked

14   quite a few questions?

15                   A.    There was a few questions,

16   correct, yeah.  Clarifications, I guess, so...  And

17   to do -- the questions were to do a list of some

18   documents that they -- they were showing me.

19                   Q.    Did you say that there were

20   several businesses and you had to look at a bunch

21   of sheets to come up with the numbers?

22                   A.    I don't remember what that was

23   referring to.  I don't remember what that was for.

24                   Q.    Did you tell them that there was

25   50 to 60 million in revenue for the Firefly

Antonio Severin                                    May 16, 2025

Page 210

1    companies?

2                 A.    Correct.

3                 Q.    And they asked questions of you

4    about dividends.  Did you say they were not

5    dividends but advances?

6                 A.    In that period, in the 2014 to

7    2019 period, payments that were classified as

8    dividends were actually made to -- that was changed

9    to advances on dividends, so it was called advances

10   after that, yeah.

11                Q.    So there, in the period of time

12   2014 to 2019, there in fact were no dividends

13   issued by Firefly to the shareholders?

14                A.    Correct.  There was no dividends,

15   there was no dividend resolutions.  They were not

16   classified as dividends.

17                Q.    So, to have a dividend, there had

18   to be a resolution, correct?

19                A.    Correct.

20                Q.    And during the period of time 2013

21   to 2019, there were no resolutions, correct?

22                A.    Correct.

23                Q.    And without resolutions, there

24   couldn't be a dividend?

25                MS. SCOTT:  Objection, asked and

Antonio Severin                                    May 16, 2025

                                              Page 211

1    answered.

2    BY MR. MAUZY:

3              Q.   Go ahead.

4              A.   That's my understanding.

5              Q.   And no dividends, in fact, were

6    issued between 2013 to 2019?

7              A.   Correct.

8              Q.   What's the approximate revenue for

9    Firefly during those years?

10             A.   Firefly, the company?

11             Q.   The entities.

12             A.   Oh, the entity?  Sorry, the

13   question was revenue, you're talking about?

14             Q.   Yes.

15             A.   Yeah, it was about, you know, 60

16   million.

17             Q.   60 million during the period of

18   time --

19             A.   Correct.

20             Q.   -- 2013 to '19?

21             A.   Maybe a bit more.

22             Q.   And if you wanted records from

23   Firefly, you could go to the director of Firefly?

24             A.   If I wanted -- like, share

25   registers, incorporation documents, all those

Antonio Severin                                          May 16, 2025

Page 212

1      corporate records were kept by United Trust as a

2      director.

3                 Q.   And you had access to those?

4                 A.   I would ask them, somebody at

5      United Trust, and they would provide them to me.

6                 Q.   And they would give them to you?

7                 A.   Correct.

8                 Q.   So you'd ask for those records at

9      Firefly and they would give you the records you

10     asked for?

11                A.   I would ask somebody at United

12     Trust.

13                Q.   At United Trust?

14                A.   Correct.

15                Q.   Okay.  And you were asked

16     questions whether the partners always wanted money.

17     Let's talk about that for a moment.  So, this is a

18     company that was started up, true?  It started up

19     small?

20                A.   Yeah, I wasn't there.

21                MS. SCOTT:  Objection, personal,

22     foundation.

23                THE WITNESS:  Yeah.  I wasn't there.

24     I'm assuming, yeah, it was an entrepreneurial --

25     you know, did have a entrepreneur bent, let's put

Antonio Severin                                    May 16, 2025

Page 213

1      it that way.

2      BY MR. MAUZY:

3              Q.    Okay.  So this was an enterprise?

4              A.    It was an enterprise, yes.

5              Q.    Started by entrepreneurs?

6              A.    Correct.

7              Q.    People who invested in the

8      business?

9              MS. SCOTT:  Objection, foundation.

10             THE WITNESS:  Yeah, I don't -- I'm not

11     sure.  I wouldn't say "invested," but invested

12     their time, that much I know.

13     BY MR. MAUZY:

14             Q.    Yes.  And the business became

15     successful?

16             A.    Yes.

17             Q.    And when people invest in a

18     company and that company becomes successful, the

19     owners of the company typically want to receive the

20     fruits of their investment, correct?

21             A.    Correct.

22             Q.    They want to receive money?

23             A.    Yes.

24             Q.    That's the hope of every business

25     that is started by individuals, that --

Antonio Severin                                    May 16, 2025

Page 214

1                    MS. SCOTT:  Objection, foundation,
2        improper opinion.
3                    MR. MAUZY:  A number of times, you
4        asked me to allow you to finish the question.  I
5        ask you for the same courtesy that I extended to
6        you.  Thank you.
7        BY MR. MAUZY:
8                    Q.   In businesses that start up, the
9        owners of the business desire to receive money from
10       the business?
11                   MS. SCOTT:  Objection, foundation,
12       improper opinion.
13                   THE WITNESS:  I would put it that
14       obviously we -- businesses try to be as profitable
15       as possible, and then hopefully the shareholders
16       benefit from that, yes, yes.
17       BY MR. MAUZY:
18                   Q.   Right.  And this is an obvious
19       fact --
20                   A.   Yeah.
21                   Q.   -- people who set up businesses
22       desire to receive money from the businesses?
23                   A.   Sure.  Shareholders want to be
24       compensated, for sure.
25                   Q.   Shareholders want to participate

Antonio Severin                                    May 16, 2025

                                              Page 215

1      in the profits of the business that they own?

2                    MS. SCOTT:  Objection, foundation,

3      improper opinion.

4                    THE WITNESS:  Correct.

5      BY MR. MAUZY:

6           Q.   And the shareholders are the

7      owners of the business?

8           A.   That is correct.

9           Q.   Shareholders want to receive the

10     benefit of that ownership and receive funds from

11     the business?

12                   MS. SCOTT:  Asked and answered.

13                   THE WITNESS:  Yeah, that's correct.

14     BY MR. MAUZY:

15          Q.   Nothing unusual about that?

16          A.   No.

17          Q.   And let's talk about Dave Erickson

18     was a shareholder through Bannister, correct, of

19     Firefly?

20          A.   Yes.  He was one of the founders

21     and a shareholder of the UBO for Bannister.  And

22     Bannister was a shareholder.

23          Q.   And who were the other founding

24     shareholders?

25          A.   The other founding shareholders

1        were -- the holding companies changed, but David

2        van der Poel would be another founding member, and

3        Toine Rodenburg, and his company is 10Q21.

4                      Q.   And those shareholders also wanted

5        to receive funds from Firefly, the entities, the

6        group that they had ownership interest in?

7                      A.   They wanted to obviously receive

8        compensation, right, if the company did well, yes.

9                      Q.   All of the shareholders of

10       Firefly, like David Erickson and Bannister, were

11       interested in receiving payments, correct?

12                     A.   That's my understanding.

13                     Q.   And they did receive, in the form

14       of advances?

15                     A.   Yes.

16                     Q.   In the period of time 2013 to

17       2019, all of the major shareholders received

18       advances?

19                     A.   They were receiving the monthly --

20       what was named advance on dividends, correct.

21                     Q.   And they also received consulting

22       fees?

23                     A.   And they received consulting fees,

24       correct.

25                     Q.   Yeah.  So, all of the shareholders

Antonio Severin                                    May 16, 2025

Page 217

1      received both consulting fees and advances; is that

2      correct?

3                    A.    Yeah.   Some of them, the operating

4      ones that came later, they would typically be on

5      payroll.   But they did receive payroll.   So it

6      would be payroll, consulting, and also the

7      advances.

8                    Q.    And those were the -- the new

9      shareholders?

10                   A.    Correct.

11                   Q.    Like Chad Moldon, Ryan Maule,

12     Kevin Krieg?

13                   A.    That's correct.

14                   Q.    Okay.   Those people received some

15     advances and some consulting?

16                   A.    Correct, consulting/payroll if

17     they were on payroll.

18                   Q.    Okay.   And the major shareholders

19     received monthly consulting and also received

20     advances?

21                   A.    Correct.

22                   Q.    Okay.   And those advances were

23     recorded?

24                   A.    Correct.

25                   Q.    And kept track of?

Antonio Severin                                    May 16, 2025

Page 218

1                    A.   Correct.

2                    Q.   You kept track of the advances to

3       Dave Erickson and Bannister?

4                    A.   Correct.

5                    Q.   You kept track of any loans that

6       he took out?

7                    A.   They were -- that was all in the

8       ledgers, correct, in the general ledgers.

9                    Q.   So the loans that David Erickson

10      received from Firefly in the period of time 2013 to

11      2019, those were recorded in the books of Rypl,

12      correct?

13                   A.   Correct.

14                   Q.   And you were aware of those and

15      they were recorded and available?

16                   A.   They were -- could -- yes, they

17      could have been made available, correct.

18                   Q.   And the point of the advances was

19      that eventually the advances would be paid back by

20      dividends from the Firefly entities; is that

21      correct?

22                   A.   That was my understanding, that --

23      that there was issues, which I don't know why, but

24      there was issues in having those declared as

25      dividends.  And then when they were -- that at some

Antonio Severin                                    May 16, 2025

Page 219

1    point dividends would be declared and the amount of

2    the dividends would be offset against the advances

3    that were being paid in.

4              Q.   Okay.  So let me make sure I

5    understand that.

6              So they -- all of the shareholders

7    received advances, but the idea was eventually

8    dividends would be declared after a resolution was

9    passed and then those advances would be, in effect,

10   a credit against what they were going to receive as

11   dividends?

12             A.   Correct, they would be offset

13   payment --

14             Q.   It would offset the dividends; it

15   would be deducted from the dividends owing to the

16   shareholders?

17             A.   The amount of the dividends would

18   be less advances.

19             Q.   Reduced?

20             A.   Yes.

21             Q.   The dividends would be reduced by

22   the amount of the --

23             A.   The amount paid.  The dividend

24   itself would be the same but the amount paid on the

25   dividend would be less because it would be offset

Antonio Severin                                          May 16, 2025

                                                   Page 220

1     against the advances.

2                 Q.   The dividend, the gross amount is

3     the same but the net amount is less because there

4     would be a deduction for the advances?

5                 A.   Correct.

6                 Q.   Okay.  And David Erickson and

7     Bannister, when they received funds from -- from

8     you, Rypl and Firefly, those are generally recorded

9     as loans?

10                A.   They would be recorded as -- if

11    they were paid by Rypl, they would have been

12    recorded as a loan from -- owing from Firefly, and

13    I assume on the Firefly books, it would be a loan

14    from Halstead -- or to Halstead Bay.

15                Q.   So, with Halstead Bay, it would be

16    recorded as a loan from Firefly to Halstead Bay?

17                A.   On the books of Halstead Bay?

18                Q.   No, I'm talking about on the books

19    of --

20                A.   Of Firefly?

21                Q.   Of Firefly, yeah.

22                A.   Correct, that's...  Yeah.

23                Q.   And the idea was that those sums,

24    like the advances, that even if they're

25    characterized as loans, those would be deducted

Antonio Severin                                        May 16, 2025

                                                    Page 221

1     from eventual dividends?

2                    A.    That was my understanding.

3                    Q.    And those are outstanding

4     throughout the period 2013 to 2019, correct?

5                    A.    Yes, that was my understanding.

6                    Q.    Let me go back to the beginning

7     here.

8                    You were asked back in November of 2024

9     whether you would be willing to come to the United

10    States and attend the David Erickson trial; is that

11    correct?

12                   A.    I was, yeah.

13                   Q.    Did you -- have you been to the

14    United States?

15                   A.    Have I ever been to the United

16    States?

17                   Q.    Yes.

18                   A.    Ever?

19                   Q.    Yeah.

20                   A.    Yes, I have been to the United

21    States.  Beautiful country.

22                   Q.    Have you ever been to Minnesota?

23                   A.    Yeah, yes.

24                   Q.    Some people believe that's part of

25    Canada, I think that's...

Antonio Severin                                          May 16, 2025

Page 222

```
 1                    Do you have any trouble in United
 2       States?
 3                    A.   I do not, no.
 4                    Q.   Any reason you'd be concerned
 5       about going to the United States?
 6                    A.   No.
 7                    Q.   Would you voluntarily go to the
 8       United States?
 9                    A.   Voluntarily go to the United
10       States?
11                    Q.   Yeah.
12                    A.   I have been to the U.S. and I've
13       done this all voluntary, yes.
14                    Q.   Were you willing to be a witness
15       in the United States?
16                    A.   Per counsel's advice, the advice
17       was not to come to Minnesota for the trial.
18                    Q.   Was there any -- any other reason,
19       other than advice of counsel, that you declined to
20       go to the United States?
21                    A.   That was the reason, yeah.
22                    Q.   The payments made to Firefly
23       shareholders from Rypl were on behalf of the
24       Firefly Group; is that correct?
25                    A.   The Rypl payments for -- were only
```

Antonio Severin                                    May 16, 2025

Page 223

1      in the case of Halstead Bay.

2                   Q.    Yes?

3                   A.    And they were on behalf of the

4      Firefly --

5                   Q.    Is that correct?

6                   A.    -- group, correct.

7                   Q.    It wasn't Rypl's money?

8                   A.    It was Rypl's money being used but

9      -- but would be offset by monies received from

10     Firefly.

11                  Q.    All right.  So, ultimately, it was

12     Firefly's money?

13                  A.    Correct.

14                  Q.    And any payments to Erickson

15     between 2014 and 2019 from Rypl, that would be

16     Firefly's money?

17                  A.    Correct.  I'm not a hundred -- at

18     some point, I'm not sure which year, the payments

19     did come directly, started coming directly from

20     Firefly bank account.  But for that period, I want

21     to say the 2014 to 2018/'19, those payments did

22     come from Firefly and were -- were -- did come from

23     Rypl and were Firefly's -- those were Firefly's

24     responsibility.

25                  Q.    Firefly's responsibility and

Antonio Severin                                    May 16, 2025

                                                    Page 224

1        Firefly's money?

2                    A.   At the end, yes.

3                    Q.   To pay to --

4                    A.   Correct.

5                    Q.   -- Halstead Bay?

6                    A.   To reimburse Rypl.

7                    Q.   All right.

8                    [Reporter intervened for clarification

9        purposes]

10       BY MR. MAUZY:

11                   Q.   Let me start over again.  So the

12       money during the period of time 2013 to 2019 that

13       went to Halstead Bay was Firefly money?

14                   A.   It was considered Firefly's

15       responsibility and Firefly's payment, correct.

16                   Q.   Okay.  Firefly's payment to

17       Halstead Bay?

18                   A.   Correct.

19                   Q.   Rypl handled the transaction, but

20       the source of the funds was Firefly?

21                   A.   Correct.

22                   Q.   And that money that was paid to

23       Erickson through Halstead Bay between 2014 and 2019

24       couldn't be a dividend because there was not a

25       resolution for a dividend?

Antonio Severin                                    May 16, 2025

Page 225

1                    A.    Correct.  They were not coded as
2       dividends because there was no dividend resolution
3       to support it being called a dividend.
4                    Q.    And for Halstead Bay, it was a
5       loan?
6                    A.    Correct.
7                    Q.    And it was coded as a loan?
8                    A.    Correct.
9                    Q.    And Halstead Bay, with that loan,
10      would have to pay that money back at some point in
11      the future?
12                   A.    My understanding is that they
13      would have been -- those monies would be offset
14      against the dividend, as we talked about earlier.
15                   Q.    Yes, and they'd be paid back
16      ultimately by dividends from Firefly?
17                   A.    That's my understanding.
18                   Q.    And shareholders were entitled to
19      dividends if a resolution was passed authorizing
20      that?
21                   A.    Correct.  It would have to be a
22      Board resolution to -- to declare a dividend.
23                   Q.    And those dividends would pay back
24      the loans, correct?
25                   A.    Those dividends that the -- my

Antonio Severin                                    May 16, 2025

Page 226

1    understanding was that those dividend resolutions

2    would be used to pay back outstanding loans.

3              Q.   And in 2021, is it true that

4    Firefly began issuing resolutions to pay down the

5    advances and loans that shareholders had received

6    over the years?

7              A.   The -- there was a dividend in

8    2021 from Firefly, in the amount of 1,869,000.  I

9    don't believe that particular one was used to pay

10   down any outstanding advances.

11             Q.   Yeah.  We'll look at that

12   resolution in a minute.

13             Let's look at -- let's see if we can

14   put on the screen Government Exhibit 5.  Is this

15   the resolution in 2023 that you looked at

16   yesterday?

17             A.   I'm not sure if this was the one,

18   the $5 million from, I believe --

19             Q.   8 -- $8 million, I believe.

20             A.   This one's 5 million.

21             Q.   Give us a second here.

22             (Brief pause in the proceedings).

23             THE VIDEOGRAPHER:  Excuse me for

24   interrupting.  Mr. Ginter, could you move the

25   microphone six inches closer to the witness?

Antonio Severin                                    May 16, 2025

Page 227

1                      MR. GINTER:  Yes.

2                      THE VIDEOGRAPHER:  Thank you.

3                      MS. SCOTT:  Mr. Mauzy, for your

4          reference, yesterday I showed two resolutions, they

5          were Defense Exhibits D-46 and also D-9.

6                      MR. MAUZY:  Thank you.

7                      Okay, we're going to put up on the

8          screen D-9.

9                      EXHIBIT NO. D-9:  Resolutions of the

10                     Sole Managing Director of Firefly Lane

11                     Corporation N.V. adopted August 10th, 2023.

12         BY MR. MAUZY:

13                     Q.   I hand you what's been marked as

14         Defendant's Exhibit 9, ask you if you recognize

15         that as a resolution adopted August 10th, 2023, a

16         resolution of the sole managing director of Firefly

17         Lane Corporation?

18                     A.   Yes.  Yes, that's what it is.

19                     Q.   Okay.  I believe this has been

20         received, but this looks like a true and correct

21         copy of the resolution that was issued in

22         August 10th, 2023?

23                     A.   Yes.

24                     Q.   And the second paragraph states

25         that numerous shareholders have received

Antonio Severin                                    May 16, 2025

Page 228

1    interest-free loans?

2              A.    Yes.

3              Q.    Is that your understanding, that

4    numerous shareholders of Firefly had received

5    interest-free loans?

6              A.    Yes, those advances discussed

7    there.

8              Q.    The advances were in fact

9    interest-free loans?

10             A.    Yeah.  They were interest-free,

11   yes.

12             Q.    Yes.  And the loans to Halstead

13   Bay were interest-free?

14             A.    I've never seen the loan

15   documents, so, um...

16             Q.    No interest was paid on those

17   loans?

18             A.    Correct.

19             Q.    And looking at paragraph 5 --

20   paragraph 4 is:

21                   "[...] the Company should

22                   declare a dividend payable to its

23                   shareholders of record in the amount

24                   of Eight Million [...]"

25                   Is that correct?

Antonio Severin                                    May 16, 2025

                                        Page 229

1                    A.    Correct.

2                    Q.    And the next paragraph, does it

3      say:

4                          "Pursuant to discussion and

5                    vote of the Company's shareholders

6                    on August 9 and 10, 2023 it was

7                    determined by unanimous vote [...]

8                    the extent any shareholder is in

9                    debt to the Company for loans

10                   outstanding, the Company may retain

11                   all or a portion of that

12                   shareholder's share of the dividend

13                   paid by the Company [...]"

14                   A.    Correct.

15                   Q.    And the company would make

16     corresponding journal entries into the company's

17     books and records?

18                   A.    Correct.

19                   Q.    So the dividend that would be

20     declared, there would be a deduction to the

21     shareholder for the loans outstanding to the

22     company?

23                   A.    Correct.

24                   Q.    And it was resolved that this

25     amount would be $8 million that would be paid to

Antonio Severin                                    May 16, 2025

Page 230

1    the shareholders?

2                A.   The dividend was $8 million,

3    correct.

4                Q.   And from that, there would be a

5    deduction to the extent there were loans

6    outstanding?

7                A.   Correct.

8                Q.   Yeah.  And this is signed by

9    Gregory Elias?

10               A.   Correct.

11               Q.   And he was the director of United

12   International Trust?

13               A.   Yeah, he's the director for

14   Firefly --

15               Q.   Authorized --

16               A.   Yeah.

17               Q.   Pardon me?

18               A.   Yeah, he's a -- he's, I guess, a

19   director of United International Trust, and United

20   International Trust is the director of Firefly,

21   yeah.

22               Q.   Okay.  And he was authorized to

23   speak on behalf of Firefly?

24               A.   Correct, yeah.

25               Q.   So this is a resolution granting

Antonio Severin                                    May 16, 2025

Page 231

1       $8 million to the shareholder?

2                    A.    Correct.

3                    Q.    And you were aware of this

4       document?

5                    A.    Yes.

6                    EXHIBIT NO. D-10:  Syntego Bay Purchase

7                    Agreement adopted March 28, 2024.

8       BY MR. MAUZY:

9                    Q.    I'm going to show you Defendant's

10      Exhibit 10 and ask you if you recognize that as the

11      Syntego Bay Purchase Agreement.

12                   A.    Yes.

13                   Q.    And this is a purchase of a

14      hundred percent of the issued and outstanding

15      shares of Bannister Corporation for purpose of

16      acquisition of shares owned by Bannister and

17      Denningshire, correct?

18                   A.    Correct.

19                   Q.    And there's an agreement to pay

20      the purchase price of $9,668,100?

21                   A.    Correct.

22                   Q.    In paragraph 1, it says:

23                   "Firefly shall apply the sales

24                   proceeds to pay an amount equal to

25                   the adjusted outstanding debt owed

Antonio Severin                                           May 16, 2025

Page 232

1                by Seller and/or Related Entities to

2                Firefly and/or Related Entities."

3                Correct?

4                A.    That is correct.

5                Q.    And the current unreconciled

6     amount was 5,579,570, correct?

7                A.    Correct.

8                Q.    So from the 9,668,100 purchase

9     price, there would be a deduction to pay off the

10    outstanding debt in the amount of 5,579,570?

11               A.    That is correct.

12               Q.    And in addition to that deduction,

13    in paragraph 6, the purchaser and Firefly would pay

14    Bannister two and a half million dollars on closing

15    by wire transfer?  Paragraph 6.

16               A.    Yeah, number 6 states that the --

17    that the purchaser and Firefly pay 2.5 million on

18    closing as a wire transfer to Eidsness Law Office

19    PLC --

20               Q.    Yes.

21               A.    -- in trust.  And...  Yeah.

22               Q.    And paragraph 7, there's an

23    agreement that the purchaser and Firefly shall pay

24    the balance of the purchase price directly to the

25    account of the seller.  The seller was Bannister?

Antonio Severin                                    May 16, 2025

                                        Page 233

1              A.    The seller was David Erickson.

2              Q.    And the shares were Bannister?

3              A.    His shares in Bannister, correct.

4              Q.    But he officially was the seller?

5              A.    Correct.

6              Q.    And he's identified as seller on

7     the first page, correct?

8              A.    Correct.

9              Q.    And paragraph 7 says that the

10    seller, that is David Erickson, will be paid

11    directly equal monthly installments of 89,583.35

12    over 24 months following closing?

13             A.    Correct.

14             Q.    And this agreement was signed by

15    David Erickson?

16             A.    It is signed by David Erickson as

17    a seller.

18             Q.    And signed by David Erickson on

19    behalf of Bannister?

20             A.    As a shareholder, correct.

21             Q.    And by Greg Elias on behalf of

22    Syntego?

23             A.    Correct.

24             Q.    And Greg Elias on behalf of

25    Firefly?

Antonio Severin                                        May 16, 2025

Page 234

1                 A.   On behalf of Fire -- correct.

2                 Q.   Okay.  And Greg Elias stated that

3       he had authority to bind the corporation?

4                 A.   To bind Firefly?  Sorry?

5                 Q.   Does he write -- does he sign

6       above the line that says, "I have the authority to

7       bind the Corporation on Firefly"?

8                 A.   Under Firefly, yes.

9                 Q.   Yes.  And under Syntego Bay?

10                A.   Yes.

11                Q.   So he's representing that he has

12      the authority to bind Firefly Lane?

13                A.   Yes.

14                Q.   Okay.  And in 13, you say,

15      "Excluded Assets," "1,620,000 Dividend Receivable

16      from Firefly in favour of Bannister"?

17                A.   Correct.

18                Q.   And looking at 23 -- I'm sorry,

19      21.  Does that indicate:

20                     "If substantially all of the

21                     assets or shares of Firefly are sold

22                     at any time that there is any

23                     principal amount outstanding under

24                     the Promissory Note, for an amount

25                     in excess of $50,000,000, an amount

Antonio Severin                                    May 16, 2025

                                        Page 235

1              equal to 20% of the positive

2              difference between the aggregate net

3              purchase price of such assets and

4              shares and $50,000,000, shall be

5              paid" by the Seller. [As read]

6         A.   Yes, that's what it says.

7         Q.   So, in other words, if after this

8    agreement, if Firefly was sold for in excess of

9    $50 million, then the seller may be entitled to

10   additional compensation?

11        A.   That's my understanding of that

12   paragraph.

13        Q.   Considering the purchase price was

14   9,668,100 that was for 20.25 percent interest in

15   Firefly, can you calculate the approximate value of

16   Firefly based on the purchase price of that 20.25

17   interest?

18        A.   Can I calculate it or...

19        Q.   Yes.

20        A.   Ballpark, it's about 50 million.

21        Q.   50 million?

22        A.   Yeah.

23        Q.   And the intent of this purchase

24   agreement was to wipe out David Erickson's and

25   Bannister's loans with Firefly and/or related

Antonio Severin                                    May 16, 2025

Page 236

1    entities, correct?

2              MS. SCOTT:  Objection, lack of

3    foundation.

4              THE WITNESS:  My understanding of the

5    purchase was to exit the Defendant from the

6    shareholder group.

7    BY MR. MAUZY:

8              Q.   In effect, it was a buy-out of

9    Dave Erickson?

10             A.   Correct.

11             Q.   And in exchange for the buy-out,

12   there would be a payoff of all of the loans owing

13   to Firefly and related entities by Bannister and

14   Dave Erickson?

15             A.   Correct.

16             Q.   There were also -- there was also

17   a resolution for a $5 million dividend to be issued

18   by shareholders?

19             A.   There is.

20             Q.   Do you remember that?

21             A.   There was a $500,000 resolution,

22   correct.

23             EXHIBIT NO. D-56:  Resolution of the

24             Sole Managing Director of Firefly

25             Corporation N.V. adopted December 15, 2021

Page 237

1                    (USAProd00403432).

2        BY MR. MAUZY:

3                Q.    Okay.  I'm going to show you

4        what's been marked as Defendant's Exhibit 56, and

5        see if you recognize that as a resolution of

6        Firefly.

7                A.    Yes.

8                Q.    And this is again signed by

9        Gregory Elias on behalf of United International

10       Trust?

11               A.    Correct.

12               Q.    Does this resolve that the company

13       will pay a yearly dividend of 5 million prior to

14       the end of 2022?

15               A.    Correct.  Yeah.

16               Q.    And this dividend, unlike -- this

17       resolution, unlike the previous resolution, does

18       not have language that says it would be applied to

19       outstanding loans?

20               A.    Correct.

21               Q.    It recognizes in paragraph 3 that

22       shareholders have received interest-free loans?

23               A.    Correct.

24               Q.    But it doesn't have the language

25       in the $8 million dividend that the dividend would

Antonio Severin                                      May 16, 2025

Page 238

1    be applied to outstanding debt?

2                  A.   That is correct.

3                  Q.   Yeah.  And you'd seen this

4    resolution before?

5                  A.   Yes.

6                  Q.   Yeah, you were familiar with it?

7                  A.   Yes.

8                  Q.   Okay.  And this appears to be

9    authentic?

10                 A.   Yes.

11                 Q.   I'm going to show you what's been

12   marked as Defense Exhibit 57 and ask you if you

13   recognize that as a resolution of the sole managing

14   director of Firefly Lane Corporation NV?

15                 A.   Yes.

16                 Q.   You recognize this resolution?

17                 A.   I do.

18                 Q.   You had received this resolution

19   at the time?

20                 A.   We did.

21                 Q.   This appears to be authentic to

22   you --

23                 A.   Yes.

24                 Q.   -- you recognize it?  Yeah.

25                 And this again is a resolution by

Antonio Severin                                    May 16, 2025

                                        Page 239

1      Gregory Elias, director of United International

2      Trust NV, right?

3                     A.   Correct.

4                     Q.   And he also was authorized to

5      speak on behalf of Firefly and its entities?

6                     A.   Correct.

7                     Q.   And, at paragraph 2, it says that

8      there was:

9                          "...a discussion and vote of

10                         the Company's shareholders on

11                         January 12, 2023, it was determined

12                         [...] that the Company should

13                         declare a yearly dividend payable to

14                         its shareholders of record as of

15                         January 1, 2023, in the amount of

16                         $3,000,000 to be paid prior to the

17                         end of 2023..."

18                    A.   Correct.

19                    Q.   And, again, this resolution does

20     not have the language that the dividend should be

21     used in part to pay off any debts?

22                    A.   That is correct.

23                    Q.   And the reason for that is that

24     the debts had already been paid off?

25                    A.   I don't know why there's no

Page 240

1      language in there.

2                  Q.    Okay.  But you recognize this as a

3      resolution that you received January 12th, 2023?

4                  A.    Correct, this is dividend

5      resolution for 2023.

6                  Q.    If you give me a minute, please.

7                  A.    Okay.

8                  (Brief pause in the proceedings).

9                  BY MR. MAUZY:

10                 Q.    All right.  So looking at -- we've

11     looked at two -- we've looked at three resolutions.

12     The second and third are 55 and 57, a $5 million

13     dividend and a $3 million dividend.  Were there

14     some difficulties in getting those dividends to

15     David Erickson and Bannister?

16                 A.    I don't remember having

17     difficulties.  The 22 -- there was a situation

18     where they were offset by -- there was loans given

19     to a new company that Mr. Erickson did up, called

20     Raindrop.

21                 Q.    Yes.

22                 A.    That was because there was some

23     banking issues.  And once we got the banking issues

24     cleared, we -- we did offset those.

25                 Q.    Okay.  So there were -- there was

Antonio Severin                                    May 16, 2025

Page 241

1       a loan issued to Raindrop, but there were some

2       banking difficulties in paying money to Bannister

3       and David Erickson.  Money was issued to Raindrop

4       instead?

5                    A.    Correct.

6                    Q.    And once it was issue --

7                    A.    In a loan document.

8                    Q.    In a loan document --

9                    A.    Yeah.

10                   Q.    -- which was properly prepared?

11                   A.    Correct.

12                   Q.    And the loan document said that

13      there -- it would be paid back?

14                   A.    Correct.

15                   Q.    And the funds were transferred to

16      Raindrop?

17                   A.    And the funds were -- yes.  A loan

18      was made to Raindrop, paid to Raindrop.

19                   Q.    And that loan was paid back?

20                   A.    Those were, those amounts were

21      offset by dividends --

22                   Q.    Okay.

23                   A.    -- that were to be paid by

24      Bannister, but were not.

25                   Q.    All right.  So, really, the same

Antonio Severin                                    May 16, 2025

Page 242

1      situation, a loan was extended or -- let's start

2      over.

3                  There were banking difficulties in

4      getting dividends to Bannister and David Erickson.

5      And because of those banking difficulties, Raindrop

6      was formed and Raindrop received a loan from

7      Firefly?

8                  A.   Yeah, I'm not --

9                  MS. SCOTT:  Objection, misstating the

10     witness.

11                 THE WITNESS:  I'm not -- I don't know

12     why Raindrop itself was formed.

13     BY MR. MAUZY:

14                 Q.   Yeah?

15                 A.   But that's -- but there was a loan

16     that was made to Raindrop, and those were offset

17     when the Bannister bank account was set up at

18     Yoursafe, and the first payments were offset

19     against an amount owing from --

20                 Q.   And that --

21                 [Reporter intervened for clarification

22     purposes]

23                 THE WITNESS:  From Raindrop.

24     BY MR. MAUZY:

25                 Q.   And that took care of the Raindrop

Antonio Severin                                    May 16, 2025

Page 243

1    loan?

2                A.   Correct.

3                Q.   Okay.  So the Raindrop loan was

4    extinguished by those dividends?

5                A.   It was -- it was paid off.

6                [Reporter intervened for clarification

7    purposes]

8    BY MR. MAUZY:

9                Q.   And the dividends that were used

10   to pay off the Raindrop loan were dividends from

11   the $5 million resolution and the $3 million

12   resolution?

13               A.   I'm not -- I'm not a hundred

14   percent sure which resolution was, but yes, it was

15   one of those.

16               Q.   One of those two?

17               A.   Correct.

18               Q.   And that was Exhibit 55 and

19   Exhibit 56.  55 was a $5 million dividend, 56 --

20   I'm sorry.  57 was the $3 million dividend?

21               A.   Correct.

22               Q.   Okay.  So one of the other

23   dividends authorized by Greg Elias on behalf of

24   Firefly was utilized to pay off the Raindrop loan,

25   correct?

Antonio Severin                                    May 16, 2025

Page 244

```
 1                 A.    That is correct.

 2                 Q.    All right.  Let's turn to 2024.

 3     Erickson was an owner of Firefly in 2024?

 4                 A.    Bannister was an owner, a

 5     shareholder, of Firefly.

 6                 Q.    Okay.  So Erickson was the owner

 7     of Bannister; Bannister was an owner of Firefly?

 8                 A.    Correct.

 9                 Q.    Okay.  And Bannister owned

10     50 percent of Demmingshire Corporation?

11                 A.    That is my understanding.

12                 Q.    And Bannister owned 20.25 percent

13     of Firefly Lane?

14                 A.    Yes.

15                 Q.    And his ownership was always

16     reflected in his ownership of Bannister, right?

17                 A.    Yes.

18                 Q.    And the reason that Erickson was

19     bought out, because he was indicted?

20                 A.    That was one of the reasons, yes.

21                 Q.    Yeah.  And an indictment is a

22     criminal charge?

23                 A.    Correct.

24                 Q.    And, ultimately, an indictment is

25     -- goes to a jury trial.  On the jury trial, the
```

Antonio Severin                                    May 16, 2025

                                          Page 245

1      jury will decide whether or not he is guilty or not

2      guilty?

3                A.    Correct.

4                Q.    Correct?

5                A.    Yeah.

6                Q.    So an indictment is just a charge,

7      correct?

8                A.    That's my understanding.

9                Q.    And because of that charge,

10     though, banks get nervous about someone who has

11     been charged criminally?

12               A.    There's, certain banks are -- most

13     of the banks will have banking applications, and

14     within that, there are questions such as, "Have you

15     been indicted for a crime?"

16               Q.    And Firefly and Rypl had

17     difficulty from time to time with banks?

18               A.    Correct.  Firefly more than Rypl,

19     but yes.

20               Q.    And Firefly would be concerned

21     that if they had an owner who had been criminally

22     charged, that banks would not do business with

23     Firefly?

24               A.    Yes.

25               Q.    And that would be a diaster for

Antonio Severin                                        May 16, 2025

                                                    Page 246

1     Firefly?

2                    A.   Yeah.  That would be bad, yes.

3                    Q.   That could put them out of

4     business?

5                    A.   I don't know -- um...

6                    Q.   It would --

7                    A.   Yeah, it would stop -- yeah, bank

8     accounts would not provide banking, yes.

9                    Q.   Without banking, Firefly would be

10    out of business?

11                   A.   Firefly, the entity, would be out

12    of business.  It would not be able to function.

13                   Q.   And you were involved in coding

14    the buy-out of Erickson and Bannister, correct?

15                   A.   Correct.

16                   Q.   You worked with Brian Hanlon,

17    correct?

18                   A.   Correct.

19                   Q.   And Hanlon worked for Granity?

20                   A.   Correct.

21                   Q.   And you also worked with

22    accountants at BB Advisory?

23                   A.   Correct.

24                   Q.   What is BB Advisory?

25                   A.   They're an outsourced accounting

Antonio Severin                                      May 16, 2025

Page 247

1      firm, based in India.

2                      Q.    And you utilized them for

3      accounting purposes?

4                      A.    Yes, mainly clerical, but they do

5      have some skilled accountants on staff as well.

6                      Q.    And that was a cost-saving

7      measure?

8                      A.    Yes.  On the clerical side, yeah.

9                      Q.    Okay.  On the clerical side, they

10     do a good job and their services were --

11                     A.    Correct.

12                     Q.    -- relatively, in comparison to

13     Canada, inexpensive?

14                     A.    Correct.

15                     Q.    All right.  Now, the buy-out deal

16     was valued at 47 million, correct?

17                     A.    That sounds like --

18                     Q.    No, I mean -- you estimated it was

19     about 50 million?

20                     A.    Yeah.

21                     Q.    20.25 percent of the shares were

22     worth 9,668,000.  So, approximately, the value of

23     Firefly was around 50 million, right?

24                     A.    Correct.

25                     Q.    And that was the number that the

Antonio Severin                                    May 16, 2025

Page 248

1      shareholders of Firefly determined; is that

2      correct?

3                  A.   Yes.

4                  Q.   And from the 9.5 million that he

5      received, you deducted the amount that he owed at

6      the time of the buy-out?

7                  A.   Per the buy-out document -- per

8      the agreement.

9                  Q.   Yes?

10                 A.   The amount of $5,579,570 was

11     determined to be the unreconciled amount, and that

12     would have been the amount that was deducted.

13                 Q.   I want to look at Government

14     Exhibit 59.

15                 It's up on the screen.  I believe you

16     looked at this yesterday.  Can you identify this?

17                 A.   Yes.

18                 Q.   What is it?

19                 A.   This is a deck prepared by the

20     Defendant, to be used basically as an RFP for

21     banking services.

22                 Q.   And does this state that the

23     organization has roughly 60 million in annual

24     shares -- in annual sales, excuse me, operating

25     Cam4?

Antonio Severin                                    May 16, 2025

Page 249

1                    A.    Yes.

2                    Q.    60 million in annual sales

3      operating Cam4?

4                    A.    Correct.

5                    Q.    So profitable company?

6                    A.    It was, yes.  It is.

7                    Q.    Is that consistent with your

8      understanding of the annual sales of Cam4 --

9      stemming from Cam4?

10                   A.    Yes.  It's above that now, but

11     probably at the time of this...

12                   Q.    At the time of that?

13                   A.    That preparation, yes.

14                   Q.    It had become more than that?

15                   A.    It has become more than that, yes.

16                   Q.    Okay.  What was the amount in

17     annual sales in 2020?

18                   A.    2020, it would have been, you

19     know, close to 70 million.

20                   Q.    And in 2022?

21                   A.    I think we've -- we've gone back a

22     bit.  So now we're in probably around the 65

23     million.

24                   Q.    And the next year?

25                   A.    About 65 million.

Antonio Severin                                    May 16, 2025

Page 250

 1              Q.   And '24?

 2              A.   '24, a little less than that,

 3      maybe about 63 million.

 4              Q.   Okay.  And at the present?

 5              A.   Present, we're tracking about 65

 6      million.

 7              Q.   All right.  So essentially the

 8      buy-out was -- put a valuation of about 50 million,

 9      which is an amount less than valuations put on

10      Firefly in the future?

11              A.   Sorry?

12              Q.   Would the valuation of Firefly

13      have gone up from the time of the Syntego Buyout?

14              A.   Well, Syntego Buyout was 2024,

15      right?

16              Q.   Yes.

17              A.   Yeah, that I don't -- I don't know

18      the value of Firefly right now.

19              Q.   Okay.  But you do know the annual

20      sales?

21              A.   Yes.

22              Q.   And someone could compute, a

23      business evaluation person could compute the value

24      from annual sales that repeated year after year?

25              A.   I would --

Antonio Severin                                        May 16, 2025

                                                    Page 251

 1                    MS. SCOTT:  Objection, lack of

 2       foundation.

 3                    THE WITNESS:  I would assume they'd be

 4       more on the profits than the actual revenues, but

 5       yeah, the valuation -- it's different methods for

 6       business valuation.

 7       BY MR. MAUZY:

 8                    Q.    Okay.  Let's look at Exhibit 57,

 9       Government Exhibit 57.  We'll try to put that up on

10       the board.

11                    Does this exhibit show 35 million in

12       net income between November 2012 and December 2021?

13                    A.    Yes.

14                    Q.    Is that an accurate amount, in

15       your judgment?

16                    A.    Yes.

17                    Q.    And this is after all of the

18       company expenses were taken care of, paid?

19                    A.    Correct.  That's revenue less

20       expenses.

21                    Q.    And it's fair to say Firefly Group

22       was very profitable during the period of time 2013

23       through 2019?

24                    A.    Through 2019?

25                    Q.    Yes.

Antonio Severin                                    May 16, 2025

                                                        Page 252

1                    A.    Yeah, there were some ups and

2          downs but, for the most part, profitable.

3                    Q.    And from 2020 to the present, it

4          was very profitable?

5                    A.    Again, there's been some ups and

6          downs, but it is profitable, yes.

7                    Q.    I'm going to look at Defendant's

8          10.  You have that in front of you, the Syntego

9          Buyout?

10                   A.    Yes.  The Syntego Buyout, yes.

11                   Q.    And, again, the debt owed by the

12         seller, and the seller was David Erickson, was

13         wiped out by this buy-out agreement, correct?

14                   A.    That is correct.

15                   Q.    And we'll look at Defendant's

16         Exhibit 24.  I hand you this and see if you

17         recognize this as from Brian Hanlon to you,

18         relating to that buy-out.  That's Defendant's 24.

19                   A.    Uhm-hmm.  Little small.

20                   (Witness reviews document).  Yup.

21                   Q.    You recognize your e-mail address?

22                   A.    Yes.

23                   Q.    You recognize Brian Hanlon's

24         e-mail address?

25                   A.    Yes.

Page 253

```
1                   Q.   This is an e-mail chain involving
2       you, BB Advisory and Brian Hanlon?
3                   A.   Correct.
4                   Q.   Okay.  And you recognize this as
5       an authentic document, correct?
6                   A.   Yes.
7                   Q.   You had received this back in May
8       of 2024?
9                   A.   Correct.
10                  Q.   All right.  And you say in this
11      e-mail that there are four parts of the deal.  The
12      deal you're referring to is the Syntego Buyout?
13                  A.   Correct.
14                  Q.   And this e-mail is after the
15      buy-out, correct?
16                  A.   Correct.
17                  Q.   A month or so after the buy-out?
18                  A.   Correct.
19                  Q.   And you were trying to figure out
20      how to code this properly?
21                  A.   Uhm-hmm, yes.
22                  Q.   Yes?  Okay.
23                  At page 2 of this, you have "Here is
24      the breakdown."  Correct?  You see there's a
25      section:
```

Antonio Severin                                    May 16, 2025

Page 254

1                    "From Dave's perspective, there
2             are four components to the deal."
3             Then, under that:
4                    "Here is the breakdown."
5        A.    Sorry.  Are you looking at page 2:
6                    "Based on this I get the
7             following entry for Firefly"?
8             Is that what you're looking for?
9        Q.    Okay.  Do you have Defense
10   Exhibit 24?
11        A.    Oh, sorry, the second page.  Okay.
12   Yes, I see that.
13        Q.    Okay.  So, you and I have never
14   met before, right?
15        A.    I have never met you, Bill.
16        Q.    I've never asked --
17        A.    It's been a pleasure.
18        Q.    -- you a question before?
19        A.    No.
20        Q.    We had no time to prepare; is that
21   correct?
22        A.    That is correct.
23        Q.    We didn't go through questions I'd
24   be asking you?
25        A.    No.

Antonio Severin                                        May 16, 2025

Page 255

1                    Q.    In any orderly fashion?

2                    A.    Yeah.

3                    Q.    Never met.

4                    A.    Never met.

5                    Q.    Never chatted?

6                    MS. SCOTT:  Objection, asked and

7        answered.

8                    THE WITNESS:  We met yesterday.

9        BY MR. MAUZY:

10                   Q.    Here?

11                   A.    Yeah.

12                   Q.    But we never had a -- we've never

13       had the opportunity to talk?

14                   A.    No.

15                   Q.    Okay.  And you know that I asked

16       your lawyer for the opportunity to meet and

17       interview you?

18                   A.    Yes.

19                   Q.    Yeah.  And he declined on your

20       behalf?

21                   A.    Yes.

22                   Q.    Yeah.  You met with the government

23       three or four times, by video or in person?

24                   A.    Yes.

25                   Q.    All right.  Looking at page 2,

Antonio Severin                                          May 16, 2025

Page 256

 1    titled "Forgiveness of Loans."  Do you see that?

 2              A.   Okay.  Could you be a -- exactly

 3    where is that?

 4              Q.   Look at the graph.

 5              A.   So here?

 6              Q.   Yes.

 7              A.   Yes.  (Witness reviews document).

 8    Okay.

 9              Q.   Does it start off with Lloyd --

10              A.   Oh yes, okay.

11              Q.   -- "Forgiveness of Loans"?

12              A.   Yes.  Okay, yes.

13              Q.   And the first entry is

14    "Lloydsville loan to Bannister/Dave," 236,725?

15              A.   Yes.

16              Q.   And refers to Section 2?

17              A.   Yes.

18              Q.   If you look at the Syntego

19    Purchase Agreement, would you look at Section 2?

20              A.   Yes.

21              Q.   Same number?

22              A.   It is the exact same number.

23              Q.   So you're analyzing the Syntego

24    Purchase Agreement, correct?

25              A.   Correct.

Antonio Severin                                    May 16, 2025

Page 257

1                Q.   So it could be coded properly?

2                A.   Correct.

3                Q.   The next entry is "Repayment of

4    loans from Proceeds of deal From Firefly to

5    Bannister"?

6                A.   Correct.

7                Q.   And the first entry under that is

8    "Loans," 5,579,570?

9                A.   Correct.

10               Q.   And that refers to Section 1.  If

11   you'd look at Section 1 of the Syntego Purchase

12   Agreement, do you see the same figure?

13               A.   I do.

14               Q.   The next line is "Less portion of

15   $8 million declared dividend," that's 1,620,000,

16   correct?

17               A.   Correct.

18               Q.   And it refers to Section 13 of the

19   Syntego purchase.  If you look at Section 13 of the

20   Syntego Purchase Agreement, do you have the same

21   number there?

22               A.   Correct.

23               Q.   And it says "Less notes forgiven,"

24   3,959,570"?

25               A.   Correct.

Antonio Severin                                    May 16, 2025

Page 258

1               Q.   And those are notes forgiven by

2     the dividend of $8 million that was declared, and

3     there was a deduction for the loans outstanding,

4     correct?

5               A.   Correct.

6               Q.   And the net of that was 3,959,570?

7               A.   Uhm-hmm.

8               Q.   And that -- and that wiped out

9     Bannister and Erickson's loans to Firefly?

10              A.   That's -- yes.

11              Q.   The next line says, "Investments

12    transferred to Dave."  The first line is "Less

13    Amgine sales," 780,000?

14              A.   Correct.

15              Q.   If you look at Section 10 of the

16    Syntego agreement, is the same number reflected

17    there?

18              A.   Yes.

19              Q.   The next line is "Vapeshot

20    trademark."  The number is 50,000, refers to

21    Section 11.  Do you see the same number in the

22    Syntego Buyout?

23              A.   Yes.

24              Q.   The next line is entitled

25    "Consideration," has under it, the first line is

Antonio Severin                                      May 16, 2025

Page 259

1      "Payment on closing" of 2,450,000"?

2                    A.    Correct.

3                    Q.    Do you see that?

4                    A.    Yes.

5                    Q.    And under that is a "Note" of

6      2,050,525?

7                    A.    Correct.

8                    Q.    Do you see the reference to

9      Section 7 of the Syntego agreement, purchase

10     agreement?

11                   A.    Yes.

12                   Q.    Same amount there?

13                   A.    Uhm-hmm.

14                   Q.    Then there's the "Ijshuis

15     settlement" on the next line of 60,236?

16                   A.    Yes.

17                   Q.    And if you go to the Syntego

18     agreement in Section 4, you see the same number?

19                   A.    Correct.

20                   Q.    Next line is "Promise Hub,"

21     81,000, "To be paid by Firefly to Eidsness Law."

22     Does that refer to Section 5?

23                   A.    It is Section 5, correct.

24                   Q.    And Syntego Bay agreement, do you

25     see Section 5; is it the same number?

Antonio Severin                                    May 16, 2025

Page 260

1               A.   Yes.

2               Q.   And the total is 9,668,056?

3               A.   Correct.

4               Q.   And do you see that number in the

5    Syntego Bay agreement?

6               A.   The purchase price.

7               Q.   So, going through that

8    calculation, comes up with a purchase price paid to

9    David Erickson with the deductions, correct?

10              A.   Correct.

11              Q.   But that was the purchase price

12   itself?

13              A.   Correct.

14              Q.   Okay.  And based on this, in the

15   next chart, next page, page 3, based on this, I get

16   the following entry for Firefly.

17              A.   Yes.

18              Q.   "Firefly Treasury stock" is a

19   debit?

20              A.   Yes.

21              Q.   "Investment in Denningshire" of

22   $3,000?

23              A.   Correct.

24              Q.   There's a credit for "Loans

25   repaid," 3,959,570?

Page 261

```
 1                  A.    Correct.

 2                  Q.    And those were the loans repaid by

 3      David Erickson and Bannister that were deducted

 4      from the purchase price in the Syntego Bay

 5      agreement?

 6                  A.    Correct.

 7                  Q.    Same number?

 8                  A.    Correct.

 9                  Q.    Also, a credit was "Cash" with

10      2,450,000?

11                  A.    Correct.

12                  Q.    And a "Note payable" of 2,050,525

13      eight?

14                  A.    Correct.

15                  Q.    500 -- I'm sorry, 525.

16                  And "Corporate services" and then

17      "Donation," correct?

18                  A.    Right.

19                  Q.    All right.  So, based on your

20      analysis, Syntego purchased 100 percent of

21      Bannister?

22                  A.    Correct.

23                  Q.    And you were able, from the

24      Syntego Bay purchase agreement and your analysis of

25      that, to make appropriate entries in the books of
```

Antonio Severin                                    May 16, 2025

Page 262

1    Firefly and Rypl?

2                A.   Yes, this was our attempt to do

3    that.  I'm not sure if this is the final entry, but

4    yes, we did start the process of -- of making an

5    entry.

6                Q.   And this e-mail was between you

7    and Brian Hanlon, and BB Advisors participated?

8                A.   Correct, yeah.

9                Q.   And in making this calculation,

10   Dave Erickson played no part in this whatsoever?

11               A.   The Defendant wasn't part of this.

12               Q.   Okay.  He wasn't part of the

13   preparation of this calculation?

14               A.   No, this was after his exit.

15               Q.   Right.  And he didn't participate

16   in analyzing Syntego Bay, these were your

17   calculations?

18               A.   Correct.

19               Q.   And did you in fact code these

20   various entries in the books of Rypl?

21               A.   I'm not sure if this is the final

22   entry.  There was some back and forth, just to

23   clarify and just to make sure everything was

24   documented.

25               Q.   Yeah.

Antonio Severin                                      May 16, 2025

                                              Page 263

1                    A.    I believe this was pretty close to

2        the final entry, if I remember correctly.

3                    Q.    You did some fine-tuning, but then

4        you were able to make final entries in the books of

5        Rypl?

6                    A.    The entry is in -- in the books of

7        -- of primarily Firefly --

8                    Q.    Okay.

9                    A.    -- but, yes.  There was some --

10       there was some components of different companies

11       involved.

12                   Q.    Yes?

13                   A.    So the entry would have to be

14       split up a bit.

15                   Q.    Okay.

16                   A.    But in total this was the

17       objective.

18                   Q.    Okay.  The objective was to get

19       everything properly recorded in the books of

20       Firefly?

21                   A.    Correct.

22                   Q.    And you believe you accomplished

23       that?

24                   A.    Based on the agreement, and based

25       on the wording, and based on the payments, yes.

Antonio Severin                                    May 16, 2025

Page 264

1            Q.   I'm going to show you what's been

2     marked as D-25 and see if you recognize this as an

3     e-mail from Brian Hanlon where you were copied on.

4            A.   Okay.  (Witness reviews document).

5            Yes.

6            Q.   Do you recognize this as an e-mail

7     that Brian Hanlon wrote to you and BB Advisory in

8     October of 2023?

9            A.   Yes.

10           Q.   You recognize the e-mail

11     addresses?

12           A.   Yes.

13           Q.   So you would have received this

14     back in October of 2023?

15           A.   In 2023, correct.

16           Q.   And BB Advisory, again, is an

17     accounting group that you utilized?

18           A.   Correct.

19           Q.   And Brian Hanlon tells them to

20     enter Erickson Rypl transactions from a Tony Excel

21     file into Sage?

22           A.   Yes.

23           Q.   So the calculations that we've

24     talked about, after you did your fine-tuning, those

25     were -- directions were given to BB to enter the

Antonio Severin                                    May 16, 2025

Page 265

1    Erickson Rypl transactions from your Excel file?

2                    A.    That's what it sounds like,

3    correct.

4                    Q.    Okay.  You had a file that tracked

5    Dave Erickson and Bannister's Rypl transaction,

6    correct?

7                    A.    I had a file, an Excel file, yes.

8                    Q.    And you say:

9                    "The hope is Tony and Amanda

10                   categorize the transactions between

11                   advances, consulting and expenses."

12                   A.    Correct.

13                   Q.    Did you attempt to do that with

14   Erickson and Bannister's transactions with Rypl?

15                   A.    Yes.

16                   Q.    So if there was a distinction

17   between advances and consulting and expenses, you

18   tracked those, correct?

19                   A.    They were tracked, correct.

20                   Q.    And in this e-mail, October 23rd,

21   David Erickson isn't a part of this conversation?

22                   A.    Correct.

23                   Q.    This is a conversation between

24   you, Brian Hanlon, and the BB accounting folks?

25                   A.    Correct.

Antonio Severin                                    May 16, 2025

                                            Page 266

 1                Q.    And the purpose of this was to
 2      properly record the transactions, correct?
 3                A.    Correct.  Or, to be more specific,
 4      to properly report on the transactions.
 5                Q.    Okay.
 6                A.    They were in the general ledgers.
 7                Q.    Okay.
 8                A.    Yeah.
 9                Q.    They'd already been put in the
10      general ledgers at Rypl?
11                A.    Correct.
12                Q.    You wanted to make sure they're
13      properly reported?
14                A.    In the -- the -- we will go back
15      to the United Trust file.  There was reports in
16      there and they needed to match which was in -- what
17      was in the general ledgers.
18                Q.    Okay.  So the purpose was to have
19      accuracy and consistency between those?
20                A.    Correct, yeah.
21                Q.    Handing you Defendant's
22      Exhibit 26, two pages.
23                A.    (Witness reviews document).
24                Q.    Do you recognize this e-mail?
25                A.    Yes, I do.

Antonio Severin                                    May 16, 2025

Page 267

1           Q.   From you?

2           A.   It is from me.

3           Q.   And who does it go to?

4           A.   That goes to Ashank, who is part

5    of the BB Advisory Group.

6           Q.   And do you tell him:

7                "Here is the signed promissory

8                note for [...] $2,050,525.00..."?

9           A.   Correct.

10          Q.   "...and the payment schedule"?

11          A.   Correct.

12          Q.   You say you will be issuing

13   monthly payments directly to Dave at the end of the

14   month?

15          A.   Correct.

16          Q.   And BB Advisory did the

17   bookkeeping for you?

18          A.   They would enter the payables, so

19   they do the clerical part of it.

20          Q.   And when you say, "We will be

21   issuing the monthly payments directly to Dave,"

22   you're speaking on behalf of Firefly, correct?

23          A.   Correct.  Firefly will be issuing

24   the payments to Dave.

25          Q.   That would be Firefly's money?

Antonio Severin                                        May 16, 2025

                                                    Page 268

1                    A.    Correct.

2                    Q.    And the partners at Firefly knew,

3      based on the Syntego Buyout, that he was going to

4      receive this amount?

5                    MS. SCOTT:  Objection, foundation,

6      calls for speculation.

7                    THE WITNESS:  Yes, they did.

8      BY MR. MAUZY:

9                    Q.    And Erickson's interest in Firefly

10     was fully bought out by Firefly in that Syntego

11     agreement?

12                   A.    That's my understanding.

13                   Q.    And he received a lump sum of

14     2.5 million and a promissory note?

15                   A.    Yes.

16                   Q.    Firefly knew that Erickson had

17     loans, correct?

18                   A.    Correct.

19                   Q.    And knew that he paid those loans

20     back in the Syntego agreement?

21                   A.    The Syntego agreement was -- was

22     there's a payback on the outstanding loans,

23     correct.

24                   Q.    And attached to that e-mail is the

25     promissory note?

Antonio Severin                                          May 16, 2025

                                              Page 269

1                    A.    Correct, as a supporting document.

2                    Q.    And that's signed by Greg Elias on

3      behalf of Firefly and Syntego Bay?

4                    A.    That is direct.

5                    Q.    Sorry not "Bay," Syntego BV?

6                    A.    Correct.

7                    Q.    Correct?  He was authorized to

8      speak on behalf of Firefly, that is, Greg Elias?

9                    A.    Correct.

10                   Q.    And for Greg Elias to speak on

11     behalf of the Firefly Group, that means that the

12     majority of the partners must have agreed to that

13     buy-out?

14                   MS. SCOTT:  Objection, calls for

15     speculation.

16                   THE WITNESS:  That would be my

17     understanding.

18     BY MR. MAUZY:

19                   Q.    I'm going to show you a document

20     that's marked as Defendant's Exhibit 27.  It's from

21     you to Ashank, copying Brian -- Hanlon, I take

22     it -- relating to the fully executed promissory

23     note.  I ask that you review that and see if you

24     are familiar with that.

25                   A.    (Witness reviews document).  Yes.

Antonio Severin                                    May 16, 2025

Page 270

1                Q.   Did you receive this?

2                A.   I've -- I sent that e-mail on --

3                Q.   Yeah, I'm sorry.

4                A.   Okay.  I sent the --

5                Q.   You sent the e-mail?

6                A.   Correct.  On April 25th, 2024.

7                Q.   You recognize this as an e-mail

8      that you sent?

9                A.   Yes.

10               Q.   And this is an authentic copy of

11     the e-mail that you sent, right?

12               A.   Yes.

13               Q.   Okay.  On April 26th, 20 --

14               -- Interruption in the proceedings --

15               MR. MAUZY:  What was that?

16               MS. SCOTT:  I don't know.

17               THE WITNESS:  It says --

18               MS. SCOTT:  It's saying your phone

19     isn't ready?

20               THE WITNESS:  It says failed to detect

21     your speaker.

22               MS. SCOTT:  Shall we take a --

23     Mr. Court Reporter, can we please take a brief

24     recess?

25               THE VIDEOGRAPHER:  We are going off the

Antonio Severin                                           May 16, 2025

                                                    Page 271

1    record at 10:30 a.m.

2                    MR. MAUZY:  All right, is there problem

3    with the video recording?

4                    THE VIDEOGRAPHER:  No, I'm fine.

5                    -- RECESS TAKEN AT 10:30 A.M. --

6                    -- UPON RESUMING AT 10:41 A.M. --

7                    THE VIDEOGRAPHER:  This is Volume 2A,

8    unit two, of the video recorded deposition of

9    Antonio Severin.  We're back on the record at

10   10:41 a.m.

11                   Go ahead, Counsel.

12   BY MR. MAUZY:

13                   Q.   We were looking at Defendant's

14   Exhibit 27.  This is your e-mail to the BB Advisory

15   folks?

16                   A.   Correct.

17                   Q.   And do you say, "Please have the

18   payments recorded properly"?

19                   A.   "Please have this coded

20   correctly."

21                   Q.   "Correctly," I'm sorry.

22                   Do you say:  "Please have this coded

23   correctly"?

24                   A.   Yes.

25                   Q.   Okay.  And you're talking about

Antonio Severin                                    May 16, 2025

                                                    Page 272

1          payments that are paid directly to Dave on the

2          promissory note?

3                    A.    Correct.

4                    Q.    Where you were keeping an accurate

5          record of how these payments were coded?

6                    A.    Yes.

7                    Q.    I'm handing you Defendant's

8          Exhibit 28 and ask you if you recognize this as an

9          e-mail to you from Brian Hanlon.

10                   A.    Yes.

11                   Q.    Do you recognize Brian Hanlon's

12         e-mail address?

13                   A.    Yes.

14                   Q.    Your e-mail address?

15                   A.    Yes.

16                   Q.    Did you receive this approximately

17         in -- well, did you receive this June 14th, 2023?

18                   A.    Yes.

19                   Q.    And you believe this to be

20         authentic?

21                   A.    Yes.

22                   Q.    There's a reference to:

23                         "Using the Dashboard and the

24                         Paginated report you should be able

25                         to report summary and detail to the

1                        partners."

2                        What's the dashboard?

3                        A.   So the dashboard would have been

4        basically the folder of all the quote-unquote

5        "paginated reports," as we've referred them -- to

6        them, the listing.

7                        Q.   What's the paginated report?

8                        A.   That would have been the

9        individual reports we did per our -- yeah, the

10       individual reports we would do per shareholder.

11                       Q.   Okay.  So each shareholder had a

12       report?

13                       A.   Correct.

14                       Q.   And you say using the dashboard

15       and those individual reports, you should be able to

16       report summary and detail to the partners?

17                       A.   Correct.

18                       Q.   So the money going out to the

19       partners would be reported to the other partners,

20       correct?

21                       A.   That was the intention, correct.

22       That was the purpose.

23                       Q.   That's the purpose.

24                       So United Trust, the dashboard, kept

25       track of all of the transactions with David

Antonio Severin                                    May 16, 2025

Page 274

1    Erickson and Bannister?

2                   A.    To be just more precise, these

3    paginated reports were from the general ledger.

4    They were just in a format where they would be able

5    to grab all the payments for the vendors, the

6    specific vendors.  In this case, the shareholders.

7                   Q.    Okay.  So all the shareholders

8    could see all the payments going to other

9    shareholders?

10                   A.    No.  No, there would be one who

11   would build a report individually.

12                   Q.    Okay.

13                   A.    Yeah.

14                   Q.    One report to each individual?

15                   A.    That was the purpose, yeah.

16                   Q.    Could other shareholders see what

17   other shareholders were receiving?

18                   A.    Not if I -- not -- not from this,

19   no, not from this.

20                   Q.    How would they see that?

21                   A.    Well, they would be just from the

22   general ledgers.

23                   Q.    Okay.  So the general ledgers

24   could be reviewed and it would show the amount of

25   who -- of advances going to shareholders?

Antonio Severin                                          May 16, 2025

                                              Page 275

1                    A.   All payments going to

2          shareholders, correct.

3                    Q.   And loans going to the

4          shareholders?

5                    A.   Correct, yes.

6                    Q.   So any shareholder could look and

7          see the amount of payments going to David Erickson?

8                    A.   If -- if they asked me for that,

9          yes, yes.

10                   Q.   If they could, you would provide

11         that?

12                   A.   I would provide that to the Board

13         members, to the Board, yeah.

14                   Q.   And you certainly do?

15                   A.   If I --

16                   Q.   You knew the payments going to

17         Dave Erickson?

18                   A.   We tracked the payments going to,

19         correct.

20                   Q.   So you knew the payments going to

21         David?

22                   A.   We knew the payments, correct.

23                   Q.   You had a running total of the

24         payments going to Dave?

25                   A.   The report would have a running

Antonio Severin                                    May 16, 2025

                                                   Page 276

1    total of the payments, correct.

2                   EXHIBIT NO. 53:  E-mail from Dave

3                   Erickson to Simon Dowson, Mark Quirk,

4                   (USAProd-00544843).

5    BY MR. MAUZY:

6                   Q.   I hand you Defendant's 53, an

7    e-mail from Dave Erickson to Simon Dowson, Mark

8    Quirk, Poy Thompson, and copied to you.  The

9    subject is "New Controller."

10                  A.   Yes.

11                  Q.   Do you recognize that e-mail?

12                  A.   I do.

13                  Q.   You would have received a copy of

14   the e-mail at the time?

15                  A.   I was c.c.'d on this e-mail,

16   correct.

17                  Q.   Okay.  So you received that,

18   reviewed it?

19                  A.   At the time -- yeah.  I had just

20   started at that point.

21                  Q.   Okay.  And it's an authentic

22   document, correct?

23                  A.   Correct.

24                  Q.   All right.  And this reflects that

25   you became the controller as of September 19th,

Antonio Severin                                    May 16, 2025

Page 277

1    2013?

2              A.    It was around that time, correct.

3              Q.    So, during the period of time 2013

4    - 2019, you were in charge of accounting for Rypl's

5    books?

6              A.    Correct.

7              Q.    And in this capacity, you also

8    oversaw the money that the Firefly Group made from

9    the Cam4 site?

10             A.    Correct.

11             Q.    And you were responsible for

12   keeping track of that money?

13             A.    I would report on it and make sure

14   that it flowed properly, correct.

15             Q.    And you were in charge of keeping

16   track of any payments to the shareholders?

17             A.    We would enter the -- all

18   payments, including the shareholder payments, in

19   the general ledgers.

20             Q.    I'm going to look at Defendant's

21   Exhibit 52.  Be careful, it has three pages.  Ask

22   you if this is an e-mail from Dave Erickson to Tony

23   Severin, to you, and copying Chad?

24             A.    Yes.

25             Q.    Do you recognize this document?

Antonio Severin                                    May 16, 2025

Page 278

```
 1                 A.   I do.
 2                 Q.   Do you recognize the e-mail
 3     addresses?
 4                 A.   I do.
 5                 Q.   This is, in fact, an e-mail that
 6     you wrote?
 7                 A.   The initial e-mail, I wrote,
 8     correct.
 9                 Q.   Right.  And you recognize this as
10     an authentic copy, right?
11                 A.   Yes.
12                 Q.   Okay.  And you're describing a
13     transition plan?
14                 A.   Correct.
15                 Q.   You're expecting to resign?
16                 A.   I had issued a resignation letter,
17     correct.
18                 Q.   And in the course of this e-mail,
19     you describe your job, do you not?
20                 A.   Yes.
21                 Q.   What do you say your duties are?
22                 A.   "Current responsibilities,
23                 The duties of the current role has
24                 evolved over the last 6 years since
25                 I started with Rypl.com.  There
```

Antonio Severin                                    May 16, 2025

Page 279

1              really was no Job Description

2              provided when I started so part of

3              this transition process now could

4              be" -- "now would be to come up with

5              a job description."

6              "The current role is really a

7              combination of corporate

8              controller..."

9              You want me to read the whole thing

10   or...?

11              Q.   Well, do you describe what you did

12   as an accountant?

13              A.   Okay.

14              "The current role is really a

15              combination of corporate controller

16              (dealing with internal accounting

17              matters) and CFO (dealing with

18              external stakeholders, like banks,

19              tax authorities, lawyers).

20              Therefore my current title of

21              Director of Finance seems to be a

22              right fit -- fit the role properly

23              for me although you might want to

24              replace the role with 2 people, one

25              to concentrate on the internal

Page 280

1                    accounting and one to concentrate on

2                    the external stakeholder needs."

3              Q.   In this e-mail, do you describe

4    your responsibilities as including "Direct

5    Supervision of all accounting and finance

6    functions"?

7              A.   Yes.

8              Q.   You describe part of your

9    responsibilities as "Supervision over the

10   preparation of annual budgets"?

11             A.   Correct.

12             Q.   And part of your responsibilities

13   are to "implement and maintain the corporate

14   structure including making sure signed agreements

15   are in place that produce adequate cash flow for

16   the various global entities"?

17             A.   Correct.

18             Q.   Part of your responsibilities was

19   to manage the various tax audits?

20             A.   Correct.

21             Q.   And you were, at this point in

22   your career, considering a resignation, correct?

23             A.   Correct.

24             Q.   And one reason for that decision

25   was because of the constant banking problems,

Antonio Severin                                    May 16, 2025

Page 281

1    correct?

2                    A.   It was, yeah, the complexity dealt

3    with a number of issues, primarily banking.

4                    Q.   Banking was the big problem,

5    correct?

6                    A.   The ability to move money around

7    through banks, yes.

8                    Q.   Yeah.  And it's hard work?

9                    A.   It was complicated and

10   frustrating.

11                   Q.   Did you find it to be stressful

12   working with banks?

13                   A.   Yes.

14                   Q.   And you had to have a relationship

15   with banks in order to stay in business with

16   Firefly, correct?

17                   A.   Correct.

18                   Q.   If you didn't have a banking

19   relationship, then the business would collapse?

20                   A.   If people were not being paid,

21   yes, there would not be a business.

22                   Q.   And that was very stressful for

23   you to deal with the banks?

24                   A.   It was stressful.

25                   Q.   And that was a persistent problem,

Antonio Severin                                    May 16, 2025

Page 282

1    dealing with the banks?

2                A.   Yes, constant.

3                Q.   And in response to this letter,

4    did David Erickson fly to Toronto?

5                A.   Yes, he did.

6                Q.   And he did that because he wanted

7    you to stay on the job?

8                A.   That is correct.

9                Q.   He told you that he trusted you?

10               A.   That is correct, yes.

11               Q.   And he said he thought you did

12   excellent work?

13               A.   If I remember correctly, yes.

14               Q.   Yeah.  And he encouraged you to

15   stay in your role?

16               A.   Correct.

17               Q.   And you kept your position at Rypl

18   after that conversation?

19               A.   I thought about it and thought

20   about it over the weekend, and yes, he had -- I do

21   remember him saying that we could make this into a

22   win-win-win situation, that -- that I should look

23   for some help and deal with some of the

24   frustrations that way.

25               Q.   Okay.  And you decided to stay on?

Antonio Severin                                    May 16, 2025

Page 283

```
 1                 A.    Correct.

 2                 Q.    Get more assistance?

 3                 A.    Correct.

 4                 Q.    To make things a little less

 5     stressful for you?

 6                 A.    Correct.

 7                 Q.    In your role at Rypl, you managed

 8     the finance team?

 9                 A.    Correct.

10                 Q.    You managed the company books?

11                 A.    Correct.

12                 Q.    You managed the ledgers?

13                 A.    Correct.

14                 Q.    You keep track of how much money

15     came in and how much money went out?

16                 A.    Correct.

17                 Q.    You track where that money comes

18     from and where it goes?

19                 A.    Correct.

20                 Q.    And you do this so the company's

21     owners can see this flow, correct?

22                 A.    Correct.

23                 Q.    They can know how the company is

24     making and spending money?

25                 A.    Correct.
```

Antonio Severin                                          May 16, 2025

                                                    Page 284

1               Q.   Isn't it true the partners would

2     be less concerned about their own costs, that is

3     how much they were receiving?

4               MS. SCOTT:  Objection, calls for

5     speculation.

6               THE WITNESS:  I don't understand the

7     question.

8     BY MR. MAUZY:

9               Q.   Well, they were concerned to see

10    how the -- how the company was doing, right?

11              A.   Oh, yes, yes.

12              Q.   So -- and the partner costs are

13    not part of the actual operating costs?

14              A.   In the reporting that we did, we

15    would include the consulting portion of the partner

16    costs, correct.

17              Q.   Is that a below-the-line expense

18    term?

19              A.   Well, we would consider it part of

20    the operating expenses.

21              Q.   Yeah.  And that was reflected,

22    correct?

23              A.   That was shown separately,

24    correct.

25              Q.   And shareholders had access to

Antonio Severin                                    May 16, 2025

Page 285

1     that information?

2                 A.    They would be sent to what was

3     referred to as the MOM report on a monthly basis,

4     yes.

5                 Q.    Did you spend time with David van

6     der Poel?

7                 A.    We would talk.

8                 Q.    He was a shareholder?

9                 A.    He is a shareholder.

10                Q.    Does -- did he live in Toronto for

11    a period of time?

12                A.    He -- yes.

13                Q.    Did he come to your office

14    regularly?

15                A.    Yeah, he had an office in the

16    same --

17                Q.    Same building?

18                A.    Same building, yes.

19                Q.    And you saw him frequently?

20                A.    Yes.

21                Q.    And you had the ability to talk to

22    Mr. van der Poel?

23                A.    Yes.

24                Q.    And you knew he was a shareholder?

25                A.    Yes.

Antonio Severin                                    May 16, 2025

Page 286

 1                Q.   And he knew you were the

 2      controller of Rypl?

 3                A.   Yes.

 4                Q.   And you had a close relationship

 5      with him?

 6                A.   Fairly close, yes.

 7                Q.   And David Erickson, would you

 8      describe as the spokesperson for the majority

 9      shareholders in dealings with you?

10                A.   No, it was mainly Dave Erickson.

11                Q.   Dave Erickson?

12                A.   Yes.

13                Q.   Okay.  He was the primary

14      spokesperson?

15                A.   Mr. Erickson?

16                Q.   Yeah.

17                A.   Yes.

18                Q.   Okay.  You also spoke to David van

19      der Poel?

20                A.   Correct.  He was also in the

21      office.

22                Q.   What about Rodenburg?

23                A.   Never in the office, no.

24                Q.   Never in the office.

25                     But van der Poel was actually in your

Antonio Severin                                    May 16, 2025

Page 287

1      office and you talked to him regularly?

2                  A.   He was mainly marketing.  So we

3      would talk, but not as often as with Mr. Erickson.

4                  Q.   And you believe -- well, there

5      were regular meetings of the shareholders, right?

6                  A.   They would have meetings, yes.

7                  Q.   Yeah.  And you believe he was

8      authorized to speak on behalf of other

9      shareholders?

10                 A.   The shareholder group, yes.

11                 Q.   I want to talk about a stock

12     register, company stock registers for a moment.

13                 A.   Yes.

14                 Q.   A stock register describes the

15     shareholders that currently own stock in a company;

16     is that correct?

17                 A.   That is correct.

18                 Q.   Disclosure of the registered

19     shareholder amounts are often important to get a

20     bank account?

21                 A.   Correct.

22                 Q.   Banks like to know who the

23     ultimate beneficial owner of an organization is?

24                 A.   They need to know.

25                 Q.   So banks need to know who they're

Antonio Severin

Page 288

1    dealing with?

2                A.    Yeah.   That's considered KYC,

3    "Know Your Client."

4                Q.    And you're in charge of this

5    process of giving the --

6                A.    I was --

7                Q.    -- shareholder registers to them?

8                A.    Yes, I would typically be the

9    point person with the banks.

10                Q.    With the banks.   And you'd be

11    responsible for getting the stock registers to

12    them?

13                A.    Correct.

14                Q.    And that was important to be able

15    to do business with banks?

16                A.    It was a requirement.

17                Q.    And you were always accurate when

18    you reported the stock register to the banks; is

19    that correct?

20                A.    We would provide the most current

21    share register to the bank.

22                Q.    Did that disclose the name of

23    Erickson?

24                A.    Sorry?

25                Q.    On the stock -- what would be on

Page 289

1    the stock register?

2                 A.    It would be -- let's say if it's

3    for Firefly, Firefly Lane Corporation NV, the share

4    register would list at that time the eight

5    shareholders, so Bannister, the Prism Trust, 10Q21,

6    etcetera.

7                 Q.    And all of those shareholders

8    would be listed on the register, and you would give

9    that register to the banks when you were dealing

10   with banks; is that correct?

11                A.    Correct.

12                Q.    Is it true sometimes the

13   shareholders would be concerned about having their

14   names associated with the adult entertainment

15   industry?

16                MS. SCOTT:  Objection, calls for

17   speculation.

18                THE WITNESS:  I assume so, yes.

19   BY MR. MAUZY:

20                Q.    I'm going to show you Defendant's

21   Exhibit 38.  Is this an e-mail from you to

22   Charlotte Janssen and Dave Erickson and Spencer

23   York?

24                A.    Yes.

25                Q.    You recognize this as an authentic

Antonio Severin                                          May 16, 2025

Page 290

1     e-mail that you sent out?

2                    A.    Yes.

3                    Q.    And kept in the records of Rypl?

4                    A.    Yes.

5                    Q.    And is this an example of the type

6     of disclosure that you would make?

7                    A.    Yes.

8                    Q.    And do you disclose the directors

9     as Gregory Elias?

10                   A.    Correct.

11                   Q.    Do you disclose the

12    UBO shareholders with over ten percent as David van

13    der Poel, David Erickson, Richard Burry, Toine

14    Rodenburg?

15                   A.    Correct.

16                   Q.    And you identify the authorized

17    signatories?

18                   A.    Correct.

19                   Q.    And those are Tony, that's you?

20                   A.    Correct.

21                   Q.    And Amanda Zimmerman?

22                   A.    Correct.

23                   Q.    All right.  David Erickson wasn't

24    an authorized signatory, correct?

25                   A.    That is correct.

Page 291

1                    [Reporter intervened for clarification

2        purposes]

3                         THE WITNESS:  Was not.

4        BY MR. MAUZY:

5                         Q.   Charlotte Janssen is the lawyer

6        for Rypl?

7                         A.   She is.

8                         Q.   And she was involved in this

9        process of disclosure?

10                        A.   She was.

11                        Q.   I'm going to show you Defense

12       Exhibit 39 and ask you if you recognize that as an

13       e-mail from you to Richard Burry, copying Dave

14       Erickson, relating to the Alexandria bank account.

15                        A.   Yes.

16                        Q.   You would have written this

17       document?

18                        A.   I -- that this is my e-mail?

19                        Q.   Yeah, you recognize it as

20       authentic, correct?

21                        A.   Yes.

22                        Q.   And you say, "Hi Richard."  This

23       is Richard Burry?

24                        A.   Richard Burry, yes.

25                        Q.   Now, what is the purpose of the

Antonio Severin                                        May 16, 2025

Page 292

1    e-mail to Richard?

2                    A.    (Witness reviews document).

3                    This was to gather documents in regards

4    to the holding -- Richard's holding company, which

5    is called SmartVu.  So SmartVu owned shares of not

6    only Firefly but also Surecom.  And this was a --

7    we knew him to be re-incorporating SmartVu from

8    Curacao to Malta, so I was requesting those

9    documents to provide to the bank.

10                   Q.    And you say on the first page to

11   Richard, once his new company is incorporated in

12   Malta, we need Gregory -- that's Gregory Elias?

13                   A.    Correct.

14                   Q.    You need to have Gregory change

15   the ownership of the SmartVu Curacao shares in

16   Surecom and Firefly to the new company?

17                   A.    To the new company that would be

18   incorporated in Malta.

19                   Q.    And it was important to you to

20   make sure the bank had that information?

21                   A.    It was important to me to have

22   accurate share register, correct.

23                   Q.    And this is part of that process?

24                   A.    Correct.

25                   Q.    And do you tell Richard:

Antonio Severin                                    May 16, 2025

                                                    Page 293

1                    "Let me know when you have the

2               new company's information and I will

3               forward to Gregory to make the

4               changes to keep the share register

5               accurate"? [As read]

6               A.    Correct.

7               Q.    Is it fair to say that Greg Elias

8       will always be the one who has the most accurate

9       version of the company register?

10              MS. SCOTT:   Objection, calls for

11      speculation, lack of foundation.

12              THE WITNESS:   That's who I would go for

13      the most accurate...

14      BY MR. MAUZY:

15              Q.    And because of a change process,

16      we see in Exhibit 39 changing the name of the

17      company in the incorporation; he needs to know

18      that, correct?

19              A.    Yes.   The shareholder register

20      would have to be updated.

21              Q.    All right.   And that was important

22      for you, to make sure that shareholder register was

23      correct and updated?

24              A.    Yes.

25              Q.    Now, is it fair to say that

Page 294

1       Firefly pays Rypl to handle its money and its

2       accounting functions?

3                  A.   Yes.

4                  Q.   Firefly pays Rypl 10 percent of

5       all expenses paid by Rypl on behalf of Firefly?

6                  A.   Yes.

7                  Q.   Chad Moldon is the CEO of Rypl?

8                  A.   He is the President of Rypl.

9                  Q.   And he's also one of the

10      shareholders at Firefly?

11                 A.   Correct.

12                 Q.   You report to Chad Moldon as -- in

13      his capacity as President; is that correct?

14                 A.   Correct.

15                 Q.   The other shareholders are David

16      van der Poel, Toine Rodenburg, David Erickson,

17      Richard Burry, Paul Eidsness and Ryan Maule and

18      Kevin Krieg?

19                 A.   The Firefly Lane Corporation NV

20      shareholders, correct, you listed.

21                 Q.   And these shareholders live all

22      over the world?

23                 A.   They live in various places,

24      correct.

25                 Q.   Not simply in Toronto, but all

Antonio Severin                                    May 16, 2025

Page 295

1    over the world?

2                    A.    Yes.

3                    Q.    Okay.  And isn't it true that each

4    place that these shareholders live, that place,

5    that country, has different tax laws?

6                    MS. SCOTT:  Objection, lack of

7    foundation.

8                    THE WITNESS:  Yes.

9    BY MR. MAUZY:

10                   Q.    And those countries have a

11   different treatment of income?

12                   MS. SCOTT:  Objection, lack of

13   foundation, calls for a legal conclusion.

14   BY MR. MAUZY:

15                   Q.    Go ahead.

16                   A.    I would assume, yes.

17                   Q.    You aren't a shareholder of

18   Firefly?

19                   A.    No.

20                   Q.    You didn't make any administrative

21   decisions on behalf of Firefly at Firefly?

22                   A.    Administrative decisions, there

23   might have been some decisions I would have made on

24   behalf of Firefly.

25                   Q.    What kind of decisions would you

Antonio Severin                                      May 16, 2025

Page 296

1    make on behalf of Firefly?

2                 A.   Basically, we did hire somebody

3    for Firefly to do the clerical work.  So I would

4    have advised her on some things, as far as, I think

5    the -- we have a little office there, office

6    supplies, you know, payroll.  So there's some --

7    some -- there would have been some decisions, some

8    small decisions, that I would have probably done.

9                 Q.   You're not a shareholder of

10   Firefly?

11                A.   No.

12                Q.   You did not make compensation

13   decisions at Firefly?

14                A.   No.

15                Q.   You attended some of the annual

16   meetings but not all of the annual meetings?

17                A.   Just a couple.

18                Q.   In your years at Rypl, how many

19   annual meetings did you attend?

20                A.   I remember two.

21                Q.   Okay.  Were they in fact annual

22   meetings, that is, once a year?

23                A.   For the most part, they -- I

24   believe they were once a year, yes.

25                Q.   Are you familiar with the term

Antonio Severin                                        May 16, 2025

Page 297

1    "old man meetings"?

2                 A.    Yes.

3                 Q.    Did these happen every month?

4                 A.    They did.

5                 Q.    Who attended them?

6                 A.    My understanding was it was Chad

7    Moldon, David Erickson, David van der Poel, I

8    believe Richard Burry; and then maybe Toine

9    Rodenburg, I don't know.

10                Q.    Did you attend?

11                A.    I attended just a few, very few.

12   Again, I remember maybe two or three months, maybe.

13                Q.    Two or three --

14                A.    Months.

15                Q.    -- times?

16                A.    Yeah.

17                Q.    Total, the entire time you were

18   at --

19                A.    Exactly, not -- not many.

20                Q.    If Toine Rodenburg asked you to

21   make a payment to him, would you make the payment?

22                A.    If it was -- if it was approved by

23   Mr. Erickson.

24                Q.    And if David Erickson said he

25   wanted a loan, he would receive a loan?

Page 298

1            A.   We would send the money, correct.

2            Q.   And the loan, then, was owed to

3    Firefly?

4            A.   During this time, the money would

5    come from Rypl and on behalf of Firefly, correct.

6            Q.   And it's Firefly's money?

7            A.   Eventually, correct.

8            Q.   All right.  It was not Rypl's

9    money?

10           A.   Correct.

11           Q.   The loan taken out was owed to

12   Firefly?

13           A.   I've never seen any loan

14   documents, so I don't know.

15           Q.   And you trusted David Erickson to

16   only take out money approved by other shareholders?

17           A.   My understanding was this was part

18   of the Board, and he was the financial guy on the

19   Board, so my understanding was that these are Board

20   -- these are okayed by the Board.

21           Q.   And the Board would meet

22   regularly, and they -- and they'd also talk among

23   themselves?

24           MS. SCOTT:  Objection, lack of

25   foundation, calls for speculation.

Page 299

1                    THE WITNESS:  That was my

2      understanding.

3      BY MR. MAUZY:

4                    Q.   And they received your reports so

5      they could see how much money was coming in and how

6      much money was going out?

7                    MS. SCOTT:  Objection, lack of

8      foundation, calls for speculation.

9                    THE WITNESS:  Yes, I would send what we

10     call the MOM report, which is basically financial

11     statements, once a month.

12     BY MR. MAUZY:

13                   Q.   You sent the reports to the

14     shareholders once a month?

15                   A.   Correct.

16                   Q.   Okay.  The four majority

17     shareholders, the -- David van der Poel, David

18     Erickson, Toine Rodenburg, Richard Burry, did you

19     regard those as the founders?

20                   A.   I would regard the founders as

21     Mr. Erickson, Mr. Van der Poel, and Mr. Rodenburg.

22                   Q.   Because they had been involved in

23     the company the longest?

24                   A.   As far as I know, yes.

25                   Q.   And that group constituted the

Antonio Severin                                    May 16, 2025

                                                    Page 300

1      majority of the shareholders?

2                  A.    They would be 60 percent of the

3      shareholder -- the shareholdings.

4                  Q.    So those four shareholders could

5      dictate what happens at Firefly?

6                  A.    I assume the three of them could

7      have done it, yes.

8                  Q.    You need three with the majority

9      of the shareholders could make decisions on behalf

10     of Firefly?

11                 A.    That was my understanding.

12                 Q.    You had signature authority on all

13     of the bank accounts for Rypl?

14                 A.    I don't -- the Rypl one was a TD.

15     I don't believe I have signature authority, I

16     didn't have -- as far as issuing a payment, but I

17     do have viewing authority, and I do have

18     administrative authority.

19                 Q.    For which one?

20                 A.    For the TD Bank at Rypl.

21                 Q.    At Rypl, okay.

22                 A.    Yeah, right.

23                 Q.    Which banks did you have signature

24     authority?

25                 A.    I think the Granity ones.  As a

Page 301

1      director, I would have signature authority over the

2      Granity Irish ones.

3                   Q.    Okay.  Did Amanda Zimmerman have

4      signature authority?

5                   A.    She did, yes.

6                   Q.    At Toronto-Dominion?  TD is

7      Toronto-Dominion?

8                   A.    Correct, yes.

9                   Q.    David Erickson did not have

10     signature authority at the Toronto-Dominion?

11                  A.    No.  Although I believe he was on

12     the account initially.  I'm not a hundred percent

13     sure if that still exists.

14                  Q.    Early on?

15                  A.    Early on.  When the -- when the

16     account was set up in 2012, if I remember.

17                  Q.    During the period of time 2013 -

18     2019, he did not have signature authority?

19                  A.    I'm not sure.  I don't know.  I

20     don't know when that was changed.

21                  Q.    Okay.  At some point it was

22     changed and he --

23                  A.    Yes.

24                  Q.    -- did not have signature

25     authority?

Antonio Severin                                    May 16, 2025

                                                    Page 302

1                A.    Correct.

2                Q.    And that was early on in your

3      tenure?

4                A.    I believe so, yes.

5                Q.    You started in 2013?

6                A.    I did, yes.

7                Q.    So, shortly after you started, he

8      no longer had signature authority?

9                A.    I believe there was some change at

10     the bank so....   And, yes, he didn't have it.

11               Q.    Did Amanda Zimmerman have access

12     to the portal used to transfer money held at United

13     International Bank?

14               A.    She did.

15               Q.    And David Erickson -- did you have

16     access to the portal used to transfer money at

17     United International Bank?

18               A.    I do not have my own access, no.

19               Q.    Amanda Zimmerman did?

20               A.    Yes.

21               Q.    David Erickson did not?

22               A.    Not that I know of.

23               Q.    I'm handing you Defendant's

24     Exhibit 13.

25               Did Dave Erickson request so-called

Page 303

1    one-off loans?

2                    A.    Yes.

3                    Q.    Looking at Defendant's 13, is this

4    an e-mail from Dave Erickson to Amanda Zimmerman,

5    copying you?

6                    A.    Correct.

7                    Q.    And this is a -- subject is, "Loan

8    to Halstead"?

9                    A.    "Loan to Halstead," correct.

10                    Q.    You recognize this as an e-mail

11   that you would have received?

12                    A.    Correct.

13                    Q.    All right.

14                    MR. BOURGET:   Sorry to interrupt.   I

15   think you identified this as Government's 13.   It

16   is Defense 13.

17                    MR. MAUZY:   I think it's Defendant's

18   13.   It may also be your exhibit, it might be

19   duplicate.

20   BY MR. MAUZY:

21                    Q.    This is an e-mail from Dave

22   Erickson to Amanda Zimmerman, copying you, correct?

23                    A.    Correct.

24                    Q.    And you recognize this as an

25   e-mail that you would have received?

Antonio Severin                                    May 16, 2025

Page 304

1                    A.   Yes.

2                    Q.   And it indicates that Halstead

3       needs a loan in the amount of 15,000?

4                    A.   Correct.

5                    Q.   Okay.  And he would have received

6       a loan of 15,000?

7                    A.   And he would have been sent --

8       Halstead Bay would have been sent, yes.

9                    Q.   Halstead Bay?

10                   A.   Halstead Bay would have been sent

11      15,000.

12                   Q.   All right.  So he's requesting a

13      loan to Halstead, and Halstead received a loan in

14      the amount of 15,000?

15                   A.   They received 15,000, correct.

16                   Q.   And this is a loan, right?

17                   A.   He -- he states it as a loan.

18                   Q.   And you record it at Rypl as a

19      loan?

20                   A.   Correct.

21                   Q.   And it was Firefly --

22                   A.   Yes.

23                   Q.   -- money ultimately?

24                   A.   Ultimately, it was Firefly's

25      responsibility, correct.

Antonio Severin                                          May 16, 2025

Page 305

1              Q.    The payment is facilitated by

2    Rypl, but it's actually Firefly's money?

3              A.    Correct.

4              Q.    Is it fair to say that you and

5    Amanda would decide how to send them the money?

6              A.    I'm not sure if that's a fair

7    characterization.  We would send them the money.

8              Q.    Yeah.

9              A.    Amanda would send the money.

10             Q.    Okay.

11             A.    Yeah.

12             Q.    Yeah.  From -- she would decide

13   which bank account?

14             A.    Well, we only had the one.

15             Q.    Yeah.

16             A.    So this would have been from Rypl,

17   so it would have come from the TD USD account.

18             Q.    Right.  You only had one account?

19             A.    Correct.

20             EXHIBIT NO. D-14:  E-mail from

21             D. Erickson to A. Zimmerman, T.

22             Severin, et al, dated May 3, 2018, "Loan".

23   BY MR. MAUZY:

24             Q.    I'm going to hand you Defendant's

25   Exhibit 14 and ask you if you recognize that as an

Antonio Severin                                                May 16, 2025

Page 306

1       e-mail from Dave Erickson to you.

2                    A.    To Amanda and myself.

3                    Q.    And you, yeah.

4                    A.    Correct.

5                    Q.    Subject is a "Loan"?

6                    A.    Yes.

7                    Q.    And, again, this would be a loan

8       to Halstead?

9                    A.    Correct.

10                   Q.    Requesting 75,000?

11                   A.    That is correct.

12                   Q.    And he does not say in this e-mail

13      what bank account to send money from; isn't that

14      correct?

15                   A.    He does not.

16                   Q.    And this loan is being made on

17      behalf of Firefly?

18                   A.    Correct.

19                   Q.    And it's going to a shareholder of

20      Firefly?

21                   A.    Halstead's not a shareholder of

22      Firefly, but yes.

23                   Q.    Okay.  All right.  Dave Erickson

24      is, through Bannister, correct?

25                   A.    Correct.

Page 307

```
 1                 Q.   So ultimately it's going to a
 2      shareholder of Firefly?
 3                 A.   Correct, that's how we would have
 4      code it.
 5                 Q.   You would have coded it as a loan
 6      to a shareholder?
 7                 A.   Correct.
 8                 Q.   Okay.  We're going to put this one
 9      on the screen.  Do you recognize this as an e-mail
10      from Dave Erickson to Amanda and you, subject
11      "Loan"?
12                 MS. SCOTT:  Mr. Mauzy, what exhibit
13      number is this?
14                 MR. MAUZY:  D-15.
15                 EXHIBIT NO. D-15:  E-mail from D.
16                 Erickson to A. Zimmerman, et al, dated
17                 March 7, 2017, Re: Loan.
18      BY MR. MAUZY:
19                 Q.   On the screen is Defendant's
20      Exhibit 15.  Is this an e-mail from Dave Erickson
21      to Amanda and you, referencing a loan?
22                 A.   Yes.
23                 Q.   And, again, this is a loan of
24      50,000 to Halstead Bay?
25                 A.   Yes.
```

Antonio Severin                                    May 16, 2025

Page 308

1                Q.   And it uses the word "loan" twice?

2                A.   "Loan" is used as the subject and

3     also in the --

4                Q.   Correct.

5                A.   -- in the body.

6                Q.   And you agree that this is a loan?

7                A.   Well, I don't -- I didn't receive

8     a loan document but per this e-mail, it's going to

9     be coded as a loan.

10               Q.   It was coded as a loan?

11               A.   Correct.

12               Q.   He's not telling you which bank

13    account to send money from, correct?

14               A.   Well, there's only the one bank

15    account to send it from.

16               Q.   And he's not telling you?

17               A.   He did not tell us which one, no.

18               [Reporter intervened for clarification

19    purposes]

20               THE WITNESS:  He did not tell us which

21    one -- which bank to send it from.

22    BY MR. MAUZY:

23               Q.   And this is a loan being made on

24    behalf of Firefly?

25               A.   Correct.

Antonio Severin                                    May 16, 2025

Page 309

```
 1                    Q.   And going ultimately to a

 2      shareholder of Firefly?

 3                    A.   Correct.

 4                    Q.   And this payment is facilitated by

 5      Rypl, but it's Firefly's money?

 6                    A.   Correct.

 7                    EXHIBIT NO. D-16:  E-mail from

 8                    D. Erickson to T. Severin, et al

 9                    dated October 10, 2019 Re: Advance for

10                    Legal Costs.

11      BY MR. MAUZY:

12                    Q.   Defendant's Exhibit 16.  I hand

13      you the document and see if you recognize it as an

14      e-mail from Dave Erickson to you and Amanda.

15                    A.   Yes.

16                    Q.   You would have received this back

17      in October 10th, 2019?

18                    A.   Yes.

19                    Q.   You recognize this as authentic?

20                    A.   Correct.

21                    Q.   Is this a request for a $10,000

22      advance to Halstead?

23                    A.   Yes.

24                    Q.   And the subject matter is "Advance

25      for Legal Costs"?
```

Antonio Severin                                        May 16, 2025

                                              Page 310

1                    A.   Yes.

2                    Q.   Is this advance put on the books

3      of Rypl?

4                    A.   No.  This would also have been for

5      Firefly, on behalf of Firefly.

6                    Q.   Yeah.  The payment is made on

7      behalf of Firefly?

8                    A.   Correct.

9                    Q.   But you would have a record of

10     that at Rypl?

11                   A.   Correct.

12                   Q.   Right.  And there would be a

13     record of that ultimately at Firefly as well?

14                   A.   Correct.

15                   Q.   Okay.  They were informed at all

16     times of any payments that were made?

17                   A.   They would know, yes.

18                   Q.   Any payments to shareholders at

19     any time were recorded by Firefly?

20                   A.   Yeah, yes.

21                   Q.   Okay.  And this money that was

22     transferred was ultimately Firefly's money,

23     correct?

24                   A.   Correct.

25                   EXHIBIT NO. D-17:  E-mail from D.

Antonio Severin                                          May 16, 2025

                                              Page 311

1              Erickson to A. Zimmerman, et al, dated

2              February 25, 2018, Re: Amex.

3    BY MR. MAUZY:

4              Q.   I show you Defendant's Exhibit 17

5    and ask you if you recognize this as an e-mail from

6    Dave to Amanda and you, regarding Amex, dated

7    February 25th, 2018.

8              A.   (Witness reviews document).  Yes.

9              Q.   Is this an authentic copy of an

10   e-mail you would have received?

11             A.   Yes.

12             Q.   Does he ask you to please send

13   another 25,000 as a loan?

14             A.   Yes.  He asks Amanda to send it,

15   and he cc's me on the request.

16             Q.   Does this relate to Amex?

17             A.   We would not have related it to

18   Amex.

19             Q.   At the bottom of the page, does it

20   say:  "Dave Erickson":

21                  "Hi!  Maybe this got lost, but

22             it's overdue.  Can you please send

23             it..."

24             A.   Yes.

25             Q.   And in the subject line, does it

Antonio Severin                                          May 16, 2025

Page 312

1     say, "Re: Amex"?

2                     A.   The subject line says, yes, "Re:

3     Amex."

4                     Q.   And would you pay Amex bills on

5     behalf of -- that David Erickson incurred?

6                     A.   Yes.   I don't believe that's what

7     this is, but I think that the subject line doesn't

8     match with the body of the e-mail.

9                     Q.   Was it a request for another

10    25,000 as a loan after the Amex was paid off?

11                    A.   It was -- I think they just used

12    the same thread, and so --

13                    Q.   Okay.

14                    A.   -- that just became the subject

15    line.   But this was a separate request for --

16                    Q.   This is a separate --

17                    A.   -- 25,000.

18                    Q.   Correct.   So there were really two

19    requests; one relates to Amex and one relates to

20    the $25,000 loan?

21                    A.   On the same thread.

22                    Q.   Okay.

23                    A.   Yeah.

24                    Q.   Did David Erickson send to you a

25    spreadsheet every month describing his expenses?

Antonio Severin                                    May 16, 2025

                                                    Page 313

1                    A.    The process was that Mr. Erickson

2       would send an e-mail asking for an amount for his

3       Amex bill, and then, at some time after, maybe a

4       week or two, he would actually provide me a

5       spreadsheet with the coding of that amount.

6                    Q.    Okay.  And that would show

7       business expenses and personal expenses?

8                    A.    Correct.

9                    Q.    And you would code it

10      appropriately?

11                   A.    He would categorize them and -- to

12      an expense -- an expense line, expense category,

13      and, yes, that will be sent.

14                   Q.    You relied on him to identify the

15      personal expenses and the business expenses?

16                   A.    Correct.

17                   Q.    And then you would appropriately

18      code those expenses?

19                   A.    Based on his -- his categories,

20      yes.

21                   Q.    And if there are personal

22      expenses, how were those accounted for?

23                   A.    As advances.

24                   Q.    As advances?

25                   A.    (Witness nods.)

Antonio Severin                                                    May 16, 2025

Page 314

1              Q.   So, anytime --

2              A.   And he might -- he might actually

3      stipulate an advance --

4              Q.   Yeah?

5              A.   -- or just, yeah, typically it

6      would just say, "Advance."

7              Q.   Anytime he said that these

8      expenses were personal expenses, you would code

9      that as an advance?

10             A.   He would categorize it as an

11     advance, and that's what we would code it, yes.

12             Q.   And that's how you would record

13     it?

14             A.   Correct.

15             EXHIBIT NO. D-18:  E-mail from

16             D. Erickson to T. Severin, A. Zimmerman

17             dated February 26, 2018, Re: Amex

18             (USAProd00544949).

19     BY MR. MAUZY:

20             Q.   I'm going to show you 18,

21     Defendant's Exhibit 18, from David Erickson to you

22     and Amanda, regarding Amex.

23             A.   Correct, okay.

24             Q.   And who -- who's Pierre?

25             A.   Pierre is the external accountant

Antonio Severin                                          May 16, 2025

Page 315

1     for Rypl.

2                 Q.   Is the subject line "Amex"?

3                 A.   Yes.

4                 Q.   And he tells you:

5                      "Call me today regarding

6                 documentation."

7                 A.   Yes.

8                 Q.   And you send Amanda an e-mail that

9     says, "Please pay from Rypl," correct?

10                A.   Correct.

11                Q.   And:

12                     "Code to new account 14360 and

13                shareholder advance."

14                A.   Correct.

15                Q.   What's account 14360?

16                A.   This was in regards to -- looks

17    like it's in regards to that $25,000 loan.  And

18    that would have been an advance, balance sheet

19    advance, general journal account.

20                Q.   So the shareholder advance would

21    have been recorded as a shareholder advance?

22                A.   Correct.

23                Q.   All right.  I'm showing you

24    Defendant's 19, an e-mail from Dave Erickson to

25    Amanda and you.

Antonio Severin                                      May 16, 2025

Page 316

1            Do you recognize this as an e-mail

2    dated October 27th, 2014, relating to payments to

3    Richard Burry?

4            A.   Yes, I do.

5            Q.   This is an accurate copy of that?

6            A.   It looks to be, yes.

7            Q.   And does Dave indicate that he has

8    reviewed Richard's payments and made a few requests

9    of you?

10           A.   Yes.

11           Q.   And does he say, stop paying the

12   $10,000 wire to SmartVu?

13           A.   Yes.

14           Q.   And to send the account name that

15   you've been using to book his advances?

16           A.   Yes.

17           Q.   And was there a change in Richard

18   Burry's company?

19           A.   I don't remember.  I wasn't really

20   involved with the shareholder payments at that

21   point in time, 2014.

22           Q.   Okay.  Does he -- does ask you to

23   confirm that SmartVu has received only 10,000 each

24   month and no Euro payments?

25           A.   Yes.

Antonio Severin                                          May 16, 2025

Page 317

```
 1                Q.   And that the total of these
 2      payments since 2013, February 2013, is $160,000?
 3                A.   Correct, yeah.
 4                Q.   Okay.  Were you tracking his
 5      payments?
 6                A.   Yes.  These payments were being
 7      tracked on the old system, on the Peachtree system.
 8                Q.   Okay.  Did that end up being
 9      changed to Sage?
10                A.   Correct.
11                Q.   And this advance, these advances,
12      to Richard Burry were on the books as advances?
13                A.   I assume so.
14                Q.   And ultimately it's an advance, a
15      loan, of Firefly's money, correct?
16                A.   Correct.  I believe these
17      payments -- and, again, I wasn't actively involved
18      during the 2024 period with these type of payments,
19      but I believe they would have come from Firefly
20      directly.
21                Q.   Okay.  And this e-mail reflects
22      that Richard Burry was receiving payments as well
23      as -- in the form of advances?
24                A.   Yes.
25                Q.   He was a shareholder?
```

Antonio Severin                                    May 16, 2025

                                                    Page 318

1                    A.    Correct.

2                    Q.    And all of the shareholders

3     received advances -- the majority shareholders?

4                    A.    The majority shareholders,

5     correct.

6                    EXHIBIT NO. D-20:  E-mail from T. Rodenburg

7                    to A. Zimmerman & D. Erickson dated

8                    June 16, 2016, Re: Invoice Payment by FFL.

9                    BY MR. MAUZY:

10                   Q.    I'm looking at 20.  I'm handing

11    you 20, Defendant's Exhibit 20, and ask you:  Do

12    you recognize this as an e-mail from Toine

13    Rodenburg to Amanda Zimmerman, copying Dave

14    Erickson?

15                   MS. SCOTT:  Objection.  Lack of

16    foundation.

17                   THE WITNESS:  Well, I'm not on this

18    e-mail so...

19                   MR. MAUZY:  I think it's already been

20    received.

21    BY MR. MAUZY:

22                   Q.    Can you review this e-mail, and

23    then I'll ask you some questions on it.  It's

24    already in evidence.  Is Toine Rodenburg associated

25    with a company 10Q21?

Antonio Severin                                          May 16, 2025

                                        Page 319

1                    A.    Yes, he is.

2                    Q.    And did Toine Rodenburg receive

3      advances?

4                    A.    Yes, he has -- 10Q21 has received

5      advances, correct.

6                    Q.    And 10Q21 is associated with Toine

7      Rodenburg?

8                    A.    Correct.

9                    Q.    And he was a -- 10Q21 was a

10     shareholder?

11                   A.    Correct.

12                   Q.    And the advances he received came

13     ultimately from Firefly's money, correct?

14                   A.    It came directly from Firefly.

15                   EXHIBIT NO. D-21:  E-mail from D.

16                   Erickson to T. Severin, A. Zimmerman

17                   dated May 30, 2018 (USAProd-00001058).

18                   BY MR. MAUZY:

19                   Q.    I show you Defendant's Exhibit 21,

20     e-mail from Dave Erickson to you, copying Amanda

21     Zimmerman, May 30th, 2018.

22                   A.    Yes.

23                   Q.    Do you recognize this document?

24                   A.    Yes.

25                   Q.    You would have received this back

Antonio Severin                                      May 16, 2025

Page 320

1    in 2018?

2                    A.   Yes.

3                    Q.   This is an accurate copy?

4                    A.   Yes.

5                    Q.   Does this relate to a request to

6    transfer money from Lloydsville to 10Q21?

7                    A.   Yes.

8                    Q.   So, is Dave Erickson asking you to

9    move money on behalf of David van der Poel, that is

10   Lloydsville, to Toine at 10Q21?

11                   A.   Yes.

12                   Q.   And did you do that?

13                   A.   I would have asked Amanda to do

14   it.

15                   Q.   Yeah, okay.

16                   A.   But yes, I did...

17                   Q.   Rypl did this?

18                   A.   No.  Firefly would -- Lloydsville

19   would have sent the money.

20                   Q.   Okay.  And you facilitated that

21   transfer?

22                   A.   I asked Amanda to --

23                   Q.   Okay.

24                   A.   -- do it up.

25                   Q.   So it was Lloydsville money going

Antonio Severin                                            May 16, 2025

Page 321

1    to 10Q21, correct?

2                   A.   Correct.

3                   Q.   And this is David van der Poel

4    loaning Mr. Rodenburg money?

5                   A.   Correct.

6                   Q.   And then David van der Poel

7    receives 100,000 from Firefly to cover it?

8                   A.   Correct.

9                   Q.   Correct?

10                  A.   (Witness nods.)

11                  Q.   And the reference is Loan?

12                  A.   Correct.

13                  EXHIBIT NO. D-30:  E-Mail Chain from

14                  T. Rosenburg to T. Severin & D. Erickson

15                  Re: Regular payments (USAProd-00544952).

16   BY MR. MAUZY:

17                  Q.   I'm showing you Defendant's

18   Exhibit 30.  This is from Toine Rodenburg to you,

19   copying Dave Erickson, June 27, 2019; is that

20   correct?

21                  A.   Correct.

22                  Q.   And the attachments are credit

23   card expenses for 2019 for Toine Rodenburg?

24                  A.   Correct.

25                  Q.   And it's from Toine Rodenburg?

Antonio Severin                                        May 16, 2025

                                                    Page 322

1                A.    Correct.

2                Q.    He says he also sent it to Amanda?

3                A.    Correct.

4                Q.    All right.  Now, were these credit

5      card payments paid?

6                A.    The credit card payments were

7      paid.

8                Q.    All right.  And this is an example

9      of another shareholder having the credit card

10     payments paid?

11               A.    These were automatically paid

12     because these are Firefly Lane credit cards.

13               Q.    Okay.

14               A.    So they were on autopayment.

15               Q.    All right.  So the difference

16     between David Erickson, he had his own personal

17     credit card, and Toine Rodenburg and other

18     shareholders had Firefly Lane credit cards?

19               A.    Firefly Lane, or in the case of

20     Chad Moldon and Ryan, they would have Rypl credit

21     cards.

22               Q.    But you'd still pay those credit

23     card expenses for those shareholders?

24               A.    Yes.  They're attached to the bank

25     accounts, so they're automatic payment.

Antonio Severin                                          May 16, 2025

Page 323

1                Q.   And you -- and you'd keep track of

2      them?

3                A.   Correct.  We would receive a

4      statement.

5                Q.   And the only difference between

6      the other shareholders was they had company credit

7      cards and Dave Erickson had his own personal credit

8      card?

9                A.   That is correct.

10               Q.   You treated them the same way,

11     correct?

12               A.   Yeah.  Well, the company credit

13     card, we would have the statement so we could ask

14     questions about it.  In Mr. Erickson's case, we did

15     not; we did not have the statement.

16               Q.   But the ultimate payment was

17     treated the same --

18               A.   Correct.

19               Q.   -- for those credit cards?

20               A.   Correct.

21               Q.   That is, the credit cards to the

22     other shareholders, either Rypl credit card or

23     Firefly credit card, and Dave's personal American

24     Express were treated the same?

25               A.   They were all paid.

Antonio Severin                                May 16, 2025

Page 324

1            Q.    They were all paid?

2            A.    Correct.

3            Q.    All right.  Going to the -- oh,

4    I'm sorry, this is the second page.

5            A.    Okay.

6            Q.    The second page of Defendant's 30.

7    Does he say:

8                  "In was talking to Dave about

9            the $200K payment from Lloydsville"?

10                 And then you say:

11                 "Also in terms of the other

12           $200K loan that came directly from

13           Firefly, Dave confirms that this

14           will be deducted from the 'extra

15           dividend' although we are not sure

16           when this will happen."

17           Do you see that?

18           A.    I'm not sure which page.  This

19    particular page?

20           Q.    It should say on the bottom, 002.

21           A.    Yes, okay.

22           Q.    Okay.  Do you see the line in the

23    middle of the page above "Tony":

24                 "[...] the $200K loan that came

25           directly from Firefly, Dave confirms

Antonio Severin                                    May 16, 2025

Page 325

```
 1                        that this will be deducted from the
 2                        'extra dividend' although we are not
 3                        sure when this will happen."
 4              A.   Correct.
 5              Q.   Okay.  And in the period of time
 6      2018, the dividends had not been issued through a
 7      resolution by Firefly, correct?
 8              A.   Correct.
 9              Q.   So the extra dividend was
10      something that would be received in the future,
11      that was the hope?
12              A.   Again, that was the plan, yes.
13              Q.   Yeah.  At the bottom of the page,
14      does it say: "per DE," Dave Erickson, the extra
15      dividend is expected soon now that the banking is
16      squared up?
17              A.   That's the response from Toine,
18      yes.
19              Q.   Yes.  But dividends, in fact, were
20      not issued in 2018?
21              A.   There was no dividends in 2018.
22              Q.   Okay.  There was a hope that
23      dividends would be declared?
24              A.   There was a plan for dividends to
25      be declared at some point, yes.
```

Page 326

1            Q.    All right.  I mean, there was

2     always a plan that eventually the dividends would

3     be issued and the dividends would clear up the

4     loans?

5            A.    That was the objective, yes.

6            Q.    Right.  That was the objective?

7            A.    Yes.

8            Q.    And that was always the objection

9     (verbatim) during the period of time 2013 to 2019?

10           A.    That was my understanding.

11           EXHIBIT NO. D-32:  E-Mail Chain from

12           D. Erickson to T. Severin dated May 29,

13           2014, Re: Partner Payments

14           (USAProd00544934).

15     BY MR. MAUZY:

16           Q.    I'm going to show you what's been

17     marked as Defendant's Exhibit 32.  This is an

18     e-mail chain, starts, if you look on the back page,

19     an e-mail from you.

20           A.    Uhm-hmm.

21           Q.    You say, "Hi Dave, I went..."  Do

22     you recognize this as an accurate copy of e-mails

23     that you would have received?

24           A.    Yes.

25           Q.    And the e-mail May 28th, 2014:

Antonio Severin                                    May 16, 2025

Page 327

 1                    "Hi Dave,

 2                    [...] went through the [...]

 3              numbers and pulled out expenses that

 4              I could easily identify as payments

 5              for (or to) partners.  They total

 6              $384K."

 7         A.   Yes.

 8         Q.   And Dave says:

 9                    "I think there are a number of

10              these that are not 'Partner

11              Payments' per se."

12              You could be missing some numbers for

13      partners who are not paid via reimbursements, need

14      to allocate for health benefits, office space,

15      utilities, etcetera.  And those could be hidden

16      costs, correct?

17         A.   Correct.

18         Q.   And you tell Dave:

19                    "Since the partner payments and

20              reimbursements are in multiple

21              accounts, [you] wanted to identify

22              lines in the expense categories that

23              were going to partners [...]"

24         A.   Uhm-hmm.

25         Q.   And Dave says:

Antonio Severin                                      May 16, 2025

Page 328

1                    "Let's talk about this.  I have

2              had many discussions over the years

3              about 'normalizing' the expenses.

4              They tend to be political and have

5              no useful application that I have

6              ever seen, unless one is planning on

7              selling the business and wants to up

8              the bottom line."

9              Does he tell you --

10                   "I can tell you after partner

11             meetings we have had that there is

12             no impetus for cutting partner

13             compensation and as such, these

14             'partner payments' are indeed

15             payroll costs and not distributions

16             of profit."

17             Correct?

18             A.    Correct.

19             Q.    So all of the money that went to

20      the shareholders were listed and recorded as

21      advances; isn't that true?

22             A.    Well, this is an e-mail from 2014.

23             Q.    Yeah.

24             A.    So I don't know if that's exactly

25      the case.  Again, there we were using -- we were on

Page 329

1    the old accounting system, so information was a

2    little hard to put together.

3              Q.   Yeah.

4              A.   So I really can't --

5              Q.   This was --

6              A.   -- speak much more to it.

7              Q.   Okay.  This was early on in your

8    tenure?

9              A.   Yes, I was new here.

10             [Reporter intervenes for clarification

11   purposes]

12             THE WITNESS:  I was new.

13   BY MR. MAUZY:

14             Q.   Let's go to the period of time

15   2013-2019.  The payments that the shareholders

16   received were advances?

17             A.   The -- quote-unquote, the advance

18   on payment program, or advance on dividend program,

19   started, I believe, was April of 2014, around this

20   time.

21             Q.   Yeah.

22             A.   Where it was kind of formalized,

23   this would be an amount that the shareholders would

24   get every month.

25             Q.   Even the 2013, they were recorded

Antonio Severin                                    May 16, 2025

Page 330

1    as advances?

2                 A.   That I don't know.  That -- There

3    was -- a portion of something -- like that 10,000

4    was --

5                 Q.   Yeah?

6                 A.   I don't know -- I don't know all

7    the payments --

8                 Q.   All right.

9                 A.   -- going back that far.

10                Q.   But the payments to David Erickson

11   were always loans or advances during that period of

12   time, 2013 to 2019?

13                A.   Okay.  Going back to 2013, he did

14   receive consulting payments.

15                Q.   Yeah.

16                A.   Halstead Bay did get consulting

17   payments.

18                Q.   All right.

19                A.   And obviously Amex payments.

20                Q.   Right.  So, in addition to

21   consulting payments and Amex payments, the money

22   that he received were advances?

23                A.   Correct.

24                EXHIBIT NO. D-33:  E-Mail from T. Severin

25                to D. Erickson dated March 29, 2016,

 1                    Re: Feb-16 (USAProd-00259268).

 2       BY MR. MAUZY:

 3                    Q.    Okay.   I'm handing you Defendant's

 4       Exhibit 33, and ask you if you recognize that as an

 5       e-mail that you sent to Dave Erickson March 29th,

 6       2016.

 7                    A.    Yes.

 8                    Q.    All right.   This is an automatic

 9       copy of that e-mail?

10                    A.    Uhm-hmm.

11                    Q.    And you said:

12                         "Hi Dave, I misspoke this

13                         morning" about "273K before your

14                         expenses."

15                    And in terms of expenses:   Van der Poel

16       had a house rental of 84,000; there was a Halstead

17       loan of 25,000; Toine, 16,000; and Dave's Amex

18       typically 50 percent expensed.

19                    And when you said -- is that correct?

20                    A.    Correct.

21                    Q.    None of these were payments made

22       to those companies --

23                    A.    Correct.

24                    Q.    -- or individuals?

25                    And you also say the dividends are

Antonio Severin                                    May 16, 2025

Page 332

1    about 80,000 a month.

2                  A lot of times, when people refer to

3    dividends -- and this is 2016 -- they aren't

4    actually dividends in the sense of a resolution

5    being passed by the Board authorizing a dividend to

6    be paid?

7                  MS. SCOTT:  Objection.  Lack of

8    foundation, improper opinion, calls for

9    speculation, vague.

10                  THE WITNESS:  That is correct.

11   BY MR. MAUZY:

12                  Q.   That's correct?

13                  A.   Yes.

14                  Q.   Okay.  The reference to dividends

15   here is really advances?

16                  A.   Correct.

17                  EXHIBIT NO. D-34:  E-Mail from T.

18                  Severin to D. Erickson dated March 23,

19                  2016 Re: Amex (USAFilterProd-00001070).

20   BY MR. MAUZY:

21                  Q.   I'm going to hand you Defense

22   Exhibit 34, and ask you if this -- you recognize

23   this as an e-mail March 23rd, 2016, from you to

24   Dave Erickson, subject "Amex"?

25                  A.   Yes.

Antonio Severin                                              May 16, 2025

                                                        Page 333

1                    Q.   And you give him the cash -- you

2       recognize this as an authentic copy of an e-mail

3       you would have received?

4                    A.   I do.

5                    Q.   And you said you were going back

6       to book $2,876.33 as interest on Chad's shareholder

7       loan --

8                    A.   Correct.

9                    Q.   -- per your spreadsheet.

10                   And you say he does have personal

11      items?

12                   A.   Correct.

13                   Q.   And he also asks you to send the

14      general ledger breakdown of last month's Amex?  At

15      the bottom of the page.

16                   A.   I'm asking Dave, yes.

17                   Q.   To send the breakdown of last

18      month's Amex, right?

19                   A.   Correct.

20                   Q.   Okay.  All right.  So, you kept

21      track of Chad Moldon's expenses and loans?

22                   A.   Not the loans.  I would provide

23      Dave a listing of his personal expenses that Dave

24      would, in turn -- I guess he had a -- he had a

25      spreadsheet document stating those loans, and then

Antonio Severin                                        May 16, 2025

Page 334

1     he would send me back an amount of interest,

2     basically saying, "Okay, the company owes Chad

3     Moldon, Firefly owes Chad Moldon, money, and we

4     will -- you know, we want to expense some interest

5     based on the loan that Chad has with the company."

6                    Q.   Okay.  What company did they have

7     the loan on?

8                    A.   I assume Firefly.

9                    Q.   Okay.

10                   A.   It wasn't -- this particular one

11    wasn't really on the books.  Mr. Erickson had this

12    in the spreadsheet somewhere.

13                   Q.   Okay.  So this wasn't an official

14    loan from Firefly?

15                   A.   No.

16                   Q.   It was a different type of loan?

17                   A.   I believe it was some amounts that

18    were owing to Mr. Moldon pre him becoming a

19    shareholder.

20                   EXHIBIT NO. D-35:  E-Mail from T.

21                   Severin to D. Erickson dated November

22                   15, 2017, Re: FW: Cash Balance at end

23                   of October (USAFilterProd-00001102).

24    BY MR. MAUZY:

25                   Q.   Okay.  All right.  Let's look at

Antonio Severin                                                  May 16, 2025

                                                        Page 335

1        -- I'm going to hand you Defendant's Exhibit 35.

2                    A.    (Witness reviews document).

3                    Q.    This is -- you recognize this as

4        an e-mail from you to Dave Erickson, November 15th,

5        2017?

6                    A.    Yes.

7                    Q.    And he would have received this

8        e-mail?

9                    A.    Yes.

10                   Q.    At the bottom of the page, you say

11       cash -- you give him the cash balance, it was over

12       5 million.  "No shareholder activity for Chad."

13       And "please provide coding for the Amex payment"?

14                   A.    Correct.

15                   Q.    Okay.  So you were keeping close

16       track of all of these expenses, were you not?

17                   A.    Well, we needed to close the

18       books, so, yeah, it was about making sure that all

19       the entries were in the books.

20                   Q.    And that was part of your job, to

21       keep track of all those?

22                   A.    Correct, yes.

23                   EXHIBIT NO. D-36:  E-Mail from T.

24                   Severin to D. Erickson dated September

25                   23, 2016, Re: Accounting

```
 1                 (USAFilterProd-00001035).

 2      BY MR. MAUZY:

 3                 Q.   All right.  I'm showing you

 4      Defendant's Exhibit 36.  Do you recognize this as

 5      an e-mail chain, you, Dave Erickson and Paul

 6      Eidsness?

 7                 A.   Yes.

 8                 Q.   And you were keeping track of Paul

 9      Eidsness, he was a shareholder?

10                 A.   Correct.

11                 Q.   You're keeping track of payments

12      to him?

13                 A.   Yes.

14                 Q.   And you say:  The shareholder

15      payments you show are as follows, and you list

16      several beneath that, correct?

17                 A.   Yes.  Mr. Erickson had asked me

18      for a copy of Paul's ledger accounts.  Some of

19      these -- these were amounts paid to Mr. Eidsness,

20      some of them before he became a shareholder.  And I

21      don't have the -- some parts, there's some missing

22      here.

23                 Q.   Okay.  But Paul Eidsness did

24      become a shareholder?

25                 A.   He did, yes.
```

Antonio Severin                                          May 16, 2025

Page 337

1              Q.   Yes.  And he received advances as

2     a shareholder?

3              A.   He -- I don't believe he ever

4     received an advance on -- on dividend.  He was one

5     of the people that did not, one of the shareholders

6     who did not receive those.

7              Q.   Okay.  But did he get loans, then?

8              A.   He received -- he would be paid a

9     consulting fee, and he did take a loan.  If I

10     remember correctly, it was $200,000, a one-time

11     loan.

12              Q.   And that was booked as a loan?

13              A.   Correct.

14              Q.   And Firefly's money?

15              A.   That was Firefly's money, correct.

16              Q.   Okay.  39 -- do you recognize this

17     as -- I'm sorry, 37, Defendant's Exhibit 37.

18              A.   37.

19              Q.   From Dave Erickson to Amanda,

20     copying you, relating to Toine's cash advances?

21              A.   Correct, from the corporate card.

22              Q.   You recognize this as authentic,

23     an e-mail you would have received at the time?

24              A.   Yes.

25              Q.   And does it say that:

Antonio Severin                                        May 16, 2025

Page 338

1                    "Toine -- that's Toine
2              Rodenburg -- "making investment in
3              Spain by taking cash advances from a
4              corporate card."
5         A.   Correct.
6         Q.   And does he say:
7                    "[...] please code them to his
8              partner loan account and pay it back
9              from his dividends from April
10             through December of this year."
11        A.   Yes.
12        Q.   But no dividends were issued in
13   2016, correct?
14        A.   Correct.  These would have been
15   deducted from the advances that were paid during
16   that year.
17        Q.   And Toine Rodenburg was a
18   shareholder?
19        A.   Correct.
20        Q.   He took cash advances?
21        A.   He took cash advances on his
22   corporate card, correct.
23        Q.   And you recorded those as
24   advances?
25        A.   Correct.

Antonio Severin                                    May 16, 2025

                                        Page 339

1              Q.   And the money came from Firefly?

2              A.   Correct.

3              EXHIBIT NO. D-40:  E-Mail from T.

4              Severin to G. Elias, et al, dated

5              September 24, 2018, Re: Surecom/Firefly

6              advances/dividends and accounting.

7    BY MR. MAUZY:

8              Q.   I'm handing you Defendant's

9    Exhibit 40.  Do you recognize this as an e-mail

10   from you to Gregory Elias, copying Eidsness Law

11   Offices?

12             A.   Yes.

13             Q.   And this is in 2018?

14             A.   Yes.

15             Q.   And you say:

16             "[...] we wanted to stop doing

17             the advances and start doing

18             Dividends.  This would require

19             proper board resolutions from both

20             Surecom and Firefly.  Is that

21             possible?"

22             A.   Yes.

23             Q.   But Board resolutions did not

24   issue in 2018?

25             A.   Correct.

Antonio Severin                                    May 16, 2025

                                              Page 340

1                    Q.   There was a general desire to stop
2         doing advances and start using dividends in 2018?
3                    A.   Correct.
4                    Q.   But it didn't happen?
5                    A.   It did not -- the advances on
6         dividend program continued to the end of 2019.
7                    Q.   So no dividends were issued after
8         a Board resolution in 2018?
9                    A.   Correct.
10                   EXHIBIT NO. D-41:  E-mail from T.
11                   Severin to D. Erickson dated February
12                   13, 2017, Re: Cash position at end of
13                   Jan-17 (USAProd-00263403).
14        BY MR. MAUZY:
15                   Q.   I show you Defendant's Exhibit 41,
16        ask you if you recognize this as an e-mail from you
17        to Dave Erickson, February 13th, 2017, regarding
18        cash position at the end of January '17.
19                   A.   Yes.
20                   Q.   Do you recognize that as an
21        authentic e-mail that you would have received?
22                   A.   It is.
23                   Q.   And you say:
24                        "[...] my understanding is that
25                        you have only four actual payments

Antonio Severin                                    May 16, 2025

Page 341

1                    (of which 2 are for Richard)."

2                    And then you give a list of Surecom

3       dividends?

4                    A.    Correct.

5                    Q.    And under "Bannister," you have

6       "Firefly," 468,418, and it says, "Apply to Loan"?

7                    A.    Yes.   This is a copy of Dave

8       Erickson's spreadsheet.

9                    Q.    Yeah.

10                   A.    And that's what he puts beside

11      that figure.

12                   Q.    Right.   And he makes the same then

13      for Lloydsville and the others on that sheet?

14                   A.    Correct.

15                   Q.    He -- it's his spreadsheet he

16      provides with you, and he's keeping track on behalf

17      of all the shareholders, correct?

18                   A.    He's keeping track of all the

19      shareholders, correct.

20                   Q.    And although it uses the term

21      "dividend," you would agree that in 2017, no

22      dividends authorized by resolution had been paid?

23                   A.    There is no -- yes, there is no

24      dividend for that year.

25                   Q.    We're going to put a couple up on

Page 342

1    the board.  Thank you for your patience with me.

2    These go much smoother if there are meetings ahead

3    of time with the witness.

4              MS. SCOTT:  Permission to strike,

5    improper statement.

6    BY MR. MAUZY:

7              Q.   Let's look at Government

8    Exhibit 40.  I think this was discussed yesterday.

9              There's a discussion of dividends in

10   this e-mail.  But when they use the term

11   "dividends," they're really discussing the dividend

12   advance; isn't that correct?

13             A.   Correct.

14             Q.   Look at 42.  First let's go to 41.

15             MS. SCOTT:  I'll note for the record

16   the government did not introduce Government

17   Exhibit 40 on the record yesterday.

18             MR. MAUZY:  All right.  Well, we would

19   move to admit Government 40.

20             MS. SCOTT:  No objection.

21             EXHIBIT NO. G-40:  E-mail from T.

22             Severin to D. Erickson dated August 8,

23             2017, Re: August dividend.

24   BY MR. MAUZY:

25             Q.   I'm showing you Government

Antonio Severin                                    May 16, 2025

                                              Page 343

1     Exhibit 41.

2               MR. MAUZY:  Has this been admitted?

3     I'm going to move to admit Government 41.  This is

4     an e-mail from David van der Poel to Tony Severin,

5     regarding dividends.

6               EXHIBIT NO. G-41:  E-mail from D.

7               Erickson to T. Severin dated September

8               12, 2017, Re: Cash Balance as of

9               Aug-17, Amex and Chad's SH.

10    BY MR. MAUZY:

11              Q.   Do you recognize this?

12              A.   I do.  Is this regarding

13    dividends, you're saying?

14              Q.   Okay.  Cash balance as of August

15    17th, Amex and Chad, shareholder.  It says:

16    "Thanks Dave."  There's a reference to "a small

17    amount of the dividends were accrued" and "yes, we

18    paid close to $1 million in dividends in August."

19              Do you see that?

20              A.   Yes.

21              Q.   And when you refer to "dividends,"

22    you're actually meaning advances; is that -- is

23    that correct?

24              A.   Correct.  These were coded as

25    advances.

Antonio Severin                                    May 16, 2025

                                              Page 344

1                    Q.   Okay.  On the books of Rypl and

2         Firefly, these were advances?

3                    A.   Correct.

4                    Q.   Okay.  In 2017, no dividends

5         authorized by resolution had, in fact, been passed,

6         correct?

7                    A.   Correct.

8                    Q.   Government 42.  I believe this has

9         been admitted.  If I'm incorrect, please correct

10        me.

11                   MS. SCOTT:  Correct.

12        BY MR. MAUZY:

13                   Q.   42, again, they're discussing --

14        there's a use of the term "dividends," "great to

15        declare the dividend," "next board meeting."

16                   And Dave Erickson says a "shareholder

17        agreement allows for Advances."

18                   And you say -- sounds like jokingly:

19                        "Don't say that."  I "need to

20                        produce all the shareholder

21                        agreements to the bank."

22                   MS. SCOTT:  Objection, improper

23        characterization.

24        BY MR. MAUZY:

25                   Q.   Does the first line of this

Antonio Severin                                          May 16, 2025

Page 345

1     exhibit say:

2                    "Then I would need to produce

3                all the shareholder agreements to

4                the bank."?

5                A.   It does.

6                Q.   Did I read that correctly?

7                A.   Yes.

8                Q.   Do you recognize this as an

9     authentic e-mail that you would have received?

10               A.   Yes.

11               Q.   And even though there's a

12    discussion of dividends in this e-mail, there were

13    no dividends issued?

14               A.   These were advances.

15               Q.   Yes.  And you were aware that

16    there was a shareholder agreement among the

17    shareholders?

18               MS. SCOTT:  Objection, lack of

19    foundation.

20               THE WITNESS:  No, I wasn't --  wasn't

21    saying that there was a shareholder agreement.  I

22    had not seen any shareholder agreement.

23    BY MR. MAUZY:

24               Q.   Right.

25               A.   What I'm insinuate -- what I'm

Antonio Severin                                    May 16, 2025

                                        Page 346

1    saying here is that, if you're going to call these

2    "advances," the bank is going to want to see the

3    shareholder agreement, you know, so it's...

4                    Q.   But that might cause issues?

5                    A.   Yeah, it would.

6                    Q.   Okay.

7                    A.   You got to send the shareholder

8    agreement, and I've never seen one, so I don't

9    know.

10                   Q.   All right.

11                   A.   It would cause an issue if we

12   didn't send it to them.

13                   Q.   All right.  Defendant 42.  In the

14   last exhibit, Dave Erickson refers to a shareholder

15   agreement, right?

16                   A.   He does.

17                   Q.   And he says the shareholder

18   agreement allows advances?

19                   A.   Correct.

20                   EXHIBIT NO. D-42:  E-mail from T.

21                   Severin to D. Erickson dated October

22                   22, 2018, Re: Last wire.

23   BY MR. MAUZY:

24                   Q.   I'm showing you Defendant's

25   Exhibit 42.  And this references a Lisbon meeting?

Antonio Severin                                        May 16, 2025

                                            Page 347

1              A.    Uhm-hmm.

2              Q.    Do you recognize this as an e-mail

3     you would have received from David van der Poel?

4              A.    Yes.

5              Q.    It's an authentic copy of an

6     e-mail that you would have received?

7              A.    Yes.

8              Q.    And they're discussing things they

9     agreed on at a Lisbon meeting?

10             A.    Yes.

11             Q.    "Dave will set out plan for

12                   advance payments and adjust the

13                   budget [...]

14             A.    Yes.

15             Q.    And they agreed that Dave will

16    create a plan for advance payments that they all

17    approve?

18             A.    Okay.  Yes.

19             Q.    Would you agree this shows the

20    shareholders were agreeing to continue the advances

21    to themselves?

22             MS. SCOTT:  Objection, calls for

23    speculation.

24             THE WITNESS:  That would be my

25    assumption.

Antonio Severin                                    May 16, 2025

                                              Page 348

1    BY MR. MAUZY:

2             Q.   So let me see if I can summarize

3    this.  The shareholders receive payments in the

4    form of loans, receive regular payments or advances

5    in anticipation of dividends, and receive personal

6    expenses that are paid on credit cards?

7             It's not on the exhibit.

8             A.   Oh, I see.  Okay.

9             Yeah, the shareholders received -- some

10   of them received those monthly advances on

11   dividends.  Other ones -- and then there will be

12   these ad hoc advances and other loans.

13            Q.   Okay.  And you kept track of all

14   these?

15            A.   Correct.

16            MS. SCOTT:  Objection, asked and

17   answered.

18   BY MR. MAUZY:

19            Q.   And they ultimately were all from

20   Firefly funds, correct?

21            MS. SCOTT:  Objection, asked and

22   answered.

23            THE WITNESS:  They would have been

24   ultimately from Firefly, yes.

25

Page 349

1    BY MR. MAUZY:

2              Q.   And they were going to

3    shareholders of Firefly?

4              MS. SCOTT:  Objection, asked and

5    answered, duplicative.

6              THE WITNESS:  That's what the intention

7    was, correct.

8    BY MR. MAUZY:

9              Q.   Okay.  And the intention

10   ultimately was that those advances would be paid by

11   dividends issued by a Board resolution?

12             MS. SCOTT:  Objection, asked and

13   answered.

14             THE WITNESS:  That was the plan.

15             EXHIBIT NO. D-43:  E-mail from D.

16             Erickson to T. Severin dated February

17             27, 2020, Re: Shareholder balances.

18   BY MR. MAUZY:

19             Q.   I'm going to show you Defendant's

20   Exhibit 43.

21             A.   Yes.

22             Q.   Do you recognize that as an

23   e-mail?

24             A.   Yes.

25             Q.   You received that in the regular

Antonio Severin                                              May 16, 2025

                                                        Page 350

1     course of business?

2                    A.    Yes.

3                    Q.    It's from Dave Erickson to you?

4                    A.    Correct.

5                    Q.    This is an automatic copy?

6                    A.    Uhm-hmm.

7                    [Reporter intervened for clarification

8     purposes]

9                    THE WITNESS:  Yes.

10    BY MR. MAUZY:

11                   Q.    Looking at the second page:  Dave

12    had asked --

13                        "David had asked for

14                        shareholder balances now that

15                        effective" January '20, "we are not

16                        doing advances of dividends [...]"

17                   A.    Correct.

18                   Q.    So, by February 2020, there

19    weren't advances of dividends.  And it says:

20                        "(or as Russell refers to them

21                        as Loans)."

22                   MS. SCOTT:  Objection, improper

23    question.

24    BY MR. MAUZY:

25                   Q.    Do you have the exhibit before

Page 351

1    you?  On the second page.

2                    A.    Yes.

3                    Q.    Okay.  And do you say:

4                          "David had asked for

5                    shareholder balances now that

6                    effective..." January 1st, 2020,

7                    we're "...doing advances of

8                    dividends (or as Russell refers to

9                    them as Loans)." [As read]

10                   A.    Yes.

11                   Q.    And at this point, there had not

12   been a resolution as yet authorizing dividends; is

13   that correct?

14                   A.    That is correct.

15                   Q.    So any payments received were

16   either advances or loans?

17                   A.    Or -- or whatever the other

18   categories --

19                   Q.    Yeah.

20                   A.    -- they were talking about.

21                   Q.    Expenses and payment?

22                   A.    Yeah.

23                   EXHIBIT NO. D-45: E-mail from T. Severin

24                   dated July 18, 2022 "Ledgers Reconciliation".

25   BY MR. MAUZY:

Antonio Severin                                    May 16, 2025

                                                   Page 352

1                    Q.    Now look at Defendant's

2       Exhibit 45.  This is an e-mail from you, July 18th,

3       2022.  Subject is, "Ledgers reconciliation"?

4                    A.    Yes.

5                    Q.    And do you recognize this as an

6       e-mail you would have received in July 18th, 2022?

7                    A.    An e-mail that I would have sent?

8                    Q.    Sent, yes.

9                    A.    Yes, on July 18th, 2022.

10                   Q.    It's an e-mail exchange that you

11      were a part of, right?

12                   A.    Yes, with Mr. -- Mr. Eidsness.

13                   Q.    And Eidsness sent it to you, and

14      then you responded to him?

15                   A.    Correct.

16                   Q.    And you say it's the:

17                         "...first draft of the Ledgers

18                         reconciliation for the distributable

19                         income..."?

20                   A.    Correct.

21                   Q.    And you say that the --

22                         "This profit is 35.6 million."

23                   And you want to deduct 9 million to

24      keep in reserve?

25                   A.    Correct.

Antonio Severin                                    May 16, 2025

                                          Page 353

1                    Q.   And then you say:

2                         "That means we should -- we

3                    should have distributed 26.6 million

4                    to the shareholders in dividends

5                    based on the share ownership put in

6                    place in November 2012." [As read]

7                    A.   Correct.

8                    Q.   Correct?

9                    But, in fact, the dividend resolution

10   had not been issued by 2022, correct?

11                   A.   I believe there was a dividend in

12   20 -- at the end of 2021.  I think there was a

13   dividend resolution for 1,869,250.

14                   Q.   Yeah.  But your statement is, "we

15   should have distributed $26.6 million to the

16   shareholders in dividends"?

17                   A.   When -- as part of the ledgers,

18   yes.

19                   Q.   But you did not distribute

20   26.6 million, correct?

21                   A.   What... (Witness reviews

22   document).

23                   MS. SCOTT:  Objection, vague,

24   confusing.

25                   THE WITNESS:  I'm not sure how to

Antonio Severin                                          May 16, 2025

Page 354

 1    answer that.

 2    BY MR. MAUZY:

 3              Q.    All right.  There's a sentence

 4    that says the "profit was 35.6 million"?

 5              A.    Correct.

 6              Q.    You deduct 9 million we keep in

 7    reserve?

 8              A.    Correct.

 9              Q.    "That means we should have" --

10    when you use the term "should have" that means you

11    didn't -- "should have distributed 26.6 million";

12    is that correct?

13              A.    We should have distributed

14    26.6 million.

15              Q.    Yeah, but you did not distribute

16    26.6 million?

17              A.    Well, we did distribute monies, we

18    talk about -- that's the whole conversation about

19    loans and all that.

20              Q.    Yeah.

21              A.    It's obviously not going to be

22    exactly 26.6 million.

23              Q.    Right.

24              A.    But there was -- there is a

25    figure.

Antonio Severin                                    May 16, 2025

Page 355

1              Q.   Right.  But it was not -- when

2       you're referring to dividends, they're not actually

3       dividends?

4              A.   Correct.

5              Q.   Okay.  Okay.

6              A.   My -- I guess my thinking, to

7       expand on that, is that if they were dividends, it

8       would have been 26.6 million we would have

9       distributed.

10             Q.   Yeah.  But they weren't

11      distributed?

12             A.   They were not dividends, no.

13             Q.   Okay.  We're going to go to

14      Government Exhibit 47 that you were asked about it

15      -- 57.  All right.

16             So we have up on the board Government

17      Exhibit 57.  I think you reviewed this yesterday.

18             A.   Yes.

19             Q.   There was an e-mail, and the

20      spreadsheet was attached to it.  This is 45 --

21      well --

22             Did you often make spreadsheets as part

23      of your job at Rypl?

24             A.   Yes.

25             Q.   And was this spreadsheet made in

Antonio Severin                                May 16, 2025

Page 356

1    the ordinary course of business of your job at

2    Rypl?

3                    A.   I wouldn't say "ordinary."  This

4    was requested by David van der Poel and Charlotte

5    as well.

6                    Q.   And this was part of your duties

7    at Rypl?

8                    A.   It was part of my financial

9    duties, to put this together, yes.

10                   Q.   Do you remember making this

11   spreadsheet?

12                   A.   I do.

13                   Q.   Yesterday, Ms. Scott asked you

14   about several loans --

15                   A.   Correct.

16                   Q.   -- in the "Bannister" column?

17                   A.   Correct.

18                   Q.   You pointed out that there were

19   other loans on the spreadsheet?

20                   A.   Correct.

21                   Q.   Do you agree that line 26 shows

22   the total advances and loans received by each

23   shareholder from 2012 to 2019?

24                   A.   Again, this is draft 1.  I can't

25   speak to, like, the actual final numbers.  There

Antonio Severin                                            May 16, 2025

Page 357

 1    were some revisions there.  But that was the idea,

 2    that that line would be the amount, yes.

 3              Q.   This is what you were attempting

 4    to do, was to show the total advances and loans

 5    received by --

 6              A.   Correct.

 7              Q.   -- each shareholder from 2012 to

 8    2019, correct?

 9              A.   Correct.

10              Q.   And it shows that David van der

11    Poel, Lloydsville, owes $5,209,574?

12              A.   It would have shown he took out

13    5,200,000.  The distributable profit for the

14    shareholder would have been line -- I can't see

15    that line, but line -- that line there, yes.  And

16    so that he would have been eligible for an

17    additional 180,000.

18              Q.   Okay.  Did he owe 5,209,000?

19              A.   He had received 5.2 million in

20    advances.

21              Q.   Advances?

22              A.   Those are listed up there.

23              Q.   Yeah.

24              A.   And then -- and then some charges,

25    some Demmingshire, some other ad hoc stuff.

Page 358

```
1              Q.   Okay.  So he received over

2      5 million in advances?

3              A.   Correct.

4              Q.   And David Erickson of Bannister,

5      on your spreadsheet, owes over $7 million?

6              A.   Correct.

7              Q.   And Toine Rodenburg, another

8      shareholder, 10Q21, owes over $6 million?

9              A.   Sorry.  That's the wrong line.  As

10     far as owing -- it would have been paid in

11     advances.

12             Q.   Okay.

13             A.   Yeah.

14             Q.   Advances?

15             A.   Yeah.

16             Q.   Right.  We all get confused about

17     advances.

18             So he received over 6 million in

19     advances?

20             A.   Correct.

21             Q.   And Richard Burry received four

22     and a half million in advances?

23             A.   Correct.

24             Q.   And David van der Poel received

25     over 5 million in advances?
```

Antonio Severin                                      May 16, 2025

Page 359

1            A.    Correct.

2            Q.    And your spreadsheet is really an

3    attempt to see how much everyone had been paid, so

4    that the partners could begin to plan on, if

5    dividends were issued, how to pay back those

6    amounts?

7            A.    The objective really of this would

8    have been to kind of do up like a partnership

9    reporting.

10           Q.    Yeah?

11           A.    I use the example of a legal firm,

12   they're partners, the company made -- the legal

13   firm made X amount, you're going to distribute --

14   distribute Y amount, and then that's, you know, you

15   get 10 percent of that less your draws.  So, you

16   know, there would be an amount owing.  So that's

17   basically the objective of the -- of this

18   particular document.

19           Q.    Okay.  So that all the

20   shareholders would know how much the other

21   shareholders had received?

22           A.    Correct, correct.

23           EXHIBIT NO. D-46:  E-Mail from Paul

24           Eidsness to T. Severin dated March 15,

25           2021.

Antonio Severin                                    May 16, 2025

                                                  Page 360

1    BY MR. MAUZY:

2              Q.   I'm going to show you Exhibit 46,

3    which has three pages to it, from Paul Eidsness to

4    you.  Do you recognize this as an e-mail from Paul

5    Eidsness --

6              A.   Yes.

7              Q.   -- to you, March 15th, 2021?

8              A.   Yes.

9              Q.   And the subject is, "Projected

10   Surecom dividends 2021"?

11             A.   Yes.

12             Q.   And you would have received this

13   in your job at Rypl, correct?

14             A.   Correct.

15             Q.   And this is authentic?

16             A.   Yes.

17             Q.   And you remember receiving this?

18             A.   Yes.

19             Q.   So, at this point in time, had

20   there been a resolution issued in 2021?

21             A.   There was a -- there was a

22   resolution, and I believe it to be at the end of

23   2021.

24             Q.   Does Paul Eidsness say, in

25   paragraph 4 on page 2, that:

Antonio Severin                                                    May 16, 2025

                                                              Page 361

1                    "Before we declare dividends

2               paid to the shareholders of Firefly,

3               we need to have the amount of

4               dividends 'advanced' or 'loaned'

5               before for each shareholder"?  [As

6               read]

7          A.   He does.

8          Q.   Does he say:

9                    "That way we can decide how

10              much of their 'loans' they should

11              repay after they calculate how much

12              of their dividend needs to go to the

13              tax man"?  [As read]

14         A.   Yes.

15         Q.   So the idea here is that dividends

16    would be declared and they, the shareholders, need

17    to know how much they've been advanced or loaned so

18    that they can apply the dividend to the -- those

19    amounts owing?

20              MS. SCOTT:  Objection.  Calls for

21    speculation, compound, improper characterization.

22              THE WITNESS:  Yes, I assume that's what

23    it means.

24    BY MR. MAUZY:

25         Q.   Is that what it means?

Antonio Severin                                    May 16, 2025

Page 362

1                    A.    I assume that's what is meant by

2      that, correct.

3                    Q.    Okay.   And is that something you

4      would need to have in order to pay off loans?

5      You'd need to know the amount of the loans or

6      advances?

7                    A.    Correct.

8                    THE VIDEOGRAPHER:   Excuse me, Counsel.

9      At an appropriate time, could I end this video and

10     start a new one?

11                   MR. MAUZY:   Yes.

12                   THE VIDEOGRAPHER:   Okay.   One moment,

13     please.

14                   This marks the end of media number two

15     of Volume 2.   We are going off the record at

16     12:27 p.m.   Thank you.

17                   -- RECESS TAKEN AT 12:27 P.M. --

18                   -- UPON RESUMING AT 12:38 P.M. --

19                   THE VIDEOGRAPHER:   This is media unit

20     three of Volume 2 of the video recorded deposition

21     of Antonio Severin.   We're back on the record at

22     12:38 p.m.

23                   Go ahead, Counsel.

24                   MR. MAUZY:   Thank you.

25                   EXHIBIT NO. D-47:   E-mail from G. Elias

Antonio Severin                                         May 16, 2025

Page 363

1              to T. Severin, et al, dated August 10,

2              2023, Re: Firefly Lan Corporation

3              Resolution 8/10/2023.

4    BY MR. MAUZY:

5              Q.   I'm handing you Defendant's

6    Exhibit 47, marked for identification.  There's two

7    or three e-mails.  One's from you to Paul Eidsness,

8    and one is from Paul Eidsness to you, and one is

9    from Greg Elias to you and Paul Eidsness and the

10   shareholders.

11             Do you recognize this?

12             A.   Yes.

13             Q.   Okay.  This is an e-mail from

14   Gregory Elias, and you recognize his e-mail

15   address?

16             A.   Yes.

17             Q.   You recognize your e-mail address?

18             A.   Yes.

19             Q.   Paul Eidsness' e-mail address?

20             A.   Yes.

21             Q.   And c.c., you recognize the e-mail

22   addresses of all of the shareholders, as well as

23   Charlotte Janssen, Counsel?

24             A.   Correct, yes.

25             Q.   Okay.  And this is an authentic

Antonio Severin                                          May 16, 2025

Page 364

1      copy of an e-mail that you would have received back

2      in August 2023, correct?

3                  A.    Correct.

4                  Q.    I'm going to start by looking at

5      the bottom of this exhibit, which says, "Good

6      morning Mr. Elias."  This is from Paul Eidsness.

7      Does he say he's attaching a draft resolution of

8      the director of Firefly Lane for his execution?

9                  A.    Yes.

10                 Q.    And that:

11                       "This Resolution is for the

12                       payment of a dividend in the amount

13                       of 8M dollars to Firefly's

14                       shareholders"?

15                 A.    Yes.

16                 Q.    And does he say that:

17                       "[...] the Resolution is tied

18                       to the prior resolution from

19                       December 15, 2021 which acknowledged

20                       the numerous outstanding loans that

21                       had been provided to the

22                       shareholders over the course of

23                       several years when Firefly was not

24                       yet positioned to pay dividends"?

25                 A.    Yes.

Antonio Severin                                    May 16, 2025

Page 365

1                    Q.   And we have looked at that

2       12/15/21 resolution earlier, correct?

3                    A.   I believe so.  I don't remember

4       that one specifically but...  I believe that one

5       referred to the 2022 dividend.

6                    Q.   Okay.  And he goes on to say:

7                    "You may recall that many of

8                    these loans were loosely referred to

9                    as the 'dividend advance

10                   program'..."

11                   Do you remember that?

12                   A.   Yes.

13                   Q.   "...and consisted of regular

14                   payments to some of the

15                   shareholders."

16                   A.   Correct.

17                   Q.   Was that true?

18                   A.   As we've discussed, yes, that's

19      true.

20                   Q.   And it states:

21                   "Other shareholders were

22                   borrowing money ad hoc during the

23                   same period to help them with home

24                   purchases, marital dissolutions and

25                   the like."

Antonio Severin                                    May 16, 2025

Page 366

1              A.   Correct.

2              Q.   And was that true?

3              A.   That is true.

4              Q.   And:

5                   "Pursuant to the 12/15/21

6              Resolution acknowledging the need to

7              repay these loans, and in

8              conjunction with the fact the

9              company had begun to pay dividends,

10             we are making this present

11             Resolution with the

12             understanding..." that the

13             shareholders "...with outstanding

14             loans will use the process -- the

15             proceeds of this dividend to pay

16             down their loan balances." [As read]

17             A.   Correct.

18             Q.   Is that true?

19             A.   That is true.

20             Q.   "While the loan balances will

21             not be fully extinguished in most

22             cases," it's "a very good start."

23             Is that correct?

24             A.   Correct.

25             Q.   And you were able to reconstruct

Antonio Severin                                    May 16, 2025

Page 367

1    how much each shareholder owed, either in the form

2    of advances or loans, correct?

3                    A.   Yes.

4                    Q.   You had that information?

5                    A.   I had it, yes.

6                    Q.   You kept that information at the

7    time?

8                    A.   We had worked on it, and had

9    finalized it, correct.

10                   MR. MAUZY:  I need a moment, sorry.

11                   EXHIBIT NO. D-49:  E-Mail from T.

12                   Severin to B. Granity, et al, dated

13                   June 22, 2023, Re: RE: Dave Erickson

14                   due To/From Balances and Dividends

15                   received June 21, 2023.

16   BY MR. MAUZY:

17                   Q.   I'm going to show you Defendant's

18   Exhibit 49, and ask if you recognize this as an

19   e-mail from Dave Erickson to you and others.

20                   MS. SCOTT:  Objection, mischaracterizes

21   exhibit.

22   BY MR. MAUZY:

23                   Q.   Well, is Exhibit D-49 from Brian

24   Hanlon --

25                   A.   Yes.

Antonio Severin                                    May 16, 2025

Page 368

1              Q.   -- to you --

2              A.   Yes.

3              Q.   -- saying, "Hi Tony"?

4              A.   Yes.

5              Q.   And then you send an e-mail to

6     him, to Brian Granity?

7              A.   Correct.

8              Q.   And others at United International

9     Trust, right?

10             A.   Correct.

11             Q.   All right.  Let's look at -- Brian

12    Hanlon is the director at Granity?

13             A.   Correct.

14             Q.   And he says:

15                  "This is the first attempt at

16                  reporting trying to get agreements

17                  on Partner Balances.  We will start

18                  with Dave Erickson to begin with, I

19                  have broken out the transactions by

20                  year.  As you can see there are a

21                  large amount of transactions and

22                  many are inadequately documented."

23             A.   Correct.

24             Q.   And you respond:

25                  "There is a lot to go through."

Antonio Severin                                    May 16, 2025

Page 369

1                    A.    Correct.

2                    Q.    So every effort was being made to

3        account for the loans that were made to David

4        Erickson, correct?

5                    A.    Correct.

6                    Q.    The intention was to make sure

7        that all of the payments that had gone to him

8        would, in fact, be paid off?

9                    MS. SCOTT:    Objection, calls for

10       speculation, improper conclusion.

11                   THE WITNESS:    Yeah.    I mean, there was

12       obviously an interest to make sure that the

13       balances were correct.

14       BY MR. MAUZY:

15                   Q.    Yeah.    And to make sure that they

16       were correct was to make sure that all of the loans

17       and advances would be paid off with dividends?

18                   A.    And we were -- eventually paid

19       them off, yes.

20                   Q.    Yes.    And, in fact, that was the

21       plan from the very start, as you understood it:

22       People would receive loans, would receive advances,

23       would receive payment of expenses; all of those

24       would be tracked, and ultimately dividends would be

25       issued and those dividends would be utilized to pay

Antonio Severin                                    May 16, 2025

Page 370

1    back the loans?

2                 A.   Yes.  That's -- that's why it was

3    referred to as "advances on dividends."  The

4    objective of the -- the plan was to have them

5    offset by declared dividends.

6                 Q.   All right.  I'm going to put up --

7    you were asked about Government Exhibit 26.  And

8    this is an exhibit about David Erickson reducing

9    his ownership in Rypl?

10                A.   Yes.  I asked him to -- that we

11   should talk about this.

12                Q.   Correct.  And this was your idea,

13   right?

14                A.   Yes.

15                Q.   And David's shares in Rypl were

16   preferred shares, correct?

17                A.   I believe they were, yeah.  I

18   can't remember.

19                Q.   Let me show you Government 55.

20                Okay.  This is page 22 of Government

21   55.  Does it reference common shares?

22                A.   Yes.

23                Q.   And preferred shares?

24                A.   Yes.

25                Q.   Did David Erickson own 50 percent

Antonio Severin                                      May 16, 2025

                                                    Page 371

1      of the preferred shares?

2                    A.    Yes.

3                    Q.    Which would be 25 percent of all

4      of the shares?

5                    A.    Correct.

6                    Q.    And the suggestion -- your

7      suggestion was to reduce that amount to under

8      25 percent?

9                    A.    Correct.

10                   Q.    And the reason he got preferred

11     shares in the first place was because of some

12     immigration issues, because he was coming to Canada

13     so often?

14                   MS. SCOTT:  Objection, calls for

15     speculation.

16                   THE WITNESS:  That's my understanding.

17     BY MR. MAUZY:

18                   Q.    And what is the difference between

19     preferred shares and common shares?

20                   A.    Typically, common shares are

21     voting shares, and pref shares, preferred shares,

22     are more like a debt, but they're not -- nonvoting.

23                   So in this situation, Chad Moldon owns

24     -- is the holder of 100 percent of the voting

25     shares of Rypl.

Antonio Severin                                          May 16, 2025

                                                    Page 372

1                 Q.   And, generally, preferred
2      shareholders do not get dividends, right?
3                 A.   They can.
4                 Q.   Yeah?
5                 A.   Yeah.
6                 Q.   Did David Erickson get dividends
7      ever from Rypl?
8                 A.   From Rypl, there's never been any
9      dividends issued from Rypl.
10                Q.   Nobody has ever received a
11     dividends from Rypl?
12                A.   Nobody has ever received a
13     dividend from Rypl.
14                Q.   And David Erickson did not receive
15     a dividend from Firefly and its entities until
16     Board resolutions were passed authorizing the
17     issuance of dividends?
18                MS. SCOTT:  Objection, asked and
19     answered.
20                THE WITNESS:  So Bannister did not.
21     BY MR. MAUZY:
22                Q.   Bannister?
23                A.   Yeah, did not receive dividends
24     until I think the resolution of late 2021, if I
25     remember the date of that one.

Antonio Severin                                        May 16, 2025

                                              Page 373

1                    MR. MAUZY:  I have no other questions.

2                    MS. SCOTT:  Before the government seeks

3      a redirect, it is my understanding that counsel for

4      Mr. Severin would like to make a statement on the

5      record.

6                    MR. GINTER:  That's correct.  We heard

7      today about some documents in e-mail form that had

8      Ms. Janssen either attached or part of that e-mail.

9      Ms. Janssen has put on the record that she is the

10     counsel for Rypl.

11                   It is our position that Ms. Janssen has

12     not waived any sort of privilege with respect to

13     the e-mails that she was involved in in her role as

14     counsel for Rypl.

15                   I believe there was two e-mails that we

16     saw with Ms. Janssen on -- on them, and that it is

17     our position with respect to Ms. Janssen, that

18     those e-mails are privileged communication between

19     her as her position as counsel for Rypl.

20                   We did hear about some e-mails as well

21     regarding Paul Eidsness.  I understand that

22     Mr. Eidsness had a dual function possibly, but

23     Mr. Severin described Mr. Eidsness, I believe

24     multiple times, as "the attorney," and we are --

25     it's our position that we're not waiving any

Antonio Severin                                              May 16, 2025

Page 374

1     privilege with respect to Mr. Eidsness and any work

2     he did as counsel in this matter.

3                    So we wanted to put that on the record

4     as well.

5                    MS. SCOTT:  Thank you, Mr. Ginter.

6                    Mr. Mauzy, Mr. Dooling, I have about

7     ten minutes of questions.  I would respectfully

8     like to sit in front of the witness.  If you like,

9     we can take a moment to switch seats.

10                   Mr. Court Reporter, may we please go

11    off the record briefly?  Thank you.

12                   THE VIDEOGRAPHER:  Yes, one moment,

13    please.

14                   Going off the record at 12:53 p.m.

15    Thank you.

16                   -- RECESS TAKEN AT 12:53 P.M. --

17                   -- UPON RESUMING AT 12:58 P.M. --

18                   THE VIDEOGRAPHER:  We are back on the

19    record at 12:58 p.m.  Go ahead, Counsel.

20                   MS. SCOTT:  Before the government

21    begins its redirect examination, Mr. Mauzy would

22    like to make a statement.

23                   MR. MAUZY:  Our recollection is that

24    there are numerous e-mails in discovery that

25    reference Charlotte Janssen.  No objection was made

Antonio Severin                                    May 16, 2025

Page 375

1    to the disclosure of any of those documents.

2           Secondly, Mr. Erickson was a preferred

3    shareholder and can certainly waive the privilege.

4    The documents were distributed to people outside of

5    the privileged context and no assertion has been

6    made before today.  No assertion was made before

7    the examination.

8           MS. SCOTT:  The government would also

9    like to put on the record to clarify the matter of

10   discovery.  As defense counsel is well aware from

11   numerous discovery productions made by the United

12   States Government, the United States Government

13   received e-mails pursuant to an electronic search

14   warrant executed on the e-mail account

15   dave@halsteadbayholdings.com.  The government then

16   applied a series of keyword searches to identify

17   both responsive e-mails to the search warrant, as

18   well as privileged e-mails to the search warrant.

19          It is the government's position here to

20   put on the record that Ms. Janssen's name and

21   Mr. Eidsness's name were included as potentially

22   privileged keywords.  All such records hitting on

23   those keywords were segregated from the

24   government's access.

25          In order to comply with the

Page 376

1    government's discovery production, the government

2    produced the entire universe of records obtained

3    from that search warrant, including records that

4    had been deemed both non-responsive and potentially

5    e-mailed to the defense under Rule 16, as

6    containing Defendant's statements, and potentially

7    other rules of discovery.

8              The government will note on the record

9    today that, in particular, Defense Exhibit 38 and

10   39 were first received by the government yesterday.

11   It is the government's understanding that counsel

12   for -- that neither counsel for Rypl, nor counsel

13   for Mr. Severin, had reviewed either such e-mail

14   until today.

15             Are we ready to proceed with redirect

16   examination?

17             REDIRECT EXAMINATION BY MS. SCOTT:

18        Q.   Hi, Mr. Severin, how are you?

19        A.   Very good.

20        Q.   I briefly have some questions for

21   you that came up on your cross-examination with

22   Mr. Mauzy.

23             I am going to show you what's been --

24   what was shown to you as Defense Exhibit 18.  Do

25   you recall reviewing this e-mail with Mr. Mauzy?

Antonio Severin                                    May 16, 2025

Page 377

1              A.   Yes.

2              Q.   I would just like to direct your

3      attention to the highlighted portion, which is the

4      last full sentence above your name.

5              This reads:

6                   "So on the advance, can I get

7                   Paul E. to do some paperwork for the

8                   advance.  Term, interest rate,

9                   etc??"

10             Were you asking Mr. Erickson, the

11     Defendant, for documentation regarding a payment

12     request that he had sent you?

13             A.   Yes.

14             Q.   Can you please describe what sort

15     of paperwork you were hoping to receive in

16     response?

17             A.   Hopefully receive a loan document

18     that would list the repayment terms, basically, and

19     the interest rate.

20             Q.   And did you ever receive such

21     document?

22             A.   No.

23             Q.   Have you ever received a document

24     pertaining to a loan agreement between Dave

25     Erickson and Firefly or related companies, between

Antonio Severin                                    May 16, 2025

Page 378

1    the years 2013 and 2019?

2               A.    No.

3               Q.    I am also going to show you what

4    was marked -- what was discussed as Defense

5    Exhibit 26, and I'm going to go to page 2.

6               The title of this document is, "Demand

7    Promissory Note."  Do you recall reviewing this

8    document with Mr. Mauzy?

9               A.    Yes.

10              Q.    Based on your role as a controller

11   and the Director of Finance, and your background in

12   accounting, is this the type of document or similar

13   to the type of document you were hoping to receive

14   related to the loan payments sent to the Defendant

15   in earlier years?

16              A.    Yes.  This would be a typical

17   promissory note or loan -- loan document.

18              Q.    What makes it typical?

19              A.    Because there's an amount of the

20   loan, there's a date of the loan, there's a

21   repayment schedule, and there's an interest rate

22   associated with it.

23              Q.    Thank you.

24              You were also asked questions about the

25   time in which you tendered a resignation to Rypl;

Antonio Severin                                    May 16, 2025

Page 379

1    do you recall that?

2                    A.    Yes.

3                    Q.    Mr. Mauzy asked you several

4    questions about whether that resignation was due,

5    in part, because it was stressful dealing with

6    banks.  Do you recall discussing that, too?

7                    A.    Yes.

8                    Q.    Was it also stressful working with

9    the partners?

10                   A.    It was sometimes frustrating, for

11   sure.

12                   Q.    Can you explain why it was

13   frustrating occasionally?

14                   A.    I think --

15                   MR. MAUZY:  Objection.  Objection,

16   relevance and 403.

17                   THE WITNESS:  I think I did note in my

18   resignation e-mail that part of the issue, we were

19   going -- Rypl was going through a CRA audit, a

20   Canada Revenue Agency audit.  Part of the issue

21   there was that the supporting documents were not

22   readily available, and that's not just on the Amex

23   billing but also on the other -- the other

24   partners, being Chad and Ryan, had credit card

25   bills, and it was always a tough time getting the

Page 380

1    receipts on these credit card bills.  So that just

2    fed into extra paperwork for -- or extra work for

3    me, and extra frustrations regarding that audit.

4    BY MS. SCOTT:

5             Q.   And you just referred to Amex.

6    Are you referring to the Defendant's credit card

7    that was paid by Rypl?

8             A.   Yes, I am, yes.

9             Q.   Do you also recall discussing with

10   Mr. Mauzy the types of information regarding

11   partner payment -- strike that, I'm going to

12   rephrase that question.

13            You testified that any shareholder

14   would be able to see amounts paid to the

15   shareholders if they had access to the general

16   ledger.  Is that a statement that you said on

17   cross-examination?

18            A.   In relation to if they want to see

19   their payment listing?

20            Q.   Yes.

21            A.   Let's say if they want to see

22   their amounts of money that was paid, yes, they

23   would request it from me, or Amanda, and we can go

24   into the general ledgers and run a report that

25   would show all their -- all their payments.

Antonio Severin                                          May 16, 2025

Page 381

1              Q.    Did they have to request it from

2       you, or could they access it themselves

3       individually?

4              A.    No, they couldn't access it

5       themselves, no.

6              Q.    Do you recall any instances in

7       which Mr. Rodenburg asked you to see a copy of the

8       general ledger, prior to 2019?

9              A.    No.

10             Q.    Do you recall any instances in

11      which Mr. Van der Poel asked to see a copy of the

12      ledger, prior to 2019?

13             A.    No.

14             Q.    Do you recall any instance in

15      which Mr. Burry asked to see the ledger, prior to

16      2019?

17             A.    No.

18             Q.    Do you recall any instance in

19      which Mr. Moldon asked to see the ledger, prior to

20      2019?

21             A.    No.

22             Q.    I'm now going to show you what was

23      shown as Defense Exhibit 45, which was an e-mail

24      between you and Mr. Eidsness, in 2022, regarding

25      the ledger reconciliation.  Do you recall

Antonio Severin                                          May 16, 2025

Page 382

1    discussing this?

2              A.   With Mr. Mauzy?

3              Q.   Yes, sir.

4              A.   Yes.

5              Q.   I'm going to highlight the

6    sentence that begins, "This is pretty close..."  It

7    continues:

8                   "...but there is a vast

9                   difference on how the payments were

10                  distributed to each shareholder

11                  which will obviously bring about a

12                  lot of tensions."

13             I'd like to ask you about the last

14   clause in this sentence.  What are you referring to

15   when you say "will obviously bring about a lot of

16   tensions"?

17             A.   Well, the Bannister payouts were a

18   lot more than the other senior -- senior

19   shareholders, so I knew that would cause some

20   issues.

21             Q.   Prior to 2022, do you recall

22   having any conversation with any shareholder of

23   Firefly, apart from the Defendant, about payments

24   that were being made to the Defendant?

25             A.   No.

Antonio Severin                                    May 16, 2025

                                                    Page 383

1                     MR. MAUZY:  Calls for hearsay.

2        Objection.

3        BY MS. SCOTT:

4                     Q.   Around the time of Defense

5        Exhibit 45, 2022, did you have conversations with

6        other Firefly shareholders about payments that were

7        made to the Defendant over the years?

8                     MR. MAUZY:  Objection, hearsay.

9                     THE WITNESS:  What time period?

10                    MR. MAUZY:  Right to confrontation.

11       BY MS. SCOTT:

12                    Q.   I'll rephrase.  Around the time of

13       this e-mail, Defense Exhibit 45, July 2022, do you

14       recall having any conversations with shareholders

15       other than the Defendant about payments that were

16       made to him over the years?

17                    MR. MAUZY:  Objection.  Hearsay, denial

18       of right to confrontation.

19                    THE WITNESS:  Yes.

20       BY MS. SCOTT:

21                    Q.   Did you have an opportunity to

22       observe how those shareholders responded to

23       learning about those payments?

24                    MR. MAUZY:  Objection, vague, calling

25       for hearsay, 403, 404.

Antonio Severin                                    May 16, 2025

Page 384

 1                    THE WITNESS:  Yes, particularly our
 2        interactions with David van der Poel.  So he was
 3        not -- he was not happy to learn of the excessive
 4        amounts that Mr. Erickson had taken over him --
 5        over -- the extra payments that Mr. Erickson had
 6        had versus his holding company.
 7        BY MS. SCOTT:
 8                    Q.   And can you please describe what
 9        about Mr. van der Poel led you to that conclusion
10        that he was surprised?
11                    MR. MAUZY:  Objection, hearsay, denial
12        of right to confrontation, 403, 404.
13                    THE WITNESS:  Yeah, he had -- he had
14        told me as such.
15                    [Reporter intervened for clarification
16        purposes]
17        BY MS. SCOTT:
18                    Q.   Mr. Severin, I've highlighted the
19        second-to-last sentence shown in this blown-up
20        section, starting with, "Based on this formula."
21        Can you please read that highlighted sentence?
22                    A.   Sure.
23                         "Based on this formula Dave and
24                         Toine received more than their
25                         entitlement and the rest received

Antonio Severin                                    May 16, 2025

Page 385

1           less."

2                   Q.   Now, switching gears just a little

3      bit, I have one more topic I'd like to discuss with

4      you.

5                   You testified on cross-examination that

6      there came a time when what was phrased as "the

7      advance dividend program" was formalized.  Do you

8      recall discussing that?

9                   A.   Yes.

10                  Q.   You stated during

11     cross-examination that that meant there was an

12     agreement that certain shareholders would receive

13     certain amounts advanced; isn't that --

14                  MR. MAUZY:  Objection, misstates the

15     testimony, and counsel is testifying, leading.

16     BY MS. SCOTT:

17                  Q.   Is that a correct summary of the

18     statement you made earlier?

19                  A.   That certain shareholders received

20     certain amounts of the advance on dividend program?

21     Yes, that's what I stated.

22                  Q.   That's a fair characterization of

23     what you meant when you said "formalize the advance

24     dividends program"?

25                  MR. MAUZY:  Objection, asked and

Antonio Severin                                    May 16, 2025

Page 386

1    answered.

2                    THE WITNESS:  That was the formal

3    advance on dividend program, yes.

4    BY MS. SCOTT:

5                    Q.  I'd like to show you Defense

6    Exhibit 30, which was shown to you.  This was an

7    e-mail from Mr. Rodenburg to you, with

8    Mr. Erickson, the Defendant, copied on it, from

9    June of 2019.

10                   Do you recall reviewing this e-mail?

11                   A.  I do.

12                   Q.  The last full sentence -- the

13   second-to-last full sentence states:

14                        "Please note that the last

15                        advance (minus credit card

16                        deductions) that I received was for

17                        the month of March." [As read]

18                   Is this an e-mail from Mr. Rodenburg?

19                   A.  Yes.

20                   Q.  Was Mr. Rodenburg one of the

21   shareholders who received set amounts as advanced

22   dividends?

23                   A.  Yes.

24                   Q.  From those amounts, were personal

25   credit card deductions taken out from the amount?

Antonio Severin                                    May 16, 2025

Page 387

1              A.   Yes.

2              Q.   Can you please compare this

3    treatment to how Rypl handled the personal expenses

4    paid by the Defendant on his credit card?

5              A.   Compare -- in this situation here,

6    I think Toine had discussed this with Mr. Erickson

7    about these personal charges that were going to go

8    on his Firefly credit card.

9              MR. MAUZY:  I'm going to object to this

10   as hearsay.

11             THE WITNESS:  And that that will be a

12   repayment plan to that.  That never happened, but

13   -- in any of the personal expenses on

14   Mr. Erickson's credit card.

15   BY MS. SCOTT:

16             Q.   Did the Defendant receive a set

17   advance pursuant to the advanced dividend program

18   monthly?

19             A.   No.

20             Q.   Based on your interactions with

21   the Defendant, and from your position as the

22   Director of Finance and the controller of Rypl, did

23   there appear to be any different rules regarding

24   how the Defendant received partner payments and how

25   the other Firefly shareholders received partner

Antonio Severin                                                May 16, 2025

Page 388

1   payments?

2              MR. MAUZY:  Objection.  Vague, calling

3   for speculation, potentially calling for hearsay,

4   403, 404.

5              THE WITNESS:  There was obviously

6   differences.  I assume that they were approved at

7   the Board level, but there were certainly

8   differences in the way the three other senior

9   shareholders received advances on dividends versus

10  how Mr. Erickson received them.

11  BY MS. SCOTT:

12             Q.   And who was directing you how to

13  make advanced dividend payments?

14             A.   Mr. Erickson.

15             MS. SCOTT:  I have no further

16  questions.

17             MR. MAUZY:  No questions.

18             MS. SCOTT:  This will conclude the

19  deposition of Mr. Tony Severin.

20             THE VIDEOGRAPHER:  Okay.  We are off

21  the record at 1:17 p.m.  And this concludes today's

22  testimony given by Antonio Severin, Volume 2.

23  Total number of media used was three and will be

24  retained by Veritext Legal Solutions.

25  -- Deposition concluded at 1:17 p.m.

Antonio Severin                                           May 16, 2025

Page 389

1                    REPORTER'S CERTIFICATE

2

3              I, JUDITH M. CAPUTO, RPR, CSR, CRR,

4        Registered Professional Reporter, certify;

5                  That the foregoing proceedings were

6        taken before me at the time and place therein set

7        forth, at which time the witness was put under oath

8        by me;

9                  That the testimony of the witness and

10       all objections made at the time of the examination

11       were recorded stenographically by me and were

12       thereafter transcribed;

13                 That the foregoing is a true and

14       correct transcript of my shorthand notes so taken.

15

16

17

18                 Dated this 30th day of May, 2025.

19

20                    _____

21

22            PER: JUDITH CAPUTO, RPR, CSR, CRR

23

24

25

Antonio Severin                                          May 16, 2025

Page 390

1                    CERTIFICATE OF REPORTER

2

3       CANADA                      )

4       PROVINCE OF ONTARIO    )

5

6       I, Judith M. Caputo, the officer before whom the

7       foregoing deposition was taken, do hereby certify

8       that the witness whose testimony appears in the

9       foregoing deposition was duly sworn by me; that the

10      testimony of said witness was taken by me in

11      shorthand, using Computer Aided Realtime, to the

12      best of my ability and thereafter reduced to

13      written format; that I am neither counsel for,

14      related to, nor employed by any of the parties to

15      the action in which the deposition was taken, and

16      further that I am not related or any employee of

17      any attorney or counsel employed by the parties

18      thereto, nor financially or otherwise interested in

19      the outcome of the action.

20

21           *[signature]*

22      Judith M. Caputo, RPR, CSR, CRR

23

24      Commissioner for taking

25      Oaths in the Province of Ontario

Antonio Severin                                              May 16, 2025

                                                        Page 391

 1                    INSTRUCTIONS TO WITNESS

 2

 3              Read your deposition over carefully.

 4     It is your right to read your deposition and make

 5     changes in form or substance.  You should assign a

 6     reason in the appropriate column on the erratum

 7     sheet for any change made.

 8                    After making any changes in form or

 9     substance, and which have been noted on the

10     following erratum sheet, along with the reason for

11     any change, sign your name on the erratum sheet and

12     date it.

13                    Then sign your deposition at the end of

14     Your testimony in the space provided.  You are

15     signing it subject to the changes you have made in

16     the erratum sheet, which will be attached to the

17     deposition before filing.  You must sign it in

18     front of a witness.  The witness need not be a

19     notary public.  Any competent adult may witness

20     your signature.

21                    Return the original erratum sheet

22     promptly.  Court rules require filing within 30

23     days after you receive the deposition.

24

25

Antonio Severin                                    May 16, 2025

```
                                              Page 392

1                    * * ERRATA SHEET * *

2        NAME OF CASE:  USA v. D. Erickson

3        DATE OF DEPOSITION:  May 16, 2025

4        NAME OF WITNESS:  ANTONIO SEVERIN

5        PAGE   LINE        FROM     TO

6        ____|_____|_____|_____

7        ____|_____|_____|_____

8        ____|_____|_____|_____

9        ____|_____|_____|_____

10       ____|_____|_____|_____

11       ____|_____|_____|_____

12       ____|_____|_____|_____

13       ____|_____|_____|_____

14       ____|_____|_____|_____

15       ____|_____|_____|_____

16       ____|_____|_____|_____

17       ____|_____|_____|_____

18

19                              _____

20                                  ANTONIO SEVERIN

21

22       _____

23       (Notary Public)

24       My Commission Expires:  _____

25
```

**&**

**&**   193:18,24
318:7 321:14

**0**

**00001035**
194:16 336:1
**00001058**
193:22 319:17
**00001070**
194:9 332:19
**00001102**
194:13 334:23
**002**   324:20
**00259268**
194:6 331:1
**00263403**
194:24 340:13
**00544843**
192:25 276:4
**00544952**
193:25 321:15

**1**

**1**   231:22
239:15 257:10
257:11 343:18
356:24
**1,620,000**
234:15 257:15
**1,869,000**
226:8
**1,869,250**
353:13
**10**   192:18
193:8 195:16
229:6 231:6,10
252:8 258:15

294:4 309:9
359:15 363:1
**10,000**   309:21
316:12,23
330:3
**100**   261:20
371:24
**100,000**   321:7
**10:30**   271:1,5
**10:41**   271:6,10
**10q21**   216:3
289:5 318:25
319:4,6,9
320:6,10 321:1
358:8
**10th**   227:11,15
227:22 309:17
**11**   258:21
**12**   195:2
239:11 343:8
**12/15/21**   365:2
366:5
**120**   190:22
**12:27**   362:16
362:17
**12:38**   362:18
362:22
**12:53**   374:14
374:16
**12:58**   374:17
374:19
**12th**   240:3
**13**   194:22
234:14 257:18
257:19 302:24
303:3,15,16,18
340:12

**13th**   200:3
340:17
**14**   193:1
305:20,25
**14202**   190:22
**14360**   315:12
315:15
**14th**   197:8
272:17
**15**   192:22
193:4 194:11
195:14 196:13
236:25 307:14
307:15,20
334:22 359:24
364:19
**15,000**   304:3,6
304:11,14,15
**150**   190:6
**15th**   197:3,9,9
198:21 335:4
360:7
**16**   189:14,23
193:7,19 194:6
196:4 309:7,12
318:8 331:1
376:5 392:3
**16,000**   331:17
**160,000**   317:2
**16th**   197:9
**17**   193:10
194:23 195:3
310:25 311:4
340:13,18
343:9
**17th**   343:15
**18**   193:13
195:12 314:15

314:20,21
351:24 376:24
**180,000**   357:17
**18th**   352:2,6,9
**19**   211:20
223:21 315:24
**196**   192:5
**19th**   276:25
**1:17**   388:21,25
**1g4**   190:17
**1st**   209:11
351:6

**2**

**2**   196:5 239:7
253:23 254:5
255:25 256:16
256:19 279:24
341:1 360:25
362:15,20
378:5 388:22
**2,050,525**
259:6 261:12
**2,050,525.00...**
267:8
**2,450,000**
259:1 261:10
**2,876.33**   333:6
**2.5**   232:17
268:14
**20**   193:17
235:1 270:13
318:6,10,11,11
350:15 353:12
**20.25**   235:14
235:16 244:12
247:21

Antonio Severin                                    May 16, 2025

**[200,000 - 273k]**                                          Page 2

**200,000** 337:10

**20002** 190:6

**200k** 324:9,12
324:24

**2012** 251:12
301:16 353:6
356:23 357:7

**2013** 210:20
211:6,20
216:16 218:10
221:4 224:12
251:22 277:1,3
301:17 302:5
317:2,2 326:9
329:25 330:12
330:13 378:1

**2013-2019**
329:15

**2014** 194:2
210:6,12
223:15,21
224:23 316:2
316:21 326:13
326:25 328:22
329:19

**2015** 209:9,11

**2016** 193:19
194:5,8,15
318:8 330:25
331:6 332:3,19
332:23 335:25
338:13

**2017** 193:5
194:11,22
195:2,23
307:17 334:22
335:5 340:12
340:17 341:21

342:23 343:8
344:4

**2018** 193:3,12
193:15,22
194:19 195:6
223:21 305:22
311:2,7 314:17
319:17,21
320:1 325:6,20
325:21 339:5
339:13,24
340:2,8 346:22

**2019** 193:8
198:5 210:7,12
210:21 211:6
216:17 218:11
221:4 223:15
224:12,23
251:23,24
277:4 301:18
309:9,17
321:19,23
326:9 330:12
340:6 356:23
357:8 378:1
381:8,12,16,20
386:9

**202** 190:7,7

**2020** 189:22
195:9 249:17
249:18 252:3
349:17 350:18
351:6

**2021** 192:22
195:14 226:3,8
236:25 251:12
353:12 359:25
360:7,10,20,23

364:19 372:24

**2022** 195:12
237:14 249:20
351:24 352:3,6
352:9 353:10
365:5 381:24
382:21 383:5
383:13

**2023** 195:16,19
195:21 226:15
227:11,15,22
229:6 239:11
239:15,17
240:3,5 264:8
264:14,15
272:17 363:2
364:2 367:13
367:15

**2024** 189:14
192:19 197:3
199:19 200:3
200:15 221:8
231:7 244:2,3
250:14 253:8
270:6 317:18

**2025** 189:23
196:5,13
197:10 198:11
389:18 392:3

**21** 193:20
195:21 234:19
319:15,19
367:15

**22** 195:6,19
240:17 346:22
367:13 370:20

**227** 192:16

**23** 194:8,15
201:7 234:18
332:18 335:25

**231** 192:18

**236** 192:20

**236,725** 256:14

**23rd** 265:20
332:23

**24** 194:18
233:12 250:1,2
252:16,18
254:10 339:5

**24-7** 189:3

**24th** 197:2

**25** 193:11
201:3,3,6
264:2 311:2
371:3,8

**25,000** 311:13
312:10,17,20
315:17 331:17

**25th** 270:6
311:7

**26** 193:15
266:22 314:17
356:21 370:7
378:5

**26.6** 353:3,15
353:20 354:11
354:14,16,22
355:8

**260** 190:12

**26th** 270:13

**27** 195:9
269:20 271:14
321:19 349:17

**273k** 331:13

Antonio Severin                                            May 16, 2025

[276 - 52]                                                    Page 3

**276**  192:23
**27th**  316:2
**28**  192:19
  231:7 272:8
**28th**  198:5
  326:25
**29**  194:2,5
  326:12 330:25
**29088**  389:21
  390:21
**29th**  331:5
**2a**  271:7

**3**

**3**  193:3 237:21
  240:13 243:11
  243:20 260:15
  305:22
**3,000**  260:22
**3,000,000**
  239:16
**3,959,570**
  257:24 258:6
  260:25
**30**  193:21,23
  319:17 321:13
  321:18 324:6
  386:6 391:22
**300**  204:3,5,10
  204:13,17
  205:21 206:13
  206:14,17,25
  209:8,11
**305**  193:1
**307**  193:4
**307-2182**  190:7
**309**  193:7

**30th**  319:21
  389:18
**310**  193:10
**314**  193:13
**318**  193:17
**319**  193:20
**32**  194:1
  326:11,17
**321**  193:23
**326**  194:1
**33**  194:4
  330:24 331:4
**330**  194:4
**332**  194:7
**334**  194:10
**335**  194:14
**339**  194:17
**34**  194:7
  332:17,22
**340**  194:21
**341**  195:3
**342**  195:22
**343**  195:1
**346**  195:5
**349**  195:8
**35**  194:10
  251:11 334:20
  335:1
**35.6**  352:22
  354:4
**351**  195:11
**359**  195:13
**36**  194:14
  335:23 336:4
**362**  195:15
**367**  195:18
**37**  337:17,17
  337:18

**376**  192:6
**38**  289:21
  376:9
**384k**  327:6
**39**  291:12
  293:16 337:16
  376:10

**4**

**4**  228:20
  259:18 360:25
**40**  194:17
  195:22 339:3,9
  342:8,17,19,21
**403**  379:16
  383:25 384:12
  388:4
**404**  383:25
  384:12 388:4
**41**  194:21
  195:1 340:10
  340:15 342:14
  343:1,3,6
**416**  190:18
**42**  190:22
  195:5 342:14
  344:8,13
  346:13,20,25
**43**  195:8
  349:15,20
**45**  195:11
  351:23 352:2
  355:20 381:23
  383:5,13
**46**  195:13
  227:5 359:23
  360:2

**468,418**  341:6
**47**  195:15
  247:16 355:14
  362:25 363:6
**49**  195:18
  367:11,18,23

**5**

**5**  226:14,18,20
  228:19 236:17
  237:13 240:12
  243:11,19
  259:22,23,25
  335:12 358:2
  358:25
**5,200,000**
  357:13
**5,209,000**
  357:18
**5,209,574**
  357:11
**5,579,570**
  232:6,10
  248:10 257:8
**5.2**  357:19
**50**  209:25
  235:9,20,21
  244:10 247:19
  247:23 250:8
  331:18 370:25
**50,000**  258:20
  307:24
**50,000,000**
  234:25 235:4
**500**  261:15
**500,000**  236:21
**52**  277:21

| | | | |
|---|---|---|---|
| **525** 261:15 | **716** 190:23 | **9,668,100** | 305:13,17,18 |
| **53** 192:23 | **718-2056** 190:7 | 231:20 232:8 | 306:13 308:13 |
| 276:2,6 | **75,000** 306:10 | 235:14 | 308:15 315:12 |
| **55** 240:12 | **77** 189:22 | **9.5** 248:4 | 315:15,19 |
| 243:18,19 | **780,000** 258:13 | **90,000** 202:12 | 316:14 338:8 |
| 370:19,21 | **8** | 202:14 | 369:3 375:14 |
| **55402** 190:13 | | **929-1103** | **accountant** |
| **56** 192:20 | **8** 195:23 | 190:18 | 279:12 314:25 |
| 236:23 237:4 | 226:19,19 | **a** | **accountants** |
| 243:19,19 | 229:25 230:2 | | 246:22 247:5 |
| **57** 238:12 | 231:1 237:25 | **a.m.** 189:23 | **accounted** |
| 240:12 243:20 | 257:15 258:2 | 196:1,4 271:1 | 313:22 |
| 251:8,9 355:15 | 342:22 | 271:5,6,10 | **accounting** |
| 355:17 | **8/10/2023** | **ability** 204:20 | 194:16,20 |
| **59** 248:14 | 195:17 363:3 | 281:6 285:21 | 204:7,11,17,20 |
| **6** | **80,000** 332:1 | 390:12 | 204:23 205:10 |
| | **81,000** 259:21 | **able** 204:23 | 246:25 247:3 |
| **6** 232:13,15,16 | **84,000** 331:16 | 205:3 207:7,10 | 264:17 265:24 |
| 278:24 358:8 | **849-1333** | 246:12 261:23 | 277:4 279:16 |
| 358:18 | 190:23 | 263:4 272:24 | 280:1,5 294:2 |
| **60** 209:25 | **89** 190:17 | 273:15 274:4 | 329:1 335:25 |
| 211:15,17 | **89,583.35** | 288:14 366:25 | 339:6 378:12 |
| 248:23 249:2 | 233:11 | 380:14 | **accounts** 246:8 |
| 300:2 | **8:59** 189:23 | **above** 189:20 | 300:13 322:25 |
| **60,236** 259:15 | 196:1,4 | 234:6 249:10 | 327:21 336:18 |
| **612** 190:13 | **8m** 364:13 | 324:23 377:4 | **accrued** 343:17 |
| **63** 250:3 | **8th** 197:10 | **access** 208:13 | **accuracy** |
| **65** 249:22,25 | 198:9,11 | 212:3 284:25 | 266:19 |
| 250:5 | 199:22 | 302:11,16,18 | **accurate** |
| **650** 190:12 | **9** | 375:24 380:15 | 201:25 251:14 |
| **688-1154** | | 381:2,4 | 272:4 288:17 |
| 190:13 | **9** 192:16 227:5 | **accessed** 208:7 | 292:22 293:5,8 |
| **7** | 227:8,9,14 | **accomplished** | 293:13 316:5 |
| | 229:6 352:23 | 203:24 263:22 | 320:3 326:22 |
| **7** 193:5 232:22 | 354:6 | **account** 223:20 | **acknowledged** |
| 233:9 259:9 | **9,668,000** | 232:25 242:17 | 364:19 |
| 307:17 358:5 | 247:22 | 287:20 291:14 | **acknowledging** |
| **70** 249:19 | **9,668,056** | 301:12,16 | 366:6 |
| | 260:2 | | |

**acquisition**
231:16
**action** 390:15
390:19
**actively** 317:17
**activity** 335:12
**actual** 201:15
203:21 251:4
284:13 340:25
356:25
**actually** 201:8
201:17 202:4
210:8 286:25
305:2 313:4
314:2 332:4
343:22 355:2
**ad** 348:12
357:25 365:22
**addition**
232:12 330:20
**additional**
235:10 357:17
**address** 252:21
252:24 272:12
272:14 363:15
363:17,19
**addresses**
264:11 278:3
363:22
**adequate**
280:15
**adjust** 347:12
**adjusted**
231:25
**administrative**
295:20,22
300:18

**admit** 342:19
343:3
**admitted** 343:2
344:9
**adopted** 192:19
192:22 227:11
227:15 231:7
236:25
**adult** 289:14
391:19
**advance** 193:9
216:20 309:9
309:22,24
310:2 314:3,6
314:9,11
315:13,18,19
315:20,21
317:11,14
329:17,18
337:4 342:12
347:12,16
365:9 377:6,8
385:7,20,23
386:3,15
387:17
**advanced**
361:4,17
385:13 386:21
387:17 388:13
**advances**
194:20 210:5,9
210:9 216:14
216:18 217:1,7
217:15,20,22
218:2,18,19
219:2,7,9,18
220:1,4,24
226:5,10 228:6

228:8 265:11
265:17 274:25
313:23,24
316:15 317:11
317:12,23
318:3 319:3,5
319:12 328:21
329:16 330:1
330:11,22
332:15 337:1
337:20 338:3
338:15,20,21
338:24 339:6
339:17 340:2,5
343:22,25
344:2,17
345:14 346:2
346:18 347:20
348:4,10,12
349:10 350:16
350:19 351:7
351:16 356:22
357:4,20,21
358:2,11,14,17
358:19,22,25
362:6 367:2
369:17,22
370:3 388:9
**advice** 222:16
222:16,19
**advised** 296:4
**advisors** 262:7
**advisory**
246:22,24
253:2 264:7,16
267:5,16
271:14

**affirmed**
196:18
**afternoon**
202:3
**agency** 379:20
**agent** 197:21
202:3
**aggregate**
235:2
**ago** 198:15
**agree** 308:6
341:21 347:19
356:21
**agreed** 269:12
347:9,15
**agreeing**
347:20
**agreement**
192:18 202:15
203:3,21,23
231:7,11,19
232:23 233:14
235:8,24 248:8
252:13 256:19
256:24 257:12
257:20 258:16
259:9,10,18,24
260:5 261:5,24
263:24 268:11
268:20,21
344:17 345:16
345:21,22
346:3,8,15,18
377:24 385:12
**agreements**
280:14 344:21
345:3 368:16

**ahead** 208:2
211:3 271:11
295:15 342:2
362:23 374:19
**aided** 390:11
**aird** 191:4
**al** 193:2,5,8,11
194:18 195:16
195:19 305:22
307:16 309:8
311:1 339:4
363:1 367:12
**alexandria**
291:14
**allocate** 327:14
**allow** 214:4
**allows** 344:17
346:18
**amanda** 190:5
197:25 202:4
265:9 290:21
301:3 302:11
302:19 303:4
303:22 305:5,9
306:2 307:10
307:21 309:14
311:6,14
314:22 315:8
315:25 318:13
319:20 320:13
320:22 322:2
337:19 380:23
**america** 189:6
196:8
**american**
323:23
**amex** 193:12
193:15 194:8

195:3 311:2,6
311:16,18
312:1,3,4,10
312:19 313:3
314:17,22
315:2 330:19
330:21 331:17
332:19,24
333:14,18
335:13 343:9
343:15 379:22
380:5
**amgine** 258:13
**amount** 219:1
219:17,22,23
219:24 220:2,3
226:8 228:23
229:25 231:24
232:6,10
234:23,24,25
239:15 242:19
248:5,10,11,12
249:16 250:9
251:14 259:12
268:4 274:24
275:7 304:3,14
313:2,5 329:23
334:1 343:17
357:2 359:13
359:14,16
361:3 362:5
364:12 368:21
371:7 378:19
386:25
**amounts**
241:20 287:19
334:17 336:19
359:6 361:19

380:14,22
384:4 385:13
385:20 386:21
386:24
**analysis** 261:20
261:24
**analyzing**
256:23 262:16
**annual** 248:23
248:24 249:2,8
249:17 250:19
250:24 280:10
296:15,16,19
296:21
**answer** 354:1
**answered**
207:25 211:1
215:12 255:7
348:17,22
349:5,13
372:19 386:1
**anthony** 196:6
196:18
**anticipation**
348:5
**antonio** 189:18
192:3 271:9
362:21 388:22
392:4,20
**anytime** 314:1
314:7
**apart** 382:23
**appear** 387:23
**appears** 238:8
238:21 390:8
**application**
328:5

**applications**
245:13
**applied** 237:18
238:1 375:16
**apply** 231:23
341:6 361:18
**appropriate**
261:25 362:9
391:6
**appropriately**
313:10,17
**approve**
347:17
**approved**
297:22 298:16
388:6
**approximate**
211:8 235:15
**approximately**
247:22 272:16
**april** 270:6,13
329:19 338:9
**ashank** 267:4
269:21
**asked** 197:23
199:3,10,23
200:20 204:2
205:25 206:5,9
207:22,24
209:13 210:3
210:25 212:10
212:15 214:4
215:12 221:8
254:16 255:6
255:15 275:8
297:20 320:13
320:22 336:17
348:16,21

349:4,12
350:12,13
351:4 355:14
356:13 370:7
370:10 372:18
378:24 379:3
381:7,11,15,19
385:25
**asking** 200:6
254:24 313:2
320:8 333:16
377:10
**asks** 311:14
333:13
**assertion** 375:5
375:6
**assets** 234:15
234:21 235:3
**assign** 391:5
**assistance**
283:2
**associated**
205:2 289:14
318:24 319:6
378:22
**assume** 220:13
251:3 289:18
295:16 300:6
317:13 334:8
361:22 362:1
388:6
**assuming**
212:24
**assumption**
347:25
**attached**
268:24 322:24
355:20 373:8

391:16
**attaching**
364:7
**attachments**
321:22
**attempt** 262:2
265:13 359:3
368:15
**attempting**
357:3
**attend** 221:10
296:19 297:10
**attended**
296:15 297:5
297:11
**attention** 377:3
**attorney**
190:10 373:24
390:17
**audit** 379:19
379:20 380:3
**audits** 280:19
**aug** 195:3
343:9
**august** 195:16
195:23,24
197:2 198:5
227:11,15,22
229:6 342:22
342:23 343:14
343:18 363:1
364:2
**authentic**
238:9,21 253:5
270:10 272:20
276:21 278:10
289:25 291:20
309:19 311:9

333:2 337:22
340:21 345:9
347:5 360:15
363:25
**authorities**
279:19
**authority**
234:3,6,12
300:12,15,17
300:18,24
301:1,4,10,18
301:25 302:8
**authorized**
230:15,22
239:4 243:23
269:7 287:8
290:16,24
341:22 344:5
**authorizing**
225:19 332:5
351:12 372:16
**automatic**
322:25 331:8
350:5
**automatically**
322:11
**autopayment**
322:14
**available**
218:15,17
379:22
**avenue** 190:12
190:22
**aware** 198:25
199:2 218:14
231:3 345:15
375:10

**b**

**b** 195:18
367:12
**back** 209:8
218:19 221:6,8
225:10,15,23
226:2 241:13
241:19 249:21
253:7 262:22
264:14 266:14
268:20 271:9
309:16 319:25
326:18 330:9
330:13 333:5
334:1 338:8
359:5 362:21
364:1 370:1
374:18
**background**
378:11
**bad** 246:2
**balance** 194:12
195:3 232:24
315:18 334:22
335:11 343:8
343:14
**balances**
195:10,21
349:17 350:14
351:5 366:16
366:20 367:14
368:17 369:13
**ballpark**
235:20
**bank** 223:20
242:17 246:7
287:20 288:21

291:14 292:9
292:20 300:13
300:20 302:10
302:13,17
305:13 306:13
308:12,14,21
322:24 344:21
345:4 346:2
**banking**
240:23,23
241:2 242:3,5
245:13 246:8,9
248:21 280:25
281:3,4,18
325:15
**banks** 245:10
245:12,13,17
245:22 279:18
281:7,12,15,23
282:1 287:22
287:25 288:9
288:10,15,18
289:9,10
300:23 379:6
**bannister**
202:16 203:8
203:24 209:2,3
215:18,21,22
216:10 218:3
220:7 231:15
231:16 232:14
232:25 233:2,3
233:19 234:16
236:13 240:15
241:2,24 242:4
242:17 244:4,7
244:7,9,12,16
246:14 256:14

257:5 258:9
261:3,21 274:1
289:5 306:24
341:5 356:16
358:4 372:20
372:22 382:17
**bannister's**
203:1 235:25
265:5,14
**based** 235:16
247:1 254:6
260:14,15
261:19 263:24
263:24,25
268:3 313:19
334:5 353:5
378:10 384:20
384:23 387:20
**basically**
248:20 273:4
296:2 299:10
334:2 359:17
377:18
**basis** 285:3
**bay** 192:18
207:20,21
208:24 209:3
220:14,15,16
220:17 223:1
224:5,13,17,23
225:4,9 228:13
231:6,11 234:9
259:24 260:5
261:4,24
262:16 269:3,5
304:8,9,10
307:24 330:16

**bb** 246:22,24
253:2 262:7
264:7,16,25
265:24 267:5
267:16 271:14
**beautiful**
221:21
**becoming**
334:18
**began** 226:4
**beginning**
221:6
**begins** 374:21
382:6
**begun** 366:9
**behalf** 190:3,9
190:15,20
202:22 222:23
223:3 230:23
233:19,21,24
234:1 237:9
239:5 243:23
255:20 267:22
269:3,8,11
287:8 294:5
295:21,24
296:1 298:5
300:9 306:17
308:24 310:5,7
312:5 320:9
341:16
**believe** 221:24
226:9,18,19
227:19 248:15
263:1,22
272:19 287:4,7
296:24 297:8
300:15 301:11

302:4,9 312:6
317:16,19
329:19 334:17
337:3 344:8
353:11 360:22
365:3,4 370:17
373:15,23
**beneath** 336:16
**beneficial**
287:23
**benefit** 214:16
215:10
**benefits** 327:14
**bent** 212:25
**best** 390:12
**better** 205:3,22
206:18 207:3
**bi** 206:16 208:9
**big** 281:4
**bill** 196:22
200:11 254:15
313:3
**billing** 379:23
**bills** 312:4
379:25 380:1
**bind** 234:3,4,7
234:12
**bit** 211:21
249:22 263:14
385:3
**blown** 384:19
**board** 225:22
251:10 275:12
275:13 298:18
298:19,19,20
298:21 332:5
339:19,23
340:8 342:1

344:15 349:11
355:16 372:16
388:7
**body** 308:5
312:8
**book** 316:15
333:6
**booked** 337:12
**bookkeeping**
267:17
**books** 218:11
220:13,17,18
229:17 261:25
262:20 263:4,6
263:19 277:5
283:10 310:2
317:12 334:11
335:18,19
344:1
**boris** 190:4
197:25 202:4
**borrowing**
365:22
**bottom** 311:19
324:20 325:13
328:8 333:15
335:10 364:5
**bought** 244:19
268:10
**bourget** 190:4
190:7 202:4
303:14
**breakdown**
253:24 254:4
333:14,17
**brian** 205:25
206:19 246:16
252:17,23

253:2 262:7
264:3,7,19
265:24 269:21
272:9,11
367:23 368:6
368:11
**brief** 226:22
240:8 270:23
**briefly** 374:11
376:20
**bring** 382:11
382:15
**broken** 368:19
**budget** 347:13
**budgets** 280:10
**buffalo** 190:22
**build** 274:11
**building**
285:17,18
**bunch** 209:20
**burry** 290:13
291:13,23,24
294:17 297:8
299:18 316:3
317:12,22
358:21 381:15
**burry's** 316:18
**business** 213:8
213:14,24
214:9,10 215:1
215:7,11
245:22 246:4
246:10,12
250:23 251:6
281:15,19,21
288:15 313:7
313:15 328:7
350:1 356:1

**businesses**
209:20 214:8
214:14,21,22
**buy** 203:3,8
236:8,11
246:14 247:15
248:6,7 250:8
252:13,18
253:15,17
269:13
**buyout** 202:19
202:24 250:13
250:14 252:9
252:10 253:12
258:22 268:3
**bv** 269:5

**c**

**c** 190:1 201:9
**c.c.** 363:21
**c.c.'d** 276:15
**calculate**
235:15,18
361:11
**calculation**
260:8 262:9,13
**calculations**
262:17 264:23
**call** 299:10
315:5 346:1
**called** 189:18
206:16,23
210:9 225:3
240:19 292:5
302:25
**calling** 383:24
388:2,3

**calls** 268:6
269:14 284:4
289:16 293:10
295:13 298:25
299:8 332:8
347:22 361:20
369:9 371:14
383:1
**cam4** 248:25
249:3,8,9
277:9
**cambria**
190:21
**canada** 189:13
191:4 221:25
247:13 371:12
379:20 390:3
**cancel** 202:25
**capacity** 277:7
294:13
**caputo** 189:25
196:11 389:3
389:22 390:6
390:22
**card** 321:23
322:5,6,9,17
322:23 323:8
323:13,22,23
337:21 338:4
338:22 379:24
380:1,6 386:15
386:25 387:4,8
387:14
**cards** 322:12
322:18,21
323:7,19,21
348:6

Antonio Severin May 16, 2025

**care** 242:25
251:18
**career** 280:22
**careful** 277:21
**carefully** 391:3
**case** 223:1
274:6 322:19
323:14 328:25
392:2
**cases** 366:22
**cash** 194:12,23
195:3 261:9
280:15 333:1
334:22 335:11
335:11 337:20
338:3,20,21
340:12,18
343:8,14
**categories**
313:19 327:22
351:18
**categorize**
265:10 313:11
314:10
**category**
313:12
**cause** 346:4,11
382:19
**cc's** 311:15
**ceo** 294:7
**certain** 245:12
385:12,13,19
385:20
**certainly**
275:14 375:3
388:7
**certificate**
389:1 390:1

**certified** 196:9
**certify** 389:4
390:7
**cfo** 279:17
**chad** 198:25
217:11 277:23
294:7,12 297:6
322:20 333:21
334:2,3,5
335:12 343:15
371:23 379:24
**chad's** 195:4
333:6 343:9
**chain** 193:23
194:1 253:1
321:13 326:11
326:18 336:5
**change** 292:14
293:15 302:9
316:17 391:7
391:11
**changed** 210:8
216:1 301:20
301:22 317:9
**changes** 293:4
391:5,8,15
**changing**
293:16
**characterizati...**
305:7 344:23
361:21 385:22
**characterized**
220:25
**charge** 244:22
245:6,9 277:4
277:15 288:4
**charged** 245:11
245:22

**charges** 357:24
387:7
**charlotte**
190:16 289:22
291:5 356:4
363:23 374:25
**chart** 260:15
**chatted** 255:5
**clarification**
224:8 242:21
243:6 291:1
308:18 329:10
350:7 384:15
**clarifications**
209:16
**clarify** 262:23
375:9
**classified** 210:7
210:16
**clause** 382:14
**clear** 208:4
209:12 326:3
**cleared** 240:24
**clerical** 247:4,8
247:9 267:19
296:3
**client** 288:3
**close** 249:19
263:1 286:4,6
335:15,17
343:18 382:6
**closer** 226:25
**closing** 232:14
232:18 233:12
259:1
**clvs** 191:7
**cmj** 190:18

**code** 253:20
262:19 307:4
313:9,18 314:8
314:11 315:12
338:7
**coded** 225:1,7
257:1 271:19
271:22 272:5
307:5 308:9,10
343:24
**codes** 205:6
**coding** 246:13
313:5 335:13
**collapse** 281:19
**column** 356:16
391:6
**combination**
279:7,15
**come** 209:21
221:9 222:17
223:19,22,22
279:4 285:13
298:5 305:17
317:19
**comes** 260:8
283:17
**coming** 223:19
299:5 371:12
**commencing**
189:23 196:1
**commission**
392:24
**commissioner**
390:24
**common**
370:21 371:19
371:20

**communicati...**
373:18
**companies**
205:2,17,23
210:1 216:1
263:10 331:22
377:25
**company** 203:7
204:24 205:5
211:10 212:18
213:18,18,19
216:3,8 228:21
229:9,10,13,15
229:22 237:12
239:12 240:19
249:5 251:18
283:10,23
284:10 287:12
287:15 292:4
292:11,16,17
293:9,17
299:23 316:18
318:25 323:6
323:12 334:2,5
334:6 359:12
366:9 384:6
**company's**
229:5,16
239:10 283:20
293:2
**compare** 387:2
387:5
**comparison**
247:12
**compensated**
214:24
**compensation**
216:8 235:10

296:12 328:13
**competent**
391:19
**complexity**
281:2
**complicated**
205:20 281:9
**comply** 375:25
**components**
254:2 263:10
**compound**
203:18 361:21
**compute**
250:22,23
**computer**
390:11
**concentrate**
279:25 280:1
**concerned**
222:4 245:20
284:2,9 289:13
**concerning**
199:4
**conclude**
388:18
**concluded**
388:25
**concludes**
388:21
**conclusion**
295:13 369:10
384:9
**confirm** 316:23
**confirms**
324:13,25
**confrontation**
383:10,18
384:12

**confused** 198:6
358:16
**confusing**
353:24
**conjunction**
366:8
**consider**
284:19
**consideration**
258:25
**considered**
224:14 288:2
**considering**
235:13 280:22
**consisted**
365:13
**consistency**
266:19
**consistent**
249:7
**consolidate**
205:8
**consolidated**
205:9
**constant**
280:25 282:2
**constituted**
299:25
**consulting**
216:21,23
217:1,6,15,16
217:19 265:11
265:17 284:15
330:14,16,21
337:9
**cont'd** 196:20
**containing**
376:6

**context** 375:5
**continue**
347:20
**continued**
189:17 340:6
**continues**
382:7
**controller**
276:9,25 279:8
279:15 286:2
378:10 387:22
**convenience**
200:8
**conversation**
265:21,23
282:18 354:18
382:22
**conversations**
383:5,14
**copied** 264:3
276:8 386:8
**copy** 227:21
270:10 276:13
278:10 311:9
316:5 320:3
326:22 331:9
333:2 336:18
341:7 347:5
350:5 364:1
381:7,11
**copying** 269:21
277:23 291:13
303:5,22
318:13 319:20
321:19 337:20
339:10
**corporate**
212:1 261:16

Antonio Severin

May 16, 2025

[corporate - correct]

| | | | |
|---|---|---|---|
| 279:7,15 | 223:5,6,13,17 | 261:8,11,14,17 | 299:15 301:8 |
| 280:13 337:21 | 224:4,15,18,21 | 261:22 262:8 | 302:1 303:6,9 |
| 338:4,22 | 225:1,6,8,21 | 262:18 263:21 | 303:12,22,23 |
| **corporation** | 225:24 227:20 | 264:15,18 | 304:4,15,20,25 |
| 190:16 192:17 | 228:18,25 | 265:3,6,12,18 | 305:3,19 306:4 |
| 192:21 195:17 | 229:1,14,18,23 | 265:19,22,25 | 306:9,11,14,18 |
| 227:11,17 | 230:3,7,10,24 | 266:2,3,11,20 | 306:24,25 |
| 231:15 234:3,7 | 231:2,17,18,21 | 267:9,11,15,22 | 307:3,7 308:4 |
| 236:25 238:14 | 232:3,4,6,7,11 | 267:23 268:1 | 308:11,13,25 |
| 244:10 289:3 | 233:3,5,7,8,13 | 268:17,18,23 | 309:3,6,20 |
| 294:19 363:2 | 233:20,23 | 269:1,6,7,9 | 310:8,11,14,23 |
| **correct**   197:4 | 234:1,17 236:1 | 270:6 271:16 | 310:24 312:18 |
| 197:11 198:3 | 236:10,15,22 | 272:3 273:13 | 313:8,16 |
| 198:16,20 | 237:11,15,20 | 273:17,20,21 | 314:14,23 |
| 200:4,18,19,22 | 237:23 238:2 | 275:2,5,19,22 | 315:9,10,14,22 |
| 201:22,25 | 239:3,6,18,22 | 276:1,16,22,23 | 317:3,10,15,16 |
| 202:20,23 | 240:4 241:5,11 | 277:2,6,10,14 | 318:1,5 319:5 |
| 203:1,9,14,17 | 241:14 243:2 | 278:8,14,17 | 319:8,11,13 |
| 204:1,4,8,21 | 243:17,21,25 | 280:11,17,20 | 321:1,2,5,8,9 |
| 205:19,23,24 | 244:1,8,23 | 280:22,23 | 321:12,20,21 |
| 206:1 207:5,9 | 245:3,4,7,18 | 281:1,5,16,17 | 321:24 322:1,3 |
| 207:12,16 | 246:14,15,17 | 282:8,10,16 | 323:3,9,11,18 |
| 208:21 209:4 | 246:18,20,23 | 283:1,3,6,9,11 | 323:20 324:2 |
| 209:16 210:2 | 247:11,14,16 | 283:13,16,19 | 325:4,7,8 |
| 210:14,18,19 | 247:24 248:2 | 283:21,22,25 | 327:16,17 |
| 210:21,22 | 249:4 251:19 | 284:16,22,24 | 328:17,18 |
| 211:7,19 212:7 | 252:13,14 | 286:20 287:16 | 330:23 331:19 |
| 212:14 213:6 | 253:3,5,9,13 | 287:17,21 | 331:20,23 |
| 213:20,21 | 253:15,16,18 | 288:13,19 | 332:10,12,16 |
| 215:4,8,13,18 | 253:24 254:21 | 289:10,11 | 333:8,12,19 |
| 216:11,20,24 | 254:22 256:24 | 290:10,15,18 | 335:14,22 |
| 217:2,10,13,16 | 256:25 257:2,6 | 290:20,22,24 | 336:10,16 |
| 217:21,24 | 257:9,16,17,22 | 290:25 291:20 | 337:13,15,21 |
| 218:1,4,8,12 | 257:25 258:4,5 | 292:13,22,24 | 338:5,13,14,19 |
| 218:13,17,21 | 258:14 259:2,7 | 293:6,18,23 | 338:22,25 |
| 219:12 220:5 | 259:19,23 | 294:11,13,14 | 339:2,25 340:3 |
| 220:22 221:4 | 260:3,9,10,13 | 294:20,24 | 340:9 341:4,14 |
| 221:11 222:24 | 260:23 261:1,6 | 298:1,5,7,10 | 341:17,19 |

342:12,13
343:23,24
344:3,6,7,9,11
346:19 348:15
348:20 349:7
350:4,17
351:13,14
352:15,20,25
353:7,8,10,20
354:5,8,12
355:4 356:15
356:17,20
357:6,8,9
358:3,6,20,23
359:1,22,22
360:13,14
362:2,7 363:24
364:2,3 365:2
365:16 366:1
366:17,23,24
367:2,9 368:7
368:10,13,23
369:1,4,5,13
369:16 370:12
370:16 371:5,9
373:6 385:17
389:14
**correction**
201:13,14,19
**corrections**
199:24 200:1
200:21,23,25
201:1,10,21
**correctly** 263:2
271:20,21,23
282:13 337:10
345:6

**corresponding**
229:16
**cost** 247:6
**costs** 193:9
284:2,12,13,16
309:10,25
327:16 328:15
**counsel** 189:19
196:7 222:19
271:11 362:8
362:23 363:23
373:3,10,14,19
374:2,19
375:10 376:11
376:12,12
385:15 390:13
390:17
**counsel's**
222:16
**countries**
295:10
**country** 221:21
295:5
**couple** 296:17
341:25
**course** 278:18
350:1 356:1
364:22
**court** 189:1,2
196:11 270:23
374:10 391:22
**courtesy** 214:5
**cover** 321:7
**cra** 379:19
**create** 347:16
**credit** 219:10
260:24 261:9
321:22 322:4,6

322:9,12,17,18
322:20,22
323:6,7,12,19
323:21,22,23
348:6 379:24
380:1,6 386:15
386:25 387:4,8
387:14
**crime** 245:15
**criminal** 189:3
191:3 244:22
**criminally**
245:11,21
**cross** 192:5
196:19 376:21
380:17 385:5
385:11
**crr** 189:25
389:3,22
390:22
**cs7296587**
189:25
**csr** 189:25
389:3,22
390:22
**curacao** 292:8
292:15
**currency**
204:24
**current** 232:5
278:22,23
279:6,14,20
288:20
**currently**
287:15
**cutting** 328:12

| **d** |
| --- |

**d** 190:21 192:1
192:16,18,20
193:1,1,4,4,7,7
193:10,10,13
193:13,17,18
193:20,20,23
193:24 194:1,1
194:4,5,7,7,10
194:10,14,14
194:17,21,22
195:1,5,5,8,8
195:11,13,15
195:18,22
227:5,5,8,9
231:6 236:23
264:2 305:20
305:21 307:14
307:15,15
309:7,8 310:25
310:25 314:15
314:16 318:6,7
319:15,15
321:13,14
326:11,12
330:24,25
332:17,18
334:20,21
335:23,24
339:3 340:10
340:11 342:22
343:6 346:20
346:21 349:15
349:15 351:23
359:23 362:25
367:11,23
392:2

Antonio Severin                                    May 16, 2025

[dashboard - deducted]                                    Page 14

**dashboard**
206:10,13,23
207:23 208:7
208:10,10,20
272:23 273:2,3
273:14,24
**database**
206:15,16,17
**date** 198:7
372:25 378:20
391:12 392:3
**dated** 193:2,5,8
193:11,14,18
193:21 194:2,5
194:8,11,15,18
194:22 195:2,6
195:9,11,14,16
195:19,23
305:22 307:16
309:9 311:1,6
314:17 316:2
318:7 319:17
326:12 330:25
332:18 334:21
335:24 339:4
340:11 342:22
343:7 346:21
349:16 351:24
359:24 363:1
367:12 389:18
**dave** 192:23
195:20 204:16
206:6 207:17
215:17 218:3
236:9,14
256:14 258:12
262:10 265:5
267:13,21,24

272:1 275:17
275:24 276:2,7
277:22 286:10
286:11 289:22
291:13 302:25
303:4,21 306:1
306:23 307:10
307:20 309:14
311:6,20
315:24 316:7
318:13 319:20
320:8 321:19
323:7 324:8,13
324:25 325:14
326:21 327:1,8
327:18,25
331:5,12
332:24 333:16
333:23,23
335:4 336:5
337:19 340:17
341:7 343:16
344:16 346:14
347:11,15
350:3,11
367:13,19
368:18 375:15
377:24 384:23
**dave's** 254:1
323:23 331:17
**david** 189:9
190:9 196:8,22
208:22 216:1
216:10 218:9
220:6 221:10
233:1,10,15,16
233:18 235:24
240:15 241:3

242:4 252:12
260:9 261:3
265:21 273:25
275:7,21 282:4
285:5 286:7,18
290:12,13,23
294:15,16
297:7,7,24
298:15 299:17
299:17 301:9
302:15,21
312:5,24
314:21 320:9
321:3,6 322:16
330:10 343:4
347:3 350:13
351:4 356:4
357:10 358:4
358:24 369:3
370:8,25 372:6
372:14 384:2
**david's** 370:15
**day** 389:18
**days** 197:6,7
391:23
**dc** 190:6
**de** 325:14
**deal** 202:15
247:15 253:11
253:12 254:2
257:4 281:23
282:23
**dealing** 279:16
279:17 282:1
288:1 289:9
379:5
**dealings** 286:9

**dealt** 281:2
**debit** 260:19
**debt** 229:9
231:25 232:10
238:1 252:11
371:22
**debts** 239:21
239:24
**december**
192:22 236:25
251:12 338:10
364:19
**decide** 245:1
305:5,12 361:9
**decided** 282:25
**decision** 204:12
280:24
**decisions**
295:21,22,23
295:25 296:7,8
296:13 300:9
**deck** 248:19
**declare** 225:22
228:22 239:13
344:15 361:1
**declared**
218:24 219:1,8
229:20 257:15
258:2 325:23
325:25 361:16
370:5
**declined**
222:19 255:19
**deduct** 352:23
354:6
**deducted**
203:11 219:15
220:25 248:5

248:12 261:3
324:14 325:1
338:15
**deduction**
220:4 229:20
230:5 232:9,12
258:3
**deductions**
260:9 386:16
386:25
**deemed** 376:4
**defendant**
189:10 190:9
202:18 203:4
204:14 236:5
248:20 262:11
346:13 377:11
378:14 382:23
382:24 383:7
383:15 386:8
387:4,16,21,24
**defendant's**
227:14 231:9
237:4 252:7,15
252:18 266:21
269:20 271:13
272:7 276:6
277:20 289:20
302:23 303:3
303:17 305:24
307:19 309:12
311:4 314:21
315:24 318:11
319:19 321:17
324:6 326:17
331:3 335:1
336:4 337:17
339:8 340:15

346:24 349:19
352:1 363:5
367:17 376:6
380:6
**defense** 227:5
238:12 254:9
291:11 303:16
332:21 375:10
376:5,9,24
378:4 381:23
383:4,13 386:5
**delaware**
190:22
**demand** 378:6
**demmingshire**
244:10 357:25
**denial** 383:17
384:11
**denningshire**
231:17 260:21
**department**
190:4 191:4
**departmental**
205:7
**deposition**
189:17 196:6
199:1 271:8
362:20 388:19
388:25 390:7,9
390:15 391:3,4
391:13,17,23
392:3
**der** 216:2
285:6,22
286:19,25
290:13 294:16
297:7 299:17
299:21 320:9

321:3,6 331:15
343:4 347:3
356:4 357:10
358:24 381:11
384:2,9
**describe**
278:19 279:11
280:3,8 286:8
377:14 384:8
**described**
373:23
**describes**
287:14
**describing**
278:12 312:25
**description**
192:15 279:1,5
**desire** 214:9,22
340:1
**detail** 272:25
273:16
**detect** 270:20
**determined**
229:7 239:11
248:1,11
**diaster** 245:25
**dictate** 300:5
**difference**
235:2 322:15
323:5 371:18
382:9
**differences**
388:6,8
**different** 251:5
263:10 295:5
295:11 334:16
387:23

**difficulties**
240:14,17
241:2 242:3,5
**difficulty**
245:17
**direct** 269:4
280:4 377:2
**directing**
388:12
**directions**
264:25
**directly** 223:19
223:19 232:24
233:11 267:13
267:21 272:1
317:20 319:14
324:12,25
**director** 192:17
192:21 206:3,4
211:23 212:2
227:10,16
230:11,13,19
230:20 236:24
238:14 239:1
279:21 301:1
364:8 368:12
378:11 387:22
**directors** 290:8
**disclose** 288:22
290:8,11
**disclosure**
287:18 290:6
291:9 375:1
**discovery**
374:24 375:10
375:11 376:1,7
**discuss** 385:3

| | | | |
|---|---|---|---|
| **discussed** | 224:25 225:2,3 | 325:24 326:2,3 | 333:25 335:2 |
| 228:6 342:8 | 225:14,22 | 331:25 332:3,4 | 353:22 359:18 |
| 365:18 378:4 | 226:1,7 228:22 | 332:14 338:9 | 377:17,21,23 |
| 387:6 | 229:12,19 | 338:12 339:6 | 378:6,8,12,13 |
| **discussing** | 230:2 234:15 | 339:18 340:2,7 | 378:17 |
| 342:11 344:13 | 236:17 237:13 | 341:3,22 342:9 | **documentation** |
| 347:8 379:6 | 237:16,25,25 | 342:11 343:5 | 315:6 377:11 |
| 380:9 382:1 | 239:13,20 | 343:13,17,18 | **documented** |
| 385:8 | 240:4,13,13 | 343:21 344:4 | 262:24 368:22 |
| **discussion** | 243:19,20 | 344:14 345:12 | **documents** |
| 197:15 199:5 | 257:15 258:2 | 345:13 348:5 | 202:6 209:18 |
| 229:4 239:9 | 324:15 325:2,9 | 348:11 349:11 | 211:25 228:15 |
| 342:9 345:12 | 325:15 329:18 | 350:16,19 | 292:3,9 298:14 |
| **discussions** | 332:5 337:4 | 351:8,12 353:4 | 373:7 375:1,4 |
| 328:2 | 340:6 341:21 | 353:16 355:2,3 | 379:21 |
| **dissolutions** | 341:24 342:11 | 355:7,12 359:5 | **doing**  206:20 |
| 365:24 | 342:23 344:15 | 360:10 361:1,4 | 284:10 339:16 |
| **distinction** | 353:9,11,13 | 361:15 364:24 | 339:17 340:2 |
| 265:16 | 361:12,18 | 366:9 367:14 | 350:16 351:7 |
| **distributable** | 364:12 365:5,9 | 369:17,24,25 | **dollars**  232:14 |
| 352:18 357:13 | 366:15 372:13 | 370:3,5 372:2 | 364:13 |
| **distribute** | 372:15 385:7 | 372:6,9,11,17 | **dominion** |
| 353:19 354:15 | 385:20 386:3 | 372:23 385:24 | 301:6,7,10 |
| 354:17 359:13 | 387:17 388:13 | 386:22 388:9 | **donation** |
| 359:14 | **dividends** | **division**  190:4 | 261:17 |
| **distributed** | 194:20 195:21 | **divisions**  205:7 | **dooling**  190:12 |
| 353:3,15 | 210:4,5,8,9,12 | **dlm**  189:3 | 196:23 374:6 |
| 354:11,13 | 210:14,16 | **document** | **downs**  252:2,6 |
| 355:9,11 375:4 | 211:5 216:20 | 231:4 241:7,8 | **dowson**  192:24 |
| 382:10 | 218:20,25 | 241:12 248:7 | 276:3,7 |
| **distributions** | 219:1,2,8,11 | 252:20 253:5 | **draft**  352:17 |
| 328:15 | 219:14,15,17 | 256:7 264:4 | 356:24 364:7 |
| **district**  189:1,2 | 219:21 221:1 | 266:23 269:1 | **draws**  359:15 |
| **dividend** | 225:2,16,19,23 | 269:19,25 | **dual**  373:22 |
| 195:24 210:15 | 225:25 240:14 | 276:22 277:25 | **dublin**  201:12 |
| 210:17,24 | 241:21 242:4 | 291:17 292:2 | 206:4 |
| 219:23,25 | 243:4,9,10,23 | 308:8 309:13 | **due**  195:20 |
| 220:2 224:24 | 325:6,19,21,23 | 311:8 319:23 | 367:14 379:4 |

**duly** 189:21
390:9
**duplicate**
303:19
**duplicative**
349:5
**duties** 278:21
278:23 356:6,9

**e**

**e** 190:1,1 192:1
192:23 193:1,4
193:7,10,13,17
193:20,23
194:1,4,7,10
194:14,17,21
195:1,5,8,11
195:13,15,18
195:22 201:8
252:21,24
253:1,11,14
262:6 264:3,6
264:10 265:20
266:24 268:24
270:2,5,7,11
271:14 272:9
272:12,14
276:2,7,11,14
276:15 277:22
278:2,5,7,18
280:3 289:21
290:1 291:13
291:18 292:1
303:4,10,21,25
305:20 306:1
306:12 307:9
307:15,20
308:8 309:7,14

310:25 311:5
311:10 312:8
313:2 314:15
315:8,24 316:1
317:21 318:6
318:12,18,22
319:15,20
321:13 326:11
326:18,19,22
326:25 328:22
330:24 331:5,9
332:17,23
333:2 334:20
335:4,8,23
336:5 337:23
339:3,9 340:10
340:16,21
342:10,21
343:4,6 345:9
345:12 346:20
347:2,6 349:15
349:23 351:23
352:2,6,7,10
355:19 359:23
360:4 362:25
363:7,13,14,17
363:19,21
364:1 367:11
367:19 368:5
373:7,8,13,15
373:18,20
374:24 375:13
375:14,17,18
376:5,13,25
377:7 379:18
381:23 383:13
386:7,10,18

**earlier** 225:14
365:2 378:15
385:18
**early** 301:14,15
302:2 329:7
**easier** 205:4,5
205:9 206:25
**easily** 327:4
**easy** 207:2
**effect** 219:9
236:8
**effective**
350:15 351:6
**effort** 369:2
**eidsness** 195:13
232:18 259:21
294:17 336:6,9
336:19,23
339:10 352:12
352:13 359:24
360:3,5,24
363:7,8,9,19
364:6 373:21
373:22,23
374:1 381:24
**eidsness's**
375:21
**eight** 228:24
261:13 289:4
**either** 323:22
351:16 367:1
373:8 376:13
**electronic**
375:13
**elias** 194:18
195:15 230:9
233:21,24
234:2 237:9

239:1 243:23
269:2,8,10
290:9 292:12
293:7 339:4,10
362:25 363:9
363:14 364:6
**eligible** 357:16
**eliminate**
202:25
**employed**
390:14,17
**employee**
390:16
**enabled** 205:21
**encouraged**
282:14
**enter** 264:20,25
267:18 277:17
**enterprise**
213:3,4
**entertainment**
289:14
**entire** 297:17
376:2
**entities** 205:21
207:8 211:11
216:5 218:20
232:1,2 236:1
236:13 239:5
280:16 372:15
**entitled** 225:18
235:9 258:24
**entitlement**
384:25
**entity** 211:12
246:11
**entrepreneur**
212:25

**entrepreneurial**
212:24
**entrepreneurs**
213:5
**entries** 229:16
261:25 262:20
263:4 335:19
**entry** 254:7
256:13 257:3,7
260:16 262:3,5
262:22 263:2,6
263:13
**equal** 231:24
233:11 235:1
**erickson** 189:9
190:9 192:23
193:1,4,7,10
193:13,18,20
193:24 194:1,5
194:8,11,15,22
195:1,6,8,20
195:23 196:8
196:22,24
204:9,16
207:18 208:23
215:17 216:10
218:3,9 220:6
221:10 223:14
224:23 233:1
233:10,15,16
233:18 236:9
236:14 240:15
240:19 241:3
242:4 244:3,6
244:18 246:14
252:12 260:9
261:3 262:10
264:20 265:1,5

265:14,21
268:16 274:1
275:7,17 276:3
276:7 277:22
282:4 286:7,10
286:11,15
287:3 288:23
289:22 290:13
290:23 291:14
294:16 297:7
297:23,24
298:15 299:18
299:21 301:9
302:15,21,25
303:4,22
305:21 306:1
306:23 307:10
307:16,20
309:8,14 311:1
311:20 312:5
312:24 313:1
314:16,21
315:24 318:7
318:14 319:16
319:20 320:8
321:14,19
322:16 323:7
325:14 326:12
330:10,25
331:5 332:18
332:24 334:11
334:21 335:4
335:24 336:5
336:17 337:19
340:11,17
342:22 343:7
344:16 346:14
346:21 349:16

350:3 358:4
367:13,19
368:18 369:4
370:8,25 372:6
372:14 375:2
377:10,25
384:4,5 386:8
387:6 388:10
388:14 392:2
**erickson's**
202:25 203:25
206:6 235:24
258:9 268:9
323:14 341:8
387:14
**errata** 392:1
**erratum** 391:6
391:10,11,16
391:21
**esquire** 190:4,5
190:11,12,16
190:21
**essentially**
250:7
**estimated**
247:18
**et** 193:2,5,8,11
194:18 195:16
195:19 305:22
307:16 309:8
311:1 339:4
363:1 367:12
**etcetera** 289:6
327:15
**euro** 316:24
**evaluation**
250:23

**eventual** 221:1
**eventually**
218:19 219:7
298:7 326:2
369:18
**evidence** 200:8
318:24
**evolved** 278:24
**exact** 256:22
**exactly** 199:11
256:2 297:19
328:24 354:22
**examination**
189:19 192:5,6
196:19 374:21
375:7 376:16
376:17,21
380:17 385:5
385:11 389:10
**example** 290:5
322:8 359:11
**excel** 264:20
265:1,7
**excellent**
282:12
**excess** 234:25
235:8
**excessive** 384:3
**exchange**
236:11 352:10
**excluded**
234:15
**excuse** 226:23
248:24 362:8
**executed**
269:22 375:14
**execution**
364:8

exhibit   226:14
227:9,14 231:6
231:10 236:23
237:4 238:12
243:18,19
248:14 251:8,9
251:11 252:16
254:10 266:22
269:20 271:14
272:8 276:2
277:21 289:21
291:12 293:16
302:24 303:18
305:20,25
307:12,15,20
309:7,12
310:25 311:4
314:15,21
318:6,11
319:15,19
321:13,18
326:11,17
330:24 331:4
332:17,22
334:20 335:1
335:23 336:4
337:17 339:3,9
340:10,15
342:8,17,21
343:1,6 345:1
346:14,20,25
348:7 349:15
349:20 350:25
351:23 352:2
355:14,17
359:23 360:2
362:25 363:6
364:5 367:11

367:18,21,23
370:7,8 376:9
376:24 378:5
381:23 383:5
383:13 386:6
exhibits   192:12
227:5
exists   301:13
exit   236:5
262:14
expand   355:7
expected
325:15
expecting
278:15
expense   284:17
313:12,12,12
327:22 334:4
expensed
331:18
expenses   207:1
207:8 251:18
251:20 265:11
265:17 284:20
294:5 312:25
313:7,7,15,15
313:18,22
314:8,8 321:23
322:23 327:3
328:3 331:14
331:15 333:21
333:23 335:16
348:6 351:21
369:23 387:3
387:13
experience
206:19

expires   392:24
explain   379:12
express   323:24
extended   214:5
242:1
extent   229:8
230:5
external
279:18 280:2
314:25
extinguished
243:4 366:21
extra   324:14
325:2,9,14
380:2,2,3
384:5

**f**

facilitated
305:1 309:4
320:20
fact   210:12
211:5 214:19
228:8 262:19
278:5 296:21
325:19 344:5
353:9 366:8
369:8,20
factors   206:14
failed   270:20
fair   251:21
293:7,25 305:4
305:6 385:22
fairly   201:21
286:6
familiar   238:6
269:24 296:25

far   296:4
299:24 300:16
330:9 358:10
fashion   255:1
favour   234:16
feb   194:6 331:1
february
193:11,15
194:22 195:9
311:2,7 314:17
317:2 340:11
340:17 349:16
350:18
fed   380:2
fee   337:9
fees   216:22,23
217:1
ffl   193:19
318:8
figure   253:19
257:12 341:11
354:25
file   264:21
265:1,4,7,7
266:15
filing   391:17
391:22
final   262:3,21
263:2,4 356:25
finalized   367:9
finance   279:21
280:5 283:8
378:11 387:22
finances
205:22
financial   205:4
298:18 299:10
356:8

**financially**
  390:18
**find** 201:20
  207:5 281:11
**fine** 263:3
  264:24 271:4
**finish** 214:4
**fire** 234:1
**firefly** 192:17
  192:21 194:19
  195:16 199:4
  203:12,17,25
  205:2,15,16
  209:25 210:13
  211:9,10,23,23
  212:9 215:19
  216:5,10
  218:10,20
  220:8,12,13,16
  220:20,21
  222:22,24
  223:4,10,20,22
  224:13,20
  225:16 226:4,8
  227:10,16
  228:4 230:14
  230:20,23
  231:23 232:2
  232:13,17,23
  233:25 234:4,7
  234:8,12,16,21
  235:8,15,16,25
  236:13,24
  237:6 238:14
  239:5 242:7
  243:24 244:3,5
  244:7,13
  245:16,18,20

245:23 246:1,9
246:11 247:23
248:1 250:10
250:12,18
251:21 254:7
257:4 258:9
259:21 260:16
260:18 262:1
263:7,20
267:22,23
268:2,9,10,16
269:3,8,11
277:8 281:16
289:3,3 292:6
292:16 294:1,4
294:5,10,19
295:18,21,21
295:24 296:1,3
296:10,13
298:3,5,12
300:5,10
304:21 306:17
306:20,22
307:2 308:24
309:2 310:5,5
310:7,13,19
317:19 319:14
320:18 321:7
322:12,18,19
323:23 324:13
324:25 325:7
334:3,8,14
339:1,5,20
341:6 344:2
348:20,24
349:3 361:2
363:2 364:8,23
372:15 377:25

382:23 383:6
387:8,25
**firefly's** 223:12
  223:16,23,23
  223:25 224:1
  224:14,15,16
  267:25 298:6
  304:24 305:2
  309:5 310:22
  317:15 319:13
  337:14,15
  364:13
**firm** 196:12
  201:15 247:1
  359:11,13
**first** 197:2
  233:7 242:18
  256:13 257:7
  258:12,25
  292:10 342:14
  344:25 352:17
  368:15 371:11
  376:10
**fit** 279:22,22
**flow** 280:15
  283:21
**flowed** 277:14
**fly** 282:4
**folder** 206:23
  273:4
**folks** 265:24
  271:15
**following**
  233:12 254:7
  260:16 391:10
**follows** 336:15
**foregoing**
  389:5,13 390:7

390:9
**forgiven**
  257:23 258:1
**forgiveness**
  256:1,11
**form** 201:6
  216:13 317:23
  348:4 367:1
  373:7 391:5,8
**formal** 386:2
**formalize**
  385:23
**formalized**
  329:22 385:7
**format** 274:4
  390:13
**formed** 242:6
  242:12
**formula** 384:20
  384:23
**forth** 262:22
  389:7
**forward**
  204:13 293:3
**foundation**
  212:22 213:9
  214:1,11 215:2
  236:3 251:2
  268:5 293:11
  295:7,13
  298:25 299:8
  318:16 332:8
  345:19
**founders**
  215:20 299:19
  299:20
**founding**
  215:23,25

[founding - granting]

216:2
**four**  253:11
254:2 255:23
299:16 300:4
340:25 358:21
**fourth**  201:7
**free**  228:1,5,9
228:10,13
237:22
**frequently**
285:19
**friday**  189:14
189:23
**front**  200:6
252:8 374:8
391:18
**fruits**  213:20
**frustrating**
281:10 379:10
379:13
**frustrations**
282:24 380:3
**full**  377:4
386:12,13
**fully**  268:10
269:22 366:21
**function**
246:12 373:22
**functions**  280:6
294:2
**funds**  215:10
216:5 220:7
224:20 241:15
241:17 348:20
**further**  388:15
390:16
**future**  225:11
250:10 325:10

**fw**  194:12
334:22

**g**

**g**  194:17 195:1
195:15,22
339:4 342:21
343:6 362:25
**gather**  292:3
**gears**  385:2
**general**  218:8
266:6,10,17
274:3,22,23
277:19 315:19
333:14 340:1
380:15,24
381:8
**generally**  220:8
372:1
**getting**  198:6
240:14 242:4
288:11 379:25
**ginter**  190:21
226:24 227:1
373:6 374:5
**give**  212:6,9
226:21 240:6
289:8 333:1
335:11 341:2
**given**  202:11
240:18 264:25
388:22
**giving**  288:5
**gl**  205:6
**global**  280:16
**go**  204:13
208:2 211:3,23
221:6 222:7,9

222:20 254:23
259:17 266:14
267:3 271:11
293:12 295:15
329:14 342:2
342:14 355:13
361:12 362:23
368:25 374:10
374:19 378:5
380:23 387:7
**goes**  206:17
244:25 267:4
283:18 365:6
**going**  196:4,25
200:5,7 209:8
219:10 222:5
227:7 231:9
237:3 238:11
252:7 260:7
264:1 268:3
269:19 270:25
273:18 274:8
274:25 275:1,3
275:7,16,18,20
275:24 277:20
289:20 291:11
299:6 305:24
306:19 307:1,8
308:8 309:1
314:20 320:25
324:3 326:16
327:23 330:9
330:13 332:21
333:5 335:1
341:25 343:3
346:1,2 349:2
349:19 354:21
355:13 359:13

360:2 362:15
364:4 367:17
370:6 374:14
376:23 378:3,5
379:19,19
380:11 381:22
382:5 387:7,9
**good**  196:3,21
247:10 364:5
366:22 376:19
**goodale**  191:7
196:9
**government**
197:1 226:14
248:13 251:9
255:22 342:7
342:16,16,19
342:25 343:3
344:8 355:14
355:16 370:7
370:19,20
373:2 374:20
375:8,12,12,15
376:1,8,10
**government's**
303:15 375:19
375:24 376:1
376:11
**grab**  274:5
**granity**  195:19
206:4 246:19
300:25 301:2
367:12 368:6
368:12
**granity's**  201:7
**granting**
230:25

**graph** 256:4
**great** 344:14
**greatly** 204:19
**green** 190:21
**greg** 233:21,24
  234:2 243:23
  269:2,8,10
  293:7 363:9
**gregory** 230:9
  237:9 239:1
  290:9 292:12
  292:12,14
  293:3 339:10
  363:14
**gross** 220:2
**group** 205:16
  216:6 222:24
  223:6 236:6
  251:21 264:17
  267:5 269:11
  277:8 287:10
  299:25
**guess** 209:16
  230:18 333:24
  355:6
**guilty** 245:1,2
**guy** 298:18

**h**

**half** 232:14
  358:22
**halstead**
  207:19,21
  208:24,25
  209:3 220:14
  220:14,15,16
  220:17 223:1
  224:5,13,17,23

225:4,9 228:12
303:8,9 304:2
304:8,9,10,13
304:13 306:8
307:24 309:22
330:16 331:16
**halstead's**
306:21
**halsteadbayh...**
375:15
**hand** 227:13
252:16 276:6
305:24 309:12
332:21 335:1
**handing**
266:21 272:7
302:23 318:10
331:3 339:8
363:5
**handle** 294:1
**handled** 224:19
387:3
**hanlon** 205:25
206:19 246:16
246:19 252:17
253:2 262:7
264:3,7,19
265:24 269:21
272:9 367:24
368:12
**hanlon's**
252:23 272:11
**happen** 297:3
324:16 325:3
340:4
**happened**
387:12

**happens** 300:5
**happy** 384:3
**hard** 281:8
329:2
**health** 327:14
**hear** 373:20
**heard** 373:6
**hearsay** 383:1
383:8,17,25
384:11 387:10
388:3
**held** 302:12
**help** 282:23
365:23
**hi** 291:22
311:21 326:21
327:1 331:12
368:3 376:18
**hidden** 327:15
**highlight** 382:5
**highlighted**
377:3 384:18
384:21
**hire** 296:2
**hired** 204:12
**hitting** 375:22
**hmm** 252:19
253:21 258:7
259:13 326:20
327:24 331:10
347:1 350:6
**hoc** 348:12
357:25 365:22
**holder** 371:24
**holding** 216:1
292:4,4 384:6
**home** 365:23

**hope** 213:24
265:9 325:11
325:22
**hopefully**
214:15 377:17
**hoping** 377:15
378:13
**house** 331:16
**hub** 259:20
**huge** 205:11,14
**hundred**
223:17 231:14
243:13 301:12

**i**

**idea** 219:7
220:23 357:1
361:15 370:12
**identification**
363:6
**identified**
233:6 303:15
**identify** 206:10
248:16 290:16
313:14 327:4
327:21 375:16
**ii** 189:15
**ijshuis** 259:14
**immigration**
371:12
**impact** 204:25
**impetus** 328:12
**implement**
280:13
**implementati...**
206:24
**implemented**
204:15 205:6

[implemented - issue]

209:10
**implementing**
204:10
**important**
287:19 288:14
292:19,21
293:21
**improper**
214:2,12 215:3
332:8 342:5
344:22 350:22
361:21 369:10
**improvement**
205:12,14
207:4,5
**inadequately**
368:22
**inches** 226:25
**include** 284:15
**included**
375:21
**including**
207:17,19
208:22 277:18
280:4,14 376:3
**income** 251:12
295:11 352:19
**incorporated**
292:11,18
**incorporating**
292:7
**incorporation**
211:25 293:17
**incorrect** 344:9
**increased**
204:19
**incurred** 312:5

**index** 192:12
**india** 247:1
**indicate** 234:19
316:7
**indicates** 304:2
**indicted** 244:19
245:15
**indictment**
244:21,24
245:6
**individual**
273:9,10,15
274:14
**individually**
274:11 381:3
**individuals**
213:25 331:24
**industry**
289:15
**inexpensive**
247:13
**information**
206:17 209:8
285:1 292:20
293:2 329:1
367:4,6 380:10
**informed**
310:15
**initial** 278:7
**initially** 301:12
**insinuate**
345:25
**installments**
233:11
**instance**
381:14,18
**instances** 381:6
381:10

**instructions**
391:1
**integrated**
204:14
**intent** 235:23
**intention**
273:21 349:6,9
369:6
**interactions**
384:2 387:20
**interest** 216:6
228:1,5,9,10
228:13,16
235:14,17
237:22 268:9
333:6 334:1,4
369:12 377:8
377:19 378:21
**interested**
216:11 390:18
**internal** 279:16
279:25
**international**
230:12,19,20
237:9 239:1
302:13,17
368:8
**interrupt**
303:14
**interrupting**
226:24
**interruption**
270:14
**intervened**
224:8 242:21
243:6 291:1
308:18 350:7
384:15

**intervenes**
329:10
**interview**
197:5,13,15
199:20 200:3
200:15 202:12
255:17
**interviewed**
197:2,11
198:19
**introduce**
200:7 342:16
**introducing**
204:17
**invest** 213:17
**invested** 213:7
213:11,11
**investigation**
191:3
**investment**
213:20 260:21
338:2
**investments**
258:11
**invoice** 193:19
318:8
**involved** 206:6
246:13 263:11
291:8 299:22
316:20 317:17
373:13
**involving** 253:1
**irish** 301:2
**irs** 191:3
**issuance**
372:17
**issue** 241:6
339:24 346:11

379:18,20
**issued** 210:13
    211:6 227:21
    231:14 236:17
    241:1,3 278:16
    325:6,20 326:3
    338:12 340:7
    345:13 349:11
    353:10 359:5
    360:20 369:25
    372:9
**issues** 218:23
    218:24 240:23
    240:23 281:3
    346:4 371:12
    382:20
**issuing** 226:4
    267:12,21,23
    300:16
**items** 333:11

**j**

**j** 190:11
**jan** 194:23
    340:13
**janssen** 190:16
    190:16,18
    289:22 291:5
    363:23 373:8,9
    373:11,16,17
    374:25
**janssen's**
    375:20
**january** 209:11
    239:11,15
    240:3 340:18
    350:15 351:6

**jginter** 190:23
**jmb** 189:3
**job** 189:25
    247:10 278:19
    279:1,5 282:7
    335:20 355:23
    356:1 360:13
**jokingly**
    344:18
**journal** 229:16
    315:19
**judgment**
    251:15
**judith** 189:25
    196:11 389:3
    389:22 390:6
    390:22
**july** 195:12
    351:24 352:2,6
    352:9 383:13
**june** 193:19
    195:19,21
    272:17 318:8
    321:19 367:13
    367:15 386:9
**jury** 244:25,25
    245:1
**justice** 190:4
    191:4
**justin** 190:21

**k**

**kandia** 191:4
**keep** 199:13
    204:20 205:15
    205:21 206:25
    207:10,13
    208:25 283:14

293:4 323:1
    335:21 352:24
    354:6
**keeping** 205:1
    272:4 277:12
    277:15 335:15
    336:8,11
    341:16,18
**kept** 212:1
    217:25 218:2,5
    273:24 282:17
    290:3 333:20
    348:13 367:6
**kevin** 217:12
    294:18
**keyword**
    375:16
**keywords**
    375:22,23
**kind** 295:25
    329:22 359:8
**king** 189:22
**kiser** 191:3
    197:18 199:4
    199:20 202:3
**knew** 268:2,16
    268:19 275:16
    275:20,22
    285:24 286:1
    292:7 382:19
**know** 199:13
    205:3 211:15
    212:25 213:12
    218:23 239:25
    242:11 246:5
    249:19 250:17
    250:19 255:15
    270:16 283:23

287:22,24,25
    288:3 293:1,17
    296:6 297:9
    298:14 299:24
    301:19,20
    302:22 310:17
    328:24 330:2,6
    330:6 334:4
    346:3,9 359:14
    359:16,20
    361:17 362:5
**krieg** 217:12
    294:18
**kyc** 288:2

**l**

**lack** 236:2
    251:1 293:11
    295:6,12
    298:24 299:7
    318:15 332:7
    345:18
**lan** 363:2
**lane** 192:17
    227:10,17
    234:12 238:14
    244:13 289:3
    294:19 322:12
    322:18,19
    364:8
**language**
    237:18,24
    239:20 240:1
**large** 368:21
**late** 372:24
**law** 190:10,16
    232:18 259:21
    339:10

law.com
  190:18
laws  295:5
lawyer  255:16
  291:5
lawyers  279:19
leading  385:15
learn  384:3
learning
  383:23
led  384:9
ledger  274:3
  333:14 336:18
  380:16 381:8
  381:12,15,19
  381:25
ledgers  195:12
  207:16 218:8,8
  266:6,10,17
  274:22,23
  277:19 283:12
  351:24 352:3
  352:17 353:17
  380:24
legal  189:21
  193:9 196:10
  196:10,12
  201:15 295:13
  309:10,25
  359:11,12
  388:24
letter  201:9
  278:16 282:3
level  388:7
lglaw.com
  190:23
limiting  206:14

line  192:15
  201:7 234:6
  257:14 258:11
  258:12,19,24
  258:25 259:15
  259:20 284:17
  311:25 312:2,7
  312:15 313:12
  315:2 324:22
  328:8 344:25
  356:21 357:2
  357:14,15,15
  357:15 358:9
  392:5
lines  327:22
lipsitz  190:21
lisbon  346:25
  347:9
list  208:17
  209:17 289:4
  336:15 341:2
  377:18
listed  208:15
  289:8 294:20
  328:20 357:22
listing  208:10
  208:12 273:6
  333:23 380:19
little  250:2
  252:19 283:4
  296:5 329:2
  385:2
live  285:10
  294:21,23
  295:4
lloyd  256:9
lloydsville
  256:14 320:6

320:10,18,25
  324:9 341:13
  357:11
loan  193:3,6
  220:12,13,16
  225:5,7,9
  228:14 241:1,7
  241:8,12,17,19
  242:1,6,15
  243:1,3,10,24
  256:14 297:25
  297:25 298:2
  298:11,13
  303:7,9 304:3
  304:6,13,13,16
  304:17,19
  305:22 306:5,7
  306:16 307:5
  307:11,17,21
  307:23 308:1,2
  308:6,8,9,10
  308:23 311:13
  312:10,20
  315:17 317:15
  321:11 324:12
  324:24 331:17
  333:7 334:5,7
  334:14,16
  337:9,11,12
  338:8 341:6
  366:16,20
  377:17,24
  378:14,17,17
  378:20,20
loaned  361:4
  361:17
loaning  321:4

loans  203:1,12
  203:16,25
  218:5,9 220:9
  220:25 225:24
  226:2,5 228:1
  228:5,9,12,17
  229:9,21 230:5
  235:25 236:12
  237:19,22
  240:18 256:1
  256:11 257:4,8
  258:3,9 260:24
  261:2 268:17
  268:19,22
  275:3 303:1
  326:4 330:11
  333:21,22,25
  337:7 348:4,12
  350:21 351:9
  351:16 354:19
  356:14,19,22
  357:4 361:10
  362:4,5 364:20
  365:8 366:7,14
  367:2 369:3,16
  369:22 370:1
located  201:7
long  197:5
longer  302:8
longest  299:23
look  209:20
  226:11,13
  248:13 251:8
  252:7,15 256:4
  256:18,19
  257:11,19
  258:15 275:6
  277:20 282:22

326:18 334:25
342:7,14 352:1
368:11
**looked**  226:15
240:11,11
248:16 365:1
**looking**  228:19
234:18 240:10
254:5,8 255:25
271:13 303:3
318:10 350:11
364:4
**looks**  227:20
315:16 316:6
**loosely**  365:8
**lost**  311:21
**lot**  332:2
368:25 382:12
382:15,18
**lump**  268:13

**m**

**m**  189:25 190:6
389:3 390:6,22
**m5r**  190:17
**made**  201:4
204:13 210:8
218:17 222:22
241:18 242:16
277:8 295:23
306:16 308:23
310:6,16 316:8
331:21 355:25
359:12,13
369:2,3 374:25
375:6,6,11
382:24 383:7
383:16 385:18

389:10 391:7
391:15
**mail**  192:23
193:1,4,7,10
193:13,17,20
193:23 194:1,4
194:7,10,14,17
194:21 195:1,5
195:8,11,13,15
195:18,22
252:21,24
253:1,11,14
262:6 264:3,6
264:10 265:20
266:24 268:24
270:2,5,7,11
271:14 272:9
272:12,14
276:2,7,11,14
276:15 277:22
278:2,5,7,18
280:3 289:21
290:1 291:13
291:18 292:1
303:4,10,21,25
305:20 306:1
306:12 307:9
307:15,20
308:8 309:7,14
310:25 311:5
311:10 312:8
313:2 314:15
315:8,24 316:1
317:21 318:6
318:12,18,22
319:15,20
321:13 326:11
326:18,19,25

328:22 330:24
331:5,9 332:17
332:23 333:2
334:20 335:4,8
335:23 336:5
337:23 339:3,9
340:10,16,21
342:10,21
343:4,6 345:9
345:12 346:20
347:2,6 349:15
349:23 351:23
352:2,6,7,10
355:19 359:23
360:4 362:25
363:13,14,17
363:19,21
364:1 367:11
367:19 368:5
373:7,8 375:14
376:13,25
379:18 381:23
383:13 386:7
386:10,18
**mailed**  376:5
**mails**  326:22
363:7 373:13
373:15,18,20
374:24 375:13
375:17,18
**maintain**
280:13
**major**  216:17
217:18
**majority**
269:12 286:8
299:16 300:1,8
318:3,4

**make**  199:23
200:20,23
201:11 219:4
229:15 261:25
262:23 263:4
266:12 277:13
282:21 283:4
290:6 292:20
293:3,22
295:20 296:1
296:12 297:21
297:21 300:9
355:22 369:6
369:12,15,16
373:4 374:22
388:13 391:4
**makes**  341:12
378:18
**making**  201:13
201:14,18
209:1 262:4,9
280:14 283:24
335:18 338:2
356:10 366:10
391:8
**malta**  292:8,12
292:18
**man**  297:1
361:13
**manage**  280:19
**managed**  283:7
283:10,12
**management**
206:20
**managing**
192:16,20
206:3 227:10
227:16 236:24

Antonio Severin                                                May 16, 2025

**[managing - minnesota]**                                     Page 27

| | | | |
|---|---|---|---|
| 238:13 | 242:24 243:8 | 383:1,8,10,17 | 255:8,22 |
| **march** 192:19 | 251:7 255:9 | 383:24 384:11 | **methods** 251:5 |
| 193:5 194:5,8 | 268:8 269:18 | 385:14,25 | **microphone** |
| 195:14 231:7 | 270:15 271:2 | 387:9 388:2,17 | 226:25 |
| 307:17 330:25 | 271:12 276:5 | **mean** 209:13 | **microsoft** |
| 331:5 332:18 | 284:8 289:19 | 247:18 326:1 | 206:16 |
| 332:23 359:24 | 291:4 293:14 | 369:11 | **mid** 199:22 |
| 360:7 386:17 | 295:9,14 299:3 | **meaning** | **middle** 324:23 |
| **marital** 365:24 | 299:12 303:17 | 343:22 | **million** 209:25 |
| **mark** 192:24 | 303:20 305:23 | **means** 269:11 | 211:16,17 |
| 276:3,7 | 307:12,14,18 | 353:2 354:9,10 | 226:18,19,20 |
| **marked** 192:13 | 308:22 309:11 | 361:23,25 | 228:24 229:25 |
| 227:13 237:4 | 311:3 314:19 | **meant** 362:1 | 230:2 231:1 |
| 238:12 264:2 | 318:9,19,21 | 385:11,23 | 232:14,17 |
| 269:20 326:17 | 319:18 321:16 | **measure** 247:7 | 235:9,20,21 |
| 363:6 378:4 | 326:15 329:13 | **media** 196:5 | 236:17 237:13 |
| **marketing** | 331:2 332:11 | 362:14,19 | 237:25 240:12 |
| 287:2 | 332:20 334:24 | 388:23 | 240:13 243:11 |
| **marks** 362:14 | 336:2 339:7 | **meet** 255:16 | 243:11,19,20 |
| **match** 266:16 | 340:14 342:6 | 298:21 | 247:16,19,23 |
| 312:8 | 342:18,24 | **meeting** 344:15 | 248:4,23 249:2 |
| **matter** 189:20 | 343:2,10 | 346:25 347:9 | 249:19,23,25 |
| 196:7 309:24 | 344:12,24 | **meetings** 287:5 | 250:3,6,8 |
| 374:2 375:9 | 345:23 346:23 | 287:6 296:16 | 251:11 257:15 |
| **matters** 279:17 | 348:1,18 349:1 | 296:16,19,22 | 258:2 268:14 |
| **maule** 217:11 | 349:8,18 | 297:1 328:11 | 335:12 343:18 |
| 294:17 | 350:10,24 | 342:2 | 352:22,23 |
| **mauzy** 190:10 | 351:25 354:2 | **member** 216:2 | 353:3,15,20 |
| 190:11 192:5 | 360:1 361:24 | **members** | 354:4,6,11,14 |
| 196:17,20,22 | 362:11,24 | 275:13 | 354:16,22 |
| 203:22 208:1 | 363:4 367:10 | **memorandum** | 355:8 357:19 |
| 211:2 213:2,13 | 367:16,22 | 199:19 200:14 | 358:2,5,8,18 |
| 214:3,7,17 | 369:14 371:17 | **mentioned** | 358:22,25 |
| 215:5,14 | 372:21 373:1 | 189:20 | **minneapolis** |
| 224:10 227:3,6 | 374:6,21,23 | **met** 197:1 | 190:13 |
| 227:12 231:8 | 376:22,25 | 198:10 199:18 | **minnesota** |
| 236:7 237:2 | 378:8 379:3,15 | 200:17 254:14 | 189:2 190:13 |
| 240:9 242:13 | 380:10 382:2 | 254:15 255:3,4 | 221:22 222:17 |

minor  201:21
  201:23
minus  386:15
minute  226:12
  240:6
minutes  374:7
mischaracteri...
  367:20
missing  327:12
  336:21
misspoke
  331:12
misstates
  385:14
misstating
  242:9
mistake  209:1
moldon  198:25
  217:11 294:7
  294:12 297:7
  322:20 334:3,3
  334:18 371:23
  381:19
moldon's
  333:21
mom  285:3
  299:10
moment  212:17
  287:12 362:12
  367:10 374:9
  374:12
money  203:11
  203:12,16
  212:16 213:22
  214:9,22 223:7
  223:8,12,16
  224:1,12,13,22
  225:10 241:2,3

267:25 273:18
277:8,12 281:6
283:14,15,17
283:24 294:1
298:1,4,6,9,16
299:5,6 302:12
302:16 304:23
305:2,5,7,9
306:13 308:13
309:5 310:21
310:22 317:15
319:13 320:6,9
320:19,25
321:4 328:19
330:21 334:3
337:14,15
339:1 365:22
380:22
monies  223:9
  225:13 354:17
month  202:12
  202:14 253:17
  267:14 297:3
  299:11,14
  312:25 316:24
  329:24 332:1
  386:17
month's  333:14
  333:18
monthly
  216:19 217:19
  233:11 267:13
  267:21 285:3
  348:10 387:18
months  233:12
  297:12,14
morning  196:3
  196:21 331:13

364:6
move  226:24
  281:6 320:9
  342:19 343:3
multi  204:24
  204:24
multiple
  327:20 373:24

**n**

n  190:1 192:1
n.v.  192:17,21
  227:11 236:25
name  196:9
  288:22 293:16
  316:14 375:20
  375:21 377:4
  391:11 392:2,4
named  216:20
names  289:14
ne  190:6
need  205:6
  287:24,25
  292:12,14
  300:8 327:13
  344:19 345:2
  361:3,16 362:4
  362:5 366:6
  367:10 391:18
needed  205:7
  266:16 335:17
needs  280:2
  293:17 304:3
  361:12
neither  376:12
  390:13
nervous  245:10

net  220:3 235:2
  251:12 258:6
netherlands
  201:16
never  228:14
  254:13,15,16
  255:3,4,5,12
  255:12 286:23
  286:24 298:13
  346:8 372:8
  387:12
new  190:22
  217:8 240:19
  276:9 292:11
  292:16,17
  293:2 315:12
  329:9,12
  362:10
night  209:13
nods  313:25
  321:10
non  376:4
nonvoting
  371:22
normalizing
  328:3
notary  391:19
  392:23
note  234:24
  259:5 261:12
  267:8 268:14
  268:25 269:23
  272:2 342:15
  376:8 378:7,17
  379:17 386:14
noted  391:9
notes  202:11
  202:12 257:23

258:1 389:14
**november**
194:11 197:3
198:21 199:19
200:3,15 221:8
251:12 334:21
335:4 353:6
**number** 192:15
214:3 232:16
247:25 256:21
256:22 257:21
258:16,20,21
259:18,25
260:4 261:7
281:3 307:13
327:9 362:14
388:23
**numbers**
209:21 327:3
327:12 356:25
**numerous**
205:21 227:25
228:4 364:20
374:24 375:11
**nv** 238:14
239:2 289:3
294:19

**o**

**oath** 196:16
199:12 389:7
**oaths** 390:25
**object** 387:9
**objection**
203:18 207:24
210:25 212:21
213:9 214:1,11
215:2 236:2

242:9 251:1
255:6 268:5
269:14 284:4
289:16 293:10
295:6,12
298:24 299:7
318:15 326:8
332:7 342:20
344:22 345:18
347:22 348:16
348:21 349:4
349:12 350:22
353:23 361:20
367:20 369:9
371:14 372:18
374:25 379:15
379:15 383:2,8
383:17,24
384:11 385:14
385:25 388:2
**objections**
389:10
**objective**
263:17,18
326:5,6 359:7
359:17 370:4
**observe** 383:22
**obtained** 376:2
**obvious** 214:18
**obviously**
214:14 216:7
330:19 354:21
369:12 382:11
382:15 388:5
**occasionally**
379:13
**october** 193:8
194:12 195:6

264:8,14
265:20 309:9
309:17 316:2
334:23 346:21
**office** 201:7
232:18 285:13
285:15 286:21
286:23,24
287:1 296:5,5
327:14
**officer** 390:6
**offices** 339:11
**official** 334:13
**officially** 233:4
**offset** 219:2,12
219:14,25
223:9 225:13
240:18,24
241:21 242:16
242:18 370:5
**oh** 198:12
208:3 211:12
254:11 256:10
284:11 324:3
348:8
**okay** 197:23
198:2,4,8,15
198:17,22
200:2,5,11,13
201:3,24
202:17,21
206:24 208:5
208:12 209:7
212:15 213:3
217:14,18,22
219:4 220:6
224:16 227:7
227:19 230:22

234:2,14 237:3
238:8 240:2,7
240:25 241:22
243:3,22 244:6
244:9 247:9
249:16 250:4
250:19 251:8
253:4,22 254:9
254:11,13
255:15 256:2,8
256:10,12
260:14 262:12
263:8,15,18
264:4 265:4
266:5,7,18
270:4,13
271:25 273:11
274:7,12,23
276:17,21
278:12 279:13
282:25 286:13
286:18 295:3
296:21 299:16
300:21 301:3
301:21 304:5
305:10 306:23
307:8 310:15
310:21 312:13
312:22 313:6
314:23 316:22
317:4,8,21
320:15,20,23
322:13 324:5
324:21,22
325:5,22 329:7
330:13 331:3
332:14 333:20
334:2,6,9,13

334:25 335:15
336:23 337:7
337:16 343:14
344:1,4 346:6
347:18 348:8
348:13 349:9
351:3 355:5,5
355:13 357:18
358:1,12
359:19 362:3
362:12 363:13
363:25 365:6
370:20 388:20
**okayed** 298:20
**old** 297:1 317:7
329:1
**once** 240:23
241:6 292:11
296:22,24
299:11,14
**one's** 226:20
363:7
**ones** 217:4
300:25 301:2
348:11
**ontario** 189:13
189:22 190:17
390:4,25
**operating**
217:3 248:24
249:3 284:13
284:20
**opinion** 214:2
214:12 215:3
332:8
**opportunity**
255:13,16
383:21

**order** 281:15
362:4 375:25
**orderly** 255:1
**ordinary** 356:1
356:3
**organization**
248:23 287:23
**original** 391:21
**outcome**
390:19
**outside** 375:4
**outsourced**
246:25
**outstanding**
203:17 221:3
226:2,10
229:10,21
230:6 231:14
231:25 232:10
234:23 237:19
238:1 258:3
268:22 364:20
366:13
**overdue** 311:22
**oversaw** 277:8
**owe** 357:18
**owed** 203:12
231:25 248:5
252:11 298:2
298:11 367:1
**owes** 334:2,3
357:11 358:5,8
**owing** 219:15
220:12 236:12
242:19 334:18
358:10 359:16
361:19

**own** 215:1
284:2 287:15
302:18 322:16
323:7 370:25
**owned** 231:16
244:9,12 292:5
**owner** 244:3,4
244:6,7 245:21
287:23
**owners** 213:19
214:9 215:7
283:21
**ownership**
203:6 215:10
216:6 244:15
244:16 292:15
353:5 370:9
**owns** 371:23

**p**

**p** 190:1,1
**p.m.** 362:16,17
362:18,22
374:14,16,17
374:19 388:21
388:25
**page** 192:4,15
233:7 253:23
254:5,11
255:25 260:15
260:15 292:10
311:19 324:4,6
324:18,19,23
325:13 326:18
333:15 335:10
350:11 351:1
360:25 370:20
378:5 392:5

**pages** 266:22
277:21 360:3
**paginated**
272:24 273:5,7
274:3
**paid** 203:11
218:19 219:3
219:23,24
220:11 224:22
225:15 228:16
229:13,25
233:10 235:5
239:16,24
241:13,18,19
241:23 243:5
251:18 259:21
260:8 268:19
272:1 281:20
294:5 312:10
322:5,7,10,11
323:25 324:1
327:13 332:6
336:19 337:8
338:15 341:22
343:18 348:6
349:10 358:10
359:3 361:2
369:8,17,18
380:7,14,22
387:4
**paperwork**
377:7,15 380:2
**paragraph**
227:24 228:19
228:20 229:2
231:22 232:13
232:15,22
233:9 235:12

237:21 239:7
360:25
**pardon** 230:17
**part** 197:19
202:15 221:24
239:21 252:2
262:10,11,12
265:21 267:4
267:19 279:2
280:8,12,18
284:13,19
292:23 296:23
298:17 335:20
352:11 353:17
355:22 356:6,8
373:8 379:5,18
379:20
**participate**
214:25 262:15
**participated**
262:7
**particular**
201:4 203:3
226:9 324:19
334:10 359:18
376:9
**particularly**
384:1
**parties** 390:14
390:17
**partner** 194:3
208:18 284:12
284:15 326:13
327:10,19
328:10,12,14
338:8 368:17
380:11 387:24
387:25

**partners**
212:16 268:2
269:12 273:1
273:16,19,19
284:1 327:5,13
327:23 359:4
359:12 379:9
379:24
**partnership**
206:21 359:8
**parts** 253:11
336:21
**party** 203:20
**passed** 219:9
225:19 332:5
344:5 372:16
**patience** 342:1
**paul** 195:13
294:17 336:5,8
336:23 359:23
360:3,4,24
363:7,8,9,19
364:6 373:21
377:7
**paul's** 336:18
**pause** 226:22
240:8
**pay** 203:16
224:3 225:10
225:23 226:2,4
226:9 231:19
231:24 232:9
232:13,17,23
237:13 239:21
243:10,24
312:4 315:9
322:22 338:8
359:5 362:4

364:24 366:9
366:15 369:25
**payable** 228:22
239:13 261:12
**payables**
267:18
**payback**
268:22
**paying** 202:12
202:13,14,18
202:21 203:24
241:2 316:11
**payment**
193:19 219:13
224:15,16
259:1 267:10
297:21,21
300:16 305:1
309:4 310:6
318:8 322:25
323:16 324:9
329:18 335:13
351:21 364:12
369:23 377:11
380:11,19
**payments**
193:25 194:3
206:7 207:11
207:13,15,17
207:19 208:17
208:19,22
210:7 216:11
222:22,25
223:14,18,21
242:18 263:25
267:13,21,24
271:18 272:1,5
274:5,8 275:1

275:7,16,18,20
275:22,24
276:1 277:16
277:18,18
310:16,18
316:2,8,20,24
317:2,5,6,17
317:18,22
321:15 322:5,6
322:10 326:13
327:4,11,19
328:14 329:15
330:7,10,14,17
330:19,21,21
331:21 336:11
336:15 340:25
347:12,16
348:3,4 351:15
365:14 369:7
378:14 380:25
382:9,23 383:6
383:15,23
384:5 387:24
388:1,13
**payoff** 236:12
**payouts** 382:17
**payroll** 217:5,5
217:6,16,17
296:6 328:15
**pays** 294:1,4
**peachtree**
317:7
**people** 213:7
213:17 214:21
217:14 221:24
279:24 281:20
332:2 337:5
369:22 375:4

**percent** 231:14
235:14 243:14
244:10,12
247:21 261:20
290:12 294:4
300:2 301:12
331:18 359:15
370:25 371:3,8
371:24
**period** 210:6,7
210:11,20
211:17 216:16
218:10 221:4
223:20 224:12
251:22 277:3
285:11 301:17
317:18 325:5
326:9 329:14
330:11 365:23
383:9
**permission**
342:4
**persistent**
281:25
**person** 250:23
255:23 288:9
**personal**
212:21 313:7
313:15,21
314:8 322:16
323:7,23
333:10,23
348:5 386:24
387:3,7,13
**perspective**
254:1
**pertaining**
377:24

**peter** 191:7
196:9
**phone** 270:18
**phrased** 385:6
**pierre** 314:24
314:25
**place** 280:15
295:4,4 353:6
371:11 389:6
**places** 294:23
**plaintiff** 189:7
189:19 196:7
**plaintiffs** 190:3
**plan** 278:13
325:12,24
326:2 347:11
347:16 349:14
359:4 369:21
370:4 387:12
**planning** 328:6
**played** 262:10
**plc** 232:19
**please** 196:16
206:11 240:6
270:23 271:17
271:19,22
311:12,22
315:9 335:13
338:7 344:9
362:13 374:10
374:13 377:14
384:8,21
386:14 387:2
**pleasure**
254:17
**plus** 209:6
**poel** 216:2
285:6,22

286:19,25
290:13 294:16
297:7 299:17
299:21 320:9
321:3,6 331:15
343:4 347:3
356:4 357:11
358:24 381:11
384:2,9
**point** 199:14
199:18 203:15
218:18 219:1
223:18 225:10
276:20 280:21
288:9 301:21
316:21 325:25
351:11 360:19
**pointed** 356:18
**political** 328:4
**portal** 302:12
302:16
**portion** 229:11
257:14 284:15
330:3 377:3
**position** 194:23
282:17 340:12
340:18 373:11
373:17,19,25
375:19 387:21
**positioned**
364:24
**positive** 235:1
**possible** 214:15
339:21
**possibly** 373:22
**potentially**
375:21 376:4,6
388:3

**power** 206:16
208:8
**poy** 276:8
**pre** 334:18
**precise** 274:2
**pref** 371:21
**preferred**
370:16,23
371:1,10,19,21
372:1 375:2
**preparation**
249:13 262:13
280:10
**prepare** 254:20
**prepared**
199:20 241:10
248:19
**present** 191:1
196:13,14
250:4,5 252:3
366:10
**president**
294:8,13
**pretty** 263:1
382:6
**previous**
237:17
**previously**
192:13 196:18
**price** 231:20
232:9,24 235:3
235:13,16
260:6,8,11
261:4
**primarily**
205:8 263:7
281:3

**primary**
286:13
**principal**
234:23
**prior** 237:13
239:16 364:18
381:8,12,15,19
382:21
**prism** 289:5
**privilege**
373:12 374:1
375:3
**privileged**
373:18 375:5
375:18,22
**probably**
249:11,22
296:8
**problem** 271:2
281:4,25
**problems**
280:25
**proceed** 376:15
**proceedings**
189:24 226:22
240:8 270:14
389:5
**proceeds**
231:24 257:4
366:15
**process** 199:8
199:11 203:10
262:4 279:3
288:5 291:9
292:23 293:15
313:1 366:14
**produce** 205:4
205:4 280:15

**produced**
376:2
**production**
376:1
**productions**
375:11
**professional**
190:16 389:4
**profit** 328:16
352:22 354:4
357:13
**profitable**
214:14 249:5
251:22 252:2,4
252:6
**profits** 215:1
251:4
**program** 204:6
204:8 329:18
329:18 340:6
365:10 385:7
385:20,24
386:3 387:17
**project** 206:20
**projected**
360:9
**promise** 259:20
**promissory**
234:24 267:7
268:14,25
269:22 272:2
378:7,17
**promptly**
391:22
**proper** 339:19
**properly**
241:10 253:20

257:1 263:19
266:2,4,13
271:18 277:14
279:22
**provide** 212:5
246:8 275:10
275:12 288:20
292:9 313:4
333:22 335:13
**provided** 279:2
364:21 391:14
**provides**
341:16
**province** 390:4
390:25
**public** 391:19
392:23
**pulled** 327:3
**purchase**
192:18 231:6
231:11,13,20
232:8,24 235:3
235:13,16,23
236:5 256:19
256:24 257:11
257:19,20
259:9 260:6,8
260:11 261:4
261:24
**purchased**
261:20
**purchaser**
232:13,17,23
**purchases**
365:24
**purpose** 202:24
231:15 266:1
266:18 273:22

273:23 274:15
291:25
**purposes** 224:9
242:22 243:7
247:3 291:2
308:19 329:11
350:8 384:16
**pursuant** 229:4
366:5 375:13
387:17
**put** 200:5
212:25 214:13
226:14 227:7
246:3 250:8,9
251:9 266:9
307:8 310:2
329:2 341:25
353:5 356:9
370:6 373:9
374:3 375:9,20
389:7
**puts** 341:10

**q**

**question** 201:4
206:5 211:13
214:4 254:18
284:7 350:23
380:12
**questioning**
196:25
**questions**
197:16,24
199:3,9,16
200:6 202:5
204:2 206:9
207:22 209:14
209:15,17

210:3 212:16
245:14 254:23
318:23 323:14
373:1 374:7
376:20 378:24
379:4 388:16
388:17
**quirk** 192:24
276:3,8
**quite** 209:14
**quote** 273:4
329:17

**r**

**r** 190:1,5
**raindrop**
240:20 241:1,3
241:16,18,18
242:5,6,12,16
242:23,25
243:3,10,24
**rate** 377:8,19
378:21
**read** 235:5
279:9 293:5
345:6 351:9
353:6 361:6,13
366:16 384:21
386:17 391:3,4
**readily** 379:22
**reads** 377:5
**ready** 270:19
376:15
**really** 241:25
279:1,6,14
312:18 316:19
329:4 332:15
334:11 342:11

359:2,7
**realtime**
390:11
**reason** 222:4
222:18,21
239:23 244:18
280:24 371:10
391:6,10
**reasons** 244:20
**recall** 365:7
376:25 378:7
379:1,6 380:9
381:6,10,14,18
381:25 382:21
383:14 385:8
386:10
**receipts** 380:1
**receivable**
234:15
**receive** 213:19
213:22 214:9
214:22 215:9
215:10 216:5,7
216:13 217:5
219:10 268:4
270:1 272:16
272:17 297:25
308:7 319:2
323:3 330:14
337:6 348:3,4
348:5 369:22
369:22,23
372:14,23
377:15,17,20
378:13 385:12
387:16 391:23
**received**
195:21 216:17

216:21,23
217:1,14,19,19
218:10 219:7
220:7 223:9
226:5 227:20
227:25 228:4
237:22 238:18
240:3 242:6
248:5 253:7
264:13 268:13
276:13,17
299:4 303:11
303:25 304:5
304:13,15
309:16 311:10
316:23 318:3
318:20 319:4
319:12,25
325:10 326:23
329:16 330:22
333:3 335:7
337:1,4,8,23
340:21 345:9
347:3,6 348:9
348:10 349:25
351:15 352:6
356:22 357:5
357:19 358:1
358:18,21,24
359:21 360:12
364:1 367:15
372:10,12
375:13 376:10
377:23 384:24
384:25 385:19
386:16,21
387:24,25
388:9,10

**receives** 321:7
**receiving**
216:11,19
274:17 284:3
317:22 360:17
**recess** 270:24
271:5 362:17
374:16
**recognize**
200:14 227:14
231:10 237:5
238:13,16,24
240:2 252:17
252:21,23
253:4 264:2,6
264:10 266:24
270:7 272:8,11
276:11 277:25
278:2,9 289:25
291:12,19
303:10,24
305:25 307:9
309:13,19
311:5 316:1
318:12 319:23
326:22 331:4
332:22 333:2
335:3 336:4
337:16,22
339:9 340:16
340:20 343:11
345:8 347:2
349:22 352:5
360:4 363:11
363:14,17,21
367:18
**recognizes**
237:21

**[recollection - replace]**

**recollection**
374:23
**reconciliation**
195:12 351:24
352:3,18
381:25
**reconstruct**
366:25
**record** 196:4
228:23 239:14
266:2 271:1,9
272:5 304:18
310:9,13
314:12 342:15
342:17 362:15
362:21 373:5,9
374:3,11,14,19
375:9,20 376:8
388:21
**recorded** 196:6
217:23 218:11
218:15 220:8
220:10,12,16
263:19 271:8
271:18 310:19
315:21 328:20
329:25 338:23
362:20 389:11
**recording**
271:3
**records** 205:15
211:22 212:1,8
212:9 229:17
290:3 375:22
376:2,3
**redirect** 192:6
373:3 374:21
376:15,17

**reduce** 371:7
**reduced** 219:19
219:21 390:12
**reducing** 370:8
**refer** 259:22
332:2 343:21
**reference** 227:4
259:8 272:22
321:11 332:14
343:16 370:21
374:25
**references**
346:25
**referencing**
307:21
**referred** 273:5
285:3 365:5,8
370:3 380:5
**referring** 198:7
209:23 253:12
355:2 380:6
382:14
**refers** 256:16
257:10,18
258:20 346:14
350:20 351:8
**reflected**
244:16 258:16
284:21
**reflects** 276:24
317:21
**regard** 299:19
299:20
**regarding**
311:6 314:22
315:5 340:17
343:5,12
373:21 377:11

380:3,10
381:24 387:23
**regards** 292:3
315:16,17
**register** 287:12
287:14 288:18
288:21 289:1,4
289:8,9 292:22
293:4,9,19,22
**registered**
287:18 389:4
**registers**
211:25 287:12
288:7,11
**regular** 193:24
287:5 321:15
348:4 349:25
365:13
**regularly**
285:14 287:1
298:22
**reimburse**
224:6
**reimburseme...**
327:13,20
**relate** 311:16
320:5
**related** 232:1,2
235:25 236:13
311:17 377:25
378:14 390:14
390:16
**relates** 312:19
312:19
**relating** 202:11
252:18 269:22
291:14 316:2
337:20

**relation** 380:18
**relationship**
281:14,19
286:4
**relatively**
247:12
**relevance**
379:16
**relied** 313:14
**remember**
197:22 201:1
201:13,14,18
202:8 209:22
209:23 236:20
240:16 263:2
282:13,21
296:20 297:12
301:16 316:19
337:10 356:10
360:17 365:3
365:11 370:18
372:25
**reminded**
196:15 199:11
**rental** 331:16
**repaid** 260:25
261:2
**repay** 361:11
366:7
**repayment**
257:3 377:18
378:21 387:12
**repeated**
250:24
**rephrase**
380:12 383:12
**replace** 279:24

| | | | |
|---|---|---|---|
| **report** 208:8 | **request** 302:25 | 340:8 341:22 | **rest** 384:25 |
| 266:4 272:24 | 309:21 311:15 | 344:5 349:11 | **resuming** |
| 272:25 273:7 | 312:9,15 320:5 | 351:12 353:9 | 271:6 362:18 |
| 273:12,16 | 377:12 380:23 | 353:13 360:20 | 374:17 |
| 274:11,14 | 381:1 | 360:22 363:3 | **retain** 229:10 |
| 275:25 277:13 | **requested** | 364:7,11,17,18 | **retained** |
| 285:3 294:12 | 356:4 | 365:2 366:6,11 | 388:24 |
| 299:10 380:24 | **requesting** | 372:24 | **return** 391:21 |
| **reported** | 292:8 304:12 | **resolutions** | **revenue** 209:25 |
| 266:13 273:19 | 306:10 | 192:16 210:15 | 211:8,13 |
| 288:18 | **requests** | 210:21,23 | 251:19 379:20 |
| **reporter** | 312:19 316:8 | 226:1,4 227:4 | **revenues** 251:4 |
| 196:11 224:8 | **require** 339:18 | 227:9 240:11 | **review** 199:19 |
| 242:21 243:6 | 391:22 | 339:19,23 | 269:23 318:22 |
| 270:23 291:1 | **requirement** | 372:16 | **reviewed** |
| 308:18 329:10 | 288:16 | **resolve** 237:12 | 200:17 274:24 |
| 350:7 374:10 | **reserve** 352:24 | **resolved** | 276:18 316:8 |
| 384:15 389:4 | 354:7 | 229:24 | 355:17 376:13 |
| 390:1 | **resign** 278:15 | **respect** 373:12 | **reviewing** |
| **reporter's** | **resignation** | 373:17 374:1 | 376:25 378:7 |
| 389:1 | 278:16 280:22 | **respectfully** | 386:10 |
| **reporting** | 378:25 379:4 | 374:7 | **reviews** 252:20 |
| 204:24 205:8 | 379:18 | **respond** 368:24 | 256:7 264:4 |
| 206:15,18,22 | **resolution** | **responded** | 266:23 269:25 |
| 208:9 284:14 | 192:20 195:17 | 352:14 383:22 | 292:2 311:8 |
| 359:9 368:16 | 210:18 219:8 | **response** 282:3 | 335:2 353:21 |
| **reports** 206:21 | 224:25 225:2 | 325:17 377:16 | **revisions** 357:1 |
| 206:21,22,22 | 225:19,22 | **responsibilities** | **rfp** 248:20 |
| 208:11,12,16 | 226:12,15 | 278:22 280:4,9 | **richard** 290:13 |
| 266:15 273:5,9 | 227:15,16,21 | 280:12,18 | 291:13,22,23 |
| 273:10,15 | 230:25 236:17 | **responsibility** | 291:24 292:1 |
| 274:3 299:4,13 | 236:21,23 | 223:24,25 | 292:11,25 |
| **representing** | 237:5,17,17 | 224:15 304:25 | 294:17 297:8 |
| 196:10,22 | 238:4,13,16,18 | **responsible** | 299:18 316:3 |
| 234:11 | 238:25 239:19 | 204:10,16 | 316:17 317:12 |
| **represents** | 240:3,5 243:11 | 277:11 288:11 | 317:22 341:1 |
| 196:23 | 243:12,14 | **responsive** | 358:21 |
| | 325:7 332:4 | 375:17 376:4 | |

**richard's** 292:4
316:8
**right** 198:15
201:20 202:2
214:18 216:8
223:11 224:7
239:2 240:10
241:25 244:2
244:16 247:15
247:23 250:7
250:15,18
253:10 254:14
255:25 261:18
261:19 262:15
270:11 271:2
276:24 278:9
278:10 279:22
284:10 287:5
290:23 293:21
298:8 300:22
303:13 304:12
304:16 305:18
306:23 310:12
315:23 322:4,8
322:15 324:3
326:1,6 330:8
330:18,20
331:8 333:18
333:20 334:25
336:3 341:12
342:18 345:24
346:10,13,15
352:11 354:3
354:23 355:1
355:15 358:16
368:9,11 370:6
370:13 372:2
383:10,18

384:12 391:4
**robust** 204:22
205:10
**rodenburg**
193:17 216:3
286:22 290:14
294:16 297:9
297:20 299:18
299:21 318:6
318:13,24
319:2,7 321:4
321:18,23,25
322:17 338:2
338:17 358:7
381:7 386:7,18
386:20
**role** 278:23
279:6,14,22,24
282:15 283:7
373:13 378:10
**rosenburg**
193:23 321:14
**roughly** 248:23
**rpr** 189:25
389:3,22
390:22
**rule** 376:5
**rules** 376:7
387:23 391:22
**run** 380:24
**running** 205:1
275:23,25
**russell** 350:20
351:8
**rusty** 191:3
197:18 199:4
199:20

**ryan** 217:11
294:17 322:20
379:24
**rypl** 190:15
199:4 204:20
205:1,14
218:11 220:8
220:11 222:23
222:25 223:15
223:23 224:6
224:19 245:16
245:18 262:1
262:20 263:5
264:20 265:1,5
265:14 266:10
282:17 283:7
286:2 290:3
291:6 294:1,4
294:5,7,8
296:18 298:5
300:13,14,20
300:21 304:18
305:2,16 309:5
310:3,10 315:1
315:9 320:17
322:20 323:22
344:1 355:23
356:2,7 360:13
370:9,15
371:25 372:7,8
372:9,11,13
373:10,14,19
376:12 378:25
379:19 380:7
387:3,22
**rypl's** 223:7,8
277:4 298:8

**rypl.com.**
278:25

**s**

**s** 190:1 201:8
**sage** 204:3,5,10
204:13,17
205:21 206:13
206:14,17,25
209:8,11
264:21 317:9
**sake** 200:8
**sales** 231:23
248:24 249:2,8
249:17 250:20
250:24 258:13
**saving** 247:6
**saw** 285:19
373:16
**saying** 270:18
282:21 334:2
343:13 345:21
346:1 368:3
**says** 231:22
233:9 234:6
235:6 237:18
239:7 257:23
258:11 270:17
270:20 312:2
315:9 322:2
327:8,25 341:6
343:15 344:16
346:17 350:19
354:4 364:5
368:14
**schedule**
267:10 378:21

**scime** 190:21
**scollard** 190:17
**scott** 190:5,7
190:6 202:4
203:18 207:24
210:25 212:21
213:9 214:1,11
215:2,12 227:3
236:2 242:9
251:1 255:6
268:5 269:14
270:16,18,22
284:4 289:16
293:10 295:6
295:12 298:24
299:7 307:12
318:15 332:7
342:4,15,20
344:11,22
345:18 347:22
348:16,21
349:4,12
350:22 353:23
356:13 361:20
367:20 369:9
371:14 372:18
373:2 374:5,20
375:8 376:17
380:4 383:3,11
383:20 384:7
384:17 385:16
386:4 387:15
388:11,15,18
**screen** 226:14
227:8 248:15
307:9,19
**se** 197:15
327:11

**seafield** 201:8
**search** 375:13
375:17,18
376:3
**searches**
375:16
**seats** 374:9
**second** 226:21
227:24 240:12
254:11 324:4,6
350:11 351:1
384:19 386:13
**secondly** 375:2
**section** 253:25
256:16,19
257:10,11,18
257:19 258:15
258:21 259:9
259:18,22,23
259:25 384:20
**see** 201:2,14
208:19 226:13
237:5 252:16
253:24 254:12
256:1 257:12
258:21 259:3,8
259:18,25
260:4 264:2
269:23 274:8
274:16,20
275:7 283:21
284:9 293:16
299:5 309:13
324:17,22
343:19 346:2
348:2,8 357:14
359:3 368:20
380:14,18,21

381:7,11,15,19
**seeks** 373:2
**seem** 201:20
**seems** 279:21
**seen** 228:14
238:3 298:13
328:6 345:22
346:8
**segregated**
375:23
**seller** 232:1,25
232:25 233:1,4
233:6,10,17
235:5,9 252:12
252:12
**selling** 328:7
**send** 298:1
299:9 305:5,7
305:9 306:13
308:13,15,21
311:12,14,22
312:24 313:2
315:8 316:14
333:13,17
334:1 346:7,12
368:5
**senior** 382:18
382:18 388:8
**sense** 332:4
**sent** 270:2,4,5
270:8,11 285:2
290:1 299:13
304:7,8,10
313:13 320:19
322:2 331:5
352:7,8,13
377:12 378:14

**sentence** 354:3
377:4 382:6,14
384:19,21
386:12,13
**separate**
312:15,16
**separately**
284:23
**september**
194:15,18
195:2 276:25
335:24 339:5
343:7
**series** 375:16
**services** 247:10
248:21 261:16
**set** 214:21
242:17 301:16
347:11 386:21
387:16 389:6
**settlement**
259:15
**several** 209:20
336:16 356:14
364:23 379:3
**severin** 189:18
192:3 193:2,8
193:14,21,24
194:2,4,7,10
194:14,17,21
195:2,5,9,11
195:14,15,18
195:22 196:6
196:15,18,21
271:9 277:23
305:22 309:8
314:16 319:16
321:14 326:12

330:24 332:18
334:21 335:24
339:4 340:11
342:22 343:4,7
346:21 349:16
351:23 359:24
362:21 363:1
367:12 373:4
373:23 376:13
376:18 384:18
388:19,22
392:4,20
**sh** 195:4 343:9
**share** 211:24
229:12 288:21
289:3 292:22
293:4 353:5
**shareholder**
195:10 208:18
215:18,21,22
229:8,21 231:1
233:20 236:6
244:5 273:10
273:11 275:6
277:18 285:8,9
285:24 287:10
287:19 288:7
293:19,22
295:17 296:9
300:3 306:19
306:21 307:2,6
309:2 315:13
315:20,21
316:20 317:25
319:10 322:9
333:6 334:19
335:12 336:9
336:14,20,24

337:2 338:18
343:15 344:16
344:20 345:3
345:16,21,22
346:3,7,14,17
349:17 350:14
351:5 356:23
357:7,14 358:8
361:5 367:1
375:3 380:13
382:10,22
**shareholder's**
229:12
**shareholders**
207:11,14,15
208:20 209:6,7
210:13 214:15
214:23,25
215:6,9,24,25
216:4,9,17,25
217:9,18 219:6
219:16 222:23
225:18 226:5
227:25 228:4
228:23 229:5
230:1 236:18
237:22 239:10
239:14 248:1
274:6,7,9,16
274:17,25
275:2,4 277:16
284:25 286:9
287:5,9,15
289:5,7,13
290:12 294:10
294:15,20,21
295:4 298:16
299:14,17

300:1,4,9
310:18 318:2,3
318:4 322:18
322:23 323:6
323:22 328:20
329:15,23
337:5 341:17
341:19 345:17
347:20 348:3,9
349:3 353:4,16
359:20,21
361:2,16
363:10,22
364:14,22
365:15,21
366:13 372:2
380:15 382:19
383:6,14,22
385:12,19
386:21 387:25
388:9
**shareholdings**
300:3
**shares** 231:15
231:16 233:2,3
234:21 235:4
247:21 248:24
292:5,15
370:15,16,21
370:23 371:1,4
371:11,19,19
371:20,21,21
371:21,25
**shauna** 197:20
197:22
**sheet** 315:18
341:13 391:7
391:10,11,16

391:21 392:1
**sheets** 209:21
**shorthand**
389:14 390:11
**shortly** 302:7
**show** 202:6
231:9 237:3
238:11 251:11
264:1 269:19
274:24 289:20
291:11 311:4
313:6 314:20
319:19 326:16
336:15 340:15
349:19 357:4
360:2 367:17
370:19 376:23
378:3 380:25
381:22 386:5
**showed** 227:4
**showing**
209:18 315:23
321:17 336:3
342:25 346:24
**shown** 284:23
357:12 376:24
381:23 384:19
386:6
**shows** 347:19
356:21 357:10
**side** 247:8,9
**sign** 234:5
391:11,13,17
**signatories**
290:17
**signatory**
290:24

CASE 0:24-cr-00007-JMB-DLM   Doc. 136-4   Filed 06/27/25   Page 244 of 253
Antonio Severin                                    May 16, 2025
[signature - states]                                         Page 40

signature
  300:12,15,23
  301:1,4,10,18
  301:24 302:8
  389:21 390:21
  391:20
signed  230:8
  233:14,16,18
  237:8 267:7
  269:2 280:14
significant
  202:5,9
signing  391:15
similar  378:12
simon  192:24
  276:3,7
simply  294:25
sir  382:3
sit  374:8
site  277:9
situation
  240:17 242:1
  282:22 371:23
  387:5
six  226:25
skilled  247:5
small  212:19
  252:19 296:8
  343:16
smartvu  292:5
  292:5,7,15
  316:12,23
smoother
  342:2
software  204:5
  204:7,11,17
sold  234:21
  235:8

sole  192:16,20
  227:10,16
  236:24 238:13
solutions
  189:21 196:11
  196:12 388:24
somebody
  212:4,11 296:2
soon  325:15
sorry  197:3
  198:6,13
  208:25 211:12
  234:4,18
  243:20 250:11
  254:5,11
  261:15 269:5
  270:3 271:21
  288:24 303:14
  324:4 337:17
  358:9 367:10
sort  373:12
  377:14
sounds  247:17
  265:2 344:18
source  224:20
south  190:12
space  327:14
  391:14
spain  338:3
speak  230:23
  239:5 269:8,10
  287:8 329:6
  356:25
speaker  270:21
speaking
  267:22
special  197:21

specific  266:3
  274:6
specifically
  365:4
speculation
  268:6 269:15
  284:5 289:17
  293:11 298:25
  299:8 332:9
  347:23 361:21
  369:10 371:15
  388:3
speed  200:10
spelled  201:8
spencer  289:22
spend  285:5
spending
  283:24
split  263:14
spoke  286:18
spokesperson
  286:8,14
spreadsheet
  312:25 313:5
  333:9,25
  334:12 341:8
  341:15 355:20
  355:25 356:11
  356:19 358:5
  359:2
spreadsheets
  355:22
squared  325:16
staff  247:5
stake  203:6
stakeholder
  280:2

stakeholders
  279:18
start  196:25
  214:8 224:11
  242:1 256:9
  262:4 339:17
  340:2 362:10
  364:4 366:22
  368:17 369:21
started  209:10
  212:18,18
  213:5,25
  223:19 276:20
  278:25 279:2
  302:5,7 329:19
starting  384:20
starts  326:18
state  248:22
stated  234:2
  385:10,21
statement
  323:4,13,15
  342:5 353:14
  373:4 374:22
  380:16 385:18
statements
  205:5,9 299:11
  376:6
states  189:1,6
  196:8 221:10
  221:14,16,21
  222:2,5,8,10
  222:15,20
  227:24 232:16
  304:17 365:20
  375:12,12
  386:13

stating  333:25
stay   281:15
   282:7,15,25
stemming
   249:9
stenographic...
   389:11
stenotype
   189:24
stipulate  314:3
stock  260:18
   287:11,12,14
   287:15 288:11
   288:18,25
   289:1
stop  246:7
   316:11 339:16
   340:1
street  189:22
   190:6,17
stressful
   281:11,22,24
   283:5 379:5,8
strike  342:4
   380:11
structure
   280:14
stuff  357:25
subject  276:9
   303:7 306:5
   307:10 308:2
   309:24 311:25
   312:2,7,14
   315:2 332:24
   391:15
substance
   391:5,9

substantially
   234:20
substantive
   199:15
successful
   213:15,18
suggestion
   371:6,7
suite  189:22
   190:12,22
sum  268:13
summarize
   348:2
summary
   200:3 201:25
   201:25 272:25
   273:16 385:17
sums  220:23
supervision
   280:5,9
supplies  296:6
support  225:3
supporting
   269:1 379:21
sure  197:14
   207:3 213:11
   214:23,24
   219:4 223:18
   226:17 243:14
   262:3,21,23
   266:12 277:13
   280:14 292:20
   293:22 301:13
   301:19 305:6
   324:15,18
   325:3 335:18
   353:25 369:6
   369:12,15,16

379:11 384:22
surecom
   194:19 292:6
   292:16 339:5
   339:20 341:2
   360:10
surprised
   384:10
switch  374:9
switching
   385:2
sworn  189:21
   390:9
syntego  192:18
   202:19,24
   231:6,11
   233:22 234:9
   250:13,14
   252:8,10
   253:12 256:18
   256:23 257:11
   257:19,20
   258:16,22
   259:9,17,24
   260:5 261:4,20
   261:24 262:16
   268:3,10,20,21
   269:3,5
system  204:23
   205:10 317:7,7
   329:1

t

t   193:2,7,14,17
   193:20,23,24
   194:2,4,7,10
   194:14,17,21
   195:1,5,9,11

195:14,15,18
   195:22 201:17
   305:21 309:8
   314:16 318:6
   319:16 321:14
   321:14 326:12
   330:24 332:17
   334:20 335:23
   339:3 340:10
   342:21 343:7
   346:20 349:16
   351:23 359:24
   363:1 367:11
take  200:9,11
   269:21 270:22
   270:23 298:16
   337:9 374:9
taken  189:21
   189:24 196:6
   251:18 271:5
   298:11 362:17
   374:16 384:4
   386:25 389:6
   389:14 390:7
   390:10,15
talk  198:22
   212:17 215:17
   255:13 285:7
   285:21 287:3
   287:11 298:22
   328:1 354:18
   370:11
talked  202:2
   225:14 264:24
   287:1
talking  211:13
   220:18 271:25
   324:8 351:20

[tasked - total]                                                    Page 42

tasked  206:20
tax  190:4
    201:16 279:19
    280:19 295:5
    361:13
taxand  201:17
td  300:14,20
    301:6 305:17
team  283:8
tell  208:6
    209:24 267:6
    292:25 308:17
    308:20 327:18
    328:9,10
telling  308:12
    308:16
tells  264:19
    315:4
ten  290:12
    374:7
tend  328:4
tendered
    378:25
tensions  382:12
    382:16
tenure  302:3
    329:8
term  284:18
    296:25 341:20
    342:10 344:14
    354:10 377:8
terms  324:11
    331:15 377:18
testified  199:1
    380:13 385:5
testifying
    385:15

testimony
    385:15 388:22
    389:9 390:8,10
    391:14
thank  196:17
    207:21 209:1,5
    214:6 227:2,6
    342:1 362:16
    362:24 374:5
    374:11,15
    378:23
thanks  343:16
thereto  390:18
thing  279:9
things  200:10
    283:4 296:4
    347:8
think  197:8
    201:2,6,19
    221:25 249:21
    296:4 300:25
    303:15,17
    312:7,11
    318:19 327:9
    342:8 353:12
    355:17 372:24
    379:14,17
    387:6
thinking  355:6
third  190:12
    240:12
thompson
    276:8
thought  282:11
    282:19,19
thread  312:12
    312:21

three  240:11
    255:23 277:21
    297:12,13
    300:6,8 360:3
    362:20 363:7
    388:8,23
tied  364:17
time  197:2
    210:11,20
    211:18 213:12
    216:16 218:10
    224:12 234:22
    238:19 245:17
    245:17 248:6
    249:11,12
    250:13 251:22
    254:20 276:14
    276:19 277:2,3
    285:5,11 289:4
    297:17 298:4
    301:17 310:19
    313:3 316:21
    325:5 326:9
    329:14,20
    330:12 337:10
    337:23 342:3
    360:19 362:9
    367:7 378:25
    379:25 383:4,9
    383:12 385:6
    389:6,7,10
times  197:1
    214:3 255:23
    297:15 310:16
    332:2 373:24
title  279:20
    378:6

titled  256:1
today  196:14
    315:5 373:7
    375:6 376:9,14
today's  388:21
together  329:2
    356:9
toine  216:3
    290:13 294:16
    297:8,20
    299:18 318:12
    318:24 319:2,6
    320:10 321:18
    321:23,25
    322:17 325:17
    331:17 338:1,1
    338:17 358:7
    384:24 387:6
toine's  337:20
told  199:10
    282:9 384:14
tony  264:20
    265:9 277:22
    290:19 324:23
    343:4 368:3
    388:19
took  218:6
    242:25 338:20
    338:21 357:12
tool  208:9
topic  385:3
toronto  189:13
    189:22 190:17
    282:4 285:10
    294:25 301:6,7
    301:10
total  260:2
    263:16 275:23

**[total - understanding]**

276:1 297:17
317:1 327:5
356:22 357:4
388:23
**tough** 379:25
**track** 204:20
205:1,7,15,22
206:25 207:7
207:10,13
217:25 218:2,5
273:25 277:12
277:16 283:14
283:17 323:1
333:21 335:16
335:21 336:8
336:11 341:16
341:18 348:13
**tracked** 265:4
265:18,19
275:18 317:7
369:24
**tracking** 250:5
317:4
**trademark**
258:20
**transaction**
224:19 265:5
**transactions**
264:20 265:1
265:10,14
266:2,4 273:25
368:19,21
**transcribed**
389:12
**transcript**
389:14
**transfer** 232:15
232:18 302:12

302:16 320:6
320:21
**transferred**
241:15 258:12
310:22
**transition**
278:13 279:3
**treasury**
260:18
**treated** 323:10
323:17,24
**treatment**
295:11 387:3
**trial** 221:10
222:17 244:25
244:25
**trouble** 222:1
**true** 212:18
226:3 227:20
284:1 289:12
295:3 328:21
365:17,19
366:2,3,18,19
389:13
**trust** 206:10,12
206:23 207:23
208:6,9,20
212:1,5,12,13
230:12,19,20
232:21 237:10
239:2 266:15
273:24 289:5
368:9
**trusted** 282:9
298:15
**truthful** 199:13
**try** 214:14
251:9

**trying** 203:20
253:19 368:16
**tuning** 263:3
264:24
**turn** 244:2
333:24
**turner** 197:20
197:22
**twice** 308:1
**two** 197:6,7
227:4 232:14
240:11 243:16
266:22 271:8
296:20 297:12
297:13 312:18
313:4 362:14
363:6 373:15
**type** 206:22
290:5 317:18
334:16 378:12
378:13
**types** 380:10
**typical** 378:16
378:18
**typically**
213:19 217:4
288:8 314:5
331:18 371:20

**u**

**u.s.** 222:12
**ubo** 215:21
290:12
**uhm** 252:19
253:21 258:7
259:13 326:20
327:24 331:10
347:1 350:6

**ultimate**
287:23 323:16
**ultimately**
223:11 225:16
244:24 304:23
304:24 307:1
309:1 310:13
310:22 317:14
319:13 348:19
348:24 349:10
369:24
**um** 228:15
246:5
**unanimous**
229:7
**under** 196:16
199:12 234:8,9
234:23 254:3
257:7 258:25
259:5 341:5
371:7 376:5
389:7
**understand**
219:5 284:6
373:21
**understanding**
203:2,13,14,19
204:1 211:4
216:12 218:22
221:2,5 225:12
225:17 226:1
228:3 235:11
236:4 244:11
245:8 249:8
268:12 269:17
297:6 298:17
298:19 299:2
300:11 326:10

340:24 366:12
371:16 373:3
376:11
**understood**
369:21
**unit** 196:5
271:8 362:19
**united** 189:1,6
196:8 206:10
206:12,23
207:23,23
208:6,9,20
212:1,5,11,13
221:9,14,15,20
222:1,5,8,9,15
222:20 230:11
230:19,19
237:9 239:1
266:15 273:24
302:12,17
368:8 375:11
375:12
**universe** 376:2
**unquote** 273:4
329:17
**unreconciled**
232:5 248:11
**unusual** 215:15
**updated**
293:20,23
**ups** 252:1,5
**usa** 392:2
**usafilterprod**
194:9,13,16
332:19 334:23
336:1
**usaprod**
192:25 193:22

193:25 194:6
194:24 276:4
319:17 321:15
331:1 340:13
**usaprod0040...**
192:22 237:1
**usaprod0054...**
194:3 326:14
**usaprod0054...**
193:16 314:18
**usd** 305:17
**use** 206:15
342:10 344:14
354:10 359:11
366:14
**used** 201:15
223:8 226:2,9
239:21 243:9
248:20 302:12
302:16 308:2
312:11 388:23
**useful** 328:5
**uses** 308:1
341:20
**using** 272:23
273:14 316:15
328:25 340:2
390:11
**utilities** 327:15
**utilized** 243:24
247:2 264:17
369:25

| v |
| --- |

**v** 189:8,9 190:9
196:8 392:2
**vague** 332:9
353:23 383:24

388:2
**valuation**
250:8,12 251:5
251:6
**valuations**
250:9
**value** 235:15
247:22 250:18
250:23
**valued** 247:16
**van** 216:2
285:5,22
286:18,25
290:12 294:16
297:7 299:17
299:21 320:9
321:3,6 331:15
343:4 347:3
356:4 357:10
358:24 381:11
384:2,9
**vapeshot**
258:19
**various** 207:8
262:20 280:16
280:19 294:23
**vast** 382:8
**vendors** 274:5
274:6
**verbatim** 326:9
**veritext** 189:21
196:10,12
388:24
**version** 293:9
**versus** 196:8
384:6 388:9
**video** 196:6
197:12 198:2

199:7 255:23
271:3,8 362:9
362:20
**videographer**
191:6 196:3,10
226:23 227:2
270:25 271:4,7
362:8,12,19
374:12,18
388:20
**videotaped**
189:17
**viewing** 300:17
**volume** 189:15
196:5 271:7
362:15,20
388:22
**voluntarily**
222:7,9
**voluntary**
222:13
**vote** 229:5,7
239:9
**voting** 371:21
371:24

| w |
| --- |

**waive** 375:3
**waived** 373:12
**waiving** 373:25
**want** 208:4
213:19,22
214:23,25
215:9 223:20
248:13 279:9
279:23 287:11
334:4 346:2
352:23 380:18

380:21
**wanted** 211:22
211:24 212:16
216:4,7 266:12
282:6 297:25
327:21 339:16
374:3
**wants** 328:7
**warrant**
375:14,17,18
376:3
**washington**
190:6
**way** 213:1
282:24 323:10
361:9 388:8
**we've** 240:10
240:11 249:21
249:21 255:12
264:23 273:5
365:18
**wednesday**
202:3 209:13
**week** 198:15,23
199:1,5 200:18
313:4
**weekend**
282:20
**went** 197:6
206:22 224:13
283:15 326:21
327:2 328:19
**west** 189:22
**whatsoever**
262:10
**william** 190:10
190:11,12

**willing** 221:9
222:14
**win** 282:22,22
282:22
**wipe** 235:24
**wiped** 252:13
258:8
**wire** 195:7
232:15,18
316:12 346:22
**witness** 189:18
189:20 190:20
192:3 203:19
212:23 213:10
214:13 215:4
215:13 222:14
226:25 236:4
242:10,11,23
251:3 252:20
255:8 256:7
264:4 266:23
268:7 269:16
269:25 270:17
270:20 284:6
289:18 291:3
292:2 293:12
295:8 299:1,9
308:20 311:8
313:25 318:17
321:10 329:12
332:10 335:2
342:3 345:20
347:24 348:23
349:6,14 350:9
353:21,25
361:22 369:11
371:16 372:20
374:8 379:17

383:9,19 384:1
384:13 386:2
387:11 388:5
389:7,9 390:8
390:10 391:1
391:18,18,19
392:4
**word** 201:17
201:18 308:1
**wording**
263:25
**words** 235:7
**work** 199:11
281:8 282:12
296:3 374:1
380:2
**worked** 246:16
246:19,21
367:8
**working**
281:12 379:8
**world** 294:22
295:1
**worth** 247:22
**write** 234:5
**written** 201:16
291:16 390:13
**wrong** 358:9
**wrote** 264:7
278:6,7

**x**

**x** 189:5,11
192:1 201:17
359:13

**y**

**y** 359:14
**yeah** 197:8,20
198:10,18
201:3,10,22
202:7 203:5,14
203:23 207:3
207:21 209:16
210:10 211:15
212:20,23,24
213:10 214:20
215:13 216:25
217:3 220:21
220:22 221:12
221:19,23
222:11,21
226:11 228:10
230:8,13,16,18
230:21,24
232:16,21
235:22 237:15
238:3,6,24
241:9 242:8,14
244:21 245:5
246:2,7,7
247:8,20
250:17 251:5
252:1 255:2,11
255:19,22
262:8,25 266:8
266:20 270:3
273:9 274:13
274:15 275:13
276:19 281:2,8
282:14 284:21
285:15 286:16
287:7 288:2

| | |
|---|---|
| 291:19 297:16 | 342:8,17 |
| 300:22 305:8 | 355:17 356:13 |
| 305:11,12,15 | 376:10 |
| 306:3 310:6,20 | **york**   190:22 |
| 312:23 314:4,5 | 289:23 |
| 317:3 320:15 | **yoursafe** |
| 323:12 325:13 | 242:18 |
| 328:23 329:3 | **yup**   252:20 |
| 329:21 330:5 | |
| 330:15 335:18 | **z** |
| 341:9 346:5 | |
| 348:9 351:19 | **zimmerman** |
| 351:22 353:14 | 193:2,5,11,14 |
| 354:15,20 | 193:18,21 |
| 355:10 357:23 | 290:21 301:3 |
| 358:13,15 | 302:11,19 |
| 359:10 369:11 | 303:4,22 |
| 369:15 370:17 | 305:21 307:16 |
| 372:4,5,23 | 311:1 314:16 |
| 384:13 | 318:7,13 |
| **year**   198:20 | 319:16,21 |
| 199:22 223:18 | |
| 249:24 250:24 | |
| 250:24 296:22 | |
| 296:24 338:10 | |
| 338:16 341:24 | |
| 368:20 | |
| **yearly**   237:13 | |
| 239:13 | |
| **years**   211:9 | |
| 226:6 278:24 | |
| 296:18 328:2 | |
| 364:23 378:1 | |
| 378:15 383:7 | |
| 383:16 | |
| **yesterday** | |
| 226:16 227:4 | |
| 248:16 255:8 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.